Gregory L. Diskant
Sarah E. Zgliniec
Rachael Kuilema Klein
Ravi Sitwala
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: (212) 336-2000
Fax: (212) 336-2222

Roger L. Zissu
Richard Z. Lehv
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017
Tel: (212) 813-5900

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 07-CV-07061 (JSR) |
| v. | ) ) | |
| THE AMERICAN NATIONAL RED CROSS, LEARNING CURVE INTERNATIONAL, INC., MAGLA PRODUCTS, LLC, WATER-JEL TECHNOLOGIES, INC., and FIRST AID ONLY, INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs, Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc.

(collectively, "J&J"), by their undersigned attorneys, Patterson Belknap Webb & Tyler LLP, and

Fross Zelnick Lehrman & Zissu, P.C., for their First Amended Complaint against Defendants,

the American National Red Cross ("ARC"), Learning Curve International, Inc. ("Learning

Curve"), Magla Products, LLC ("Magla"), Water-Jel Technologies, Inc. ("Water-Jel"), and First

Aid Only, Inc. ("FAO"), allege as follows:

## SUBSTANCE OF THE ACTION

1.    This is a complaint for tortious interference with prospective economic

advantage, unfair competition, trademark dilution and related causes of action.  J&J, through

continuous use since 1879 and through Congressional legislation, has secured exclusive rights in

the use of the symbol of a Greek red cross, a red cross with lines of equal length, and the words

"red cross" (the symbol and/or the words are hereinafter referred to as the "Red Cross Emblem")

to identify itself and its operating companies as the source of certain first-aid and health-care-

related consumer products that are sold in commercial channels in the United States.

2.    By its Congressional charter, Defendant ARC has no ability to engage in

commercial activities in competition with private businesses such as J&J, and it has repeatedly

disclaimed its right and desire to engage in any commercial activity.  In particular, ARC has

promised that it would not compete with J&J for commercial sales.  As long ago as 1895, Clara

Barton, on behalf of ARC, promised J&J that if ARC were empowered to engage in commercial

activity through the licensing of the Red Cross Emblem, ARC would not license it for use in the

fields in which J&J uses it.  In Congressional hearings, ARC repeated that it would not compete

with J&J in the sale of goods, including but not limited to first-aid kits.

3.    In fact, ARC is limited by its charter, and now by criminal statute, from

licensing its mark to others for commercial use in competition with J&J or anyone else, and it

has consistently recognized this limitation for decades.  As ARC has said many times over the

years, "Federal statutes prohibit the use of the name and emblem of the Red Cross by

commercial concerns except those [such as J&J] that had used the name or emblem in

1393880v1

connection with their manufacture or sale of the same product prior to 1905," and ARC "has no authority to interpret, waive, or relax the stipulations" of that statute by granting licenses or otherwise.

4.    Recently, however, ARC has instituted a licensing program through which it has purported to grant licenses, including those to the other defendants, that are not permitted by federal law and that purport to allow for the use of the Red Cross Emblem on products sold in competition with J&J's products bearing the Red Cross Emblem. ARC also has begun advertising and offering for sale Red Cross-branded first-aid and health-care-related consumer products on its website. These activities are in contravention of ARC's rights and powers under federal law and its repeated promises over the past 112 years. They interfere with J&J business relations with its customers and potential customers and are also likely to dilute J&J's rights in the Red Cross Emblem.

5.    To be clear, this is NOT a complaint about ARC's charitable activities or its legitimate fundraising efforts. Johnson & Johnson fully supports ARC's mission. Over the years, J&J's support for the ARC has taken the form of cash donations, goods and services and cooperative activities to protect the Red Cross Emblem that both entities share. In the past three years alone, J&J has donated about $5 million to ARC. J&J fully intends to continue its support in the years ahead. Instead, this is a complaint about ARC's improper entry into the commercial arena – its decision to engage in activities that, according to press reports, have generated ARC $2 million of revenue last year. As protection of J&J's intellectual property is the primary objective of this action, J&J will donate any net monetary recovery from this litigation to charity.

6.    J&J asserts claims for tortious interference with prospective economic advantage; tortious interference with contract; unfair competition; promissory estoppel;

3

trademark dilution under §43(c) of the Lanham Act, 15 U.S.C. §1125(c); dilution under New York law; and breach of contract. J&J seeks injunctive relief, damages, and such other and further relief as the Court deems just and proper.

## PARTIES

7.    Plaintiff Johnson & Johnson is a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933-7001.

8.    Plaintiff Johnson & Johnson Consumer Companies, Inc. ("JJCCI") is a New Jersey corporation with a main office at 199 Grandview Road, Skillman, New Jersey 08558, and is a subsidiary of Johnson & Johnson. Through its Johnson & Johnson Consumer Products Company Division, JJCCI develops and markets baby care, wound care, first aid, and skin care products that address the needs of the consumer and health care professionals and incorporate the latest innovations.

9.    Defendant ARC is a federally-chartered corporation with its principal place of business at 430 Seventeenth Street, N.W., Washington, D.C. 20006.

10.    Defendant Learning Curve is a Delaware corporation with its principal place of business at 314 W. Superior St., Chicago, Illinois 60610.

11.    Defendant Magla is a New Jersey limited liability company with its principal place of business at 159 South Street, Morristown, New Jersey 07960.

12.    Defendant Water-Jel is a New York corporation with its principal place of business at 243 Veterans Boulevard, Carlstadt, New Jersey 07072.

13.    Defendant FAO is a Washington corporation, with its principal place of business at 11101 NE 37th Circle, Vancouver, Washington 98682.

4

1393880v1

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1338 (trademark).  In addition, ARC's

federal charter allows it "to sue and be sued" in the federal courts, 36 U.S.C. § 300105, thereby

conferring original jurisdiction in this Court over all claims, under both federal and state law,

against ARC.  The Court also has supplemental jurisdiction over the State law claims under

Section 1367(a) of the Judicial Code, 28 U.S.C. § 1367(a).

15.     This Court has personal jurisdiction over Defendants because they are

either incorporated in New York or doing business in this district and the products that are the

subject of this action are sold in this district.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because

this is a district in which a substantial part of the events or omissions giving rise to the claim

occurred.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

**Historical Use of the Red Cross Symbol**

17.     Red cross symbols in various depictions are not novel either to J&J or

ARC.  Rather, the history of the red cross goes back many millennia.

18.     The red cross has strong religious connotations in western Asia, northern

Africa and Europe that go back at least fifteen centuries before Christ.  WILLIAM W. BLAKE, THE

CROSS, ANCIENT AND MODERN 11-13 (1889).  In the Christian era, the red cross was associated

with a variety of Christian saints, including St. George, the patron saint of England.  *See*

WILLIAM GORDON PERRIN, BRITISH FLAGS (1922).  During the Crusades, the Knights of the

Templar displayed a red cross on their habits and were known at the "Red Cross Knights."

CHARLES GREENSTREET ADDISON, THE KNIGHTS TEMPLARS 25 (1852).

5

19.    The red Cross of St. George is still today a part of the British flag, and it was used in the flags of a large number of American colonies, even after the revolution.

20.    At least by the seventeenth century, the red cross had acquired a medicinal connotation. It was used as a mark on the doors of infected houses during the London plagues of that century. In 1665, the Council of the City of London adopted an ordinance requiring quarantined houses to "be marked with a red cross of a foot long, in the middle of the door, evident to be seen." THE HISTORY OF THE GREAT PLAGUE IN LONDON IN THE YEAR 1665 BY A CITIZEN WHO LIVED THE WHOLE TIME IN LONDON 88 (1819)

21.    In 1745, the Commonality of Surgeons (now the Royal College of Surgeons) was created in England. Their arms bore the red cross as their principal insignia, with a crown at the center and an anchor above and below. WILLIAM MAITLAND, HISTORY OF LONDON 1249 (1775).

22.    The red cross symbol has been used in commerce for centuries. Indeed, in England the red cross – the Cross of St. George and of the Knights Templar – was the most common mark used to identify places of business, even before the general use of street addresses. JACOB LARWOOD & JOHN CAMDEN HOTTEN, HISTORY OF SIGNBOARDS 275-77 (1866).

**Johnson & Johnson's Adoption of the Red Cross Emblem**

23.    The firm of Seabury & Johnson, the predecessor to Johnson & Johnson, was founded in 1873, as a partnership between George Seabury and Robert W. Johnson. The firm acted as a wholesale druggist and manufactured pharmaceutical products and surgical and porous plasters. In 1877, Mr. Seabury traveled to Europe to study advanced pharmaceutical and antiseptic methods. He did not return to the United States until 1879. *Protection of the Name and Emblem of the Red Cross: Hearings Before the House Comm. on Foreign Affairs*, 77th

6

1393880v1

Cong., 2d Sess., 175-77 (1942) (hereinafter, "1942 House Comm. Hearings") (quoting testimony of Seabury from Jan. 27, 1903).

24. During his travels in Europe, Mr. Seabury discovered that the red cross was used as a mark to distinguish antiseptic and surgical goods in virtually every country he visited, especially in Austria, Germany, France and Italy. In addition, he discovered the red cross was used as an identifying mark for drug stores, particularly in Austria and Germany. Mr. Seabury liked the mark. As he testified in 1903, "[W]hen I came back [in 1879], I made up my mind I would adopt in the United States, and I did." *Id.*

25. J&J filed its first trademark application with respect to the mark at least as early as 1905, stating that the mark had been used since at least 1887. In fact, Mr. Seabury retained a printed use of the mark from 1884 and testified that the firm had used the mark earlier upon his return from Europe in 1879. This was the first use of the Red Cross Emblem in the United States in connection with the sale of medicinal goods, and it predated the creation of ARC, the earliest predecessor of which was created in 1881. *Id.*

26. By using the Red Cross Emblem as a source identifier, Johnson & Johnson transformed the symbol and words from a mark common in Europe into a trademark in the United States that was widely recognized and associated with J&J. As the federal court in New Jersey noted in 1903, the Red Cross Emblem was:

> adopted and duly registered by [J&J] as a trade-mark, by which not
> only [the goods at issue in the case] but all the articles
> manufactured by them are designated and commercially known.
> So distinctive has this trade-mark become that their goods are often
> spoken of as 'Red Cross' goods, and are advertised by [Johnson &
> Johnson] under that name.

*Johnson & Johnson v. Rutan*, 122 F. 993, 994 (C.C.N.J. 1903).

27.    In the same year, the New Jersey Court of Chancery made much the same

point, recognizing the success of J&J's efforts:

> In the case under consideration [J&J] by conspicuous and
> continuous use of, and by exclusively advertising its goods under
> the red-cross symbol, so impressed the public that it came to rely
> upon the red cross as indicating [J&J's] goods, and to look upon
> the red-cross symbol as an indicia of origin, and from this grew the
> habit of the consumer when desiring [J&J's] goods to call for "Red
> Cross cotton," . . . so that by the act of the public these words
> became the usual designation of the articles, which the court will
> protect.

See 1942 House Comm. Hearings at 160.

**Efforts by J&J to Protect the Mark and Distinguish Its Uses**

28.    With success, however, came imitation, and from the beginning, J&J has

worked to prevent misappropriation of its valuable trademark.  In the beginning, R.W. Johnson

printed special color stationary showing J&J Red Cross products alongside imitations.  He sent

letters to physicians around the country, explaining that

> Red Cross Aseptic Ligatures in the new sealed envelopes had
> scarcely been placed upon the market when several imitations
> appeared as illustrated.  While imitation is a flattering
> acknowledgement of the superiority of the original, we fear that
> where the end sought is of a commercial nature the requirements of
> surgery are apt to be omitted.  The cost for the original will be no
> greater than the other kinds.

LAWRENCE G. FOSTER, ROBERT WOOD JOHNSON: THE GENTLEMAN REBEL 72-73 (1999).

29.    But letters were not always enough, and J&J had to enlist the assistance of

courts to protect its rights.  See, e.g., Johnson & Johnson v. Bauer & Black, 82 F. 662, 663-65

(7th Cir. 1897) (ordering the lower court to enter judgment for J&J restraining Bauer & Black's

use of "the Maltese or other description of cross of red color upon [its] goods and packages" and

for "an accounting with respect to the damages which have accrued by reason of the use of the

infringing design"); Johnson v. Brunor, 107 F. 446, 467 (C.C.N.Y. 1901) (granting Johnson &

8

Johnson "an order pendente lite enjoining defendant" from selling cotton in packages bearing "in any form or manner whatsoever, the representation of a red cross, or the designation 'Red Cross'").

30.    Since the end of the 19th Century, J&J has vigorously promoted, and defended, its red cross trademarks.

**J&J's Registered Red Cross Emblem Trademarks**

31.    J&J registered the Red Cross Emblem in the U.S. Patent and Trademark Office in 1906, under Registration No. 54,308 (Exhibit A hereto), alleging that it made first use of the mark in 1887.  Johnson & Johnson is currently the owner of the following registrations for the Red Cross Emblem:

| Reg. No. | Mark | Date Registered | Goods | First Use Date Listed on Reg. |
|---|---|---|---|---|
| 54,308 | Red Cross Emblem | June 26, 1906 | Medical and Surgical Plasters | 1887 |
| 1,889,576 | Red Cross Emblem | April 18, 1995 | First Aid kits, adhesive bandages, topical preparations for medical and therapeutic use, medical adhesive tape, gauze, sterile cotton for medical purposes, and wound dressings. | 1898 |
| 1,888,143 | Red Cross Emblem | April 11, 1995 | Cotton for cosmetic use. | 1898 |
| 1,870,955 | "Red Cross" (word mark) | Jan. 3, 1995 | Cotton for personal use, and sterile cotton for medical use. | 1898 |

The foregoing registrations are valid, subsisting, in full force and effect, and incontestable pursuant to Section 15 of the Trademark Act, 15 U.S.C. § 1065.  They also constitute

constructive notice of the registrant's claim of ownership thereof, under Section 22 of the
Trademark Act, 15 U.S.C. § 1072.

32.    J&J, itself or through subsidiaries such as JJCCI, has used the Red Cross
Emblem as a trademark for a wide range of first-aid and wound care products, including gauze
pads, adhesive tape, and first-aid kits, which contain such items as adhesive bandages, gauze
pads, adhesive tape, analgesics, first-aid cream, health care gloves, cleansing wipes and
instructional manuals.

33.    As a result of J&J's nationwide extensive and continuous use of the Red
Cross Emblem, that mark has acquired enormous value and has become famous to the
consuming public in identifying and distinguishing first-aid products from JJCCI. The mark has
come to represent the enormous goodwill of J&J in this field of use.

**The Creation and Purposes of the ARC**

34.    In 1864, several countries – but not including the United States – signed
the Convention for the Amelioration of the Condition of the Wounded in Armies in the Field,
more commonly known as the First Geneva Convention. The Convention provides that the Red
Cross Emblem shall be the emblem of those serving the wounded in battlefields.

35.    In 1881, Clara Barton founded a group to campaign for the ratification of
the First Geneva Convention by the United States. In 1882, the group's efforts resulted in
ratification of the Convention by the United States. As a result, the Convention became a treaty
obligation of the United States. At the same time, its terms were not yet enacted as positive law.

36.    Barton incorporated the organization that is the predecessor to ARC in
1893 under the name the American Association of the National Red Cross. The organization's
early efforts were dedicated to securing Congressional recognition and sanctioning of its
activities and purpose. It took several years for the group to achieve this goal.

1393880v1

37.     The U.S. Congress first chartered the ARC in 1900. Under the 1900

charter – and its charter today – the purposes of ARC are entirely noncommercial:

> First. To furnish volunteer aid to the sick and wounded of armies
> in time of war, in accordance with the spirit and conditions of the
> [First Geneva Convention].
>
> Second. . . . [T]o perform all the duties devolved upon a national
> society by each nation which has acceded to said treaty.
>
> Third. To succeed to all the rights which have been hitherto held
> and to all duties which have heretofore been performed by the
> American National Red Cross as a corporation organized an
> existing under the laws of the United States relating to the District
> of Columbia, which organization is hereby dissolved.
>
> Fourth. To act in matters of voluntary relief and in accordance
> with the military and naval authorities as a medium of
> communication between the people of the United States of
> America and their armies . . . .
>
> Fifth. . . . [T]o continue and carry on a system of national and
> international relief in time of peace and to apply the same in
> mitigating the sufferings caused by pestilence, famine, fire, floods,
> and other great national calamities.
>
> Sixth. And to devise and carry on measures for preventing the
> same, and generally to promote measures of humanity and welfare
> of mankind.

31 Stat. at 279.

38.     Among the powers with which the ARC was vested was the right to use

the Red Cross Emblem:

> to have the right to have and to use, in carrying out its purposes
> hereinafter designated, as an emblem and a badge, a Greek red
> cross on a white ground, as the same has been described in the
> treaty of Geneva, August twenty-second, eighteen hundred and
> sixty-four, and adopted by the several nations acceding
> thereto . . . .

31 Stat. at 278-79.

11

39.     ARC's charter has been amended numerous times, most recently in 2007. The changes have primarily dealt with governance of the organization – its purposes and powers have not materially changed since the 1900 charter.  *See* Kevin R. Kosar, Congressional Research Service, *The Congressional Charter of the American National Red Cross:  Overview, History, and Analysis*, March 15, 2006, available at www.fas.org/sgp/crs/misc/RL33314.pdf.

**ARC Unsuccessfully Attempts to Bar Preexisting Users and to Obtain Exclusive Licensing Rights to the Red Cross Emblem**

40.     As part of its campaign to get recognition from Congress, ARC attempted to secure extraordinary protection against any third-party use of the Red Cross Emblem in the United States.

41.     In 1894, ARC caused a bill to be submitted to Congress that, if adopted, would have banned all previously-existing uses of the Red Cross Emblem.  The proposed bill not only granted ARC exclusive use of the emblem for charitable activities, but it also granted ARC the right to license others – such as J&J – to use the mark commercially.  The relevant text of the bill read:

> [E]veryone not directly connected with the American Red Cross *or without special permission granted by the central committee of the Red Cross* is hereby forbidden and prohibited from . . . using, or in any way displaying the sign of the Red Cross . . . .  All persons who have adopted or are using the Red Cross as a trade-mark shall, within one year after the passage of this Act, discontinue the use of the same or be liable to a fine of not less than fifty dollars or more than five hundred dollars and confiscation of said articles of whatever description, *unless the central committee of the American National Red Cross gives them special written permission to do so, for which the privilege a consideration of not less than five hundred dollars shall be paid to the committee* . . . .

1942 House Comm. Hearings at 280 (emphases added).

1393880v1

42.    Such a bill, if it passed, could have precluded J&J from exercising its pre-existing right to its use its own trademark, thereby eliminating J&J's substantial investment and goodwill in establishing the Red Cross Emblem as J&J's mark with respect to first-aid and related health-care products.   At best, if the bill passed, J&J would have had to pay ARC a license fee for the right to use its own mark in commerce.  Accordingly, J&J was prepared to oppose this legislation unless its rights could be protected.

43.    Instead, J&J and ARC reached a signed and binding contractual agreement.  The contract is dated January 29, 1895 and is signed by R.W. Johnson on behalf of J&J and Clara Barton on behalf of ARC's predecessor corporation.  ARC agreed that J&J had, through its efforts, secured "the exclusive right to use in the United States the symbol of a red cross as a trade-mark for chemical, surgical, and pharmaceutical goods of every description." Accordingly, ARC promised that, if the bill granting it the right to commercially license the emblem passed, ARC would grant J&J the same exclusive rights that it enjoyed prior to the passage of the bill for the nominal payment of one dollar annually.

44.    The agreement began by reciting the proposed legislation, which would have given ARC the right to license third parties to use the Red Cross Emblem in commerce:

> [W]hereas there is now pending before the Fifty-third Congress of the United States a certain bill . . . which bill provides also that *the central committee of said American National Red Cross shall be authorized and empowered to grant special permission to use the symbol of a red cross in connection with the manufacture and sale of articles of commerce*, and which bill, it is anticipated, will be duly enacted and become a statute, de facto, of the United States.

45.    The agreement then recognized and acknowledged J&J's pre-existing and exclusive use of the Red Cross Emblem for chemical, surgical and pharmaceutical goods:

> It is agreed that the said *Johnson & Johnson are now and for a long time past have been entitled at common law and otherwise*

13

> *to the exclusive use of the symbol of a red cross as a trade-mark*
> *and otherwise for chemical, surgical, and pharmaceutical goods*
> *of every description . . .*

46.     The parties then agreed that, if the law granting ARC the power to license

third parties to use the Red Cross Emblem commercially was enacted, then ARC would license

back to J&J its pre-existing exclusive rights for the annual payment of one dollar:

> [I]f the said bill shall be passed by both Houses of the Fifty-third
> Congress and become a de facto statute of the United States, the
> said American National Red Cross shall execute and deliver to said
> Johnson & Johnson upon demand and without unnecessary delay,
> an instrument of writing whereby all the privileges whatsoever
> enjoyed by the said American National Red Cross under such act
> in respect of *the-use of the symbol of a red cross upon chemical,*
> *surgical, and pharmaceutical preparations shall be transferred*
> *and conveyed to said Johnson & Johnson the same to be held*
> *and enjoyed by said Johnson & Johnson to the exclusion of all*
> *others* but subject, nevertheless, to the provision that the transfer
> and conveyance shall become null and void if the said Johnson &
> Johnson shall fail in any wise to compensate the said American
> National Red Cross in every way as hereinafter set forth . . .

A copy of the original contract is attached as Exhibit B.

47.     The bill that ARC sought never became law.  Instead, Congress struck a

different balance.  It passed a series of laws (1) giving ARC the exclusive right to use the Red

Cross Emblem for its non-commercial activities, (2) grandfathering the rights of prior

commercial users of the Emblem such as J&J, and (3) criminalizing all other use of the Emblem

by commercial entities such as the individual defendants.

48.     Indeed, notwithstanding ARC's current conduct, Congress has never – to

this day – given ARC the power to grant licenses for the commercial use of the Red Cross

Emblem.  As ARC has repeatedly recognized, it has no power to change the federal law, and its

rights do not extend to granting commercial entities the right to use the Red Cross Emblem.

14

1393880v1

49.    The first federal protection of ARC was passed in 1900, when Congress granted ARC an unusual federal charter.  That law contains the first restriction on the right to use the Red Cross Emblem.  It banned use of the emblem or colorable imitations in connection with (1) fraudulent solicitation of money, and (2) fraudulent inducement of the belief that one is a member of the ARC.  The charter made no restrictions on pre-existing commercial use and granted ARC no licensing rights.  31 Stat. at 279.

50.    In 1905, in response to several internal problems at the ARC, Congress passed a new charter that superseded the 1900 charter.  Among other things, the 1905 charter for the first time prohibited the use of the Red Cross Emblem by third parties for any commercial purpose.  At the same time, it grandfathered in commercial uses already lawful at that time.  In relevant part, the revised provision read:

> ***Nor shall it be lawful for any person or corporation, other than the Red Cross of America, not now lawfully entitled to use the sign of the Red Cross, hereafter to use such sign or any insignia colored in imitation thereof for the purposes of trade or as an advertisement to induce the sale of any article whatsoever.***  If any person violates the provisions of this section, he shall be guilty of a misdemeanor and shall be liable to a fine of not lees than one nor more than five hundred dollars, or imprisonment for a term not exceeding one year, or both, for each and every offense. The fine so collected shall be paid to the American National Red Cross.

33 Stat. 600-01 (emphasis added).

51.    The 1905 legislation permitted the ARC, and the ARC alone, to use the Red Cross Emblem for its charitable, non-commercial purposes.  Unlike the rejected 1895 legislation, the 1905 law gave ARC no rights whatsoever to authorize others to use the mark.  Such licensing rights would clearly conflict with the grandfathered, vested rights of pre-existing users.  Thus, any third party using the mark who was not grandfathered would violate the

criminal statute. By its terms, the 1905 legislation did not even allow ARC to permit its own employees and agents to use the mark.

52.    Five years later, in 1910, ARC petitioned Congress to broaden the protection against use of the Red Cross Emblem "[j]ust as much as [Congress] possibly [could]." 1942 Hearings at 353-56, reprinting *The Red Cross: Hearings before the Comm. on Foreign Affairs*, 61st Cong., 2d Session, on H.R. 22311 at 5 (April 21, 1910) (stmt. of Mabel Boardman on behalf of ARC).

53.    As a result of ARC's efforts, its charter was amended in 1910. The new charter narrowed the rights of pre-existing users to make commercial use of the mark, while slightly expanding the ARC's right to make non-commercial use of the Emblem. Specifically, the grandfather clause was narrowed to permit pre-1905 users to use the Red Cross Emblem only "for the same purpose and same category of goods" as their pre-1905 use:

> [N]o person, corporation, or association that actually used or whose assignor actually used the said emblem, sign, insignia, or words for any lawful purpose prior to January fifth, nineteen hundred and five, shall be deemed forbidden by this Act to continue the use thereof *for the same purpose and for the same class of goods*.

36 Stat. 604 (emphasis added). J&J's pre-1905 uses of the mark were in U.S. classes 18 (covering medicines and pharmaceutical preparations); 44 (covering dental, medical, and surgical appliances); and 51 (covering cosmetics and toilet preparations).

54.    At the same time, the amendment now for the first time permitted ARC to authorize its employees and agents to use the Emblem, and it permitted its use as well by U.S. army and navy sanitary and hospital authorities:

> It shall be unlawful for any person, corporation or association *other than the American National Red Cross and its duly authorized employees and agents and the army and navy sanitary and hospital authorities of the United States* for the purpose of

1393880v1

> trade or as an advertisement to induce the sale of any article
> whatsoever or for any business or charitable purpose to use within
> the territory of the United States of America and its exterior
> possessions the emblem of the Greek Red Cross on a white ground,
> or any sign or insignia made or colored in imitation thereof, or of
> the words 'Red Cross' or ' Geneva Cross' or any combination of
> these words . . . .

36 Stat. 604 (emphasis added). Overall, Congress struck the same balance in 1910 that it had in

1905 – pre-existing users could continue to use the mark in commerce and ARC was denied the

right to grant "special permission" to third parties, in return for payment, to use the Red Cross

Emblem in commerce in competition with the grandfathered users.

      55.    ARC has made numerous attempts since 1910 to have Congress eliminate

the grandfather clause. But every attempt "has been rejected by Congress because they thought

it was undue and unfair to legitimate and established businesses." 1942 House Comm. Hearings

as 19 (statement of Rep. Tinkham).

      56.    In 1948, as part of the recodification of the U.S. criminal code, the

provision concerning the Red Cross Emblem was removed from ARC's charter. It was reworded

and moved to 18 U.S.C. § 706. As it has continuously since 1910, this criminal provision

permits ARC to authorize use of its Red Cross Emblem by its employees and agents. It does not

permit ARC to license third parties to use the Emblem for commercial purposes.

      57.    In this regard, section 706 stands in sharp contrast to certain other federal

statutes concerning the use of specified charitable marks, where Congress has permitted

licensing by the charities to third parties. *See, e.g.*, 36 U.S.C. §130506 (Little League Baseball's

charter: "The corporation has the exclusive right to use and ***to allow others to use*** the names

'Little League' and 'Little Leaguer' and the official Little League emblem or any colorable

simulation of that emblem."); 36 U.S.C. §30106 (Big Brothers Big Sisters' charter: "The

corporation and its subordinate divisions have the exclusive right to use the names 'The Big

17

Brothers of America, Big Sisters International, Incorporated', 'Big Sisters of America', 'Big

Brothers', 'Big Sisters', 'Big Brother – Big Sisters of America', and 'Big Sisters – Big Brothers',

and to use and *to allow others to use* seals, emblems, and badges the corporation adopts.").

**ARC's Recognizes It Is Powerless to Engage In Commercial Activity**

58. ARC is a rarity among charitable enterprises in that it functions under a

federal charter that grants it extraordinary protections not afforded to ordinary charitable

enterprises. Those protections include the federal law described above that makes it a crime for

any third party to use the Red Cross Emblem in commerce. Unlike an ordinary charitable

enterprise, whose ability to protect its trademark is limited to protecting against third party uses

that are confusingly similar, ARC is protected from third party use whether or not the third party

use is likely to be confused with ARC. Moreover, ARC is granted this extraordinary protection

under the federal *criminal* law. The use of its mark by any non-grandfathered third party is a

federal crime.

59. Because of the breadth of its federal protection, Congress has frequently

been concerned that ARC not misuse the powers it has been granted. Commercial use of ARC's

mark would be such a misuse, since ARC was granted no rights to engage in commercial

activities in its charter. As detailed above, ARC had expressly been denied the right to license

third parties to use its Emblem for commercial purposes. Moreover, commercial use of the

ARC's Red Cross Emblem would be unfair, since ARC could compete using its federally

protected mark in ways that ordinary commercial users could not.

60. Accordingly, Congress has frequently inquired about whether the ARC

was engaged in commercial activities and ARC has repeatedly promised the Congress – and J&J

– that it does not engage in commercial activity of any kind. When pressed further by Congress,

ARC ultimately acknowledged it was powerless to engage in such activities.

18

61.     Early comments by ARC suggested it disavowed commercial activity only by choice.  In 1919, for instance, Colonel Joseph M. Hartfield, a representative of ARC testified before Congress that:  "[T]he Red Cross does not manufacture any merchandise of any kind, and is not engaged in commercial business of any character. . . .  We have refused to permit [corporations] to divide profits with us . . . .  [W]e have consistently refused to lend ourselves to any of these commercial ventures."  *Hearings before House Comm. on Patent*, 65th Cong., 3d Sess., at 9 (1919) (stmt. of Col. Hartfield); *see also id.* at 20 ("The Red Cross adopted the policy that they would not accept any divisions of profits with any concern so as to be in any sort of a commercial venture; and concerns come to us every day, and we turn them down.").

62.     Colonel Hartfield explained ARC's distaste for associating its emblem with commercial activity:

> [T]he use of the [Red Cross] emblem for commercial purposes tends to cheapen it, tends to make it appear a commercial proposition, tends to make it appear that we are lending our name and emblem to the commercial advantage of these people . . . . The use of the emblem for commercial purposes does seriously embarrass the Red Cross officials in their work and does interfere with it.

*Id.* at 8-9.

63.     In 1942, ARC's General Counsel, H.J. Hughes, reaffirmed ARC's refusal to engage in commercial endorsements during hearings before the House Committee on Foreign Relations.  He said he was aware of only one "tragic case" where a misguided member authorized a commercial endorsement, "horrif[ying]" the national leadership:

> [Rep. Eberharter:]  Mr. Hughes, did the American Red Cross ever endorse any article manufactured or sold?
>
> Mr. Hughes:  No, sir.  We did have a tragic case where a particular article was endorsed by a volunteer member of one of our chapters. She undertook to write a letter to the manufacturer endorsing his product as the official motor corps shoe of the Red Cross . . .

19

We were simply horrified when we learned of that situation from the Federal Trade Commission. We were able to arrange with the manufacturer who regretted the mistake, to have him publish a retraction in the two papers in which his original advertisement appeared, but other than that, *I can say I know of no other – certainly there has never been an authorized endorsement*.

[Rep. Eberharter:] *Either by the national organization or local chapters.*

[Mr. Hughes:] *No. None are permitted to endorse any article of merchandise, nor have we ever, though we have had innumerable requests for permission to use the emblem, and we could, as some charity institutions or character-building institutions do, we could gain large sums of money from licensing the use of the Red Cross emblem; that has not been done in a single instance.*

1942 House Comm. Hearings at 26 (emphases added).

64.    ARC's Vice Chairman in Charge of Finance gave similar testimony: "The Red Cross does not manufacture supplies for resale. . . . *The Red Cross has never sought to raise funds from the public by purchasing or manufacturing supplies for sale*. . . . [A]s a matter of policy such fund-raising methods have never been adopted by the Red Cross." 1942 House Comm. Hearings at 267 (stmt. of James K. McClintock) (emphasis added).

65.    Notwithstanding these assurances, ARC's contention that it refrained from commercial activities only "as a matter of policy" led Congress to be concerned about whether there was a loophole in the law that might theoretically permit ARC to change its mind and engage in the very commercial activities that it said it disclaimed. Congressman Mundt asked Hon. Norman H. Davis, chairman of ARC, whether ARC would object to an explicit ban on commercial activities. Mr. Davis emphatically insisted that ARC engaged in no such activities and, with some equivocation, he also testified that ARC's charter did not permit any commercial activities:

1393880v1

[Rep. Mundt:]  I would like to ask . . . whether the Red Cross authorizes the making of any products for commercial purposes.  It seems to me the writing of this bill would still permit the Red Cross to do that and I was wondering whether the Red Cross does engage in any commercial practice.

. . . .

[Mr. Davis (Chairman of ARC):]  I can answer it.  It [sic] will say, "No; we do not."

. . . .

[Mrs. Rogers (of ARC):]  I am very sure of this because there is an organization in my own district, a firm which is very anxious to manufacture something with a red cross on it, it is a big red cross, and the American Red Cross wrote them repeatedly and wrote me, that they would never sanction that.

[Rep. Mundt:]  *Am I correct in my assumption that as far as the Red Cross itself is concerned, you would have no objection if this bill were so revised, and so written, that if it passes, no commercial use by anybody, including commercial use by the Red Cross, would be made of this emblem? . . . I do not believe that the American Red Cross as an organization . . . should ever have the right under this bill to do things which we are attempting to prevent the private individuals from doing.*

[Mr. Davis:] *. . . We do not use it for commercial purposes, and we do not go into commercial enterprises at all.*

[Rep. Mundt:]  *Does the charter permit you to do so if you care to?*

[Mr. Davis:]  *No, sir it does not.  I do not think so.*

[The Chairman:]  May the Chair ask – you do sell books and things there?

[Mr. Davis:]  For our own needs; we can sell things; we have got power to buy and sell things.

[The Chairman:]  *But not for commercial purposes?*

[Mr. Davis:]  *No*

. . .

[Rep. Mundt:]  This bill, if it were passed as now worded, would permit you to manufacture if you chose, matches to sell at a profit for the Red Cross, and it seems to me if we deny others that right, we should not invest the Red Cross with that right.

21

[Mrs. Belmont]  I have said that I am not a lawyer, sir, but I would feel that the Red Cross workers would be thoroughly satisfied with that . . . .

. . . .

[Rep. Eaton:]  *Mr. Davis, would you say that this bill would put the American Red Cross into the commercial business or give them the opportunity to do so as a monopoly.*

[Mr. Davis:]  *No. It never occurred to me that such a thing would happen.*

1942 House Comm. Hearings at 252-57 (emphases added).

66.    This exchange led to the amendment that Congressman Mundt had proposed – an explicit ban on ARC engaging in commercial activity.  ARC vigorously opposed the amendment.  It told Congress that such legislation was insulting to an institution such as ARC.  Abandoning any ambiguity or suggestion that its decision to refrain from commercial activities was only "a matter of policy," ARC unequivocally represented to Congress that the amendment was unnecessary because ARC had no power under its existing charter to engage in commercial activities:

[H.J. Hughes, General Counsel of ARC:]  [I]nclusion of a clause [prohibiting the ARC from engaging in commercial ventures for profit] is a gratuitous and unfair criticism of something which has never occurred . . . .

[Sen. Mahoney:]  *Your point is that [the clause] undertakes to prohibit something which the Red Cross is not authorized to do by its charter?*

[Hughes:]  *That is it; yes, sir.*

*Red Cross: Hearings Before the Senate Subcomm. on the Judiciary on S. 2241 and H.R. 7420*, at 6 (Dec. 4,8, 1942) (emphases added) (hereinafter 1942 Sen. Subcomm. Hearings).

67.    To confirm its assertion that it had no power to engage in commercial activity, ARC obtained an extraordinary letter opinion from the Attorney General of the United

22

States, Francis Biddle, "on what power or right, if any, [ARC] possessed under its present

congressional charter, to engage in commercial activity." 1942 Senate Subcomm. Hearings at 5.

Confirming ARC's unambiguous representation to Congress, Attorney General Biddle found that

ARC possessed no such power, writing:

> I have your letter of June 8, 1842, in which you propound a
> question to me as counselor with respect to the powers of the
> American Red Cross
> . . . .
> The corporation was granted no powers, either directly or by
> implication, to engage in ordinary commercial manufacturing or
> mercantile activities. It is, of course, axiomatic that a corporation
> has only those powers which are granted affirmatively in its charter
> or which may be incidentally necessary to the fulfillment of the
> functions which it is created to discharge. Needless to say, this
> principle applies with stronger reason to an institution such as the
> American Red Cross which has been repeatedly declared in
> administrative rulings and judicial decisions to be a nonprofit,
> charitable, and educational institution and which has long enjoyed
> under such rulings a unique status among charities as a quasi-
> governmental agency.
>
> ***For the reasons thus briefly indicated it is clear that the
> American Red Cross is not empowered to engage in business of a
> commercial or manufacturing character in competition with
> private business.***

*Id.* at 5-6 (emphasis added). ARC formally submitted his opinion as part of the legislative

record.

    68.    Focusing in particular on its sale of first-aid kits, which had consumed

attention at the earlier hearings, ARC explained that its sale of first-aid kits was only to its

chapters and employees and not commercial sales to the general public:

> It apparently occurred to some . . . that the Red Cross in fact was
> engaged in commercial transactions. This is not the fact. We do
> have for sale to our chapters . . . and employees first-aid kits. Our
> pamphlet listing resale supplies carries the following statement:
> ***"Since the Red Cross makes no attempt to handle the foregoing
> items on a commercial basis, any inquiries from individuals,***

> **industries, or organizations other than the Red Cross should be
> referred to the usual trade channels."**

1942 Senate Subcomm. Hearings at 5 (emphases added).

      69.    A J&J representative was present at these hearings and engaged in an

extended colloquy with the ARC representative.  J&J's representative vigorously objected to

ARC's possible commercial sale and advertising of first-aid kits.  ARC promised J&J, just as it

promised Congress, that it did not, and could not, make commercial sales to public:

> [Mr. Perry (of J&J):]  With relation to the discussion on the section
> prohibiting use of the Red Cross symbol by the American Red
> Cross for commercial purposes, there is mentioned by Mr. Hughes
> [of ARC] the sale of first-aid books, but no mention of the sale of
> first-aid kits and first-aid materials which, according to the record
> of the House, run into the hundreds of thousands of dollars.
>
> We have no information as to what those sales have been in the
> year 1941 and 1942, but we do know, from our experience in the
> field, that it certainly is many times that of 1940 and 1941.
>
> [Mr. Hughes (of ARC):]  *As a matter of fact, Mr. Perry, the sales
> of first-aid kits were less than 3,600, less than 1 to each chapter
> in the United States.*
>
> *I would be very glad to have a sworn statement from our supply
> department, if that is material. . . .*
> . . . .
> [Sen. Mahoney:]  *Is that done as a profit-making business?*
>
> [Mr. Hughes:]  *No, sir. . . .*
>
> [Sen. Mahoney:]  The kits are not sold to the general public?
>
> [Mr. Hughes:]  Occasionally a person will go right in and get them.
> They are sold; there is no complete prohibition against it, but they
> are not advertised; *they are not offered generally for sale to the
> public.*  They are not maintained by us as a resale article to the
> public.
>
> [Sen. Mahoney:]  All right.

1942 Senate Subcomm. Hearings at 27-29 (emphases added).

70.    Relying on ARC's representations – as confirmed by the Attorney General of the United States – that it had no power to engage in commercial activities in competition with private business and that it was not in fact engaged in such activities, Congress did not pass the proposed provision explicitly barring ARC from engaging in commercial activities.  And when the next Congress considered the same bill, the commercial-use ban had been removed.

**ARC's Continuous Recognition of Its Limited Right**
**to Use the Red Cross Emblem**

71.    Not only is ARC powerless to engage in commercial activity, it is also powerless to license to others the use of the Red Cross Emblem for any activity.  When ARC sought that right in 1895, it failed to secure it, and no subsequent legislation has ever granted ARC that right.

72.    The current criminal statute regulating the use of the Red Cross Emblem grants the right to use the Red Cross Emblem to only four groups:  (1) ARC, (2) those employees and agents of ARC authorized by ARC to use the Emblem, (3) the sanitary and hospital authorities of the U.S. armed forces, and (4) grandfathered users, such as J&J.  ARC has no right to license third parties to use the Red Cross Emblem for commercial use.  Rather it is a crime for a non-grandfathered third-party to use the Red Cross Emblem.

73.    ARC has long recognized this limitation on its rights to use the Red Cross Emblem.  In countless cease and decease letters sent to third party users of the Red Cross Emblem, ARC has stated:  "Federal statutes prohibit the use of the name and emblem of the Red Cross by commercial concerns except those that had used the name or emblem in connection with their manufacture or sale of the same product prior to 1905."  In those letters, ARC simply asked the third parties to cease their use of the Emblem.  It did not (except perhaps recently)

25

invite discussions about the possibility of licensing the mark to those users. This is because there is no lawful basis on which ARC could license such third parties to use the Emblem.

74. Over the decades, ARC has consistently recognized that it has no authority to relax the statute and permit commercial concerns to use the Emblem. For instance, in a 1980 flyer entitled "The Red Cross Emblem: Its History, its Usage, its Restrictions," ARC explained that "although the American Red Cross is one of the entitled users of the Red Cross name and emblem as specified in the federal statute, *it has no authority to interpret, waive, or relax the stipulations*" of that statute. The same flyer explains: "The prohibitions [of Section 706] are *not designed to protect any vested interest of the Red Cross as an organization*. Actually the American Red Cross and other national Red Cross societies are in effect *only licensees*. They have been granted the right to use the name and emblem *for specified humanitarian purposes*."

75. Similarly, a 1997 ARC webpage entitled "Name & Emblem: Restrictions on Usage" states: "Although the American Red Cross is one of the entitled users of the Red Cross name and emblem, as specified in the federal statute, *it has no authority to interpret, waive, or relax the stipulations*."

76. Most recently, *The American Red Cross Guide to Marketing Sponsorships*, which ARC published in February 2000, states that ARC's use of the Red Cross Emblem is "limited by the fact that the organization does not own or fully control the use of the Red Cross emblem and by a concern that commercial use of the name or emblem would be inappropriate and, in some military, international, and other contexts, potentially dangerous."

**Cooperation and Coexistence of ARC and Plaintiffs**

77. Until recently, J&J and ARC have cooperated with each other amicably and effectively in exercising and enforcing their respective rights in the Red Cross Emblem. Each has recognized and respected the clear line that separates their lawful uses: J&J's

26

grandfathered commercial use and ARC's statutory right to use the Emblem for non-commercial purposes.

78.    Over the years, the ARC and J&J have sent coordinated cease and desist letters to third parties who have used the red Greek cross on commercial products, with J&J asserting its trademark rights in the Red Cross Emblem, and ARC relying on 18 U.S.C. § 706.

79.    In 2000, J&J joined ARC as a co-defendant/counterclaim plaintiff in an action brought by Microflex Corporation, which sought to use a red cross logo on disposable medical gloves. *Microflex Corp. v. Am. Nat'l Red Cross & Johnson & Johnson*, CV-N-00-178-ECR-PHA (D.N.V. 2000). In papers filed in that suit, ARC confirmed J&J's ownership of its marks and its continuous use of them in commerce.

**ARC's Recent Commercial Activity and Purported License to Other Defendants**

80.    For reasons that it has not made clear, in the last few years, ARC has turned its back on over 100 years of history and – contrary to its limited rights under its charter and in violation of federal law – begun to authorize the use of the Red Cross Emblem in the commercial arena. ARC has begun pursuing commercial co-ventures with a variety of companies through cause-related marketing agreements, sponsoring items such as first-aid kits, hand-sanitizers, latex gloves, nail clippers, comb and brush sets, humidifiers, shoes, and Christmas ornaments. In fact, ARC is attempting to create a "Red Cross brand," as, with many of these products, the overwhelming mark appearing on the packaging is the red cross symbol together with the ARC name.

81.    For example, in 2006 ARC entered into such an agreement with Warner-Lambert Company by which the Red Cross mark was placed on Warner-Lambert's Purell-brand hand sanitizer. The contract provides for payment by Warner-Lambert to ARC of a "donation"

1393880v1

based upon the number of units sold. Notably, the contract admits that Warner-Lambert is not an employee or agent of ARC – the only parties that ARC may authorize to use the Red Cross Emblem under federal law. To the contrary, Warner-Lambert promised to indemnify ARC's "employees" and "agents".

82. Upon information and belief, ARC has entered such agreements with each co-defendant here. Indeed, in some instances, ARC has purported to authorize companies to apply the Red Cross mark to their products *when those same companies have specifically contracted with J&J that they would not do so*.

83. For instance, in 1995, J&J contested a trademark application filed by Defendant Water-Jel to use a red cross symbol on burn dressings and ointments. As was common until recently, J&J and ARC worked closely together in opposing Water-Jel's application. ARC's Assistant General Counsel advised J&J's counsel that ARC had sent Water-Jel its "standard letter" and resolved the matter upon Water-Jel's assurance that it "was willing to discontinue using the red cross in their mark." J&J and Water-Jel thereupon reached a similar agreement that Water-Jel would "disclaim any right to the use of the Greek cross portion of its mark in red or in white on a red background." As a consequence, J&J, like ARC, agreed not to oppose Water-Jel's application. Yet Water-Jel now is using the Red Cross Emblem, with the authorization of ARC and in breach of the contract with J&J. A copy of the Water-Jel agreement with J&J is attached as Exhibit C.

84. In 2005, J&J reached a similar agreement with defendant FAO. FAO contracted to remove a red cross symbol from its trademark application, and J&J agreed not to oppose the application going forward. As part of the settlement, FAO promised "not use the design feature of the mark . . . in whole or in part in the color red or orange, or in white on a red

28

or orange background, or colorable imitations hereof, in connection with the goods identified in said application." Yet, again, FAO is now using the Red Cross Emblem, with the authorization of ARC. A copy of the FAO agreement with J&J is attached as Exhibit D.

85.    On information and belief, prior to or during its negotiations with FAO and Water-Jel, ARC was aware of the agreements between them and J&J prohibiting them from using the Red Cross Emblem.

86.    Under color of agreements with ARC, Water-Jel and FAO have breached these contractual obligations to J&J and now use the Red Cross Emblem openly on their products, which compete with J&J's products.

87.    FAO's first-aid kits are sold in mass-market retailers, and they compete directly with JJCCI's first-aid kits sold under the Red Cross Emblem, with the unfair advantage of using the same mark and displaying ARC's imprimatur.

88.    Similarly, Water-Jel's hand-sanitation products unfairly compete with J&J's hand-sanitation products by wrongfully displaying ARC's imprimatur.

89.    Even where ARC has not induced third parties to breach contractual obligations to J&J, it has purported to authorize other companies to sell goods using the Red Cross Emblem in competition with J&J.

90.    Defendant Learning Curve, which is also on information and belief a party to a cause-related marketing agreement with ARC, uses the Red Cross Emblem on and in connection with its first-aid kits. These first-aid kits are sold by Learning Curve in mass-market retailers, and they compete directly with JJCCI's first-aid kits sold under the Red Cross Emblem. The packaging of these kits proclaims that "[t]he American Red cross logo is a trademark owned by the American Red Cross. Officially licensed product of the American Red Cross."

1393880v1

91.    Defendant Magla, which is also by information and belief a party to a cause-related marketing agreement with ARC, uses the Red Cross Emblem on and in connection with its medical examination gloves. The packaging of these gloves states that they are an "official Licensed Product of the American Red Cross" and directs consumers to www.redcrossgloves.com.

92.    While commercial co-ventures and cause-related marketing may be commonplace for ordinary charitable organizations, ARC's extraordinary federal charter and 18 U.S.C. § 706 prohibit ARC from entering into such agreements using the Red Cross Emblem. Unlike the ordinary tax-exempt charity, ARC is acting under a federal charter that does not permit ARC to engage in *any* commercial activity. And unlike the ordinary tax-exempt charity, ARC is acting under a federal criminal statute that allows ARC to authorize only its agents and employees to use the Red Cross Emblem. As ARC has recognized, "Federal statutes prohibit the use of the name and emblem of the Red Cross by commercial concerns except those that had used the name or emblem in connection with their manufacture or sale of the same product prior to 1905," and ARC "has no authority to interpret, waive, or relax the stipulations" of the criminal statute.

93.    On its website, ARC goes well beyond the mere acknowledgment of its licensees' support. Instead, it actively promotes the commercial efforts of its purported licensees. For example, ARC promotes shoes to the consuming public:

> The American Red Cross – a trusted name in nursing – is proud to introduce a footwear line designed for nurses and other healthcare professionals by Phoenix Footwear Group, Inc.
>
> When you are on your feet all day you need shoes that are comfortable, durable and protect your feet. The American Red Cross Footwear line has built-in design and performance features like the patented Softwalk® footbed, slip-resistant soles and

30

> anatomically designed shoe shapes that make them the smart
> choice for the healthcare professional.

American Red Cross, *Supporters*, http://www.redcross.org/sponsors/howtohelp/dollars.html.

Likewise, ARC promotes hand cream to consumers:

> Cure your dry winter skin and support the American Red Cross at
> the same time, by purchasing a Limited Edition bottle of Curel®
> Ultra Healing® lotion. The Curel® Skincare team is helping cure
> the winter blues this season by making a $250,000 donation to
> support the Red Cross's lifesaving work. Visit www.curel.com for
> more information about this exciting campaign including the
> opportunity to enter a sweepstakes to cure your winter blues, or
> find a "Curel Cure's the Winter Blues" tour stop near you!

*Id.*

94.     ARC has also undertaken to advertise and sell its own line of branded

first-aid and health-care related products from its "Red Cross Store" webpage –

https://www.redcrossstore.org.  The website has an entire section devoted to "first-aid kits and

supplies" – not to mention T-shirts, baby apparel, radios, and jewelry.  Thus, in addition to

purportedly authorizing companies that directly compete with J&J to use the Red Cross Emblem

– and contrary to its promises to Congress and J&J that it only sells goods to its chapters and its

employees – ARC itself has decided to enter the commercial realm and sell goods branded with

the Red Cross Emblem to the general public.

**Defendants' Conduct Has Injured and Continues to Injure Plaintiffs**

95.     ARC's commercial use and licensing of the Red Cross Emblem have

resulted in a loss of sales and market share with respect to J&J's first-aid and health-care related

products.  Its conduct is also likely to dilute the value of J&J's famous mark.  The other

Defendants, acting under purported licenses from ARC, have similarly damaged J&J.

31

**FIRST CLAIM FOR RELIEF FOR TORTIOUS INTERFERENCE
WITH PROSPECTIVE ECONOMIC ADVANTAGE**
(By Plaintiffs against all Defendants)

96.     Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 95 above.

97.     Plaintiffs have ongoing business relationships and opportunities with wholesalers, retailers and consumers of their red-cross-branded products.  Defendants are well aware of such relationships and opportunities.

98.     Defendant ARC's *ultra vires* commercial activity and inducement of and entry into license agreements contrary to 18 U.S.C. § 706 have been undertaken intentionally and willfully.  These actions are illegal and have wrongfully interfered and continue to interfere with Plaintiffs' business relationships and opportunities.  Defendant ARC is well aware that harm to Plaintiffs would proximately result from its actions.

99.     Defendants Learning Curve, Magla, Water-Jel, and FAO's wrongful use of the Red Cross Emblem in violation if 18 U.S.C. § 706 has been undertaken intentionally and willfully.  These actions are illegal and have interfered and continue to interfere with Plaintiffs' business relationships and opportunities.  These Defendants are well aware that harm to Plaintiffs would proximately result from their actions.

100.     Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiffs.

**SECOND CLAIM FOR RELIEF FOR TORTIOUS
INTERFERENCE WITH CONTRACTUAL RELATIONS**
(By Plaintiff Johnson & Johnson against Defendant ARC)

101.     Plaintiff J&J hereby reallege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 95 above.

102.    Plaintiff J&J has valid and enforceable contracts with Defendants Water-Jel and FAO prohibiting their use of the Red Cross Emblem.

103.    On information and belief, Defendant ARC was aware or on actual or constructive notice of those contracts when negotiating and executing its license agreements with Water-Jel and FAO.

104.    Defendant ARC, through its *ultra vires* commercial activity and inducement of and entry into illegal license agreements contrary to 18 U.S.C. § 706, intentionally and wrongfully has caused Defendants Water-Jel, and FAO to breach their contracts with Plaintiffs.

105.    Defendant ARC's conduct has caused and is causing immediate and irreparable injury to Johnson & Johnson.

### THIRD CLAIM FOR RELIEF FOR UNFAIR COMPETITION
(By Plaintiffs against all Defendants)

106.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 95 above.

107.    Defendant ARC's *ultra vires* commercial activity and inducement of and entry into license agreements contrary to 18 U.S.C. § 706 have been undertaken intentionally and willfully.  These actions are illegal and constitute unfair trade practices in violation of Plaintiffs' rights.  Defendant ARC is well aware that harm to Plaintiffs would proximately result from its actions.

108.    Defendants Learning Curve, Magla, Water-Jel, and FAO's wrongful use of the Red Cross Emblem in violation if 18 U.S.C. § 706 has been undertaken intentionally and willfully.  These actions are illegal and constitute unfair trade practices in violation of Plaintiffs'

33

rights.  These Defendants are well aware that harm to Plaintiffs would proximately result from their actions.

109.    Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiffs.

### FOURTH CLAIM FOR RELIEF FOR PROMISSORY ESTOPPEL
(By Plaintiffs against Defendant ARC)

110.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 95 above.

111.    ARC has clearly and unambiguously promised never to engage in commercial activity, including promises not to license the Red Cross Emblem to others and promises not to sell first-aid kits and first-aid products in competition with J&J.

112.    ARC, through the Johnson-Barton Agreement, promised J&J that, even if it had the right to license the Red Cross Emblem within J&J's classes of goods, it would not do so, nor would ARC itself enter those classes using the Red Cross Emblem.

113.    ARC promised the Congress, J&J and the American public that it would not engage in commercial activity, and, indeed, under its charter could not do so.  In swearing off such activities, ARC specifically pledged never to sell its own products for profit or share in the proceeds of the sale of other entities' products sold using the Red Cross Emblem.

114.    ARC reemphasized its promise never to engage in commercial activity in response to J&J's explicit concern regarding the sale of first-aid kits by, or branded by, ARC.

115.    The ARC's statements and actions, including the foregoing statements and actions, have led Plaintiffs to believe that the ARC would not engage in commercial activity or enter into commercial licenses and led Plaintiffs to conduct their business on the basis of such belief.

34

116.    Plaintiffs have reasonably relied on ARC's promises, including by expending substantial sums and efforts over many decades in building and maintaining the Red Cross Emblem with respect to their classes of goods.

117.    Defendant ARC's statements and conduct have caused and are causing immediate and irreparable injury to Johnson & Johnson.

## FIFTH CLAIM FOR RELIEF FOR FEDERAL DILUTION UNDER § 43(C) OF THE TRADEMARK ACT, 15 U.S.C. § 1125(C)
(By Plaintiff J&J against all Defendants)

118.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 95 above.

119.    Johnson & Johnson's federally-registered Red Cross Emblem became famous and distinctive prior to the commencement of use of the Red Cross Emblem by Defendants Learning Curve, Magla, Water-Jel, and FAO.

120.    The unauthorized use of the Red Cross Emblem by Defendants Learning Curve, Magla, Water-Jel and FAO is likely to cause dilution by blurring and dilution by tarnishment of Johnson & Johnson's federally-registered Red Cross Emblem, in violation of Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c).

121.    Defendant ARC's program of licensing and indiscriminately offering to license the Red Cross Emblem to third parties, including Defendants Learning Curve, Magla, Water-Jel and, FAO, for commercial use is diluting and inducing and contributing to the dilution of J&J's mark.

122.    Defendants' unauthorized acts have caused and will continue to cause irreparable damage to Johnson & Johnson.

1393880v1

**SIXTH CLAIM FOR RELIEF FOR TRADEMARK DILUTION
UNDER NEW YORK GENERAL BUSINESS LAW § 360-1**
(By Plaintiff J&J against all Defendants)

123.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 95 above.

124.    Johnson & Johnson's federally registered Red Cross Emblem had acquired distinctiveness in connection with a range of first aid and would care products before Defendants Learning Curve, Magla, Water-Jel and FAO first began to use the Red Cross Emblem.

125.    The unauthorized use of the Red Cross Emblem by Defendants Learning Curve, Magla, Water-Jel, and FAO is diluting and is likely to continue diluting Plaintiffs' Red Cross Emblem and to damage Plaintiffs' reputation, in violation of Section 360-l of the New York General Business Law.

126.    Defendant ARC is inducing and contributing to the foregoing conduct of Defendants Learning Curve, Magla, Water-Jel, and FAO.

127.    Defendant's unauthorized acts have caused and will continue to cause irreparable damage to Plaintiffs' business and goodwill.

**SEVENTH CLAIM FOR RELIEF FOR BREACH OF CONTRACT**
(By Plaintiff J&J against FAO)

128.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 95 above.

129.    On July 27, 2004, based on its rights in its Red Cross Emblem, J&J opposed FAO's Application Serial No. 76/394,583 to register the mark FIRST AID ONLY and Emblem. J&J asserted that the design feature of FAO's mark, a cross design, would be likely to cause confusion if displayed in red or orange or in white on a red or orange background.

36

130.    To resolve that opposition, FAO and Johnson & Johnson entered into an agreement supported by consideration, effective as of July 7, 2005 (the "FAO Agreement"), in which Johnson & Johnson agreed to withdraw its opposition to FAO's registration of the mark, on condition that FAO "not use the design feature of the mark . . . in whole or in part in the color red or orange, or in white on a red or orange background, or colorable imitations hereof, in connection with the goods identified in said application." (FAO Agreement, Paragraph 1, Exhibit D hereto.)

131.    FAO is in breach of Paragraph 1 of the FAO Agreement by using the design shown in Application Serial No. 76/394,583 in red on a variety of FAO goods and by using the Red Cross Emblem on a variety of FAO goods.

### EIGHTH CLAIM FOR RELIEF FOR BREACH OF CONTRACT
(By Plaintiff J&J against Water-Jel)

132.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 95 above.

133.    On January 31, 1995, based on its rights in its Red Cross Emblem, J&J opposed Water-Jel's Application Serial No. 74/419,451 to register the mark DROPLET AND GREEK CROSS DESIGN.  J&J asserted that Water-Jel's mark, a cross design, would be likely to cause confusion if displayed in red or orange or in white on a red or orange background.

134.    To resolve that opposition, Water-Jel and Johnson & Johnson entered into an agreement supported by consideration, effective as of January 31, 2995 (the "Water-Jel Agreement"), in which J&J agreed to withdraw its opposition to Water-Jel's registration of the mark, on condition that Water-Jel "not use a Greek Cross feature of its marks in red, or in white on a red background." (Water-Jel Agreement, Paragraph 1, Exhibit C hereto.)

1393880v1

135.    Water-Jel is in breach of Paragraph 1 of the Water-Jel Agreement by using the Red Cross Emblem on a variety of its goods.

**WHEREFORE**, Plaintiffs respectfully demand judgment as follows:

(a)    Permanently enjoining Defendant ARC from licensing or otherwise permitting use of the Red Cross Emblem by third-parties or purporting to do so;

(b)    Permanently enjoining Defendant ARC from using the Red Cross Emblem commercially;

(c)    Permanently enjoining Defendant ARC from using the Red Cross Emblem in competition with Plaintiffs;

(d)    Permanently enjoining Defendant ARC from engaging in commercial activities in any class of goods for which Plaintiffs hold trademark rights, including but not limited to medicines and pharmaceutical preparations; dental, medical, and surgical appliances; and cosmetics and toilet preparations;

(e)    Permanently enjoining defendants, their officers, licensees, agents, and all those persons in concert or participation with any of them, from using the Red Cross Emblem, or any colorable imitation thereof, on or in connection with any first-aid kits, wound care products, medical examination gloves, hand sanitizers or related products offered for sale to the consuming public and from licensing or authorizing others to do so;

(f)    Declaring the licensing agreements between Defendant ARC and each of Defendants Learning Curve, Magla, Water-Jel, and FAO null and void;

38

(g)     Awarding Plaintiffs damages for injuries caused by Defendants' unlawful

        conduct, and all profits derived by Learning Curve, Magla, Water-Jel, and

        FAO from that conduct;

(h)     Awarding Plaintiffs such other and further relief as the Court may deem

        just and proper.

DATED:  September 5, 2007

                                    Gregory L. Diskant
                                    Sarah E. Zgliniec
                                    Rachael Kuilema Klein
                                    Ravi Sitwala
                                    PATTERSON BELKNAP WEBB & TYLER LLP
                                    1133 Avenue of the Americas
                                    New York, New York 10036
                                    Tel:  (212) 336-2000
                                    Fax:  (212) 336-2222

                                            and

                                    Roger L. Zissu
                                    Richard Z. Lehv
                                    FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                                    866 United Nations Plaza
                                    New York, New York 10017
                                    Tel:  (212) 813-5900

                                    *Attorneys for Plaintiffs*

39

# Exhibit A

# The United States of America



# 54308
Red Cross
Design
Renewal

## CERTIFICATE OF RENEWAL

### Reg. No. 54,308

Application to renew the above identified registration having been duly filed in the Patent and Trademark Office and there having been compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents and Trademarks,

This is to certify that said registration has been renewed in accordance with the Trademark Act of 1946 to Johnson & Johnson of New Brunswick, New Jersey

New Jersey corporation
and said registration will remain in force for twenty years from    June 26, 1986
unless sooner terminated as provided by law.



In Testimony Whereof I have hereunto set my hand and caused the seal of the Patent and Trademark Office to be affixed this eighth day of July 1986.

Commissioner of Patents and Trademarks

# TRADE-MARK.

No. 54,308.

REGISTERED JUNE 26, 1906.

## JOHNSON & JOHNSON.
### MEDICAL AND SURGICAL PLASTERS.

APPLICATION FILED OCT. 17, 1905.



PROPRIETOR

Johnson & Johnson

by

ATTORNEY

*(over)*

# RENEWED

# UNITED STATES PATENT OFFICE.

## JOHNSON & JOHNSON, OF NEW BRUNSWICK, NEW JERSEY.

### TRADE-MARK FOR MEDICAL AND SURGICAL PLASTERS.

No. 54,308            Statement and Declaration.            Registered June 26, 1906.

Application filed October 17, 1905. Serial No. 12,868. Used ten years.

## STATEMENT.

*To all whom it may concern:*

Be it known that the JOHNSON & JOHNSON, a corporation duly organized and existing under and by virtue of the laws of the State of New Jersey, and located and doing business in the city of New Brunswick, county of Middlesex, in said State, has adopted for its use a trade-mark, of which the following is a description.

The trade-mark is illustrated in the accompanying drawing, wherein appears a representation of a red Greek cross.

The trade-mark has been continuously used in the business of said corporation by it and its predecessors, from whom it derived title, since 1887.

The class of merchandise to which the trade-mark is appropriated is medicinal and surgical articles, and the particular description of goods comprised in said class upon which said trade-mark is used is medicinal and surgical plasters.

The trade-mark is usually displayed on the wrappers, spools, containers, boxes, and other receptacles holding the goods by printing it directly thereon and by means of labels and in other customary ways.

JOHNSON & JOHNSON.
R. W. JOHNSON,
*President.*

Witnesses:
EDWARD NORRIS,
LOUIS H. LEITHEISER.

## DECLARATION.

State of New Jersey, county of Middlesex, ss:

R. W. JOHNSON, being duly sworn, deposes and says that he is president of JOHNSON & JOHNSON, a corporation, the applicant named in the foregoing statement; that he believes that the foregoing statement is true; that he believes the said corporation is the owner of the trade-mark sought to be registered; that no other person, firm, corporation or association, to the best of his knowledge and belief, has the right to use said trade-mark either in the identical form or in any such near resemblance thereto as might be calculated to deceive; that said trade-mark is used by said corporation in commerce among the several States of the United States and particularly between New Jersey and Illinois and between the United States and foreign nations and particularly with Cuba and Canada; and that the description drawing and specimens presented truly represent the trade-mark sought to be registered; and that the mark has been in actual use as a trade-mark of the applicant or its predecessors from whom it derived title for ten years next preceding the passage of the act of February 20, 1905, and that, to the best of his knowledge and belief, such use has been exclusive.

R. W. JOHNSON.

Subscribed and sworn to before me this 14th day of Sept., 1905.
[L. S.]

CHARLES A. McCORMICK,
*Notary Public.*

Renewed June 26, 1946 to Johnson & Johnson, of New Brunswick, New Jersey, a corporation of New Jersey.

Republished, under the Act of 1946, Jan. 31, 1950, by Johnson & Johnson, New Brunswick, N. J.

AFFIDAVIT SEC. 8
ACCEPTED

AFFIDAVIT SEC. 15
RECEIVED Feb. 3, 1955

 **United States Patent and Trademark Office**
Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz
alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Tue Aug 7 04:10:03 EDT 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout | Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button*
*of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | RED CROSS |
| **Goods and Services** | IC 003. US 044 051. G & S: cotton for personal use. FIRST USE: 18980000. FIRST USE IN COMMERCE: 18980000 |
| | IC 005. US 044. G & S: sterile cotton for medical use. FIRST USE: 18980000. FIRST USE IN COMMERCE: 18980000 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 74422554 |
| **Filing Date** | August 6, 1993 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | August 2, 1994 |
| **Registration Number** | 1870955 |
| **Registration Date** | January 3, 1995 |
| **Owner** | (REGISTRANT) JOHNSON & JOHNSON CORPORATION NEW JERSEY One Johnson & Johnson Plaza New Brunswick NEW JERSEY 08933 |
| **Attorney of Record** | RICHARD F. BIRIBAUER |
| **Prior Registrations** | 0054308 |
| **Type of Mark** | TRADEMARK |

| | |
|---|---|
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20050801. |
| **Renewal** | 1ST RENEWAL 20050801 |
| **Live/Dead Indicator** | LIVE |

Int. Cl.: 5

Prior U.S. Cls.: 18 and 44

**United States Patent and Trademark Office**

Reg. No. 1,889,576
Registered Apr. 18, 1995

## TRADEMARK
### PRINCIPAL REGISTER



JOHNSON & JOHNSON (NEW JERSEY CORPO-
RATION)
ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, NJ 08933

FOR: FIRST AID KITS, ADHESIVE BAN-
DAGES, TOPICAL PREPARATIONS FOR MED-
ICAL AND THERAPEUTIC USE, MEDICAL
ADHESIVE TAPE, GAUZE, STERILE COTTON
FOR MEDICAL PURPOSES, AND WOUND
DRESSINGS, IN CLASS 5 (U.S. CLS. 18 AND 44).

FIRST USE 0-0-1898; IN COMMERCE
0-0-1898.

OWNER OF U.S. REG. NO. 54,308.

THE DRAWING IS LINED FOR THE COLOR
RED.

SER. NO. 74-422,859, FILED 8-9-1993.

PATRICIA HORRALL, EXAMINING ATTOR-
NEY

Int. Cl.: 3

Prior U.S. Cl.: 51

Reg. No. 1,888,143

## United States Patent and Trademark Office

Registered Apr. 11, 1995

## TRADEMARK
### PRINCIPAL REGISTER



JOHNSON & JOHNSON (NEW JERSEY CORPO-
RATION)
ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, NJ 08933

FOR: COTTON FOR COSMETIC USE, IN
CLASS 3 (U.S. CL. 51).
FIRST USE 0-0-1898; IN COMMERCE
0-0-1898.

OWNER OF U.S. REG. NO. 54,308.

THE DRAWING IS LINED FOR THE COLOR
RED.

SER. NO. 74-422,556, FILED 8-6-1993.

PATRICIA HORRALL, EXAMINING ATTOR-
NEY

Exhibit B

Cv-1334

THIS AGREEMENT, made and entered into this twenty-ninth day of January, 1895, by and between the American National Red Cross, an organization incorporated under the laws of the District of Columbia, and Johnson & Johnson, a corporation organized and existing under the laws of the State of New Jersey, WITNESSETH:

THAT, WHEREAS there is now pending before the Fifty-third Congress of the United States a certain Bill entitled "A Bill to protect the insignia and the name of the Red Cross," which bill, within certain limitations, provides, in substance, that the said American National Red Cross shall in the United States enjoy and be protected in the exclusive use of the symbol of a red cross, and which bill provides also that the Central Committee of said American National Red Cross shall be authorized and empowered to grant special permission to use the symbol of a red cross in connection with the manufacture and sale of articles of commerce, and which bill, it is anticipated, will be duly enacted and become a statute, de facto, of the United States.

NOW, THEREFORE, in consideration of the premises and of the payment of One Dollar by said Johnson & Johnson to said American National Red Cross, the receipt of which is hereby acknowledged, the said parties have agreed as follows, to wit:

FIRST:  It is agreed that the said Johnson &

Johnson are now and for a long time past have been en-
titled at common law and otherwise to the exclusive use of
the symbol of a red cross as a trade-mark and otherwise
for chemical, surgical and pharmaceutical goods of every
description, and that the execution of this instrument and
the acceptance by said Johnson & Johnson of a permission
or license from the said American National Red Cross shall
not in any wise affect the right of said Johnson & Johnson
to continue to use the symbol of a red cross as they have
heretofore used it as a trade-mark for the goods of their
production; nor shall this instrument be taken or under-
stood to be a recognition of any right or title in the
said American National Red Cross, nor as an alienation of
any right existing in the said Johnson & Johnson as afore-
said, nor shall it be/construed to create any relation
whatsoever of licensor or licensee, nor otherwise than as
making provision for a voluntary payment on the part of
said Johnson & Johnson to said American National Red
Cross, as hereinafter set forth, for the privileges re-
lating to chemical, surgical and pharmaceutical prepara-
tions, be the same what they may be, conferred upon said
American National Red Cross by virtue of the said bill now
before the Fifty-third Congress, if the same shall become
a statute, de facto, of the United States.

     And the said American National Red Cross does
hereby expressly recognize and admit for the purposes of
this agreement the exclusive right of said Johnson &

Johnson to use in the United States the symbol of a red cross as a trade-mark for chemical, surgical and pharmaceutical goods of every description, and it, the said American National Red Cross, covenants and agrees that it will not in any form or manner contest the right of the said Johnson & Johnson to the exclusive use as a trade-mark of the symbol of a red cross in connection with chemical, surgical and pharmaceutical goods of every description, provided always that the said Protection Bill passes the Fifty-third Congress and becomes a law.

SECOND: That, if the said bill shall be passed by both Houses of the Fifty-third Congress and become a defacto statute of the United States, the said American National Red Cross shall execute and deliver to said Johnson & Johnson, upon demand and without unnecessary delay, an instrument of writing whereby all the privileges whatsoever enjoyed by the said American National Red Cross under such Act in respect of the use of the symbol of a red cross upon chemical, surgical and pharmaceutical preparations shall be transferred and conveyed to said Johnson & Johnson, the same to be held and enjoyed by said Johnson & Johnson to the exclusion of all others, but subject, nevertheless, to the provision that the transfer and conveyance shall become null and void if the said Johnson & Johnson shall fail in any wise to compensate the said American National Red Cross in every way

(3)

as hereinafter set forth:

THIRD:   In consideration of the enjoyment of the privilege in the next preceding section of this instrument described, the said Johnson & Johnson covenant and agree that so long as this instrument shall be in force it, the said Johnson & Johnson, will pay the sum of One Dollar per year, at the main office of the American National Red Cross, in Washington, D. C.   This contract shall not be terminated by non-payment of the annual lease until due notice has been sent Johnson & Johnson and always in writing, allowing at least three months time.

FOURTH:   This instrument shall continue and be in force only so long as the said Johnson & Johnson shall enjoy the exclusive right to the use of the symbol of a red cross in connection with the manufacture and sale of chemical, surgical and pharmaceutical preparations of every description, and if there shall be a use by others in the United States of the symbol of a red cross in connection with any chemical, surgical or pharmaceutical preparation or preparations not made by or for said Johnson & Johnson, the said Johnson & Johnson may at its own expense make reasonable efforts to prevent such competing use of the symbol of a red cross, but if such competing use shall be continued notwithstanding the efforts of said Johnson & Johnson in the premises, and of the said American National Red Cross it, the said Johnson &

(4)

Johnson, shall have the right and privilege, if it shall
so elect, forthwith to terminate and cancel this instru-
ment by written notice to be served upon the said American
National Red Cross, and the service of such written
notice shall be taken to be a termination and cancellation
of this instrument and of all obligations and liabilities
whatsoever created or intended to be created thereby.

*attest*

*Geo. H. Pullman,*
*Secy.*

*Clara Barton,*
*President American Nat'l Red Cross,*

*Johnson & Johnson*
*R. W. Johnson*
*President*

*attest*

*R. W. Johnson Secy*

At a special meeting of the Board of Directors
of the American National Red Cross, of the City of
Washington, District of Columbia, duly called and held on
the Twenty-ninth day of January, 1895, a quorum being
present, IT WAS RESOLVED,

THAT this Society recognizes certain rights of
Johnson & Johnson, a corporation, in their use of a red
cross as a trade-mark, and that the President of this
Society be and hereby is authorized to enter into an
agreement with the said Johnson & Johnson in relation
thereto and to sign the same in behalf of the company,
and that the same shall be binding.

(5)

RESOLVED, THAT the Secretary of the company
also attest the signature of the President in due form.

Exhibit C

*O914*

## AGREEMENT

This Agreement made this 31st day of <u>January</u> 1995 by and between Johnson & Johnson, a New Jersey corporation, having an address at One J&J Plaza, New Brunswick, New Jersey 08933-7001 ("J&J"), and Water-Jel Technologies, Inc., a New York corporation, having a principal place of business at 243 Veterans Boulevard, Carlstadt, New Jersey 07072 ("Water-Jel").

## RECITALS

A.   J&J has used the marks RED CROSS and a Red Cross Design in connection with medical and surgical bandages and dressings, and other health care products since long prior to 1905.

B.   Water-Jel filed applications on July 29, 1993, to register the mark Droplet and Greek Cross Design, Serial No. 74/419,451, and Droplet and Greek Cross Design in a Rectangle, Serial No. 419,598, for intended use in connection with pharmaceutical preparations, namely, burn dressings, lotions, creams and ointments for the treatment of burns, sunburn and skin irritations. The applications were published on January 25, 1994 and J&J has obtained extensions of time within which to oppose the applications.

C.   The parties are desirous of settling their controversy and of avoiding any likelihood of confusion, mistake or deception by the public.

## UNDERTAKINGS

NOW, THEREFORE, in consideration of the above Recitals, the mutual promises and undertakings set forth in this agreement, and other good and valuable consideration being extant, the parties agree as follows:

1.   Water-Jel agrees that it will not use a Greek Cross feature of its marks in red, or in white on a red background.

2.   Water-Jel shall promptly amend application Serial Nos. 74/419,451 and 74/419,598 by entering the following amendment:

> The Applicant disclaims any right to the use of the Greek Cross portion of its mark in red or in white on a red background.

3.   J&J will not oppose the use or registration of the mark shown in application Serial Nos. 74/419,451 and 74/419,598 or of the Greek Cross portions of any other mark of Water-Jel, provided that the terms of ¶¶1 and 2, above, are met.

2827LUBY.0D/329A

4.    Each party may freely assign its marks as set forth in this agreement. However, by taking an assignment, an assignee shall be deemed to have accepted all of the rights and to perform all of the obligations of the assignor under this Agreement.

5.    This Agreement constitutes the entire understanding between the parties regarding the subject matter (into which all prior negotiations, commitments, representations, inducements, and undertakings with respect to the subject matter hereof are merged), and, except as provided herein, there are no other oral or written undertakings or agreements between the parties relating to the subject matter hereof. The terms of this Agreement may not be changed except by consent of the parties in writing.

6.    This Agreement constitutes and shall be deemed a contract made under the laws of the State of New York for any and all purposes, and shall be interpreted and enforced in accordance with such laws.

7.    Each of the parties hereto warrants that it has the authority to bind itself by the signature of the person who signs this Agreement.

8.    This Agreement may be executed in identical counterparts with the same force and effect as if the signatures were all set forth on a single instrument. This Agreement is deemed to be executed as of the last day date on which a party signs a counterpart to this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed by its duly authorized representative on the day, month and year set forth adjacent to each of the parties' signatures hereto.

JOHNSON & JOHNSON

Date: January 31, 1995        By: _____
                                   Roger S. Fine
                              Title: Vice President

WATER-JEL TECHNOLOGIES, INC.

Date: _____, 1994      By: _____

                              Title: President

Exhibit D

# *09/2

## AGREEMENT

THIS AGREEMENT, made effective as of this _7 th_ day of July 2005, by and between JOHNSON & JOHNSON, a New Jersey corporation, having an address at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933-7001 ("J&J") and FIRST AID ONLY INC., a Washington corporation, having an address at 11101 NE 37th Circle, Vancouver, Washington 98682 ("FAO").

## RECITALS

A.    J&J has used and registered the marks RED CROSS and a Red Cross Design in connection with medical and surgical bandages and dressings, first aid kits, skin creams, and other health care products since long prior to 1905, as evidenced by its ownership of U.S. Reg. Nos. 54,308; 1,870,955; 1,888,143 and 1,889,576.

B.    FAO is the owner of application Serial No. 76/394,583 – FIRST AID ONLY & Design for goods in classes 5, 10, 16 and 28.

C.    J&J has evidenced its concern to FAO that there may be a likelihood of confusion, mistake or deception with J&J's RED CROSS and Red Cross Design marks if the design feature of FAO's mark appears solely in red or orange or in white on a red or orange background. FAO disagrees with J&J's allegations, but in the interest of avoiding further legal proceedings is willing to enter into this compromise settlement.

D.    The parties are desirous of avoiding any likelihood of confusion, mistake or deception by the public resulting from the use of their respective marks.

## UNDERTAKINGS

NOW THEREFORE, in consideration of the above Recitals, the mutual promises and undertakings set forth in this Agreement, and other good and valuable consideration being extant, the parties agree as follows:

1.    Effective as of the date identified in paragraph 2, below, FAO will not use the design feature of the mark identified in Serial No. 76/394,583 in whole or in part in the color red or orange, or in white on a red or orange background, or colorable imitations thereof, in connection with the goods identified in said application.

2.    Notwithstanding the terms of paragraph 1 above, FAO may continue using the design feature in red in connection with the goods identified in its application for the limited purpose of selling off its existing inventory and packaging which bears the design feature in red until the earlier of:  a) December 31, 2005, or b) exhaustion of existing inventory.

3.    J&J will not object to the registration of Serial No. 76/394,583 provided that FAO amends the application to enter the following disclaimer:

The quadrilaterals in the mark are not displayed in the color red or orange, or in white on a red or orange background.

4.  J&J will consent to FAO's amendment of Ser. No. 76/394,583 to include a box border around the mark as currently displayed in this application. In the event the proposed amendment is not accepted by the United States Patent and Trademark Office ("PTO"), FAO agrees that any new application to register the same or similar mark will include the disclaimer set forth in paragraph 3 above.

5.  Within fifteen (15) days of receipt of evidence of the PTO's acceptance of the amendments to Ser. No. 76/394,583 contemplated in paragraphs 3 and 4 hereof, J&J will withdraw Opposition No. 91-161,584 without prejudice.

6.  J&J will not oppose any application or seek to cancel any registration of FAO for a mark in the form discussed herein and with the disclaimer described herein, so long as FAO is in compliance with all terms of this Agreement.

7.  J&J will not object to the use of the mark shown in Ser. No. 76/394,583, as-is, or as proposed, provided that FAO is in compliance with the terms of this Agreement.

8.  Each party may freely assign its marks as set forth in this Agreement. However, by taking an assignment, an assignee shall be deemed to have accepted all of the rights and to perform all of the obligations of the assignor under this Agreement.

9.  This Agreement constitutes the entire understanding between the parties regarding the subject matter (into which all prior negotiations, commitments, representations, inducements and undertakings with respect to the subject matter hereof are merged), and except as provided herein, there are no other oral or written undertakings or agreements between the parties relating to the subject matter hereof. The terms of this Agreement may not be changed except by consent of the parties in writing.

10. This Agreement constitutes and shall be deemed a contract made under the laws of the State of New Jersey for any and all purposes, and shall be interpreted and enforced in accordance with such laws.

11. Each of the parties hereto warrants that this it has the authority to bind itself by the signature of the person who signs this agreement.

12. This Agreement may be executed in identical counterparts with the same force and effect as if the signatures were all set forth on a single instrument. This Agreement is deemed to be executed as of the last day date on which a party signs a counterpart to his Agreement.

- 2 -

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed on the day, month and year set forth adjacent to each of the parties' signatures hereto.

JOHNSON & JOHNSON

Date: August 25, 2005

By: _Kaye Foster-Cheek_
Kaye Foster-Cheek
Title: Vice President

FIRST AID ONLY INC.

Date: 7-7, 2005

By: _____

Title: _____Chairman_____

- 3 -

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK      )
                            :ss.:
COUNTY OF NEW YORK    )

         CHRISTINA I. BELANGER, being duly sworn, deposes and says:

         1.      I am over 18 years of age, not a party to this action, and am employed by the law firm of Patterson, Belknap, Webb & Tyler LLP, located at 1133 Avenue of the Americas, New York, New York 10036.

         2.      On September 5, 2007, I served a true copy of the foregoing *FIRST AMENDED COMPLAINT* by overnight courier service (Federal Express) upon the following, directed to him at the address below:

         Jonathan L. Abram, Esq.
         HOGAN & HARTSON, L.L.P
         555 Thirteenth Street, N.W.
         Washington, D.C. 20004

                                    CHRISTINA I. BELANGER

Sworn to before me this
5th day of September, 2007

Notary Public

ELIZABETH WILLIS
Notary Public, State of New York
No. 31-01WI6014358
Qualified in New York County
Commission Expires October 13, 2010