**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE AMERICAN NATIONAL RED CROSS, LEARNING CURVE INTERNATIONAL, INC., MAGLA PRODUCTS, LLC, WATER-JEL TECHNOLOGIES, INC., and FIRST AID ONLY, INC., <br><br> Defendants. | 07 Civ. 7061 (JSR/DCF) <br><br> **DEFENDANT THE AMERICAN NATIONAL RED CROSS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS** <br><br> **ECF CASE** <br> **ELECTRONICALLY FILED** |

**DEFENDANT THE AMERICAN NATIONAL RED CROSS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS**

Defendant The American National Red Cross ("Red Cross" or "Defendant") hereby answers the First Amended Complaint ("Complaint") of Plaintiffs Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc. ("JJCC") ("J&J" or "Plaintiffs").**1/**   Except as expressly admitted herein, Defendant denies each and every allegation set forth in Plaintiffs' Complaint, and the allegations admitted by Defendant herein are only admitted to the extent expressly stated herein.

---

1/      Defendants have also filed a Motion to Dismiss seeking dismissal of the First, Second, Fourth, Seventh and Eighth Claims of Plaintiffs' First Amended Complaint.

## INTRODUCTORY STATEMENT

1.      The Red Cross occupies a unique place among the approximately 100 nonprofit organizations that have been chartered by Congress for patriotic, national, historical and other purposes.    From its inception over a Century ago, the Red Cross has been charged with developing and maintaining a "system of national and international relief in time of peace," applying that system "in mitigating the sufferings caused by pestilence, famine, fire, floods, and other great national calamities," devising and carrying out "measures for preventing the same," and generally "promot[ing] measures of humanity and welfare of mankind."

2.      The Red Cross is the only Congressionally-chartered organization that has been designated as a "treaty obligation organization" due to the Red Cross' responsibilities with respect to U.S. treaty obligations under the Geneva Convention.

3.      While the Red Cross maintains a close relationship with the federal government, particularly in the areas of disaster preparedness and response, the Red Cross is not a federal agency nor does it receive federal funding on a regular basis to carry out its life-saving, emergency preparedness, disaster relief and health and safety services and programs.    Rather, it receives its financial support from voluntary public contributions and from cost-recovery charges for some of its products and services.    These donations and cost-recovery charges are then used to carry out the critical work of the Red Cross, including among other things disaster relief, preparedness, and health and safety services.

4.      In emergencies large and small, the Red Cross provides the injured or displaced with free services and health care, survival, and recovery items and equipment.    Obviously, the Red Cross does not manufacture everything it provides.    The vast majority of items handed out

in emergencies are manufactured by third parties, often for the Red Cross and bearing the Red Cross Emblem.

5.    In addition to providing free supplies and services during times of emergency or disaster, the Red Cross has during most of its history also offered health and safety related products like first aid kits for sale to the American public, promoting preparedness and safety, raising funds, and increasing awareness of preparedness, health and safety issues and of the critical work of the Red Cross.    Like many of the supplies provided in emergencies, these products have also carried the name and Emblem of the Red Cross and have been manufactured by others for the Red Cross.

6.    In recent years, especially since September 11 and Hurricanes Katrina and Rita, the Red Cross has redoubled its efforts to promote emergency preparedness and health and safety by providing the public products that they need, and often including pamphlets with important emergency preparedness and/or health and safety information.    Research shows that only 7 percent of Americans have taken the necessary steps to prepare for disasters, but that 82 percent would get prepared if it was easier to do so.    The Red Cross is therefore providing first-aid and preparedness kits and other supplies in retail locations where Americans regularly shop and online stores where such products can be conveniently purchased, all in keeping with its mission to provide for emergency preparedness and for the health and safety of the American public and also to assist in its fundraising efforts.

7.    In this lawsuit, Johnson & Johnson and its consumer marketing arm, JJCC, seek to stop the Red Cross from doing that.    J&J attacks the Red Cross for using its name and its Emblem on preparedness, first aid, and other health and safety products.    And it attacks the manufacturers who have partnered with the Red Cross as it provides these products to the public

3

− products including first aid and emergency preparedness kits, as well as hand-sanitation products and medical examination gloves.    Initially, J&J demanded the seizure and destruction of these items, a demand shockingly inconsistent with this Country's need to be prepared for the next emergency.    In its amended complaint, J&J has now backed off that outrageous demand, but it persists in claiming that somehow the Red Cross is disabled from furthering its mission in this way.    Indeed, J&J even contends that the Red Cross is engaging in "unfair competition," claiming that the Red Cross' use of its Emblem violates a federal statute – the very statute that Congress enacted to protect the Red Cross' right to use its Emblem in furtherance of its vital mission.

8.      J&J is complaining today because late in the Nineteenth Century one of its founders went to Europe and saw the red cross mark used to convey its universally understood message of first aid, medical and surgical care.    As J&J admits in its amended complaint, its founder returned to the United States bent on appropriating for itself this widely understood medical care signal as a mark to use for its own corporate purposes.

9.      To be sure, Johnson & Johnson did embark on that use.    And when Congress acted in 1905 to protect the Emblem for use by the Red Cross, Johnson & Johnson's existing corporate use of the mark on a limited group of products entitled it to grandfathered status, so that its continued use of the mark on those limited products is not a violation of the criminal law. But J&J has absolutely no right to impede the Red Cross' use of the Emblem, whether directly or through firms that manufacture first aid and emergency preparedness and other items offered by the Red Cross, as it furthers its disaster preparedness and health and safety mission.

## FACTUAL BACKGROUND

**The History of the American Red Cross and the Emblem**

10.     Following the Civil War, Clara Barton visited Europe, where she first heard of the Swiss-inspired Red Cross Movement and served as a Red Cross volunteer during the Franco-Prussian War.   Upon her return to the United States, Ms. Barton formed the American Red Cross on May 21, 1881.   Since at least as early as 1881 (six years earlier than the earliest date of first use Johnson & Johnson identifies in its trademark registrations for the red cross symbol), the American Red Cross, has used the symbol of a Greek red cross on a white background (the "Emblem") in identifying itself and carrying out its objectives.

11.     The early American Red Cross focused on five initial objectives:   (1) to secure adoption of the Geneva Convention by the United States;   (2) to obtain official recognition by the United States government;   (3) to organize a system of national relief and apply the same in mitigating the suffering caused by war, pestilence, famine and other calamities;   (4) to collect and disseminate information on such matters as relief, sanitary science, and hospital service; and (5) to cooperate with other national societies of the Red Cross.

12.     The efforts of the organization were successful.   The United States assumed the obligations of the Geneva Conventions upon ratification in 1882, and Congress chartered the American National Red Cross in 1900 for the purpose of fulfilling the obligations of the United States under the Geneva Conventions as well to "continue and carry on a system of national and international relief in time of peace and apply the same in mitigating the sufferings caused by pestilence, famine, fire, floods, and other great national calamities" and "to devise and carry on measures for preventing the same, and generally to promote measures of humanity and welfare of mankind."   31 Stat. at 279.

13.    The 1900 charter also provided that the Red Cross would succeed to all rights and property previously held by the early American Red Cross founded by Ms. Barton.    *Id*.    This included all rights that the American Red Cross had acquired in the Emblem since its first use of the Emblem at least as early as 1881.    In fact, Clara Barton owned U.S. Registration No. 30,428 covering the Emblem as used in connection with "books, pamphlets, paper, and envelopes" that issued in 1897; that registration lapsed when it became superfluous following enactment of the criminal statute protecting the Emblem, as discussed below.

14.    Since 1900, Congress has re-chartered the Red Cross once (in 1905) and amended the charter at several points in the Red Cross' history.    Notably, the 1905 charter included stricter rules designed to protect the Red Cross against use of the red cross symbol by entities other than the Red Cross.    The 1905 charter made it unlawful for "any person or corporation, *other than the Red Cross of America*, not now lawfully entitled to use the sign of the Red Cross, hereafter to use such sign or any insignia colored in imitation thereof *for the purposes of trade or as an advertisement to induce the sale of any article whatsoever*."    33 Stat. 601 (emphasis added).    Thus, the 1905 charter expressly acknowledged the Red Cross' right to use the Emblem for the purposes of "trade or . . . to induce the sale of any article whatsoever," even as it made similar use by third parties unlawful.    *Id.*

15.    The charter was amended in 1910, but as amended the charter continued to include similar provisions stating that it would be unlawful for any person *other than* the American National Red Cross, its employees and agents, the military medical users and certain pre-1905 users to use the Emblem for the "purpose of trade or as an advertisement to induce the sale of any article whatsoever *or for any business or charitable purpose*."    36 Stat. 604.    Thus,

in addition to the uses secured to the Red Cross under the 1905 charter, the 1910 amendment also made clear that Red Cross' use of the Emblem for "business" purposes was lawful.

16.    In keeping with these charter provisions, the Red Cross has used the Emblem in trade, in connection with the sale of articles and for trade and business purposes, for over a century.   For example, the Red Cross has sold first aid kits bearing the Emblem to the American public since at least as early as 1903.   Attached as Exhibit A are a photograph of such first aid kits as well as printouts from 1917 and 1932 catalogs for goods the Red Cross sold directly to the American public.   Additionally, various products bearing the Emblem, including first aid and related products, have long been sold through the more than 700 local chapters of the Red Cross.

17.    All of this is well encompassed in the Red Cross' core mission.   Indeed, the only limitations on the Red Cross' mission in its original and amended charters are that its activities be in furtherance of its purposes and within its powers, both of which are broadly defined. Among the purposes of the Red Cross are "to carry out a system of national and international relief in time of peace, and apply that system in mitigating the suffering caused by pestilence, famine, fire, floods, and other great national calamities, and to devise and carry out measure for preventing those calamities" and "to conduct other activities consistent with the foregoing purposes."   36 U.S.C. § 300102.   *See also id.* § 300105 (Red Cross empowered to "do any other act necessary to carry out this chapter and promote the purposes of the corporation").

18.    In 1948, the U.S. criminal code was recodified and the provisions imposing criminal penalties for unlawful use of the Emblem were moved from Title 36 of the U.S. Code and placed in Title 18.   Today, the prohibitions against unlawful use of the Emblem are set forth at 18 U.S.C. § 706:

> Whoever wears or displays the sign of the Red Cross or any
> insignia colored in imitation thereof for the fraudulent purpose of

inducing the belief that he is a member of or an agent for the
American National Red Cross; or

Whoever, whether a corporation, association or person, other than
the American National Red Cross and its duly authorized
employees and agents and the sanitary and hospital authorities of
the armed forces of the United States, uses the emblem of the
Greek red cross on a white ground, or any sign or insignia made or
colored in imitation thereof or the words "Red Cross" or "Geneva
Cross" or any combination of these words—

Shall be fined under this title or imprisoned not more than six
months, or both.

19.     Section 706 also provides that it "shall not make unlawful the use of any such

emblem, sign, insignia or words which was lawful on the date of enactment of this title."

Obviously, Section 706 does not in any way make unlawful those activities of the Red Cross

which the 1910 charter explicitly contemplated as lawful, including activities for the purpose of

trade or business and the sale of articles.

**Clara Barton Agreement Between the Red Cross and J&J**

20.     J&J focuses on a document known as the Clara Barton Agreement, entered into in

the late Nineteenth Century.    In 1894, six years before the Red Cross received its first federal

charter, a bill was introduced in Congress that would have forbidden all use of the Emblem by

any person not directly connected with the Red Cross.    H.R. 5580 (introduced February 1894).

Concerned about the implications of that bill on its existing use of the red cross symbol, Johnson

& Johnson sought to protect that use by proposing an agreement with the Red Cross the

following year that would have allowed Johnson & Johnson to continue its use of the red cross

symbol.

21.     It proposed an agreement that was quite clear in its effect:    "*if the said bill shall

be passed* by both the Houses of the Fifty-third Congress and become a de facto statute of the

United States" (emphasis added), then the Red Cross would convey rights in the Emblem for certain goods. Lest there be any misunderstanding, the agreement also expressly recognized certain rights of Johnson & Johnson in the red cross symbol for certain goods for purposes of the agreement only "provided always that the said protection bill passes the Fifty-third Congress and becomes a law."

22. The legislation contemplated by the purported agreement, H.R. 5580, was never enacted into law. Instead, several years later, Congress adopted the 1900 charter of the Red Cross, which grandfathered existing users. Since the Agreement that J&J points to was expressly conditioned on the 1894 bill becoming law, the agreement never took effect. 2/ And that only made sense. As ultimately enacted by Congress, the Red Cross charter protected Johnson & Johnson's existing use of the red cross by grandfathering it. There was therefore no need for any agreement with the Red Cross to permit J&J's grandfathered use of the mark.

**The Work of Today's American Red Cross**

23. The American Red Cross carries out its mission every day and in innumerable ways, large and small. Each year, the American Red Cross responds immediately to more than 70,000 disasters, ranging from house or apartment fires to transportation accidents, explosions, hazardous materials spills, hurricanes, floods, earthquakes, tornadoes, and other natural and man-made disasters. And as it has for nearly a century, the Red Cross works to prepare people

---

2/    This failure of a condition precedent was noted in *Johnson & Johnson v. Seabury & Johnson*, 67 A. 36, 37 (N.J. Ct. Err. & App. 1907) (finding that the statement that the Red Cross had granted complainant exclusive use of the Red Cross trade-mark was "untrue"). J&J has also acknowledged in Congressional hearings that the failure of the bill to become law rendered the contract null.

Ironically, it appears that the purported agreement would have been ineffective regardless of the fate of H.R. 5580. The bill clearly specified that any grant of permission from the Red Cross for the continued commercial use of the Emblem must be supported by a minimum consideration of $500 in order to be effective. The purported agreement provided for a

to save lives through health and safety education and training.    From first aid, CPR and blood borne pathogens training to swimming and lifeguarding, HIV/AIDS education and babysitter training, Red Cross preparedness programs help people lead safer and healthier lives.    Last year, nearly 11 million people enrolled in American Red Cross health and safety courses.

24.    Since its inception, the Red Cross has used the Emblem in connection with all of its services and products, and in this Country, the Emblem has thus become ubiquitous and synonymous with the Red Cross and its services and products.

25.    The Red Cross receives its financial support from voluntary public contributions and from cost-recovery charges for some of its products and services, including blood and blood products, health and safety training courses, and the products that are the subject of J&J's lawsuit. For example, the Red Cross' biomedical services operation collects over 40% of the blood donated by Americans each year, and its blood-related sales accounted for over a third of the Red Cross' consolidated operating revenue in the fiscal year ending June 30, 2006.    Contributions from donors around the country and around the world accounted for an even higher percentage, totaling nearly $2.5 billion in the most recent year.    *See* Red Cross Consolidated Statement of Activities for the year ended June 30, 2006.    These and other means of financial support permit the Red Cross to carry out its critical work.

26.    The Red Cross has sought to further its mission and supplement its financial support in various ways over the years.    In the last decade, for example, the Red Cross has entered into cause-related marketing agreements with companies that agree to donate a share of the proceeds from the sale of certain goods.    And, for about a century, the Red Cross has also supported its work by offering to the public health and safety-related products like first aid kits.

---

consideration of $1 per year.

27.    As described above, recent national disasters have made emergency preparedness and response top priorities in this Country.    The Red Cross has responded in myriad ways too complex and numerous to detail here.    Among its many other initiatives, the Red Cross redoubled its efforts to provide needed emergency and health supplies and raise funds through the offering of first aid, emergency preparedness, and other supplies consistent with its mission. These items include those that J&J attacks in this lawsuit, first aid and emergency preparedness kits, hand-sanitation products and medical examination gloves.

28.    In many cases, these products include pamphlets or other informational material designed to inform the public about emergency preparedness, first aid, or other important health- and safety-related subjects.    For example, Red Cross first aid kits that are offered in partnership with Learning Curve provide information on infant CPR classes provided by the Red Cross. And not surprisingly, in virtually every case - whether an item is given away during an emergency or sold to the public − Red Cross supplies and products bear the American Red Cross name and Emblem and are manufactured and distributed by third parties who partner with the Red Cross for that purpose.    Among the parties the Red Cross has partnered with are the other defendants J&J has sued in this case − Magla, Water-Jel, Learning Curve, and FAO.

29.    These products are sold through the Red Cross' website, through the more than 700 local chapters of the Red Cross, in retail stores such as CVS and Target, directly to employers and institutions and as part of first aid and related training programs.    As noted above only seven percent of Americans have taken the necessary steps to prepare for disasters, but 82 percent would get prepared if it was easier to do so.    So by offering its first-aid and preparedness products in retail locations where Americans regularly shop and online stores

where such products can be conveniently purchased, the Red Cross is fulfilling its obligations under its charter to devise a plan for preparing Americans for emergencies.

30.     There is nothing remarkable, and certainly nothing unlawful, about the Red Cross partnering with manufacturers or distributors to assist in making and providing supplies and products to the public.    The federal criminal statute securing the Red Cross' right to use the Emblem makes clear that the Red Cross may authorize agents like manufacturers and distributors to place the Emblem on Red Cross products in carrying out the mission of the Red Cross. 18 U.S.C. § 706.

31.     The Department of Justice recognized this right in an October 11, 1978 opinion letter:

> However, when such action serves a purpose reasonably related to the proper activities and needs of the ANRC, a request by the ANRC that a non-ANRC entity or person utilize the insignia in the course of an activity furthering in reasonable degree the operation for the ANRC, that entity or person would appear to us to be a duly authorized agent of the ANRC for the given purpose and thus without the prohibitions of the statute.

The Red Cross products being offered in partnership with Magla, Water-Jel, Learning Curve, and FAO are precisely the kind of activities that the Department of Justice has opined to be within the bounds of 18 U.S.C. § 706.

**Legislative History**

32.     J&J seeks support for its attack on this Red Cross effort by pointing to snippets from legislative hearings that took place just after Worlds Wars I and during World War II.    A review of this legislative history establishes four important propositions.

33.     *First*:    In the era roughly spanning World Wars I and II, the Red Cross had a general policy against participating in what were then thought of as "commercial" ventures.

But Red Cross unquestionably sold products to the public in that era, as it had since at least the turn of the Twentieth Century. Although Congress heard about such sales during the 1942 hearings − and even heard Johnson & Johnson complain that the Red Cross had permitted Johnson & Johnson's competitors to use the Emblem − Congress did not then enact, and has never enacted, a prohibition on such use of the Emblem by the Red Cross.

34. *Second*: The Red Cross' general policy was just that − a policy. To be sure, Red Cross witnesses did testify during the 1942 hearings that the Red Cross charter did not permit it to operate as a profit-making commercial enterprise; it is, after all, the Red Cross. But Red Cross witnesses also made clear their understanding that it was proper for Red Cross to raise revenue through sales and other commercial activity in order to support the organization's vital humanitarian mission.

35. *Third*: In 1942, Congress considered − and rejected − proposed legislation that would have prohibited the Red Cross from using the Emblem for commercial purposes. J&J is now asking this Court to do precisely what Congress declined to.

36. *Fourth*: During the 1942 hearings, Johnson & Johnson itself testified that allowing use of the Emblem by Red Cross "employees and agents" – a provision that existed at the time in the Red Cross charter and that still exists today in 18 U.S.C. § 706 – would appear to authorize the Red Cross to use the Emblem for commercial purposes. J&J now claims exactly the opposite.

37. **The 1919 Hearing**. At the 1919 congressional hearing, a Red Cross lawyer testified that "[t]he Red Cross *adopted the policy* that [it] would not accept any division of profits with any concern so as to be in any sort of commercial venture." *To Protect the Name "Red Cross": Hearing Before the H. Comm. on Patents*, 65th Cong. 19 (1919) (statement of Col.

Hartfield, Legal Advisor, Red Cross War Council) (emphasis added).    *See also id*. at 9 ("We

have refused to permit [corporations] to divide profits with us or to advertise in our publication.")

(statement of Col. Hartfield).

38.    **The 1942 House Hearings**.    In 1942, further hearings were held in both houses

of Congress.    *See Protection of the Name and Emblem of the Red Cross:    Hearings on H.R.*

*6911 Before the H. Comm. on Foreign Affairs*, 77th Cong. (1942) (hereinafter, "House

Hearings"); *Red Cross:    Hearings on S. 2411 and H.R. 7420 Before a Subcomm. of the S.*

*Comm. on the Judiciary*, 77th Cong. (1942) (hereinafter, "Senate Hearings").

39.    The House Hearings came first.    Norman Davis, the Chairman of the Red Cross,

and August Belmont, a member of the Red Cross Central Committee, testified at those hearings.

As J&J notes, the Red Cross witnesses expressed the view that the organization did not and

could not engage in "commercial" activity or make "profits."    But they also explained that it

was necessary and proper for the organization to sell Red Cross products and engage in other

revenue-raising activities in order to support the Red Cross' important humanitarian work.

40.    For example, when Mrs. Belmont was asked about another witness' claim that the

Red Cross had purchased and distributed books of matches bearing the Emblem in an advertising

effort, she responded:

> I assume it is correct that they have been purchased.    I would like
> to say on behalf of the American Red Cross, about the purchase of
> matches, that *we not only do our work, but we raise funds to pay
> for it*.    These funds are given to us by the people of the United
> States who feel that the American Red Cross is theirs; people in
> all walks of life give to the Red Cross.

House Hearings at 251 (emphasis added).

41.     She later explained that sales of products by the Red Cross do not make profits because the revenues raised are used to finance the organization's humanitarian work just as they are today:

> Mr. Vorys:    . . . [T]he truth is that you do not make any profits at all; is that true?
>
> Mrs. Belmont:    The truth is that we not only do not make profits but we must go out to the public again for more money to carry on this great service program in which every part of the country is participating.

*Id*. at 257.

42.     Appearing at the hearing alongside Mrs. Belmont, Mr. Davis testified in response to a question posed by Rep. Mundt that the Red Cross "does not go into commercial enterprises at all."    *Id*. at 252.    When asked whether the Red Cross charter permitted the Red Cross to do so, he testified as follows:    "No, sir; it does not.    I do not think so."    *Id*.    Immediately thereafter, however, he qualified his (already equivocal) statement.    The hearing transcript continues:

> The Chairman:    May the Chair ask − you do sell books and things there?
>
> Mr. Davis:    *For our own needs, we can sell things; we have got power to buy and sell things*.
>
> The Chairman:    But not for commercial purposes?
>
> Mr. Davis:    No.
>
> The Chairman:    Does that answer your question, Mr. Mundt?
>
> Mr. Mundt:    Well, partially . . . .

*Id*. at 252-253 (emphasis added).

43.     Thus, Mrs. Belmont's testimony clarified that the Red Cross did indeed sell

products and generate revenue from such sales.    She also later explained that the Red Cross did

not make much profit on these sales.    House Hearings at 253.    The clear message was that then,

as now, the Red Cross used revenues from sales to further its humanitarian work, and the Red

Cross witnesses did not view such sales as "commercial" or as making "profits."

44.    The legislative record reflects that Committee members − and perhaps the entire

Committee − agreed with Mrs. Belmont that the Red Cross must be allowed to raise revenue and

use the Emblem to finance its humanitarian mission:

> Mr. Kee:    Wouldn't it be rather, not only unfortunate, but
> disastrous, if the Red Cross was restricted from engaging in any
> sort of an enterprise that would bring a return into the
> organization?
>
> Mrs. Belmont:    I am sure that our chairman stated what would be
> the will of the American people; that the Red Cross would not wish
> to undertake a commercial enterprise.    From the point of view of
> educational material, the tools, *such as our first aid kit*, let us say,
> that is something that would have to be sold because no private
> organization could afford to give this material away in the numbers
> that are required for use.
>
> Mr. Kee:    We should not pass any act to restrict the people
> themselves, from under the insignia of the Red Cross, carrying
> on fairs and bazaars and enterprises of that kind, lectures, for the
> purpose of raising money for this worthy purpose; it is being done
> every year, and all of the time, isn't it?
>
> Mrs. Belmont:    *I would not consider that a commercial enterprise.*
> That is a philanthropic effort to raise money to meet the needs of
> the Red Cross, and the Red Cross receives 100 percent of such
> proceeds. . . .
>
> Mr. Kee:    *You do not consider that your using of even the emblem
> of the Red Cross in the sale of some commodity for the use and
> benefit of the organization would be objectionable at all*, any more
> so than the private enterprises use their trade-marks, they have a
> monopoly on their trade-marks, and use their emblem to shove
> their enterprises to success, and *what objection would there be to
> the Red Cross, an organization for charity and humanity, using
> their emblem to raise funds for the benefit of their organization?*

> *I do not see any need of restricting that*.
>
> The Chairman:    *I just want to say that he is right*.
>
> Mr. Kee:    I did not mean to testify.
>
> Mrs. Belmont:    I am glad that you did testify.
>
> Mr. Kee:    I do not mean to speak for members of the committee but *I think that all of the members of the committee agree with everything that you have said* . . . .

House Hearings at 257-258 (emphases added).

45.    The Red Cross also made clear that its sales of products were not equivalent to becoming involved in commercial ventures, something that was thought to be incompatible with its status as a charitable organization.    After the House Hearings, Mr. Davis provided to the Committee a letter that further clarified his testimony and the views of the Red Cross.    In the letter, he explained that the Red Cross did not and could not engage in commercial activities just *in order to turn a profit*.    His letter stated:

> The American Red Cross is not now engaged in any commercial venture *for profit*, has no intention of engaging in such operations, and is advised that the provisions of its charter, by which it is bound, would not permit it to engage in commercial enterprises *for profit*.    If there was any misunderstanding with respect to this situation, I    hope you will permit this letter to be placed in the record.

Letter from Norman Davis to Committee Chairman Sol Bloom, *reprinted in* House Hearings at 262 (emphases added).

46.    Also included in the record was the written statement of James McClintock, Vice Chairman in Charge of Finance, American Red Cross.    *See* House Hearings at 266-269.    Mr. McClintock's statement confirmed that in general, the Red Cross raised funds through donations, not through sales of products.    He stated:

> The Red Cross has never sought to raise funds from the public by
> purchasing or manufacturing supplies for sale.   Friends of the Red
> Cross have often presented attractive proposals of this sort which
> they believed would result in raising large sums of money for the
> Red Cross, but *as a matter of policy* such fund-raising methods
> have never been adopted by the Red Cross.

Statement of James McClintock, *reprinted in* House Hearings at 267 (emphasis added).

47.    **The Senate Hearings**.    The Senate Hearings were held a few months after the

House Hearings.    At the time, the Senate was considering a House bill, H.R. 7420, that would

have revised the Red Cross' charter to prohibit the Red Cross from using the Emblem for

"business or commercial purposes."    The proposed provision, § 5, would have amended the Red

Cross' charter to state that the charter shall not "be construed to authorize the American National

Red Cross, its employees or agents . . . to use the Red Cross for purposes of advertising to induce

the sale of any article for profit or for any business or commercial purpose."    H.R. 7420, § 5,

*reprinted in* Senate Hearings at 3.

48.    This proposed limitation on the Red Cross' ability to use the Emblem was not

enacted by the 77th Congress and has not been by any subsequent Congress.    Indeed, the Red

Cross strongly objected to § 5 of H.R. 7420.    As H.J. Hughes, the General Counsel of the Red

Cross, testified:

> I might say on that point that the American Red Cross feels that
> the inclusion of a clause like that . . . violates all basic principles
> of corporate charter law in that it is the only charter of any
> corporation that I know of where affirmative provisions are
> contained, determining what a corporation shall not do rather
> the normal corporate charter which sets forth what a corporation
> may do.   The American Red Cross would certainly feel that that
> anomalous insertion into our basic corporate charter should be
> removed [from the bill], and we hope its removal will have the
> favorable consideration of the Senate committee.

Senate Hearings at 6.   *See also* House Hearings at 252 ("I do not think it is the proper place to

18

determine what the Red Cross should do and shall not do.") (statement of Norman Davis,

Chairman, Red Cross).

49.    Mr. Hughes also presented a June 8, 1942 letter written by Attorney General

Francis Biddle.   The letter, written in General Biddle's capacity as "counselor" to the Red Cross,

responded to a question posed by Mr. Davis regarding the powers of the Red Cross as a federally

chartered charitable organization.   The Biddle letter states that the Red Cross "was granted no

powers, either directly or by implication, to engage in ordinary commercial manufacturing or

mercantile activities" and concludes that "[f]or the reasons thus briefly indicated it is clear that

the American Red Cross is not empowered to engage in business of a commercial or

manufacturing character in competition with private business."   Letter from Francis Biddle to

Norman Davis, *reprinted in* Senate Hearings at 6.

50.    The Biddle letter did not suggest that the Red Cross could not sell Red Cross

products in order to further and fund the organization's critical humanitarian work.   To the

contrary, the Red Cross was a charitable organization, not a commercial enterprise.   Thus, after

introducing the Biddle letter, Sen. O'Mahoney asked Mr. Hughes a question about § 5, the

proposed prohibition on commercial use of the Emblem by the Red Cross:

> Sen. O'Mahoney:   Your point is that section 5 of this bill
> undertakes to prohibit something which the Red Cross is not
> authorized to do by its charter?
>
> Mr. Hughes:   That is it; yes, sir.

Senate Hearings at 6.

56.    Of course, in the House Hearings, Red Cross witnesses had established (1) that

the Red Cross' general policy against commercial activity was only that − a matter of policy; (2)

that the Red Cross had indeed sold first aid kits and other products and raised revenue to support

its humanitarian work; and (3) that the Red Cross charter prohibited the Red Cross from engaging in commercial activities *for profit*.    Mr. Hughes referenced the record developed in the House Hearings immediately after the above-quoted exchange took place.    *See id.* ("The Red Cross feels that the hearings which occurred before the House were so extensive and we were given such a generous opportunity to present the Red Cross point of view that there isn't much that we could add at this time . . . .").

57.    Later in the hearing, Mr. Hughes again informed Congress that the Red Cross had, in fact, sold certain Red Cross products, such as first-aid kits, to the public, making clear not only that they were sold but also that doing so was not prohibited.    *Id.* at 28.    Obviously, Mr. Hughes' testimony that Red Cross first-aid kits had been sold to members of the public confirms that his answer to Sen. O'Mahoney's question regarding proposed § 5 cannot be read as J&J does, to mean that the charter prohibited sales of such products by the Red Cross.    Mr. Hughes testified that kits "are sold."    *Id.*    And he testified that doing so was not unlawful under the charter.    *Id.*

58.    Helpfully, Johnson & Johnson made the record even more clear.    Immediately after Mr. Hughes spoke, Kenneth Perry, the Secretary of Johnson & Johnson, testified, presenting evidence that the Red Cross had advertised kits for sale to the general public and had even allowed the Emblem to be used by one of J&J's competitors:

> I have here the 1914 and 1915 [Red Cross] catalogs.    From these catalogs it appears that the kits were advertised for distribution and sale generally to the public; and that the products thus sold commercially under the red-cross symbol were those of our competitor Bauer & Black.
>                          *        *        *
> I direct attention in these catalogs of 1914-15 to the advertising material on the opening page, inviting the public to buy and calling attention to the merits and reasonable price of the product.    I also direct attention to the fact that while all of the products were sold

> under the auspices of the American National Red Cross, that the
> Red Cross insignia appears on the product of our competitor Bauer
> & Black . . . .

*Id*. at 29.   *See also* House Hearings at 170 (statement of Mr. Perry of J&J) ("[W]e have felt very

bad about the fact that the American Red Cross has really endorsed the product of Bauer &

Black, our principal competitor, in its own price lists.").

59.    Thus, Congress was well aware in 1942 of Johnson & Johnson's claim that the

Red Cross had advertised products for sale to the general public and had permitted a Johnson &

Johnson competitor to use the Emblem on its products.    But Congress declined to enact a

prohibition on commercial use of the Emblem by the Red Cross.    J&J is now essentially asking

this Court to enact a prohibition which Johnson & Johnson was unable to secure from Congress.

60.    That is even more striking in view of Johnson & Johnson's testimony through Mr.

Perry that allowing use of the Emblem by "employees and agents" of the Red Cross would

appear to allow the Red Cross to use the Emblem for commercial purposes.    He explained his

view that, without the prohibition in § 5, the Red Cross would be allowed to make commercial

use of the Emblem:

> I also call attention to the fact that the language in H.R. 7420, in
> section 4 as amended, would appear, except for the prohibition
> later contained in this act to permit commercial use by the
> American National Red Cross of the Red Cross symbol in
> commerce.

*Id*.   Pointing to (and paraphrasing) bill language making Emblem use "unlawful for any persons,

firms, and so forth, except the American Nation Red Cross and its duly authorized employees

and agents," Mr. Perry testified that "[t]he exception *would appear to give them permission to

use it for commercial purpose*."    *Id*. (emphasis added).

61.    The "employees and agents" exception, of course, *was already in* the Red Cross'

charter, and had been since 1910.    *See* 36 Stat. 604.    In 1948, the "employees and agents"

exception was moved to 18 U.S.C. § 706, and it remains in § 706 to this day.    The legislative

history thus reveals that it was none other than J&J itself who testified to Congress that the same

"employees and agents" exception that existed at the time and that still exists in § 706 appears to

permit "commercial" use of the Emblem by the Red Cross.

## ANSWER

1.      Paragraph one is mere characterization of the Complaint and requires no

admission or denial.    Defendant denies the remaining allegations in numbered paragraph 1.

2.      Defendant denies the allegations in numbered paragraph 2.    Defendant hereby

incorporates its Introductory Statement.

3.      Defendant denies the allegations in numbered paragraph 3.    Defendant hereby

incorporates its Introductory Statement.

4.      Defendant denies the allegations in numbered paragraph 4.    Defendant hereby

incorporates its Introductory Statement.

5.      Defendant admits that J&J has donated $5 million to the Red Cross in the past

three years.    Defendants denies or is without sufficient information to form a belief as to the

truth of the allegations asserted in numbered paragraph 5 and therefore denies those allegations

in numbered paragraph 5.

6.      Defendant admits the allegations in numbered paragraph 6.

7.      Defendant admits that J&J is a New Jersey corporation with a place of business at

One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933-7001.

8.      Defendant admits that JJCC is a New Jersey corporation with a place of business

at 199 Grandview Road, Skillman, New Jersey 08558.    Defendant lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations asserted in numbered paragraph 8 and therefore denies those allegations.

9.      Defendant admits the allegations in numbered paragraph 9.

10.     Defendant admits the allegations in numbered paragraph 10.

11.     Defendant admits the allegations in numbered paragraph 11.

12.     Defendant denies the allegations in numbered paragraph 12.

13.     Defendant admits the allegations in numbered paragraph 13.

14.     Defendant admits the allegations in numbered paragraph 14.

15.     Defendant admits the allegations in numbered paragraph 15.

16.     Defendant admits the allegations in numbered paragraph 16.

17.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 17 and therefore denies those allegations.

18.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 18 and therefore denies those allegations.

19.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 19 and therefore denies those allegations.

20.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 20 and therefore denies those allegations.

21.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 21 and therefore denies those allegations.

22.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 22 and therefore denies those allegations.

23.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 23 and therefore denies those allegations.

24.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 24 and therefore denies those allegations.

25.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 25 and therefore denies those allegations.

26.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 26 and therefore denies those allegations.

27.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 27 and therefore denies those allegations.

28.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 28 and therefore denies those allegations.

29.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 29 and therefore denies those allegations. Defendant further states that the decisions cited by Plaintiffs pre-date the 1905 charter which found the Red Cross' use of the Emblem for trade purposes and the sale of article to be lawful and hereby incorporates its Introductory Statement.

30.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 30 and therefore denies those allegations.

31.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 31 and therefore denies those allegations.

32.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 32 and therefore denies those allegations.

33.     Defendant denies that J&J's use of the Red Cross Emblem has come to represent the enormous goodwill of J&J in connection with first-aid products.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations asserted in numbered paragraph 33 and therefore denies those allegations.

34.     Defendant admits to the allegations in numbered paragraph 34.

35.     Defendant admits that Clara Barton founded the American Red Cross in 1881 for the purpose, among other things, of securing adoption of the Geneva Convention by the United States.    Defendant denies that the original American Red Cross was first incorporated in 1893 as stated (the American Red Cross was first incorporated in 1881), and denies the allegations in numbered paragraph 35.

36.     Defendant admits that Barton incorporated the organization that is the predecessor to the Red Cross under the name the American Association of the Red Cross, but denies the remaining allegations in numbered paragraph 36.    Defendant denies the remaining allegations in numbered paragraph 36.

37.     Defendant denies that the purposes of the Red Cross are entirely noncommercial and hereby incorporates its Introductory Statement.    Defendant further states that the Red Cross' 1900 charter speaks for itself and denies Plaintiffs' characterization thereof.

38.     Defendant admits that the Red Cross' charter vests the Red Cross with the right to use the Red Cross Emblem.    Defendant further states that the Red Cross' 1900 charter speaks for itself and denies Plaintiffs' characterization thereof.

39.     Defendant admits that the Red Cross' charter has been amended.    Defendant further states that the Red Cross' charter and amendments thereto speaks for themselves and denies Plaintiffs' characterization thereof.

40.    Defendant admits that the Red Cross sought to prohibit all third party use of the Red Cross Emblem in the United States other than by the Red Cross.    Defendant denies the remaining allegations in numbered paragraph 40.

41.    Defendant admits that the Red Cross submitted a bill to Congress in 1894 seeking protection of the Red Cross Emblem in the United States and further states that the bill speaks for itself and hereby incorporates its Introductory Statement.    Defendant denies Plaintiffs' characterization of the bill in numbered paragraph 41.

42.    Defendant states that the 1894 bill speaks for itself and denies Plaintiffs' characterization of the same in numbered paragraph 42.

43.    Defendant denies that J&J and the Red Cross reached a signed and binding contractual agreement and hereby incorporates its Clara Barton Agreement Between the Red Cross and J&J discussion.    Defendant further states that the document dated January 29, 1895 signed by R.W. Johnson and Clara Barton speaks for itself and denies Plaintiffs' characterization thereof.

44.    Defendant hereby incorporates its answer to numbered paragraph 43.

45.    Defendant hereby incorporates its answer to numbered paragraph 43.

46.    Defendant hereby incorporates its answer to numbered paragraph 43.

47.    Defendant admits that the bill referenced in the 1895 Document never became law and hereby incorporates its Clara Barton Agreement Between the Red Cross and J&J discussion. Defendant further states that Congressional history speaks for itself and denies Plaintiffs' characterization thereof in numbered paragraph 47.

48.    Defendant denies the allegations in numbered paragraph 48 and hereby incorporates its Introductory Statement.

49.     Defendant admits that the first Congressional charter for the Red Cross was passed in 1900.   Defendant further states that the 1900 Congressional charter speaks for itself and denies Plaintiffs' characterization thereof in numbered paragraph 49.

50.     Defendant admits that in 1905 Congress amended the Congressional charter for the Red Cross and states that the 1905 Congressional charter speaks for itself.   Defendant hereby incorporates its Introductory Statement.     Defendant denies the remaining allegations in numbered paragraph 50, including Plaintiffs' characterization of the 1905 Congressional charter.

51.     Defendant states that the 1905 Congressional charter speaks for itself and denies Plaintiffs' characterization of the same in numbered paragraph 51.   Defendant hereby incorporates its Introductory Statement.

52.     Defendant admits that the 1910 charter offered the Red Cross further protection against third party use of the Red Cross Emblem and hereby incorporates its Introductory Statement.   Defendant denies the remaining allegations in numbered paragraph 52.

53.     Defendant admits that the Red Cross' Congressional charter was amended in 1910 and further states that the 1910 charter speaks for itself and hereby incorporates its Introductory Statement.   Defendant denies Plaintiffs' characterization of the 1910 charter.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in numbered paragraph 53 and therefore denies those allegations.

54.     Defendant states that the 1910 charter speaks for itself and denies Plaintiffs' characterization of the same in numbered paragraph 54.   Defendant hereby incorporates its Introductory Statement.

55.     Defendant denies the allegations in numbered paragraph 55.   Defendant hereby incorporates its Introductory Statement.

56.     Defendant denies that 18 U.S.C. § 706 prohibits the Red Cross from licensing or allowing use of the Emblem by third parties for purposes consistent with the Red Cross charter and hereby incorporates its Introductory Statement.    Defendant admits to the remaining allegations of numbered paragraph 56.

57.     Defendant states that the federal statutes referenced in numbered paragraph 57 speaks for themselves and denies Plaintiffs' characterization of the same in numbered paragraph 57.   Defendant hereby incorporates its Introductory Statement.

58.     Defendant admits the allegations in numbered paragraph 58.

59.     Defendant denies the allegations in numbered paragraph 59 and hereby incorporates its Introductory Statement.

60.     Defendants denies the allegations in numbered paragraph 60.    Defendant hereby incorporates its Legislative History discussion in response to numbered paragraph 60.

61.     Defendant admits that Col. Hartfield, Legal Advisor, Red Cross War Council, testified before Congress in 1919.    Defendant states that his complete testimony speaks for itself.   Defendant denies the remaining allegations in numbered paragraph 61, including Plaintiffs' characterization of the quoted materials.    Defendant hereby incorporates its Legislative History discussion in response to numbered paragraph 61.

62.     Defendant states that the quoted materials referenced in numbered paragraph 62 speak for themselves.    Defendant denies the remaining allegations in numbered paragraph 62, including Plaintiffs' characterization of the quoted materials.    Defendant hereby incorporates its Legislative History discussion in response to numbered paragraph 62.

63.     Defendant admits that in 1942 Red Cross General Counsel H.J. Hughes testified before the House Committee on Foreign Affairs (not, as stated, the House Committee on Foreign

Relations).    Defendant states that his testimony speaks for itself.    Defendant denies the

remaining allegations in numbered paragraph 63, including Plaintiffs' characterization of the

quoted materials.    Defendant hereby incorporates its Legislative History discussion in response

to numbered paragraph 63.

64.    Defendant admits that the written statement of James McClintock, Red Cross

Vice Chairman in Charge of Finance, was submitted to Congress.    Defendant states that his

complete testimony speaks for itself.    Defendant denies the remaining allegations in numbered

paragraph 64, including Plaintiffs' characterization of the quoted materials.    Defendant hereby

incorporates its Legislative History discussion in response to numbered paragraph 64.

65.    Defendant admits that Red Cross Chairman Norman Davis testified before

Congress.    Defendant states that his complete testimony speaks for itself.    Defendant denies

the remaining allegations in numbered paragraph 65, including Plaintiffs' characterization of the

quoted materials.    Defendant hereby incorporates its Legislative History discussion in response

to numbered paragraph 65.

66.    Defendant admits that the Red Cross opposed a legislative proposal that would

have prohibited the Red Cross from using the Red Cross Emblem for purposes of advertising to

induce the sale of any article for profit or for any business or commercial purpose but denies that

the proposal would have enacted a ban on the Red Cross engaging in commercial activity, as

stated.    Defendant states that the quoted materials referenced in numbered paragraph 66 speak

for themselves.    Defendant denies the remaining allegations in numbered paragraph 66,

including Plaintiffs' characterization of the quoted materials.    Defendant hereby incorporates its

Legislative History discussion in response to numbered paragraph 66.

67.    Defendant admits that a letter from Francis Biddle to Norman Davis dated June 8,

1942 was submitted to Congress.    Defendant states that the quoted materials referenced in numbered paragraph 67 speak for themselves.    Defendant denies the remaining allegations in numbered paragraph 67, including Plaintiffs' characterization of the quoted materials. Defendant hereby incorporates its Legislative History discussion in response to numbered paragraph 67.

68.    Defendant states that the quoted materials referenced in numbered paragraph 68 speak for themselves.    Defendant denies the remaining allegations in numbered paragraph 68, including Plaintiffs' characterization of the quoted materials.    Defendant hereby incorporates its Legislative History discussion in response to numbered paragraph 68.

69.    Defendant admits that a J&J representative and a Red Cross representative were present at the hearings.    Defendant states that the quoted materials referenced in numbered paragraph 69 speak for themselves.    Defendant denies the remaining allegations in numbered paragraph 69, including Plaintiffs' characterization of the quoted materials.    Defendant hereby incorporates its Legislative History discussion in response to numbered paragraph 69.

70.    Defendant admits that Congress did not pass the proposed provision barring the Red Cross from engaging in commercial activities and further states that Congress has never passed any provision barring the Red Cross from engaging in commercial activities in order to further its authorized purposes.    Defendant denies the remaining allegations contained in numbered paragraph 70.    Defendant hereby incorporates its Legislative History discussion in response to numbered paragraph 70.

71.    Defendant admits that the legislation pending in 1895 was never enacted but denies the allegations contained in numbered paragraph 71.    Defendant hereby incorporates its Introductory Statement.

72.    Defendant states that the criminal statute speaks for itself and denies Plaintiffs' characterization of the same.    Defendant denies that the Red Cross has no right to license or allow use of the Emblem by third parties for purposes consistent with the Red Cross charter and hereby incorporates its Introductory Statement.    Defendant admits the remaining allegations of numbered paragraph 72.

73.    Defendant states that its cease and desist letters speak for themselves and denies Plaintiffs' characterization of the same.    Defendant denies the remaining allegations of numbered paragraph 73.

74.    Defendant states that the flyer referenced in paragraph numbered 74 speaks for itself but otherwise denies the remaining allegations in paragraph numbered 74, including Plaintiffs' characterization of such statements.    Defendant hereby incorporates its Introductory Statement.

75.    Defendant states that the webpage referenced in paragraph numbered 75 speaks for itself but otherwise denies the remaining allegations in paragraph numbered 74, including Plaintiffs' characterization of such statements.

76.    Defendant states that the publication referenced in paragraph numbered 75 speaks for itself but otherwise denies the remaining allegations in paragraph numbered 75, including Plaintiffs' characterization of such statements.

77.    Defendant denies the allegations in numbered paragraph 77.

78.    Defendant denies the allegations contained in numbered paragraph 78.

79.    Defendant admits that J&J joined the Red Cross as a co-defendant/counterclaim plaintiff in an action brought by Microflex Corporation in 2000 but otherwise denies the remaining allegations contained in numbered paragraph 79.

80.     Defendant denies the allegations contained in numbered paragraph 80.

Defendant incorporate by reference its Introductory Statement.

81.     Defendant admits that in 2006 the Red Cross entered into an agreement with

Warner Lambert Company.    Defendant denies the remaining allegations in numbered paragraph

81.

82.     Defendant admits that the Red Cross has entered into agreements with Learning

Curve, Water-Jel, Magla and FAO but otherwise denies the remaining allegations in numbered

paragraph 82.

83.     Defendant admits that Water-Jel entered into an agreement with J&J.    Defendant

denies the remaining allegations in numbered paragraph 83.

84.     Defendant admits that FAO entered into an agreement with J&J.    Defendant

denies the remaining allegations in numbered paragraph 84.

85.     Defendant denies the allegations in numbered paragraph 85.

86.     Defendant denies the allegations in numbered paragraph 86.

87.     Defendant admits that the Red Cross' first-aid kits are sold in retail locations but

otherwise denies the remaining allegations in numbered paragraph 87.

88.     Defendant admits that the Red Cross sells hand-sanitation products but otherwise

denies the allegations in numbered paragraph 88.

89.     Defendant denies the allegations in numbered paragraph 89.

90.     Defendant admits that the Red Cross' first aid kits are sold in retail locations but

otherwise denies the remaining allegations in numbered paragraph 90.

91.     Defendant admits that the Red Cross' medical examination gloves are sold in

retail locations but otherwise denies the remaining allegations in numbered paragraph 91.

92.     Defendant states that the federal charter and statute reference in numbered paragraph 92 speaks for themselves and denies the allegations in numbered paragraph 92, including Plaintiffs' characterization of the same.   Defendant hereby incorporates its Introductory Statement.

93.     Defendant states that the webpage referenced in numbered paragraph 93 speaks for itself and denies the allegations in numbered paragraph 93, including Plaintiffs' characterization of the same.

94.     Defendant states that the webpage referenced in numbered paragraph 94 speaks for itself and denies the allegations in numbered paragraph 94, including Plaintiffs' characterization of the same.

95.     Defendant denies the allegations contained in numbered paragraph 95.

## FIRST CLAIM

96.     Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 96 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 96.

97.     Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 97 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 97.

98.     Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 98 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 98.

99.     Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 99 relates, and accordingly Defendant need not answer the

allegations set forth in numbered paragraph 99.

100.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 100 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 100.

## SECOND CLAIM

101.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 101 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 101.

102.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 102 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 102.

103.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 103 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 103.

104.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 104 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 104.

105.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 105 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 105.

## THIRD CLAIM

106.    Defendant hereby incorporates its answer to the allegations of numbered paragraphs 1 through 95 above.

107.    Defendant denies the allegations of numbered paragraph 107.

108.    Defendant denies the allegations of numbered paragraph 108.

109.    Defendant denies the allegations of numbered paragraph 109.

## FOURTH CLAIM

110.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 110 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 110.

111.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 111 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 111.

112.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 112 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 112.

113.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 113 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 113.

114.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 114 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 114.

115.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 115 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 115.

116.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim

to which numbered paragraph 116 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 116.

117.    Defendants have contemporaneously herewith filed a Motion to Dismiss the claim to which numbered paragraph 117 relates, and accordingly Defendant need not answer the allegations set forth in numbered paragraph 117.

## FIFTH CLAIM

118.    Defendant hereby incorporates its answer to the allegations of numbered paragraphs 1 through 95 above.

119.    Defendant denies the allegations in numbered paragraph 119.

120.    Defendant denies the allegations in numbered paragraph 120.

121.    Defendant denies the allegations in numbered paragraph 121.

122.    Defendant denies the allegations in numbered paragraph 122.

## SIXTH CLAIM

123.    Defendant hereby incorporates by its answer to the allegations of numbered paragraphs 1 through 95 above.

124.    Defendant denies the allegations in numbered paragraph 124.

125.    Defendant denies the allegations in numbered paragraph 125.

126.    Defendant denies the allegations in numbered paragraph 126.

127.    Defendant denies the allegations in numbered paragraph 127.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE
### (Failure to State a Claim)

Plaintiffs' Complaint fails to state a cause of action upon which relief can be granted.

## SECOND DEFENSE
### (Unclean Hands)

Plaintiffs' claims are barred by the equitable doctrine of unclean hands from obtaining

the relief requested.

## THIRD DEFENSE
### (Abandonment)

Plaintiffs' claims are barred because it has abandoned its alleged rights in the red cross

symbol in connection with one or more of the goods on which Johnson & Johnson was allegedly

using the red cross symbol prior to 1905.

## FOURTH DEFENSE
### (Statute of Limitations and/or Repose)

Plaintiffs' claims may be barred by the applicable statute of limitations and/or repose.

## FIFTH DEFENSE
### (Laches, Estoppel and/or Waiver)

Plaintiffs' claims are barred by the doctrines of laches, estoppel and/or waiver.

WHEREFORE, Defendant denies that Plaintiffs are entitled to any relief whatsoever, including,

but not limited to, the relief set forth in Paragraphs (a) through (h) of the prayer for relief.

## <u>COUNTERCLAIMS</u>

## PARTIES

1.    The American National Red Cross ("Red Cross") is a federally – chartered

corporation with its principal place of business at 430 Seventeenth Street, N.W. Washington,

D.C. 20006.

2.    Johnson & Johnson is New Jersey corporation with its principal place of business at

One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933-7001.

3.     Johnson & Johnson Consumer Companies, Inc. ("JJCC") is a New Jersey corporation with a main office at 199 Grandview Road, Skillman, New Jersey 08558, and is a subsidiary of Johnson & Johnson.    Johnson & Johnson and JJCC are collectively referred to herein as "J&J."

**JURISDICTION**

4.     This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, 28 U.S.C. §§ 2201 and 2202 and 15 U.S.C. § 1121.

5.     This Court has personal jurisdiction over J&J because they are doing business in this District and the products that are the subject of this action are sold in this District.    This Court also has jurisdiction over the state law claims under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367, because the federal and state claims are based on the same operative facts, and judicial economy, convenience, and fairness to the parties will result if this Court assumes and exercises jurisdiction over the state law claims.

**VENUE**

6.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because the acts complained of occurred and are occurring in the United States and in this District, and have caused damage to the Red Cross in the United States and in this District.

**STATEMENT OF FACTS**

**The History of the American Red Cross and the Emblem**

7.     The Red Cross hereby incorporates its Introductory Statement.

**J&J's Use of the Red Cross Symbol**

8.     As discussed in the Introductory Statement, the 1905 charter permitted any person or corporation who was using the red cross symbol prior to 1905 to continue using the red cross

symbol.    The 1910 amendment to the charter narrowed the rights of these Grandfathered Users, permitting them to use the red cross symbol only for "the same purpose and for the same class of goods."    The 1948 criminal recodification of this provision secures exclusive use of the Emblem for the Red Cross, its employees and agents, and the military medical services, but also states that use which was lawful on the date of the enactment of the title would remain lawful. 18 U.S.C. § 706.    Thus the limitations of the 1910 charter remain effective today.

9.    At the time the 1905 charter was enacted, the number of trademark registrations owned by Grandfathered Users with a Greek red cross had grown to 61 (including the registration owned by Clara Barton) and by 1942, the number of companies claiming rights existing prior to January 5, 1905, had swollen to more than 200.    Jennifer Stearman, *et al*, *Don't Try To Copy Its Name or Emblem − the Red Cross is protected by Federal Criminal Statute*, Legal Times (1997).    "Over the last 50 years, the number of pre-1905 users has dwindled significantly.    Johnson & Johnson continues to market Red Cross brand cotton, first aid kits, and a variety of other consumer products.    Nine West manufactures Red Cross shoes under license from the US Shoe Corp. Red Cross toothache medication is still available for canker sores.    Some products sold in the Midwest include Red Cross canned vegetables, Red Cross salt, and Red Cross macaroni.    Red Cross Nurse disinfectant, formerly distributed in the Northeast only, has begun to make its way across the country.    And in a handful of states, there are Red Cross drug stores.    Today, 21 pre-1905 users remain."    *Id.*

10.    Prior to 1905, Johson & Johnson allegedly used the red cross symbol in connection with certain first-aid and wound care products, but did not use the red cross symbol in connection with medical examination gloves or hand sanitizer gel (products which the Red Cross is currently offering and the sale of which J&J now seeks to enjoin).    *See Protection of the*

*Name and Emblem of the Red Cross: Hearing on H.R. 6911 Before the H. Comm. on Foreign Affairs*, 77th Congress, 2d. Sess. 429-433 (1942).    Further, Johnson & Johnson's first use of the red cross symbol on first aid kits was after the Red Cross' first use of the Emblem, which was at least as early as 1881.

11.    Both the Red Cross and J&J have been offering first aid kits bearing a red cross symbol for over a 100 years in the United States.    Further, the Red Cross' use of the Emblem on first aid kits is always accompanied by the AMERICAN RED CROSS word mark, and upon information and belief, J&J's use of the red cross symbol is always accompanied by the JOHNSON & JOHNSON word mark as well as a disclaimer of any connection with the American National Red Cross.

12.    Despite this longstanding use of the Emblem and red cross symbol by the Red Cross and J&J, respectively, J&J has recently taken a variety of actions incompatible with its status as a Grandfathered User.    Most recently, of course, J&J brought the instant action seeking to enjoin the Red Cross' use of the Emblem in connection with the sale of all goods, even goods in connection with which J&J itself is prohibited from using its red cross symbol.

13.    Additionally, J&J has engaged in a whisper campaign with the potential manufacturers and distributors of Red Cross supplies and with retailers offering or considering whether to offer Red Cross' products, telling these third parties that the Red Cross is not authorized to use its own Emblem and even threatening lawsuits against retailers who were considering offering Red Cross products and supplies.

14.    That is not the end of J&J's campaign.    J&J has begun to expand its own use of the red cross symbol to products beyond its grandfathered use – products including, without

limitation, light sticks and magnets.    Attached as Exhibit B are photographs of such products being sold in packaging prominently featuring the red cross symbol.

15.    These goods are not used for the same purpose and/or in the same class of goods as those with which J&J was using the red cross symbol prior to 1905.

16.    Additionally, J&J has departed from its grandfathered form of the red cross symbol. Courts interpreting statutes similar to Section 706 prohibiting third party use of federally protected symbols have found that grandfathered users are not permitted to register and use such symbols in a form conveying a different commercial impression than that of the grandfathered use .    Nevertheless, J&J recently obtained U.S. Reg. No. 3,178,913 for a mark comprised of a Greek red cross against a white background as well as various other elements.    The mark as depicted in the registration appears in a significantly different form from the pre-1905 uses of the red cross symbol by J&J.    Additionally, J&J appears to be using the red cross symbol in other altered forms which are beyond the scope of its grandfathered rights.    Attached as Exhibit C are printouts of the registration and photographs depicting the altered forms in which J&J is using the red cross symbol.

**J&J's Actions Have Harmed and Continue to Harm the Red Cross and its Mission**

17.    To be clear, the Red Cross does not seek to enjoin J&J's use of the red cross symbol within the scope of its rights as a Grandfathered User.    Rather, the Red Cross is happy to coexist, as it has for over a Century, with J&J's use of the red cross symbol in the form and on the goods with which J&J was using the symbol prior to 1905.    J&J may not, however, expand the category of goods or alter the form of the red cross symbol for which it is grandfathered.

18.    J&J's institution of the instant action to enjoin the Red Cross' use of its own Emblem on emergency, first aid, and health supplies harms not only the Red Cross but the

41

American public, whom the Red Cross is tasked with protecting.    As if to demonstrate that very harm, J&J's original complaint sought to force the destruction of emergency preparedness and first aid supplies bearing the Red Cross Emblem.    Now, J&J still seeks to enjoin the Red Cross from selling and distributing supplies and products that further its mission and enable it to raise funds to support that mission.

19.    The fact is that J&J's lawsuit has had the effect of interfering with and impeding the Red Cross' preparedness and health and safety mission, diverting attention and resources away from vital activities, and during hurricane season at that.    Even now, after the sixth anniversary of September 11, the vast majority of Americans remain unprepared for national disaster.    The distribution and sale of these Red Cross products, which J&J now seeks to stop, is aimed at making it easier for Americans to purchase these life-saving, emergency and health and safety products and putting preparedness in the hands of the American public.

### FIRST COUNTERCLAIM
**Declaratory Judgment of Violation of 18 U.S.C. § 706 Pursuant To 28 U.S.C. § 2201**

20.    Red Cross hereby realleges and incorporates by reference as fully set forth herein the allegations set forth in Paragraphs 1 through 19 above.

21.    An actual controversy exists between the parties.

22.    J&J is the owner of a federal trademark registration for U.S. Reg. No. 3,178,913 ("the '913 Registration").    The '913 Registration is a design mark comprised of a Greek red cross against a white background, next to the name JOHNSON & JOHNSON (in red) and FIRST AID (in blue).    *See* Exhibit C.    J&J applied for such registration on October 18, 2004.    The effective date of the registration is December 5, 2006.

23.  J&J is also using a red cross symbol against a white ground in a form conveying a different commercial impression from its pre-1905 uses of the red cross symbol, including, without limitation, in the form depicted in Exhibit C ("Altered Red Cross Symbol").

24.  Upon information and belief, J&J did not use the red cross symbol in connection with the words JOHNSON & JOHNSON (in red) and FIRST AID (in blue), as depicted in the '913 Registration and/or the Altered Red Cross Symbol, before 1905.

25.  J&J's current use of the red cross symbol as depicted in the '913 Registration and/or in the Altered Red Cross Symbol conveys a different commercial impression from the use of the red cross symbol for which J&J received limited grandfathered rights in 1905 under 18 U.S.C. § 706.

26.  J&J's current use of the red cross symbol in connection with the additional words JOHNSON AND JOHNSON (in red) and FIRST AID (in blue), as depicted in the '913 Registration and/or the Altered Red Cross Symbol, is thus beyond J&J's limited grandfather rights under 18 U.S.C. § 706 and therefore a violation of the statute.

27.  J&J currently uses the red cross symbol as a mark on containers for various goods including, without limitation, light sticks and magnets.  *See* Exhibit B.

28.  Upon information and belief, J&J did not use the red cross symbol as a mark in connection with light sticks and magnets before 1905.

29.  Certain of J&J's goods currently sold under the red cross symbol, e.g., light sticks, magnets and other goods that were not sold under the red cross symbol prior to 1905, are not sold "for the same purpose and for the same class of goods" as J&J's goods sold before 1905 under the red cross symbol.

30.   By selling products which were not used in connection with the red cross symbol before 1905, J&J has impermissibly exceeded the scope of its rights as a Grandfathered User and thus violated 18 U.S.C. § 706.

31.   In view of the foregoing, the Red Cross is entitled to a judicial declaration that the '913 Registration and/or Altered Red Cross Symbol represents a violation of 18 U.S.C. § 706 and that J&J's use of the red cross symbol to sell light sticks, magnets and other goods or services that are not for the same purpose and in the same class of goods as those offered prior to 1905 violates 18 U.S.C. § 706.

**SECOND COUNTERCLAIM**
**Cancellation Of Trademark Under 15 U.S.C. § 1119 and 15 U.S.C. 1064(3)**

32.   Red Cross hereby realleges and incorporates by reference as fully set forth herein the allegations set forth in Paragraphs 1 through 19 above.

33.   Red Cross brings this claim under 15 U.S.C. § 1119 and 15 U.S.C. § 1064(3), seeking that the Court issue an order canceling the federal trademark registration for the '913 Registration, on the grounds that such trademark consists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof prohibited under 15 U.S.C. § 1052(b).

34.   J&J's red cross symbol in connection with the additional words JOHNSON AND JOHNSON (in red) and FIRST AID (in blue), as depicted in the '913 Registration conveys a different commercial impression than the use of the red cross symbol for which J&J received limited grandfathered rights in 1905 under 18 U.S.C. § 706 and is in violation of 15 U.S.C. § 1052(b).

35.    Red Cross has a real interest in this cancellation proceeding because there is an

actual controversy in which J&J has disputed Red Cross' rights to use the Emblem in view of

J&J's alleged rights in the red cross symbol.

36.    Given the existing controversy, Red Cross will be damaged in the absence of such

cancellations.

**THIRD COUNTERCLAIM**
**Unfair Competition**

37.    Red Cross hereby realleges and incorporates by reference as fully set forth herein

the allegations set forth in Paragraphs 1 through 19 above.

38.    As set forth above, the Red Cross has used the Emblem for over one hundred years

to fulfill its mission.    Section 706 grants the Red Cross a near-exclusive right to use its Emblem

for any purpose necessary to further its mission as set forth under its Congressional charter,

subject only to uses by military medical services and to limited use by Grandfathered Users, who

are permitted to continue any pre-1905 uses of a Greek red cross on a white ground for goods of

the same purpose and for the same class of goods.

39.    As set forth above, J&J has knowingly violated a criminal statute, 18 U.S.C. § 706,

by exceeding the scope of its limited authority as a Grandfathered User.

40.    J&J's violation of 18 U.S.C. § 706 is illegal, upon information and belief was

conducted in bad faith, and represents an unfair commercial practice that has violated Red Cross'

rights as outlined in 18 U.S.C. § 706.    Such actions constitute unfair competition under New

York common law.

41.    By violating this criminal statute, J&J is    misappropriating for its own commercial

advantage certain rights and benefits to use a Greek red cross on a white ground.    Under 18

U.S.C. § 706, J&J has no such right to those rights and benefits. Only the Red Cross does.

42.    J&J's actions have caused and continue to cause irreparable harm to the Red Cross.

## **JURY DEMAND**

Red Cross demands a jury trial on all issues so triable.

**WHEREFORE**, Red Cross prays for the following relief:

(a)    That the Court enter judgment for Red Cross on all of the counterclaims set forth herein;

(b)    That the Court enter a judgment declaring that (1) J&J's grandfathered right to use the red cross symbol is limited to the same uses and goods with which it was using the red cross symbol prior to 1905; (2) that J&J is not entitled to use the red cross symbol in connection with goods on which it was not using the red cross symbol prior to 1905, including, without limitation, light sticks and magnets; and (3) J&J's use of the trademark set forth in the '913 Registration and the Altered Red Cross Symbol and J&J's sale of goods on which it was not using the red cross symbol prior to 1905 represent violations of 18 U.S.C. § 706;

(c)    That the Court enter an order canceling U.S. Registration No. 3,178,913, and that the Director of the U.S. Patent & Trademark Office be provided with a certified order of the same;

(d)    That J&J be found liable for unfair competition, and permanently enjoined from any further uses of the red cross symbol other than those uses to which it has grandfathered rights under 18 U.S.C. § 706 ; and

(e)    That J&J account for and pay over to the Red Cross all of the profits realized by J&J, or others acting in concert or participation with J&J, from J&J's acts of unfair competition.

(f)    Any other relief the Court deems fair and just.


Dated: September 20, 2007                    Respectfully submitted,

                                             HOGAN & HARTSON, L.L.P.

                                             By: s/ Jonathan L. Abram
                                             Jonathan L. Abram (admitted pro hac vice)
                                             Raymond A. Kurz (admitted pro hac vice)
                                             555 Thirteenth Street, N.W.
                                             Washington, D.C. 20004
                                             Tel:   (202) 637-5681
                                             Fax: (202) 637-5910

                                             Counsel for Defendant

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that on the 20th day of

September, 2007, I caused a true and correct copy of the foregoing to be served upon the

following via the Court's ECF Notification System:

> Gregory L. Diskant
> Sarah Elizabeth Zgliniec
> Patterson, Belknap, Webb & Tyler LLP
> 1133 Avenue of the Americas
> New York, NY 10036
> (212) 336-2710
> Fax: (212) 336-2222
> Email: gldiskant@pbwt.com
> Email: sezgliniec@pbwt.com
>
> Richard Zachary Lehv
> Roger L. Zissu
> Fross Zelnick Lehrman & Zissu, P.C.
> 866 United Nations Plaza
> New York, NY 10004
> (212) 813-5900
> Fax: (212)-813-5901
> Email: rlehv@frosszelnick.com
> Email: rzissu@frosszelnick.com

s/ Jonathan L. Abram
Jonathan L. Abram
