# EXHIBIT A

September 12, 1978

The Honorable Griffin B. Bell
Attorney General of the United States
Department of Justice
Washington, D.C.  20530

ATTENTION:  Mr. J. Michael Kelly
             Counselor to the Attorney General

Dear Sir:

    We appreciate the opportunity of speaking with Mr. Kelly on September 11 and receiving his suggestion that we should write directly to you to seek appropriate referral within the Department of Justice for consideration of the matter described below which is of great concern to the American National Red Cross and its Board of Governors.

    As you know, the American National Red Cross is a corporation chartered by the Congress for the purpose, among others (36 U.S.C. 1 et seq.), of assisting the United States to carry out obligations the latter has as an adherent to the Geneva Conventions for the Protection of War Victims.  Because of the unique status of the American National Red Cross, the Department of Justice originally instituted, and subsequently directly prosecuted, the case of Department of Employment v. United States, 385 U.S. 355 (1966) in which the U.S. Supreme Court unanimously held that the American National Red Cross is an instrumentality of the United States for purposes of immunity from state taxation levied on its operations.  See also Sturges, "The Legal Status of the Red Cross," 56 Michigan Law Rev. 1 (1957).

    We refrain from seeking Justice Department assistance except on rare occasions involving significant matters.  However, in several instances subsequent to the above decision, your Department has advised and represented the American Red Cross in successful efforts to vindicate state recognition of the exemption of the Red Cross from statutes regulating charitable solicitation and accountability, also upon the basis of the legal status of the Red Cross as a federal instrumentality.  This invaluable help has greatly assisted the Red Cross to operate effectively without burdensome financial exactions and unnecessary regulation by multiple jurisdictions.

    We are deeply grateful for the previous advice, assistance and representation given by the Department of Justice and make reference to it here only for the purpose of calling your attention to circumstances which we feel make it entirely appropriate for us also to seek the advice and guidance requested below.

The Honorable Griffin B. Bell       - 2 -       September 12, 1978

Under the Geneva Conventions, adhering governments are obligated to prevent, within territory under their control, improper use of the Red Cross emblem which would dilute its effectiveness as the symbol utilized by certain personnel, equipment and facilities devoted to the care of the sick and wounded which identify them as entitled to protection from attack in the event of international armed conflicts. The Act approved January 5, 1905 (33 Stat. 599), constituting the corporate charter of the American Red Cross, originally included such prohibitory provisions which are now codified in 18 U.S.C. 706. The problem on which we now seek the Department's advice and guidance concerns the appropriate interpretation and application of such prohibitions.

From the beginning, the American Red Cross and its agents have had full entitlement to make use of the name and emblem of the Red Cross but their use by private entities generally has been prohibited. The American Red Cross has avoided actions and practices which might appear to involve the granting of permission to others improperly to use the Red Cross name or emblem. However, the increasing sophistication of communications techniques, combined with the necessity for the Red Cross to provide extensive information to and receive substantial support, assistance and cooperation from the public including businesses and other entities, have caused us to conclude that our previous narrow and informal interpretation of the permissible uses of the name and emblem under 18 U.S.C. 706 is probably an unnecessary obstacle to the success of Red Cross services to the public.

I am enclosing a brief memorandum and its attachments tracing the history of the statutory prohibitions under discussion and Red Cross practices in connection with them. As will be noted from the enclosed paper, we would like to have the approval of the Department of Justice to an interpretation of the statute that would permit the American Red Cross to use and, on a highly selective basis, to permit the use of its name and emblem in peacetime by non-Red Cross organizations whenever the specific use can reasonably be regarded as primarily for the benefit of the American Red Cross, even though some incidental, although substantial, benefit might also accrue to the non-Red Cross entity.

We would be glad to furnish any further information you require and to discuss the matter with such Department representatives as may be suggested. We feel that the present matter is of sufficient importance and that the interests of the United States are sufficiently direct that it is entirely appropriate for us to make this request.

Sincerely,

John L. Currin
Counselor & Secretary

Enclosures
JLC:mbr
cc: Dr. Stanton
    Mr. J. Marshall Weaver
    Mr. Elsey

## USE OF THE RED CROSS NAME AND EMBLEM

A significant feature of the series of treaties known as the Geneva Conventions For The Protection Of War Victims is the agreement by the civilized nations of the world that the emblem of a Greek red cross on a white background shall be reserved for use in identifying personnel, equipment and facilities entitled to immunity from attack in the course of international armed conflicts because they are employed in rendering aid to the sick and wounded and in related humanitarian activities. Pursuant to the obligations undertaken by the United States as an adherent to the Conventions, 18 U.S.C. 706 proscribes, under misdemeanor penalties, the use of the emblem of the Greek red cross on a white background or the words "Red Cross" by anyone "other than the American National Red Cross and its duly authorized employees and agents and the sanitary and hospital authorities of the armed forces of the United States" and other than certain entities which made lawful use thereof prior to the enactment of the statutory prohibitions in the Act approved January 5, 1905 (33 Stat. 599).

To assist in understanding the background to the current statutory provisions codified in 18 U.S.C. 706, there is attached a copy of an internal Red Cross memorandum dated March 22, 1951, which traces the history of the treaties and the predecessors of the current statute.  To complete the historical summary set forth in such memorandum it should be noted that "The 1949 Draft" of the revised Conventions referred to therein was ratified by the United States on July 14, 1955 (TIAS 3362, 3363, 3364, 3365).  Also attached is a copy of the Opinion of the United States Supreme Court in Federal Trade Commission v. A.P.W. Paper Company, Inc., 328 U.S. 193 (1946), a decision referred to in the memorandum, which, in addition to its holding that pre-1905 users of the Red Cross name or emblem may lawfully continue non-deceptive uses, sheds pertinent historical and judicial light on the matter under discussion.

-2-

Except to the extent of the FTC litigation and trademark cases with similar holdings, typified by Loonen v. Deitsch, 189 F. 487 (1912), referred to in the Supreme Court opinion, the only information we have of other litigation under the statute involves a series of prosecutions of municipalities and others in Wisconsin that were filed and unsuccessfully prosecuted in the early part of this century. The only evidence we have of the outcome of the latter cases is the attached copy of a decision rendered by Federal Judge Geiger on November 8, 1914 in United States v. Milwaukee (apparently unreported) in which the statute was held not to prohibit a city health department from using the emblem for governmental purposes.

Inasmuch as the above statute is a part of the federal criminal law, the American Red Cross has no authority or duty officially to interpret or enforce it. The American Red Cross is obligated, however, not to violate or participate in violations of the statutory provisions. Accordingly, although often requested to do so in a variety of circumstances, the Red Cross has consistently refrained from authorizing other parties to use its name or emblem except when such use was to be made as an agent of the Red Cross. For example, United Way and other federated fund raising organizations, through which the Red Cross conducts annual campaigns for contributions to meet its financial requirements, regularly use both the Red Cross name and emblem because they are authorized to do so as an agent of the Red Cross.

Despite its lack of obligation to do so, the American Red Cross has long followed the practice of calling the above statutory provisions to the attention of businesses when the Red Cross became aware that they were improperly using the name and emblem, usually in ignorance of the statutory restrictions. Attached is a leaflet (ARC 587) which is used for this purpose. Also attached is a leaflet (ARC 544) which is used internally within the Red Cross to give guidance to staff and volunteers on the proper use of the Red Cross name and emblem.

-3-

An increasing number of instances are occurring in which Red Cross' very literal interpretation of the statutory provisions is causing increasing problems and concerns for the organization. For example, other reputable organizations, both profit and nonprofit, which publish or produce printed or visual materials on first aid, safety or health matters, or materials in other fields in which the Red Cross has some expertise, often seek and receive Red Cross technical assistance in connection with their publications and express their desire to acknowledge that fact and express their appreciation in the materials they produce. Some of those organizations also express willingness to assist in disseminating Red Cross educational materials by distributing them in connection with projects which otherwise might be primarily unrelated to the Red Cross. Commercial organizations frequently offer to sponsor activities in which funds can be raised for the Red Cross, either in conjunction with the sale of their products or services or the incidental promotion of their business image in the eyes of the public. However, in pursuit of its scrupulous practice to literally interpret the statutory terms, the Red Cross has withheld permission to use its name or emblem in these projects unless the particular use can be construed as solely for the benefit of the Red Cross, and hence a use by its agent, and not directly or indirectly for the benefit of a commercial or other non-Red Cross undertaking. This, perhaps self-imposed, limitation has often deprived the Red Cross of outside help in pursuing or publicizing Red Cross objectives and has minimized its flexibility to use the Red Cross name and emblem for organizational purposes in ways that would be regarded as entirely appropriate and unobjectionable for other organizations whose name and emblem are not statutorily encumbered by use restrictions. Accordingly, the American Red Cross is hopeful that it can receive assistance and guidance from the United States Department of Justice which may afford greater latitude to the Red Cross in the use of its name

-4-

and emblem to promote Red Cross services even though some commercial or non-Red Cross enterprise may incidentally benefit or be involved. In essence, the American Red Cross would like to be able to use or, on a highly selective basis, to permit the use of its name and emblem in peacetime by non-Red Cross organizations whenever the specific use can reasonably be regarded as primarily for the benefit of the American Red Cross even though some incidental, although substantial, benefit might also accrue to the non-Red Cross entity.

A few examples of those highly selective cases in which the Red Cross would like to have this freedom are as follows:

1. A chain of fast food restaurants is willing to publicize the fact that a Red Cross representative will be available at specified times in the chain's stores to give free blood pressure tests to members of the public. This would be highly beneficial since early detection of abnormal blood pressure can save lives and since the taking of blood pressures where many people congregate reaches many people who otherwise might not be reached.

2. Another fast food chain wants to publicize that its food preparation and service capabilities will be available to the Red Cross in times of natural disasters when the Red Cross will be feeding disaster victims and disaster relief workers who may have greatly restricted access to meal facilities.

3. The operator of a popular underground cavern in which there is a "wishing well" desires to donate to the Red Cross some $25,000 in coins extracted from the well and to receive Red Cross cooperation in publicizing the event at which the donation will be made.

4. A distributor of commercial products or services wishes to state in its advertising that for each product or service sold the distributor will donate to the Red Cross a stated sum of money.

-5-

5.  A manufacturer of aquatic equipment wishes to produce and distribute a film on water safety depicting Red Cross personnel demonstrating the use of safe procedures and techniques to be followed in enjoying aquatic recreation.

6.  A large publisher wishes to promote subscriptions to its book series on personal and family safety and health by offering a free copy of the American Red Cross textbook on First Aid and Personal Safety.

7.  Publishers or producers of written or audiovisual materials on subjects, such as safety, first aid, home care of the elderly or ill, disaster protection measures or blood, in which the Red Cross has experience and expertise, wish to acknowledge publicly the true fact that such materials have been reviewed and authenticated by the Red Cross. Despite the benefit those acknowledgements would presumably afford to such firms, they would also pay rightful credit to the Red Cross as well as further the dissemination and acceptance by the public of worthwhile information.

The President                                    March 22, 1951

Harold W. Starr

        The United States has acceded to or ratified three treaties
popularly known as "Red Cross Treaties."  The technical name of the
final treaty is "Convention for the Amelioration of the Condition of
the Wounded and the Sick of Armies in the Field," and the others have
substantially the same title.  The technical name is seldom used, and
the treaties are usually referred to either as "Geneva Conventions"
or "Red Cross Treaties."  The latter designation will be used through-
out this memorandum.

        The first Red Cross Treaty was concluded in 1864 but was not
acceded to by the United States until 1882.  Hereafter it is called
the 1864 Treaty.

        The second Red Cross Treaty was concluded in 1906 and was
ratified and proclaimed by the United States in 1907.  Hereafter it is
called the 1906 Treaty.

        The third Red Cross Treaty was concluded in 1929 and was
ratified and proclaimed by the United States in 1932.  Hereafter it is
called the 1929 Treaty.  For the purposes of this memorandum, we may
consider that the 1906 Treaty superseded the 1864 Treaty and that the
1929 Treaty superseded that of 1906, so that the 1929 Treaty is now in
effect.

        In addition to the foregoing Red Cross Treaties, a fourth
draft was signed on behalf of the United States in 1949.  It has not
yet been ratified by the Senate nor proclaimed on behalf of the United
States and, hence, is not now in effect in the United States.  Here-
after it is called the 1949 draft.

        The following portions of this memorandum will briefly sum-
marize the provisions of the separate treaties bearing upon the use of
the Red Cross name and emblem and the legislative efforts made by the
United States to implement those provisions.

                        The Treaty of 1864

        This treaty contained only the following pertinent language:

        "A distinctive and uniform flag shall be adopted for
hospitals, ambulances, and evacuations.  It must, on

The President                    -2-                    March 22, 1951

every occasion, be accompanied by the national flag.
An arm badge (brassard) shall also be allowed for
individuals neutralized, but the delivery thereof
shall be left to military authority.

"The flag and the arm badge shall bear a red cross
on a white ground." Article VII

Nine bills to incorporate what is now the American National
Red Cross were introduced in the Federal Congress beginning in 1887,
but none of them became law. Most of these bills contained some provi-
sions limiting the use of the name and emblem of the Red Cross. Some
of them would have absolutely prohibited the use of the name and em-
blem except by agents of the United States Government and the Red
Cross, while others contained less comprehensive prohibitions.

In the meantime, the American Association of the Red Cross
was formed as a private corporation in the District of Columbia in
1881, whose primary object was to secure the adoption of the 1864
Treaty by the United States. After the United States acceded to the
1864 Treaty, the charter of the American Association of the Red Cross
was amended, and the name of the organization was changed to "The
American National Red Cross." The American National Red Cross was
first incorporated by the Federal Congress on June 6, 1900, and that
bill contains the first legislation adopted by the United States deal-
ing with the use of the name and emblem of the Red Cross. The perti-
nent portion of the statute follows:

"That from and after the passage of this Act it shall
be unlawful for any person within the jurisdiction of
the United States to falsely and fraudulently hold
himself out as, or represent or pretend himself to be
a member of or an agent for the American National Red
Cross for the purpose of soliciting, collecting, or
receiving money or material; or for any person to
wear or display the sign of the red cross, or any in-
signia colored in imitation thereof, for the fraudu-
lent purpose of inducing the belief that he is a mem-
ber of or an agent for the American National Red
Cross. If any person violates the provisions of
this section he shall be guilty of a misdemeanor,
and shall be liable to a fine of not less than one
or more than five hundred dollars, or imprisonment
for a term not exceeding one year, or both, for each
and every offense. The fine so collected shall be
paid to the American National Red Cross..." Sec. 4

By an act approved January 5, 1905, the charter of the
American National Red Cross was amended, and the section of the

The President                 -3-                    March 22, 1951

previous law dealing with the use of the name and emblem was amended
to read as follows:

> "That from and after the passage of this Act it shall
> be unlawful for any person within the jurisdiction of
> the United States to falsely and fraudulently hold
> himself out as, or represent or pretend himself to be,
> a member of, or an agent for, the American National
> Red Cross, for the purpose of soliciting, collecting,
> or receiving money or material; or for any person to
> wear or display the sign of the Red Cross, or any in-
> signia colored in imitation thereof for the fraudu-
> lent purpose of inducing the belief that he is a mem-
> ber of, or an agent for, the American National Red
> Cross. Nor shall it be lawful for any person or cor-
> poration, other than the Red Cross of America, not
> now lawfully entitled to use the sign of the Red
> Cross, hereafter to use such sign or any insignia col-
> ored in imitation thereof for the purposes of trade
> or as an advertisement to induce the sale of any
> article whatsoever. If any person violates the pro-
> visions of this section, he shall be guilty of a
> misdemeanor and shall be liable to a fine of not
> less than one nor more than five hundred dollars, or
> imprisonment for a term not exceeding one year, or
> both, for each and every offense. The fine so col-
> lected shall be paid to the American National Red
> Cross." Sec. 4

Whereas the earlier section was designed only to penalize
the use of the Red Cross by persons falsely holding themselves out
to be members or agents of the Red Cross, the amended act dealt spe-
cifically with the commercial use of the emblem. However, the
amended section did permit persons or corporations who were thereto-
fore lawfully entitled to use the Red Cross for the purposes of
trade or advertising to continue such use.

Section 4 of the 1905 Act was again amended on June 23,
1910, and the amended section made it unlawful for any person, cor-
poration, or association, other than the American Red Cross or the
Army and Navy sanitary authorities of the United States and their
agents and employees, "for the purpose of trade or as an advertise-
ment to induce the sale of any article whatsoever or for any busi-
ness or charitable purpose to use within the territory of the
United States of America and its exterior possessions the emblem of
the Greek red cross on a white ground, or any sign or insignia made
or colored in imitation thereof or of the words "Red Cross" or
"Geneva Cross" or any combination of these words: Provided, however,
That no person, corporation, or association that actually used or
whose assignor actually used the said emblem, sign, insignia, or

The President                    -4-                    March 22, 1951

words for any lawful purpose prior to January fifth, nineteen hundred
and five, shall be deemed forbidden by this Act to continue the use
thereof for the same purpose and for the same class of goods."

    For the purposes of this memorandum we may consider that
this is the last action taken by Congress on the subject although the
above-quoted provisions have been recodified as part of the Criminal
Code.

### The Treaty of 1906

    This treaty provided in pertinent part:

    "The signatory powers whose legislation may not now be
adequate engage to to take or recommend to their legis-
latures such measures as may be necessary to prevent
the use, by private persons or by societies other than
those upon which this convention confers the right there-
to, of the emblem or name of the Red Cross or Geneva
Cross, particularly for commercial purposes by means of
trade-marks or commercial labels.

    "The prohibition of the use of the emblem or name in
question shall take effect from the time set in each
act of legislation, and at the latest five years after
this convention goes into effect. After such going
into effect, it shall be unlawful to use a trade-mark
or commercial label contrary to such prohibition."
Article XXVII.

    A bill introduced in 1919 would have prohibited completely
the use of the name and emblem except by the American National Red
Cross and the army and navy sanitary and hospital authorities, but it
was not acted upon.

### The Treaty of 1929

    This treaty provided in pertinent part:

    "The Governments of the High Contracting Parties whose
legislation may not now be adequate shall take or shall
recommend to their legislatures such measures as may be
necessary at all times:

    "(a) to prevent the use by private persons or by socie-
ties other than those upon which this Convention con-
fers the right thereto, of the emblem or of the name of
the Red Cross or Geneva Cross, as well as any other
sign or designation constituting an imitation thereof,
whether for commercial or other purposes..."

The President                    -5-                    March 22, 1951

"The prohibition mentioned in subparagraph (a) of the
use of signs or designations constituting an imitation
of the emblem or designation of the Red Cross or
Geneva Cross...shall take effect from the time set in
each act of legislation and at the latest five years
after this Convention goes into effect. After such
going into effect it shall be unlawful to take out a
trade-mark or commercial label contrary to such prohi-
bitions." Article 28

It has always been the contention of the executive depart-
ment of the United States Government that the above-quoted language
required the United States as an adherent to the Treaty to enact legis-
lation prohibiting absolutely the commercial use of the name or emblem
of the Red Cross. Bills to that effect were introduced in 1942 and
1943, and in the 78th Congress a bill which would have eliminated over
a period of years the exemption of pre-1905 commercial users passed
the Senate. Opponents of these measures representing commercial inter-
ests maintained that the quoted language of the 1929 Treaty did not
require the United States to ban the use of the emblem but only required
the United States to recommend such action to the Congress. The oppo-
nents further argued that the quoted language of the 1929 Treaty was
not intended to have retrospective effect so that any person who had
used the name and emblem prior to United States adherence to the 1929
Treaty should be permitted to continue such use.

The 1949 Draft

This draft provides in pertinent part:

"With the exception of the cases mentioned in the follow-
ing paragraphs of the present Article, the emblem of
the Red Cross on a white ground and the words 'Red
Cross,' or 'Geneva Cross' may not be employed, either
in time of peace or in time of war, except to indicate
or to protect the medical units and establishments, the
personnel and material protected by the present Conven-
tion and other Conventions dealing with similar matters.
The same shall apply to the emblems mentioned in Arti-
cle 38, second paragraph, in respect of the countries
which use them. The National Red Cross Societies and
other Societies designated in Article 26 shall have the
right to use the distinctive emblem conferring the pro-
tection of the Convention only within the framework of
the present paragraph.

"Furthermore, National Red Cross (Red Crescent, Red
Lion and Sun) Societies may, in time of peace, in
accordance with their national legislation, make use
of the name and emblem of the Red Cross for their

The President                    -6-                    March 22, 1951

other activities which are in conformity with the
principles laid down by the International Red Cross
Conferences.  When those activities are carried out
in time of war, the conditions for the use of the
emblem shall be such that it cannot be considered
as conferring the protection of the Convention; the
emblem shall be comparatively small in size and may
not be placed on armlets or on the roofs of build-
ings..."  Article 44

"The use by individuals, societies, firms or compan-
ies either public or private, other than those enti-
tled thereto under the present Convention, of the
emblem or the designation 'Red Cross' or 'Geneva
Cross', or any sign or designation constituting an
imitation thereof, whatever the object of such use,
and irrespective of the date of its adoption, shall
be prohibited at all times...

"Nevertheless, such High Contracting Parties as were
not party to the Geneva Convention of July 27, 1929,
may grant to prior users of the emblems, designations,
signs or marks designated in the first paragraph, a
time limit not to exceed three years from the coming
into force of the present Convention to discontinue
such use provided that the said use shall not be such
as would appear, in time to war, to confer the protec-
tion of the Convention..."  Article 53

These provisions differ in substance from the 1929 provi-
sions only in that it is made entirely clear that commercial use of
the name and emblem shall be prohibited irrespective of prior use and
the undertaking is in absolute terms and omits the use of the phrase
"recommend to their legislatures."

In other words, the provisions of the 1949 draft are in-
tended to accomplish exactly the same purpose as the members of the
executive department of the United States have always contended to
have been the intent of the 1929 provisions.

There has been confusion on the part of some as to the rele-
vance of litigation with the APW Paper Company to the statutes men-
tioned above.  Actually that litigation did not directly involve the
criminal statutes dealing with the use of the Red Cross name and em-
blem.  The action against the paper company was begun by the United
States Government under the Federal Trade Commission Act.  The govern-
ment contended that the paper company's use of the Red Cross on its

The President                    -7-                    March 22, 1951

products had the tendency to mislead and deceive a substantial portion of the purchasing public that the company's products were sponsored, endorsed, or approved by the Red Cross, and the Commission found that the use of the Red Cross on the paper company's product would mislead the public and issued an order forbidding the company from using the name or emblem of the Red Cross in describing or marking its products. The Circuit Court of Appeals reversed the order of the Commission and held that the Commission's order went too far.  The Circuit Court remanded the case to the Commission with directions that the Commission formulate a new order which would not absolutely forbid the use of the name and emblem of the Red Cross on the company's products but which would require statements to be placed on the company's products that would avoid any inference that the goods were sponsored, approved, or in any way connected with the American National Red Cross.  The Supreme Court affirmed the decision of the Circuit Court.

Harold N. Starr
Associate Counselor

(Federal Trade Commission Docket 4747)

# SUPREME COURT OF THE UNITED STATES.

No. 320.—OCTOBER TERM, 1945.

| | |
|---|---|
| Federal Trade Commission, Petitioner, *vs.* A. P. W. Paper Company, Inc. | On Writ of Certiorari to the United States Circuit Court of Appeals for the Second Circuit. |

[May 6, 1946.]

Mr. Justice DOUGLAS delivered the opinion of the Court.

Respondent manufactures and sells toilet tissues and paper towels in interstate commerce. On each package or roll of one brand are a Greek red cross and the words "Red Cross". Respondent registered the words "Red Cross" and the Red Cross symbol as a trade mark; and it features them in its advertisements and on its letterheads.

By § 4 of the American Red Cross Act of January 5, 1905, 33 Stat. 600, 36 U. S. C. § 4 it was made unlawful "for any person or corporation, other than the Red Cross of America, not now lawfully entitled to use the sign of the Red Cross, hereafter to use such sign or any insignia colored in imitation thereof for the purposes of trade or as an advertisement to induce the sale of any article whatsoever." That section was amended by the Act of June 23, 1910, 36 Stat. 604, 36 U. S. C. § 4. Sec. 4 of that Act made unlawful the use of the Greek red cross on a white ground or the words "Red Cross" for the purpose of trade or as an advertisement "to induce the sale of any article" or "for any business or charitable purpose" by any person other than the American National Red Cross[1] or its duly authorized employees and agents or the sanitary and hospital authorities of the army and navy. It

---

[1] The Red Cross organization had its origin in a treaty drafted at the Geneva Convention in 1864 and acceded to by the United States in 1882. 22 Stat. 940. The American Association of the Red Cross was incorporated in 1881 under the laws of the District of Columbia. It was reincorporated in 1893 under the laws of the District of Columbia as the American National Red Cross. On June 6, 1900 it was incorporated under the same name by Act of Congress (31 Stat. 277) and was reincorporated January 5, 1905. 33 Stat. 599. From the time of its first incorporation in 1881 down to the present, it has used the words "Red Cross" as a part of its name and has also used the emblem adopted by the 1864 Geneva Convention, the Greek red cross on a white ground.

2    *Federal Trade Commission* vs. *A. P. W. Paper Co., Inc.*    2

contained, however, a proviso which reads as follows: "That no person, corporation, or association that actually used or whose assignor actually used the said emblem, sign, insignia, or words for any lawful purpose prior to January fifth, nineteen hundred and five. shall be deemed forbidden by this Act to continue the use thereof for the same purpose and for the same class of goods."

Petitioner's use of the trade name and emblem antedate January 5, 1905.[2] But in 1942 the Federal Trade Commission charged petitioner with a violation of § 5(a) of the Federal Trade Commission Act, 38 Stat. 719, as amended 52 Stat. 111, 15 U. S. C. § 45, which makes unlawful "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce."

A hearing was had, findings were made and a cease and desist order was issued.  The Commission found that "the use by respondent of the words 'Red Cross' and of the mark of the Greek red cross to designate its products has the tendency and capacity to mislead and deceive a substantial portion of the purchasing public, in that such name and mark represent or imply that respondent's products are sponsored, endorsed, or approved by the Red Cross; that the Red Cross is financially interested in the sale of the products; that the products are used by the Red Cross; that the products are manufactured in accordance with sanitary standards set up by the Red Cross; or that there is some other connection between the products and the Red Cross.  Not only are these, in the opinion of the Commission, reasonable inferences to be drawn from the use of the name and mark, but the record affirmatively shows that the name and mark are in fact so understood and interpreted by many members of the public."  The Commission also found that statements on respondent's products that they are made by respondent and that the name and mark are registered "do not serve to correct the erroneous and misleading impression created through the use of the trade name and mark."  The Commission entered an order which, among other things, forbade respondent from using the

---

[2] Toilet tissues were marketed by petitioner under that trade name and emblem since 1897 and paper towels since 1933.  The trade-mark was first registered in the Patent Office in 1911 and was extended to cover paper towels in 1934.

The Commission made no finding as to whether the paper towels were of the same class of goods as the toilet tissue within the meaning of the proviso to § 4 of the 1910 Act.

320

3    *Federal Trade Commission* vs. *A. P. W. Paper Co., Inc.*    3

words "Red Cross" to describe its products and from displaying the Greek red cross on them.[3]

On a petition for review the Circuit Court of Appeals, by a divided vote, reversed the order of the Commission. 149 F. 2d 424. It held that the order went beyond permissible limits in forbidding any use of the words and the mark. It remanded the case to the Commission for the formulation of a new *order* which, though not forbidding the use of the words and the symbol, might require statements which would avoid any inference that the goods were sponsored or approved or in any way connected with the American National Red Cross. The case is here on petition for a writ of certiorari which we granted because of the importance of the problem in the administration of the Federal Trade Commission Act.

There is no suggestion that the pre-1905 use of the words and the symbol was an unlawful one within the meaning of either the 1905 or the 1910 Act. Nor has the Commission found that respondent has engaged in any fraudulent activity or made any untruthful statements in connection with its use of the words and the symbol. Therefore this is not a case where the words and symbols were either adopted or used pursuant to a fraudulent design, aimed at creating the impression that these products were sponsored by or otherwise carried the imprimatur of the Red Cross. Hence, here, as in *Siegel Co. v. Federal Trade Commission*, 327 U. S. ——, we have no problem involving the power of the Commission to uproot a fraudulent scheme in its entirety. But it is argued that however lawful the earlier use may have been, it cannot survive a finding by the Commission that the use constitutes an unfair or deceptive act or practice in commerce. It is pointed out that the 1938 amendment to the Federal Trade Commission Act gave the

[3] It ordered respondent to cease and desist from

"1. Using the words 'Red Cross' or any abbreviation or simulation thereof, either alone or in combination or connection with any other word or words, to designate, describe, or refer to respondent's products.

"2. Using or displaying on respondent's products or in any advertisement of such products the mark of the Greek red cross, or any other mark, emblem, sign, or insignia simulating or resembling such cross.

"3. Representing in any manner or by any means, directly or by implication, that respondent's products are sponsored, endorsed, or approved by the Red Cross; that the Red Cross is financially interested in the sale of said products; that said products are used by the Red Cross; that said products are manufactured in accordance with sanitary standards set up by the Red Cross; or that there is any other connection between said products and the Red Cross."

320

5   *Federal Trade Commission* vs. *A. P. W. Paper Co., Inc.*   5

The House Report stated that the Act as amended "will permit the use of the symbol . . . by such persons, corporations, and associations as actually used the emblem prior to January 5, 1905, for the purposes for which they were so entitled to use it and for the same class of goods. The section, as so amended, grants to the American National Red Cross the fullest protection it is possible to afford it by congressional enactment and at the same time amply protects the concerns possessing vested property rights in the emblem." H. Rep. No. 1256, 61st Cong., 2d Sess., pp. 2-3. It is apparent from the terms of the 1905 Act and the 1910 Act[7] that Congress was concerned not only with protecting the Red Cross against pretenders but also with protecting the public against the false impression that goods purchased were the products of the Red Cross or were sponsored by it. Congress, however, did not go the full distance. It preserved the right of earlier, good faith users to continue the use of the words and the symbol. It may have concluded that the mark which had been acquired was a valuable business asset which should not be destroyed. Or it may have thought that the extent and manner of the use by the established concerns were not likely to injure the public.[8] But whatever the

gress has now definitely declared in the proviso of the latter act that it would permit such marks if they antedated 1905. Congress had power so to legalise the use of it; the question of public policy was for it and for it alone, and it is now finally closed."

[7] As we have already noted, the 1905 Act made it unlawful "for any person or corporation, other than the Red Cross of America, not now lawfully entitled to use the sign of the Red Cross, hereafter to use such sign or any insignia colored in imitation thereof for the purposes of trade or as an advertisement to induce the sale of any article whatsoever."
    And § 4 of the 1910 Act, which we have already summarized, provided:
    "It shall be unlawful for any person, corporation, or association other than the American National Red Cross and its duly authorized employees and agents and the army and navy sanitary and hospital authorities of the United States for the purpose of trade or as an advertisement to induce the sale of any article whatsoever or for any business or charitable purpose to use within the territory of the United States of America and its exterior possessions the emblem of the Greek Red Cross on a white ground, or any sign or insignia made or colored in imitation thereof, or of the words 'Red Cross' or 'Geneva Cross' or any combination of these words: *Provided, however*, That no person, corporation, or association that actually used or whose assignor actually used the said emblem, sign, insignia, or words for any lawful purpose prior to January fifth, nineteen hundred and five, shall be deemed forbidden by this Act to continue the use thereof for the same purpose and for the same class of goods."

[8] Judge Learned Hand in *Loenen v. Deitsch, supra*, note 6, p. 489, stated:
    "Does the mark actually mean that the society is in any way concerned with the manufacture of the goods? I think not. We have become

320

6     *Federal Trade Commission* vs. *A. P. W. Paper Co., Inc.*     6

purpose, the fact remains that the good faith use of the mark by the pre-1905 users was intended to be preserved unimpaired.

We cannot lightly infer that this specific right was intended to be swept away under the 1938 amendment to the Federal Trade Commission Act. Repeals by implication are not favored. Yet if the order of the Commission stands, the right granted or recognized by the 1910 Act becomes a nullity. For the use of the words and the symbol by good faith pre-1905 users becomes *per se* unlawful. As the 1910 Act, like the Federal Trade Commission Act, was in part directed towards protection of the public against deceptive practices, we think the two Acts must be read in *pari materia*. The problem is to reconcile the two, if possible, and to give effect to each. We think that may be done by recognizing that while the good faith use of the words and symbols by pre-1905 users is permissible, the Commission may require the addition of language which removes any misleading inference that the products are in fact sponsored, approved, or in any manner associated with the American National Red Cross.

We need comment only briefly on the Geneva Convention of 1929, which was ratified by the United States in 1932.[9] The undertaking "to prevent the use by private persons" of the words or symbol is a matter for the executive and legislative departments. The problem has been before the Congress in recent years.[10] No action has

familiar with it in the past for many other uses than that of the society, though—happily such uses will now slowly disappear. It has been used on hospital ambulances, upon medicaments, upon doctors' motor cars, upon barber shops, upon laundries, and for military field service not connected with the Red Cross Society. In short, until the legislation of 1905 (Act Jan. 5, 1905, c. 23, 33 Stat. 599 [U. S. Comp. St. Supp. 1909, p. 1033]), it had been quite instinctively adopted for many uses which were congruous with the chief objects of the society, but which did not indicate that the society had anything to do with them, or certainly with the frequency of the use ceased to do so. Finally, Congress has clearly recognized that fact by permitting all those who prior to 1905 had used the mark lawfully, to continue.'

[9] See note 5, *supra*.

[10] In the 77th Congress a bill to eliminate over a period of years the exemption given to pre-1905 users was favorably reported by the Committee on Foreign Affairs of the House. H. Rep. 2387, 77th Cong., 2d Sess. This proposed legislation was designed to discharge the obligation of the United States under the Geneva Convention of 1929. *Id.*, pp. 1, 2, 4.
In the 78th Congress a bill passed the Senate with similar provisions. 90 Cong. Rec. 398, 401, 3658. It was reported favorably, with amendments, by the Committee on Foreign Affairs of the House. H. Rep. No. 2054, 78th Cong., 2d Sess. This proposed legislation was likewise designed to discharge the obligation of the United States under the Geneva Convention of 1929. *Id.*, pp. 4-6. And see 90 Cong. Rec. 399.

320

7    *Federal Trade Commission* vs. *A. P. W. Paper Co., Inc.*    7

yet been taken. But we can find in that inaction no basis for concluding that the rights of good faith, pre-1905 users granted or recognized by the 1910 Act are today in any way impaired. Indeed, the existence of that right was recognized as giving rise to the need for additional legislation.[11] That assumption can hardly be reconciled with the conclusion that complete relief is already accorded under the Federal Trade Commission Act.

We do not undertake to prescribe the order which the Commission should enter. The fashioning of the remedy is a matter entrusted to the Commission, which has wide latitude for judgment. *Siegel Co. v. Trade Commission, supra.* We only hold that under the facts of this case the Commission may not absolutely forbid the use of the words and the symbol by respondent.

*Affirmed.*

Mr. Justice JACKSON took no part in the consideration or decision of this case.

---

[11] See H. Rep. No. 2337, *supra*, note 10, pp. 2, 3; H. Rep. No. 2054, *supra*, note 10, pp. 4–5. In the latter Report it was, indeed, recognized "that under existing law, there are legal uses of the symbol by commercial users." p. 4.

PTC 11.5745

<u>United States vs. Milwaukee.</u>

"It is not necessary to consider whether the emblem or insignia, which is used by the city or its Health Department officials, or superintendents, is in fact the emblem or insignia of the American Red Cross, whose use the statute seeks to prohibit. In my judgment, the City of Milwaukee is in no real sense engaged in the use of this emblem for the purpose of trade, or as an advertisement to induce the sale of any article whatever, or for any business or charitable purpose. On the contrary, the City is exercising a delegated sovereign function of the State in respect of the health of its citizens, and it is not engaged in business, nor is it seeking to accomplish any charitable purpose. A public officer who wears an emblem or insignia cannot be said thereby to "advertise" his position. It is simply the insignia of his office and authority, and the moment it is used to "advertise" the office, such use is necessarily extra-official; I therefore conclude that under the admitted facts of the plea, the defendant is outside of a fair construction of the act. This renders unnecessary a discussion of the constitutionality of the act, either by reason of the alleged discriminatory nature of the proviso, or whether it is within the power of Congress to appropriate to the exclusive use of the Federal Government and to forbid the State to use the emblem for purposes to which it has been internationally dedicated and for which it had been used prior to the enactment of the law under which this intimation is found. It is presumed that if Congress had power to incorporate the American National Red Cross, it had ample power to forbid the fraudulent use of the emblem, but this may be a long ways from the power of absolute prohibition of its use."

Filed November 5, 1914.