Gregory L. Diskant
Sarah E. Zgliniec
Ravi V. Sitwala
Rachael Kuilema Klein
Kathryn Picanso
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: (212) 336-2000
Fax: (212) 336-2222

Roger L. Zissu
Richard Z. Lehv
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017
Tel: (212) 813-5900

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC., )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE AMERICAN NATIONAL RED CROSS, LEARNING CURVE INTERNATIONAL, INC., MAGLA PRODUCTS, LLC, WATER-JEL TECHNOLOGIES, INC., and FIRST AID ONLY, INC., )<br><br>Defendants. ) | Case No. 07-CV-07061 (JSR) |

---

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

PRELIMINARY STATEMENT.........................................................................1

ARGUMENT ...................................................................................................4

    I.     J&J Has Properly Alleged Tortious Interference with
           Prospective Economic Advantage........................................................4

          1.     Identification of Business Relationship between
                 Plaintiff and Third Party .......................................................5

          2.     Defendants' Intentional Interference with
                 Plaintiff's Business Relations by Wrongful Means ........................8

          3.     Resultant Injury to J&J's Business Relations with
                 Its Customers .......................................................................11

    II.    J&J Has Properly Stated a Claim for Promissory Estoppel....................12

        A.    ARC Made Clear and Unambiguous Promises to J&J
             that It Would Not Engage in Commercial Activities .................13

          1.     ARC's Promises.....................................................................13

          2.     ARC's Promises Were Made to J&J ..............................................16

        B.    J&J Is Not Required to Allege Unconscionable Injury.............................17

    III.   J&J Has Properly Alleged the Breach of Its Contracts with
           FAO and Water-Jel ...............................................................................19

        A.    J&J Has Properly Alleged that FAO Breached
             Its Agreement with J&J.............................................................19

        B.    J&J Has Properly Alleged that Water-Jel Breached
             Its Agreement with J&J.............................................................21

        C.    ARC's Motion to Dismiss the Tortious Interference
             with Contract Claim Should Be Denied.................................23

CONCLUSION..............................................................................................23

1401714v1

## <u>TABLE OF AUTHORITIES</u>

<b>CASES</b>                                   **Page(s)**

<u>Argus Co. v. Mayor, Alderman & Commonalty of the City of Albany</u>,
    55 N.Y. 495 (1874)...................................................................................................18

<u>Bochino v. Palmer</u>,
    203 N.Y.S.2d 301 (N.Y. Sup. Ct. 1960) .............................................................18

<u>Calvin Klein Trademark Trust v. Wachner</u>,
    129 F. Supp. 2d 248 (S.D.N.Y. 2001) ...................................................................8

<u>Carvel Corp. v. Noonan</u>,
    3 N.Y.3d 182, 818 N.E.2d 1100, 785 N.Y.S.2d 359 (2004)................................10

<u>Conley v. Gibson</u>,
    355 U.S. 41, 47 (1957), <u>abrogated in part by</u> <u>Bell Atl. Corp. v. Twombly</u>,
    127 S. Ct. 1955 (2007)............................................................................................5

<u>Deutsch v. Kroll Associates, Inc.</u>,
    No. 02 Civ. 2892, 2003 WL 22203740 (S.D.N.Y. Sept. 23, 2003)........................8

<u>Eli Attia Architects v. Safra</u>,
    No. 94 Civ. 2928, 1996 WL 480721 (S.D.N.Y. Aug. 23, 1996) ..........................20

<u>Excellus Health Plan, Inc. v. Tran</u>,
    287 F. Supp. 2d 167 (W.D.N.Y. 2003) ..................................................................5

<u>F. McConnell & Sons, Inc. v. Target Data Systems, Inc.</u>,
    84 F. Supp. 2d 961 (N.D. Ind. 1999)....................................................................20

<u>Fuchs v. Fuchs</u>,
    65 A.D.2d 595, 409 N.Y.S.2d 414 (N.Y. App. Div. 1978) ...................................19

<u>G.K.A. Beverage Corp. v. Honickman</u>,
    55 F.3d 762 (2d Cir. 1995)......................................................................................9

<u>Gianni Versace S.p.A. v. Versace</u>,
    No. 01 Civ. 9645, 2003 WL 470340 (S.D.N.Y. Feb. 25, 2003)..............................6

<u>Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.</u>,
    50 N.Y.2d 183 (1980)............................................................................................10

<u>Hannex Corp. v. GMI, Inc.</u>,
    140 F.3d 194 (2d Cir. 1998) ..................................................................................12

ii

Kaufman v. Provident Life & Casualty Insurance Co.,
    828 F. Supp. 275 (D.N.J. 1992), aff'd, 993 F.2d 877 (3d Cir. 1993) ........................................21

Kaye v. Grossman,
    202 F.3d 611 (2d Cir. 2000) ........................................12

Leadsinger, Inc. v. Cole,
    No. 05 Civ. 5606, 2006 WL 2320544 (S.D.N.Y. 2006) ........................................5, 6

Leon v. Lukash,
    121 A.D.2d 693, 504 N.Y.S.2d 455 (N.Y. App. Div. 1986) ........................................22

Magellan International Corp. v. Salzgitter Handel GmbH,
    76 F. Supp. 2d 919 (N.D. Ill. 1999) ........................................20

Matisoff v. Dobi,
    90 N.Y.2d 127, 659 N.Y.S.2d 209 (1997) ........................................18

Merex A. G. v. Fairchild Weston System, Inc.,
    29 F.3d 821 (2d Cir. 1994) ........................................17

Nadel v. Play-by-Play Toys & Novelties, Inc.,
    208 F.3d 368 (2d Cir. 2000) ........................................4, 8, 9

Nester v. O'Donnell,
    693 A.2d 1214, 30 N.J. Super. 198 (N.J. 1997) ........................................21

Newin Corp v. Hartford Accident & Indemnity Co.,
    62 N.Y.2d 916, 467 N.E.2d 887, 479 N.Y.S.2d 3 (N.Y. 1984) ........................................23

PKG Group, LLC v. Gamma Croma, S.p.A.,
    446 F. Supp. 2d 249 (S.D.N.Y. 2006) ........................................4, 5

Pacheco v. United Medical Association, P.C.,
    305 A.D.2d 711, 759 N.Y.S.2d 556 (3d Dep't 2003) ........................................11

PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,
    818 F.2d 266 (2d Cir. 1987) ........................................12

Petri v. Gatlin,
    997 F. Supp. 956 (N.D. Ill. 1997) ........................................20

Reading International, Inc. v. Oaktree Capital Management LLC,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003) ........................................5, 6

1401714v1

SLM, Inc. v. Shelbud Products Corp.,
     No. 92 Civ. 3073, 1993 WL 127969 (S.D.N.Y. Apr. 20, 1993) .................................5

Scholastic, Inc. v. Stouffer,
     124 F. Supp. 2d 836 (S.D.N.Y. 2000) ...........................................................6, 8

Shred-It, USA, Inc. v. Mobile Data Shred, Inc.,
     202 F. Supp. 2d 228 (S.D.N.Y. 2002) ................................................................5

Solar Travel Corp. v. Nachtomi,
     No. 00 Civ. 3564, 2001 WL 641151 (S.D.N.Y. June 08, 2001) ..............................6

State Street Bank & Trust v. Inversiones Errazuriz Limitada,
     374 F.3d 158 (2d Cir. 2004) .........................................................................11

Stone Capital Advisors, LLC v. Fortrend International, LLC,
     15 A.D.3d 300, 791 N.Y.S.2d 11 (N.Y. App. Div. 2005) ....................................18

Taussig v. Clipper Group,
     16 A.D.3d 224, 790 N.Y.S.2d 602 (N.Y. App. Div. 2005) ..................................19

In re Verestar, Inc.,
     343 B.R. 444 (Bankr. S.D.N.Y. 2006).............................................................6

Zeising v. Kelly,
     152 F. Supp. 2d 335 (S.D.N.Y. 2001) ............................................................18

## STATUTES

Fed. R. Civ. P. 8(a) ..................................................................................4, 5, 8, 20

McKinney General Obligation Law § 5-701; 5-107(b)(3) ....................................17, 18

18 U.S.C. § 706............................................................................................2, 7, 10

18 U.S.C. § 1001 ...........................................................................................17, 18

## MISCELLANEOUS

Restatement (Second) of Torts § 766B ..........................................................9, 10, 12

*Protection of the Name and Emblem of the Red Cross: Hearings before
     the House Comm. on Foreign Affairs*, 77th Cong., 2d Sess. (1942)......................15

## PRELIMINARY STATEMENT

This is not a case about ARC's charitable activities or legitimate fundraising activities. Johnson & Johnson fully supports ARC's mission.[1] Over the years, J&J's support for the ARC has taken the form of cash donations, goods and services, and cooperative activities to protect the Red Cross Emblem that both entities share. In the past three years alone, J&J has donated about $5 million to ARC. J&J fully intends to continue its support in the years ahead.

Instead, this case arises out of ARC's decision to depart from its historical mission and to enter into commercial business in competition with J&J, ignoring over 100 years of history, its federal charter, and the federal criminal law. In a dramatic reversal, ARC has recently begun the practice of licensing the commercial use of the Red Cross Emblem to profit-making businesses. Those businesses, including the Co-Defendants here, then brand commercial products with the Red Cross Emblem and sell them to the public – in direct competition with J&J's similar products, which also bear the Red Cross Emblem due to J&J's legal status as a grandfathered user of the mark since at least 1887.

ARC's actions are in violation of its charter and the criminal law. First, under its charter, ARC may not engage in commercial activity. ARC has admitted this countless times – to J&J, to third parties, and to Congress. ARC now attempts to recast that long history, claiming that its abstention from commercial activity has always been "just" a matter of "policy." (ARC Answer ¶ 34.) This is patently untrue. In its numerous statements on this issue, ARC described its limited authority under its charter from the federal government. Indeed, in order to prove that

---

[1]    The following abbreviations are used herein:  "J&J" means Plaintiffs Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc., collectively.  "Defendants" means all five of the defendants:  the American National Red Cross ("ARC"), Learning Curve International, Inc. ("Learning Curve"), Magla Products, LLC ("Magla"), Water-Jel Technologies, Inc. ("Water-Jel"), and First Aid Only, Inc. ("FAO").  "Co-Defendants" means the four defendants other than ARC.

1

its federal charter precluded the ARC from "engag[ing] in business of a commercial character . . . in competition with private business," ARC obtained and submitted to Congress the written opinion of Attorney General Francis Biddle.

Second, ARC's recent entry into the commercial sphere has been by criminal means. Except for grandfathered users such as J&J, 18 U.S.C. § 706 prohibits anyone "other than the American National Red Cross and its *duly authorized employees and agents* and the sanitary and hospital authorities of the armed forces of the United States" from using the Red Cross Emblem, and makes violators subject to criminal sanctions. 18 U.S.C. § 706 (emphasis added). ARC expressly sought guidance from the Department of Justice on this restriction in 1978, asking the Attorney General to opine about the limits of that language. *See* Affirmation of Ravi V. Sitwala ("Sitwala Aff."), Exhibit A (9/12/78 Ltr. from ARC to DOJ) at 2. DOJ responded that "mere authorization" of use of the Emblem by ARC "is not enough." Rather, DOJ cautioned that "[t]he authorization may run *only* to ANRC employees and agents," and that any such "request should *specifically designate* the non-ANRC entity as an agent of the ANRC for the purpose of the display of the insignia." *See* Sitwala Aff., Exhibit B (10/11/78 Ltr. from DOJ to ARC) at 1, 2 (emphases added).

Before commencing its recent activity, however, ARC did not ask DOJ whether, and under what circumstances, it was permitted to authorize private businesses to sell branded ARC goods in commerce in competition with grandfathered users of the Red Cross Emblem. Instead, ARC decided to embark on that unlawful course without the comfort of a DOJ opinion. As J&J has alleged in its Amended Complaint, ARC's four Co-Defendants in this action are not its authorized agents – "specifically designated" or otherwise – for any purpose. Accordingly,

2

their use of the Red Cross Emblem is not sanctioned, and ARC's attempts to permit them to use the Emblem are in violation of the law.

Defendants have not answered these serious allegations. Instead, they have moved to dismiss certain causes of action based on unpersuasive merits arguments, rather than addressing whether the Amended Complaint meets the requirements of notice pleading. Thus, Defendants move to dismiss J&J's claim for tortious interference with prospective economic advantage (Claim 1), arguing that that the Amended Complaint does not provide them notice of what J&J complains. In fact, the Amended Complaint spells out in lengthy details J&J's allegations of Defendants' criminal violations and the interference that those violations have caused to the relations between J&J and its customers.

Next, ARC moves to dismiss J&J's promissory estoppel claim (Claim 4), arguing that it has not promised J&J anything. As J&J will prove at trial – and is clearly alleged – this is manifestly untrue. In written and oral statements before Congress, many detailed in the Amended Complaint, ARC promised J&J and the American public that it could not and would not enter into commercial activities. Congress relied on those promises in determining not to pass legislation that would have prohibited ARC's entry into the commercial arena – legislation that ARC claimed was redundant of the restrictions already in its charter. J&J likewise relied on these promises and continued to commercialize its Red Cross brand of products on the well-founded conviction that it would never face commercial competition from ARC. Because ARC's promises are evidenced by writings and because ARC admits in its Answer making the contested statements, there is no Statute of Frauds issue.

Finally, Defendants FAO and Water-Jel move to dismiss J&J's breach of contract claims against them (Claims 7 and 8). Defendants' arguments on this point relate not to the

3

sufficiency of J&J's allegations, but to the proper interpretation of the contracts at issue. These are not matters for a motion to dismiss. Defendants assert ambiguities in these contracts that – if they exist – can only be resolved after trial. Because these contractual claims may not be dismissed at this point, neither should J&J's claim that ARC tortiously interfered with the contracts at issue (Claim 2).

Defendants' motion to dismiss should be denied in its entirety.

## ARGUMENT

### I.     J&J Has Properly Alleged Tortious Interference with Prospective Economic Advantage

The parties agree on the elements of a cause of action for tortious interference with prospective economic advantage under New York law: "(1) the existence of business relations between [the plaintiff] and a third party; (2) that [the defendant] intentionally interfered with those relations; (3) that [the defendant] so acted either (a) for the sole purpose of harming [plaintiff] or (b) by wrongful means; and (4) resultant injury to the [plaintiff's] business relations with a third party." *Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000) (cited at Br. at 6).

Where the parties do not agree is on the applicable pleading standard. Defendants' sole argument for the dismissal of this claim is that J&J has not pleaded it with the required degree of particularity. Defendants claim that the allegations in the Amended Complaint are "conclusory," "speculative," and "vague" on all elements, and argue that a plaintiff alleging this claim must meet a more "demanding" standard that than with some other torts. (Br. at 6.) But in the very case that Defendants cite for that proposition – *PKG Group, LLC v. Gamma Croma, S.p.A.*, 446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006) (Rakoff, J.) – this Court specifically rejected a heightened pleading requirement for tortious interference with prospective

4

economic advantage. *Id.* at 252 n.1. Instead, the Court made clear that the normal notice

pleading requirements of Federal Rule of Procedure 8(a) apply, holding: "[A] complaint

[alleging this tort] must state enough details regarding the claim asserted to provide a defendant

with fair notice of what kind of misconduct is alleged." *Id.* at 251-52 (citing *Conley v. Gibson*,

355 U.S. 41, 47 (1957), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 127 S. Ct.

1955 (2007)). Further specificity is not required at the pleading stage.

This principle disposes of all of Defendants' arguments that J&J's allegations

concerning this claim are insufficient.

### 1. Identification of Business Relationship between Plaintiff and Third Party

As to the first element – the existence of a business relationship between plaintiff

and a third party – Defendants argue that the claim should be dismissed because J&J has failed to

name the third parties whose business relationships with J&J were injured. (Br. at 6-8.) But

"[t]he fact that [a] complaint fails to identify the relationships that were interfered with is of no

consequence" at this stage. *Shred-It, USA, Inc. v. Mobile Data Shred, Inc.*, 202 F. Supp. 2d 228,

236-37 (S.D.N.Y. 2002). To the contrary, "Plaintiff may use the discovery period to identify the

specific relationships at issue." *SLM, Inc. v. Shelbud Prod. Corp.*, No. 92 Civ. 3073, 1993 WL

127969, at *5 (S.D.N.Y. Apr. 20, 1993).

On this principle, many courts have found such a pleading to be sufficient under

New York law. *See, e.g., Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301,

335 (S.D.N.Y. 2003) (rejecting defendants' assertion that plaintiffs failed to identify with

sufficient specificity the prospective relationships in question, and holding that it "would be

unreasonable to require more specific pleadings prior to discovery"); *Excellus Health Plan, Inc.*

*v. Tran*, 287 F. Supp. 2d 167, 177-78 (W.D.N.Y. 2003) (holding defendants' generalized

allegations of interference with doctors' business relationships with their patients sufficient to

withstand plaintiff's motion to dismiss); *Leadsinger, Inc. v. Cole*, No. 05 Civ. 5606, 2006 WL

2320544, at *13 (S.D.N.Y. Aug. 10, 2006) ("[I]n the context of a tortious interference with

prospective economic advantage claim, plaintiff is not required at the pleading stage 'to identify

with sufficient specificity the prospective contractual relationships in question. . . . It would be

unreasonable to require more specific pleadings prior to discovery.'") (quoting *Reading Int'l*); *In

re Verestar, Inc.*, 343 B.R. 444, 485 (Bankr. S.D.N.Y. 2006) ("Although [plaintiff] has not

identified all relevant business relations by name, it has alleged facts demonstrating interference

with [its] relations with its vendors and customers. These allegations fairly place [defendant] on

notice, and there can be further identification of the specific contracts and relationships at issue

during the course of discovery.").

There are other cases, some cited by Defendants (*see* Br. at 6-7), that appear to

mandate the identification of particular business relationships in the complaint. In some of these

cases, the courts required such specification because, without it, the pleading was "not sufficient

to apprise defendant of plaintiff's claims." *See, e.g., Gianni Versace S.p.A. v. Versace*, No. 01

Civ. 9645, 2003 WL 470340, at *2 (S.D.N.Y. Feb. 25, 2003) (allegation that plaintiff "would

have been able to find someone with whom to do business" but for defendant's interference was

merely speculative); *Solar Travel Corp. v. Nachtomi*, No. 00 Civ. 3564, 2001 WL 641151, at *10

(S.D.N.Y. June 08, 2001) (plaintiff's allegation that it "lost business from its customers" was

"not sufficient to apprise defendant of plaintiff's claims"); *Scholastic, Inc. v. Stouffer*, 124

F. Supp. 2d 836, 852 (S.D.N.Y. 2000) ("Without any details as to the identity of the third parties

or plaintiffs' dealings with them, Stouffer's conclusory allegation that such third parties

6

influenced the decisions of the publishers, and that such publishers included Landoll, is not sufficient to apprise plaintiffs of Stouffer's claims.").

Speculative allegations such as those described above do not give the defendant a fair opportunity to respond to the claim. But such is not the case here. J&J's contentions are amply clear from the Amended Complaint: ARC's purported licensing of the Red Cross Emblem to serve as the "brand" of commercial products manufactured and sold by the Co-Defendants is in violation of both ARC's charter and 18 U.S.C. § 706, and has caused J&J to lose sales and market share from its customers. For instance, J&J has alleged:

- "[J&J] ha[s] ongoing business relationships and opportunities with wholesalers, retailers and consumers of their red-cross-branded products." (A.C. ¶ 96.)

- "ARC has begun pursuing commercial co-ventures with a variety of companies through cause-related marketing agreements, sponsoring items such as first-aid kits, hand-sanitizers, latex gloves, nail clippers, comb and brush sets, humidifiers, shoes, and Christmas ornaments." (A.C. ¶ 80.)

- "Under color of agreements with ARC, Water-Jel and FAO . . . now use the Red Cross Emblem openly on their products, which compete with J&J's products." (A.C. ¶ 86.)

- "FAO's first-aid kits are sold in mass-market retailers, and they compete directly with JJCCI's first-aid kits sold under the Red Cross Emblem . . . ." (A.C. ¶ 87.)

- "Similarly, Water-Jel's hand-sanitation products unfairly compete with J&J's hand-sanitation products by wrongfully displaying ARC's imprimatur." (A.C. ¶ 88.)

- "Th[e] first-aid kits are sold by Learning Curve in mass-market retailers, and they compete directly with JJCCI's first-aid kits sold under the Red Cross Emblem." (A.C. ¶ 90.)

- "ARC's commercial use and licensing of the Red Cross Emblem have resulted in a loss of sales and market share with respect to J&J's first-aid and health-care related products. . . . The other Defendants, acting under purported licenses from ARC, have similarly damaged J&J." (A.C. ¶ 95.)

7

These allegations make clear that it is the Defendants' entry into the commercial market and into competition with J&J that causes the interference with J&J's customers. J&J need not provide Defendants a customer list in order to apprise Defendants of its claims.

Nevertheless, if not already apparent from the Amended Complaint, the customers of most concern to J&J are the ones actually selling Defendants' products. Their names appear on the ARC website and are, of course, already known to the Defendants: Target, Wal-Mart, Walgreens, and CVS. Other customers may be identified during discovery. If the Court determines that such extra specificity is mandated in this case by Rule 8(a), J&J respectfully requests leave to replead to identify these third parties. *See, e.g., Scholastic, Inc.*, 124 F. Supp. 2d at 850-52 (allowing defendant leave to replead its tortious interference with prospective economic advantage counterclaim to, among other things, identify specific entities with which she had relationships).

### 2. Defendants' Intentional Interference with Plaintiff's Business Relations by Wrongful Means

Defendants also contend that J&J has not sufficiently pleaded the second and third elements of the tort: (2) that Defendants intentionally interfered with the economic relations of J&J and the third parties, (3) either (a) with the sole purpose of harming plaintiff or (b) by wrongful means.

On these elements, some cases insert an "intent" requirement in the second element, while others leave "intent" entirely to be governed by the third element. *Compare Deutsch v. Kroll Assocs., Inc.*, No. 02 Civ. 2892, 2003 WL 22203740, at *5 (S.D.N.Y. Sept. 23, 2003) (Rakoff, J.) (requiring "(2) that defendants *intentionally* interfered with those relations; (3) that defendants so acted either (a) for the sole purpose of harming plaintiffs or (b) by wrongful means . . . .") (emphasis added) *with Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d

8

248, 254 (S.D.N.Y. 2001) (Rakoff, J.) (requiring "(2) interference with those business relations; (3) actions taken for the sole purpose of causing harm to the claimant or the use of dishonest, unfair, or improper means . . . ."); *compare also Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000) (quoted *supra*) *with G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995) ("To prevail on this claim, 'a plaintiff must demonstrate that the defendant interfered with business relations existing between a plaintiff and a third party, either with the purpose of harming the plaintiff or by means that are dishonest, unfair, or improper.'").

To the extent that "intent" is required in the second element, it is the Restatement "intent" that an actor does an act knowingly, recognizing its substantially certain consequences, Restatement (Second) of Torts § 766B cmt. d, leaving the pleading of either "malicious" or "wrongful" actions for the third element. So understood, the second element requires interference and intention. The third element requires either purpose to harm or wrongful activity. On these elements, J&J's allegations are sufficient.

First, the Amended Complaint amply details Defendants' interference with J&J's business relationships. The Amended Complaint alleges that the Defendants branded products with the Red Cross Emblem and offered those goods for sale to mass market retailers with whom J&J has business relationships. (A.C. ¶¶ 80-100.) The pleading also alleges that Defendants' introduction of such Red Cross-branded goods into this market has caused J&J to lose sales of its own Red Cross-branded products. (A.C. at ¶¶ 95, 98-99.) In particular, as noted above, Defendants have directed their activities towards Target, Wal-Mart, Walgreens and CVS, and convinced those J&J customers to purchase ARC goods to compete with J&J's market-leading brands. Since shelf-space is limited, the necessary and expected effect of Defendants' activities has been to reduce J&J's sales to these customers. From these allegations, Defendants are fully

9

on notice as to which of their actions caused the interference J&J complains of: J&J complains that Defendants' entry into the commercial market for Red Cross-branded goods has interfered with J&J's relationships with its customers.

Second, J&J's allegations regarding Defendants' "intention" are also sufficient. Under the Restatement definition, which has been favorably cited in New York, *see Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 189 (1980), J&J must allege that Defendants intended to take the action that results in the interference, with the knowledge that interference was substantially certain to occur. Restatement (Second) of Torts § 766B cmt. d ("The interference with the other's prospective contractual relation is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action."). Defendants do not dispute that their actions were intentional; there is no contention in their Answers or Counterclaims that they introduced Red Cross Emblem-branded goods into the commercial market inadvertently or negligently. And the Amended Complaint alleges that Defendants knew that their actions would result in a loss of sales for J&J. (A.C. at ¶¶ 98-99.) These allegations are sufficient under the second element.

Under the third element of this cause of action, a plaintiff may allege *either* that the defendants acted "for the sole purpose of harming plaintiff," *or* that they acted "by wrongful means." Under New York law, "wrongful means" may be sufficiently plead by alleging that the defendant has engaged in criminal conduct. *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190, 818 N.E.2d 1100, 1103-04, 785 N.Y.S.2d 359, 362 (2004) (conduct "amount[ing] to a crime" is sufficiently culpable to support a tortious interference with prospective economic advantage claim). The Amended Complaint is rife with allegations concerning Defendants' criminal conduct: it alleges that ARC violated 18 U.S.C. § 706 by purporting to license the Red Cross

Emblem to parties (the Co-Defendants) who are not ARC's agents, and that ARC's Co-Defendants violated the same criminal statue by their use of the Red Cross Emblem on commercial products. These allegations are expressly incorporated by reference into each of J&J's causes of action, including its claim for tortious interference with prospective economic advantage. (*See* A.C. ¶ 96.) The Amended Complaint thus provides Defendants with fair and detailed notice of the criminal activity that J&J alleges in support of its tort claim.

### 3.     Resultant Injury to J&J's Business Relations with Its Customers

Finally, Defendants contend that J&J has not sufficiently alleged that their actions caused the injury of which J&J complains. Defendants claim that J&J's allegations of injury will not suffice unless J&J can state that "but for Defendants' conduct, J&J's prospective business opportunities would have resulted in actual contracts or relationships." (Br. at 9.)

The Amended Complaint plainly alleges "but for" causation. J&J has specifically alleged that Defendants were aware that "harm to Plaintiffs would proximately result from [their] actions" (A.C. ¶¶ 98-99) and that those actions are in fact causing "immediate and irreparable injury to Plaintiffs" (A.C. ¶ 100). This is a sufficient pleading and is, in fact, an allegation of but for causation. *See, e.g., State Street Bank & Trust v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171 (2d Cir. 2004) ("The defendants cannot prevail on their tortious interference counterclaim unless they 'demonstrate . . . that the wrongful acts were the proximate cause of the rejection of the plaintiff's proposed contractual relations.'") (quoting *Pacheco v. United Med. Ass'n, P.C.*, 305 A.D.2d 711, 712, 759 N.Y.S.2d 556, 559 (3d Dep't 2003)).

Defendants also claim that the pleading is deficient because it does not allege that Defendants' actions cost J&J "actual contracts or relationships." (Br. at 9.) In a business where purchase orders from retailers form the only contracts, Defendants' actions have indeed cost J&J

contracts for goods, reducing J&J's sales and interfering with its business relationships. Thus, J&J has alleged that Defendants' activities "have resulted in a loss of sales and market share with respect to [J&J's] first-aid and health-care related products." (A.C. ¶ 95.) That is sufficient under New York law. "[I]t is well-settled that a plaintiff can recover if that plaintiff can prove that the defendant tortiously interfered with 'a continuing business or other customary relationship not amounting to a formal contract.'" *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir. 1998) (citation omitted). Thus, "the tort encompasses the kind of conduct alleged here, including 'interferences with . . . the opportunity of selling or buying . . . chattels or services, and any other relations leading to potentially profitable contracts.'" *Id.* (quoting Restatement (Second) of Torts § 766B cmt. c; alteration in original). The alleged diminution of J&J sales as a result of Defendants' actions more than suffices. *Cf. PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 270 (2d Cir. 1987) (dismissing tortious interference claim where "the underlying business relations remained undisturbed" and "unchanged in any way," and plaintiff had not alleged "severance of the relationship itself, or at least some injury to that relationship").

## II.    J&J Has Properly Stated a Claim for Promissory Estoppel

ARC argues for the dismissal of J&J's promissory estoppel claim (Claim 4) on two bases: first, that J&J cannot point to any promise ARC made to J&J, and second, that J&J has not alleged unconscionability. Both of these contentions are baseless. J&J has properly pled all of the elements of this claim: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party for whom the party was made; and (3) detrimental reliance by the party to whom the promise was made. *See, e.g., Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000). And because the Statute of Frauds is no bar to J&J's claim, J&J need not plead unconscionability.

12

A.    **ARC Made Clear and Unambiguous Promises to J&J that It Would Not Engage in Commercial Activities**

ARC contends that the J&J has failed to point to any promise from ARC to J&J. This is not the case. As J&J has alleged, and as ARC has admitted in its Answer, ARC promised in writing that "[t]he American Red Cross is not now engaged in any commercial venture for profit, has no intention of engaging in such operations, and is advised that the provisions of its charter, by which it is bound, would not permit it to engage in commercial enterprises for profit." (ARC Answer ¶ 45.) That written promise was clear and unequivocal, it was addressed to Congress, J&J, and the American Public, and it certainly suffices for purposes of pleading.

1.    **ARC's Promises**

The context for ARC's promises came in 1942, when the U.S. House of Representatives and Senate convened hearings to review the scope of ARC's federal charter. As part of this review, Congress considered enacting legislation to ban all commercial uses of the Red Cross Emblem – whether by ARC itself or by the grandfathered users like J&J. Both ARC and J&J were keenly interested in these issues. For J&J, its ability to continue to use its Red Cross trademark on first aid kits and other health-related products hung in the balance. For ARC, the concern was that new legislation prohibiting it from using the Emblem commercially was insulting – unnecessary and redundant – because such commercial activities were already prohibited by ARC's charter.

In this context, H.J. Hughes, General Counsel of ARC, unequivocally promised Congress that the statute was unnecessary because ARC had no power to engage in any future commercial activity:

> [Mr. Hughes (of ARC):]  [I]nclusion of a clause [prohibiting the ARC from engaging in commercial ventures for profit] is a gratuitous and unfair criticism of something which has never occurred . . . .

13

> [Sen. Mahoney:] *Your point is that [the clause] undertakes to prohibit something which the Red Cross is not authorized to do by its charter?*
>
> [Hughes:] *That is it; yes, sir.*

(A.C. ¶ 66.)

ARC objected vehemently to the passage of this legislation. It provided testimony from numerous witnesses, all of whom admitted that ARC does not engage in commercial activities, and is not permitted to do so by its charter. These statements are alleged in detail in the Amended Complaint. (*See, e.g.*, A.C. ¶¶ 63, 65.)

ARC also confirmed its lack of authority to engage in commercial activities in two letters that it submitted to Congress. The first letter was from ARC's Chairman, Norman H. Davis. As ARC has admitted in its Answer, Davis promised that the ARC would not, and could not, engage in commercial activities:

> *The American Red Cross is not now engaged in any commercial venture for profit, has no intention of engaging in such operations, and is advised that the provisions of its charter, by which it is bound, would not permit it to engage in commercial enterprises for profit.*

(ARC Answer ¶ 45 (emphasis added).)

Thereafter, ARC invoked even higher authority, then-Attorney General Francis Biddle, whom ARC claims in its Answer was acting in the capacity of "counselor" to the organization. (ARC Answer ¶ 49.) On behalf of ARC, the Attorney General of the United States unequivocally promised the Congress that it need not be concerned that ARC would engage in commercial activities in the future because it had no power to do so:

> I have your letter of June 8, 1942, in which you propound a question to me as counselor with respect to the powers of the American Red Cross.
> . . . .

14

> The corporation was granted no powers, either directly or by implication, to engage in ordinary commercial manufacturing or mercantile activities.  It is, of course, axiomatic that a corporation has only those powers which are granted affirmatively in its charter or which may be incidentally necessary to the fulfillment of the functions which it is created to discharge.  Needless to say, this principle applies with stronger reason to an institution such as the American Red Cross which has been repeatedly declared in administrative rulings and judicial decisions to be a nonprofit, charitable, and educational institution and which has long enjoyed under such rulings a unique status among charities as a quasi-governmental agency.
>
> ***For the reasons thus briefly indicated it is clear that the American Red Cross is not empowered to engage in business of a commercial or manufacturing character in competition with private business.***

(A.C. ¶ 67.)

These statements were made as part of a clear and unequivocal promise from ARC to the Congress that it would not, and could not, engage in commercial activities.  Thus, Chairman Davis, in his oral testimony, declared, "I am sure that you cannot make a case that the Red Cross is in the commercial business.  We are not running any commercial enterprise.  We are not conducting any commercial enterprises, and *we have no intention whatever of doing so*." *Protection of the Name and Emblem of the Red Cross:  Hearings before the House Comm. on Foreign Affairs*, 77th Cong., 2d Sess., at 255 (1942) (emphasis added) (cited at A.C. ¶ 65).  A Congressman then pressed Davis further:

> [Rep. Eaton:]  Mr. Davis, would you say that this bill [to ban commercial use by grandfathered users] would put the American Red Cross into the commercial business or give them the opportunity to do so as a monopoly?
>
> [Mr. Davis:]  It never occurred to me that such a thing would happen.

(A.C. ¶ 65.)

15

For purposes of pleading, J&J has pleaded a clear and unequivocal promise, made as part of a *quid pro quo* to prevent Congress from passing legislation that ARC viewed as unnecessary and insulting.[2]

### 2.    ARC's Promises Were Made to J&J

ARC argues that any statements it made before Congress were at most promises to Congress, not to J&J. (Br. at 11-12.) J&J has pleaded that the promises were made to it, and that should suffice at this stage of the case. (A.C. ¶¶ 63-69.)

In fact, as J&J will prove at trial, ARC's written and oral promises before Congress were promises to the public at large – and were very specifically promises to the other parties engaged in the legislative hearings, whose commercial interests were at stake in the hearings. J&J was such a party. J&J was present at the hearings, presented testimony, and actively engaged in colloquy with the ARC representatives during the testimony. For example, Kenneth Perry, a J&J representative, directly engaged the ARC representative precisely on the subject at hand, and received a direct promise from ARC that it had not engaged in the commercial sale of Red Cross kits.

> [Mr. Perry (of J&J):] With relation to the discussion on the section prohibiting use of the Red Cross symbol by the American Red Cross for commercial purposes, there is mentioned by Mr. Hughes [of ARC] the sale of first-aid books, but no mention of the sale of first-aid kits and first-aid materials which, according to the record of the House, run into the hundreds of thousands of dollars.
>
> We have no information as to what those sales have been in the

---

[2]    ARC misunderstands J&J's reliance on the "Barton Agreement," a contract entered into in 1895 by Robert Wood Johnson of J&J and Clara Barton of ARC. J&J recognizes that the Barton Agreement never came into effect. Nonetheless, in that contract, ARC recognized J&J's pre-existing use of the Red Cross Emblem and promised J&J that, if it obtained the power to license third parties to compete in commercial business using the Emblem, it would honor J&J's pre-existing exclusive markets. Although this contract is not, in itself, the actionable promise on which J&J sues, it provides part of the basis for J&J's reasonable reliance on the promises made by ARC during the legislative hearings.

16

year 1941 and 1942, but we do know, from our experience in the
field, that it certainly is many times that of 1940 and 1941.

[Mr. Hughes (of ARC):]  As a matter of fact, Mr. Perry, the sales of
first-aid kits were less than 3,600, less than 1 to each chapter in the
United States.  I would be very glad to have a sworn statement
from our supply department, if that is material. . . .
. . . .
[Sen. Mahoney:]  Is that done as a profit-making business?

[Mr. Hughes:]  No, sir. . . .

(A.C. ¶ 69.)

### B.    J&J Is Not Required to Allege Unconscionable Injury

ARC also contends that J&J's allegations are insufficient for failure to allege

unconscionable injury.  It argues that, because ARC's promises could not be performed within

one year, J&J's case would otherwise be barred by the Statute of Frauds and so must be

supported by "unconscionable injury."  *Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821,

826 (2d Cir. 1994) ("To invoke the power that equity possesses to trump the Statute of Frauds,

plaintiff must demonstrate 'unconscionable' injury, i.e., injury beyond that which flows naturally

(expectation damages) from the non-performance of the unenforceable agreement.").

ARC just assumes that the Statute of Frauds would otherwise bar J&J's claim for

promissory estoppel.  In fact, there is no Statute of Frauds issue here.  The promises upon which

J&J relies are (1) signed, written promises that ARC submitted to Congress, and (2) oral

promises that ARC made before Congress that were transcribed, given subject to penalty for

false statement under 18 U.S.C. § 1001, and admitted by ARC.  These promises raise no issues of

enforceability under the Statute of Frauds.  *See* McKinney's General Oblig. Law § 5-701.

Both the statements of ARC's chairman and its "counselor," the Attorney General,

cited above are signed writings that fully meet the requirements of the Statute of Frauds.

Mr. Davis wrote:

17

> The American Red Cross is not now engaged in any commercial
> venture for profit, has no intention of engaging in such operations,
> and is advised that the provisions of its charter, by which it is
> bound, would not permit it to engage in commercial enterprises for
> profit.

(ARC Answer ¶ 45.)  Attorney General Biddle wrote:

> For the reasons thus briefly indicated it is clear that the American
> Red Cross is not empowered to engage in business of a
> commercial or manufacturing character in competition with private
> business.

(A.C. ¶ 67; ARC Answer ¶ 49.)

Moreover, the oral testimony also complies with the Statute of Frauds.  The testimony was recorded and subject to the penalties of 18 U.S.C. § 1001 for false statements. These protections more than meet the purposes of the Statute of Frauds.  *See Zeising v. Kelly*, 152 F. Supp. 2d 335, 343 (S.D.N.Y. 2001) (noting that purpose of Statute of Frauds is to "protect people from alleged contractual obligations not supported by written evidence"); *Bochino v. Palmer*, 203 N.Y.S.2d 301, 305 (N.Y. Sup. Ct. 1960) ("The minutes and records of [a legislative or governing body of a municipal corporation] proceeding constitute sufficient compliance with the Statute of Frauds."); *Argus Co. v. Mayor, Alderman & Commonalty of the City of Albany*, 55 N.Y. 495, 495 (1874) (holding that the minutes of a municipality meeting comply with Statute of Frauds).

In any event, ARC admits to making the quoted statements in its Answer.  (ARC Answer ¶¶ 45, 49-50.)  Under the "judicial admissions exception" to the Statute of Frauds, that is also sufficient.  An oral agreement is enforceable if the promisor admits in court to having made it.  *See* McKinney's General Oblig. Law § 5-107(b)(3); *Matisoff v. Dobi*, 90 N.Y.2d 127, 134, 659 N.Y.S.2d 209, 212-13 (1997); *see also Stone Capital Advisors, LLC v. Fortrend Int'l, LLC*, 15 A.D.3d 300, 300-01, 791 N.Y.S.2d 11, 12 (N.Y. App. Div. 2005) (Statute of Frauds is no bar

18

to enforcement of oral agreement that was admitted in summary judgment motion); *Taussig v. Clipper Group*, 16 A.D.3d 224, 224-25, 790 N.Y.S.2d 602, 602 (N.Y. App. Div. 2005) (same, where oral agreement was admitted in deposition); *Fuchs v. Fuchs*, 65 A.D.2d 595, 596, 409 N.Y.S.2d 414, 415 (N.Y. App. Div. 1978) (same, where oral agreement was read into court record).

### III.    J&J Has Properly Alleged the Breach of Its Contracts with FAO and Water-Jel

Defendants FAO and Water-Jel have also moved to dismiss J&J's claims for breach of contract against them (Claims 7 and 8), and ARC has moved to dismiss J&J's claim that ARC tortiously interfered with those contracts (Claim 2). In so arguing, Defendants ignore J&J's properly-pled allegations of breach, and instead assert alternative readings of the underlying contracts. Defendants' arguments serve only to create ambiguity and raise questions of fact as to the proper interpretation of those contracts – issues that cannot be considered on a motion to dismiss.

### A.    J&J Has Properly Alleged that FAO Breached Its Agreement with J&J

On April 11, 2002, FAO filed a trademark application to register the mark pictured below for intended use in connection with goods in International Classes 5, 10, 16, and 28:



The application specifically stated that FAO intended to use the mark on, among other items, "first aid kits; safety kits containing first aid supplies [and] wound care supplies . . . ." (*See* Sitwala Aff., Exhibit C, Serial No. 76/394,583.)

Because the proposed mark contained a Greek cross, J&J opposed its registration. To settle that opposition proceeding, the parties entered into a contract dated July 7, 2005, pursuant to which FAO agreed "not [to] use the design feature of the mark identified in Serial No. 76/394,583 in whole or in part in the color red or orange, or in white on a red or orange background, or colorable imitations thereof, in connection with the goods identified in such application." (*See* A.C. Exhibit D, J&J/FAO Agreement.) Now, purportedly under license from ARC, FAO uses the Red Cross Emblem on a line of first aid kits.

J&J has alleged the elements of breach of contract: the existence of a contract, FAO's duty thereunder, FAO's breach of that duty, and J&J's injury. (*See* A.C. ¶¶ 86-87, 95, 129-31.)[3] J&J's allegations are based in its interpretation of the underlying agreement: the Red Cross Emblem is "a part" of and a "colorable imitation" of the mark that FAO earlier agreed not to register, and FAO now uses the Red Cross Emblem on a line of first aid kits, which are among the (International Class 5) goods identified in the application it agreed to amend.

In support of its motion to dismiss, FAO cannot point to any insufficiency in J&J's pleading. Instead, it argues the merits. FAO contends that the underlying agreement does

---

[3]     ARC also argues that, under New Jersey law, J&J failed explicitly to allege its performance of its own obligations under the J&J/FAO Agreement (*i.e.*, that J&J would not oppose FAO's trademark application once it was revised as set out in the Agreement). (Br. at 16 n.4.) The objection is properly raised in a footnote, since it is makeweight. ARC does not allege that J&J did not perform its contractual obligation and so could not meet this pleading requirement. To the contrary, J&J met its obligations and has implicitly satisfied this pleading requirement. The fact that J&J performed its simple obligation not to oppose the application at issue is an obvious inference from the Amended Complaint. (*See* A.C. ¶ 130 ("[J&J] agreed to withdraw its opposition to FAO's registration . . . ."). *See also Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 925 (N.D. Ill. 1999) (performance by plaintiff could be inferred from complaint); *Eli Attia Architects v. Safra*, No. 94 Civ. 2928, 1996 WL 480721, at *1 (S.D.N.Y. Aug. 23, 1996) (refusing to dismiss a quantum meruit claim, stating that "one can infer that plaintiff performed his obligations in good faith, and in reliance on the oral contract"). To require more formalistic pleading of this element would be contrary to the liberal notice pleading standard of the Federal Rules. *See, e.g., F. McConnell & Sons, Inc. v. Target Data Sys., Inc.*, 84 F. Supp. 2d 961, 978 (N.D. Ind. 1999) ("Rule 8(a)(2) does not require a plaintiff to plead the specific elements of a contract claim, but only requires that the complaint put the defendant on notice of that claim."); *Petri v. Gatlin*, 997 F. Supp. 956, 964-66 (N.D. Ill. 1997) (same).

20

not contain any restriction on FAO's use of the actual Red Cross Emblem, but only covers the exact design mark depicted above. (Br. at 16.) FAO also argues that its agreement with J&J only applies to goods listed under its original application serial number. Here, FAO attempts to avail itself of a technicality: following its agreement with J&J, FAO split its application into two, leaving certain goods to be covered by the original serial number, but moving first aid kits into a second, separate application (Serial No. 76/978,361). FAO appears to contend that its agreements with J&J only apply to the goods that it left listed in the original application, not those that it transferred to its successor.

These issues are not pleading issues. To the extent that the terms of the J&J/FAO agreement are ambiguous and susceptible to more than one interpretation, under New Jersey law (the governing law of the agreement), the proper construction of the agreement is a matter for the jury. *See Kaufman v. Provident Life & Cas. Ins. Co.*, 828 F. Supp. 275, 282 (D.N.J. 1992), *aff'd*, 993 F.2d 877 (3d Cir. 1993) (table); *Nester v. O'Donnell*, 693 A.2d 1214, 30 N.J. Super. 198 (N.J. 1997). The jury will have to weigh the strength of the parties' extrinsic evidence on these points, in ascertaining whether they intended the agreement to apply only to the literal design mark depicted above, and only to goods that remained listed in FAO's original trademark application after FAO split that application in two.

**B.    J&J Has Properly Alleged that Water-Jel Breached Its Agreement with J&J**

Defendant Water-Jel makes similar arguments for the dismissal of J&J's breach of contract claim against it. On July 29, 1993, Water-Jel filed applications to register the mark pictured below for use in connection with International Class 5 goods, specifically "pharmaceutical preparation, namely burn dressings, lotions, creams, and ointments for the

21

treatment of burns, sunburn and skin irritations." (*See* Sitwala Aff., Exhibit D, Serial

Nos. 74/419,451 and 74/419,598.)



   J&J opposed these registrations, and to settle that dispute, the parties entered into

a contract dated January 31, 1995, pursuant to which Water-Jel agreed "not [to] use a Greek

Cross feature of its marks in red, or in white on a red background." (*See* A.C. Exhibit C,

J&J/Water-Jel Agreement.)  Notwithstanding that agreement, Water-Jel has now entered into an

agreement with ARC purporting to allow it to use the Red Cross Emblem on a line of

moisturizing hand sanitizers.

   J&J has properly alleged the elements of breach of contract with respect to this

agreement.  (*See* A.C. ¶¶ 86, 88, 95, 133-35.)  The basis for J&J's claim is that the Red Cross

Emblem Water-Jel is now using is the "Greek Cross feature" that Water-Jel committed not to use,

in the color red.

   Water-Jel now argues that the agreement only covers "its own trademark" as

depicted above, and does not limit its use of the actual Red Cross Emblem in any way.  (Br. at

17.)  This is not an argument as to the sufficiency of J&J's pleading; it is an argument about the

proper interpretation of the contract.  Under New York law (which governs the contract), the

meaning of ambiguous contractual terms is a factual matter for the jury – not an issue for the

court to determine on a motion to dismiss.  *See Leon v. Lukash*, 121 A.D.2d 693, 694, 504

N.Y.S.2d 455, 455 (N.Y. App. Div. 1986) ("When the language of a contract is ambiguous, its

22

construction presents a question of fact."); *see also Newin Corp v. Hartford Accident & Indem. Co.*, 62 N.Y.2d 916, 918, 467 N.E.2d 887, 888-89, 479 N.Y.S.2d 3, 4-5 (N.Y. 1984) (extrinsic evidence required to determine interpretation of ambiguous contractual language).

Because J&J's allegations of Water-Jel's breach of contract are wholly sufficient, this claim should not be dismissed.

### C.    ARC's Motion to Dismiss the Tortious Interference with Contract Claim Should Be Denied

ARC argues that J&J's claim that it tortiously interfered with the FAO and Water-Jel contracts described above (Claim 2) should also be dismissed, due to the insufficiency of J&J's pleading of the underlying breach of contract claims (Claims 7 and 8). As shown above, J&J has properly pled the breach of both contracts, and the motion to dismiss those contract claims should be denied. As such, ARC's motion to dismiss Claim 2 should also be denied.

### CONCLUSION

For the foregoing reasons, J&J respectfully requests that the Court deny defendants' motion to dismiss in its entirety. If the Court concludes that the pleading is in any way deficient, J&J respectfully asks for leave to replead.

Dated:  New York, New York
        October 8, 2007

                                    Gregory L. Diskant
                                    Sarah E. Zgliniec
                                    Ravi V. Sitwala
                                    Rachael Kuilema Klein
                                    Kathryn Picanso
                                    PATTERSON BELKNAP WEBB & TYLER LLP
                                    1133 Avenue of the Americas
                                    New York, New York 10036
                                    Tel:  (212) 336-2000
                                    Fax:  (212) 336-2222

1401714v1

and

Roger L. Zissu
Richard Z. Lehv
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017
Tel:  (212) 813-5900

*Attorneys for Plaintiffs*

1401714v1