Jonathan L. Abram
Raymond A. Kurz
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel:  (202) 637-5681
Fax:  (202) 637-5910

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC., <br><br>    Plaintiffs, <br><br> v. <br><br> THE AMERICAN RED CROSS, LEARNING CURVE INTERNATIONAL, INC., MAGLA PRODUCTS, LLC, WATER-JEL TECHNOLOGIES, INC., and FIRST AID ONLY, INC., <br><br>    Defendants. | 07 Civ. 7061 (JSR/DCF) <br><br><br> **ECF CASE** <br> **ELECTRONICALLY FILED** |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ..........................................................................................6

LEGAL STANDARD...................................................................................................6

ARGUMENT ...............................................................................................................7

I.     AS A MATTER OF LAW, NEITHER THE CRIMINAL PROHIBITION
       IN SECTION 706 NOR ARC'S CHARTER BARS ARC FROM
       SELLING PRODUCTS ITSELF OR AUTHORIZING THE NAMED
       CO-DEFENDANTS TO USE THE EMBLEM ON PRODUCTS SOLD
       TO THE PUBLIC IN FURTHERANCE OF THE ARC'S MISSION ..............................7

       A.     18 U.S.C. § 706 Does Not Preclude ARC From Authorizing Third
              Parties To Use The Emblem ....................................................................7

       B.     J&J Cannot Rely On The Charter Of ARC To Prevent ARC From
              Selling Products Or Engaging In Other "Commercial Activity"..........10

              1.     The Charter. ................................................................................11

              2.     The IRS. ......................................................................................13

              3.     Fundraising .................................................................................14

              4.     A Century Of Congressional Authorization .................................16

II.    SUMMARY JUDGMENT IS WARRANTED ON THE TRADEMARK
       DILUTION CLAIMS (COUNTS FIVE & SIX) ............................................21

       A.     There Can Be No Trademark Dilution Claim Because Congress
              Expressly Allows ARC To Use The Emblem In Furtherance Of
              ARC's Mission .....................................................................................22

       B.     J&J's Trademark Dilution Claims Are Barred By Laches ....................24

       C.     J&J's Allegations Of Dilution By Tarnishment Fail As A Matter
              Of Law For Additional Reasons ...........................................................29

       D.     J&J's Allegations Of Dilution By Blurring Also Fail For
              Additional Reasons ...............................................................................30

**TABLE OF CONTENTS—Continued**

Page

III.    SUMMARY JUDGMENT IS WARRANTED ON COUNT ONE FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE ...................................................................................31

    A.    J&J Cannot Establish The Claim Element That ARC Acted By Wrongful Means ..........................................................................32

    B.    J&J Also Cannot Establish The Loss Of Its Business Relationship with CVS, Walgreens, Wal-Mart, or Target; Nor Can It Establish Interference, Injury, or Proximate Cause ...............................33

IV.    SUMMARY JUDGMENT IS WARRANTED ON COUNT THREE FOR UNFAIR COMPETITION.................................................................35

    A.    J&J Is Unable To Point To Any Unlawful Activity In Support Of Its Unfair Competition Claim ......................................................35

    B.    J&J Lacks Any Evidence Of Bad Faith By ARC, A Required Claim Element ...........................................................................35

V.    SUMMARY JUDGMENT IS WARRANTED ON COUNT TWO FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS......................36

        1.    Knowledge. ..................................................................36

        2.    Intent. ...........................................................................37

VI.    THE UNDISPUTED FACTS DEMONSTRATE THAT J&J HAS EXCEEDED THE SCOPE OF ITS GRANDFATHERED RIGHTS.............................38

    A.    J&J Has Impermissibly Exceeded The Scope Of Its Grandfathered Rights ...........................................................................38

    B.    J&J's '913 Registration Is In Violation Of 15 U.S.C. § 1052(b) And Should Therefore Be Cancelled ......................................40

CONCLUSION.............................................................................40

# TABLE OF AUTHORITIES

**Page**

## CASES:

@Wireless Enters., Inc. v. AI Consulting, LLC, 2006 WL 3370696, at \*7
   (W.D.N.Y. Oct. 30, 2006)............................................................................................37

800America, Inc. v. Control Commerce, Inc., 202 F. Supp. 2d 288, 289 (S.D.N.Y. 2002)..........37

Ala. Power Co. v. Ickes, 302 U.S. 464, 482 (1938)................................................................11, 36

Allcar Motor Parts Corp. v. Federal-Mogul Corp., 1998 WL 671448, at \*5
   (S.D.N.Y. Sept. 29, 1998)...........................................................................................33

Allied Main. v. Allied Mech. Trades, Inc., 369 N.E.2d 1162, 1166 (N.Y. 1977) .........................22

AM Gen. Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 803, 809, 823-824
   (7th Cir. 2002)...................................................................................................... 27-28, 29

Am. Nat'l Red Cross v. ASD Specialty Healthcare, Inc., 888 So. 2d 464, 465 (Ala. 2003).........19

Am. Nat'l Red Cross v. S.G., 505 U.S. 247, 250, 263, 266 (1992)........................................12, 19

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-250, 252 (1986)........................................6, 7

Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 42 (2d Cir. 1986)............................................. 6-7

Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995) ........................................................12

Berry v. Housing & Home Fin. Agency, 340 F.2d 939, 940 (2d Cir. 1965) ...........................11, 36

Brockmeyer v. Hearst Corp., 248 F. Supp. 2d 281, 301 (S.D.N.Y. 2003) ...................................30

Capitol Records, Inc. v. Naxos of Am., Inc., 372 F.3d 471, 482 (2d Cir. 2004)..........................35

Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003) ..............................................................31

Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1103-04 (N.Y. 2004) ...............................................32

Charles Atlas, Ltd. v. DC Comics, Inc., 112 F. Supp. 2d 330, 334 n.7 (S.D.N.Y. 2000) .............25

Computer Assocs. Int'l, Inc. v. AJV Computerized Data Mgmt., Inc., 889 F. Supp. 630,
   639 (E.D.N.Y. 1995)..................................................................................................31

Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 191 (2d Cir. 1996)........................................25

Cook v. N.Y. State Div. of Parole, 321 F.3d 274, 279 n.4 (2d Cir. 2003)....................................24

## TABLE OF AUTHORITIES—Continued

**Page**

Cooper v. Hodge, 814 N.Y.S.2d 447, 449 (N.Y. App. Div. 2006)..................................32

D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998) ..........................................6

D'Andrea v. Rafla-Demetrious, 3 F. Supp. 2d 239, 250 (E.D.N.Y. 1996), aff'd,
      146 F.3d 63 (2d Cir. 1998)......................................................................................34

Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 42-43 (2d Cir. 1994)..........................22, 28, 29, 30

Doe v. Am. Nat'l Red Cross, 500 N.W.2d 264, 266 (Wis. 1993) .................................19

Eppendorf-Netheler-Hinz GmbH v. Enterton Co., 89 F. Supp. 2d 483, 485
      (S.D.N.Y. 2000)........................................................................................................29

FTC v. A.P.W. Paper Co., 328 U.S. 193, 201 (1946).....................................................7

Fine v. Dudley D. Doernberg & Co., 610 N.Y.S.2d 566, 567 (N.Y. App. Div. 1994)..................34

Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir. 1996) ................................................36

Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 482 (S.D.N.Y. 1997)............33

Harris v. Town of Fort Ann, 825 N.Y.S.2d 804, 806 (N.Y. App. Div. 2006) .......................... 37-38

Hilton Int'l Co. v. Hilton Hotels Corp., 888 F. Supp. 520, 537 (S.D.N.Y. 1995) .........................29

Imig, Inc. v. Electrolux Home Care Prods., Ltd., 2007 WL 900310, at *18
      (E.D.N.Y. Mar. 22, 2007) ........................................................................................34

In re Bradley's Estate, 63 N.W.2d 374, 376 (Minn. 1954).............................................13

Info. Superhighway, Inc. v. Talk Am., Inc., 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) .................36

Jim Beam Brands Co. v. Beamish & Crawford, Ltd., 852 F. Supp. 196, 201
       (S.D.N.Y. 1994)........................................................................................................31

Jordache Enters., Inc. v. Levi Strauss & Co., 841 F. Supp. 506, 523 (S.D.N.Y. 1993) ...............31

Kij v. Aszkler, 296 N.Y.S. 351, 353 (Sup. Ct. 1937) .....................................................13

Kramer v. Pollock-Krasner Found., 890 F. Supp. 250, 258 (S.D.N.Y. 1995) .......................... 31-32

La Cibeles, Inc. v. Adipar, Ltd., 2000 WL 1253240, at *14 (S.D.N.Y. Sept. 1, 2000).................30

Lama Holding Co. v. Smith Barney Inc., 668 N.E.2d 1370, 1376 (N.Y. 1996)...........................37

**TABLE OF AUTHORITIES—Continued**

**Page**

MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc., 2004 WL 434404, at *9
(S.D.N.Y. Mar. 8, 2004) ............................................................................................30

McMichael v. Am. Red Cross, 532 S.W.2d 7, 8 (Ky. 1975) ..........................................19

Momentum Luggage & Leisure Bags v. Jansport, Inc., 2001 WL 830667, at *12
(S.D.N.Y. July 23, 2001) ..........................................................................................30

Montblanc-Simplo v. Aurora Due S.r.L., 363 F. Supp. 2d 467, 484 (E.D.N.Y. 2005) ..........21, 30

Morton v. Mancari, 417 U.S. 535, 550-51 (1974) ........................................................23

Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 216 (2d Cir. 1999) .............................21

Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 383 (2d Cir. 2000).......................32

Nazzaro v. United States, 304 F. Supp. 2d 605, 615 (D.N.J. 2004) ...............................14

New Orleans, M & T.R. Co. v. Ellerman, 105 U.S. 166, 173-74 (1881) ................11, 36

O-M Bread, Inc. v. U.S. Olympic Comm., 65 F.3d 933, 936, 937, 938
(Fed. Cir. 1995).............................................................................................. *passim*

Paco Sport, Ltd. v Paco Rabanne Perfumes, 234 F.3d 1262, text in 2000 WL 1721126,
at *7 (2d Cir. Nov. 16, 2000) ....................................................................................29

Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 216 (2d Cir. 2003)...............................25

Phelps v. Harris, 101 U.S. 370, 380-381 (1879)............................................................12

Philip Morris USA Inc. v. Felizardo, 2004 WL 1375277, at *6 (S.D.N.Y. June 18, 2004)..........36

Phlo Corp. v. Stevens, 2001 WL 630491, at *7 (S.D.N.Y. June 7, 2001)......................................32

PKG Group, LLC v. Gamma Croma, S.p.A., 446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006)...........33

PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 269-270 (2d Cir. 1987).........32, 34

ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.,
314 F.3d 62, 70 (2d Cir. 2002)............................................................................27, 29

Radzanower v. Touche Ross & Co., 426 U.S. 148, 153 (1976) .....................................23

Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC, 2007 WL 39301, at *19 & n.20
(S.D.N.Y. Jan. 8, 2007)............................................................................................32

**TABLE OF AUTHORITIES—Continued**

**Page**

Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1040, 1044 (2d Cir. 1980) ...............25, 35

Savin Corp. v. Savin Group, 391 F.3d 439, 449 (2d Cir. 2004) ....................................................22

Scholastic, Inc. v. Stouffer, 221 F. Supp. 2d 425, 437 (S.D.N.Y. 2002).................................. 21-22

Scientific Components Corp. v. Sirenza Microdevices, Inc., 2006 WL 2524187, at *29
     (E.D.N.Y. Aug. 30, 2006)............................................................................................... 35-36

Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., 2004 WL 691680, at *21
     (S.D.N.Y. Mar. 31, 2004) ....................................................................................................34

Tenn. Elec. Power Co. v. Tenn. Valley Auth., 306 U.S. 118, 139 (1939)...............................11, 36

Tommy Hilfiger Licensing, Inc. v. Nature Labs., LLC, 221 F. Supp. 2d 410, 422
     (S.D.N.Y. 2002)..............................................................................................................29, 30

Torcik v. Chase Manhattan Bank, Inc., 2006 WL 3544211, at *1 (2d Cir. Dec. 7, 2006) ............37

Urban v. Am. Legion Dep't of Minn., 723 N.W.2d 1, 3-4 (Minn. 2006)......................................14

Varity Corp. v. Howe, 516 U.S. 489, 511 (1996)..........................................................................23

Vigoda v. DCA Prods. Plus Inc., 293 A.D.2d 265, 266-67 (N.Y. App. Div. 2002).....................34

Whitman Realty Group, Inc. v. Galano, 838 N.Y.S.2d 585, 588 (N.Y. App. Div. 2007).............37

Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir. 1998) .............................................................7, 38

**STATUTES:**

33 Stat. 600-01 .............................................................................................................................40

33 Stat. 601 .........................................................................................................................4, 12, 16

15 U.S.C. § 1064(3) .....................................................................................................................40

15 U.S.C. § 1052(b) .................................................................................................................38, 40

15 U.S.C. § 1119...........................................................................................................................40

15 U.S.C. § 1125(c)(1)...................................................................................................................21

15 U.S.C. § 1125(c)(2)(B) .............................................................................................................22

15 U.S.C. § 1125(c)(2)(C) .............................................................................................................22

## TABLE OF AUTHORITIES—Continued

**Page**

18 U.S.C. § 706 ...................................................................................................... _passim_

36 U.S.C. § 80304(4) ............................................................................................... 15

36 U.S.C. § 80304(6) ............................................................................................... 15

36 U.S.C. §§ 80304-80307 ...................................................................................15, 16

36 U.S.C. §§ 130501-10513 ....................................................................................15

36 U.S.C. §§ 220501-220512 ..................................................................................15

36 U.S.C. § 300102(4) .........................................................................................5, 11, 12

36 U.S.C. § 300102(5) .......................................................................................... _passim_

36 U.S.C. §§ 300101-300113 ..................................................................................11

36 U.S.C. § 300105(a) .............................................................................................13

36 U.S.C. § 300105(a)(1) ........................................................................................14

36 U.S.C. § 300105 (a)(3) .......................................................................................12

36 U.S.C. § 300105(a)(6) ........................................................................................13

36 U.S.C. § 300110(a) .............................................................................................18

36 U.S.C. § 300110(b) .............................................................................................18

Pub. L. No. 110-26, American National Red Cross Governance Modernization Act of
  2007 (May 11, 2007) ............................................................................................19

N.Y. Gen. Bus. Law § 360-_l_ ...............................................................................21, 29

## RULES:

Local Civ. R. 56.1 ...............................................................................................4, 6, 30

## LEGISLATIVE HISTORY:

H.R. 1681, § 2(a)(1), 77th Cong. (1942) ...............................................................19

**TABLE OF AUTHORITIES—Continued**

**Page**

Protection of the Name and Emblem of the [ARC]:  Hearings on H.R. 6911
    Before the H. Comm. on Foreign Affairs, 77th Cong. 170, 251-53, 257-58,
    262 (1942)...................................................................................................................17, 18, 20

Red Cross:  Hearings on S. 2411 and H.R. 7420 Before the Subcomm. of the S. Comm.
    on the Judiciary, 77th Cong. 6, 28-29 (1942) ............................................17, 18, 20

## OTHER AUTHORITIES:

4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 24:72
    (4th ed. 2001)......................................................................................................................23

6 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 31:21
    (4th ed. 2001).......................................................................................................................27

5A William Meade Fletcher, Fletcher Cyclopedia of the Law of Corps. § 2336 (2007) .............11

72 N.Y. Jur. 2d Interference § 44 (2d ed. 2007) ...................................................... 34-35

Black's Law Dictionary 560 (7th ed. 2000)..................................................................38

Black's Law Dictionary 699 (6th ed. 1990) ................................................................22

Black's Law Dictionary 945 (5th ed. 1979).................................................................12

"2007–08 Girl Scout Cookie Program Activity,"
    http://www.girlscouts.org/program/gs_cookies/cookie_activity.asp................................ 14-15

"Girl Scout Cookie History,"
    http://www.girlscouts.org/program/gs_cookies/cookie_history/today.asp............................15

 "Little League® Officially Licensed Merchandise Online Store,"
    http://stores.xpapparel.com/llb/...................................................................................16

"US Olympic Shop," http://www.usolympicshop.com/ home/default.cfm?SID=8723 ...............15

## PRELIMINARY STATEMENT

Johnson & Johnson ("J&J") brought this case in an attempt to stop the American Red Cross ("ARC") from selling first aid, emergency preparedness, and other health and safety products to the American public and from authorizing others to do so using the Red Cross Emblem. With its promissory estoppel claim dismissed, J&J now bases its effort essentially on two arguments: that even though authorized, the uses at issue violate 18 U.S.C. § 706, and that any sales by or on behalf of ARC amount to "commercial activity," which J&J now argues is beyond the powers granted ARC by its Charter. Both are wrong as a matter of law.

1.       Section 706 makes it a federal crime for anyone to use the Emblem "other than the [ARC] and its duly authorized employees and agents" (and certain limited grandfathered users). The Supreme Court has held that § 706 and its predecessors were enacted to protect ARC and the public "against pretenders"— those who display the Emblem without authorization to falsely pass themselves off as ARC representatives or their products off as authorized by ARC. Even J&J does not claim that this case is about pretenders. And for good reason: The uses of the Emblem at issue here were indisputably authorized by ARC.

That resolves the matter under § 706, which clearly permits use by ARC's authorized agents. That was confirmed almost 30 years ago, when ARC sought guidance from the Department of Justice—the agency charged with enforcing § 706. The Department made clear that ARC may authorize third parties to use the Emblem in furtherance of its mission, and that when it does § 706 is <u>not</u> violated by the third party's use of the Emblem as authorized by ARC.

History bears that out. Since its inception, ARC has always authorized third-party use of the Emblem. Indeed, ARC depends on its power to authorize third-party use of its Emblem to further its critical mission. There is no dispute that over the years, ARC has authorized tens of

thousands of volunteers to wear the Emblem in responding to floods, hurricanes, and other disasters and emergencies. ARC has also authorized myriad manufacturers to place the Emblem on their products—products ranging from the first aid kits that ARC has sold for over a century, to disaster-response goods needed in times of crisis, to disaster-preparedness items, to items needed by ARC as it provides about half of the Nation's blood supply.

There is a very good reason why ARC has authorized so many third-parties over the years to use its Emblem—and why Congress has never stepped in to halt that practice: ARC cannot do its work alone. It simply does not have enough employees, and does not own or operate any manufacturing facilities. It therefore depends on the abilities of others—individuals and businesses alike—to volunteer to help and also to provide ARC with the thousands of items that it sells or gives away each year to prepare the Nation for disasters and to alleviate human suffering after those disasters occur.

J&J has suggested that they must all qualify as "agents" as defined by the law of agency, or ARC cannot authorize their use of the Emblem. But as the Justice Department has concluded, that is just not so. If ARC authorizes Weyerhauser to make cartons bearing the Emblem— cartons that will contain, for example, water bottles to hand out to flood victims—Weyerhauser need not analyze its legal relationship for indicia of agency in order to know it is committing no crime in using the Emblem to make boxes as authorized by ARC. And if ARC agrees with the maker of an emergency hand-crank radio that it can use the Emblem on radios offered for sale to the public and say that part of the proceeds will be donated to ARC, that manufacturer need not hire an expert in agency law to know that it commits no crime in using the Emblem as authorized by ARC.

Applying § 706 is much simpler than that.  The statute was enacted to protect ARC and the public "against pretenders"—those falsely claiming to act on behalf of ARC or to offer ARC products.  Those whom ARC <u>authorizes</u> to use the Emblem on its behalf cannot be convicted under § 706 for doing so.  Here, both ARC and the third parties have testified that the uses at issue were authorized by ARC.  That, as the Justice Department recognized, is what § 706 requires, regardless of whether the use is by a volunteer, a donor displaying a Red Cross bumper sticker, a cause-related marketing partner licensed to use the Emblem, or a firm like First Aid Only or Water-Jel authorized to use the Emblem by ARC.  Given the authorization that occurred here, no one committed a federal crime in this case.

In urging a contrary result, J&J proposes a cramped reading of § 706 that is at war with the view of the Department of Justice, with a century of practice by ARC, and with common sense.  Certainly nothing in the plain language of § 706 would hamstring ARC's ability to use the Emblem in whatever ways best advance the mission of this important national organization.  And given that Congress has squarely considered on several occasions over the past century whether to impose strict limits on ARC's use of the Emblem—often at J&J's invitation—this Court should be wary of reading into § 706 words of limitation that do not exist.

2.    J&J strays even further by claiming that ARC's Charter does not authorize it to engage in what J&J calls "commercial activity."  To begin with, it is not at all clear that J&J's complaint even makes such a claim.[1]  No count claims that ARC exceeds its Charter by engaging in the sale of goods.  And the references to "<u>ultra</u> <u>vires</u>" acts appear to relate to J&J's estoppel claim based on statements made to Congress in 1942—a claim that has been dismissed with prejudice.  And J&J's failure to plead a violation of ARC's Charter may have been no mistake,

---

[1]    J&J raised this argument at the hearing on the defendants' motion to dismiss.

for it is well settled that a competitor lacks standing to complain about another's sale of goods on the ground that the sales exceed its corporate charter.

But even assuming J&J made this claim—and ignoring J&J's lack of standing to do so—the claim is flatly wrong. ARC's Charter permits it to engage in "commercial activities"—including the sale of goods—consistent with its mission. Indeed, Congress could not have been clearer when it adopted ARC's Charter in 1905. There, Congress expressly prohibited all uses of the Emblem "for the purpose of trade or as an advertisement to induce the sale of any article whatsoever," by "any person or corporation, other than the Red Cross of America, not now lawfully entitled to use the sign of the ARC." Amended Complaint ("Compl.") ¶ 50 (quoting 33 Stat. 601) (emphasis added). And the same is true today. While ARC is not empowered to engage in commercial activities as a profit-making enterprise like J&J, it is empowered to sell goods and services consistent with its mission, for a price that covers its costs and raises revenue in support of that mission.

ARC has been doing just that for over 100 years—all in plain sight of Congress and the public. Thus, as early as 1903, ARC reported to Congress about its sales of first aid kits, and as far as we know, ARC has never missed a year in reporting revenues from its sales of various items. The attached Rule 56.1 Statement of Material Undisputed Facts ("SOF") lists scores of examples unearthed from ARC archival material showing its consistent practice of selling first aid kits and other products throughout its history. Congress has also received testimony numerous times about ARC's sales of goods and services, including the World War II era hearings where J&J itself made the point. And ARC has testified since then about its sales of emergency kits and its extensive sales of blood services and products to America's hospitals.

Indeed, just this year Congress readopted the ARC Charter, making material changes to the organization's governance for the first time in 60 years.  Yet even though ARC's sales of goods and services have been widely known for a century, Congress did nothing to restrict ARC from selling Emblem-bearing products or authorizing their sale by non-ARC entities.  If anything, it confirmed ARC's powers by enacting a provision clarifying that ARC's purposes include "conduct[ing] other activities consistent with" its other listed purposes.  36 U.S.C. § 300102(5).  Selling first aid or emergency-preparedness kits (or training services or blood services or products) is clearly "consistent" with ARC's purpose to "carry out a system of national and international relief in time of peace, and to apply that system in mitigating the suffering caused by pestilence, famine, fire, floods, and other great national calamities, and to devise and carry out measures for preventing those calamities."  Id. § 300102(4).

Yet despite all this history, J&J does its best Inspector Renault impersonation and insists that it is shocked—shocked—to learn that ARC is engaging in "commercial activities."  Of course, it comes as no surprise that a non-profit would sell goods and services.  Many other non-profits (federally chartered and otherwise) sell products consistent with their mission.  Indeed, there is an entire body of tax law—that relating to the "unrelated business income tax" or UBIT—aimed at distinguishing sales by non-profits that are within mission and therefore nontaxable from sales that are beyond mission and subject to tax.  Like "commercial" sales by scores of other non-profits, ARC's sales of first aid products have been blessed by the IRS and deemed "substantially related" to ARC's purposes and operations.  SOF ¶ 85.

The operations of ARC would be completely hobbled if J&J were right in its reading of § 706 or the Charter.  If § 706 meant what J&J says, no person or company of right mind would make ARC's boxes or water bottles or enter into cause-related marketing relationships or display

the Emblem in times of crisis, or even display a pin or bumper sticker proclaiming support for ARC, for fear of violating the federal criminal law. And if the ARC Charter were suddenly read to preclude the "commercial activity" of selling products and services, training in first aid and lifesaving would suffer and our Nation's hospitals would suddenly lose half their blood supply.

Because J&J has no basis for claiming that any of the activities at issue were unlawful, summary judgment should be granted on J&J's claims for trademark dilution (Counts Five and Six), tortious interference with prospective economic advantage (Count One), and unfair competition (Count Three). These claims fail for additional reasons as well. And J&J's claim for tortious interference with contractual relations (Count Two) should be rejected at this stage for several reasons, including that J&J has no proof that ARC was aware of either of the two contracts at issue; the relevant witnesses have all testified that it was not. Further, ARC seeks summary judgment on its declaratory judgment and cancellation counterclaims.

### STATEMENT OF FACTS

A complete recitation of the undisputed facts material to this motion is set forth in Defendants' Statement of Material Undisputed Facts Pursuant to Local Civil Rule 56.1.

### LEGAL STANDARD

The legal standard is clear: "summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). The non-moving party may not survive summary judgment by relying on conclusory allegations or unsubstantiated speculation. D'Amico, 132 F.3d at 149; Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 42 (2d Cir. 1986) ("mere conjecture or speculation by the party resisting summary judgment does not

provide a basis upon which to deny" the motion) (internal quotation marks omitted).  Rather,

"the non-movant must produce specific facts indicating" that a genuine factual issue exists.

Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir. 1998).  To defeat a motion for summary

judgment, the non-moving party must present evidence that is more than "merely colorable"; it

must be "evidence on which the jury could reasonably find for the [non-movant]."  Anderson,

477 U.S. at 249-250, 252.

## ARGUMENT

I.    **AS A MATTER OF LAW, NEITHER THE CRIMINAL PROHIBITION IN SECTION 706 NOR ARC'S CHARTER BARS ARC FROM SELLING PRODUCTS ITSELF OR AUTHORIZING THE NAMED CO-DEFENDANTS TO USE THE EMBLEM ON PRODUCTS SOLD TO THE PUBLIC IN FURTHERANCE OF THE ARC'S MISSION.**

A.    **18 U.S.C. § 706 Does Not Preclude ARC From Authorizing Third Parties To Use The Emblem.**

Section 706 was enacted to protect ARC and the American public against pretenders—

those who use the Emblem to make themselves or their products appear to be ARC or its

products.  FTC v. A.P.W. Paper Co., 328 U.S. 193, 201 (1946).  J&J turns the statute on its head

in this case by claiming that it makes criminals out of people or firms whose use of the Emblem

was indisputably authorized by ARC.  For that reason, its reliance on § 706 must be rejected.

Section 706 makes it a federal crime for anyone to use the Emblem "other than the [ARC] and its

duly authorized employees and agents."  (emphasis added).  Thus, pretenders violate § 706;

those authorized to use the Emblem by ARC do not.

This Court can and should rule now, on summary judgment, that this is the proper

interpretation of the criminal statute on which J&J relies.  In doing so, it may be guided by the

fact that ours is precisely the reading given § 706 by the Department of Justice, the agency

charged with enforcing § 706, when ARC asked it the same question 30 years ago.  In 1978,

ARC wrote the Attorney General seeking guidance on the meaning of § 706.  The letter was

prompted by ARC's realization that an overly broad construction of § 706 would be at odds with

ARC's need to "receive substantial support, assistance and cooperation from the public including

businesses and other entities."  SOF ¶ 82.

In its response, the Justice Department observed that the prohibition in § 706 does not

apply to duly authorized agents of ARC.  It then explicitly defined the meaning of "duly

authorized agent" under the statute:

> [When] a request by the ANRC that a non-ANRC entity or person utilize
> the insignia in the course of an activity furthering in reasonable degree the
> operations of the ANRC, that entity or person would appear to us to be a
> duly authorized agent of the ANRC for the given purpose and thus without
> the prohibition of the statute.

SOF ¶ 84.  This letter defined the term "duly authorized agent" within the meaning of the statute

as an "entity or person" that uses the Emblem in furtherance of the operations of ARC and at the

request of ARC.  Thus, the Justice Department construed § 706 to permit ARC to authorize non-

ARC entities and persons to use the Emblem in connection with any "activity furthering in

reasonable degree [ARC] operations."  Id.  Under such circumstances, the third party's use of the

Emblem is "without the prohibition of the statute."  Id.

Further, the Justice Department clarified that an entity may properly be authorized to use

the Emblem even though the entity benefits from the authorization more than does ARC.  See id.

It even approved a scenario presented by ARC that involved a relationship analogous to the one

J&J attacks here—where ARC authorizes or licenses a distributor of commercial products to use

the Emblem on advertising for products sold at retail.  SOF ¶ 83.  This example is what has come

to be commonly known as "cause-related marketing."  The Justice Department stated that "we

would find no violation of 18 U.S.C. 706" in that or any of the other six examples, so long as an

appropriate written agreement existed between ARC and the non-ARC entity using the Emblem. SOF ¶ 83.

Let there be no mistake, ARC authorizes third-party firms to use the Emblem every day in numerous other ways, and must continue to do so. We trust there will be no dispute, for example, that ARC licenses numerous third parties to use the Emblem on their products at retail and in advertising in cause-related marketing situations like those described to the Justice Department. SOF ¶¶ 36-107. Obviously, ARC also contracts with numerous other companies to place the Emblem on products they manufacture for ARC. SOF ¶¶ 23-26, 36-107. In the course of its work, ARC enters into manufacturing arrangements with a wide variety of companies, not just to make emergency preparedness kits, but to make cardboard boxes and water bottles and blood bags and all manner of other supplies and materiel critically needed by ARC, either to give away during times of crisis or to sell in preparation for crises to come or to use in fundraising. SOF ¶¶ 23-26. All of these companies are authorized by ARC to use the Emblem on the products they make. None violate § 706 when they act pursuant to that authorization, regardless of whether J&J would regard their relationship as a formal master-servant agency relationship.

Here, there is no dispute that ARC authorized each of the co-defendants in this case to use the Emblem in the ways J&J now attacks. That is evidenced by testimony from all parties to the arrangements at issue: testimony of ARC itself and testimony of each co-defendant whose use of the Emblem J&J now challenges. SOF ¶¶ 140, 146, 152, 155. Indeed, we have also submitted for the record the detailed written agreements under which ARC unequivocally authorized the co-defendant companies to use the Emblem in offering certain specific emergency preparedness and health and safety products to the public. SOF ¶¶ 139, 145, 151, 154. The agreements confirm that it was the intent of all parties that the use of the Emblem was

being made on behalf of and at the request of ARC.  In fact, the original license agreements maintained ARC's careful control over the use of the Emblem, giving ARC absolute veto power over the products on which it would be used.  Id.

There was thus no doubt that ARC authorized each of the other defendants to use the Emblem on the goods at issue in this case.  After J&J elected to file this lawsuit, ARC and its partners even executed nunc pro tunc confirmatory amendments to each of the agreements memorializing the original intent of the parties that each third-party firm was authorized to use the Emblem by ARC, that doing so was in furtherance of ARC's mission, and that each acted as ARC's duly authorized agent for purposes of using the Emblem under the agreements.  SOF ¶¶ 139, 145, 151, 154.  It is abundantly clear that this is not a case of pretenders—the sole focus of 18 U.S.C. § 706.  Just as would be true if the Government sought to indict a maker of first aid equipment bearing the Emblem or a person seeking donations wearing an ARC armband, the fundamental question is authorization.  Here, where there is no dispute that ARC authorized each of the co-defendants to use the Emblem in making and distributing emergency preparedness and other health and safety products that further ARC's mission, this Court can and should rule as a matter of law that none of the defendants has violated § 706 as J&J alleges.

**B.      J&J Cannot Rely On The Charter Of ARC To Prevent ARC From Selling Products Or Engaging In Other "Commercial Activity."**

Even if J&J's complaint has actually claimed that the sales at issue were unlawful because they exceed ARC's Charter,[2] this claim would fail.  First, J&J has no standing to make

---

[2]      None of J&J's causes of action are premised on ARC's powers under its federal charter. Excluding references to the grandfathered-user provision, only three of the 135 paragraphs in the Complaint even cite or reference ARC's charter.  See Compl. ¶¶ 37-39.  Out of an abundance of caution, however, and because J&J raised a charter-based theory at the hearing on the motion to dismiss, ARC addresses the possibility that mere use of the term "ultra vires" in Count Three could be used to import a charter-based theory into the Complaint.

the claim.  The law has long been settled that a competitor cannot challenge the activities of another on the ground that they exceed the other's corporate charter.  See New Orleans, M. & T.R. Co. v. Ellerman, 105 U.S. 166, 173-174 (1881) (competitor has no remediable injury in preventing competition, regardless of whether competition is allegedly ultra vires); accord Tenn. Elec. Power Co. v. Tenn. Valley Auth., 306 U.S. 118, 139 (1939); Ala. Power Co. v. Ickes, 302 U.S. 464 (1938); Berry v. Housing & Home Finance Agency, 340 F.2d 939, 940 (2d Cir. 1965); see also 36 U.S.C. §§ 300101-300113 (ARC Charter, containing no private right of action).[3]

Second, and more fundamentally, J&J is just wrong in its crabbed reading of the ARC Charter—a reading that ignores the words and history of the Charter, the supporting ruling by the IRS, and over a century of practice during which Congress has been fully aware of sales of goods by ARC and never acted to preclude them.

1.      **The Charter.**  In addition to several purposes relating to wartime and the Geneva Convention, ARC has—for over a century—been directed by Congress to "carry out a system of national and international relief in time of peace, and to apply that system in mitigating the suffering caused by pestilence, famine, fire, floods, and other great national calamities, and to devise and carry out measures for preventing those calamities."  36 U.S.C. § 300102(4).  Just this year, Congress made clear that ARC is fully empowered to "conduct other activities consistent with" the other specified purposes.  Id. § 300102(5).  Selling first aid or emergency-preparedness kits (or training services and materials or blood services or products) to the American public is

---

3       As a leading corporate treatise explains:  "Federal corporations derive their existence and powers from acts of Congress, and ordinarily, proceedings challenging the right of such corporations to exercise corporate franchises or powers must be undertaken by the United States."  5A William Meade Fletcher, Fletcher Cyclopedia of the Law of Corps. § 2336 (2007) (emphasis added).

unquestionably "consistent" with ARC's purpose of national relief in times of peace and devising and carrying out measures for preventing calamities.  Id. § 300102(4).

In addition, from its earliest days, ARC has been authorized to use the Emblem in commerce.  33 Stat. 601.  If that were not enough, the plain language of ARC's Charter gives it the power to sell to the public, and to license others to sell to the public, products bearing the Emblem.  Its enumerated powers include the power to "do any other act necessary to carry out this chapter and promote the purposes of the corporation."  Id. § 300105(a)(6).  ARC's Charter is construed according to "the ordinary sense of the language used."  Am. Nat'l Red Cross v. S.G., 505 U.S. 247, 263 (1992); see also id. at 266 (Scalia, joined by Rehnquist, O'Connor, and Kennedy, dissenting, noting that the ARC Charter provides "a list of more or less ordinary corporate powers."); Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning.").  Thus, ARC has all of the ordinary powers of a corporation and can do any act necessary to carry out the Charter or promote its purposes.  Whether it is blood services or emergency preparedness kits or CPR training, ARC can unquestionably sell things, or authorize others to do the same, in furtherance of its mission.

And even if the original authorization to engage in commercial activities and ARC's general power to do any act needed to further its mission were not enough, § 300105(a)(3) grants ARC the power to "dispose of property," a power that encompasses the power to sell property (and more).  As the Supreme Court has explained:  "The expression 'to dispose of' is very broad, and signifies more than 'to sell.'  Selling is but one mode of disposing of property."  Phelps v. Harris, 101 U.S. 370, 380 (1879).  "The word is nomen generalissimum," id. at 381—i.e., a word "of the most general meaning."  Black's Law Dictionary 945 (5th ed. 1979).

In <u>Kij v. Aszkler</u>, 296 N.Y.S. 351 (Sup. Ct. 1937), the court construed the city of Lackawanna's charter, which authorized the common council to "dispose" of the city's property, to include the power to sell such property. It held: "The contention of plaintiff's counsel that the word 'dispose' does not include a power to sell is without force. The greater includes the lesser. To sell property is but one means of disposing of property." <u>Id.</u> at 353; <u>see also</u> <u>In re Bradley's Estate</u>, 63 N.W.2d 374, 376 (Minn. 1954) ("The expression 'to dispose of' is extremely broad and comprehensive when used generally and without qualification. It gives the power to sell, exchange, barter, or give the property away."). Of course, ARC can "dispose" of property, whether that property is land or blood services and products or emergency preparedness kits or the first aid kits that ARC has been selling for over a century.

It would make no sense to limit ARC to the powers specifically enumerated in § 300105(a). Under that view, ARC would not, for example, be able to enter contracts because contract-making is not a power specifically enumerated in § 300105(a). Needless to say, such a result would debilitate ARC from carrying out its purposes as set forth in its Charter. Just as ARC surely can enter into contracts, the sale of products is an entirely typical corporate power. ARC is authorized to do both under subsection (a)(6).

**2. The IRS.** Even the IRS agrees that the "commercial" sale of first-aid-related products furthers the ARC mission in a substantive way. Over 20 years ago, the IRS issued a ruling regarding the applicability of the unrelated business income tax on the "business income" arising from ARC's plan to sell first aid kits to the public at a price above the cost of manufacturing the kits. SOF ¶ 85. ARC advised the IRS that it would sell kits directly to wholesalers or retailers, who (like the other defendants here) would pay ARC "a royalty for the use of the [ARC] name and emblem." <u>Id.</u> The IRS ruled that income from the proposed sales

was exempt from tax because the sales were "substantially related" to ARC's tax-exempt purposes and operations and "contribute[ ] importantly to the accomplishment of the purposes for which exemption was granted." Id. The IRS concluded that "the proposed distribution of a first aid kit . . . is in direct and substantial furtherance of the purpose for which [ARC was] recognized as exempt" under the Internal Revenue Code. Id. Thus, the IRS has agreed that when ARC engages in "commercial activity" by selling products such as first aid and emergency-preparedness kits and other health and safety products, either directly to the public or on a royalty basis, it furthers the ARC mission. And activities that further the ARC mission are expressly permitted by the ARC Charter. 36 U.S.C. § 300102(5).

     **3.**    **Fundraising.** In addition to furthering the ARC mission in a substantive way, sales of the products at issue here also advance ARC's mission in the same way other fundraising does: by generating revenue to fund the organization's vital work. See Nazzaro v. United States, 304 F. Supp. 2d 605, 615 (D.N.J. 2004) (stating that the federally chartered Civil Air Patrol "behaves no differently than most charities in cobbling together sufficient funding from a variety of sources to achieve its goals"); Urban v. Am. Legion Dep't of Minn., 723 N.W.2d 1, 3-4 (Minn. 2006) (noting that local chapters of the federally chartered American Legion raise revenue through food and beverage sales). Revenue-generating sales and license agreements are "activities consistent with" ARC's purposes. 36 U.S.C. § 300102(5).[4]

     ARC is hardly the only federally chartered corporation that sells and licenses the sale of products. Everyone knows that the Girl Scouts sell cookies—a lot of cookies. See "2007–08 Girl Scout Cookie Program Activity," available at http://www.girlscouts.org/program/gs_

---

[4]     We note that the charter also empowers ARC to "adopt policies and regulations." Id. § 300105(a)(1). ARC's bylaws authorize it to receive payments and funds "for such purposes as are within the general scope of its corporate purposes and powers." Amended and Restated Bylaws § 9.1.

cookies/cookie_activity.asp ("Last year girls sold over 10 billion boxes of Girl Scout cookies.").

These cookies are manufactured by licensed bakers. <u>See</u> "Girl Scout Cookie History,"

http://www.girlscouts.org/program/gs_cookies/cookie_history/today.asp ("The licensed bakers

produce a maximum of eight varieties, including three mandatory ones (Thin Mint, Peanut Butter

Sandwich, and Shortbread)."). The Girl Scouts' charter is similar to ARC's Charter. <u>See</u> 36

U.S.C. §§ 80304-80307.[5] Yet no sane person would contend that the Girl Scouts lack the power

to sell cookies to support their scouting activities, despite the competition such sales give to other

cookie purveyors. While most Girl Scout items are sold door-to-door, not at retail, other cookie

makers would no doubt confirm that selling cookies that compete with those of private cookie

makers is undeniably "commercial activity," in the same way that ARC's sales of first aid or

preparedness kits are "commercial activity" regardless of whether the sales are to those who

walk into chapter offices around the country or click on the ARC or a chapter website, or to a

family in need of a preparedness kit who finds one at Target. The array of other federal charter

organizations that sell products would do Norman Rockwell proud, ranging from sales of

baseball items by the Little League of America to sales of gear by the United States Olympic

Committee.[6] ARC's sales are no less authorized than theirs.

---

[5]     The Girl Scouts' charter includes the power to "acquire, own, lease, encumber, and
transfer property, and use any income from the property, as necessary to carry out the purposes
of the corporation," <u>id.</u> § 80304(4), and a catch-all like ARC's, <u>see id.</u> § 80304(6). The Girl
Scouts surely can sell cookies even though the statute says "transfer" rather than "sell." And
ARC, like the Girl Scouts, surely can use income derived from selling property for corporate
purposes. There is no reason to believe that Congress intended ARC's Charter to be less
expansive than the Girl Scouts' charter or other federal charters. The point of the catch-all
provisions included in federal charters is to prevent any claim, based on a hypertechnical reading
of the power-conferring provisions, that a chartered entity is acting <u>ultra</u> <u>vires</u>.

[6]     The United States Olympic Committee (36 U.S.C. §§ 220501-220512) sells Olympic
gear and merchandise. <u>See</u> "US Olympic Shop," http://www.usolympicshop.com/
home/default.cfm?SID=8723. Little League Baseball, Inc. (36 U.S.C. §§ 130501-10513), sells

4.    **A Century Of Congressional Authorization.**  When it amended ARC's charter in 1905, Congress prohibited all uses of the Emblem "for the purpose of trade or as an advertisement to induce the sale of any article whatsoever," by "any person or corporation, other than the Red Cross of America, not now lawfully entitled to use the sign of the Red Cross." Compl. ¶ 50 (quoting 33 Stat. 601) (emphasis added).  From then until now, ARC has advanced its mission through a wide range of what J&J calls "commercial activities"—not as a profit-making enterprise but to further its mission and to raise needed funds to support its disaster response and other humanitarian work.  None of this is in dispute.  ARC charges for the blood services and products it has sold to hospitals for over 50 years; as annually reported to Congress, the resulting revenue makes up a very significant part of ARC's funding base.  SOF ¶¶ 25, 132-133.  ARC has also long charged a fee for first aid kits and charged a fee for CPR and first aid and babysitting training (consistent with ARC's health and safety mission) and swimming lessons (such classes began in response to an outbreak of drownings in the early Twentieth Century).  SOF ¶ 24, 36.  These fees and charges have never been a secret.

Nor have these sales been in any way a covert operation.  To the contrary, for as long as ARC has been making sales to advance its mission and financially support its vital work, its activities have been well known to the public and to Congress.  Congress' awareness of the 100-plus years of ARC's sales and licensing programs is significant, for Congress has never elected to restrict ARC's power to make sales and license the Emblem.  At least as early as 1904, ARC was engaged in the same activities that J&J alleges as unlawful in this lawsuit, the sale of first aid kits and supplies.  SOF ¶ 36.  That year and every year since, ARC submitted annual reports to Congress, and since 1904, the reports have directly informed Congress about ARC's sales.

---

baseball equipment and uniforms.  See "Little League® Officially Licensed Merchandise Online Store," http://stores.xpapparel.com/llb/.

Indeed, in 1904, just a year before Congress enacted the 1905 charter protecting the ARC's right to use the Emblem for commercial purposes, ARC specifically informed Congress that it had generated revenue during fiscal-year 1903 from the sale of emergency cases <u>and had received royalties</u> from the sale of first aid cases.  SOF ¶ 37.  ARC told Congress the same thing the following year, stating that it had again received royalties on sales of first aid cases.  SOF ¶ 38.  ARC's sales and licensing activities, and its reporting to Congress of the very substantial revenues from those activities, have continued over the years up to the present day.  SOF ¶¶ 39-79, 86-107.

In addition, as J&J has helpfully noted, ARC's sale and licensing of goods bearing the Emblem was discussed at length in hearings held in 1942 in both the House and Senate.  <u>See Protection of the Name and Emblem of the [ARC]:  Hearings on H.R. 6911 Before the H. Comm. on Foreign Affairs</u>, 77th Cong. 170, 251-53, 257-58, 262 (1942) ("1942 House Hearings"); <u>Red Cross:  Hearings on S. 2411 and H.R. 7420 Before the Subcomm. of the S. Comm. on the Judiciary</u>, 77th Cong. 6, 28-29 (1942) ("1942 Senate Hearings").  In those hearings, ARC witnesses informed Congress that ARC sells products, and engages in other revenue-raising activities, in order to support its important work.  <u>See</u> 1942 House Hearings at 251-253 (statement of August Belmont of ARC's Central Committee); 1942 Senate Hearings at 28 (statement of H.J. Hughes, ARC's General Counsel); <u>see also</u> ARC's Answer, Affirmative Defenses and Counterclaims ("Answer") ¶¶ 40-43, 57 (quoting testimony).

J&J itself made the record even clearer by displaying ARC catalogs that advertised kits for sale to the general public and noting that ARC had even allowed the Emblem to be used by

one of J&J's competitors.  See 1942 Senate Hearings at 29 (statement of Mr. Perry);[7]  1942

House Hearings at 170 (statement of Mr. Perry) ("[W]e have felt very bad about the fact that the

[ARC] has really endorsed the product of Bauer & Black, our principal competitor, in its own

price lists."); see also Answer ¶ 58.  House Committee members—and perhaps the entire

Committee—agreed with ARC witnesses that ARC must be allowed to raise revenue and use the

Emblem to finance its humanitarian mission.  As one member of Congress aptly observed,

referring to ARC sales, "what objection would there be to the [ARC], an organization for charity

and humanity, using their emblem to raise funds for the benefit of their organization?  I do not

see any need of restricting that."  1942 House Hearings at 257-258 (statement of Rep. Kee).

And ARC's role in providing half the Nation's blood supply through sales to America's

hospitals has also been no secret.   ARC has frequently testified to Congress regarding its blood

program, and has noted there and in its reports the financial significance of these sales to ARC.

SOF ¶ 133.  As noted above, ARC's Charter requires it to submit annual reports on its activities,

"including a complete, itemized report of all receipts and expenditures," to the Department of

Defense.  36 U.S.C. § 300110(a).  The Defense Department is in turn required to "audit the

report and submit a copy of the audited report to Congress."  Id. § 300110(b).  These reports

disclose information about the sales involved in ARC's blood program.  SOF ¶ 27.  Yet,

---

[7]     Mr. Perry's statement was:

> I have here the 1914 and 1915 [Red Cross] catalogs.  From these catalogs
> it appears that the kits were advertised for distribution and sale generally
> to the public; and that the products thus sold commercially under the red-
> cross symbol were those of our competitor Bauer & Black.
>
> \*     \*     \*
>
> I direct attention in these catalogs of 1914-15 to the advertising material
> on the opening page, inviting the public to buy and calling attention to the
> merits and reasonable price of the product.  I also direct attention to the
> fact that while all of the products were sold under the auspices of the
> American National Red Cross, that the Red Cross insignia appears on the
> product of our competitor Bauer & Black . . . .

Congress has never even hinted at an accounting or legal problem with ARC's sale of blood products—sales that are no less "commercial" than sales of CPR training or of first aid kits.[8]

ARC has also long issued other annual reports designed to inform stakeholders and the public about its activities. These reports discuss ARC's sale and licensing of Emblem-bearing products and its revenue from the sale of blood products. SOF ¶¶ 37-56. The sales at issue here are no exception. See, e.g., SOF 107 (ARC 2006 Annual Report at 10 ("To make preparedness products easily accessible, ARC identified where consumers want to buy them—at local retailers."); id. at 26 (reporting products and services revenue of $2.3 billion, "including course fees and materials, whole blood and components and tissue services"). Recent annual reports are made available to the public on ARC's website.

After decades of reporting and with full knowledge of what J&J now calls "commercial activity"—sales of products to the public and others—Congress revamped the ARC Charter just this year. That effort resulted in several material changes to the Charter for the first time in 60 years. But what it did not do was to restrict ARC from directly selling Emblem-bearing products or authorizing the sale of the same by non-ARC entities. See Pub. L. No. 110-26, American National Red Cross Governance Modernization Act of 2007 (May 11, 2007). Just the opposite. Congress went out of its way to confirm the broad sweep of ARC's powers by adding an expansive provision clarifying that ARC's purposes include "conduct[ing] other activities

---

[8]    Courts have also taken note of ARC's sales of blood services and products. See, e.g., McMichael v. Am. Red Cross, 532 S.W.2d 7, 8 (Ky. 1975) (ARC "furnished the blood in sterile condition to the hospital for a service charge of $9.95 per unit"); Doe v. Am. Nat'l Red Cross, 500 N.W.2d 264, 266 (Wis. 1993) ("The Red Cross collects blood from donors, tests it, processes it, and sells it to hospitals and physicians . . . ."); Am. Nat'l Red Cross v. ASD Specialty Healthcare, Inc., 888 So. 2d 464, 465 (Ala. 2003) (case arising from ARC contract to sell blood products to LA Pharmaceutical). Even the Supreme Court has remarked on the point: "Since its founding in 1881 as part of an international effort to ameliorate soldiers' wartime suffering, the [ARC] has expanded its activities to include, among others, the civilian blood-supply services here at issue." Am. Nat'l Red Cross v. S.G., 505 U.S. at 250.

consistent with" its other listed purposes.  36 U.S.C. § 300102(5).  If J&J thought ARC's

activities were (or should be) unlawful under the Charter, J&J could have asked Congress to

rectify matters in the 2007 legislation.  J&J either did not do so or was turned down by Congress.

In either case, the fact remains that Congress did nothing to restrict ARC's well known

"commercial activity" of selling products to further and fund its mission.

      In the face of all this, J&J will likely rely on the 1942 Biddle letter to argue that despite a

century of selling first aid and other items, and despite 50 years of sales of blood services and

products, ARC has all this time been without power to sell products in commerce.  Letter from

Francis Biddle to ARC Chairman Norman Davis, reprinted in 1942 Senate Hearings at 6.  But

the Biddle letter did not suggest that ARC could not sell, or license the sale of, Emblem-bearing

products in order to further or fund the organization's critical humanitarian work.  The best

reading of the letter is that it is consistent with the view articulated by ARC witnesses in the

1942 hearings:  that ARC has no power to engage in commercial enterprise just to turn a profit.

See, e.g., 1942 House Hearing at 257-258 (statement of Mrs. Belmont).  As ARC Chairman

Davis wrote in a letter to House Committee Chairman Sol Bloom:

> The ARC is not now engaged in any commercial venture for profit, has no
> intention of engaging in such operations, and is advised that the provisions of its
> charter, by which it is bound, would not permit it to engage in commercial
> enterprises for profit.  If there was any misunderstanding with respect to this
> situation, I hope you will permit this letter to be placed in the record.

Letter from Mr. Davis to Chairman Bloom, reprinted in 1942 House Hearing at 262 (emphasis

added).  See also legislative history quoted at Answer ¶¶ 39, 43-45.  ARC is a not-for-profit

organization.  But there is no doubt that the ARC Charter allows it to sell training services,

guides, and materials, lifesaving backboards, first aid kits, blood services and products, and any

other product that furthers and funds its critical mission, as those involved here clearly do.

20

For all these reasons, J&J has failed to show anything unlawful in the sale of the emergency preparedness kits and other products at issue, or in the use of the Emblem for that purpose. Because J&J's claims for dilution, unfair competition, and tortious interference all depend on this Court adopting J&J's counter-textual reading of § 706 (and ignoring a century's worth of practice), this Court should grant summary judgment on each of those claims. We elaborate below.

## II.   SUMMARY JUDGMENT IS WARRANTED ON THE TRADEMARK DILUTION CLAIMS (COUNTS FIVE & SIX).

Counts Five and Six allege trademark dilution under federal and New York law. To establish a claim for trademark dilution under the Federal Trademark Dilution Act, codified as § 43(c) of the Lanham Act, "the owner of a famous mark that is distinctive" must establish that "after the owner's mark [became] famous," the defendant began using a mark "that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark[.]" 15 U.S.C. § 1125(c)(1). To establish a claim for trademark dilution under New York's General Business Law § 360-*l*, a plaintiff must similarly show: (1) ownership of a distinctive mark; and (2) a likelihood of dilution of the mark. Montblanc-Simplo v. Aurora Due S.r.L., 363 F. Supp. 2d 467, 484 (E.D.N.Y. 2005). Thus, both the federal and New York trademark dilution statutes apply only to a subset of all trademarks. For these statutes to come into play, the plaintiff must have a distinctive and unique mark. See 15 U.S.C. § 1125(c)(1); McKinney's Gen. Bus. Law § 360-*l* (2007). Mere possession of a trademark is not sufficient to trigger the antidilution statutes.[9]

---

[9]    The federal dilution claim is only triggered by "a famous mark that is distinctive." 15 U.S.C. § 1125(c)(1); see Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 216 (2d Cir. 1999) ("A mark that, notwithstanding its fame, has no distinctiveness is lacking the very attribute that the antidilution statute seeks to protect."). Similarly, "to merit protection under the New York dilution statute, a plaintiff cannot simply show that she possesses trademark rights; rather, she must possess a trademark or name which is 'truly of distinctive quality' or which has 'acquired a

The statutes protect against two kinds of dilution:  (1) dilution by blurring—i.e., "diminishing the capacity of the mark to identify and distinguish goods and services," and (2) dilution by tarnishment—i.e., linking the plaintiff's trademark "to products of shoddy quality" or "portray[ing it] in an unwholesome or unsavory context likely to evoke unflattering thoughts" about the trademark owner's products.   Savin Corp. v. Savin Group, 391 F.3d 439, 449 (2d Cir. 2004); Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 43 (2d Cir. 1994); see also 15 U.S.C. § 1125(c)(2)(B) & (C) (defining dilution by blurring as "impair[ing] the distinctiveness of the famous mark" and dilution by tarnishment as "harm[ing] the reputation of a famous mark").

### A.    There Can Be No Trademark Dilution Claim Because Congress Expressly Allows ARC To Use The Emblem In Furtherance Of ARC's Mission.

Here, J&J's trademark dilution claim fails as a matter of law because Congress has expressly permitted ARC and its authorized users to use the Emblem.  When Congress chartered ARC more than 100 years ago, it preempted any argument that a Greek red cross would serve as a unique and distinct identifier for J&J products by giving ARC the right to use a Greek red cross in furthering every aspect of ARC's purposes and mission.  In fact, Congress actually gave ARC an exclusive right to use the Emblem; it is only by virtue of the grandfathered user provision that J&J is even allowed to continue to use it at all.  The grandfathered user provision limits J&J to the precise uses of the Emblem that it had lawfully made prior to 1905.[10]

---

secondary meaning in the mind of the public.' " Scholastic, Inc. v. Stouffer, 221 F. Supp. 2d 425, 437 (S.D.N.Y. 2002) (quoting Allied Maint. v. Allied Mech. Trades, Inc., 369 N.E.2d 1162, 1166 (N.Y. 1977) ("Allied" not sufficiently distinctive to warrant protection).  Here, assuming arguendo J&J even has trademark rights, it cannot show that it meets this high standard.

[10]    "A 'grandfather' provision in a statute is '[a]n exception to a restriction that allows all those already doing something to continue doing it even if they would be stopped by the new restriction.' " O-M Bread, Inc. v. U.S. Olympic Comm., 65 F.3d 933, 936 (Fed. Cir. 1995) (quoting Black's Law Dictionary 699 (6th ed. 1990)).

This is an insurmountable barrier to J&J's dilution claims for two reasons. First, even if dilution theory could apply here, J&J's claim would fail. Since 1905, the Emblem has been in widespread use by ARC. Clearly, it has not served to distinctly identify J&J as the source of goods and services bearing the Emblem. As a result, the "underlying rationale of the dilution doctrine," which is avoiding the "gradual attenuation or whittling away of the value of a trademark," simply does not apply here. 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 24:72 (4th ed. 2001).

Second, Congress has spoken on use of the Emblem, and dilution theory cannot be used to undermine that congressional mandate. Congress secured the Emblem for ARC's exclusive use. J&J was permitted to continue using the Greek red cross only as a grandfathered user, and only in the limited ways it was using the mark in 1905. Clearly, that specific statutory mandate granting ARC use of the Emblem cannot be trumped now, 100 years later, by a grandfathered user claiming its continued limited use is being "diluted" by the dominant use Congress specifically granted to ARC. The specific enactment about use by ARC prevails over the general statutory provisions concerning dilution of any famous mark. See Varity Corp. v. Howe, 516 U.S. 489, 511 (1996) ("the specific governs over the general"); see also Radzanower v. Touche Ross & Co., 426 U.S. 148, 153 (1976) ("It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum."); Morton v. Mancari, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."). As the Second Circuit has explained, "[t]he rationale for this canon is that a general provision should not be applied when doing so

would undermine limitations created by a more specific provision." <u>Cook v. N.Y. State Div. of Parole</u>, 321 F.3d 274, 279 n.4 (2d Cir. 2003) (citation omitted).

Applying the canon "the specific governs the general" here makes sense. After all, J&J is seeking to use statutes of general applicability—including a <u>state</u> law—to trump a plenary right with which Congress specifically endowed ARC. Moreover, the usual trademark-dilution case is premised on blurring or tarnishment of a mark caused by non-competitive use. Under J&J's theory, ARC has been diluting J&J's trademark every time it uses the Emblem to offer course material to one of the millions of first aid or lifesaving trainees, every time one of its volunteers or nurses wears the Emblem on a uniform, and every time it hosts a blood drive. Congress could not possibly have intended grandfathered users to be able to constrain ARC's use of the Emblem by complaining that the uses Congress specifically secured to ARC were "diluting" their grandfathered mark.

ARC's statutory Charter and the history of its enactment and amendments demonstrate that the primary purpose of these provisions has always been to secure to ARC exclusive rights to the Emblem; the only relevant exception was Congress's decision to grandfather the limited commercial uses that existed prior to January 5, 1905. Congress did the same with respect to the name "Olympic" when it chartered the United States Olympic Committee. <u>O-M Bread, Inc. v. U.S. Olympic Comm.</u>, 65 F.3d 933, 937 (Fed. Cir. 1995). Just as the baker with grandfathered trademark rights to sell "Olympic" bread in <u>O-M Bread</u> could not have sued the United States Olympic Committee ("USOC") for trademark dilution because it was advertising the Olympic Games, J&J cannot claim trademark dilution by ARC's use of the Emblem or that of others authorized by ARC to do so.

**B.      J&J's Trademark Dilution Claims Are Barred By Laches.**

Even if it were not preempted by Congress' express authorization to ARC to use the Emblem, J&J's trademark-dilution claim would be barred by laches.  Laches is a "fundamental threshold matter" that must be resolved before reaching the merits of J&J's trademark claims.  See Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 216 (2d Cir. 2003).  Laches bars a claim when (1) "the plaintiff had knowledge of defendant's use of its marks," (2) "plaintiff inexcusably delayed in taking action with respect thereto," and (3) "defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time."  Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1040 (2d Cir. 1980).  Under Second Circuit law, a presumption of unreasonable delay for taking action arises when a plaintiff brings a claim that is beyond the statute of limitations, which for a trademark dilution claim is three years.  Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 192 (2d Cir. 1996); Charles Atlas, Ltd. v. DC Comics, Inc., 112 F. Supp. 2d 330, 334 n.7 (S.D.N.Y. 2000).  ARC first began using the Emblem over 100 years ago, so J&J bears quite a burden of showing why laches ought not apply in this case.

That is a burden J&J cannot sustain.  After all, throughout the past century, the Emblem has been used to identify shelters, first aid kits, water bottles, blankets, and other forms of aid provided by ARC in times of floods, hurricanes, and other natural and man-made disasters.  SOF ¶¶ 20-23.  It has been front and center on all the materials and textbooks provided to the millions of Americans who have taken Red Cross class in first aid, water safety, family and babysitter health care, or CPR, and it has been on the badge that course participants received to signify their accomplishment in passing an ARC training course.  SOF ¶ 24.  The Emblem is also a deeply ingrained symbol in ARC's extensive blood-supply program.  SOF ¶ 25-26.  It marks the many thousands of locations where blood drives take place, it is used in the transport of blood, it is used on packaging, and it is used by manufacturing and processing partners. SOF ¶ 26.  The

Emblem has been prominently displayed on millions of Christmas Seals and fundraising items distributed or used by ARC employees, chapters, and authorized volunteers and fundraising partners in the course of their daily efforts to support the organization's humanitarian mission. SOF ¶ 28.

The Emblem has also been used on products sold directly to the American public since at least 1903, the year of ARC's earliest documented sale of first aid kits. SOF ¶ 28. ARC has sold all sorts of specialized first aid kits—at various times called first aid boxes or first aid pouches—including those designed for homes, automobiles, bicycles, boats, railroads, factories, and other workplaces. SOF ¶¶ 55, 63-65. It has sold to members of the public a wide variety of portable disaster shelters, disaster preparedness kits, and CPR supplies. SOF ¶ 77, 88, 95, 100, 121. It has sold to the public a full array of first aid textbooks. SOF ¶ 24, 41, 54, 57, 59-66, 71. Indeed, during World War II, ARC's first aid textbook "ha[d] become a national 'Best Seller.' " SOF ¶ 66. As described above, ARC has also worked with various licensees to sell a wide assortment of products such as first aid kits, vintage posters, Tiffany & Co. items, Christmas cards, and clothing. SOF ¶¶ 87, 97, 102, 103.

ARC has sold these items directly through its national headquarters and also through its local chapters. SOF ¶¶ 67-79, 121. It has set up temporary retail stores at conventions. SOF ¶ 87. Products designed by local chapters have been sold in the national catalog. SOF ¶¶ 81, 95, 100. It has sold products through other companies' catalogs. SOF ¶¶ 91, 93. It has sold products through newspaper inserts. SOF ¶ 99. It has sold products through retail stores, including Red Cross stores the Kansas City chapter operated in local shopping malls. SOF ¶¶ 74, 128. Numerous newspapers have run stories discussing ARC's sales of products. SOF ¶¶ 68, 79, 92. Because ARC has no manufacturing or publishing facilities, SOF ¶ 30, the sales of

each of these products has required ARC to license innumerable manufacturers and publishers as duly authorized agents to use the ARC name and Emblem.  SOF 23, 26, 31, 33, 80-103.

No sentient person could have missed these sales over the past century.  And J&J certainly didn't.  As early as 1904, J&J complained about ARC being in the "commercial business."  SOF ¶ 109.  And the record documents that since then, J&J has known about or complained about ARC authorizing other companies to make ARC products in at least 1913, 1917, 1937, 1942, 1984, 1992, 1997, and 2005-2007.  SOF ¶¶ 111, 113, 115, 116, 118, 121, 130.  Given the more than a century of documented use of the Emblem by ARC in every facet of pursuing its mission, laches applies.  Otherwise, the prejudice that would inure to ARC and to ARC's ability to pursue its mission and purposes is beyond obvious.  ARC relies on its product sales to fund its vital humanitarian mission; the Red Cross Emblem is what links the products with ARC and its message of safety, first aid, and emergency response for purchasers.  SOF ¶ 107.  Thus, because the three factors for laches—knowledge, inexcusable delay, and prejudice—are all present here.  J&J's trademark dilution claims are therefore barred.

With nowhere else to turn, J&J might well try to evade laches by importing the doctrine of "progressive encroachment" from the trademark infringement context.  This doctrine allows a trademark owner to "tolerate de minimis or low-level infringements" and still have the right to "act promptly when a junior user either gradually edges into causing serious harm or suddenly expands or changes its mark."  6 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 31:21 (4th ed. 2001); see also ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C., 314 F.3d 62, 70 (2d Cir. 2002) (progressive encroachment permits trademark holder to wait to sue until "the likelihood of public confusion of the marks" is great enough to amount to infringement).

But there is a simple reason why this Court should not apply the progressive encroachment doctrine: it does not apply to a dilution claim.  <u>AM General Corp. v. DaimlerChrysler Corp.</u>, 311 F.3d 796, 824 (7th Cir. 2002).  This is because dilution does not depend on competition between the products or likelihood of confusion, as in an infringement case; it depends instead on the blurring or tarnishment of a mark caused by someone else making even noninfringing use of a distinctive mark.[11]

The Seventh Circuit addressed this precise issue in <u>AM General</u>.  There, DaimlerChrysler—maker of the Jeep brand of sport utility vehicles ("SUVs")—claimed that AM General—maker of the Humvee and Hummer ("H1") SUVs—diluted DaimerChrysler's trademark by selling a new lower-priced brand of Hummer SUV, called H2.  <u>Id.</u> at 803. The dilution claim was based on an alleged similarity between the front grilles on Jeeps and Hummers.  <u>Id.</u>  The facts showed that AM General had produced Humvees (with the same front grille) for the United States military since 1985 and had been selling the H1 to the general public since 1992, although no more than 900 H1s were ever sold to the public in any one year.  <u>Id.</u> at 809.  DaimlerChrysler argued that it was justified in waiting to bring suit because, until this new marketing push, AM General had sold Humvees and H1s only to the military or to the public in small numbers; according to DaimlerChrysler, it was only when the use ramped up that AM General's use entered Jeep's market and began diluting Jeep's trademark grille.  <u>Id.</u> at 823.

The court squarely rejected DaimlerChrysler's argument, holding that "the test for likelihood of dilution <u>ignores competition</u> and looks solely to the marks' similarity and to the renown of the senior mark."  <u>Id.</u> at 823-24 (emphasis added).  The court found that laches barred

---

[11]   <u>See</u>, <u>e.g.</u>, <u>Deere & Co. v. MTD Prods., Inc.</u>, 41 F.3d 39, 42 (2d Cir. 1994) ("The anti-dilution statute applies to competitors as well as noncompetitors, and explicitly does not require a plaintiff to demonstrate a likelihood of consumer confusion.") (internal citations omitted).

the dilution claim because introduction of the H2 was irrelevant to DaimlerChrysler's dilution claim:  the H2 grille was no more similar to the Jeep grille when suit was filed in 2001 than was the Humvee's grille in 1985 or the H1's grille in 1992, and similarly, Jeep's grille was no more renowned in 2001 than it was in either 1985 or 1992.  Id. at 824.

AM General applies with force here.  ARC has been using the Emblem in myriad ways and on myriad products since it was chartered by Congress to do so.  ARC's Emblem is no more similar to J&J's trademark now than it was in 1905.  Just as the AM General-GM arrangement did not revive DaimlerChrysler's moribund right to sue over use of the Hummer grille, ARC's arrangements with the other defendants here did not revive J&J's right to sue over the Emblem.  If it ever existed, that right expired many years ago.[12]

### C.    J&J's Allegations Of Dilution By Tarnishment Fail As A Matter of Law for Additional Reasons.

Even if the Court were to conclude that J&J's dilution by tarnishment claim is not barred for the above reasons, summary judgment would still be appropriate for a third reason:  there is no evidence that ARC's products at issue are "shoddy," use the mark in "an unwholesome, or unsavory context," or will in any way lead the public to associate a lack of quality with J&J products.  Deere & Co., 41 F.3d at 43.  When the evidence does not demonstrate that the plaintiff will suffer from any sort of negative association, the claim fails.  See, e.g., Paco Sport, Ltd. v Paco Rabanne Perfumes, 2000 WL 1721126, at *7 (2d Cir. Nov. 16, 2000) (applying N.Y. Gen. Bus. Law § 360-l); Tommy Hilfiger Licensing, Inc. v. Nature Labs., LLC, 221 F. Supp. 2d 410,

---

[12]    Laches similarly bars J&J's unfair competition claim for all the same reasons it bars the trademark dilution claim.  See Eppendorf-Netheler-Hinz GmbH v. Enterton Co., 89 F. Supp. 2d 483, 485 (S.D.N.Y. 2000).  And the progressive encroachment doctrine is similarly inapplicable to laches when applied in an unfair competition context where, as here, there is no allegation of likelihood of confusion.  See ProFitness Physical Therapy Ctr., 314 F.3d at 70 (progressive encroachment doctrine only applies where likelihood of confusion is at issue); Hilton Int'l Co. v. Hilton Hotels Corp., 888 F. Supp. 520, 537 (S.D.N.Y. 1995) ("the [progressive encroachment] doctrine has apparently only been applied in trademark infringement cases").

422 (S.D.N.Y. 2002) (applying both federal and state law).  And the case law readily establishes

that when products are of the same or similar quality, there can be no tarnishment.  See, e.g.,

MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc., 2004 WL 434404, at *9 (S.D.N.Y.

Mar, 8, 2004) (granting summary judgment where "there is no evidence that plaintiff's marks

could be tarnished or suffer from negative associations in the eyes of the public due to

defendants' use of those marks"); Momentum Luggage & Leisure Bags v. Jansport, Inc., 2001

WL 830667 at *12 (S.D.N.Y. July 23, 2001) (granting summary judgment where plaintiff

"offered no evidence that [defendant's] products are of inferior quality or of any possible

tarnishment of its products").  Accord Montblanc-Simplo v. Aurora Due S.r.L., 363 F. Supp. 2d

467, 484 (E.D.N.Y. 2005); Brockmeyer v. Hearst Corp., 248 F. Supp. 2d 281, 301 (S.D.N.Y.

2003); Tommy Hilfiger Licensing, Inc., 221 F. Supp. 2d at 422; La Cibeles, Inc. v. Adipar, Ltd.,

2000 WL 1253240, at *14 (S.D.N.Y. Sept. 1, 2000).  Here, J&J has conceded that it has no

evidence that the goods at issue are anything other that ordinary retail ware like J&J's own

products.  SOF ¶¶ 158-159.

### D.    J&J's Allegations Of Dilution By Blurring Also Fail for Additional Reasons.

J&J's claim of dilution by blurring also fails for additional reasons.  Blurring occurs

"where the defendant uses or modifies the plaintiffs' trademark to identify the defendant's goods

and services, raising the possibility that the mark will lose its ability to serve as a unique

identifier of the plaintiffs' product."  Deere & Co., 41 F.3d at 43 (emphasis in original & added).

There are two ways in which J&J's claim fails as a matter of law.  First, the Emblem is not—and

never has been—a unique identifier of J&J's goods.  As the 56.1 Statement sets out and as

described above, the Emblem has been used in every aspect of ARC's mission and is ubiquitous

in the United States with ARC—because of its continuous use over the last century by ARC and

those authorized by ARC to display it. And second, the premise of a blurring claim—use or modification of the plaintiff's trademark—is wholly inapplicable here. ARC and its duly authorized agents are not using or modifying J&J's grandfathered trademark; rather, they are using the mark that Congress assigned to ARC. ARC's use of its own Emblem, Congressionally-sanctioned no less, cannot be the basis for a blurring claim.

Additionally, one of the elements of a blurring claim is predatory intent, which is wholly absent here. " 'Predatory intent involves more than mere knowledge of the senior user's mark— it requires a showing that the junior user adopted its mark hoping to benefit commercially from association with the senior user.' " Computer Assocs. Int'l, Inc. v. AJV Computerized Data Mgmt., Inc., 889 F. Supp. 630, 639 (E.D.N.Y. 1995) (quotation omitted). A lack of predatory intent, and a party's clear good faith, "mandates the resolution of the dilution issue in defendant's favor." Jim Beam Brands Co. v. Beamish & Crawford, Ltd., 852 F. Supp. 196, 201 (S.D.N.Y. 1994) (finding lack of predatory intent where defendant, a maker of Irish stout ale, had used the mark in question since 1792). Here, there is no evidence that any of the defendants sought to take "unfair advantage of the business values developed by plaintiff." Jordache Enters., Inc. v. Levi Strauss & Co., 841 F. Supp. 506, 523 (S.D.N.Y. 1993). Instead, the defendants made the most of the name and reputation of ARC—an endeavor they fully pursued in good faith.

## III.    SUMMARY JUDGMENT IS WARRANTED ON COUNT ONE FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.

To prevail on a claim for tortious interference with prospective business relations a plaintiff must prove: (1) that there was a business relationship with a third party; (2) the defendant's knowledge of and intentional interference with that relationship; (3) that the defendant acted with malice or used wrongful means; and (4) injury to the business relationship with the third party. Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003). A plaintiff must

point to "some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior." Kramer v. Pollock-Krasner Found., 890 F. Supp. 250, 258 (S.D.N.Y. 1995) (citing PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 269 (2d Cir. 1987)). Summary judgment is warranted where the plaintiff lacks evidence of any one of these elements. E.g., Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 383 (2d Cir. 2000); Phlo Corp. v. Stevens, 2001 WL 630491, at *7 (S.D.N.Y. June 7, 2001). In ruling on the defendants' motion to dismiss, the Court limited J&J's claim to four specific relationships: Target, Wal-mart, Walgreens, and CVS. See Order (Nov. 6, 2007) (Docket No. 34). Summary judgment is now appropriate for multiple reasons.

**A.    J&J Cannot Establish That ARC Acted By Wrongful Means.**

J&J does not suggest that ARC acted with malice. Therefore, to satisfy the third prong of this test, J&J is forced to gin up allegations that the defendants acted by "wrongful means." But that is wrong as a matter of law and fact.

In Carvel Corp. v. Noonan, 818 N.E.2d 1100 (N.Y. 2004), the Court of Appeals characterized "wrongful means" as conduct that amounts "to a crime or an independent tort." Id. at 1103-04; see also Cooper v. Hodge, 814 N.Y.S.2d 447, 449 (N.Y. App. Div. 2006) (quoting Carvel Corp., 818 N.E.2d at 1103); accord Reading Int'l, Inc. v. Oaktree Capital Management LLC, 2007 WL 39301, at *19 & n.20 (S.D.N.Y. Jan. 8, 2007) (granting summary judgment to defendant after determining that the alleged "wrongful conduct" did not violate the Sherman Act). But the only wrongful means that J&J asserts is violation of § 706. As we have already shown, supra 1-3, § 706 guards against pretenders and is not violated when ARC authorizes a third party to use its name and Emblem in furtherance of its mission. It is undisputed that in each of the four licensing agreements at issue here, both parties to the agreement understood that ARC

was doing just that. [13]  SOF ¶¶ 140, 146, 152, 155.  Because the only "wrong" that J&J points to

is no wrong at all, summary judgment should be granted on Count One.

> **B.    J&J Also Cannot Establish The Loss Of Its Business Relationship With CVS, Walgreens, Wal-mart, Or Target; Nor Can It Establish Interference, Injury, Or Proximate Cause.**

Although this Court need go no further to dispose of Count One, the claim also fails

because J&J cannot establish the other elements of this "demanding" tort.  PKG Group, LLC v.

Gamma Croma, S.p.A., 446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006).  To satisfy the second

requirement, " 'the defendant must direct some activities toward the third party and convince the

third party not to enter into a business relationship with the plaintiff.' "  Allcar Motor Parts Corp.

v. Federal-Mogul Corp., 1998 WL 671448, at *5 (S.D.N.Y. Sept. 29, 1998) (quoting Fonar Corp.

v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 482 (S.D.N.Y. 1997)).  The undisputed

evidence demonstrates that J&J has not lost its relations with any of the four retailers to which its

allegations are limited.  SOF ¶ 169.

Indeed, Jeffrey Tolonen, J&J's product director for its Red Cross-branded portfolio of

products, admitted in depositions that he had no knowledge of lost customers as a result of sales

of ARC products in retail and that J&J continues to sell its Red Cross-branded products to Target,

Wal-mart, Walgreens, and CVS.  SOF ¶ 169.  J&J can point to no evidence that CVS, Walgreens,

Wal-mart, or Target has been convinced by anyone not to enter a business relationship with J&J;

its business relationships with these four retailers remain intact.  SOF ¶ 168; see also SOF ¶¶ 144,

153, 157.  Thus, J&J has no evidence that it lost or failed to obtain a business relationship with

any of the four retailers, let alone that it was proximately caused by the defendants.

---

[13]    This is the same activity that the ARC has undertaken and authorized for over a 100 years.  For the reasons discussed above, J&J's claim for tortious interference with prospective business relations is also barred by laches.

This means J&J's claim cannot survive summary judgment. "A cause of action for interference with prospective economic advantage contemplates a defendant who has interfered with specific precontractual relations or a prospective relationship between the plaintiff and a third party that would have proceeded to some sort of binding, if not contractual, relationship <u>but for</u> the defendant's interference." <u>D'Andrea v. Rafla-Demetrious</u>, 3 F. Supp. 2d 239, 250 (E.D.N.Y. 1996), <u>aff'd</u>, 146 F.3d 63 (2nd Cir. 1998) (emphasis added). <u>See Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.</u>, 2004 WL 691680, at *21 (S.D.N.Y. Mar. 31, 2004) (in an action for interference with prospective contractual relations, plaintiff must meet a "but for" causation requirement by demonstrating that it would have received a contract but for the acts of the defendant) (citing <u>Fine v. Dudley D. Doernberg & Co.</u>, 610 N.Y.S.2d 566, 567 (N.Y. App. Div. 1994);[14] <u>see also</u> <u>PPX Enters., Inc. v. Audiofidelity Enters, Inc.</u>, 818 F.2d 266, 270 (2d Cir. 1987) (under New York law, alleged "interference" with the benefits derived from a relationship that leaves the relationship itself unchanged cannot constitute interference with the underlying business relations); <u>Vigoda v. DCA Prods. Plus Inc.</u>, 293 A.D.2d 265, 266-267 (N.Y. App. Div. 2002) ("Tortious interference with prospective economic relations requires an allegation that plaintiff would have entered into an economic relationship but for the defendants wrongful conduct. As plaintiffs cannot name the parties to any specific contract they would have obtained had they performed at the NACA showcase, they have failed to satisfy the 'but for' causation required by this tort.").[15] In sum, because nothing the defendants did "prevented [CVS,

---

[14] The requirement of proximate cause appropriately limits application of this tort because "a prospective relationship, in which the plaintiff has only speculative interest, will be protected very little in comparison with an actual contractual relationship, in which both parties have substantive rights." <u>Imig, Inc. v. Electrolux Home Care Prods., Ltd.</u>, 2007 WL 900310, at *18 (E.D.N.Y. Mar. 22, 2007).

[15] These cases hold that J&J must have evidence that it lost its relationship with the four named retailers; reduced sales under an intact retail arrangement will not suffice. But J&J cannot

Walgreens, Wal-mart, or Target] from extending a contractual relationship to the plaintiff,"

J&J's claim fails and should be dismissed.  72 N.Y. Jur. 2d Interference § 44 (2d ed. 2007).

## IV.    SUMMARY JUDGMENT IS WARRANTED ON COUNT THREE FOR UNFAIR COMPETITION.

### A.    J&J Is Unable To Point To Any Unlawful Activity In Support Of Its Unfair Competition Claim.

As a threshold matter, laches bars J&J's claim.  See supra 29 and n. 12.  But the claim

also fails on the merits.  J&J points to just two putatively "unfair" things to support its unfair

competition claim:  its mistaken views (1) that rather than protecting ARC, § 706 prohibits ARC

from authorizing the co-defendants to manufacture and market ARC products that further ARC's

mission and (2) that ARC's is not empowered to engage in the "commercial activity" it has been

engaging in for over a hundred years  We debunked both of these in Section I.   Since J&J has

pointed to no unlawful activity by the defendants, J&J's claim for unfair competition cannot

survive summary judgment.

### B.    J&J Lacks Any Evidence Of Bad Faith by ARC, A Required Claim Element.

There is yet one more fatal flaw with J&J's unfair competition claim:  there is no

evidence of bad faith, an essential element of this tort under New York law.  This makes

summary judgment appropriate.  See Capitol Records, Inc. v. Naxos of Am., Inc., 372 F.3d 471,

482 (2d Cir. 2004) (affirming summary judgment on unfair competition claim where plaintiff

had not provided evidence to raise a genuine issue of material fact concerning bad faith on the

part of defendant); Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980)

("Central [to an unfair competition claim] is some element of bad faith."); accord Scientific

---

even show that.  It's key witness testified that J&J has not lost sales as a result of the presence of
ARC products on retail shelves.  SOF ¶ 171 (testimony of Mr. Tolonen that he did not "know of
a specific example" where J&J lost customers as a result of ARC products being offered at retail).

Components Corp. v. Sirenza Microdevices, Inc., 2006 WL 2524187, at *29 (E.D.N.Y. Aug. 30, 2006); Info. Superhighway, Inc. v. Talk Am., Inc., 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005); Philip Morris USA Inc. v. Felizardo, 2004 WL 1375277, at *6 (S.D.N.Y. June 18, 2004).  The defendants have manufactured and marketed products bearing the Emblem together with the words American Red Cross because of the value and reputation that it provides and because it furthers ARC's mission to encourage a broader spectrum of Americans to be prepared for emergencies and disasters.  There is no support in the record that the defendants sought to misappropriate any commercial advantage of J&J's name or to exploit J&J's name and reputation in any way.  Summary judgment should be granted.

## V.    SUMMARY JUDGMENT IS WARRANTED ON COUNT TWO FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS.

Under New York law, the elements of a tortious interference with contractual relations claim are:  (1) that a valid contract exists; (2) that the defendant had knowledge of the contract; (3) that the defendant intentionally and improperly procured the breach of the contract; and (4) that the breach resulted in damage to the plaintiff.  See Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir. 1996).  J&J's claim fails on at least two grounds.  First, there is no evidence ARC knew about J&J's settlement agreements with Water-Jel and First Aid Only when ARC entered agreements with those two companies.  And second, there is no evidence that ARC intentionally and improperly procured a breach.[16]

1.    **Knowledge.**  J&J cannot show that ARC knew about either the 1995 Water-Jel settlement agreement with J&J or the 2005 First Aid Only agreement with J&J when these two

---

[16]    Co-Defendants Water-Jel and First Aid Only further allege that there was no breach of the underlying agreements.  However, given the Court's decision not to dismiss the contract claims, Water-Jel and First Aid Only are not moving for summary judgment on those counts. They will demonstrate at trial that the agreements at issue had to do with their own marks only, not any agreement they might enter into with the ARC.

companies entered licensing agreements with ARC.  SOF ¶¶ 149-150.  As this Court has explained,

> This is dispositive.  To establish inducement of breach of contract, New York law requires, inter alia, that the alleged inducer have knowledge at the time of inducement of the contract in issue.  Here, the plaintiff has failed to demonstrate that any such knowledge existed at the relevant time.

800America, Inc. v. Control Commerce, Inc., 202 F. Supp. 2d 288, 289 (S.D.N.Y. 2002) (citing Lama Holding Co. v. Smith Barney Inc., 668 N.E.2d 1370, 1376 (N.Y. 1996)).  Just as in 800America, ARC's lack of knowledge about the underlying contract warrants summary judgment in its favor.  Accord Torcik v. Chase Manhattan Bank, Inc., 2006 WL 3544211, at *1 (2d Cir. Dec. 7, 2006).

       **2.**      **Intent.**  Besides not knowing about the underlying contracts, ARC did not commit an intentional act to induce a breach, as J&J must show to prevail on this tort.  See, e.g., Whitman Realty Group, Inc. v. Galano, 838 N.Y.S.2d 585, 588 (N.Y. App. Div. 2007) (granting summary judgment where the evidence showed the defendant had knowledge of a contract, but no evidence demonstrated the defendant had intentionally induced a breach); @Wireless Enters., Inc. v. AI Consulting, LLC, 2006 WL 3370696, at *7 (W.D.N.Y. Oct. 30, 2006).  To the contrary, the record demonstrates that ARC did not propose that either First Aid Only or Water-Jel enter the ARC Agreements, and did not initiate the discussions that led either company to do so.  SOF ¶¶ 141, 148.  As a matter of law, J&J cannot prevail on this claim because it has no evidence that ARC intentionally took steps to induce Water-Jel or First Aid Only to breach agreements with J&J (agreements that ARC did not even know about).[17]

---

[17]     Even if J&J believes that ARC was somehow negligent in not asking Water-Jel and First Aid Only whether either had an agreement with J&J limiting the marks that they could use, the tort of interference with contractual relations "is not satisfied by conduct that is 'merely

## VI.    THE UNDISPUTED FACTS DEMONSTRATE THAT J&J HAS EXCEEDED THE SCOPE OF ITS GRANDFATHERED RIGHTS.

ARC is entitled to summary judgment on its counterclaims because the undisputed facts show that J&J has impermissibly exceeded the scope of its grandfathered rights, and has done so with predatory intent.  Under the undisputed facts, the declaration sought in Counterclaim 1 is appropriate at this time.  The cancellation of the mark sought in Counterclaim 2 is also appropriate at this time, as Registration No. 3,178,913 (" '913 Registration") was obtained in violation of 15 U.S.C. § 1052(b).

### A.    J&J Has Impermissibly Exceeded The Scope Of Its Grandfathered Rights.

When a statute "grandfathers" someone, that person is exempted from a restriction that prohibits everyone else from doing something because they were doing it before the restriction went into effect.  See O-M Bread, Inc., 65 F.3d at 936; Black's Law Dictionary 560 (7th ed. 2000).  Because those within the scope of a grandfather clause are permitted to do something that is otherwise unlawful, such clauses are construed narrowly so as not to frustrate the purpose of the prohibition.  O-M Bread, Inc., 65 F.3d at 936.  Here, J&J's right to use the Emblem is narrowly limited to the precise uses that J&J was making of that Emblem before 1905.  Before 1905, J&J was using the Emblem standing alone, as its trademark registrations show.  Compl. ¶ 31; see also SOF ¶ 173.[18]  Thus, the mark to which J&J has grandfathered rights is simply the Emblem standing alone.  Nothing more, nothing less.

Nevertheless, J&J has used and registered trademarks which—in violation of § 706— combine the Emblem with other elements and thereby create new, different marks.[19]  For

---

negligent or incidental to some other, lawful, purpose.' " Harris v. Town of Fort Ann, 825 N.Y.S.2d 804, 806 (N.Y. App. Div. 2006) (citation omitted).

[18]    J&J also had a trademark to use the words "Red Cross" on cotton.  Compl. ¶ 31.

[19]    Defendants also contend that J&J has exceeded the scope of its grandfathered rights in

example, J&J is using the Emblem with the words "Johnson & Johnson" and/or "First Aid" and/or "Emergency" written through on its Emergency First Aid Kit.  SOF ¶ 175.  Even J&J's Chief Trademark Counsel Richard Biribauer admits that this mark differs from the simple Emblem it was using before 1905.  Id.  During his deposition, Mr. Biribauer testified that "there's obviously graphically a difference between the red cross mark as a pure red cross and the red cross mark with other matter added to it."  Id.  In addition, all of J&J's products in its home health care line bear a red cross symbol with the words Johnson & Johnson adjacent to it, and the words "Hospital Products for Home Care" below Johnson & Johnson.  SOF ¶ 179.  This is also a different mark from the one J&J was using prior to 1905.  And finally, J&J registered a composite mark in 2006, which it has been using on sales ever since, that is composed of three elements:  the red Greek cross, the words "FIRST AID," and the script "JOHNSON AND JOHNSON."  SOF ¶ 176.  None of these are permitted uses under the grandfather provision.

This is not the first time a grandfathered user has sought to expand use of a mark secured to a federally chartered nonprofit.  In O-M Bread, the Federal Circuit faced the question whether a bread manufacturer who was a grandfathered user of the statutorily protected word "OLYMPIC" was within his grandfathered rights when it sold bread marked "OLYMPIC KIDS."  O-M Bread argued that it was merely combining the grandfathered use of the word "OLYMPIC" with the arguably descriptive term "KIDS" used in connection with bread marketed to children.  The Court strictly construed the grandfathered use, holding that any time "different marks present a different commercial impression and are not legal equivalents, it would be an incorrect interpretation of the [statute] to hold they are nonetheless grandfathered under [the grandfather provision]."  O-M Bread, 65 F.3d at 938.  So too here.  J&J is using an

---

view of the goods on which it is currently using the Red Cross Emblem, including emergency preparedness kits which Defendants discovered J&J was offering after institution of this lawsuit.

altered version of its right to use the Emblem in ways that extend beyond its limited

grandfathered rights.  ARC is therefore entitled to summary judgment on Counterclaim 1.

### B.    J&J's '913 Registration Is In Violation Of 15 U.S.C. § 1052(b) And Should Therefore Be Cancelled.

The U.S. Code prohibits registering a mark which includes an "insignia of the United

States."  15 U.S.C. § 1052(b).  ARC is entitled to summary judgment on Counterclaim 2 because

the undisputed facts show that the '913 Registration includes an insignia of the United States.  A

Greek cross, displayed in red on a white background, was recognized as an insignia of the United

States in 1905.  Compl. ¶ 15 (citing 33 Stat. 600-01).  And that recognition continues today.  18

U.S.C. § 706.  J&J has admitted that that the '913 Registration incorporates a red Greek cross,

along with two other elements, and this registration thus falls squarely within the prohibition in

15 U.S.C. § 1052(b).  SOF ¶¶ 176-177.  As a matter of law, the '913 registration should be

cancelled pursuant to 15 U.S.C. § 1119 and 15 U.S.C. § 1064(3).

### CONCLUSION

For the forgoing reasons, the defendants' motion for summary judgment on Counts One,

Two, Three, Five, and Six should be granted.  Summary judgment should also be granted on

ARC's Counterclaims One and Two.

Dated:  November 21, 2007                    Respectfully submitted,

                                             HOGAN & HARTSON, L.L.P.

                                             By:_____s/Jonathan L. Abram_____
                                             Jonathan L. Abram (admitted pro hac vice)
                                             Raymond A. Kurz (admitted pro hac vice)
                                             555 Thirteenth Street, N.W.
                                             Washington, D.C. 20004
                                             Tel:  (202) 637-5681
                                             Fax:  (202) 637-5910

                                             Attorneys for Defendants