Jonathan L. Abram
Raymond A. Kurz
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel:  (202) 637-5681
Fax:  (202) 637-5910

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC., <br><br>        Plaintiffs, <br><br>v. <br><br>THE AMERICAN RED CROSS, LEARNING CURVE INTERNATIONAL, INC., MAGLA PRODUCTS, LLC, WATER-JEL TECHNOLOGIES, INC., and FIRST AID ONLY, INC., <br><br>        Defendants. | 07 Civ. 7061 (JSR/DCF) <br><br>**STATEMENT OF MATERIAL UNDISPUTED FACTS** <br><br>**ECF CASE** <br>**ELECTRONICALLY FILED** |

**DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS**
**PURSUANT TO LOCAL CIVIL RULE 56.1**

Pursuant to Local Civil Rule 56.1, Defendants submit this Statement of Material Undisputed Facts.  The facts necessary for a determination of the Defendants' motion for summary judgment are set forth in the Amended Complaint of Plaintiffs Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc. ("J&J"), filed on September 5, 2007 (the "Complaint"); the Declaration of Gregory Ballish, Senior Vice President, Biomedical Services of the American Red Cross ("Ballish Decl."); the Declaration of Joe Becker, Senior Vice President, Preparedness and Response of the American Red Cross ("Becker Decl."); the Declaration of

1

Scott Conner, Senior Vice President, Preparedness & Health and Safety Services of the American Red Cross ("Conner Decl."); the Declaration of Neal Denton, Senior Vice President, Service to the Armed Forces of the American Red Cross ("Denton Decl."); the Declaration of Kathleen Loehr, Interim Senior Vice President for Development of the American Red Cross ("Loehr Decl."); and the deposition testimony and other exhibits attached to the Declaration of Jonathan L. Abram ("Abram Decl.").

<u>**UNDISPUTED MATERIAL FACTS**</u>

**A.  The American Red Cross, Its Congressional Charter, and Its Use of the Red Cross Emblem**

1.      Since its founding in 1881, the American National Red Cross ("ARC") has used a universally recognized symbol to identify its organization and mission:  the Greek red cross on a white background.  This symbol is referred to as the Red Cross Emblem.  ARC's use of the Emblem thus predates by six years the first-use date that Johnson & Johnson identifies in its trademark registrations for the red cross symbol.  <u>See</u> Compl. ¶ 31.

2.      Although ARC was the first to use the symbol in the United States, it did not pioneer the Greek red cross.  In fact, use of a Greek red cross symbol to indicate a medicinal connotation dates back to at least the seventeenth century.  <u>See</u> Compl. ¶ 20.

3.      The Red Cross Emblem was internationally protected and reserved for humanitarian purposes beginning in 1864 when, at the Geneva Convention and thereafter, virtually every nation on Earth agreed that the Emblem, as used by ARC's international partner (and precursor) the International Red Cross, would be recognized globally as a neutral symbol to identify those individuals providing care for the injured during wartime.  <u>See</u> Abram Decl., Ex. 1 (ARC Museum, "A Brief History of the American Red Cross"); Compl. ¶ 34.

4.      Following the American Civil War, Clara Barton visited Europe, where she first heard of the Swiss-inspired Red Cross Movement.  She later went on to serve as a Red Cross volunteer during the Franco-Prussian War.  And on July 1, 1881, shortly after she returned to the United States, Ms. Barton incorporated the American Red Cross.  See Abram Decl., Ex. 1 (ARC Museum, "A Brief History of the American Red Cross"); Abram Decl. Ex. 2 (Articles of Incorporation, American Association of the Red Cross, July 1, 1881); Compl. ¶ 35.

5.      At its inception in 1881, ARC adopted the symbol of a Greek red cross on a white background (the "Emblem") to identify itself and to carry out its objectives.  Since then, ARC has used the Red Cross Emblem in all of the work it does throughout the United States to further its mission:  helping the Nation prepare for and respond to emergencies and disasters.  See Becker Decl. ¶ 3; Ballish Dec. ¶ 3.

6.      The United States ratified the Geneva Conventions in 1882.  To fulfill the obligations that the Nation assumed under those Conventions, Congress chartered ARC in 1900.  ARC is a unique organization, for it is the only congressionally chartered organization that has been designated as a "treaty obligation organization" due to ARC's responsibility with respect to U.S. treaty obligations under the Geneva Convention.  See Abram Decl., Ex. 3 (Excerpt of ARC Governance for the 21st Century, Section 1, Oct. 2006, at 10 n.22).

7.      Congress contemplated that ARC would serve a much broader mission.  It therefore also commanded ARC to "continue and carry on a system of national and international relief in time of peace and apply the same in mitigating the sufferings caused by pestilence, famine, fire, floods, and other great national calamities" and "to devise and carry on measures for preventing the same, and generally to promote measures of humanity and welfare of mankind."  31 Stat. at 279; see also Compl. ¶ 37.

8.     In formulating ARC's charter, Congress recognized that this unique new organization would need an identifying symbol to carryout its important mission.  Thus, the 1900 charter that Congress adopted explicitly authorized ARC to use "a Greek red cross on a white background" in carrying out its purposes.  31 Stat. at 278-279; <u>see also</u> Compl. ¶ 38.

9.     The 1900 charter also contained another key provision:  It provided that the Red Cross would succeed to all rights and property previously held by the early American Red Cross founded by Ms. Barton.  31 Stat. at 279.  This included all rights that the American Red Cross had acquired in the Emblem since its first use of the Emblem at least as early as 1881.

**B.     Congress Expressly Protects the American Red Cross' Use of its Emblem**

10.     Since 1905, ARC's use of the Emblem has been protected by federal statute.  <u>See</u> Act of January 5, 1905, ch. 23 § 3, 33 Stat. 599.

11.     The 1905 charter made it unlawful for "any person or corporation, <u>other than the Red Cross of America</u>, not now lawfully entitled to use the sign of the Red Cross, hereafter to use such sign or any insignia colored in imitation thereof <u>for the purposes of trade or as an advertisement to induce the sale of any article whatsoever</u>."  33 Stat. 601 (emphasis added).  Thus, the 1905 charter expressly acknowledged the Red Cross' right to use the Emblem for the purposes of "trade or . . . to induce the sale of any article whatsoever," even as it made similar use by third parties unlawful.  <u>Id.</u>

12.     This statute was so expansive that it rendered superfluous the registration that Clara Barton had first obtained in 1897, which covered the Emblem as used in connection with "Books, Pamphlets, Paper, and Envelops [sic]."  <u>See</u> Abram Decl., Ex. 4 (Trademark Registration No. 30,428).  As the Commissioner of Patents explained in 1907, "[i]n view of the fact that Congress has recognized the ownership of the symbol of the Red Cross by the American

National Red Cross, it is not apparent that the registration of the trade-mark comprising the Red Cross for any particular goods is necessary, since the registration is at most only prima facie evidence of ownership of the mark, whereas the recognition by Congress appears to be evidence which cannot be controverted." See Abram Decl., Ex. 5 (Letter from Edward Moore, Commissioner of Patents, to Charles Magee, ARC, Oct. 12, 1907); see also Abram Decl., Ex. 6 (Letter from ARC Chairman to Edward Moore, Commissioner of Patents, Oct. 2, 1907 (asking whether it was necessary to re-register ARC's mark given that Congress had passed a criminal provision preventing use of the mark)); Abram Decl., Ex. 10 (Letter from ARC Chairman to Edward Moore, Commissioner of Patents, Oct. 16, 1907 (confirming that ARC agreed with the Commissioner of Patent's conclusion and would therefore not re-register the mark)).

13. The charter was amended in 1910. As amended, it contained a similar provision stating that it would be unlawful for any person other than ARC, its employees and agents, the military medical users and certain pre-1905 users to use the Emblem for the "purpose of trade or as an advertisement to induce the sale of any article whatsoever or for any business or charitable purpose." 36 Stat. 604, ch. 372, June 23, 1910 (emphasis added). Thus, in addition to the uses secured to the Red Cross under the 1905 charter, the 1910 amendment also made clear that ARC's use of the Emblem for "business" purposes and for the "purpose of trade or as an advertisement to induce the sale" of an item was lawful.

14. Currently, ARC's Congressional Charter states that, "[i]n carrying out its purposes under this chapter, the [ARC] may have and use, as an emblem and badge, a Greek red cross on a white ground. . . ." 36 U.S.C. § 300106(a).

15.     In defining ARC's "purposes," Congress deliberately used broad, open-ended language, reflecting the wide latitude an organization as important as ARC must have to fulfill its National mission.  Thus, ARC's current Congressional Charter identifies its purposes as:

> (1) to provide volunteer aid in time of war to the sick and wounded of the Armed Forces, in accordance with the spirit and conditions of—(A) the conference of Geneva of October 1863; (B) the treaties of the Red Cross, or the treaties of Geneva, August 22, 1864, July 27, 1929, and August 12, 1949, to which the United States of America has given its adhesion; and (C) any other treaty, convention, or protocol similar in purpose to which the United States of America has given or may give its adhesion;
>
> (2) in carrying out the purposes described in paragraph (1) of this section, to perform all the duties devolved on a national society by each nation that has acceded to any of those treaties, conventions, or protocols;
>
> (3) to act in matters of voluntary relief and in accordance with the military authorities as a medium of communication between the people of the United States and the Armed Forces of the United States and to act in those matters between similar national societies of governments of other countries through the International Committee of the Red Cross and the Government, the people, and the Armed Forces of the United States;
>
> (4) to carry out a system of national and international relief in time of peace, and to apply that system in mitigating the suffering caused by pestilence, famine, fire, floods, and other great national calamities, and to devise and carry out measures for preventing those calamities; and
>
> (5) to conduct other activities consistent with the foregoing purposes.

36 U.S.C. § 300102.

16.     In addition to authorizing ARC's use of the Emblem in carrying out these broad purposes, federal law also prohibits others from using it through a provision of the criminal code based on the early Charter language, making it a criminal offense punishable by fine or imprisonment for any entity other than ARC or its agents or employees to use "the emblem of the Greek red cross on a white ground, or any sign or insignia made or colored in imitation thereof."  18 U.S.C. § 706 (hereinafter "§ 706").

17.     Subject to a limited "grandfather" exception to § 706 for certain entities like J&J that were lawfully using the Emblem for certain purposes before 1905, § 706 grants an exclusive right to ARC to use the Emblem.  Section 706 does not contain any language limiting ARC's right to use the Emblem.  See id.

18.     The U.S. Patent & Trademark Office ("PTO") has further provisionally protected ARC's trademark rights to the Emblem by reserving U.S. Serial No. 89/000,081 for ARC to protect the Emblem, against registration by others, in every single international class of goods and services without limitation.  See Abram Decl., Ex. 8 (Trademark Record for U.S. Serial No. 89/000,081).

19.     Additionally, ARC owns various federal trademark registrations for various AMERICAN RED CROSS word and design marks, including U.S. Reg. No. 2,740,131 for "charitable fundraising" services and U.S. Reg. No. 2,818,964 for "charitable services, namely, providing relief and support to victims of disasters by providing food and temporary housing shelters and information and consultation related therein."  According to the PTO records, ARC has used both of these registered marks "in commerce" since 1881.  See Abram Decl., Ex. 9 (Registrations); see also Abram Decl., Ex. 10 (U.S. Registrations for  U.S. Reg. Nos. 2,771,239, 2,740,133, 2,797,013 and 2,818,967).

**C.     The American Red Cross Has Used the Emblem in a Wide Variety of Contexts For More than a Century.**

20.     Since its formation, ARC has used the Emblem both as a primary means of identifying itself, including various goods and services offered by ARC, and to promote its various missions as outlined in its Congressional Charter.  See Becker Decl. ¶¶ 4-7; Ballish Decl. ¶ 3-5; Conner Decl. ¶¶ 3-6;  Loehr Decl. ¶¶ 3-5.

21.     The Red Cross Emblem is a well known symbol of comfort and relief and signifies a safe place to turn in times of emergency and disaster.  <u>See</u> Becker Decl. ¶ 4; Denton Decl. ¶ 3.  That has been so as the ARC has prominently used and displayed the Red Cross Emblem at every disaster and emergency large and small to which it has responded throughout the more than 120 years since its founding, from national calamities such as the San Francisco earthquake in 1906 to the terrorist attacks in 2001 to the 2005 Katrina and Rita hurricanes to house fires and other smaller emergencies that ARC responds to daily.  <u>See</u> Becker Decl. ¶ 4.

22.     The Red Cross Emblem is ubiquitous in the United States as a result of its use by ARC and others authorized by ARC to display it.  For example, the Emblem has been and is prominently displayed by ARC employees and volunteers, as well as on the uniforms of thousands of nurses and the vests of thousands of health professionals in paid and volunteer service with the American Red Cross.  The Emblem identifies workers, volunteers, shelters, and other forms of aid provided by ARC when people are displaced or require care or support as a result of floods, hurricanes, and other natural and man-made disasters.  <u>See</u> Becker Decl. ¶ 5; Denton Decl. ¶ 3.

23.     The Emblem is also used by ARC's manufacturing partners when they make the items bearing the Emblem that are so important during times of crisis and displacement—items ranging from cots and first-aid kits to support material like clean-up or personal hygiene kits or simple blankets.  These uses of the Emblem are critical, because the Emblem marks people, places, and items that victims can trust in time of dire need.  <u>See</u> Becker Decl. ¶ 5; Conner Decl. ¶ 7; Loehr Decl. ¶¶ 3-5.  ARC manufactures none of these supplies itself.  Of necessity, then, it regularly authorizes use of the Emblem by third parties when they manufacture these critical items for use and/or sale by ARC.  <u>See</u> Becker Decl. ¶ 14-15; Conner Decl. ¶ 17; Loehr Decl. ¶¶

6-7.  While, in order to fulfill its mission, ARC authorizes third-party use in a wide variety of situations, ARC exercises strict controls when it authorizes any third party use to the Red Cross' name and Emblem and takes care in selecting the firms it works with in defining the ways in which the Emblem may be used.  <u>See</u> Loehr Decl. ¶¶ 7-9; Becker Decl. ¶ 15; Conner Decl. ¶¶ 8-9.  In the case of manufacturers, the third party acts as ARC's "duly authorized agent" in using the Emblem.  <u>See</u> Loehr Decl. ¶¶ 7-8.  This is true regardless of whether the underlying relationship between ARC and the manufacturer might be considered a master-servant agency, a licensee, a third-party contractor, or a simple vendor-vendee.

24.     The Emblem is used in a wide variety of other ways by ARC and authorized third parties, often in settings that would be described as "commercial activities" as that phrase has been used in this litigation.  For example, the Red Cross Emblem is front and center on all the materials and textbooks and other items provided to the millions of Americans who have taken an ARC class in first aid, water safety, family and babysitter health care, CPR, and myriad other health and safety-related trainings.  The American Red Cross typically charges a price or fee for CPR, first aid and babysitting training and materials (consistent with ARC's health and safety mission) as well as for swimming lessons (such classes were offered in response to an outbreak of drownings in the early Twentieth Century).  All of these activities of ARC and uses of the Red Cross Emblem further the important work of the ARC.  <u>See</u> Conner Decl. ¶ 6.

25.     In addition, since the late 1940s, ARC has played a critical role in America's blood supply.  Over the last several decades, ARC has supplied roughly half of all blood products and services used in the United States.  In 2006, for instance, this amounted to 6 million units of blood provided by ARC to American hospitals and other customers.  Blood services and products are sold by ARC, primarily to hospitals (nonprofit and for-profit alike).  ARC's

proceeds from providing these critical services and products cover ARC's costs and also support ARC's many humanitarian efforts.[1]  See Ballish Decl. ¶ 4.

26.    The Red Cross Emblem is displayed throughout every step of ARC's role in the Nation's blood supply.  It marks locations where blood drives take place, it is used in the transport of blood, it is used on packaging, and it has been used by manufacturing and processing partners.  Like the manufacturing partners who make the many other items needed by ARC either for its own use or for sale to the public, these manufacturing and processing partners are commercial firms that have used the Emblem over the decades on a range of manufactured items needed in ARC's blood operation, items ranging from blood bags and boxes to medical equipment, uniforms, and vehicles to transport the blood and myriad others.  See Ballish Decl. ¶ 4.

27.    The financial reports submitted by ARC to its independent auditor, which are then reviewed by the U.S. Army Audit Agency and submitted to Congress reports, disclose information about the sales involved in ARC's blood program.  See, e.g., Abram Decl., Ex. 12 (Consolidated Financial Statements, June 30, 2005, including Independent Auditor's Report signed by the Auditor General of the Army, Oct. 21, 2005).

28.    Over the last hundred years, the Red Cross Emblem also has appeared on millions of Christmas Seals and other fundraising items distributed or used by ARC employees, chapters, and authorized volunteers and fundraising partners in the course of their daily efforts to support the organization's humanitarian mission.  See Conner Decl. ¶ 3; Loehr Decl. ¶ 3.  In certain circumstances, ARC also permits use of the Emblem for "cause-related marketing" fundraising. In cause-related marketing, a firm that makes a particular good or service that is compatible with

---

[1]    J&J admits that it is not challenging ARC's ability to engage in the business of collecting and selling blood services and products.  See Abram Decl., Ex. 11 (Biribauer Dep. 50).

the American Red Cross's mission agrees to make a contribution to ARC, sometimes on a per-unit-sold basis, and to include in its packaging Red Cross information on first aid or emergency preparedness or some other subject important to the American public and within ARC's mission. In exchange, the firm is permitted to state in its packaging of its products that it has made a contribution to the ARC.   Subject to ARC's controls, the Emblem is then displayed with ARC's express authorization on the firm's packaging or marketing materials, often on retail store shelves, to communicate to consumers that a portion of the proceeds of purchases will be donated to ARC.  See Loehr Decl. ¶ 3; Becker Decl. ¶ 6; Conner Decl. ¶ 3.

29.    All of these activities of ARC and uses of the Red Cross Emblem further the important work of ARC.  See Becker Decl. ¶ 6; Conner Decl. ¶ 3.

30.    ARC does not itself own any manufacturing or publishing facilities.  This means that in order to fulfill its mission it must permit third-party firms to use the Emblem in conjunction with manufacturing or publishing material for ARC's use and sale.  All of the supplies ARC provides during emergencies and in preparation for them are manufactured by third parties, who place the Emblem on boxes and items so that victims and consumers will know that ARC is the source of the water or blanket or food item they are being given.  See Conner Decl. ¶ 7; Loehr Decl. ¶ 6.

31.    Historically, the same was true in ARC's blood services operation.  Although ARC now owns and operates its own testing and processing facilities, it worked with third-party processing firms for many decades to provide the blood services and products needed by the American public.  And even today, ARC depends on for-profit firms to manufacture the special bags, packaging, and other items needed to provide blood products and services.  See Ballish Decl. ¶ 31.

32.     ARC exercises great care in identifying and training and controlling employees and volunteers and others whom it authorizes to use the Emblem.  Many volunteers are pre-screened and pre-trained and available as a "quiet corps," available to respond on behalf of ARC at a moment's notice anywhere in the United States.  Sometimes, when the emergency warrants, ARC takes on "spontaneous volunteers," people who have not been previously trained but who volunteer to help, and in some cases these spontaneous volunteers must also bear the Emblem.  Throughout its work, ARC makes every effort to screen and control those authorized to wear the Emblem, subject to the necessities of the crisis.  See Denton Decl. ¶ 5; Ballish Decl. ¶ 7.

33.     ARC exercises strict controls when it authorizes any third party to use the ARC name and Emblem, from the firms that manufacture blood bags, field boxes, and water bottles to the firms who manufacture and distribute first aid and other products for ARC.  ARC controls the nature of the product and the exact way in which the Emblem will be used, to assure the Emblem is not used in conjunction with products or services that are not authorized by ARC and do not support ARC's mission.  See Conner Decl. ¶ 8; Ballish Decl. ¶ 6; Loehr Decl. ¶¶ 6-9.  ARC also zealously guards the Emblem against the activity prohibited by 18 U.S.C. § 706, use of the Emblem by pretenders passing themselves off as ARC volunteers or passing off their products as those of ARC.  See Loehr Decl. ¶¶ 8-9.

34.     ARC could not do its work if it were unable to authorize volunteers and other third parties to use ARC's name and Emblem in appropriate circumstances.  See Conner Decl. ¶ 8; Ballish Decl. ¶ 6.

35.     ARC would be severely prejudiced if for some reason it were required to stop putting its Emblem on products or other items because the Emblem is so closely associated with ARC.  For over 100 years, the American public has seen the Red Cross Emblem on volunteers,

first responders, products and in other contexts that has imparted to the Emblem, including the American Red Cross name, a message of trust and emergency response and care that ARC works hard every day to maintain. The Emblem must of necessity be used widely by persons not directly employed by ARC, from volunteers to manufacturers to fundraising partners, in order to accomplish ARC's mission. See Conner Decl. ¶ 9; Ballish Decl. ¶ 7; Loehr Decl. ¶ 10.

**D.     ARC's Use of the Red Cross Emblem on Goods For Sale**

36.     In connection with carrying out its purposes under the Congressional Charter, ARC has used its name and Emblem on a wide variety of goods and services for sale to the American public since at least 1903. See Abram Decl., Ex. 13 (1903 First aid kit Photograph, listing price of first aid textbook as $1.00). The representative materials and facts described chronologically below aptly demonstrate more than a century of such sales.

37.     ARC has submitted annual reports to Congress, dating back to the early 1900s, in which it directly informed Congress of sales of first aid supplies. For example, ARC told Congress in its annual report for 1903 that it had generated revenue from the sale of "emergency cases" and that it had received royalties from the sale of first aid cases. See Abram Decl., Ex. 14 (Excerpt of ARC Annual Report for the Year Ending December 31, 1903, at 23).

38.     The next year, ARC's annual report informed Congress that ARC had again received royalties on sales of first aid cases. See Abram Decl., Ex. 15 (Except of ARC Annual Report for the Year Ending December 31, 1904, at 2-3).

39.     The historical record shows that at least as early as 1904, ARC was doing what Johnson & Johnson is now complaining about more than 100 years later: ARC partnered with a New Jersey corporation, First Aid Supply of the Red Cross, and licensed First Aid Supply the right to use ARC's name and Emblem on first aid boxes, dressings, supplies, and accompanying

material for a period of ten years.  See Abram Decl., Ex. 16 (Agreement, Feb. 20, 1904); Abram

Decl., Ex. 17 (First Aid Supply Catalog of ARC first aid kits) (including Style A for travelers

and sportsmen ($2.00), Style B for home use ($3.50), and Style C for factory and marine use

($5.00)).  J&J was well aware of this activity.

40.     Five years later, in 1909, ARC again reported to Congress in its annual report

about the sales of those first aid books and badges.  See Abram Decl., Ex. 18 (Excerpt of Fifth

Annual Report of the ARC, Jan. 1, 1910, at 11).

41.     In 1910, ARC again told Congress in its annual report that it had generated

revenue from the sale of first aid supplies and first aid textbooks.  See Abram Decl., Ex. 19

(Excerpt of Sixth Annual Report of ARC, Feb. 21, 1911, at 33).

42.     The year 1910 also marked another milestone for ARC's product sales.  In that

year, ARC first created its own supply department to oversee sales of its first aid products.  And

underscoring the revenue-generating focus of these initiatives, ARC published reports that year

that noted that "[a]n individual first aid packet has been on the market for some months and an

industrial first aid box, gotten out last summer, has been very well received."  Abram Decl., Ex.

20 (Report of First Aid Department, 1910, at 4).

43.     Even back in 1910, ARC was not limiting its sales to just first aid kits.  Rather, in

order to generate funds needed to carryout its essential National mission, ARC announced in its

1910 Annual Report that its existing line of retail products would soon be "supplemented during

the coming year by a gymnasium case, and automobile box, and a household chest."  Abram

Decl., Ex. 20 (Report of First Aid Department, 1910, at 4).

44.     In an effort to increase sales and raise additional revenue, the early ARC

examined how its products were performing in the marketplace, contemplated the potential for

further growth, and made public its deliberations on the subject.  Thus, for example, in its Eleventh Annual Report published in 1915, ARC noted:  "From a business standpoint the growth of the [first aid] department has been most creditable since its inauguration in 1910."  Abram Decl., Ex. 21 (Excerpt of Eleventh Annual Report of the American National Red Cross, 1915, ("Eleventh Annual Report") at 41).

45.     The first aid department's success was immediately apparent.  It sold "more than $5,000 worth of first-aid supplies" in its first year.  See Abram Decl., Ex. 22 (Memorandum on Future Policy of the First Aid Department, 1911, at 2).  In today's dollars, that would constitute more than $109,000.00.  See "Purchasing Power of Money in the United States from 1774 to 2006" ("Purchasing Power"), available at http://www.measuringworth.com/ppowerus/.

46.     In its annual report for 1911, ARC told Congress that it received "about $6,000 gross" from the sales of first aid books and supplies that year.  See Abram Decl., Ex. 23 (Excerpt of Seventh Annual Report of ARC, Apr. 1, 1912, at 31).  As ARC explained, "[t]hese books and supplies, of course, constitute an important part of our educational campaign."  Id. at 32.

47.     In January 1912, the Office of the Solicitor General sent a letter to ARC in which it inquired, "Does the American Red Cross engage in trade in any way?"  See Abram Decl., Ex. 24 (Letter from F.W. Lehmann, Office of the Solicitor General to George W. Davis, ARC, Jan. 13, 1912).  Importantly, the Government continued:  "The language of the [1910 Charter] implies that it may do so."  Id. (emphasis added).

48.     ARC answered the letter from the Solicitor General by expressly informing him that during the previous year, ARC had received over $7,000 for sales to the public of books and first aid appliances—which comes out to more than $153,000.00 in today's dollars.  See Abram Decl., Ex. 25 (Letter from ARC Chairman of the Central Committee to Frederick Lehmann,

Office of the Solicitor General, Jan. 15, 1912, at 1); "Purchasing Power," available at
http://www.measuringworth.com/ppowerus/.  ARC also informed the Solicitor General of ARC's
receipts from sales of Christmas Seals.  See Abram Decl., Ex. 25 (Letter from ARC Chairman,
Central Committee, to Frederick Lehmann, Office of the Solicitor General, Jan. 15, 1912, at 2).

49.     In the years following, ARC's sales of first aid products continued to grow.  ARC
told Congress in its annual report for 1912 that it had received $8,772.15 (more than $188,000.00
in today's dollars) from its first aid department's sales of first aid supplies.  See Abram Decl.,
Ex. 26 (Excerpt of Eighth Annual Report of ARC, May 16, 1913, at 29); "Purchasing Power,"
available at http://www.measuringworth.com/ppowerus/.

50.     That figure nearly doubled the next year, when ARC informed Congress that it
had received $15,532.02 from its first aid department's sales of first aid supplies.  See Abram
Decl., Ex. 27 (Excerpt of Ninth Annual Report of the American National Red Cross, June 10,
1914, at 29).  That is the equivalent of more than $326,000.00 in today's dollars.  See
"Purchasing Power," available at http://www.measuring worth.com/ppowerus/.

51.     ARC's annual report for 1914 stated to Congress that ARC was selling first aid
dressings, iodine containers to treat a small wound, and first aid kits designed for homes,
schools, and automobiles.  See Abram Decl., Ex. 28 (Excerpt of Tenth Annual Report of the
American National Red Cross, Mar. 4, 1915, at 29).

52.     In its next report, ARC confirmed that it was doing then what it continues to do
today:  using profits from the sale of goods to fund its mission.  Thus, the Eleventh Annual
Report explained that ARC was using the profits on sales of first aid supplies to pay for certain
office expenses; the additional receipts earned from sales of supplies were placed in ARC's
General Fund.  See Abram Decl., Ex. 24 (Excerpt of Eleventh Annual Report at 42).

53.    ARC's Twelfth Annual Report to Congress documented the meteoric growth in market sales that ARC had achieved in just six years.  The Report provided the following chart, showing that ARC's revenue had soared by 550% between 1911 and 1916:

| Year | Receipts from sales of supplies such as first aid boxes |
|---|---|
| 1911 | $6,728.07 |
| 1912 | $8,772.25 |
| 1913 | $15,532.02 |
| 1914 | $18,116.60 |
| 1915 | $32,350.97 |
| 1916 (eleven months) | $43,911.63 |

See Abram Decl., Ex. 29 (Excerpt of Twelfth Annual Report of ARC to Congress, Dec. 13, 1916, at 64).  In today's dollars, ARC had gone from selling roughly $147,000.00 in goods to more than $830,000.00.  See "Purchasing Power," available at http://www.measuringworth. com/ppowerus/.  The report also indicated that the selling prices for first aid kits had to be revised because of the costs of materials in the kits, and that the prices would be updated in ARC's catalogue.  Id.

54.    In 1916, ARC advertised its textbooks and first aid supplies in the Military Surgeon, which was the journal of military surgeons in the United States.  See Abram Decl., Ex. 30 (Advertising Request and Approval, May 6, 1916).

55.    But ARC's goods were hardly limited to just a small, specialized population.  To the contrary, ARC's Catalogue of Supplies and Books from 1917 sought "to bring to the attention of practicing physicians, and of people engaged in railroading, mining, manufacturing, etc., as well as the general public" the various first aid items available for sale.  See Abram Decl., Ex. 31 (Excerpt of Catalogue of Supplies and Books—First Aid and Life Saving, 1917, at

17) (emphasis added). As the Catalogue explained: "It is believed that the public will appreciate the value represented by the articles described herein. They are modern, practical, clean, simple, of the best quality, and the prices are extremely reasonable." Id. And ARC explicitly noted that its pricing was favorable and provided it revenue above its costs, explaining to its customers that ARC's goods are priced "only a few cents above the cost in each case." Id.

56.     ARC was also selling Christmas Seals to the general public during this time as a means of raising funds for its anti-tuberculosis work. See Abram Decl., Ex. 32 (Excerpt of Annual Report of the ARC, Dec. 1917, at 61). To sell the seals, ARC entered into an agreement with a third party, the National Association for the Study and Prevention of Tuberculosis, under which that organization acted as the national sales agent for ARC. Id. ARC's gross receipts from Christmas Seals increased each year from 1908 to 1916, from $138,000 in 1908 to $1,016,000 in 1916. Id. The seals were sold in retail stores, as well as other places. See Abram Decl., Ex. 33 (Selling Red Cross Christmas Seals, Circular B, A Guide for Agents, Revised ed. 1917, at 12).

57.     A 1919 report of the First Aid and Life Saving Bureau of the Northern Division of the American Red Cross documents sales of first aid kits, first aid pouches, and textbooks between September and December 1919. See Abram Decl., Ex. 34 (Letter from Florence Hayford, First Aid Department ARC to Colonel Connor, ARC and accompanying report, Dec. 1, 1919, at 2, 4).

58.     In 1920, ARC released $90,000 from its general fund to purchase first aid supplies that would be resold to provide a source of income to the organization. See Abram Decl., Ex. 35 (Request for Authorization, Mar. 15, 1920); Abram Decl., Ex. 36 (Request for Appropriation, May 24, 1920).

59.     According to ARC statistical questionnaires from the early 1920s, the Northern

Division of chapters in the United States was selling textbooks and first aid kits and pouches.

See Abram Decl., Ex. 37 (Statistical Questionnaire for National Headquarters, Report of First

Aid Activities of the Northern Division, 1921); Abram Decl., Ex. 38 (Statistical Questionnaire

for National Headquarters, Report of First Aid Activities of the Northern Division, 1920).

60.     The Potomac Division of chapters was also selling textbooks, first aid boxes, and

other first aid supplies.  See Abram Decl., Ex. 39 (Statistical Questionnaire for National

Headquarters, Report of First Aid Activities of the Potomac Division, 1921).

61.     So were the Northwestern Division, Penn-Del Division, and Southern Divisions.

See Abram Decl., Ex. 40 (Statistical Questionnaire for National Headquarters, Report of First

Aid Activities of the Northwestern Division, 1921); Abram Decl., Ex. 41 (Statistical

Questionnaire for National Headquarters, Report of First Aid Activities of the Penn-Del

Division, 1921); Abram Decl., Ex. 42 (Statistical Questionnaire for National Headquarters,

Report of First Aid Activities of the Southern Division, 1921).  Other statistical questionnaires

further document sales of first aid kits, textbooks, charts, and pouches.  See, e.g., Abram Decl.,

Ex. 43 (Statistical Questionnaire for National Headquarters, Report of the First Aid Activities of

Dr. Eric S. Green, 1920); Abram Decl., Ex. 44 (Statistical Questionnaire for National

Headquarters, Report of the First Aid Activities of the Northern Division, Jan. 1920); Abram

Decl., Ex. 45 (Statistical Questionnaire for National Headquarters, Report of the First Aid

Activities of the Northern Division, Feb. 1920); Abram Decl., Ex. 46 (Statistical Questionnaire

for National Headquarters, Report of the First Aid Activities of the Northern Division, Mar.

1920).

62.    As ARC's pricelist for textbooks from 1926 shows, the price for an individual to buy a textbook at that time ranged from $.25 to $1.50, with discounts available if more than 100 copies were purchased or if the purchaser was a chapter, school, or bookdealer.  See Abram Decl., Ex. 47 (Schedule of Prices on Red Cross Textbooks, July 1, 1926).

63.    ARC's 1932 Catalogue of Supplies and Books, like the 1917 Catalog described above, was directed to "practicing physicians, and [] people engaging in railroading, manufacturing, etc., as well as the general public."  See Abram Decl., Ex. 48 (Excerpt of Catalogue of Supplies and Books—First Aid and Life Saving, 1932) (emphasis added)).

64.    The 1933 First Aid and Life Saving Catalogue of Supplies and Insignia included, among other things, a 6-unit standard first aid kit for use in automobiles (list price $1.35), a 12-unit standard first aid kit (list price $3.75), a 24-unit standard first aid kit (list price $5.75), and a first aid textbook (list price $.60).  See Abram Decl., Ex. 49 (1933 First Aid and Life Saving Catalogue of Supplies and Insignia and accompanying cover letter).

65.    The 1937 First Aid and Life Saving Catalogue of Supplies and Insignia included, among other things, a 6-unit standard first aid kit for use in automobiles (list price $1.65), a 12-unit standard first aid kit (list price $4.25), a 24-unit standard first aid kit (list price $6.75), and a first aid textbook (list price $.60, cloth bound $1.00).  See Abram Decl., Ex. 50 (1937 First Aid and Life Saving Catalogue of Supplies and Insignia, July 1937).

66.    And for a period during World War II, ARC was publishing more than 60,000 copies per day of its first aid textbook—which "ha[d] become a national 'Best Seller.' "  See Abram Decl., Ex. 51 (Photograph of first aid textbook and caption).

**E.    ARC Chapters Also Made Sales Directly to the Public**

67.    In addition to the sales from the National ARC, ARC's Local Chapters all around the country have also sold first aid supplies to the public for nearly a century.

68.    For example, in 1919, during the influenza pandemic, the local newspaper for Watsonville, California—the <u>Pajaronian</u>—reported that the local ARC chapter sold surgical dressings, first aid books, gauze masks, and pneumonia jackets.  <u>See</u> Abram Decl., Ex. 52 ("Red Cross Chapter Elects Officers For Coming Year," <u>Pajaronian</u>, Mar. 11, 1919).

69.    During fiscal year 1940-41, ARC chapters sold over $30,000 in first aid kits and refills for first aid kits.  <u>See</u> Abram Decl., Ex. 53 (Summary of Essential Supplies Incidental to the Activities of ARC Distributed Principally Through its Chapters for Fiscal Year 1940-41) (ARCH-P-00004261).

70.    A sampling of the chapter annual reports documenting sales by chapters of various first aid supplies and textbooks to the public is below:

| Chapter Annual Report | Receipts from sales of first aid supplies, textbooks, etc. | Abram Decl. |
|---|---|---|
| Montgomery County, Ohio, 1938-1939 | $450.68 | Exhibit 54 |
| Buffalo, New York Chapter, 1939-1940 | $2,708.66 | Exhibit 55 |
| Cincinnati and Hamilton County, Ohio Chapter, 1939-1940 | $2,100.00 | Exhibit 56 |
| Buffalo, New York Chapter, 1940-1941 | $4,596.54 | Exhibit 57 |
| Hammond, Indiana Chapter, 1942-1932 | $4,177.35 | Exhibit 58 |
| Poweshiek County, Iowa Chapter, 1944 | $882.85 | Exhibit 59 |
| Sebastian County, Arkansas Chapter, 1945 | $385.68 | Exhibit 60 |
| Evansville, Indiana Chapter 1946-1947 | $331.23 | Exhibit 61 |
| Greenville, North Carolina Chapter, 1946-1947 | $356.90 | Exhibit 62 |
| Cass County, North Dakota Chapter, 1951-1952 | $548.85 | Exhibit 63 |

| Mercer County, Pennsylvania Chapter, 1951-1952 | $669.63 | Exhibit 64 |
|---|---|---|
| Chemung County, New York Chapter, 1953-1954 | $400.98 | Exhibit 65 |
| Upper Pinellas, Florida Chapter, 1954-1955 | $495.75 | Exhibit 66 |
| Mercer County, Pennsylvania Chapter, 1955-1956 | $351.85 | Exhibit 67 |
| Rochester-Monroe County, New York Chapter, 1957-1958 | $5,416.01 | Exhibit 68 |
| Upper Pinellas, Florida Chapter, 1957-1958 | $1,204.50 | Exhibit 69 |
| Rutherford County, North Carolina Chapter, 1958-1959 | 397.25 | Exhibit 70 |
| Chenango County, New York Chapter, 1959-1960 | $324.06 | Exhibit 71 |
| Chenango County, New York Chapter, 1961-1962 | $271.05 | Exhibit 72 |

71.     During this time, as through ARC's history, some first aid supplies were sold directly to the public and some were purchased by chapters for resale to the public. A 1948 pricelist demonstrates the difference between the purchase price of certain textbooks, emblems, and pins when purchased by chapters and the list price when sold to the public. See Abram Decl., Ex. 73 (Memorandum re: Supplies for Chapters from George Smith, Mar. 29, 1948). Pricing to the public was set out separately, and all items sold to Chapters for resale were to be sold at the vendor's price to ARC's National Headquarters. Id.

72.     In 1981, ARC decided that the price for textbooks and other chapter resale items should be increased to provide additional revenue to chapters from sales of these first aid products. See Abram Decl., Ex. 74 (Memorandum from Mr. Wick to ARC Field Office Managers and Division Managers, July 10, 1981, at 3).

73.     By the early 1990s, both the Seattle Chapter and the Cleveland Chapter had enlisted manufacturers to produce ARC first aid kits. The Seattle Chapter kits were produced by First Aid Only. The Cleveland Chapter kits were produced by Emergency Medical Products

Company.  See Abram Decl., Ex. 75 (Excerpt of Deposition of Andrea Morisi, Nov. 9, 2007

("Morisi Dep.") 139-142, 144-145).

74.    The Greater Kansas City Chapter took an even bigger step to bring the Red Cross

directly "to the people" by opening and operating stores at shopping malls throughout the

Greater Kansas City metro area.  See Abram Decl., Ex. 76 (Excerpt of Mall Service Center

Analysis:  One Year of Experience, Greater Kansas City Chapter, Aug. 1992 ("Mall Service

Center Analysis") at KC-P-00000091).

75.    These stores sold "a full line of safety products."  See Abram Decl., Ex. 77

(Brochure on Innovative Service Delivery—The Mall Way, ARC Greater Kansas City Chapter at

2).  One advantage of ARC stores in shopping malls was that these retail stores could make "Red

Cross services and products more accessible to the general public."  Id. at 3; see also Abram

Decl., Ex. 78 (Photographs of Red Cross Mall Store).[2]

76.    Making products available through the mall stores helped further "the three main

components of the mission of the American Red Cross:  to help people 'prevent, prepare for and

respond to emergencies.' "  See Abram Decl., Ex. 76 (Excerpt of Mall Service Center Analysis at

KC-P-00000094; id. at KC-P-00000097 ("Proceeds from the sale of the products support the

services of the Red Cross.")).

77.    The Greater New York Chapter similarly operates a Red Cross Store selling a

"full line of safety and preparedness gear and information for individuals, families and

organizations, from flashlights and first aid kits to CPR manuals and Disaster Supplies Go

---

[2]    As chapters have consolidated over the last 25 years—from 3011 chapters in 1982 to 756 chapters in 2007—the number of chapter locations throughout the United States where ARC products can be purchased has drastically diminished and the importance of selling ARC products through retail channels where they are readily available has increased.  See Abram Decl., Ex. 161 (ARC Museum, "American Red Cross Chapters").

Bags." See Abram Decl., Ex. 79 (Excerpt of American Red Cross in Greater New York, New Headquarters, Nov. 14, 2006, at 9).

78.     Sales of these first aid kits have had the dual purpose of assisting ARC in its fundraising efforts and furthering its various missions such as "devis[ing] and carry[ing] out measures for preventing . . . calamities." See 36 U.S.C. § 300102.

79.     Newspapers and other media outlets have publicly reported on sales of first aid supplies by ARC chapters for many decades. See Abram Decl., Ex. 80 ("Emergency! Handling trouble on the road," Consumer Reports, April 1992, 1992 WLNR 111350; "Don't Let Car Trouble Drive You Crazy," Miami Herald, Aug. 23, 1986, 1986 WLNR 489975; "Organize First-Aid Supplies to get you Through Scrapes," Miami Herald, Aug. 30, 1987, 1987 WLNR 631865; "Purge Cabinet of Unneeded," South Florida Sun-Sentinel, Sept. 2, 1993, 1993 WLNR 4299238; "Earthquakes Hitting Home," Oregonian, Sept. 22, 1993, 1993 WLNR 4496026; "First Aid Kits Suggested As Gifts," Roanoke Times, Nov. 16, 1993, 1993 WLNR 1032392; "Health Watch," Charlotte Observer, June 6, 1994, 1994 WLNR 1734444, "First Aid Kits Reduced," Cincinnati Post, Dec. 6, 1996, 1996 WLNR 844337; "Red Cross Offers First Aid Kits For Sale," Fort Pierce Tribune, Nov. 23, 1999, 1999 WLNR 6121260; "Red Cross Offers Gifts That Can Save Lives," Buffalo News, Dec. 21, 1997, 1997 WLNR 1253000; "Injury Season:  Summer's the Time to Update, Put Together First Aid Material," Birmingham News, June 9, 2003, 2003 WLNR 15947598).  These reports have occurred around the country, including in the New York Times (1953 and 1985), the Miami Herald (1986 and 1986), and Consumer Reports (1992).  Id.

**F.    The American Red Cross Licenses Its Name and Mark To Manufacture Products in Furtherance of Its Mission**

80.     As previously stated, ARC has none of its own manufacturing or publishing facilities.  Thus, throughout the early twentieth century, ARC partnered with Bauer & Black of

Chicago to manufacture and market first aid kits. See Abram Decl., Ex. 22 (Memorandum on Future Policy of First Aid Department, 1911, at 3); Abram Decl., Ex. 81 (Memorandum, Oct. 24, 1911, at 2); Abram Decl., Ex. 82 (Letter from Charles Lynch to Mabel Boardman, Aug. 22, 1911); Abram Decl., Ex. 83 (Letter from Mabel Boardman to Charles Lynch, Aug. 18, 1911 (discussing Bauer & Black's provision of various first aid boxes)). That is significant because Bauer & Black was a direct competitor to J&J. Indeed, J&J—as a competitor to Bauer & Black—was so unhappy about this partnership that it tried to interfere with the ARC-Bauer & Black relationship by attempting to convince Bauer & Black to stop furnishing first aid kits to ARC. See, e.g., Abram Decl., Ex. 82 (Letter from Charles Lynch to Mabel Boardman, Aug. 22, 1911 (discussing J&J's efforts to convince Bauer & Black not to furnish first aid kits to ARC)).

81. J&J remained focused on ARC's sales efforts for many decades. In 1942, J&J specifically complained to Congress about ARC's partnership with J&J's competitor, Bauer & Black. As J&J's corporate representative testified during a congressional hearing regarding ARC, "we have felt very bad about the fact that the American Red Cross has really endorsed the product of Bauer & Black, our principal competitor, in its own price lists." Abram Decl., Ex. 84 (House Hearings at 170 (statement of Mr. Perry of J&J)); see Abram Decl., Ex. 85 (1942 Senate Hearing at 29 (testimony of Kenneth Perry, the Secretary of Johnson & Johnson, to Congress that ARC had partnered with Bauer & Black to sell ARC first aid kits as shown in the 1914 and 1915 ARC catalogs)).

82. ARC has also sought guidance from the federal government about its work with commercial firms and its practice of authorizing them to display the Emblem. In 1978, ARC sought advice from the United States Department of Justice regarding the scope of its authority under its Federal Charter (including the predecessor to 18 U.S.C. § 706). In particular, ARC

wanted to confirm ARC's right to work with commercial firms in the course of fulfilling its

mission.  ARC gave a variety of examples of situations where it might authorize for-profit

companies to use the Emblem, including (1) permitting a distributor of commercial products or

services to state in its advertising that for each product or service sold the distributor will donate

to the Red Cross a stated sum of money; (2) allowing a manufacturer of aquatic equipment to

produce and distribute for sale a film on water safety depicting Red Cross personnel

demonstrating safety procedures and techniques; and (3) agreeing with publishers and producers

of first aid materials that they can acknowledge that the Red Cross had reviewed and

authenticated the materials.  See Abram Decl., Ex. 86 (Attachment to Letter from John Currin,

ARC, to Michael Kelly, Counselor to the Attorney General, Sept. 12, 1978, at 4-5).

83.    The Attorney General confirmed that in each of these three examples (as well as

four more described by ARC and other scenarios not specifically described in the Currin Letter),

ARC could permit the non-ARC entity to use its emblem without violating § 706.  See Abram

Decl., Ex. 87 (Letter from Philip Heymann, Assistant Attorney General, to John Currin, ARC,

Oct. 11, 1978, at 2) ("we would find no violation of 18 U.S.C. 706" in any of the seven

examples, so long as an appropriate written agreement existed between ARC and the non-ARC

entity using the Emblem).

84.    The Attorney General made his opinion clear:  when ARC seeks to permit a non-

ARC entity to use its mark "in the course of an activity furthering in reasonable degree the

operations of the [ARC], that entity or person would appear to [the Government] to be a duly

authorized agent of the [ARC] for the given purpose and thus without the prohibitions of the

statute."  Id.  The non-ARC entity "should" be designated ARC's agent for the purpose of

displaying the Red Cross Emblem.  Id.  Thus, the Justice Department construed § 706 to permit

ARC to authorize non-ARC entities and persons to use the Emblem in connection with any "activity furthering in reasonable degree [ARC] operations." Id. Under such circumstances, the third party's use of the Emblem is "without the prohibition of the statute." Id. And importantly, it was irrelevant to the § 706 analysis whether some benefit might accrue to the agent; it did not even matter if "the agency activity is of more benefit to the agent than the principal." Id.

85. A few year later, ARC went to the IRS seeking a revenue ruling that would confirm that its sales of its first aid kits "to the public at large" were not subject to the tax on unrelated business income. See Abram Decl., Ex. 88 (IRS Revenue Ruling, Feb. 8, 1985, at 2). ARC advised the IRS that it would sell kits directly to wholesalers or retailers, who (like the other defendants here) would pay ARC "a royalty for the use of the [ARC] name and emblem." Id. Taxes were not required if the sales of first aid kits are "substantially related" to the exercise of ARC's tax-exempt purpose and "contribute[] importantly to the accomplishment of the purposes for which exemption was granted." Id. at 3. In the IRS's opinion, sales of the kits serve "to reinforce and enhance [ARC's] instructional mission," and are "in direct furtherance of your educational role in the field of public health and safety, particularly the inclusion of descriptive first aid literature." Id. at 5. Thus, because "the proposed distribution of a first aid kit . . . is in direct and substantial furtherance of the purpose for which [ARC was] recognized as exempt" under the Internal Revenue Code, income from such sales is not subject to the unrelated business income tax. Id.

86. In the following years, ARC continued its sales of products carrying the ARC name and Emblem. Consumer Reports magazine included an advertisement for the American Red Cross First Aid Kit for the car, available for $24.95, in 1986. See Abram Decl., Ex. 89 (Consumer Reports at 702, Nov. 1986).

87.     During the 1986 ARC convention in Indianapolis, ARC General Supply Department set up a store to sell "clothing, jewelry, and many supply items with the Red Cross logo."  <u>See</u> Abram Decl., Ex. 90 (<u>The Daily Bulletin</u>, ARC, June 1, 1986).

88.     Around the mid-1980s, ARC licensed AMBU to manufacture CPR breathing barrier devices (bearing the Red Cross Emblem) that were and are sold in a variety of retail channels.  <u>See</u> Abram Decl., Ex. 75 (Morisi Dep. 146-148).

89.     At this same time, ARC licensed the aquatic manufacturer Keiffer to produce and distribute ARC products associated with lifeguarding, including backboards and rescue tubes.  <u>See</u> Abram Decl., Ex. 75 (Morisi Dep. 149).

90.     ARC also teamed up with CBS/FOX VIDEO in the mid-1980s to manufacture and market "American Red Cross First Aid:  The Video Kit."  <u>See</u> Abram Decl., Ex. 91 (Advertisement for "American Red Cross First Aid:  The Video Kit").

91.     In the late 1980s, ARC licensed the company Akla to manufacture and sell an ARC first aid kit through L.L. Bean or Land's End, as well as through ARC and its chapters.  <u>See</u> Abram Decl., Ex. 75 (Morisi Dep. 136-137).

92.     In 1987, ARC advertised its Red Cross First Aid Kit, available for $26.07, to the general public in a special marketing supplement to the Charlotte Observer newspaper.  <u>See</u> Abram Decl., Ex. 92 ("The Difference We Make Makes All the Difference," The Charlotte Observer Special Marketing Supplement, June 16, 1987, at 2).

93.     In 1987, ARC sold its Automobile First Aid Kit through the Horchow catalog.  <u>See</u> Abram Decl., Ex. 93 (Horchow Catalog Excerpt, May 1987).  As even J&J has admitted, a mail order catalog involves sales to the public.  <u>See</u> Abram Decl., Ex. 11 (Excerpts of Deposition of Richard Biribauer, Nov. 9, 2007 ("Biribauer Dep.") 224-226).  Indeed, J&J was well aware of

these sales.  The handwritten date "May 1987" on the Horchow catalog attached as an exhibit was written by J&J's in-house trademark counsel, Richard Biribauer.  See Abram Decl., Ex. 11 (Biribauer Dep. 113).  J&J's in-house trademark counsel acknowledged that he has known about ARC's automobile first aid kit for over ten years.  See Abram Decl., Ex. 11 (Biribauer Dep. 114-115).

94.    In the late 1980s, Curad and the American Red Cross jointly offered an American Red Cross First Aid Kit for a price of $19.95 plus one wrapper from any Curad or Curity First Aid Product.  See Abram Decl., Ex. 94 (Curad/ARC First Aid Kit Advertisement).

95.    ARC's 1989 Supply Catalog of first aid items for purchase by chapters and for resale to the public included, among other things, an automobile first aid kit and component parts (page 22) and a portable shelter available directly from the Sierra Corporation (page 111).  See Abram Decl., Ex. 95 (Supply Catalog Purchase Items, May 1989, at 22, 111).

96.    In 1992, the in-house trademark counsel for J&J—Richard Biribauer—received a memo from a J&J marketing executive attaching a photograph of an ARC first aid kit taken at Price Club Headquarters.  See Abram Decl., Ex. 96 (Memorandum from Jack Weakley to R. Biribauer, June 17, 1992).  Again, J&J has admitted that sales through Price Club, a store like Sam's Club, are sales to the public.  See Abram Decl., Ex. 11 (Biribauer Dep. 118-122, 224-226).

97.    Since the 1990s, ARC has raised needed funds by licensing various companies to use the ARC name and emblem on a variety of products—including watches, Tiffany & Co. items, scarves, Christmas cards, vintage cars, jewelry, and bottled water—some of which were sold in retail stores like Macys, Hechts, Nordstroms, and Price Club.  See Abram Decl., Ex. 75

(Morisi Dep. 134, 152-153); <u>see</u> <u>also</u>, <u>e.g.</u>, Abram Decl. Ex. 97 (American Red Cross Sales Brochure including model vintage cars, scarves, and posters).

98.     ARC has also licensed book manufacturers and a "pillow" first aid kit manufacturer to use ARC's name and emblem on certain products.  <u>See</u> Abram Decl., Ex. 75 (Morisi Dep. 128).

99.     ARC authorized the Franklin Mint as its agent to use the ARC name and emblem in conjunction with selling a Shirley Temple Red Cross Doll through Sunday morning paper glossy inserts.  <u>See</u> Abram Decl., Ex. 75 (Morisi Dep. 152).

100.     ARC's 1994 Supply Catalog of first aid items for purchase by chapters and for resale to the public included, among other things, a portable disaster shelter, disaster preparedness starter kit, various first aid and CPR publications and supplies, and CPR microshields, as well as chapter developed products including a belt pouch from the Asheville-Mountain Area Chapter, an ARC body fluid clean up kit from the Cincinnati Chapter, and double, single, and pocket first aid kits developed by the Seattle-King County Chapter.  <u>See</u> Abram Decl., Ex. 98 (Excerpt of ARC Supply Catalog, June 1994, at DD-6, DD-15, DH-2 to DH-9, DH-20, CD-1, CD-2, CD-16, CD-17).

101.     In 1995, ARC entered into an agreement with Sirena Apparel Group, Inc., permitting Sirena to use the name and mark "American National Red Cross" and the Red Cross Emblem on certain women's products "for retail distribution and sale in department and specialty stores, mass market and mail order catalogs."  <u>See</u> Abram Decl., Ex. 99 (Licensing Agreement, Feb. 1, 1995, at 1).  Under the agreement, ARC "control[led] the nature and quality of the Products" sold by Sirena.  <u>Id.</u> at § 3.1.

102.     In the mid-1990s, ARC licensed the company Make It Big to produce Red Cross posters that were sold predominantly over the internet.  See Abram Decl., Ex. 75 (Morisi Dep. 151).

103.     In the late 1990s, ARC licensed Mattel to manufacture model vintage cars bearing the Red Cross Emblem.  See Abram Decl., Ex. 75 (Morisi Dep. 155).

104.     After the terrorist attacks of September 11, 2001, the need for reaching as broad a spectrum of the American public became even more imperative because the need for preparedness became so urgent.  ARC responded in numerous ways.  One small example is that after 9-11, ARC recognized that those who had to flee the area had often done so without needed personal items.  In response, ARC developed an evacuation safety kit that could be stored in places of work or other areas where large numbers congregate and used on a "grab and go" basis in case of evacuation.  Millions have been sold around the country, every one bearing the Red Cross Emblem, with the proceeds used to cover their cost and also to support ARC's humanitarian work.  Loehr Decl. ¶ 4; Conner Decl. ¶ 4.

105.     From January 2005 through February 2007, ARC and Warner-Lambert Company had a cause-related marketing agreement whereby Warner-Lambert had the right to use the Red Cross name and emblem on the Purell hand-sanitizer product label.  See Abram Decl., Ex. 100 (Cause Related Marketing Agreement, Dec. 30, 2004).[3]  Warner-Lambert was purchased by J&J in 2006, and J&J assumed the cause-related marketing agreement at that time.  See Abram Decl., Ex. 11 (Biribauer Dep. 198-196).  ARC and J&J did not renew the Purell hand sanitizer agreement beyond its February 2007 expiration.  See Abram Decl., Ex. 101 (Letter from Jennifer Niyangoda, ARC, to Kathleen Weber, J&J, May 11, 2007).

---

[3]     Hand sanitizer, in a time of emergency, furthers important aspects of ARC's mission. See Abram Decl., Ex. 103 (Niyangoda Dep. 249).

106.    However, J&J continued to sell the Red Cross Purell product in retail stores after its purchase of Warner-Lambert Company, under the terms of the ARC-Warner Lambert agreement.  See Abram Decl., Ex. 102 (Excerpt of Deposition of Rebecca Gibbs, Nov. 16, 2007 ("Gibbs Dep.") 59-60; 63).

107.    The sales of first aid kits and other products described above (and at issue in this lawsuit) further ARC's mission and purpose in two clear ways:  (1) these products promote preparedness for medical and other emergencies, disasters, and needs, and (2) sales of these products provides funding needed to further ARC's humanitarian efforts.  Conner Decl. ¶ 4; Loehr Decl. ¶ 4.  These sales have always been reported in ARC's annual reports.  See, e.g., Abram, Decl., Ex. 156 (ARC 2006 Annual Report at 10 ("To make preparedness products easily accessible, ARC identified where consumers want to buy them—at local retailers."); id. at 11 ("The ARC and Target have partnered to design a family-friendly kit . . . Target is donating $10 from the purchase of every kit to the ARC."); id. (photograph depicting kit with Red Cross Emblem next to Target's bull's-eye symbol); id. at 26 (reporting products and services revenue of $2.3 billion, "including course fees and materials, whole blood and components and tissue services").

**G.    A Century of Discussions Between ARC and J&J Concerning the Red Cross Emblem**

108.    Although it filed suit in 2007, J&J has been aware of and complaining about ARC's sales of ARC products for almost as long as ARC has been selling these products.

109.    In 1904, J&J expressed its first written complaint that ARC was improperly in a "commercial business."  See Abram Decl., Ex. 104 (Letter from Eugene Ross of J&J to Mabel Boardman of ARC, Apr. 2, 1904, at 2).   Raising the exact same objection it would recycle a century later before this Court, J&J complained that it did "not believe the charter granted the

American Red Cross Society would permit the Society to engage in a commercial business of this nature." Id. J&J's complaint was prompted by ARC signing a contract with First Aid Supply to produce Red Cross first aid products. See ¶ 39, above.

110.    Even a hundred years ago, J&J admitted that the 1895 agreement between Clara Barton and Robert Wood Johnson never actually went into effect. See Abram Decl., Ex. 105 (Letter from Eugene Ross of J&J to Mabel Boardman of ARC, Mar. 31, 1904) ("[The 1895 Agreement] was conditional on the passage of a bill before the 53d Congress, and as the bill never became a law the agreement was never in force."). Nevertheless, J&J attempted in 2007 to use that same agreement as a premise for its lawsuit against ARC. See Original Compl. ¶ 21; Amended Complaint ¶ 43.

111.    J&J did more than complain about ARC sales in the early Twentieth Century; it sought to participate in them as ARC's manufacturing partner. In 1913, less than a decade after its 1904 complaint, J&J contacted ARC to request that ARC select J&J to market and manufacture ARC's first aid supplies. See Abram Decl., Ex. 106 (Letter from H.P. Jones, 2d Vice President of Johnson & Johnson to Major Charles Lynch of ARC, 1913). J&J recognized that ARC was then using one of J&J's competitors to make ARC's first aid supplies. It sought an arrangement "whereby we would supply to you and through you to your customers and to all parties who desired First Aid Supplies, the products manufactured by us." Id. at 2 (emphasis added). It also recognized that J&J and ARC's right to use the Red Cross Emblem on products was of "equal force." Id. at 1.

112.    Under J&J's 1913 proposal, J&J offered to provide a first aid kit that would indicate that "while it was manufactured by Johnson & Johnson it was marketed under the endorsement of [ARC]," and J&J would pay ARC a royalty for each such kit sold. Id. at 4-5.

ARC declined to enter this agreement and continued to use one of J&J's competitors to manufacture its first aid products.

113.    On August 16, 1917, J&J counsel Archibald Cox came up with another suggestion.  He sent a letter to ARC proposing that the "satisfactory solution" for J&J's disagreement over ARC's use of the Red Cross Emblem on first aid cases and supplies was that ARC should take over J&J.  See Abram Decl., Ex. 107 (Letter from Archibald Cox to General Eliot Wadsworth, Acting Chairman of ARC, Aug. 16, 1917).  The letter expressed "a sincere desire to find some plan which will make everyone more comfortable about the Red Cross symbol." Id. at 7.  The take-over plan was suggested by Mr. Cox "out of familiarity with the affairs of Johnson & Johnson and not by direction."  In his letter 90 years ago, Mr. Cox directly acknowledged that ARC was then distributing first aid cases and supplies at that time "in a mercantile way." Id. at 2.

114.    ARC rejected this proposal out of concern that ARC did not want to be responsible to J&J's investors.  See Abram Decl., Ex. 108 (Letter from General Eliot Wadsworth, Acting Chairman of ARC to Archibald Cox, Sept. 6, 1917).  ARC queried "whether there is anything that we can do to designate between the Red Cross emblem of Johnson & Johnson and that of the ARC." Id.

115.    Twenty years later, in 1937, J&J again acknowledged ARC's sales of Red Cross first aid kits, specifically noting that ARC's "sale and distribution of Red Cross Kits is national, and includes not only the initial unit but also refill orders." See Abram Decl., Ex. 109 (Letter from Kenneth Perry of J&J to H.J. Hughes of ARC, May 25, 1937, at 2).  J&J explicitly questioned (again) ARC's "legislative authority to enter into a business venture of this nature" and called ARC's attention to J&J's trademark of the red cross on first aid kits. Id. at 1.  J&J's

clear position then was the same as it finally sued on some 70 years later:  "we can find no justification for this commercial enterprise, and I think you will easily appreciate the injury that we may suffer through such competition."  Id. at 2.  J&J also expressly complained about products listed in ARC's 1936 Catalogue of Supplies and Insignia.  Id.

116.    In 1984, J&J internally discussed its "displeas[ure]" that ARC was going to use a foreign manufacturer (Cederroth of Holland) to manufacture ARC's automobile first aid kits.  See Abram Decl., Ex. 110 (Letter from H.S. Mueller, J&J, to W.E. Dorsett, J&J, Aug. 14, 1984).  J&J acknowledged that J&J had been offered a chance to bid on the manufacture of this American Red Cross first aid kit and had not done so, even though the winning bidder would furnish ARC with these kits for a period of two years, with an anticipated market of 200,000-250,000 kits.  Id. (Letter Attachment, Request for Quotation at 3).  As the internal discussions show, J&J "thought that this situation should not go unattended."  Id.[4]

117.    Two months later, J&J sent ARC a copy of the 1895 Clara Barton-Robert Wood Johnson Agreement (even though it had long since conceded that this agreement never went into effect), and expressed J&J's "concern that the American Red Cross' current and/or planned commercial activities" were "run[ning] afoul" of J&J's trademark rights.  See Abram Decl., Ex. 111 (Letter from Richard Biribauer, Attorney J&J, to Patricia Xeller, Ass't General Counsel ARC, Oct. 18, 1984).

118.    In 1984-85, J&J moved closer to achieving its goal of manufacturing first aid kits in conjunction with ARC, instead of ARC using a J&J competitor to do so,  by entering into negotiations with  ARC for a co-branded ARC-J&J First Aid Kit.  See Abram Decl., Ex. 112

---

[4]     This automobile first aid kit is the one ARC sought IRS approval to sell.  See supra ¶ 85. In May 1984, the Wall Street Journal carried a story mentioning that ARC first aid kits would hit the market in the fall.  See Abram Decl., Exhibit 114 ("More Nonprofit Groups Make Imaginative, Aggressive Sales," Wall Street Journal, May 31, 1984).

(Letter from Lewellys Barker, Senior Vice President at ARC, to Wayne Dorsett, Vice

President/General Manager at J&J, Sept. 12, 1984); Abram Decl., Ex. 113 (Letter from H.

Mueller, J&J, to Virginia Pie, ARC, June 12, 1985).  The parties agreed that the kit would be

sold through ARC chapters, but J&J had "some reservations" about whether to sell the kit in

retail stores, in part based on whether there was a "perceived need by the general public for the

American Red Cross kit."  Id.  J&J proposed as an alternative that the two companies make a

fundraising first aid kit.  Id.  The year-long negotiations did not result in a joint first aid kit.

119.    A decade later, the parties were back in negotiations.  During 1995-1997, J&J

prompted extended negotiations with ARC over manufacturing and selling joint J&J/ARC first

aid kits through ARC chapters and in retail stores.  See Abram Decl., Ex. 75 (Morisi Dep. 225-

229); Abram Decl., Ex. 115 (Memorandum from John Healey, J&J, Re: Meeting on First Aid Kit

Opportunities with American Red Cross, Feb. 3, 1997, ("Healy Memorandum") at 1).

120.    The negotiations included what would be included in the kits—which would

come in three sizes, compact, large, and deluxe—and where and how they would be sold.

Abram Decl., Ex. 116 (ARC/Johnson & Johnson First aid Kits materials).  ARC's survey of its

chapters at the time showed that the two vendors listed as having supplied first aid kits to

chapters were Emergency First Aid Products and First Aid Only.  See Abram Decl., Ex. 117

(Memorandum to Susan Livingston, Jan. 3, 1997).

121.    As of January 1997, J&J knew that "[m]ost ARC Chapters (93%) currently

purchase and resell First Aid Kits as a means of raising funds for local chapters."  See Abram

Decl., Ex. 115 (Healey Memorandum at 1); Abram Decl., Ex. 118 (Memorandum from Julio Del

Cioppo, J&J, to John Healey, J&J, Re: J&J First Aid Kit – American Red Cross Study,  Jan. 30,

1997, at 2) (quoting same 93% figure). J&J also knew that over 97% of ARC chapters sold CPR devices to the public. Id. at 3.

122.    As a result of the January 1997 ARC/J&J meeting, J&J agreed to "continue to investigate the development of a J&J ARC FAK [first aid kit] for the retail marketplace." See Abram Decl., Ex. 115 (Healey Memorandum at 1).

123.    J&J also agreed to help ARC chapters "effectively market and sell J&J/ARC FAKs [first aid kits]." See Abram Decl., Ex. 119 (Letter from John Healey, J&J, to Ferris Kaplan, ARC, ¶ 5, Feb. 27, 1997).

124.    While J&J was "not able to commit to the development of J&J/ARC First Aid Kits for the retail outlets at this time," it agreed to engage in consumer testing of a joint sports first aid kit that would be sold in the retail marketplace. Id. at 2, ¶¶ 12-13.

125.    As of at least May 1997, J&J knew that the first aid kits sold by the Seattle Chapter, one of the major suppliers to all chapters, were manufactured by Defendant First Aid Only. See Abram Decl., Ex. 120 (Letter from John Healey, J&J, to Ferris Kaplan, ARC, May 7, 1997).

126.    When the J&J/ARC deal for a joint first aid kit appeared to be faltering over price, J&J proposed an alternative to partnering with ARC's National Headquarters; J&J suggested that it would partner directly with ARC chapters. Id. at 2.

127.    As of August 1997, J&J and ARC had a marked-up contract for their jointly co-branded first aid kit. See Abram Decl., Ex. 121 (Letter from Peter Garibaldi, Jr., J&J, to Ferris Kaplan enclosing marked up version of J&J/ARC First Aid Kit Contract, Aug. 15, 1997). This contract was never executed; the negotiations broke down over the price for the kits, which ARC wanted to be lower. See Abram Decl., Ex. 75 (Morisi Dep. 229).

128.    As J&J's in-house trademark counsel testified when presented with the evidence from the 1995-1997 negotiations, "I have been aware that sales of first aid kits via ARC chapters has [sic] been going on for quite a while." Abram Decl., Ex. 11 (Biribauer Dep. 131). He also admitted having "heard that some of the chapters have put those kits that they get from the national headquarters into local retail stores." Id. at 107.

129.    In 2001, ARC was still considering working with J&J on a national first aid kit. See Abram Decl., Ex. 75 (Morisi Dep. 231).

130.    And just a year ago, in November 2006, J&J and ARC executed a Confidential Disclosure Agreement because the they were once more in discussions about a jointly created and marketed first aid emergency preparedness kit. See Abram Decl., Ex. 122 (Confidential Disclosure Statement, Nov. 14, 2006).

131.    Those discussions continued into January 2007, and included J&J's proposal that J&J and ARC partner on an Emergency First Aid Kit that J&J had under development. See Abram Decl., Ex. 123 (Excerpt of Deposition of Jeffrey Tolonen, Nov. 7, 2007 ("Tolonen Dep.") 91-95); Abram Decl., Ex. 124 (J&J/ARC Partnership Update, Jan. 2007).

**H.    ARC Congressional Testimony**

132.    In addition to the Annual Reports submitted to Congress documenting sales of ARC products, ARC has testified before Congress on the very topic of competition between nonprofit and for-profit businesses. At 1987 hearings on that subject, ARC's Senior Vice President for Development stated that in 1986, ARC's revenue from the sale of blood services totaled $485 million. See Abram Decl., Ex. 125 (Hearings Before the Subcommittee on Oversight of the Committee on Ways and Means, 100th Cong. 1068 (1987)). The hearing

included specific testimony that ARC "is regularly engaged in competitive sale of plasma products with other for-profit entities." Id. at 1069.

133.    At hearings in 1997 and 1998, ARC gave similar testimony regarding its blood program and the financial significance of these sales to ARC. See Abram Decl., Ex. 126 (Excerpt of Blood Safety, Minimizing Plasma Product Risks: Hearing Before the Subcomm. on Human Resources of the H. Comm. on Gov't Reform and Oversight, 105th Cong. 111-118 (1998)); Abram Decl., Ex. 127 (Excerpt of FDA Oversight: Blood Safety and the Implications of Pool Sizes in the Manufacture of Plasma Derivatives: Hearing Before the Subcomm. on Human Resources of the H. Comm. on Gov't Reform and Oversight, 105th Cong. 136-144 (1997)).

**I.    J&J Promotion of ARC**

134.    J&J's Complaint asserts the company's support for ARC and ARC's mission. Compl. ¶ 5.

135.    At other times, J&J has similarly taken steps to demonstrate its support for ARC and ARC's mission, and J&J has itself been licensed to use the Red Cross Emblem at retail for that purpose. For instance, J&J entered into a promotion for ARC in 1986 that included in-store promotional material for major food and drug retail stores in which consumers were encouraged to redeem specific J&J coupons; J&J agreed that it would donate to ARC $.05 for each purchase made with these coupons. See Abram Decl., Ex. 128 (Letter of Agreement, Oct. 1, 1986).

136.    Under its agreement with ARC, J&J "[was] authorized as an agent of the American Red Cross to use on advertisements and in-store promotional material the American Red Cross name and emblem" in connection with the project. Id. at 1. The specific products to be advertised and the copy to be used in the advertisements and promotional material were

subject to the prior approval of ARC.  Id. at 2.  Nothing in the agreement established J&J as the agent of ARC for all purposes; instead, J&J was designated ARC's agent for the limited purpose of using the Emblem, just as was done in the license arrangements at issue in this case.

137.    The agreement also informed J&J that during the period of the promotion, J&J would not have an exclusive relationship with ARC, and ARC could pursue other similar promotional and fundraising projects with other companies not in competition with J&J.  Id.

**J.    ARC Enters Agreements with Co-Defendants Water-Jel, First Aid Only, Learning Curve, and Magla to Manufacture and Market ARC Products**

138.    Just as in ARC's previous arrangements with third parties (including J&J) to use ARC's name and Emblem, when ARC entered agreements with Water-Jel, First Aid Only, Learning Curve, and Magla, ARC did so on the express written understanding that these companies would be duly authorized to use ARC's name and Emblem, that such use was made on behalf of and at the direction of ARC, and thus that these companies would not commit a federal crime under 18 U.S.C. § 706 when they used and displayed the Emblem as authorized by ARC.  The Department of Justice sometimes inquires of ARC about third-party companies using the Red Cross Emblem to determine whether the use is authorized.  The Department has made no such inquiry with respect to any of the four third-party companies sued by J&J in this case.  If it had, ARC would have told the Department of Justice that these four companies were ARC's duly authorized agents in their use of the Emblem.  See Loehr Decl. ¶ 9.

139.    **Water-Jel.**  ARC and Water-Jel entered a Corporate Brand License Agreement (as amended) on August 21, 2006 to manufacture hand sanitizer.  See Abram Decl., Ex. 129 (Water-Jel Agreement & Amendment).  ARC retains absolute veto power over the products sold under the Agreement bearing the Emblem.  Id.  The parties' nunc pro tunc confirmatory amendment to the agreement memorializes the original intent of the parties that each third-party

firm was authorized to use the Emblem by ARC, that doing so was in furtherance of ARC's mission, and that each acted as ARC's duly authorized agent for purposes of using the Emblem under the agreements. Id.; see also Abram Decl., Ex. 157 (Photographs of ARC products under Water-Jel agreement).

140.    Both ARC and Water-Jel understood at the time the parties originally entered this Agreement that Water-Jel was designated as ARC's "duly authorized agent" for purpose of using, and authorizing Water-Jel to use, the trade name, trademark and service mark consisting of the Red Cross Emblem and the AMERICAN RED CROSS word mark (the "Red Cross Brand") in connection with the marketing, distribution, and sale of certain American Red Cross hand sanitizer gels and other products. See Abram Decl., Ex. 130 (Water-Jel's Response to J&J's First RFA ("Water-Jel Admissions"), Response to RFAs 1, 4; Abram Decl., Ex. 131 (ARC's Response to J&J's First RFA ("ARC Admissions"), Response to RFA 86, 89-90, 196); Abram Decl., Ex. 103 (Excerpt of Deposition of Jennifer Niyangoda, Nov. 16, 2007, ("Niyangoda Dep." 138-139); Abram Decl., Ex. 129 (Water-Jel Agreement & Amendment). Both parties agree that the amendment confirmed and did not change the nature of the original agreement. See Abram Decl., Ex. 132 (Excerpt of Deposition of Howard Hirsch, Nov. 8, 2007 ("Hirsh Dep.") 134).

141.    ARC did not initiate the discussions between ARC and Water-Jel that resulted in the ARC/Water-Jel Agreement. See Abram Decl., Ex. 132  (Hirsh Dep. 10-13); Abram Decl., Ex. 130 (Water-Jel's Admissions, Response to RFAs 26-28); Abram Decl., Ex. 131 (ARC's Admissions, Response to RFAs 105-109).

142.    At the time ARC granted Water-Jel a nonexclusive license to use the Red Cross Emblem as ARC's duly authorized agent, ARC did not know that Water-Jel had previously

entered a settlement agreement with J&J in 1995. See Abram Decl., Ex. 132 (Hirsh Dep. 108-111); Abram Decl., Ex. 103 (Niyangoda Dep. 265-266); Abram Decl., Ex. 131 (ARC Admissions, Response to RFA 146); Abram Decl., Ex. 102 (Gibbs Dep. 131).

143.    J&J has produced no evidence that ARC intentionally induced Water-Jel to breach the settlement agreement between Water-Jel and J&J. See Abram Decl., Ex. 11 (Biribauer Dep. 262).

144.    At present, ARC products manufactured by Water-Jel under the agreement are not sold at CVS, Walgreens, or Target. See Abram Decl., Ex. 132 (Hirsh Dep. 63).

145.    **First Aid Only.**  ARC and First Aid Only entered into two agreements for first aid kits that are at issue in this case, the Corporate Brand License Agreement (as amended) effective August 21, 2006, and the Workplace Emergency Preparedness and First Aid Agreement (as amended) effective June 1, 2007 (collectively "FAO Agreements"). See Abram Decl., Ex. 133 (First Aid Only Agreements & Amendments).  ARC retains absolute veto power over the products sold under the Agreement bearing the Emblem. Id.  The parties' nunc pro tunc confirmatory amendment to the agreement memorializes the original intent of the parties that each third-party firm was authorized to use the Emblem by ARC, that doing so was in furtherance of ARC's mission, and that each acted as ARC's duly authorized agent for purposes of using the Emblem under the agreements. Id.; see also Abram Decl., Ex. 158 (Photographs of ARC products under First Aid Only agreement).

146.    Both ARC and First Aid Only understood at the time the parties entered this Agreement that First Aid Only was designated as ARC's "duly authorized agent" for purpose of using, and authorizing First Aid Only to use, the trade name, trademark and service mark consisting of the Red Cross Emblem and the AMERICAN RED CROSS word mark (the "Red

Cross Brand") in connection with the marketing, distribution and sale of certain American Red Cross emergency preparedness kits. See Abram Decl., Ex. 134 (Excerpt of Deposition of Dick James, Nov. 16, 2007 ("James Dep.") 186-189, 199-200, 215-217, 296-299); Abram Decl., Ex. 135 (Excerpt of Deposition of Julie Ortmeiyer, Nov. 14, 2007 ("Ortmeiyer Dep.") 176); Abram Decl., Ex. 136 (First Aid Only's Response to J&J's First RFA ("FAO Admissions"), Response to RFAs 1, 4); Abram Decl., Ex. 131 (ARC's Admissions, Response to RFAs 113, 117, 191); Abram Decl., Ex. 103 (Niyangoda Dep. 138-139); Abram Decl., Ex. 133 (First Aid Only Agreements & Amendments). Both parties agree that the amendments did not change the nature of the original agreements. See Abram Decl., Ex. 134 (James Dep. 197-200 295-299); Abram Decl., Ex. 135 (Ortmeiyer Dep. 200-201, 204-205).

147.    First Aid Only has had contractual relations with ARC and with the Seattle Chapter of ARC to manufacture first aid kits since the early 1990s. See Abram Decl., Ex. 75 (Morisi Dep. 139-142); Abram Decl., Ex. 134 (James Dep. 29-39); Abram Decl., Ex. 120 (Letter from John Healey, J&J, to Ferris Kaplan, ARC, May 7, 1997).

148.    ARC did not propose that First Aid Only enter the FAO Agreements; nor did ARC initiate discussions that led to the FAO Agreements. See Abram Decl., Ex. 134 (James Dep. 292-293); Abram Decl., Ex. 136 (FAO Admissions, Response to RFAs 27-28, Exhibit 131; ARC Admissions, Response to RFAs 133-136).

149.    Before entering into the First Aid Only Agreements, First Aid Only did not inform ARC about or provide ARC with a copy of the 2005 settlement agreement of which J&J has now claimed breach. First Aid Only entered that settlement agreement with J&J with respect to the content of First Aid Only's own trademark, to resolve a dispute with J&J about registration of that mark. See Abram Decl., Ex. 136 (FAO Admissions, Response to RFA 42); Abram Decl.,

Ex. 103 (Niyangoda Dep. 238-240); Abram Decl., Ex. 134 (James Dep. 262, 260, 294-295).
ARC was not aware of that settlement agreement when it entered the First Aid Only Corporate
Brand License Agreement.  See Abram Decl., Ex. 131 (ARC Admissions, Response to RFA
155); Abram Decl., Ex. 75 (Morisi Dep. 213); Abram Decl., Ex. 103 (Niyangoda Dep. 238-240);
Abram Decl., Ex. 102 (Gibbs Dep. 121).

150.    J&J has produced no evidence that ARC intentionally induced First Aid Only to
breach the settlement agreement between First Aid Only and J&J.  See Abram Decl., Ex. 11
(Biribauer Dep. 262); see also Abram Decl., Ex. 102 (Gibbs Dep. 121).

151.    **Learning Curve.**  ARC and Learning Curve entered into a Corporate Brand
License Agreement (as amended) that became effective October 15, 2005.  See Abram Decl., Ex.
137 (Learning Curve Agreement & Amendment).  ARC retains absolute veto power over the
products sold under the Agreement bearing the Emblem.  Id.  The parties' nunc pro tunc
confirmatory amendment to the agreement memorializes the original intent of the parties that
each third-party firm was authorized to use the Emblem by ARC, that doing so was in
furtherance of ARC's mission, and that each acted as ARC's duly authorized agent for purposes
of using the Emblem under the agreements.  Id.; see also Abram Decl., Ex. 15p (Photographs of
ARC products under Learning Curve agreement).

152.    Both ARC and Learning Curve understood at the time the parties entered this
Agreement that Learning Curve was designated as ARC's "duly authorized agent" for purpose of
using, and authorizing Learning Curve to use, the trade name, trademark and service mark
consisting of the Red Cross Emblem and the AMERICAN RED CROSS word mark (the "Red
Cross Brand") in connection with the marketing, distribution and sale of certain Red Cross infant
and child care products.  See Abram Decl., Ex. 131 (ARC Admissions, Response to RFA 182);

Abram Decl., Ex. 103 (Niyangoda Dep. 138-139); Abram Decl., Ex. 137 (Learning Curve Agreement & Amendment).  Both parties agree that the amendment did not change the nature of the original agreement or the relationship between ARC and Learning Curve.  <u>See</u> Abram Decl., Ex. 138 (Excerpt of Deposition of Patrick Meyer (Nov. 15, 2007) 66).

153.    ARC products manufactured by Learning Curve are not sold at Wal-Mart.  <u>See</u> Abram Decl., Ex. 139 (Excerpt of Deposition of Kyle Nanna (Nov. 13, 2007) 144).

154.    **<u>Magla.</u>**  ARC and Magla Products entered into a Corporate Brand License Agreement (as amended) that became effective July 14, 2005.  <u>See</u> Abram Decl., Ex. 140 (Magla Agreement & Amendment).  ARC retains absolute veto power over the products sold under the Agreement bearing the Emblem.  <u>Id.</u>  The parties' <u>nunc</u> <u>pro</u> <u>tunc</u> confirmatory amendment to the agreement memorializes the original intent of the parties that each third-party firm was authorized to use the Emblem by ARC, that doing so was in furtherance of ARC's mission, and that each acted as ARC's duly authorized agent for purposes of using the Emblem under the agreements.  <u>Id.</u>; <u>see also</u> Abram Decl., Ex. 160 (Photographs of ARC products under Magla agreement).

155.    Both ARC and Magla understood at the time the parties entered this Agreement that Magla was designated as ARC's "duly authorized agent" for purpose of using, and authorizing Magla to use, the trade name, trademark and service mark consisting of the Red Cross Emblem and the AMERICAN RED CROSS word mark (the "Red Cross Brand") in connection with the marketing, distribution and sale of certain ARC glove products.  <u>See</u> Abram Decl., Ex. 131 (ARC Admissions, Response to RFA 176); Abram Decl., Ex. 103 (Niyangoda Dep. 138-139); Abram Decl., Ex. 140 (Magla Agreement & Amendment).  Both parties agree

that the amendment did not change the nature of the original agreement. See Abram Decl., Ex. 141 (Excerpt of Deposition of Allison Carpinello, Nov. 9, 2007 ("Carpinello Dep.") 128-128).

156.    Magla initiated the discussions with ARC that resulted in the Magla Corporate Brand License Agreement. See Abram Decl., Ex. 131 (ARC Admissions, Response to RFAs 79-82); Abram Decl., Ex. 141 (Carpinello Dep. 17-19).

157.    ARC products manufactured by Magla are not sold at Walgreens. See Abram Decl., Ex. 141 (Carpinello Dep. 167-168).

158.    J&J has no information that any of the products sold under any of the agreements between ARC and its co-defendants are of inferior quality. See Abram Decl., Ex. 142 (Excerpts of Deposition of Daniel Levine, Nov. 9, 2007 ("Levine Dep.") 111); Abram Decl., Ex. 11 (Biribauer Dep. 22).

159.    J&J has no evidence that any negative or unsavory association with J&J has occurred because of ARC products at issue in this case. See Abram Decl., Ex. 11 (Biribauer Dep. 259); Abram Decl., Ex. 142 (Levine Dep. 104).

160.    J&J has no evidence that ARC wanted to harm J&J's reputation by selling the products at issue in this case. See Abram Decl., Ex. 142 (Levine Dep. 47).

161.    J&J has no evidence that ARC was specifically targeting J&J's market share, as opposed to anyone else's. See Abram Decl., Ex. 142 (Levine Dep. 52).

162.    J&J has no evidence that ARC had the goal of harming J&J in any way. See Abram Decl., Ex. 142 (Levine Dep. 52).

163.    J&J has no knowledge of any dilution of J&J's reputation or mark as a result of any action of ARC. See Abram Decl., Ex. 142 (Levine Dep. 115).

164.    J&J has no knowledge of damage to J&J's reputation caused by the presence of ARC in the first aid market and no specific examples of harm to J&J.  See Abram Decl., Ex. 143 (Excerpts of Deposition of Amlin Kotei, Nov. 6, 2007 ("Kotei Dep.") 155, 158).

165.    J&J has no specific knowledge of damages resulting from ARC's sales of first aid kits in retail stores or use of the Red Cross Emblem on first aid kits.  See Abram Decl., Ex. 144 (Excerpt of Deposition of Jeffrey Leebaw, Nov. 7, 2007, 76).

166.    J&J has no information about damage to J&J due to actions by Learning Curve, Water-Jel, Magla, or First Aid Only.  See Abram Decl., Ex. 143 (Kotei Dep. 161).

167.    J&J does not have a contract with Wal-Mart, CVS, Walgreens, or Target relating to which J&J products those stores will sell, how many J&J products they will sell, or at what price the J&J products will be sold.  See Abram Decl., Ex. 142 (Levine Dep. 44-45).

168.    Nor does J&J have any knowledge that ARC interfered in any way with J&J's current or prospective business relationship with those four retailers.  See Abram Decl., Ex. 142 (Levine Dep. 45-47); see also, e.g., Abram Decl., Ex. 145 (Target/J&J Joint Business Planning, 2007 (demonstrating continuing nature of J&J's business relationship with Target).

169.    J&J's relationship will all four retailers continues intact.  See, e.g., Abram Decl., Ex. 143 (Kotei Dep. 92); Abram Decl., Ex. 123 (Tolenon Dep. 232-235).  In fact, J&J remains the category manager of the first aid category at Wal-Mart, which means it works with the buyer at that retailer to make decisions about what products should be kept on the shelves or taken off the shelves.  Abram Decl., Ex. 132  (Hirsh Dep. 57-58).

170.    J&J also has no evidence that sales of its products generally, or its One Stop Kit specifically, have been reduced because of the presence of ARC first aid kits on the shelves of retailers.  See Abram Decl., Ex. 142 (Levine Dep. 49, 71-72).

171.    J&J has no evidence of lost sales.  See Abram Decl., Ex. 142 (Levine Dep. 108);
see also id. at 84; Abram Decl., Ex. 143 (Kotei Dep. 156); Abram Decl., Ex. 102 (Gibbs Dep.
121, 125, 127, 132).  Jeffrey Tolonen, J&J's product director for its Red Cross-branded portfolio
testified that he did not "know of a specific example" where J&J lost customers as a result of
ARC products being offered at retail.  See Abram Decl., Ex. 142 (Tolonen Dep. 234).

172.    J&J admitted that although its One Stop Kit is not selling well, J&J has no reason
to attribute the lack of consumer purchases to the sale of ARC first aid kits.  See Abram Decl.,
Ex. 142 (Levine Dep. 113).

## I.    J&J Exceeds Its Grandfather Rights

173.    Before 1905, J&J was using the Red Cross Emblem, standing alone, as its
trademark registrations show.  See Compl. ¶ 31; Abram Decl., Ex. 146 (U.S. Registration No.
54,308).

174.    J&J also has registered two trademarks for which it alleges commercial use prior
to 1905, also for a "red cross design."  See Compl. ¶ 31; Abram Decl., Ex. 147 (U.S.
Registration Nos. 1,888,143 and 1,889,576).

175.    J&J is currently using a red cross symbol with the words "Johnson & Johnson,"
"First Aid Kit," and "Emergency" or "All-Purpose" written through it on its Emergency First
Aid Kit and/or its All-Purpose First Aid Kit.  J&J acknowledges that this symbol with the words
differs from the simple Red Cross Emblem it was using before 1905.  See Abram Decl., Ex. 11;
(Biribauer Dep. 66); Abram Decl., Ex. 148 (Photographs of J&J Emergency First Aid Kit and
All Purpose First Aid Kit, exhibit to Biribauer Dep.); Abram Decl., Ex. 143 (Kotei Dep. 19, 23-
25);  Abram Decl., Ex. 149 (Photograph of J&J Emergency First Aid Kit, exhibit to Kotei Dep.);
Abram Decl., Ex. 150 (Photograph of J&J All-Purpose First Aid Kit, exhibit to Kotei Dep.);

Abram Decl., Ex. 123 (Tolonen Dep. 213); Abram Decl., Ex. 151  (Photograph of J&J

Emergency First Aid Kit, exhibit to Tolonen Dep.); Abram Decl., Ex. 152 (1904 J&J catalog)

176.    J&J registered a composite mark in 2006, Registration No. 3,178,913, which it

has been using on many of its products, that is composed of three elements:  the red Greek cross,

the words "FIRST AID," and the script "JOHNSON AND JOHNSON."  Abram Decl., Ex. 11

(Biribauer Dep. 71-73, 77); Abram Decl., Ex. 153 (File Wrapper for Registration No.

3,178,913); Abram Decl., Ex. 154 (Photograph of product using '913 Registration); see also

Abram Decl., Ex. 123 (Tolonen Dep. 165-214).

177.    J&J has admitted that it did not use the entire mark depicted in the '913

registration prior to January 5, 1905.  See Abram Decl., Ex. 155 (J&J Admissions, Response to

RFA 10).  J&J's use of the mark in the '913 registration extends back in time no earlier than

1993 and the '913 registration issued only in 2006.  See Abram Decl., Ex. 11 (Biribauer Dep.

70).

178.    J&J has also been using on its products an alternate version of the '913

registration, which is distinguishable and visually distinct from the '913 registration.  See Abram

Decl., Ex. 123  (Tolonen Dep. 189-190); Abram Decl., Ex. 11  (Biribauer Dep. 73-74).

179.    All of J&J's products in its home health care line bear a red cross symbol with the

words Johnson & Johnson adjacent to it, and the words "Hospital Products for Home Care"

below Johnson & Johnson.  See Abram Decl., Ex. 123  (Tolonen Dep. 17, 205-206); Abram

Decl., Ex. 162 (Photograph of J&J Hospital Products for Home Care product).  This is not a

symbol that J&J used prior to January 5, 1905.  See Abram Decl., Ex. 152 (1904 J&J catalog).

Dated:  November 21, 2007

Respectfully submitted,

HOGAN & HARTSON, L.L.P.

By:_____s/ Jonathan L. Abram_____
Jonathan L. Abram (admitted <u>pro</u> <u>hac</u> <u>vice</u>)
Raymond A. Kurz (admitted <u>pro</u> <u>hac</u> <u>vice</u>)
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel:  (202) 637-5681
Fax:  (202) 637-5910

Attorneys for Defendants