Gregory L. Diskant
Robert W. Lehrburger
Karla G. Sanchez
Ravi V. Sitwala
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: (212) 336-2000
Fax: (212) 336-2222

Roger L. Zissu
Richard Z. Lehv
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017
Tel: (212) 813-5900

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC., ) <br><br> Plaintiffs, ) <br><br> v. ) <br><br> THE AMERICAN NATIONAL RED CROSS, LEARNING CURVE INTERNATIONAL, INC., MAGLA PRODUCTS, LLC, WATER-JEL TECHNOLOGIES, INC., and FIRST AID ONLY, INC., ) <br><br> Defendants. ) | Case No. 07-CV-07061 (JSR) <br><br> **Publicly Filed Version** |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ...........................................................................................1

THE UNDISPUTED FACTS ................................................................................................3

     A.    Johnson & Johnson's Adoption and Use of the Red Cross Emblem............3

     B.    The American National Red Cross – Its Origin, Purposes and Powers................................................................................................................3

     C.    ARC's Long-Standing Opposition to Commercial Use of the Emblem ................................................................................................................5

     D.    ARC Begins Licensing the ARC Emblem for Use on Retail Products Sold in Competition with Private Enterprise ................................7

     E.    ARC's License Arrangements with Its Codefendants ..................................8

     F.    ARC's "Confirmatory" Amendments ............................................................9

     G.    ARC's Unfair Competition with J&J ..........................................................10

ARGUMENT ........................................................................................................................11

   I.    Legal Protection of the Red Cross Emblem..............................................12

     A.    1900 and 1905 Federal Charters ................................................................12

     B.    The 1906 Geneva Convention .....................................................................14

     C.    The 1910 Amendment to ARC's Charter ....................................................16

     D.    The 1929 and 1949 Geneva Conventions and International Committee Regulations...................................................................................19

     E.    ARC Agrees It Cannot Engage in Commercial Activity ............................21

   II.    ARC's Sale of Branded Red Cross Goods in Commerce Violates the Geneva Convention and ICRC Regulations Promulgated Thereunder.................23

   III.    ARC's Sale of Branded Red Cross Goods in Commerce Is Unlawful Under Its Federal Charter.........................................................................................................25

   IV.    ARC's Sale Of Branded Red Cross Goods In Commerce Is Illegal Under Federal Criminal Law ...................................................................................................27

A.    ARC's Scheme is Illegal Without Regard to the Licensing
      Agreements ................................................................................................27

B.    ARC's Illegal Licensing Scheme ..............................................................31

      1.    The Terms of the License Agreements Do Not Establish an
            Agency Relationship.......................................................................31

      2.    The Substance of the License Agreements Does Not
            Establish an Agency Relationship...................................................32

C.    The Amended Agreements Are Illegal.......................................................34

V.    ARC's Counterclaims Fail as a Matter of Law .....................................................35

      A.    The Scope of Section 706 ..........................................................................36

      B.    The '913 Registration and Use of J&J Inside a Red Cross Do Not
            Convey a Different Commercial Impression than J&J's Pre-1905
            Uses............................................................................................................37

      C.    Section 706 Does Not Prohibit J&J from Modifying the Contents
            of its First-Aid Kits ...................................................................................38

VI.   The Codefendants' Counterclaims Fail Due to Lack of Standing...........................39

CONCLUSION.............................................................................................................40

ii

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Ala. Power Co. v. Ickes*, 302 U.S. 464 (1938) ...................................................25

*Community For Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) .............................29

*Department of Employment v. United States*, 385 U.S. 355 (1966)....................................26

*Dunlop Tire & Rubber Corp. v. Interstate Commerce Commission*,
    724 F.2d 349 (2d Cir. 1983) .............................................25

*L.A. Gear, Inc. v. E.S. Originals, Inc.*, 859 F.Supp. 1294
    (C.D. Cal. 1994)....................................................33

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .........................................39

*Estate of Meriano v. C.I.R.*, 142 F.3d 651 (3d Cir. 1998) ..................................35

*Mini Maid Services Co. v. Maid Brigade System, Inc.*, 967 F.2d 1516
    (11th Cir. 1992) .....................................................34

*NLRB v. Amax Coal Co.*, 453 U.S. 322 (1981)...................................................29

*NLRB. v. Bell Aerospace Co.*, 416 U.S. 267 (1974)...........................................26

*O-M Bread, Inc. v. U.S. Olympic Committee*, 65 F.3d 933
    (Fed. Cir. 1995).....................................................37

*Oberlin v. Marlin America Corp.*, 596 F.2d 1322 (7th Cir. 1979) ...............................33, 34

*Perrin v. United States*, 444 U.S. 37 (1979)........................................................29

*Port Washington Teachers' Ass'n v. Board of Educ. Of Port Washington Union*,
    478 F.3d 494 (2d Cir. 2007) ........................................39

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ..................................................25

*Sandow-Pajewski v. Busch Entertainment Corp.*, 55 F.Supp.2d 422
    (E.D. Va. 1999)......................................................31

*Savitt v. United States*, 59 F.2d 541 (3d Cir. 1932) ..............................................35

*United States v. Public Utilities Commission*, 345 U.S. 295 (1953)...................................25

1415317v.1

## STATE CASES

*Chandler v. Kelley*, 149 Va. 221, 141 S.E. 389 (1928) ......................................................35

*Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294, 505 S.E.2d 196 (1998) ..............................35

*McLaughlin v. Chicken Delight, Inc.*, 164 Conn. 317, 321 A.2d 456 (1973) ...................33

*Murphy v. Holiday Inns, Inc.*, 216 Va. 490, 219 S.E.2d 874 (1975) ...........................33, 35

*Wells v. Whitaker*, 207 Va. 616, 151 S.E.2d 422 (1966) .............................................32, 35

*Whitfield v. Whittaker Mem'l Hospital*, 210 Va. 176, 169 S.E.2d 563 (1969) ...................32

## FEDERAL STATUTES

U.S. Const. art. VI...........................................................................................................23

18 U.S.C. § 706........................................................................................................ *passim*

36 U.S.C. § 300101(a) ..................................................................................................... 25

36 U.S.C. § 300102........................................................................................................5, 25

36 U.S.C. § 300106(a) ....................................................................................................5, 25

## MISCELLANEOUS

H.R. Doc. 77-693 (1942) ...........................................................................................2, 3, 28

H.R. Rep. No. 60-2188 (1909).................................................................................2, 17, 27

H.R. Rep. No. 61-1256 (1910)..................................................................................17, 28

H.R. Rep. No. 61-1256 (1910)...........................................................................................17

S. 5704, 58th Cong. (1904) (enacted) ................................................................................4

*Resolutions of the Geneva International Conference* (Oct. 26-29, 1863) ..........................3

*An Act to Incorporate the American National Red Cross*, 31 Stat. 277 (1900) ............4, 12

iv

*An Act to Incorporate the American National Red Cross*, 33 Stat. 599 (1905) ..........12, 13

*An Act to Amend an Act Entitled "An Act to Incorporate the American National
Red Cross,"* 36 Stat. 604 (1910) ........................................................................17, 18

*Geneva Convention for the Amelioration of the Conditions of the Wounded of the
Armies in the Field,* July 6, 1906, 35 Stat. 1885 ...............................14, 15, 23

*Geneva Convention for the Amelioration of the Conditions of the Wounded and
Sick of Armies in the Field,* July 27, 1929, 24 Stat. 2074 ...........................19

*Geneva Convention for the Amelioration of the Conditions of the Wounded and
Sick in Armed Forces in the Field,* Aug. 12, 1949, 6 U.S.T. 3114 ........................19, 23

*A Bill To Amend an Act approved January fifth, nineteen Hundred and five,* H.R.
27473, 60th Cong. (1909) ...............................................................14

*American National Red Cross: Hearing Before H. Subcomm. on
Foreign Affairs,* 60th Cong. 2 (1909) ...........................................30

*The Red Cross: Hearing on H.R. 22311 Before the H. Comm. on
Foreign Affairs,* 61st Cong. (2d Sess. 1910)...........................17, 28

*To Protect the Name "Red Cross": Hearing before the H. Comm. On Patents,*
65th Cong. (3d Sess. 1919) ...........................................................6, 14

*Red Cross: Hearings on S. 2241 and* H.R. *7420 Before the
S. Subcomm. on the Judiciary,* 77th Cong. 6 (2d Sess 1942)........................2, 21, 22, 26

*Protection of the Name and Emblem of the Red Cross: Hearings Before H.
Comm. on Foreign Affairs,* 77th Cong. 225 (2d Sess. 1942) .....................1, 3, 6, 22, 28

*International Committee of the Red Cross Regulations on the Use of the Emblem
of the Red Cross or the Red Crescent by the National Societies* (1965, revised
1991) .............................................................................12, 20, 24, 28

*Restatement (Third) of Agency* § 1.01 (2006) ...........................................29, 32

*7 Bus. & Com Litig. Fed. Cts.* § 82.14 (Robert L. Haig ed., 2d ed. 2007) ........................32

J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition*
§§ 18: 40, 42, 75 (4th ed. 2007).................................................................32

1415317v.1

## PRELIMINARY STATEMENT

Finding revenue is an ongoing and necessary function for any charitable organization, but fundraising should not compromise the organization's core values. As its long and rich history demonstrates, one of the American Red Cross' core values is avoiding commercial activities, which it has always recognized as antithetical to its mission, and protecting at all costs its emblem, so that when ARC chooses to authorize its display, it communicates "aid, protection and safety to people throughout the world." (Ex. 14 at 1).[1]

Forsaking these values, ARC has now embarked upon an unprecedented campaign to license and sell branded goods of all kinds bearing the Red Cross emblem through ordinary commercial channels, "cheapen[ing]" the emblem and permitting it to be misused by those outside ARC's control. *See Protection of the Name and Emblem of the Red Cross: Hearings Before the H. Comm. on Foreign Affairs*, 77th Cong. 225 (2d Sess. 1942) [hereinafter "1942 H. Comm. Hearings"] (stmt. of ARC Chairman Norman H. Davis) (App. III, Tab 53 at 225). This sales campaign flies in the face of all governing law: the Geneva Convention, ARC's federal charter, the legally binding rules of the International Red Cross, and the federal criminal law.

Johnson & Johnson (together with Johnson & Johnson Consumer Companies, Inc., "J&J") is a long-time supporter of ARC's mission and will continue to be so when this dispute is over. Nonetheless, the unlawful actions of ARC directly interfere with J&J's lawful right under federal law to use the red cross emblem in commerce. ARC is, by its charter, a "volunteer" organization designed to provide "voluntary relief" in times of war and national

---

[1] "Ex." refers to the Exhibits submitted under the Declaration of Ravi V. Sitwala Submitting Exhibits. "App." refers to the Appendices of legal materials submitted by Plaintiffs under the Declaration of Ravi V. Sitwala Submitting Appendices. The Appendices include separate appendices for (1) statutes, (2) Geneva Convention material and (3) legislative history.

1

disaster, activities far removed from the commercial world. As the Attorney General of the

United States long ago recognized, by its charter, ARC "is not empowered to engage in business

of a commercial or manufacturing character in competition with private business." *Red Cross:*

*Hearings on S. 2241 and H.R. 7420 Before the S. Subcomm. on the Judiciary*, 77th Cong. 6 (2d

Sess. Dec. 4,8, 1942) [hereinafter "1942 S. Subcomm. Hearings"] (letter from Attorney General

Francis Biddle) (App. III, Tab 54 at 6). In particular, ARC is restricted to using its emblem for

ARC's humanitarian activities and, by International Red Cross regulations binding on ARC by

virtue of the Geneva Convention, ARC "shall not authorize the display of its emblem on items

for sale." ICRC Regulations, art. 23 (App. II, Tab 38 at 11).

   Meanwhile, under federal criminal law, no one may use the red cross mark in

commerce other than those – like Johnson & Johnson – who were using it in 1905. Recognizing

that these grandfathered users of the red cross could not constitutionally be stripped of their

property rights, Congress limited "use of the emblem of The American National Red Cross . . .

for purposes of trade or advertisement" to those who have used the emblem prior to 1905. H.

Rep. No. 60-2188 (App. III, Tab 53 at 343). As a consequence, as President Franklin D.

Roosevelt recognized, other than the grandfathered users, "commercial exploitation [is]

prohibited by Federal statute." Message from Pres. Franklin D. Roosevelt, H. R. Doc. 77-693

(commending and transmitting report of Sec. of State Sumner Welles) (App. III, Tab 53 at 427).

   The illegality of ARC's actions permeates the causes of action in this litigation.

The first cause of action, tortious interference with prospective economic advantage, requires as

one of its elements proof that the action complained of was unlawful. The third cause of action,

unfair competition, similarly requires proof of unfair or wrongful conduct by the defendant.

Meanwhile, the dilution cause of action is predicated on the allegation that the individual

defendants' use of the red cross emblem is unauthorized, which requires a finding that ARC had no legal basis to permit its use by the individual defendants.

Accordingly, the central issue in this case is the legality of ARC's licensing scheme. Because this issue is susceptible to resolution as a matter of law, J&J moves for summary judgment that ARC has acted illegally in authorizing third parties to sell branded red cross products through commercial channels of trade, and that ARC's codefendants are acting illegally in doing so. In addition, J&J moves for summary judgment dismissing all of the counterclaims filed by ARC and its codefendants.

## THE UNDISPUTED FACTS

### A.    Johnson & Johnson's Adoption and Use of the Red Cross Emblem

J&J's use of the emblem dates back to at least 1879 when its predecessor, Seabury & Johnson, adopted the emblem as a mark for their pharmaceutical and surgical products. 1942 H. Comm. Hearings 175-77 (quoting testimony of George Seabury from Jan. 27, 1903) (App. III, Tab 53 at 175-77). Since then J&J has continuously used the red cross emblem as a trademark, and it owns several federal registrations for the emblem.[2] On its own or through its subsidiaries, J&J uses the emblem as a trademark for a wide range of first-aid, wound-care, and other products, including gauze pads, adhesive tape, and first-aid kits, containing such items as adhesive bandages, gauze pads, adhesive tape, analgesics, first-aid cream, health care gloves, cleansing wipes and instructional manuals. (*See, e.g.*, Exs. 6-13).

### B.    The American National Red Cross – Its Origin, Purposes and Powers

The National Societies of the Red Cross were formed pursuant to the Geneva Convention. At the First International Conference at Geneva in 1863, what is now known as the

---

[2] The registrations include nos. 54,308, 1,889,576, 1,888,143, 1,870,955 and 3,178,913. (Exs. 1-5).

1415317v.1

International Committee of the Red Cross ("ICRC") was formed.  Resolutions of the Geneva International Conference, Art. 10 (Oct. 26-29, 1863) (App. II, Tab 21).  The First Geneva Convention, adopted in 1864 by several countries, but not the United States, set forth rules for the treatment of the wounded during wartime.  (ARC Answer ¶ 34).  In furtherance of the Convention, the ICRC recommended "that there exist in every country a committee whose mission consists in cooperating in times of war with the hospital service of the armies by all means in its power."  S. 5704, 58th Cong. (3d Sess. 1904) (App. III, Tab 53 at 301).

In 1881, Clara Barton founded a group to campaign for ratification of the 1864 Geneva Convention by the United States.  (ARC Answer, Introductory Statement ¶ 10).  Her group's efforts resulted in 1882 in United States ratification of the Geneva Convention.  (*Id.* ¶ 12).  Congress granted ARC a federal charter in 1900.  Act to Incorporate the American National Red Cross, ch. 784, 31 Stat. 277 (1900) (App. I, Tab 1).  The purposes of ARC, as set forth in its 1900 charter, are essentially to furnish voluntary relief in times of war and peace.  *Id.* at 279.  To carry out those humanitarian purposes, ARC was given "the right to have and to use . . . as an emblem and a badge, a Greek red cross" as described in the Geneva Convention. *Id.* at 279.

Since 1900, ARC's charter has been reenacted and amended numerous times, most recently in 2007.[3]  Today, ARC's chartered purposes are largely identical to those in the 1900 charter:

> (1) and (2)    "to provide volunteer aid in time of war to the sick and wounded of the Armed Forces";
>
> (3)    "to act in matters of voluntary relief" and "as a medium of communication between the people of the United States and the Armed Forces";

---

[3] *See* App. I, Tabs 1-13, collecting the ARC charter statutes through the years.

> (4)    "to carry out a system of national and international relief in time of peace, and apply that system in mitigating the suffering caused by pestilence, famine, fire, floods, and other great national calamities, and to devised and carry out measures for preventing those calamities"; and
>
> (5) "to conduct other activities consistent with the foregoing purposes."

36 U.S.C. § 300102 (App. I, Tab 13).  As required by the Geneva Convention, the federal charter

empowers ARC to use the emblem only in carrying out its purposes.  36 U.S.C. § 300106(a)

(App. I, Tab 13).  Meanwhile, excluding grandfathered users like J&J, it is illegal under federal

law for anyone other than the armed forces, ARC and "its duly authorized employees and agents"

to use the red cross emblem.  18 U.S.C. § 706 (App. I, Tab 16).

## C.    ARC's Long-Standing Opposition to Commercial Use of the Emblem

ARC describes the emblem in almost religious terms – deriving from its close

association with the Christian cross: "[T]he Red Cross emblem is not simply a 'logo.'  It is more

than an icon that identifies the Red Cross Movement; it is the powerful and universally respected

symbol of the seven fundamental principles of humanitarian conduct – humanity, impartiality,

neutrality, independence, voluntary service, unity and universality.  It, along with the Red

Crescent and Crystal, is instantly recognizable and represents aid, protection and safety to people

throughout the world."  (Ex. 14 at 1).

With such a purpose, it is no surprise that ARC has consistently and vehemently

opposed any commercial use of the emblem.  For example, in 1919 ARC adviser Colonel Joseph

M. Hartfield testified to Congress about the detrimental effects of commercial use of the

emblem:

> [U]se of the emblem for commercial purposes tends to cheapen it, tends to make it appear to be a commercial proposition, tends to make it appear that we are lending our name and emblem to the commercial advantage of these people . . . .

1415317v.1

> The use of the emblem for commercial purposes does seriously
> embarrass the Red Cross officials in their work and does interfere
> with it.

*To Protect the Name "Red Cross": Hearing before the H. Comm. on Patents*, 65th Cong. (3d

Sess. 1919) [hereinafter "1919 H. Comm. Hearings"] (App. III, Tab 53 at 377-78).

During Congressional hearings in 1942, ARC Chairman Norman H. Davis

similarly opposed use of the emblem for commercial purposes:

> The use of the Red Cross emblem for commercial purposes makes
> it easy for one desiring to undermine morale and unity among the
> people, particularly in wartimes, to spread rumors, about the Red
> Cross such as that the Red Cross is selling articles that are
> contributed for free distribution for relief purposes, or that the Red
> Cross is receiving a commission from, or participation in, the
> profits from the sale of these advertised products.
>
> The commercial use of the emblem tends to cheapen it and
> weakens the respect in which it is held. There is a rising ground
> swell of resentment on the part of the American public against a
> use which in their minds is disrespectful to an emblem which they
> cherish.

1942 H. Comm. Hearings 225 (App III, Tab 53 at 225).

As recently as 2004, ARC's General Counsel noted in a letter to a commercial

user of the emblem that policing the emblem's misuse is not just about prohibiting commercial

use: "Unlike standard trademark enforcement and policing designed to protect commercial

purposes, the Red Cross mission is quite different. ***We must protect the Red Cross emblem***

***because misuse, intentional or inadvertent, can put lives at risk.***" (Ex. 15 at ARC154010)

(emphasis in original). The letter explains that "[w]hen a red cross appears on the vest of a

worker at the scene of a disaster, it indicates that person is a trained Red Cross worker with the

necessary skills and knowledge to respond to the danger at hand. When it appears on the roof of

a tent or vehicle during military hostility, the emblem signals a neutral and safe haven for

medical treatment." (*Id.*).

6

1415317v.1

**D.    ARC Begins Licensing the ARC Emblem for Use on Retail Products Sold in Competition with Private Enterprise**

Since 1978, with the support of a comfort letter from the Department of Justice (Ex. 17), ARC has experimented with "cause-related" marketing agreements under which third parties have advertised their intention to donate money to ARC in connection with the sale of their goods or services and have included the emblem in these advertisements (*see* Ex. 16, encl. at 4; Ex. 18). Such advertising efforts did not, however, involve licensing the emblem for use on red cross branded products for sale through retail channels of trade.

Recently, however, ARC has turned its back on over 100 years of history and decided to step directly into the commercial arena by instituting a branding and licensing program. This time ARC did not consult DOJ for advice as it had for its "cause related" marketing program.

# REDACTED

(Ex. 19 at ARC1970). As a result, ARC has licensed a host of companies to make and sell a wide variety of items that sport the emblem. (*See* Exs. 20-25).

In particular, ARC has licensed its codefendants, First Aid Only ("FAO"), Learning Curve, Water-Jel, and Magla, to use the emblem on red cross branded products, including first-aid kits, hand sanitizer, and latex gloves, among other products. (Exs. 26-29; Ex. 21). These products are sold variously through major retailers, including Target, Wal-Mart, Walgreens, and CVS. (Ex. 21). Under the license agreements, the codefendants manufacture, market and sell their products to retailers and pay a royalty to ARC based upon their sales. (Exs. 26-29).

ARC has also become a retailer itself, selling its own red cross branded products from its "Red Cross Store" webpage – https://www.redcrossstore.org. (Ex. 24), while also

7

promoting the red cross wares of its licensees, http://www.redcross.org/sponsors/howtohelp/

dollars.html (Ex. 21). Through ARC's website, one can purchase first-aid kits and supplies – not

to mention T-shirts, baby apparel, radios, jewelry, shoes and even Christmas ornaments.

Examples of products marketed by ARC or its codefendants and pages from the Red Cross Store

showing some of ARC's wares appear on the following pages.

   ARC's desire to make commercial sales has distracted it from its core mission.

For example, in 2005 ARC knowingly distributed dangerously misleading instructions for using

defibrillators as part of a first aid kit. The instructions contained an illustration incorrectly

showing where the defibrillator's panels ought to be placed on a person's chest. When the error

was pointed out, ARC decided to ignore it: "[I]ts [sic] important for this project to stay on time

and on budget," and so "we approve going forward with the . . . guide [including] . . . the

incorrect placement of the [defibrillator] panels . . . ." (Ex. 34; *see also* Ex. 35; Ex. 36 at

ARC86739). A third party reviewer of ARC's first aid kit, unaware of this error, identified a

different "serious" and "dangerous mistake" in the directions for treating victims of allergic

reactions, and otherwise noted the "questionable quality of [the] equipment." (Ex. 37).

  **E.**  **ARC's License Arrangements with Its Codefendants**

   ARC entered into standard trademark license agreements with each codefendant.

(Exs. 26-29). The license agreement is a form agreement containing the typical provisions found

in a standard trademark license: a grant of license, provision for payment of royalties, and

approval rights of the licensor to prevent loss of protection in the mark. (*E.g.*, Ex. 26 ¶ 2.1, ¶ 1.7,

¶ 3.1 and ¶ 4.1). The license agreements provide ARC with no control over the operation or day-

to-day activities of any of its codefendants. To the contrary, the codefendants control the means

of production, pricing and determination of the customers to whom they sell. The agreements

also provide that the codefendants will indemnify ARC for liability in connection with

### First Aid Only First Aid Kit



### Learning Curve First Aid Kit



### Water-Jel Hand-Sanitizer



### Magla Gloves



Jump to RedCross.org ⊕

Enter Search Phrase ⊕   Advanced Search

 **American Red Cross**

# RedCross.org Store

| STORE HOME | ADD A DONATION | SPECIALS | SHOPPING CART | NEED HELP? | Returning Customers Enter Here |

Store Home > Product Search Results

**10 items**

Sort by: Alphabetical


Deluxe Family First Aid Kit
$24.95


Family First Aid Kit - Hard Pack
$18.95


Family First Aid Kit - Soft Pack
$19.95


First Aid and CPR for Everyone: An Introduction to Basic Lifesaving Skills
$9.95


Laerdal™ Pocket Mask™ CPR Barrier
$12.95


Personal First Aid Kit
$6.95


Ready Essentials: First Aid Pack
$4.95


The First Years American Red Cross Deluxe First Aid Kit
$29.95


The First Years American Red Cross On-The-Go First Aid Kit
$14.95


Vintage-Style Personal First Aid Kit
$12.95

Page: ( **1** )

Have a **coupon code**? Enter it here: [          ]   Activate

powered by **OrderMotion OM**

Return Policy   Terms of Use   Privacy and Security   Your Local Red Cross

© Copyright, The American National Red Cross. All rights reserved.

EN ESPAÑOL

SEARCH194635817 is Fresh



# RedCross.org Store

STORE HOME    ADD A DONATION    SPECIALS    SHOPPING CART    NEED HELP?      Returning Customers Enter Here

Store Home > Product Search Results

**18 items**

Sort by: Alphabetical



"Cruz Roja Americana" Vintage Tee
$20.00



1881 Tee - Apparel for Life
$20.00



2nd place - "American Red Cross Loves
Threadless" St. George vs. the Dragon
$15.00



3rd place - "American Red Cross Loves
Threadless" Florence Nightingale
$15.00



American Red Cross Crystal Boutique
Necklace
$30.00



American Red Cross Deco Cloisonné
Cufflinks
$17.50



CLARA Tee - Apparel for Life
$20.00



Handle with Care Romper
$15.00



Heart Attack Baby Romper
$15.00



Heart Attack Tee - Apparel for Life
$22.00



Hope on a Wing Tee - Apparel for Life
(White)
$20.00



Hope on a Wing Tee - Apparel for Life
(Heather Gray)
$20.00



Long-sleeved Vintage Tee
$25.00



Man's Best Friend Tee - Apparel for Life
$22.00

OUR BOYS NEED SOX

Our Boys Need Sox Tee - Apparel for Life
$20.00

Page: ( 1 **2** )

manufacture, design, promotion, sale or use of the products, thus avoiding any risk that ARC might be held accountable for their actions. (*E.g.* Ex. 26 ¶ 11.1).

Each license explicitly recognizes that the parties are "independent contractors" and expressly disclaims any relationship other than licensee and licensor. In particular, section 13.4 of each license explicitly disavows an agency relationship:

> 13.4 <u>Independent Contractor</u>. This Agreement does not provide for a joint venture, partnership, agency, franchise, dealership, distributorship or employment relationship between the parties or any other relationship other than licensor and licensee.

(Exs. 26-29).

**F.    ARC's "Confirmatory" Amendments**

After J&J filed its complaint, ARC suddenly amended the licenses purportedly in order to establish agency relationships with its licensees "within the meaning of 18 U.S.C. § 706." In late September and early October 2007, FAO, Learning Curve, Water-Jel, and Magla each signed a so-called "confirmatory amendment" purporting to "confirm" – *nunc pro tunc* – the parties' original "understanding" of the agreements, as of their original effective dates. With a straight face, the confirmatory amendments assert that the parties' original "understanding" was that when the agreements said they were ***not*** agents, they actually meant that they ***were*** agents:

> Section 13.4 of the Agreement is hereby deleted in its entirety and replaced with the following:
>
> 13.4 <u>Independent Contractor</u>. This Agreement does not provide for a joint venture, partnership, franchise, dealership, distributorship or employment relationship between the parties or any other relationship other than licensor and licensee. Notwithstanding the foregoing, the parties agree that Licensee is a "duly authorized agent" of Licensor within the meaning of 18 U.S.C. § 706 and that Licensee is assisting Licensor in carrying out its purposes pursuant to 36 U.S.C. § 300101 *et seq.* under this Agreement by distributing the Products as described herein.

(Exs. 30-33 ¶ 13.4).

9

In fact, even as amended, paragraph 13.4 states that the codefendants are "Independent Contractor[s]" and do not have "any other relationship other than licensor and licensee" with ARC.

### G.     ARC's Unfair Competition with J&J

ARC and its codefendants' licensing scheme has directly targeted J&J's customer relationships, interfered with them and caused injury to J&J. From the outset ARC and its codefendants focused on J&J in selecting the retailers to which to offer ARC-branded products. (Ex. 39 at ARC80599, Ex. 40 at ARC61902, and Ex. 41 at ARC92868; Ex. 42; *see also* Ex. 43 ¶¶ 156-75; Ex. 44 ¶¶ 44-63; Ex. 45 ¶¶ 43-60; Ex. 46 ¶¶ 31-48; Ex. 47 ¶¶ 31-48). In response to questionnaires that ARC required of its licensees, FAO, Learning Curve and Water-Jel all identified J&J (or J&J operating companies) as a principal competitor. (Ex. 39 at ARC80596-97; Ex. 40 at ARC61900; Ex. 41 at ARC92865 (identifying Purell, which J&J owns)).

From the outset, ARC and its codefendants focused on taking sales from J&J. For example, FAO asserted that "[t]he content assortment of each proposed [ARC] kit has been carefully selected to meet/beat the J&J competitive product." (Ex. 39 at ARC80597). Similarly, ARC prepared to answer customer questions about why consumers would purchase "ARC over J&J." (Ex. 48 at ARC2940).

Finally, ARC was well aware that competing against J&J with products bearing the red cross emblem would implicate J&J's rights. When a potential licensee expressed interest in branding first-aid items, ARC's licensing agent, Ms. Campbell, noted "I am sure J&J lawyers are already on the phone [to ARC counsel] just for me writing this!" (Ex. 49 at ARC54902). Indeed, to induce sales, ARC promised its retail customers that, while its counsel "strongly believe" that ARC is entitled to license red cross branded products, "there is a very small chance

10

that J&J may disagree with the ARC position" and that, in the event of a recall, ARC's licensee would pay all costs. (Ex. 50 at ARC 0001713) (emphasis in original).

## ARGUMENT

ARC's scramble to rewrite its licenses to "confirm" nonexistent agency relationships is, in the end, beside the point. The problems with ARC's licensing scheme run far deeper than the content of those licensing arrangements and, ultimately, ARC's scheme is illegal under any analysis. Of course, the silly *ex post facto* revision of the licenses is a palpable admission of their illegality. But even if ARC had created true agency relationships with its licensees by use of a fig leaf, that would not solve the problem that ARC has created for itself. Rather, the problem is fundamental.

ARC has no ability under its charter to engage in commercial activities – through agents or otherwise. The Attorney General so advised Congress years ago – at ARC's behest – and nothing has changed. Meanwhile, except for grandfathered users, the federal criminal law prohibits anyone other than ARC and those under its control – its "duly authorized employees and agents" – from using the red cross emblem. The purpose of the law is to prevent the dilution of the red cross mark and to guarantee that ARC would have control over how it was used for its humanitarian purposes, while barring commercial sales except by the grandfathered users. The sale through retail channels of branded goods bearing the red cross mark surrenders ARC control over use of the emblem and thus runs counter to the federal criminal prohibition.

The retail chains that use the red cross mark in commerce to sell ARC's products are not ARC's agents and do not act under ARC's control. Rather, whether ARC gives up control over the emblem when it passes its rights to its licensees, or whether (under ARC's current theory) it gives up control over use of the emblem when its licensees pass title of branded goods to the retail trade, the simple answer under the federal criminal law is that ARC has intentionally

11

created a system whereby it gives up control over the use of the emblem in commerce – and that violates the law. The International Red Cross has no difficulty comprehending this concept. In provisions that are binding on its American society – but that ARC has ignored – the International Red Cross specifically precludes "the display [of] the emblem on products or items for sale, since they are often designed to last and the National Society has no control over their use." ICRC Regulations, art. 23, n. re ¶ 4 (App. II, Tab 38 at 12).

We review below the various sources of law that bear on this issue. They are the Geneva Convention, ARC's federal charter and the federal criminal law. Two parallel ideas run through these sources: (1) ARC is a "volunteer" agency designed for "humanitarian" purposes whose charter does not provide for it to engage in commercial activities in competition with private enterprise; and (2) use of the red cross emblem in commerce is illegal, except for grandfathered users such as J&J. This protects the sanctity of the emblem from dilution and allows ARC exclusive use of the emblem for humanitarian purposes.

## I.    Legal Protection of the Red Cross Emblem

### A.    1900 and 1905 Federal Charters

As part of ARC's first federal charter in 1900, Congress explicitly protected use of the emblem. The charter granted ARC the exclusive right to use the emblem in carrying out its humanitarian purposes, as designated in the charter. 31 Stat. at 279 (App. I, Tab 1). The charter also made it a criminal offense for any person fraudulently to use the red cross emblem to encourage the belief that he is "a member of or an agent for" ARC. *Id.* The charter made no restrictions on preexisting commercial use.

In 1905, while a new Geneva Convention was being considered, Congress passed a new charter that provided for government supervision of ARC. 33 Stat. 599 (App. I, Tab 2). The 1905 charter – like the 1900 charter and all subsequent charters – recognized the need to

12

create a voluntary humanitarian organization whose mission was plainly charitable, and not commercial.

Thus, the 1905 charter recognized the need for "a committee whose mission consists in cooperating in times of war with the hospital service of the armies" and that "a permanent organization is an agency needed in every nation to carry out the purposes of said treaty," especially "to secure supplies and to execute the humane objects contemplated by said treaty." *Id.* at 599. The charter gave ARC the exclusive right to use, "in carrying out its purposes hereinafter designated," the red cross emblem. *Id.* at 600. The purposes that warranted the use of the emblem under the Congressional charter were plainly humanitarian and not commercial. They included "to furnish volunteer aid to the sick and wounded of armies in time of war," "to act in matters of voluntary relief" in communicating with the Army and the Navy and the people of the United States and to "carry on a system of national and international relief in time of peace." *Id.*

In addition to granting ARC the exclusive right to use the red cross emblem for its humanitarian efforts, the 1905 charter for the first time prohibited use of the emblem by third parties for any commercial purpose. *Id.* at 600-01. At the same time, to comply with the Due Process Clause of the Constitution, the statute grandfathered commercial uses already lawful at that time. *Id.* at 601.

As Colonel Hartfield, legal advisor to ARC, explained in subsequent Congressional hearings, the 1905 bill banned all commercial use, but exempted existing commercial users:

> [T]he bill as prepared [in 1905] gave to the Red Cross the exclusive right to the use of the emblem and provided that *it should be unlawful to use it for trade and commercial purposes.* . . . The effect of [the grandfather clause] was, of

13

course, to say that anyone who, prior to January 5, 1905, had used
for commercial purposes and as a trade-mark in their advertising
matter the Red Cross emblem should not be liable to criminal
punishment thereafter for using it.

1919 H. Comm. Hearings (App. III, Tab 53 at 373).[4]

### B.    The 1906 Geneva Convention

In 1906, the Geneva Convention was revised.  The 1906 Convention reflects the

intent both to restrict the emblem to non-commercial uses and to criminalize uses by third

parties, particular for commercial use.

As with ARC's federal charter, it is perfectly apparent from any reading of the

Geneva Convention of 1906 (and any earlier and later Convention) that the National Societies of

the International Red Cross were created pursuant to that Conference as charitable bodies

engaged entirely in humanitarian efforts.  The Convention is directed at protecting the sick and

the wounded on the battlefield and those who care for them.  Among the caregivers identified by

the Convention were Red Cross workers – "the personnel of volunteer aid societies, duly

recognized and authorized by their own governments, who are employed in the sanitary

formations and establishment of armies . . . ."  Geneva Convention for the Amelioration of the

Condition of the Wounded of the Armies in the Field, art. 10, July 6, 1906, 35 Stat. 1885

[hereinafter "1906 Convention"] (App. II, Tab 23).

According to the U.S. delegation, during the Conference "[t]he employment of the

insignia of the convention [the red cross emblem] was made the subject of careful and extended

treatment – this with a view to prevent its abuse and *restrict its use to the personnel and*

*matériel to which its protection is intended to be accorded*."  Report of U.S. Delegation (App.

_____

[4] All emphases have been added unless otherwise noted.

14

III, Tab 53 at 329).  The U.S. delegation reported that the Convention limited use of the emblem

to designate relief establishments, personnel and equipment:

> The convention contains a provision that the emblem of the red
> cross shall be *exclusively* used, both in time of peace and war, to
> designate the personnel and matériel of the sanitary formations
> which it is the purpose of the convention to protect. . . .  With a
> view to *prevent the usurpation or abuse of its name and insignia,*
> *especially in the form of trade-marks or commercial labels*, the
> signatory powers whose legislation in this regard is insufficient
> agree to take, or to propose to their respective legislative bodies,
> such measures as are necessary to secure to the name and emblem
> of the convention a complete immunity from abuse.

*Id.* at 329-30.

The Convention's language conforms to the report's description, providing that

"[t]he emblem of the Red Cross on a white ground and the words *Red Cross* or *Geneva Cross*

*may only be used*, whether in time of peace or war, to protect or designate sanitary formations

and establishments, the personnel and matériel protected by the convention."  1906 Convention,

art. 23 (App. II, Tab 23).  Thus, ARC's right to use the emblem is limited to its humanitarian

activities – the designation of care-giving establishments, personnel, and equipment.  The

Convention calls upon its signatories to ban any other use of the emblem – in particular,

commercial use:

> The signatory powers whose legislation may not now be adequate
> engage to take or recommend to their legislatures such measures as
> may be necessary to prevent the use, by private persons or by
> societies other than those upon which this convention confers the
> right thereto, of the emblem or name of the Red Cross or Geneva
> Cross, *particularly for commercial purposes by means of trade-*
> *marks or commercial labels.*

1906 Convention, art. 27 (App. II, Tab 23).  Taken together, the Geneva Convention's limitation

that the red cross emblem can be used solely for humanitarian purposes, and its ban on all other

1415317v.1

use, particularly commercial, precludes any assertion that the Red Cross Societies can enter into commerce using the red cross emblem.

**C.    The 1910 Amendment to ARC's Charter**

While the ARC charter of 1905 largely anticipated the 1906 Convention – by limiting ARC's use of the emblem to its humanitarian mission and banning commercial use to the extent permissible under the Constitution – it fell short with regard to restricting use by individuals not controlled by ARC.

As Congress explained in amending ARC's charter in 1910, unauthorized use of the emblem by individuals outside of ARC's control had caused at least one death and a great deal of confusion since the 1905 law was passed:

> It soon became apparent that the language of the original [1905] section . . . was not sufficient to prevent the indiscriminate use of the emblem by unauthorized persons.  For instance, at the time of the San Francisco earthquake, anyone who desired to cross the so-called 'dead line' affixed to his arm the sign of the red cross and was permitted to pass, nor was there any law to prevent his doing so.  A great deal of confusion resulted from this unrestricted use of the emblem, and one man, displaying the sign of the red cross without authority, was shot and killed while attempting to cross the line.  Similar confusion was created by unauthorized use of the emblem in connection with the Cherry mine disaster, *the American Red Cross having no legal authority to prohibit the use of the sign of the red cross by irresponsible persons over whom it had no control*.

H.R. Rep. No. 61-1256 (1910) (App. III, Tab 53 at 346-47).

The Cherry mine incident involved nurses from the Visiting Nurses' Association of Chicago who visited the site of a mine disaster.  The nurses used the red cross emblem for charitable purposes to identify themselves as first aid workers, and apparently not with any fraudulent intent.  Nonetheless, as ARC's then Secretary Mabel Boardman put it in her congressional testimony, they "were not nurses that [ARC] sent there or of whom [ARC] *had*

*any control.*" The nurses "laugh[ed] and talk[ed] with . . . young militiamen" in front of women

who had lost their husbands in the mine, causing unnecessary emotional distress. The disaster

"show[ed] how a *lack of control* on [ARC's] part may give trouble," Ms. Boardman concluded.

*The Red Cross: Hearing on H.R. 22311 Before the H. Comm. on Foreign Affairs*, 61st Cong. (2d

Sess. 1910) [hereinafter "1910 H. Comm. Hearings"] (App. III, Tab 53 at 360).

        In 1910, due to these events and the 1906 Convention, Congress passed a bill

restricting all uses of the emblem "for any business or charitable purpose" and limiting ARC's

right to authorize third parties to use the emblem to "its duly authorized employees and agents."

The bill was "a step in conformity with the requirements of the [1906 Geneva Convention],"

H.R. Rep. No. 60-2188 (1909) (App. III, Tab 53 at 343), "for the purpose of affording [the

emblem] as much protection as is legally possible," H.R. Rep. No. 61-1256 (1910) (App. III, Tab

53 at 347).

        Focusing on the need to limit use of the red cross emblem to those under the

control of ARC, Congress rewrote the criminal provisions included in the charter. Congress

retained the prohibition on fraudulent misuse from the 1905 statute:

> [I]t shall be unlawful for any person within the jurisdiction of the
> United States to falsely or fraudulently hold himself out as or
> represent or pretend himself to be a member of or an agent for the
> American National Red Cross for the purpose of soliciting,
> collecting, or receiving money or material; or for any person to
> wear or display the sign of the Red Cross or any insignia colored in
> imitation thereof for the fraudulent purpose of inducing the belief
> that he is a member of or an agent for the American National Red
> Cross.

Law of June 23, 1910, ch. 372, 36 Stat. 604 (1910) (App. I, Tab 3). In the second paragraph,

Congress for the first time explicitly limited ARC's ability to allow others to use the emblem to

"its duly authorized employees and agents" and prohibited anyone else (other than grandfathered

users) from using the red cross "for any business or charitable purpose."

17

> It shall be unlawful for any person, corporation, or association
> other than the American National Red Cross and *its duly*
> *authorized employees and agents* and the army and navy and
> sanitary hospital Authorities of the United States for the purpose of
> trade or as an advertisement to induce the sale of any article
> whatsoever or *for any business or charitable purpose* to use
> within the territory of the United States of America and its exterior
> possessions the emblem of a Greek red cross on a white ground, or
> any sign or insignia made or colored in imitation thereof. . . .
>
> [N]o person, corporation or association that actually used or whose
> assignor actually used the said emblem, sign, insignia, or words for
> any lawful purpose prior to January fifth, nineteen hundred and
> five, shall be deemed forbidden by this act to continue the use
> thereof for the same purpose and for the same class of goods."

Law of June 23, 1910, ch. 372, 36 Stat. 604 (1910) (App. I, Tab 3).

The criminal prohibitions enacted in 1910 have not been substantively changed since that time and ARC agrees that "the limitations of the 1910 charter remain effective today." (ARC Counterclaims ¶ 9). Fraudulent use of the red cross emblem is a crime. Other uses – whether for charitable or business purposes – are prohibited except for the grandfathered users, the armed forces, ARC and those under ARC's direct control, "its duly authorized employees and agents." This legislative scheme does not criminalize an individual's personal use of the emblem, unless for a fraudulent purpose, but it effectively shuts down any unauthorized charitable or commercial use.

In 1948, the criminal provision was moved out of ARC's charter and to its present location in Title 18. 18 U.S.C. § 706 (Supp. II 1949) (App. I, Tab 14, Supp. II). At the time, the recitation of prohibited uses, including for "any business or charitable purpose," was simplified to bar any unauthorized "use." Congress explained that this was just a change in "phraseology." *Id.* The current statute reads in relevant part:

> Whoever, whether a corporation, association or person, other than
> the American National Red Cross and its duly authorized
> employees and agents and the sanitary and hospital authorities of

18

the armed forces of the United States, uses the emblem of the
Greek red cross on a white ground, or any sign or insignia made or
colored in imitation thereof [commits a crime].

This section shall not make unlawful the use of any such emblem,
sign, insignia or words which was lawful on the date of enactment
of this title.

18 U.S.C. § 706 (App. I, Tab 16).

###    D.    The 1929 and 1949 Geneva Conventions and International Committee Regulations

In 1929, a revised Convention was signed. The 1929 Convention expanded

slightly the ability of National Red Cross Societies to use the red cross emblem, but it did so in a

way that simply reemphasized the entirely non-commercial nature of the voluntary aid societies.

In addition to permitting use of the emblem in wartime to identify the personnel and matériel

providing volunteer services to the wounded, the 1929 Convention permitted use of the emblem

by national societies "for their *humanitarian* activities in time of peace" and on clinics and

ambulances that provide "*free* assistance to wounded or sick." Geneva Convention for the

Amelioration of the Condition of the Wounded and the Sick of Armies in the Field art. 24, July

27, 1929, 24 Stat. 2074 (App. II, Tab 25).

The 1929 Convention was superseded by the 1949 Convention, which is still in

effect today. Like its predecessors, the 1949 Convention makes clear that the National Red Cross

Societies serve humanitarian, not commercial functions. *See, e.g.*, Geneva Convention for the

Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, art. 9,

Aug. 12, 1949, 6 U.S.T. 3114 [hereinafter "1949 Convention"] (App. II, Tab 26) ("the

humanitarian activities [of] the International Committee of the Red Cross"); *id.*, art. 10 ("a

humanitarian organization, such as the International Committee of the Red Cross"). Apparently

reflecting some concern about letting National Societies determine on their own which

1415317v.1

"humanitarian activities" might be appropriate for the use of the emblem, the 1949 Convention centralized that decision-making with the International Red Cross. *Id.*, art. 44. The Convention authorizes the use of the emblem by National Societies "in time of peace, in accordance with their national legislation . . . for their other activities which are *in conformity with the principles laid down by the International Red Cross Conferences.*" *Id.*

The ICRC's principles are set forth in its Regulations on the Use of the Emblem of the Red Cross or the Red Crescent by the National Societies. ICRC Regulations (App. II, Tab 38). The Regulations were revised in 1991 in order "to enable the National Societies to diversify and expand their sources of income, without prejudice to the respect due to the emblem." Preamble to ICRC Regulations (App. II, Tab 38 at 1). ICRC expanded the authorized uses of the emblem for fundraising "as wide as it possibly can be within the framework of the Geneva Conventions." *Id.* Even with this expansion, however, the regulations explicitly prohibit National Societies such as ARC from authorizing use of the emblem on commercial goods:

> *[The National Society] shall not authorize the display of its emblem on items for sale* and may authorize its display on advertising material only with the utmost restraint and on condition that the emblem be of small dimensions and accompanied by a clear explanation of the assistance received by the Society.

ICRC Regulations, art. 23 (App. II, Tab 38 at 11). The official comments explain that the reason for prohibiting display of the emblem on items for sale is because such goods cannot be controlled by ARC: "It is though prohibited to display the emblem on products or items for sale, since they are often designed to last and the National Society has *no control* over their use." *Id.* (App. II, Tab 38 at 12).

The concern that the emblem not be used on goods for sale is reinforced by the Commentary to the 1949 Convention. The Commentary recognizes that the Convention "granted Red Cross organizations wide prerogatives in regard to the use of the sign," but that "any practice

20

likely to lower it in the eyes of the public must be scrupulously avoided." 1949 Geneva

Convention Commentary to Art. 44, nn. re ¶ 2 § 4 (App. II, Tab 33 at 5). As an example of such

an improper practice, the Commentary noted disapprovingly that "Red Cross organizations, to

raise funds, have sometimes sold objects bearing the red cross," which is "likely to lessen, in

varying degrees, the standing of the emblem, and [is] therefore prejudicial to the good name of

the Red Cross as a whole." *Id.* Echoing the concern of 18 U.S.C. § 706 about loss of control

when the emblem is used by unauthorized persons, the Commentary states "the greatest

objection of all" to the sale of items bearing the emblem in commerce "would the absence of any

form of control." *Id.* at nn. re ¶ 4 (App. II, Tab 33 at 7).

####    E.    ARC Agrees It Cannot Engage in Commercial Activity

The legislative history of the charter and the criminal statute includes many

hearings at which issues directly related to this case were discussed. Since 1910, ARC has on

several occasions lobbied Congress to eliminate the grandfather clause in the statute protecting

the emblem. Every attempt has been rejected. But in pushing for this change, ARC has often

promised Congress that it posed no threat of misusing its existing or proposed monopoly on the

emblem to enter commerce. ARC has repeatedly testified, consistent with the Geneva

Conventions, that it does not and by its charter cannot engage in commercial activity.

The question of ARC's ability to engage in commerce came to a head during the

1942 hearings, after Congress proposed to add to ARC's charter an explicit bar on commercial

activity. ARC vigorously responded that, by its existing charter, it was not empowered to engage

in such activity and passage of the proposed section would be "gratuitous." 1942 S. Subcomm.

Hearings 6 (stmt. of ARC General Counsel H.J. Hughes) (App. III, Tab 54 at 6). ARC's

Chairman Norman H. Davis explained in a letter to the Committee:

21

> The American Red Cross is not now engaged in any commercial
> venture for profit, has no intention of engaging in such operations,
> ***and is advised that the provisions of its congressional charter, by***
> ***which it is bound, would not permit it to engage in commercial***
> ***enterprises for profit.***

1942 H. Comm. Hearings 262 (App. III, Tab 53 at 262); *see also id.* at 252-57.

To confirm its point, ARC obtained an extraordinary letter opinion from Attorney

General Francis Biddle, "on what power or right, if any, [ARC] possessed under its present

congressional charter, to engage in commercial enterprises." 1942 S. Subcomm. Hearings 5

(App. III, Tab 54 at 5) (stmt. of ARC General Counsel Hughes). Attorney General Biddle found

that ARC possessed no such power:

> I have your letter of June 8, 1842, in which you propound a
> question to me as counselor with respect to the powers of the
> American Red Cross.
>
>         *   *   *
>
> The corporation was granted no powers, either directly or by
> implication, to engage in ordinary commercial manufacturing or
> mercantile activities. It is, of course, axiomatic that a corporation
> has only those powers which are granted affirmatively in its charter
> or which may be incidentally necessary to the fulfillment of the
> functions which it is created to discharge. Needless to say, this
> principle applies with stronger reason to an institution such as the
> American Red Cross which has been repeatedly declared in
> administrative rulings and judicial decisions to be a nonprofit,
> charitable, and educational institution and which has long enjoyed
> under such rulings a unique status among charities as a quasi-
> governmental agency.
>
> ***For the reasons thus briefly indicated it is clear that the***
> ***American Red Cross is not empowered to engage in business of a***
> ***commercial or manufacturing character in competition with***
> ***private business.***

*Id.* at 5-6.

ARC formally submitted the Biddle letter as part of the legislative record, and

confirmed that the purpose of the opinion was to obviate the need for the proposed explicit

limitation on ARC's powers:

22

> [Sen. Mahoney:]  *Your point is that [the clause] undertakes to*
> *prohibit something which the Red Cross is not authorized to do*
> *by its charter?*
>
> [Hughes:]  *That is it; yes, sir.*

*Id.* at 6.

## II.    ARC's Sale of Branded Red Cross Goods in Commerce Violates the Geneva Convention and ICRC Regulations Promulgated Thereunder

ARC's authorization of commercial sale of goods bearing the red cross emblem is contrary to the Geneva Convention and is proscribed by the regulations of the International Red Cross Conference, which the Convention makes legally binding. As a treaty to which the United States is a party and which has been ratified by Congress, the Geneva Convention is the law of the land. *See* U.S. Const. Art. VI ("[A]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land . . . .").

The Geneva Convention created National Societies that are "humanitarian" in nature and that provide free and voluntary services to those in time of war and disaster. Nothing in the Geneva Convention suggests the National Societies are permitted to engage in commercial activities. Rather, the Geneva Convention is explicit that – under international law – no one should be using the red cross "for commercial purposes by means of trademarks or commercial labels." 1906 Convention, art. 27 (App. II, Tab 23) (The United States has explicitly carved out an exception to that provision to protect grandfathered users. 18 U.S.C. § 706 (App. I, Tab 16)).

As ARC recognizes, its federal charter "designates the Red Cross as the national Red Cross society of the United States for purposes of carrying out the duties of the United States as a signatory to the Geneva Conventions and performing the duties required of a national Red Cross society in the International Red Cross and Red Crescent Movement." (Ex. 51 at 5 & n. 28 (citing ARC Charter, §§ 2(2) and 5(b))). One of ARC's obligations under the Geneva

23

Convention is that any use of the emblem by ARC must conform to "the principles laid down by

the International Red Cross Conferences." 1949 Convention, art. 44 (App. II, Tab 26). In turn,

the ICRC regulations specifically provide that the National Society "*shall not authorize the

display of its emblem on items for sale* . . . ." ICRC Regulations, art. 23 (App. II, Tab 38 at 11).

Such branded sales are prohibited because after the goods are sold "the National Society has no

control over their use." *Id.* at nn. re ¶ 4 (App. II, Tab 38 at 12).

> The regulations of the ICRC are binding on ARC under the Geneva Convention

and its federal charter. Indeed, ARC's own policies recognize the binding nature of the ICRC

regulations:

> As an organization, we also have a duty to abide by the
> 'Regulations on the Use of the Emblem of the Red Cross or the
> Red Crescent by the national societies' outlined and published by
> the International Committee of the Red Cross. The ICRC
> regulations require that National Societies (including the American
> Red Cross) use the Red Cross brand consistently with both
> international humanitarian law and our Fundamental Principles and
> that activities neither tarnish the prestige nor reduce the respect due
> the Red Cross brand.

(Ex. 14 at 1-2).

> Nonetheless, when one of its staffers recognized that its licensing program was

illegal under ICRC rules, ARC simply ignored it. The staffer found the conflict to be curious,

but nothing more, noting in a postscript to an email to a superior:

> P.S. It's interesting, but the Federation policy actually prohibits
> National Societies from 'authoriz[ing] the display of its emblem on
> items for sale' (Regulations on the use of the Emblem of the Red
> Cross or the Red Crescent by the National Societies, Article 23,
> Paragraph h), with the rationale that 'they are often designed to last
> and the National Society has no control over their use.' That just
> kind of interested me, given the co-branding and licensing that we
> do.

(Ex. 52 at ARC20383). This observation seems to have been brushed off. In fact, ARC is violating ICRC regulations, its charter and the Geneva Convention, by distributing in commerce branded red cross goods over which it retains no control.

**III.    ARC's Sale of Branded Red Cross Goods in Commerce Is
Unlawful Under Its Federal Charter**

ARC is a federally chartered corporation. 36 U.S.C. § 300101(a) (2007) (App. I, Tab 13). Its powers are defined by its charter and, as the Supreme Court noted long ago, acts beyond the powers granted in a corporate charter are *ultra vires*. *See Ala. Power Co. v. Ickes*, 302 U.S. 464, 481 (1938).

Because it is a statute, ARC's charter can be construed by the Court as a matter of law, *see Dunlop Tire & Rubber Corp. v. Interstate Commerce Comm'n*, 724 F.2d 349, 350 (2d Cir. 1983), considering its plain meaning, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340-41 (1997), and, if necessary, its legislative history, *United States v. Pub. Utils. Comm'n*, 345 U.S. 295, 315 (1953). Nothing in the plain meaning or the legislative history of ARC's statutory charter confers upon ARC the power to use the emblem for profit in commerce in competition with private business.

The charter limits ARC's rights to use the emblem to the purposes set forth in the charter. Under Section 6, 36 U.S.C. § 300106(a) (App. I, Tab 13), ARC "may have and use, as an emblem and badge" the red cross emblem – but only "[i]n carrying out its purposes under this chapter." Section 2 of the Charter, 36 U.S.C. § 300102 (App. I, Tab 13), sets forth those purposes, all of which clearly relate to the provision of "volunteer aid" and "volunteer relief," not commercial activities.

The legislative history of the charter makes unequivocally clear that ARC has no power under its charter to engage in commerce – and certainly not to use its emblem in

25

commerce. The hearings in the 1940s were replete with such statements, including those of the

Chairman of ARC (App. III, Tab 53 at 262) and the Attorney General of the United States (App.

III, Tab 54 at 5-6).

        ARC is an "instrumentality" of the United States, *Dep't of Employment v. United

*States*, 385 U.S. 355, 358 (1966), and its interpretation of its own powers is entitled to weight.

Likewise, the opinion of the Attorney General expressed to Congress deserves appropriate

deference. Moreover, all of these statements informed and preceded Congress's review and

amendment of ARC's charter in 1947, and thereafter, which did not change in any material

respect the powers and purposes conferred upon ARC. These interpretations thus directly inform

the meaning of the charter. *See NLRB. v. Bell Aerospace Co.*, 416 U.S. 267, 274-75 (1974) ("[A]

court may accord great weight to the longstanding interpretation placed on a statute by an agency

charged with its administration. This is especially so where Congress has re-enacted the statute

without pertinent change.").

        On the motion to dismiss, ARC insisted that it could sell anything in commerce in

competition with private business if it was remotely related to its mission. Thus, counsel readily

agreed that ARC could sell red cross branded ambulances for profits in competition with Ford

and General Motors. (Ex. 53 at 43). By this analysis, the humanitarian volunteer mission of

ARC barely exists. ARC's argument leads, without need for extrapolation, to the conclusion that

ARC's charter also permits it to create for-profit pharmaceutical and medical device companies,

to make and sell products used in medical relief services, or to create for-profit heavy equipment

manufacturers to make and sell the road clearing equipment and other machinery used in disaster

relief services – all to compete directly with private business.

1415317v.1

Without belaboring the point, there is no reason to think that Attorney General Biddle had it wrong in 1942 when he concluded:  "[I]t is clear that the American Red Cross is not empowered to engage in business of a commercial or manufacturing character in competition with private business."  1942 S. Subcomm. Hearings 6 (App. III, Tab 54 at 6).

## IV.    ARC's Sale Of Branded Red Cross Goods In Commerce Is Illegal Under Federal Criminal Law

### A.    ARC's Scheme is Illegal Without Regard to the Licensing Agreements

ARC and its codefendants are violating 18 U.S.C. § 706 by distributing red cross branded products through commercial channels of trade.  Other than grandfathered users and the armed forces, § 706 prohibits use of the emblem, whether for a "business or charitable purpose," by any corporation, association or person other than ARC and "its duly authorized employees and agents."  18 U.S.C. § 706; 36 Stat. at 604 (1910) (App. I, Tab 3).  Because ARC is not authorized to engage in commercial activities, the plain import of § 706 is to bar any person from using the mark for commercial activities, with the exception of the grandfathered users.  This is precisely what the Geneva Convention of 1906 required and what Congress intended when it acted to "restrain the abuse and to limit, as far as possible, the use of the emblem of the American National Red Cross, or the Geneva Cross, for purposes of trade or advertisement to those who may have previously acquired rights...."  H.R. Rep. No. 60-2188 (1909) (App. III, Tab 53 at 343).

President Franklin D. Roosevelt described the impact of what is now 18 U.S.C. § 706 in a 1942 report to Congress:

> From the beginning it was contemplated that the distinctive name and emblem should be used only by governments, through their medical, sanitary, and relief services, and by the national societies to be formed in the different countries. . . .  It was not until January 5, 1905, when [ARC] was reincorporated by act of Congress, that *commercial exploitation was prohibited by Federal statute*; and

27

>the prohibition enacted was effective only as to persons or corporations not then 'lawfully entitled to use the sign of the Red Cross.' Two years later, in 1907, on becoming a party to the revised Red Cross convention of 1906, *the United States assumed an express obligation under the convention to prohibit all commercial exploitation*.

Message from Pres. Franklin D. Roosevelt, H. R. Doc. 77-693 (commending and transmitting report of Sec. of State Sumner Welles) (App. III, Tab 53 at 427).

Even if the Court should find that under some circumstances ARC can engage in commercial activities, the criminal statute nonetheless bars use of the red cross emblem on branded goods in precise accord with the requirements of International Red Cross. The International Red Cross prohibits the use of the mark on "products or items for sale, since . . . the National Society has no control over their use." ICRC Regulations, art. 23, nn. re ¶ 4 (App. II, Tab 38 at 12). The criminal statute similarly limits ARC's ability to authorize use of the emblem, whether for a "business or charitable purpose," only to those over whom ARC has control – "its duly authorized employees and agents." The point was noted expressly in the House hearings in 1910 leading to this exception, when both Congress and ARC sought to eliminate the danger of those "over whom [the Red Cross] had no control" walking onto disaster sites wearing red cross emblems. H.R. Rep. No. 61-1256 (1910) (App. III, Tab 53 at 346-47); *see* 1910 H. Comm. Hearings (App. III, Tab 53 at 360) (stmt. of Mabel Boardman).

Congress thus chose two well known terms from the common law to limit ARC's right to authorize use of emblem to those over whom it had control – its employees and agents. Control is part of the black-letter definition of agency: "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and *subject to the principal's control*, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006).

28

"It is . . . well established that '[w]here Congress uses terms that have accumulated settled

meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that

Congress means to incorporate the established meaning of these terms.'" *Community For*

*Creative Non-Violence v. Reid,* 490 U.S. 730, 739 (1989), quoting *NLRB v. Amax Coal Co.,* 453

U.S. 322, 329 (1981); *see also Perrin v. United States,* 444 U.S. 37, 42 (1979).

       By definition, ARC and its codefendants violate the statute when they sell goods

in commerce to retail chains and ultimately to consumers. These sales provide ARC no control

over those who will use the emblem. Rather, sales made by retailers (over whom ARC has no

control) will enable third parties (over whom ARC also has no control) to purchase and wear red

cross T-shirts, shoes and back-packs, and carry red cross first aid kits and flashlights. Such

activities dilute the meaning of the red cross emblem. They confuse the public. And they are

potentially dangerous, permitting both intentional and unintentional misuse. As ARC's Senior

Counsel put it, "[w]e must protect the Red Cross emblem because misuse, intentional or

inadvertent, can put lives at risk." (Ex. 15 at ARC154010) (emphasis omitted).

       Not long ago, this issue was flagged by an ARC employee, but the question was

not about the danger to the public or the threat to ARC's mission posed by ARC's unrestricted

sales of branded goods. Instead, the concern was only about potential liability to ARC arising

from such misuse:

> [W]hen any American wears a licensed product (particularly the
> shoes) that look like part of a uniform and makes it look like
> wearer IS part of Red Cross, do we have liability issues if they are
> not a trained ARC volunteer or employee?

(Ex. 54 at ARC19036). And, as has been typical of late, even these concerns seem to have been

simply shrugged off.

29

But this is the core issue that led to the amendment of the criminal statute in 1910

limiting use of the emblem to ARC's "duly authorized employees and agents." The 1909

testimony of ARC Secretary Mabel Boardman plainly moved Congress:

> At the earthquake and fire at San Francisco they tried to draw a
> line and prohibit people from passing that line unless they should
> bear the Red Cross. But the newspaper men pretty generally put
> on Red Cross badges, and other people used the badges to a great
> extent, and some people put them on automobiles, until the
> emblem was no longer respected, and one man in an automobile
> with a Red Cross badge attempting to ride through the lines was
> shot at by a national guardsman on refusing to stop, and the
> emblem became so abused that people no longer recognized it.
> Now, had that man in the automobile been a physician, authorized
> to use the emblem, and had he been going to the relief of some sick
> person he might have been shot because they did not regard it.

*American National Red Cross: Hearing Before H. Subcomm. on Foreign Affairs*, 60th Cong. 2

(1909) (App. III, Tab 49 at 2). The sale of goods bearing the red cross emblem in "the absence of

any form of control" is precisely what the Geneva Convention sought to "scrupulously avoid,"

1949 Geneva Convention Commentary to Art. 44 (App. II, Tab 33 at 5), and is exactly what

Congress had in mind when it enacted criminal laws to restrain misuse of the emblem.

Setting aside for the moment the question whether ARC has sufficient control of

its licensees to make them agents, the essence of ARC's scheme necessarily violates the federal

criminal statute. When red cross goods and merchandise are sold by the licensees through

commercial channels of trade – to wholesalers and retailers for resale to consumers – those sales

conflict with the statutory requirement that the emblem at no time be used, whether for a

"business or charitable purpose," by anyone other than ARC's "duly authorized employees or

agents."

None of the retailers using the emblem qualifies as an ARC agent. ARC does not

purport to control them, let alone the methods or details of how they conduct their business or

use the emblem. Likewise the retailers do not purport to act on ARC's behalf. Because they are not "duly authorized agents" of ARC, the retailers cannot legally advertise, display and sell red cross branded products. As a result, ARC and its codefendants are violating federal criminal law.

### B.    ARC's Illegal Licensing Scheme

Although ARC's scheme to distribute branded goods in commerce is illegal under any circumstances, its licensing agreements with manufacturers to make and sell branded goods are themselves illegal, and flagrantly so. Not so long ago, ARC knew better. In hundreds of cease and desist letters written over the years and in its publications, ARC has repeatedly explained that it has no power to license third parties to use the mark: "[A]lthough the American Red Cross is one of the entitled users of the Red Cross name and emblem as specified in the federal statute, it has no authority to interpret, waive, or relax the stipulations" of that statute. (*E.g.*, Exs. 55-61 (ARC publications); Exs. 62-69 (cease and desist letters)).

### 1.    The Terms of the License Agreements Do Not Establish an Agency Relationship

Section 13.4 of each License Agreement is titled "Independent Contractor" and expressly disclaims any agency relationship: "This Agreement does not provide for a joint venture, partnership, *agency*, franchise, dealership, distributorship or employment relationship between the parties or any other relationship other than licensor and licensee." (Exs. 26-29).

Of course, just because an agreement says it creates an agency relationship does not make it so. *Sandow-Pajewski v. Busch Entm't Corp.*, 55 F. Supp. 2d 422, 431 (E.D. Va. 1999). But that doctrine typically is invoked when a third party challenges the contractual relationship and one of the parties to the contract tries unsuccessfully to *defend* the arrangement created by the contract. In contrast, here both ARC and the codefendants now seek to *deny* the agreement they signed. The Court should not permit such gamesmanship.

31

2.    **The Substance of the License Agreements Does Not Establish an Agency Relationship**

In any event, the License Agreements create classic trademark licenses, not agency relationships. Under Virginia law, which explicitly governs most of the contracts (the agreement with FAO is silent on choice of law), an agency relationship requires that the agent be under the control of its principal, both "with regard to the work to be done and the manner of performing it." *Whitfield v. Whittaker Mem'l Hosp.*, 210 Va. 176, 181, 169 S.E.2d 563, 567 (1969). Put another way, agency requires that the principal have the "right to control the methods or details of doing the work," not merely control of the results. *Wells v. Whitaker*, 207 Va. 616, 624, 151 S.E.2d 422, 429 (1966).[5]

The License Agreements do not create such a relationship. Rather, they simply grant each of the codefendants a license to use the emblem in making, advertising and marketing products for sale. (*E.g.*, Ex. 26 ¶ 2.1). In return, the codefendants pay ARC a royalty based on the percentage of sales. (*Id.* ¶ 3.1).

There are, of course, a number of provisions giving ARC certain rights of approval. ARC has the right to review and approve samples of the products, packaging and advertising "before commercial production" and the right to inspect the licensee's facilities. (*Id.* ¶¶ 4.1-4.4). These are standard quality control provisions required in trademark licenses to prevent the mark from losing protection. *See, e.g.*, J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 18:40, 42, and 75 (4th ed. 2007). They come nowhere close to

---

[5]  Virginia's law of agency is consistent with mainstream agency principles. *See, e.g.*, *7 Bus. & Com Litig. Fed. Cts.* § 82.14 (Robert L. Haig ed., 2d ed. 2007) ("Control traditionally is defined as the principal's right to control the day-to-day work of the alleged agent. The test is . . . whether the principal had the right to control the method and manner in which the agent was to act."); Restatement (Third) of Agency § 1.01 cmt. c (2006) ("A relationship is not one of agency within the common-law definition unless . . . the principal has the right throughout the duration of the relationship to control the agent's acts.").

1415317v.1

establishing the type of day-to-day control of operations required to form an agency. Courts consistently have held that the quality control and related provisions of license agreements do not in and of themselves give rise to an agency relationship. *E.g.*, *Oberlin v. Marlin Am. Corp.*, 596 F.2d 1322, 1327 (7th Cir. 1979); *L.A. Gear, Inc. v. E.S. Originals, Inc.*, 859 F. Supp. 1294, 1299-1300 (C.D. Cal. 1994); *Murphy v. Holiday Inns, Inc.*, 216 Va. 490, 495, 219 S.E.2d 874, 877-78 (1975); *McLaughlin v. Chicken Delight, Inc.*, 164 Conn. 317, 324, 321 A.2d 456, 460 (1973).

The issue whether a trademark license creates an agency has arisen in the context of franchisor/franchisee relationships, which exhibit many more aspects of control than basic trademark license agreements. In *Murphy*, for example, the plaintiff sought to hold the defendant hotel/motel chain liable for damages incurred while staying at the franchisee's motel. 216 Va. at 491, 219 S.E. 2d at 875. The plaintiff relied on a license agreement that allowed the franchisee to use the franchisor's name and other assets while providing the franchisor with regulatory control to standardize the business operation and good will associated with the franchisor's trademarks. But just like ARC, the franchisor was given no power to control the franchisee's business expenditures, fix customer rates, hire or fire employees, determine wages, set standards for productivity, and the like. The Supreme Court of Virginia found no agency because such control provisions "gave defendant no 'control or right to control the methods or details of doing the work.'" 216 Va. at 495, 219 S.E.2d at 877.

*Oberlin* is similarly instructive. There, the manufacturer of a portable telephone entered into a contract with defendant Marlin to distribute the phone. The contract recited that Marlin was an independent contractor, but provided a license to use the manufacturer's trademark subject to certain rights of quality control. The Seventh Circuit held there was no agency,

finding that these provisions did not include "the elements of constancy or detail characteristic of the control a principal exercises over his agent."  596 F.2d at 1326.

The court went on to recognize that the Lanham Act requires supervision of trademark licensees to avoid abandonment of the trademark but that a trademark licensor's exercise of such control does not create an agency:

> The purpose of the Lanham Act, however, is to ensure the integrity of registered trademarks, not to create a federal law of agency. Furthermore the scope of the duty of supervision associated with a registered trademark is commensurate with this narrow purpose. The duty does not give a licensor control over the day-to-day operations of a licensee beyond that necessary to ensure uniform quality of the product or service in question.  It does not automatically saddle the licensor with the responsibilities under state law of a principal for his agent.

*Id.* at 1327; *see also Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1520 (11th Cir. 1992) (quoting *Oberlin* and holding that a franchisor was not liable for its franchisee's infringement of another company's trademark).

The License Agreements between ARC and its codefendants are typical trademark licenses containing approval provisions related to ensuring uniformity and compliance with standards to preserve the goodwill associated with the emblem.  The Agreements do not provide control of the "day-to-day" operations required of an agency.  They are exactly what they said they were in the first instance:  licenses to "independent contractors" that "do[] not provide for . . . agency . . . or any other relationship other than licensor and licensee." (*E.g.*, Ex. 26 ¶ 13.4). Because ARC cannot lawfully authorize third party independent contractors to use its emblem for any business purpose, the licenses are illegal.

## C.    The Amended Agreements Are Illegal

ARC and its codefendants' post-lawsuit amendments do not render their arrangements legal, either going forward or retrospectively.  The amendments purport to

34

"confirm" the intent of the parties *nunc pro tunc* as of the date of the original license. But a violation of the criminal law cannot be retroactively eliminated. *Estate of Meriano v. C.I.R.*, 142 F.3d 651, 662 (3d Cir. 1998) ("The crime is complete when all of its elements have been fulfilled, and, once completed, it cannot be undone."); *see also Savitt v. United States*, 59 F.2d 541, 544 (3d Cir. 1932) ("[R]estitution or attempted restitution does not nullify or excuse a previous crime.").

Moreover, nothing about the substance of the Agreements has changed. The amendments to Paragraph 13.4 of the License Agreements still refer to each codefendant as an "Independent Contractor." (*E.g.*, Ex. 30). They still provide that the Agreements do not create any "relationship other than licensor and licensee." (*Id.*). They still contain no provisions giving ARC control over the day-to-day operations of the codefendants. *See Murphy*, 216 Va. at 495, 219 S.E.2d at 878. They still provide ARC no "right to control the methods or details of doing the work." *Wells*, 207 Va. at 623, 151 S.E.2d at 429.

The Agreements were and remain straightforward license arrangements, not agency relationships. ARC and its codefendants' attempt to call them something else in the wake of being sued is as meaningless as it is transparent. *See Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294, 300-01, 505 S.E.2d 196, 200 (1998) ("The relationship of parties to a contract does not depend on what the parties themselves call the relationship, but rather on what the relationship actually is in law.") (citing *Murphy*, 216 Va. at 494, 219 S.E.2d at 876; *Chandler v. Kelley*, 149 Va. 221, 231, 141 S.E. 389, 391-92 (1928)). No reasonable fact-finder could disagree.

## V.    ARC's Counterclaims Fail as a Matter of Law

Asserting that it is "happy" to coexist with J&J as lawful users of the red cross emblem, ARC nonetheless asserts three counterclaims in which it alleges that J&J has undertaken "a variety of actions incompatible with its status as a Grandfathered User."

Counterclaims ¶ 12.  All of its claims are predicated on the allegations that J&J has exceeded its grandfathered rights by (1) registering a mark consisting of a red cross accompanied by the words "Johnson & Johnson" and "First Aid"; (2) using a mark that contains the words "Johnson & Johnson" within a red cross (the "Altered Red Cross Symbol"); and (3) selling first-aid kits containing (among many other items) light sticks and refrigerator magnets for listing emergency telephone numbers.

### A.    The Scope of Section 706

Section 706 exempts "the use of [the emblem] which was lawful" prior to 1905. 18 U.S.C. § 706 (App. I, Tab 16).  As ARC agrees, the meaning of "use" is explained by the language of the 1910 statute, before it was recodified out of ARC's charter and into the federal criminal law in 1948.  The 1910 legislation exempts use of the emblem by entities that had used the emblem "for any lawful purpose" prior to 1905 and allows those users to continue their use "for the same purpose and for the same class of goods."  33 Stat. at 604 (App. I, Tab 3). Although these words were deleted in the 1948 recodification, Congress explained that the changes were not intended to be of substance, but merely of "phraseology."  18 U.S.C. § 706 (Supp. II 1949) (App. I, Tab 14).  ARC agrees that "the limitations of the 1910 charter remain effective today."  (ARC Counterclaims ¶ 8).

Under the 1910 codification, as a grandfathered user, J&J is permitted to use the red cross emblem for the same lawful purpose for which it was used in 1905 – to sell goods in commerce – and for the same class of goods.  (Of course, this also legitimizes the use of J&J's products by its customers, wholesalers, retailers and consumers.)  The classes of goods in which J&J used the red cross emblem before 1905 included medicines and pharmaceutical preparations, dental, medicinal, and surgical appliances, and cosmetics and toilet preparations.  (*See* Exs. 7-

1415317v.1

11).  Today J&J limits its uses of the emblem to that same purpose and those same classes of

goods, and so its activities are entirely lawful.  (*See, e.g.*, Ex. 13).

> **B.**    **The '913 Registration and Use of J&J Inside a Red Cross Do Not**
> **Convey a Different Commercial Impression than J&J's Pre-1905 Uses**

Although it did not contest the trademark when it was filed, ARC now claims that

J&J's trademark registration no. 3,178,913 (Ex. 5), and J&J's placement of "Johnson & Johnson"

inside a red cross (ARC Counterclaims Ex. C), violate § 706 and are a means of unfair

competition because the marks convey a "different commercial impression" than the red cross

mark used by J&J prior to 1905.  As shown on the next page, the '913 mark has three

components:  a red cross on a white field, the words "Johnson & Johnson," and the words "First

Aid."  On the same page is what ARC ominously calls the "Altered Red Cross Symbol," the

same red cross with J&J's familiar logo placed inside.  But, as is evident from the pages that

follow, these emblems are substantially identical to those commonly used by J&J prior to 1905.

(*E.g.*, Ex. 8 at JJARC293; Ex. 9 at JJARC364; Ex 11 at JJARC427-28, 430).

The prohibition on new uses that convey a "different commercial impression" is a

judge-made doctrine that prevents grandfathered users from expanding their grandfathered rights

in certain circumstances by, for example, turning Olympic bread into Olympic Kids bread.  *See*

*O-M Bread, Inc. v. U.S. Olympic Comm.*, 65 F.3d 933 (Fed. Cir. 1995).  ARC's attempt to invoke

this doctrine is wrong in every respect.  J&J has grandfathered rights to sell Johnson & Johnson

first aid kits bearing the red cross emblem.  Minor rearrangements of those familiar components

cannot possibly create a different commercial impression.

Thus, J&J's '913 registration explicitly adding the words "Johnson & Johnson"

and "First Aid" does not alter J&J's rights under § 706 or create a different commercial

impression.  ARC's complaint about the presence of J&J's name is particularly odd.  By being

1415317v.1



**J&J Registration No. 3,178,913**



**J&J's "Altered Red Cross Symbol"**

**Pre-1905 Examples of the Red Cross, "Johnson & Johnson," and "First Aid" Together**



Ex. 11 at JJARC427



Ex. 11 at JJARC427



Ex. 11 at JJARC427



Ex. 11 at JJARC428

**Pre-1905 Examples of "Johnson & Johnson" or "J&J" Appearing Within a Red Cross**





Ex. 11 at JJARC430                    Ex. 8 at JJARC293



Ex. 9 at JJARC364

explicit that the goods are J&J products, J&J eliminates any potential confusion that the goods come from ARC, thus helping ARC protect and limit authorized uses of ARC's emblem to its humanitarian mission.  Moreover, as ARC affirmatively alleges (with some exaggeration), "for over 100 years" "J&J's use of the red cross symbol is *always* accompanied by the JOHNSON & JOHNSON word mark . . . ." (*See* ARC Counterclaim ¶ 11).  Similarly, prior to 1905, J&J used the words "first aid" on its products, along with the red cross and the words "Johnson & Johnson," and described the products as "first aid" products. (*See, e.g.*, Ex. 11 at JJARC427-28; Ex. 12 at JJARC463-65; *see also* Ex. 7 at JJARC260; Ex. 8 at JJARC285; Ex. 9 at JJARC362, 377; Ex. 10 at JJARC 399).

ARC's complaint regarding J&J's use of a mark depicting its name inside of a red cross is similarly misguided.  J&J's pre-1905 uses included displaying the words "Johnson & Johnson" inside the red cross. (*E.g.*, Ex. 8 at JJARC293; Ex. 9 at JJARC364; Ex 11 at JJARC427, 430).

Because the premise of ARC's counterclaims regarding the '913 registration and the Altered Red Cross Symbol – that J&J did not use substantially identical marks prior to 1905 – is false, the claims fail as a matter of law.  And, in any case, no reasonable juror could find that the marks convey a different commercial impression than J&J's pre-1905 uses identified above.

C.    **Section 706 Does Not Prohibit J&J from Modifying the Contents of its First-Aid Kits**

ARC also complains that J&J has exceeded its grandfathered rights by selling light sticks and refrigerator magnets in first-aid kits that bear the emblem.  Apparently, its view is that the grandfather clause precludes J&J from including any modern improvements in first aid care in its kit. (The light sticks do not even bear the red cross emblem; the refrigerator magnets do).  This argument is not supported by any reasonable reading of the grandfather clause.  J&J

38

has sold first aid kits bearing the emblem since before 1905, and its continued sale of first aid kits, even with varied contents, is unarguably a grandfathered use. Not only are the kits in the "same class of goods" as items sold by J&J prior to 1905, they are the *same* goods. Accordingly, ARC has no viable claim that J&J's insertion of light sticks and magnets into J&J's first aid kits exceeds the scope of § 706.

## VI.     The Codefendants' Counterclaims Fail Due to Lack of Standing

The four codefendants assert counterclaims for declaratory judgment and cancellation of J&J's trademarks based on the argument that the red cross emblem is generic and functional. If the Court grants J&J's motion for partial summary judgment that codefendants' use of the emblem is illegal under 18 U.S.C. § 706, then the codefendants do not have standing to assert these counterclaims. (In response to J&J's trademark dilution claim, the codefendants assert as affirmative defenses similar arguments, which are not the subject of this motion for summary judgment.)

The "irreducible constitutional minimum" of standing requires three elements: (1) there must be an "'injury in fact,' – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) there must be "a causal connection between the injury and the conduct complained of;" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Port Washington Teachers' Ass'n v. Board of Educ. of Port Washington Union*, 478 F.3d 494, 498 (2d Cir. 2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Assuming the Court grants summary judgment that the codefendants' use of the emblem is illegal under 18 U.S.C. § 706, then none of the standing elements are satisfied. Whether or not the red cross emblem is generic or functional, the codefendants are barred from

1415317v.1

using the red cross emblem under § 706, while J&J is permitted to use it under § 706. The codefendants thus have no legally protectable interest giving rise to injury; there is no causation as between J&J's trademark rights and codefendants' alleged injury; and a declaration of invalidity or cancellation of J&J's trademark rights would not redress the codefendants' inability to use the emblem. The codefendants have no standing, and J&J is entitled to summary judgment on both of their counterclaims.

### CONCLUSION

For the foregoing reasons, J&J respectfully requests that the Court grant its motion for partial summary declaring the licensing scheme of ARC and its codefendants to be unlawful, and dismissing all the counterclaims filed against J&J.

Dated:  New York, New York
         November 21, 2007

Gregory L. Diskant
Robert W. Lehrburger
Karla G. Sanchez
Ravi V. Sitwala
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel:  (212) 336-2000
Fax:  (212) 336-2222
         and
Roger L. Zissu
Richard Z. Lehv
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017
Tel:  (212) 813-5900

*Attorneys for Plaintiffs*

1415317v.1