UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Johnson & Johnson, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> The American National Red Cross, et al., <br><br> Defendants. | CASE NO. 07-CV-07061 (JSR) <br><br> **CONTAINS HIGHLY CONFIDENTIAL MATERIAL** <br><br> **SUBJECT TO PROTECTIVE ORDER** |

### EXPERT REPORT OF KENNETH B. GERMAIN

I, Kenneth B. Germain, declare and state as follows:

1. (a) My name is Kenneth B. Germain and I live in Cincinnati, Ohio, where I am Of Counsel to Thompson Hine LLP. I also serve as Distinguished Professorial Practitioner in Residence in connection with the Program on Law and Technology of the University of Dayton School of Law, where I currently am teaching "Intellectual Property Law." From October 2002 until December 2006, I was a Partner in Thompson Hine LLP. From 1988 until September 30, 2002, I was a Partner in Frost & Jacobs LLP/Frost Brown Todd LLC. From 1989 until 2006, I served as Adjunct Professor of Law at the University of Cincinnati College of Law, where, in most academic years I taught "Unfair Trade Practices," "Introduction To Intellectual Property," "Trademark and Unfair Competition Law," or "Trademark Practice and Procedure." In 1990, I created, and since that time I have coordinated, the "All Ohio Annual Institute On Intellectual Property," a two-city (typically Cincinnati and Cleveland), full-day continuing legal education seminar that features top-flight lawyers, judges, professors, and administrators from all over the country. The 2007 program was presented in Cleveland on September 18 and in Cincinnati on September 19, to a total of approximately 550 paid attendees; this was the 17th annual program.

1412020v.1

(b)     Through the years, I often have served in an expert witness capacity in civil cases involving a wide variety of issues relating to the selection, adoption, use, registration, maintenance, and infringement of trademarks and trade designations of all kinds.

(c)     My credentials are to some extent detailed in my resume, a copy of which is attached to this Report as **Exhibit 1**. To summarize: I graduated from law school over 35 years ago. After spending two years as a junior faculty member at the Indiana University School of Law (Bloomington, Indiana), I spent the next 15 years as a professor at the University of Kentucky College of Law (Lexington, Kentucky), where I taught at least one intellectual property law course almost every year. The basic course was called "Unfair Trade Practices," and it emphasized trademarks and related unfair competition. I also taught a Copyright and Patent Law seminar a few times.

(d)     In 1973, I started to publish in the area of trademarks and unfair competition, and, beginning in 1977, I have been called upon to address various continuing legal education groups (many of them involving intellectual property law specialists) on a wide variety of topics concerning trademarks and unfair competition. To date, I have given over 200 such lectures, many of which have been presented at programs of the nation's major trademark and/or patent law associations and over a dozen of which have been presented at the U.S. Patent and Trademark Office, to Trademark Trial and Appeal Board Administrative Trademark Judges and the Trademark Examining Attorneys comprising the entire "Trademark Examining Operation." A few years ago, I presented the Trademark and Unfair Competition developments lecture at the Annual Meeting of the American Intellectual Property Law Association, the largest organization of patent (and to a lesser extent, trademark and copyright) attorneys in the United States. In 2006, I lectured in San Antonio, Boston, Cincinnati/Cleveland, and Troy (Detroit-area). In 2007, I have lectured in Chicago, Dayton, Cincinnati/Cleveland, and San Francisco.

(e)     In 1986, I accepted an appointment as Visiting Professor of Law at the George Washington University National Law Center (Washington D.C.), a law school that is nationally renowned for its Intellectual Property program. I was invited to go there because of my reputation in the area of trademarks and unfair competition. After my year at George Washington, I became "Of Counsel" to a substantial Washington, D.C. intellectual property law

firm (then known as Banner, Birch, McKie & Beckett) for a year. From 1982 until 1986 I had served as part-time "Of Counsel" to a small intellectual property law firm in Lexington, Kentucky. Both in Lexington and in Washington, I engaged in trademark prosecution practice focusing on the U.S. Patent and Trademark Office ("PTO").

(f) Since 1988, I have served as a full-time practicing trademark/unfair competition lawyer, first at Frost & Jacobs LLP (which later became Frost Brown Todd LLC), and more recently at Thompson Hine LLP. My practice includes counseling regarding the selection, adoption, use, registration, and protection of domestic trademarks. I have searched/"cleared" and filed/prosecuted hundreds of trademarks during my career. My practice also includes consulting and litigation concerning all aspects of trademark and trade dress infringement and unfair competition. In some of these situations, I served as a member of a litigation team; in other situations, I served as a legal expert asked to consider various issues as part of my analysis of the particular case. This year I also conducted two full-day trademark topic mediations.

(g) In 2001, I was named a charter member of the Advisory Council to the newly-created "J. Thomas McCarthy Institute for Intellectual Property and Technology Law" of the University of San Francisco School of Law. In 2004, I was named to the then-new Ohio Super Lawyers list (Intellectual Property) and to the Chambers USA: America's Leading Lawyers for Business list (top rating). I have been re-named to these lists each successive year.

2. I have been called upon as a potential expert witness on trademark and unfair competition matters on dozens of occasions during the past few decades. I have testified in court on approximately 15 occasions, and I have been deposed as part of the discovery process in connection with many other cases. **Exhibit 2** to this Expert Report identifies all of my in-court and deposition appearances during the 2004-2007 time frame.

3. I have been retained to opine on certain aspects of trademark licensing in connection with the above-referenced case, by Patterson Belknap Webb & Tyler LLP. Compensation (payable to my law firm) was set at a usual level for work of this type ($650/hour); such compensation is not dependent in any way upon the outcome of the

controversy. Neither my law firm nor I have any other financial interest in the outcome of this case.

4. A list of the specific materials I have reviewed in connection with this Expert Report is attached hereto as **Exhibit 3**. With regard to trademark/unfair competition principles and practices, and trademark licensing specifically, I have conducted and supervised independent statutory, decisional, and secondary authority research, and drawn upon my own knowledge and experience, both academic and practical.

5. In connection with the current case, I have been asked to comment on the following questions:

(a) Whether the "Corporate Brand License Agreement" documents initially entered into by Defendant The American National Red Cross ["ANRC"] and, individually, Co-Defendants Magla Products, LLC ["Magla"], RC2 Brands, Inc. ["RC2"], First Aid Only, Inc. ["FOA"], and WaterJel Technologies, LLC ["WJ"], are typical trademark license agreements?

(b) Whether the "Corporate Brand License Agreement" documents initially entered into by ANRC and, individually, Magla, RC2, FAO, and WJ, created agency relationships[1] between ANRC, on the one hand, and Magla, RC2, FAO, and WJ, respectively, on the other hand.

(c) Whether the "Confirmatory [Number] Amendment to Corporate Brand License Agreement" documents entered into by ANRC and, individually, Magla, RC2, FAO, and WJ, after the commencement of this lawsuit, created agency relationships between ANRC, on the one hand, and Magla, RC2, FAO, and WJ, respectively, on the other hand.

6. Having applied my knowledge and expertise, and having carefully reviewed relevant documents, I have reached these conclusions:

---

[1] For purposes of this Expert Report, "agency" will be defined as it is by the common law.

  (a) Yes, the initial Corporate Brand License Agreement documents are typical trademark license agreements.

  (b) No, the initial Corporate Brand License Agreement documents did *not* create agency relationships between ANRC and its Licensees.

  (c) No, the Confirmatory [Number] Amendment to Corporate Brand License Agreement documents did *not* create agency relationships between ANRC and its Licensees.

7. (a) The license agreements ("Corporate Brand License Agreement" ["CBLA"] documents) that Defendant ANRC, as licensor, individually entered into with Co-Defendants Magla, RC2, FAO, and WJ, respectively, bear a great deal of resemblance to each other. Accordingly, I will focus on the earliest – Magla (7/14/05) – but later I will note significant differences between that document and the other three CBLAs as appropriate.

  (b) These obvious aspects of the Magla CBLA are noteworthy because they demonstrate that this document is an ordinary trademark license agreement:

    (i) The document is denominated as a "License Agreement"; there is *no* mention of "agency" or similar term/concept.

    (ii) The document never mentions "franchise" – typically a more complex, more closely-controlled "license."

    (iii) ANRC is expressly referred to as "Licensor."

    (iv) Magla is expressly referred to as "Licensee."

    (v) The focal point of the license is "the trade name, trademark and service mark set forth on Schedule A [AMERICAN RED CROSS & Greek cross design] . . . and incorporated herein ('Brand')."

>   (vi)    "Licensee ... desires to obtain from Licensor a license to use the Brand ...." "Licensor is willing to grant Licensee a nonexclusive license to use the Brand ...." This latter language basically is reiterated under "Article II Grant of License."

(c)    The CBLA's subdivisions ("Articles") and their contents address topics typically covered by trademark licenses (such as the simple "form" included in J. T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:64 (4th ed. 2007) ["*McCarthy*"]). There are definitions, including, e.g., "Channels of Distribution," "Product(s)," "Royalties," and "Territory." There is an express denial of "Agency" or similar term/concept. There is an Article on "Approvals"; this, of course, relates to the unnamed, but legally required and thus expected, concept of "quality control," which is mandatory for trademark licenses. In the Article on Representations and Warranties, there is a provision obligating the Licensee to comply with all applicable laws pertaining to manufacture, packaging, pricing, sale and distribution of the licensed products.[2] Also, the relevant Articles do not give ANRC any unexpected aspects of "control" to be exercised over its Co-Defendant licensees.

(d)    There also is a lengthy article on "Ownership Infringement and Disclaimer of Warranties." It contains the typical, critical clause, "Licensee agrees and acknowledges that Licensee's use of the Brand shall inure to Licensor's benefit. It also includes the important provision "Licensee recognizes the value of the good will associated with the Brand and acknowledges that the Brand and the good will pertaining thereto, belong exclusively to Licensor." This provision is one of the hallmarks of the licensor/licensee relationship.

(e)    Section 13.4, entitled "Independent Contractor," unequivocally states what relationships the CBLA does *not* create: "This Agreement does *not* provide for a joint venture,

---

[2] According to both common law and the Lanham Act, trademark licensors are duty-bound (on pain of loss of validity of their marks) to prescribe and, more importantly, supervise standards for products bearing licensed marks; this protects consumers from deception and disappointment regarding the nature and quality of licensed products. Properly controlled use of trademarks avoids "naked licenses" threatening abandonment and resulting loss of the licensors' trademarks. See *McCarthy* §§ 18:42, 18:50, 18:53, 18:55-61. See also Lanham Act §§ 5, 45, 15 U.S.C. §§ 1055, 1127. Notably, these authorities do *not* treat this subject in terms of "agency."

partnership, *agency*, franchise, dealership, distributorship or employment relationship between the parties or any other relationship other than licensor and licensee." (emphasis added). This is a typical provision, designed to limit liability of a licensor for unlawful conduct of its licensees.

(f) Review of the Article about "Indemnification and Insurance" makes it clear that ANRC knew how to invoke terms such as "agents." Art. XI. Specifically, "Licensee agrees to provide, defend, indemnify and hold harmless Licensor, its . . . employees . . . and agents . . . from and against all liabilities . . . ." § 11.1, which contains two more mentions of "agents." This signals a "belt and suspenders" mindset on the part of ANRC: If, contrary to the liability-avoiding expectation created by § 13.4 – which expressly categorizes ANRC as an "Independent Contractor" *not* involved in an "agency" or "any other relationship other than licensor and licensee" – a court were to deem ANRC liable for unlawful conduct of its licensee, Article XI would come to ANRC's rescue.

(g) It also is very telling that the CBLA does *not* mention any of these terms/concepts which are typical of agency relationships: fiduciary responsibilities owed to the licensor by the licensee; powers of the licensee to commit/bind the licensor to contracts; control over ordinary operations going beyond the amount/degree of control needed to insure consistency of the quality of licensed products.[3]

8. (a) Everything in ¶ 7 of this Expert Report unequivocally indicates that the Magla CBLA did not contemplate or even allow for an agency relationship between ANRC and Magla.

(b) The same thing is true for the CBLAs of RC2, FAO, and WJ, which CBLAs do not differ from Magla's CBLA in significant ways that affect the issue of agency vel non. For example, the various CBLAs contain somewhat different language in their respective § 6.1 and § 6.3, but these differences amount to customized adjustments *not* affecting agency issues.

---

[3] Indeed, § 10.1.5 expressly reserves to Licensee responsibility "for the manufacture, production, sale and distribution of Product(s) . . . ." Similarly, § 1.5 reserves to Licensee the "ability to set Product(s) prices at Licensee's discretion."

9. (a) On September 26, 2007 – well after the current lawsuit was commenced – ANRC and Magla entered into a "Confirmatory Second Amendment to Corporate Brand License Agreement." ["Confirmatory Agr."]. This document purports to amend the Magla CBLA "nunc pro tunc as of [its] . . . Effective Date," i.e., 7/14/05, because "the parties wish to confirm their understanding of the [CBLA] and make clear the relationship between Red Cross and Licensee . . . ." P. 1, ¶ 2. The pivotal provision is substituted § 13.4, which in its entirety reads:

> 13.4 <u>Independent Contractor</u>. This Agreement does not provide for a joint venture, partnership, franchise, dealership, distributorship or employment relationship between the parties or any other relationship other than licensor and licensee. Notwithstanding the foregoing, the parties agree that Licensee is a "duly authorized agent" of Red Cross within the meaning of 18 U.S.C. § 706 and that Licensee is assisting Red Cross in carrying out its purposes pursuant to 36 U.S.C. § 300101 <u>et seq</u>. under this Agreement by distributing the Products as described herein.

*Id.* at 2. Notably, however, no new terms regarding ANRC's right to "control" Magla's conduct relating to the licensed products were added. Moreover, this provision is internally at odds with itself because it states that there is no "other relationship other than licensor and licensee" yet at the same time it states that the licensee is an "agent" of ANRC. Depositions of ANRC's licensees confirm that the relationships between ANRC, on the one hand, and its licensees, on the other hand, are mere licensor/licensee relationships, *not* principal/agent relationships.

(b) When a representative of Magla was deposed, she testified about original and "new" § 13.4. See Deposition of A. Carpinello (11/9/07). In the negotiation of Magla's CBLA, there was no discussion of "agents" or "agency," including their appearance in § 13.4. *Id.* at 115, line 11 – 116, line 12. When asked about possible effects of "new" § 13.4 (per the "Confirmatory" amendment), she answered, "The relationship hasn't changed." *Id.* at 128, line 25 – 129, line 9. When further asked specifically about any possible changes affecting "business decisions . . . approaches to retailers . . . relationships with . . . vendors . . ." she said that no changes had occurred. *Id.* at 129, lines 10-19. Similarly, she answered in the negative about changes regarding "quality control procedures," and/or "compliance with the branding standards." *Id.* at 129, line 20 – 130, line 4. She confirmed all of this by testifying that the

relationship between ANRC and Magla had *not* changed as a result of the "new" § 13.4. *Id.* at 132, lines 15-23.

      (c)    When a representative of Water-Jel was deposed, he testified about original and "new" § 13.4. See Deposition of H. Hirsch (11/8/07). For example, he referred to new § 13.4's language as "legalese that I just assume counsel will take care of." *Id.* at 126, lines 23-24. And he said that he was not involved in any pre-signing (of the relevant "Confirmatory" amendment) "discussion regarding agency in general." *Id.* at 127, lines 9-12. He noted that the Confirmatory amendment of § 13.4 was proposed by ANRC's attorneys. *Id.* at 130, lines 9-17. And he did not have "a business understanding of why 13.4 was deleted from the contract." *Id.* at 131, lines 20-23. Most significantly, when asked "After amendment 2 ["Confirmatory"] was signed was [*sic*: were] there any changes in Water-Jel and Red Cross' business relationship?" he answered, "No." *Id.* at 134, lines 14-17.

      (d)    In my carefully considered opinion, deletion of "agency" from original § 13.4, plus the addition of the second sentence expressly declaring that "the parties agree that Licensee is a 'duly authorized agent' of Red Cross within the meaning of 18 U.S.C. § 706," cannot be dispositive: substance must prevail over form, and a purportedly countermanding document *not* calling for extensive control by a licensor over the conduct of its licensees, *not* empowering a licensee to act on behalf of its licensor, and *not* creating fiduciary obligations owed by a licensee to its licensor will not be deemed to create an agency relationship.[4]

      \* \* \* \* \* \* \* \* \*

This Expert Report (including the Expert Appendix) is premised on the information and legal authorities that I reviewed as of today's date. Thus, I hereby reserve the right to supplement

---

[4] The same can be said in regard to FAO's Confirmatory Second Amendment to Corporate Brand License Agreement, which, while including the same new § 13.4 as the other Co-Defendants' "Confirmatory" documents, also includes more amended sections one of which is § 6.1 containing the phrase "is made on behalf of Licensor."

1412020v.1

this Expert Report, as appropriate, to account for additional information and/or legal authorities. Also, although I have not referred to all of the items listed in **Exhibit 3** in this Expert Report, the unreferenced items may have informed my understanding of the facts and issues, and they may have affected the opinions expressed herein.

_____
Kenneth B. Germain (November 15, 2007)