Jonathan L. Abram
Raymond A. Kurz
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C.  20004
Tel:  (202) 637-5681
Fax:  (202) 637-5910

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE AMERICAN RED CROSS, LEARNING CURVE INTERNATIONAL, INC., MAGLA PRODUCTS, LLC, WATER-JEL TECHNOLOGIES, INC., and FIRST AID ONLY, INC., <br><br> Defendants. | 07 Civ. 7061 (JSR/DCF) <br><br> **ECF CASE** <br> **ELECTRONICALLY FILED** |

**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ........................................................... 1

COUNTERSTATEMENT OF FACTS ................................................ 4

ARGUMENT ........................................................................................ 4

POINT I.    J&J IS MISTAKEN ABOUT THE AUTHORITY GRANTED TO
THE AMERICAN RED CROSS IN ITS CHARTER AND
THROUGH ITS INTERNATIONAL AFFILIATIONS .............................. 4

    A.    ARC's Federal Charter And 18 U.S.C. § 706 ............................... 5

        1.    Statutory Protections And Prohibitions On Use Of The
Emblem ............................................................................. 5

        2.    J&J Lacks Standing To Argue That ARC's Conduct
Exceeds The Scope Of Its Federal Charter ........................ 9

        3.    ARC's Charter Authorizes It To Sell Products And
Services, And It Has Been Doing So For Over A Century ............... 9

        4.    ARC's Sales Of Red Cross Products Are Not Illegal Under
§ 706 ............................................................................. 11

    B.    Geneva Conventions And The ICRC Regulations ........................ 20

        1.    The Geneva Conventions All Preserve The Emblem To The
National Red Cross Societies, And Bar Its Use By Any
Private Entity Without Exception ...................................... 20

        2.    The Geneva Conventions Are Not Self-Executing And Are
Not Enforceable By J&J .................................................... 20

        3.    ARC Is Not Violating The Geneva Conventions In Any
Event, And Is Acting Within The Authority Granted To It
By The U.S. Congress ........................................................ 25

        4.    J&J Also Cannot Rely On The 1991 ICRC Regulations .................. 27

i

**TABLE OF CONTENTS—Continued**

Page

POINT II.    THE AMERICAN RED CROSS HAS ACTED WITHIN ITS
RIGHTS IN AUTHORIZING THE OTHER DEFENDANTS—AND
MANY OTHER COMPANIES OVER THE LAST 100 YEARS—TO
MANUFACTURE AND SELL PRODUCTS BEARING THE
AMERICAN RED CROSS NAME AND EMBLEM ................................... 31

POINT III.   J&J'S SUMMARY JUDGMENT MOTION REGARDING ARC'S
COUNTERCLAIMS MUST FAIL BECAUSE THE UNDISPUTED
FACTS SHOW THAT J&J HAS EXCEEDED ITS GRAND-
FATHERED RIGHTS UNDER § 706 ......................................................... 34

        A.   J&J Has Varied The Form Of The Symbol From That In Use Before
        1905.................................................................................................... 34

        B.   J&J Is Using The Red Cross On Products It Did Not Sell In 1905. .............. 38

POINT IV.    THE DEFENDANTS HAVE STANDING TO SEEK
CANCELLATION............................................................................................ 39

CONCLUSION.................................................................................................................... 40

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

**CASES**:

Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd., 977 F. Supp. 264, 267
(S.D.N.Y. 1997) ................................................................................. 39

Ala. Power Co. v. Ickes, 302 U.S. 464, 482-483 (1938) ................................ 9

Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 420 (2003) ............................. 24

Automation By Design, Inc. v. Raybestos Prods. Co., 463 F.3d 749, 757
(7th Cir. 2006)................................................................................13, 16

Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 427 (1964)................... 24

Berry v. Housing & Home Fin. Agency, 340 F.2d 939, 940 (2d Cir. 1965) ........ 9

Botiller v. Dominguez, 130 U.S. 238, 247 (1889)................................... 23

Butler v. Maples, 76 U.S. 766, 774 (1869) ............................................. 15

Chinese Exclusion Cases, 130 U.S. 581, 603 (1889) ............................... 23

Citigroup Inc. v. City Holding Co., 2003 WL 282202, at *15
(S.D.N.Y. Feb. 10, 2003) ................................................................. 40

Cohn & Berk v. Rothman-Goodman Mgmt. Corp., 125 A.D.2d 435, 436
(N.Y. App. Div. 1986) ..................................................................... 20

Connally v. Gen. Constr. Co., 269 U.S. 385, 391-392 (1926)....................... 14

Consejo de Desarrollo Economico de Mexicali v. United States,
417 F. Supp. 2d 1176, 1184 (D. Nev. 2006) ..................................... 23

Corrie v. Caterpillar, Inc., 403 F. Supp. 2d 1019, 1025 (W.D. Wash. 2005),
aff'd, 503 F.3d 974 (9th Cir. 2007).................................................. 21

Cotz v. Mastroeni, 476 F. Supp. 2d 332, 373 n.44 (S.D.N.Y. 2007)..................29-30

Dickson v. United States, 831 F. Supp. 893, 898 n.7 (D.D.C. 1993) ................ 29

EEOC v. Watergate at Landmark Condominium, 24 F.3d 635, 639
(4th Cir. 1994)............................................................................... 15

El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 160 (1999) ......... 23

## TABLE OF AUTHORITIES—Continued

**Page**

Enron Power Mktg., Inc. v. Luzenac Am., Inc., 2006 WL 2548453,
    at *12 (S.D.N.Y. Aug. 31, 2006) ...................................................... 14

FDIC v. Schaffer, 731 F.2d 1134, 1137 & n.5 (4th Cir. 1984)............................. 13

Flanagan v. United States, 430 F. Supp. 2d 106, 115 (W.D.N.Y. 2006)............................. 9

Flintridge Station Assocs. v. Am. Fletcher Mortgage Co.,
    761 F.2d 434, 439 (7th Cir. 1985) ................................................... 15

Flores v. S. Peru Copper Corp., 414 F.3d 233, 257 n.34 (2d Cir. 2003) .............................. 21

Fund for Animals, Inc. v. Kempthorne, 472 F.3d 872, 873 (D.C. Cir. 2006) ...................... 22

Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)........................................ 14

Hartzell Fan, Inc. v. Waco, Inc., 505 S.E.2d 196, 199-200 (Va. 1998)................................. 16

Hawaii-Pacific Apparel Group, Inc. v. Cleveland Browns Football Co.,
    418 F. Supp. 2d 501, 507-508 (S.D.N.Y. 2006) ................................... 33

Hines v. Davidowitz, 312 U.S. 52, 63 (1941)........................................................24, 25

Humane Soc'y of the United States v. Glickman, 217 F.3d 882, 887
    (D.C. Cir. 2000) ....................................................................... 21

In re Assicurazioni Generali S.p.a. Holocaust Ins. Litig., 340 F. Supp. 2d 494, 502
    (S.D.N.Y. 2004) ........................................................................ 24

In re Sicari, 187 B.R. 861, 871 (Bankr. S.D.N.Y. 1994) ..................................... 14

Iwanowa v. Ford Motor Co., 67 F. Supp. 2d 424, 439 n.16 (D.N.J. 1999) .......................... 21

Jones v. United States, 526 U.S. 227, 239 (1999) ................................................. 14

Kelberine v. Societe Internationale, Etc., 363 F.2d 989, 993
    (D.C. Cir. 1966) ....................................................................... 13

Kuenstler v. Occidental Life Ins. Co., 292 F. Supp. 532, 534-535
    (C.D. Cal. 1968)........................................................................ 13

Loctite Corp. v. Nat'l Starch & Chem. Corp., 516 F. Supp. 190, 212 n.30
    (S.D.N.Y. 1981)........................................................................ 39

Mears v. Montgomery, 2004 WL 964093, at * 14 (S.D.N.Y. May 5, 2004)........................ 40

# TABLE OF AUTHORITIES—Continued

**Page**

New Orleans, M. & T.R. Co. v. Ellerman, 105 U.S. 166, 173-174 (1881) ........................... 9

O-M Bread, Inc. v. U.S. Olympic Committee, 65 F.3d 933, 936-938
(Fed. Cir. 1995) ...................................................................................... 35, 36, 38

Overton v. United States, 2000 WL 14274, at *4 (10th Cir. Jan. 7, 2000) ........................... 30

P. T. Perusahaan Pelayaran Samudera Trikora Lloyd v. Salzachtal,
373 F. Supp. 267, 277 (E.D.N.Y. 1974) .......................................................... 15

Pro-Cuts v. Schilz-Price Enters. Inc., 27 U.S.P.Q.2d 1224 (T.T.A.B. 1993) ....................... 36

Rogers v. Tennessee, 532 U.S. 451, 457 (2001) ....................................................................... 14

Rose v. Long Island R.R. Pension Plan, 828 F.2d 910, 918 (2d Cir. 1987) ......................... 10

Shanklin v. Allis-Chalmers Mfg. Co., 254 F. Supp. 223, 226
(S.D. W. Va. 1966), aff'd, 383 F.2d 819 (4th Cir. 1967) ............................... 15, 16

Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 614 (1989) ............................ 13

Starter Corp. v. Converse, Inc., 84 F.3d 592, 596 (2d Cir. 1996) ......................................... 39-40

Stutts v. De Dietrich Group, 2006 WL 1867060, at *7 (E.D.N.Y. June 30, 2006) .............. 20-21

Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 809 (D.C. Cir. 1984) .............................. 21

Tenn. Elec. Power Co. v. Tenn. Valley Auth., 306 U.S. 118, 139 (1939) ........................... 9

Trs. of Twin City Bricklayers Fringe Benefit Funds v. Superior
Waterproofing, Inc., 450 F.3d 324, 334 (8th Cir. 2006) .................................. 9

United States v. De La Pava, 268 F.3d 157, 164 (2d Cir. 2001) ......................................... 21

United States v. Fort, 921 F. Supp. 523, 526 (N.D. Ill. 1996) .............................................. 21

United States v. Pinelli, 890 F.2d 1461, 1471 (10th Cir. 1989) ........................................... 12

United States v. Rommy, 2007 WL 3243813, at *18 (2d Cir. Nov. 5, 2007) ....................... 21, 22

United States v. Vitillo, 490 F.3d 314, 323 (3d Cir. 2007) .................................................. 12, 17

Van Dyne-Crotty, Inc. v. Wear-Guard Corp., 926 F.2d 1156 (Fed. Cir. 1991) .................... 36

Zschernig v. Miller, 389 U.S. 429, 432 (1968) ..................................................................... 24

v

**TABLE OF AUTHORITIES—Continued**

**Page**

**STATUTES:**

18 U.S.C. § 666(d) ..........................................................................    12

18 U.S.C. § 666(d)(1) ......................................................................    13

18 U.S.C. § 705 ...............................................................................    8

18 U.S.C. § 706................................................................................passim

36 U.S.C. §§ 300101-300113 ...........................................................    9

36 U.S.C. § 300102(4) ......................................................................    9

36 U.S.C. § 300102(5) ....................................................................    8, 9

36 U.S.C. § 300105(a)(6)...............................................................    8, 10, 11

**TREATIES**:

1949 Geneva Convention Commentary to art. 44, nn. re ¶ 2 § 4 ..........................................25, 27

Geneva Convention for the Amelioration of the Conditions of the
    Wounded and Sick in the Armed Forces in the Field, Aug. 12, 1949,
    art. 44, 6 U.S.T. 3114......................................................................    22

Geneva Convention for the Amelioration of the Conditions of the
    Wounded of the Armies in the Field, July 6, 1906, art. 27, 35 Stat. 1885......................22, 26

**LEGISLATIVE MATERIALS**:

An Act to Incorporate the American National Red Cross, 31 Stat. 277 (1900) ...................    5

An Act to Incorporate the American National Red Cross, 33 Stat. 599 (1905) ..................    6

An Act to Amend an Act Entitled "An Act to Incorporate the American National
    Red Cross," 36 Stat. 604 (1910) ....................................................... 6-7, 8

H.R. Rep. No. 61-1256, 61st Cong., 2d Sess. (May 3, 1910)..............................    7

Protection of the Name and Emblem of the [ARC]:  Hearings on
    H.R. 6911 Before the H. Comm. on Foreign Affairs,
    77th Cong. ("1942 House Hearings") 233, 257-258, 262 (1942).........................1, 10

## TABLE OF AUTHORITIES—Continued

**Page**

Red Cross:  Hearings on S. 2411 and H.R. 7420 Before the Subcomm. of the S.
    Comm. on the Judiciary, 77th Cong. ("1942 Senate Hearings") 29 (1942) ...................    7

**OTHER AUTHORITIES**:

American Heritage Dictionary (4th ed. 2004) ........................................................    12

Black's Law Dictionary 68 (8th ed. 2004)............................................................12, 13

3 Thomas J. McCarthy, McCarthy on Trademarks & Unfair Competition
    § 17:26 (4th ed. 2007)............................................................................36, 37

3 Thomas J. McCarthy, McCarthy on Trademarks & Unfair Competition
    §§ 18:48, 18:52 (4th ed. 2007)......................................................    33

N.Y. Jur. Equity § 13 (2d ed. 2007).................................................    20

Restatement (First) of Agency (1933) ..............................................14, 15

Restatement (Third) of Agency (2006)............................................11, 14

Restatement (Third) of Foreign Relations Law of the United States (1987)........21, 22

Statutes of the International Red Cross and Red Crescent Movement, art. 1 (2006) ...........    28

## PRELIMINARY STATEMENT

J&J has now proffered yet another new theory in its effort to find a basis to stop the American Red Cross ("ARC") from using the Red Cross Emblem in selling goods and services to the American public.  Now J&J claims that international law forbids it.  Interestingly, none of the international treaties on which J&J now relies came in for even passing mention in J&J's Complaint or Amended Complaint or at the hearing on the motion to dismiss.  Like its original promissory estoppel claim and its theory that the ARC Charter prevents ARC from selling products to the American public, this new theory is flatly wrong.

Before addressing why, though, we note that the parties have found common ground in one important respect.  The Emblem has always conveyed a clear message in times of war, a message respected by armies around the world who steer clear of attacking field hospitals and other facilities bearing the Red Cross.  This message is important, and we agree with J&J that all who have the right to use the Red Cross must assure that it is not used in ways that diminish its message of first aid and emergency care in wartime.  J&J learned that lesson the hard way.  As the Court is aware, just after Pearl Harbor, President Roosevelt proposed to ban all grandfathered uses of the Emblem to protect its critical wartime message.  In the course of lobbying to protect its grandfathered use of the Red Cross, J&J was embarrassed by the fact that it had painted a giant Red Cross on the smokestack of one of its industrial plants—just exactly the kind of use that blurs the Emblem's wartime message.  1942 House Hearings at 233 (J&J App. 53, Part 10).  ARC and the other defendants are committed to assuring that such uses not occur.  For the record, we believe J&J now is as well.

Having said that, J&J's effort to stop the Red Cross from using the Red Cross Emblem remains utterly without merit.  Its analysis of ARC's Charter and of § 706 continues to miss the

boat entirely.  As we showed in our opening Memorandum in support of summary judgment, the

Charter undeniably empowers ARC to sell products to the public, and § 706 criminalizes only

those who use the Emblem without ARC's authorization.  J&J's argument also ignores ARC's

longstanding practice—begun more than 100 years ago—of partnering with manufacturing and

publishing partners to market a wide array of ARC-branded products that promote ARC's

important safety and preparedness mission—sales that Congress, the Department of Justice, and

the IRS have been fully aware of and about which they have raised no question.  J&J's argument

would also lead to absurd and disastrous results.  The various products that ARC has sold

throughout its long history—from first aid kits to blood products—have helped fund the vital

humanitarian work that ARC does.

Likewise, J&J's newly minted appeal to international law is fundamentally flawed on a

host of levels.  <u>First</u>, of course, it is up to Congress, not J&J, to implement the requirements of

the Geneva Convention within the United States.  Congress has done just that, and in doing so

has repeatedly made clear that certain commercial uses of the Emblem are permitted in this

country.  Over 100 years ago, Congress expressly protected the ARC's right to use the Emblem

in trade and commerce, even as it prohibited almost everyone else from doing so.  The Geneva

Conventions are not self-executing.  They are implemented here in the United States only by acts

of Congress, and the law is crystal clear that in such circumstances private entities like J&J have

no standing or right of action to enforce treaty obligations—either directly under the treaty or

indirectly through state tort law.  Instead, parties within the United States are bound by the

actions of Congress.  Congress has acted.

<u>Second</u>, J&J's argument is directly contrary to its own position on the matter, a position

J&J has taken repeatedly in defense of its grandfathered use of the Red Cross symbol.  In 1910

and in 1942, J&J staunchly defended its use of the symbol against the argument that commercial uses of the Red Cross conflicted with the United States' obligations under the Geneva Conventions. If Congress violated the Geneva Conventions by allowing ARC to use the Emblem in selling goods and services, so too did it violate the treaty by allowing J&J to do the very same thing. To be sure, ARC has argued in the past that grandfathered uses of the Red Cross should be banned, and the defendants are agnostic on that point in this litigation. But there is no question that as the law now stands, Congress has explicitly recognized the right of the ARC and grandfathered users to use the Red Cross in selling goods and services.

Third, J&J cites the guidelines of the International Committee of the Red Cross ("ICRC"), but it misses the mark here as well, for several reasons. J&J has no standing to enforce the ICRC guidelines. In addition, the guidelines do not have the force of United States law, which from the beginning of ARC's existence have explicitly protected the ARC's right to use the Emblem in the sale of goods and services like first aid and preparedness kits and blood services and products. But putting aside the fatal jurisdictional flaws, J&J is also wrong on the merits. The ICRC guidelines do not forbid use of the Emblem in the sale of first aid and preparedness items any more than they prohibit use of the Emblem in the sale of blood services and products.

As to the Counterclaims, J&J is asking to be allowed to use the Emblem in virtually any new way it likes, as long as the use is vaguely related to J&J's pre-1905 use of the symbol. But that is not how grandfathered rights work. As the case law establishes, grandfathered rights like J&J's are strictly construed, because by definition they allow one to do what would be a crime if done by others. J&J's grandfathered use remains today, but it remains exactly as J&J was using the symbol in 1905.

At bottom, J&J's summary judgment motion reads as though J&J has appointed itself the ARC Mission Police, responsible for monitoring ARC's adherence to the organization's "core values" and "humanitarian mission." See, e.g., J&J Memorandum in Support of Motion for Summary Judgment ("J&J Mem.") 1, 4-5, 7, 8, 11, 13. With all due respect to J&J, it is not up to J&J to police, define, implement, or ensure funding for ARC to further the organization's core values and mission. It is up to the American Red Cross, under the supervision of Congress. The ARC has been doing just that for over a century. See Defendants' Rule 56.1 Statement of Facts in Support of Their Motion for Summary Judgment ("Defs' SJ SOF") ¶¶ 36-137. J&J has offered nothing to support its unfounded effort to use private litigation to second-guess those decisions. Therefore, J&J's Motion for Summary Judgment should be denied.

## COUNTERSTATEMENT OF FACTS

A complete response to J&J's statement of undisputed facts material to this motion is set forth in Defendants' Response to Plaintiffs' Rule 56.1 Statement of Undisputed Facts and Defendants' Counter-Statement of Material Facts ("Responsive SOF").

## ARGUMENT

**POINT I.     J&J IS MISTAKEN ABOUT THE AUTHORITY GRANTED TO THE AMERICAN RED CROSS IN ITS CHARTER AND THROUGH ITS INTERNATIONAL AFFILIATIONS.**

J&J dramatically asserts that "[t]he illegality of ARC's actions permeates the causes of action in this litigation." J&J Mem. 2. It is surely true that in order to sustain its various claims, J&J must prove that it is unlawful for ARC to sell ARC products and services and to authorize others to use the Emblem in doing so. As a matter of law, neither ARC's sales of products nor its license agreements with the other defendants violate any of the "governing" law that J&J cites—much of which, as detailed below, is actually not governing law or does not provide any enforceable rights to a private-party competitor like J&J. Nor is J&J correct to call the conduct

at issue "unprecedented" (J&J Mem. 1), given ARC's extensive history of selling products to the public, which we chronicled in great detail in our motion for summary judgment and 56.1 statement.

**A.    ARC's Federal Charter And 18 U.S.C. § 706**

       **1.    Statutory Protections And Prohibitions On Use Of The Emblem.**

J&J opens its argument with an exercise in revisionist history. Purporting to canvass the history of ARC's charter, J&J offers an incomplete and inaccurate study. Because this history is so fatal to J&J's claims, we provide the full story below.

**1900 Charter.** When Congress chartered the American National Red Cross in 1900, it gave ARC the right to use the Red Cross Emblem in carrying out ARC's purposes. Congress spelled out six broad purposes for the organization: the first and second were to provide volunteer aid in time of war and to perform the duties of a national society, in accord with the Geneva Convention; the third was to succeed to all the rights and property which were held at that time by the American National Red Cross; and the fourth was to communicate between citizens and the army. 31 Stat. at 279 (J&J App. 1).

The critical fifth and sixth purposes were to "continue and carry on a system of national and international relief in time of peace and apply the same in mitigating the sufferings caused by pestilence, famine, fire, floods, and other great national calamities" and "to devise and carry on measures for preventing the same, and generally to promote measures of humanity and welfare of mankind." Id. Selling first aid, emergency preparedness, and other health products is clearly within these purposes.

The 1900 Charter also made it illegal for anyone to wear or display the Red Cross "for the fraudulent purpose of inducing the belief that he is a member of or an agent for the American National Red Cross." Id. J&J is just wrong in claiming that the 1900 Charter precluded ARC

from engaging in "commercial" activity to further its purposes in advancing a system of national relief, mitigating suffering, and devising measures to do the same.  It said no such thing.

**1905 Charter.**  The 1905 Charter likewise gave ARC the right "generally to do all such acts and things . . . as may be necessary to carry into effect the provisions of this Act and promote the purposes of [ARC]."  33 Stat. at 600 (J&J App. 2).  It contained the same list of purposes.  Id.  Thus, like the 1900 Charter, the 1905 version contains no limitation on ARC engaging in commercial activity to further its purposes in advancing a system of national relief, mitigating suffering, and devising measures to do the same.

In fact, the 1905 Charter actually authorized just that.  As has been quoted a few times before in this case, the 1905 Charter made it unlawful for "any person or corporation, other than the Red Cross of America, not now lawfully entitled to use the sign of the Red Cross, hereafter to use such sign or any insignia colored in imitation thereof for the purposes of trade or as an advertisement to induce the sale of any article whatsoever."  33 Stat. at 601 (emphases added). Thus, as long ago as 1905, Congress expressly permitted ARC to use the Emblem for the purposes of advertising or selling products to the public.  Congress was aware that ARC was doing just that when it adopted the 1905 Charter, for ARC had submitted annual reports to Congress for the preceding two years documenting its sales of first aid kits and royalties from such sales.  Defs' SJ SOF ¶¶ 37-38.

**1910 Amendments.**  The provision protecting the Red Cross Emblem against misuse was amended in 1910, after the 1906 Geneva Convention.  As amended, the provision still made it unlawful for any person other than the American National Red Cross, its employees and agents, and the military medical services to use the Emblem for the "purpose of trade or as an advertisement to induce the sale of any article whatsoever or for any business or charitable

purpose." 36 Stat. at 604 (J&J App. 3).[1]  The amended statute then carved out an exception for

grandfathered uses of the Red Cross—those that existed before 1905—permitting them to

continue "for the same purpose and for the same class of goods."  Id.  Indeed, this was J&J's

handiwork.  The original bill would have eliminated the grandfather exception and flatly banned

use of the Emblem by non-ARC entities.  The exception was only added to the bill because "a

very large company manufacturing surgical dressings and surgical goods in New Jersey"

opposed the bill unless it excepted grandfathered uses.  See H.R. 14430, 65th Cong. 3d Sess., at

373 (Statement of Colonel Joseph M. Hartfield) (J&J App. 53, part 16).[2]

    The very House Report that J&J cites (J&J Mem. 16) gives some insight into how the

restrictions in the 1910 amendment changed use of the Emblem:  Under the 1905 Charter, the

Emblem could lawfully be used "by the following persons and corporations and for the following

purposes":

(1)  By the Red Cross of America.
(2)  By persons or corporations lawfully entitled to the use of the emblem prior to
     [1905].
(3)  By any person or corporation, for any purposes except for the purposes of
     trade or as an advertisement to induce the sale of any article.

H.R. Rep. No. 61-1256, 61st Cong., 2d Sess., at 346 (May 3, 1910) (J&J App. 53, part 15).  After

the amendment, the Emblem could lawfully be used:

(1)  By the American National Red Cross and its duly authorized employees and agents.
(2)  By the army and navy sanitary and hospital authorities of the United States.

---

[1]    Indeed, even J&J has in the past read the 1910 Charter to authorize ARC's use of the
Emblem in commerce.   1942 Senate Hearing 29 (J&J's testimony acknowledging that ARC's
1910 Charter language "would appear to permit commercial use by the [ARC] of the Red Cross
symbol in commerce") (J&J App. 54, Part 2).

[2]    J&J wrongly asserts that Colonel Hartfield was talking about the 1905 Charter.  See J&J
Mem. 13-14.  Colonel Hartfield addressed the amended grandfather provision in the 1910
Charter, and specifically why Congress had carved out an exception for certain grandfathered
users despite the provisions of the 1906 Geneva Convention.

(3)   By such persons, corporations, and associations as actually used the emblem prior to January 5, 1905, for the purposes for which they were so entitled to use it and for the same class of goods.

Id. at 347.  There is no indication that Congress thought it was placing any limits on ARC's use of the Emblem for any purpose.

In 1948, the U.S. criminal law was codified in the now familiar Title 18, and the provisions imposing criminal penalties for unlawful use of the Emblem were moved there. Under § 706, only ARC, its duly authorized employees and agents, and certain military hospital authorities may use the Red Cross Emblem in any way and for any purpose, except for grandfathered users who were lawfully using the mark in June 1948 (i.e., individuals who had used the Emblem for a lawful purpose prior to 1905 who continued to use it "for the same purpose and for the same class of goods").  36 Stat. at 604.[3]

ARC's current charter—which J&J's brief conveniently flits right over—includes all of the same purposes listed since ARC's 1900 Charter, as well as the open-ended purpose to "conduct other activities consistent with" the other specified purposes.  36 U.S.C. § 300102(5). And its currently enumerated powers include the power to do any "act necessary to carry out this chapter and promote the purposes of the corporation."  Id. § 300105(a)(6).  J&J omits these important statutory powers and purposes from its brief.

Thus, from 1900 to today, Congress has never adopted any provision of law that would bar the ARC from engaging in its longstanding practice of selling goods and services to the American public.

---

[3]      J&J twice claims that the recodification involved changes in " 'phraseology' "—both as to the meaning of the term "use" (J&J Mem. 18) and the scope of grandfathered rights (id. at 36). J&J is in fact quoting the Legislative History reviser's note for 18 U.S.C. § 705, not § 706.  In fact, the 1948 prohibition is broader because it bars all uses, not just the uses for business or charitable purposes that were barred by the 1910 Charter.

**2.      J&J Lacks Standing To Argue That ARC's Conduct Exceeds The Scope Of Its Federal Charter.**

Even if there were some question about the scope of ARC's charter powers, J&J has no standing to raise it.  The law has long been settled that a competitor cannot challenge the activities of another on the ground that they exceed the other's corporate charter.  See New Orleans, M. & T.R. Co. v. Ellerman, 105 U.S. 166, 173-174 (1881) (competitor has no remediable injury in preventing competition, regardless of whether competition is allegedly ultra vires); accord Tenn. Elec. Power Co. v. Tenn. Valley Auth., 306 U.S. 118, 139 (1939); Ala. Power Co. v. Ickes, 302 U.S. 464, 482-483 (1938); Berry v. Housing & Home Fin. Agency, 340 F.2d 939, 940 (2d Cir. 1965); see also 36 U.S.C. §§ 300101-300113 (ARC Charter contains no private right of action).  Nor does J&J offer any authority for using state tort law to circumvent its lack of standing under federal law to make a claim based on ARC's charter powers.[4]

**3.      ARC's Charter Authorizes It To Sell Products And Services, And It Has Been Doing So For Over A Century.**

As we have already shown at length,[5] the ARC Charter imbues the organization with a mission of national relief in times of peace and with devising and carrying out measures for preventing calamities, as well as with conducting other activities consistent with promoting national relief and preventing injury or harm to the American people.  36 U.S.C. § 300102(4), (5).  And its current charter broadly empowers it to do any "act necessary to carry out this chapter and

---

[4]      Cf. Trs. of Twin City Bricklayers Fringe Benefit Funds v. Superior Waterproofing, Inc., 450 F.3d 324, 334 (8th Cir. 2006) ("If state tort law could be used to determine the meaning and effect of [collective bargaining agreements] to evade compliance with their terms under federal law, the uniform system envisioned by Congress for their interpretation and enforcement would be disrupted."); Flanagan v. United States, 430 F. Supp. 2d 106, 115 (W.D.N.Y. 2006) ("A plaintiff may not circumvent the [Federal Tort Claims Act] by artfully pleading a claim as one for negligence when it is in reality a claim to which the United States remains immune, such as a strict liability claim.").

[5]      See Defs' Summ. J. Mem. 10-21.

promote the purposes of the corporation." Id. § 300105(a)(6).  Activities like selling first aid or emergency-preparedness kits to the American public are unquestionably consistent with and authorized by ARC's mission, purposes, and powers.

Even if there were any ambiguity with such an expansive open-ended grant of power, it would be resolved in favor of the ARC.  That is because, as J&J itself acknowledges, ARC's "interpretation of its own powers is entitled to weight."  J&J Mem. 26.  We agree.  And, as J&J also correctly concedes, this Court should accord "great weight" to a longstanding interpretation of a statute by the entity charged with its interpretation.  Id.  We agree again.  Here, both ARC and the Department of Justice—the entity charged with interpretation of § 706—share the same longstanding interpretation.  See, e.g., Rose v. Long Island R.R. Pension Plan, 828 F.2d 910, 918 (2d Cir. 1987) (holding the interpretations of a statute by an agency charged with its administration "are entitled to great deference").  Even more, the Internal Revenue Service joined the chorus in 1985, and Congress—having refused to diminish ARC's powers or otherwise upset ARC's longstanding marketing initiatives—has likewise demonstrated that it has no objection.

In the face of this 100-year practice and authorization, J&J plucks from the historical record a single document:  the 1942 Biddle letter.  But nothing in the Biddle letter suggested that ARC could not sell, or license the sale of, Emblem-bearing products in order to further or fund the organization's critical humanitarian work.  Again, the best reading of the letter is that it is consistent with the view articulated by ARC witnesses in the 1942 hearings:  that ARC cannot engage in commercial enterprise just to turn a profit.  See, e.g., 1942 House Hearing at 257-258 (statement of Mrs. Belmont); Letter from Mr. Davis to Chairman Bloom, reprinted in 1942 House Hearing at 262; Answer ¶¶ 39, 43-45 (quoting 1942 legislative hearing testimony).

Finally, with respect, J&J goes too far in claiming that sales of ARC products mean "the humanitarian volunteer mission of ARC barely exists." J&J Mem. 26. Forgive us, but where was J&J on 9-11? Where was it in the aftermath of hurricanes, and bridge collapses, and wild fires, and where is it today at the myriad house fires and other disasters that befall Americans every day? The humanitarian mission of the American Red Cross is alive and well, pursued every day by dedicated people of the ARC, by ARC's manufacturing and publishing partners, and by thousands upon thousands of volunteers. And that mission is plainly supported and furthered by a 100-year history of selling first aid kits, and by selling the many other products— including half the Nation's blood supply—that we detailed in our Statement of Facts. Defs' SJ SOF ¶¶ 36-137. Indeed, to deprive ARC of the funding it receives from its sales (and has received for more than a century) would fundamentally impair ARC's ability to pursue its mission. That is not the result Congress desired when it expressly authorized ARC to perform any "act necessary to carry out this chapter and promote the purposes of the corporation." 36 U.S.C. § 300105(a)(6).

### 4.    ARC's Sales Of Red Cross Products Are Not Illegal Under § 706.

Besides viewing itself as ARC's Mission Police, J&J also apparently considers itself better equipped to interpret and enforce federal criminal law than federal prosecutors. J&J's argument is fundamentally flawed in at least four ways.

1.    In its primary argument under § 706, J&J lifts the word "agent" from the phrase permitting use of the Emblem by ARC and its "duly authorized agents and employees." J&J's argument is that Congress meant to constrain use of the Emblem by incorporating wholesale into the criminal statute the Restatement (Third) of Agency and common law agency principles, and to make criminals of anyone using the Emblem if they are not ARC's agent for all purposes under that body of law. J&J Mem. 28-34. J&J is wrong for a host of reasons.

11

Persons of ordinary intelligence looking at § 706 would accord the phrase "duly authorized agent" its plain, everyday meaning. After all, Congress gave no indication that it intended to import <u>sub silento</u> into § 706 the peculiar aspects of each state's common law of agency or the agency principles as articulated in the Restatement. The common understanding of "agent" is someone who has permission to act on behalf of someone else. <u>See</u>, <u>e.g.</u>, <u>American Heritage Dictionary</u> (4th ed. 2004) (defining "agent" as "[o]ne that acts or has authority to act" and "[o]ne empowered to represent or act for another"). Even <u>Black's Law Dictionary</u> defines "agent" by reference to authorization, not hoary common law or Restatement of Agency principles. <u>See</u> <u>Black's Law Dictionary</u> 68 (8th ed. 2004) (defining "agent" as "[o]ne who is authorized to act for or in place of another").

This comports precisely with the interpretation of § 706 that the Department of Justice gave in 1978: the key is whether ARC authorized a third-party to use the Emblem in the way the third party has used it. If so, that party is a duly authorized agent and not a criminal under § 706; if not, that party is a pretender and indictable. Defs' SJ SOF ¶¶ 82-84.

While no court has yet addressed the meaning of "agent" under § 706, courts have interpreted the word in other criminal statutes. In doing so, they have consistently refused to import the lines drawn by the Restatement or common law. For example, in analyzing definition of the term "agent" in 18 U.S.C. § 666(d), the Third Circuit specifically refused to "consult extrinsic sources, such as the Restatement of Agency," because "[t]o do so might result in the improper importation of extraneous language into the statutory text." <u>United States v. Vitillo</u>, 490 F.3d 314, 323 (3d Cir. 2007). Courts have specifically noted that the best way to interpret a term used in a federal criminal statute is by reference to its use in other federal criminal statutes. <u>See</u>, <u>e.g.</u>, <u>United States v. Pinelli</u>, 890 F.2d 1461, 1471 (10th Cir. 1989). To our knowledge, the

only statute in Title 18 defining "agent" does so as "a person authorized to act on behalf of another person or a government"—not with reference to any Restatement or common law principles.  <u>See</u> 18 U.S.C. § 666(d)(1).  That is just the interpretation urged by ARC here.  <u>Id.</u>

It is also an interpretation in keeping with the way courts determine in other contexts whether someone acts as an agent for another—by inquiring into his authorization to do so.  For example, the Supreme Court has held that a private party acts as an "agent" of the government in conducting federally mandated drug testing—even though the government certainly does not exercise the sort of "control" over such a person that J&J claims is required to be an agent.  <u>See</u> <u>Skinner v. Railway Labor Executives' Ass'n</u>, 489 U.S. 602, 614 (1989).  <u>See</u> <u>also</u> <u>Automation</u> <u>By Design, Inc. v. Raybestos Prods. Co.</u>, 463 F.3d 749, 757 (7th Cir. 2006) (looking to <u>Black's</u> <u>Law Dictionary</u> definition of agent as turning on authorization to act in place of another, and finding it satisfied even though the contract defined the parties' relationship as one of independent contractors).

And the precise phrase "duly authorized agent" has been defined in just this way as well, without any resort to Restatement of Agency or common law agency principles.  <u>See</u>, <u>e.g.</u>, <u>FDIC</u> <u>v. Schaffer</u>, 731 F.2d 1134, 1137 & n.5 (4th Cir. 1984) (holding that defendant's mother-in-law was his "duly authorized agent" to accept service of process under state statute; term includes one who acts at the direction of or with the knowledge or acquiescence of another); <u>Kelberine v.</u> <u>Societe Internationale, Etc.</u>, 363 F.2d 989, 993 (D.C. Cir. 1966) (an individual with power of attorney for accepting service of process was a "duly authorized agent," even though "his express authority was limited, to be sure"); <u>Kuenstler v. Occidental Life Ins. Co.</u>, 292 F. Supp. 532, 534-535 (C.D. Cal. 1968) (insurance company administering Medicare benefits pursuant to contract with government was a "duly authorized agent" of the government while acting in that

capacity); In re Sicari, 187 B.R. 861, 871 (Bankr. S.D.N.Y. 1994) (debtor's secretary was his "duly authorized agent" because she acted "with his authorization and at his specific instruction").

J&J's theory that Congress covertly incorporated complex Restatement and common law agency principles into the criminal prohibition in § 706 runs afoul not only of all these cases, but also of the "basic principle" of constitutional law that "a criminal statute must give fair warning of the conduct that it makes a crime." Rogers v. Tennessee, 532 U.S. 451, 457 (2001). Violations of criminal law cannot turn on post-hoc judicial examinations of whether a relationship did or did not qualify as a general agency relationship under Restatement and common law agency principles. When a criminal prohibition leaves those of ordinary intelligence unable to know what is permitted and what is prohibited and conform their conduct accordingly, it violates the Due Process Clause. See Grayned v. City of Rockford, 408 U.S. 104, 108 (1972); Connally v. General Constr. Co., 269 U.S. 385, 391-392 (1926). "[C]ourts should avoid construing legislation in a manner that would raise grave constitutional questions when an equally plausible explanation exists that does not raise those issues." Enron Power Mktg., Inc. v. Luzenac Am., Inc., 2006 WL 2548453, at *12 (S.D.N.Y. Aug. 31, 2006); accord Jones v. United States, 526 U.S. 227, 239 (1999). That cannon applies with force here.

One further problem with J&J's argument stems from its reliance on the Restatement (Third) of Agency. The Restatement (Third) of Agency issued in 2006, exactly 96 years after Congress first adopted the phrase "duly authorized agent" in ARC's 1910 Charter. In 1910, there was no Restatement of Agency. None. The Restatement (First) of Agency would not come out for another 23 years. As a result, even if there were any legal basis for importing extrinsic sources into a federal criminal statute, no Restatement of Agency existed for importation into

this one.  And even if one accepted J&J's fanciful theory that Congress meant to import the

Restatement at recodification in 1948, it was the Restatement (First) of Agency that was then in

effect.  That Restatement carefully laid out the difference between general agents—who are

essentially agents for all purposes—and special agents—who are essentially agents for a specific,

limited purpose (like using the Emblem).  See Restatement (First) of Agency § 3 (1933).

Even if agency law were imported into § 706, it would be fully satisfied here, for this

notion of limited agency is well recognized in cases old and new, including those from Virginia,

the state law J&J relies on here.  See, e.g., Butler v. Maples, 76 U.S. 766, 774 (1869) ("The

distinction between the two kinds of agencies is that the one is created by power given to do acts

of a class, and the other by power given to do individual acts only.").  See also EEOC v.

Watergate at Landmark Condominium, 24 F.3d 635, 639 (4th Cir. 1994) (holding that the

evidence clearly established that two individuals who were "[n]ot, to be sure, general agents,"

were nevertheless "certainly agents for the limited purpose of assisting the Watergate legal entity,

a condominium association, make decisions concerning its recreational program"); Flintridge

Station Assocs. v. Am. Fletcher Mortgage Co., 761 F.2d 434, 439 (7th Cir. 1985) (defining a

special agent as " 'one who is authorized to do one or more specific acts, in pursuance of

particular instructions or within restrictions necessarily implied from the acts to be done' ")

(quotation omitted); P. T. Perusahaan Pelayaran Samudera Trikora Lloyd v. Salzachtal, 373 F.

Supp. 267, 277 (E.D.N.Y. 1974) (finding relationship between two parties was special agency,

citing Restatement (Second) of Agency); accord Shanklin v. Allis-Chalmers Mfg. Co., 254

F. Supp. 223, 226 (S.D. W. Va. 1966), aff'd, 383 F.2d 819 (4th Cir. 1967).  Thus, even under

J&J's theory that Restatement and common law agency principles define the scope of § 706's

criminal prohibition, those principles would be fully satisfied here because ARC's manufacturing

licensees are its agents for purposes of using the Emblem. Whatever epoch's agency law governs, the law has always recognized that agency relationships can be for limited purposes.

J&J notes that the Agreements at issue specify the relationship established is not general agency but one of independent contractor. That is quite so. ARC is not directing manufacturing machine operators in their day-to-day activities or mandating delivery routes, any more than it does so with respect to the manufacture of blood bags or lifesaving training materials or equipment or emergency response supplies bearing the Emblem. But ARC designated each firm as its authorized agent for the purpose of placing the Emblem on approved products.

Such limited agency is widely recognized in the case law, even when the general relationship is that of independent contractor. In Hartzell Fan, Inc. v. Waco, Inc., 505 S.E.2d 196, 200 (Va. 1998), for example, the parties had an agreement specifying that Metrix was an independent contractor and not the legal representative of Hartzell. The agreement also author-ized Metrix to do something specific on behalf of Hartzell—to forward to Hartzell any money it received from Hartzell's customers. As the Court explained, regardless of the use of the term "independent contractor" in the agreement, Metrix was Hartzell's agent for the limited purpose of receiving payments from Hartzell customers and forwarding those payments. Id. Metrix's status as agent necessarily flowed from the authority Metrix was given to accept and forward payments. Id. See also Automation By Design, 463 F.3d at 757 (holding that status as agent turns on authorization to act in place of another, and finding it satisfied even though the contract defined the relationship as one of independent contractors); Shanklin, 254 F. Supp. at 226 (same).

So too here. A trademark license agreement by its very nature necessarily authorizes the licensee to use the licensed mark in the specified way. The agreements here plainly state they grant a license—i.e., authority—to use the Red Cross Emblem and the name "American Red

16

Cross" in certain specified ways.  See, e.g., ARC-First Aid Only License Agreement at 1 and Sch. A (Ex. 133 to Abram Decl., Nov. 21, 2007).  So regardless of the manufacturing firm's status for any other purpose as an independent contractor, it is ARC's agent for the purpose of using the Emblem.

2.      J&J also offers a few other § 706 arguments, all wrong on their face.  It claims, for example, that 706 criminalizes ARC's use of its own Emblem because (according to J&J) ARC is not authorized to engage in sales of products under its federal charter.  But it is authorized to do just that, and has been for a very long time.  See supra 5-8.  And even assuming its false premise, J&J's argument would go too far.  Surely, a Red Cross volunteer using the Emblem would not become a federal criminal if it were later determined that the activity he was engaged in, while authorized, was beyond ARC's charter powers.

3.      J&J's next argument is that even if ARC's federal charter permits sales, § 706 still makes use of the Emblem a crime because (according to J&J) it incorporates the Regulations of the ICRC.  J&J Mem. 28.  This is so wrong it is hard to know where to begin.  First, of course, § 706 makes no reference to the ICRC pronouncements on which J&J has seized.  Second, they came out many decades after § 706 was codified and many, many decades after the prohibition first appeared in ARC's 1910 Charter.  Third, incorporating ICRC regulations or guidelines into a criminal statute would run afoul of the due process vagueness principles mentioned above.  Just as the Third Circuit declined to import agency law into a criminal statute because "[t]o do so might result in the improper importation of extraneous language into the statutory text," United States v. Vitillo, 490 F.3d at 323, so importing various and subsequent pronouncements of the ICRC would render the federal criminal law not only indeterminate when enacted but mutable over time at the discretion of the ICRC.  And fourth, far from being the arbiter of U.S. criminal

law, the ICRC does not even have authority within the context of the Red Cross Movement to bind National Societies like ARC. As we show below, the ICRC is essentially a sister society, one with whom ARC works closely and whose pronouncements ARC works to abide by within the context of the Red Cross Movement. But that is all beyond the legitimate scope of this litigation, because J&J has no right to enforce ICRC pronouncements, either by importing them into the federal criminal law or otherwise. See infra 27-31.

> 4.     J&J also claims that § 706 is somehow violated by ARC and its marketing partners because when people purchase a product bearing the Red Cross Emblem, ARC has no control over their use of the product. J&J Mem. 29. This verges on ridiculous for two reasons. First, control is not the key, authorization is. The Emblem is used every day in critical ways by persons beyond the direct control of ARC. ARC volunteers fan out into disaster areas every day, proudly wearing the Emblem; neither ARC nor its thousands of volunteers are criminals because no ARC employee is directing their every move. ARC hands out blankets and water bottles and myriad other Red Cross items to disaster victims; ARC does not control what they do with them, but that does not make it a crime to give them away. ARC blood bags sit on the shelves of hospitals all over the country; selling them with a Red Cross Emblem is not criminal just because ARC does not tell the nurses and surgeons who use them how to do their jobs. Boxes of ARC materiel might be pre-positioned in a church in advance of a hurricane; that is not a crime and the pastor is not indictable for handing them out, even if ARC officials do not tell him how or to whom. And just so with first aid kits: Neither a disaster victim in a shelter nor a parent at a

soccer game is a criminal when he uses an ARC (or J&J)[6] first aid kit, even though ARC does not control his every move.

And second, even if control were dispositive, it exists here. The uses of the Emblem that J&J attacks in this case <u>are</u> closely controlled by ARC, as the License Agreements themselves make clear. Certainly compared to these myriad other uses by persons beyond the control of anyone, the ARC's manufacturing licensees are authorized to use the Emblem only under close supervision by ARC, which has the right to determine exactly how the Emblem appears and on what products. Requiring ARC control as a condition for another's non-criminal use of the Emblem would be absurd. But if control were required, it exists here. <u>See</u> <u>infra</u> 31-34.[7]

For all these and no doubt other reasons as well, J&J's view of § 706 makes no sense. It has no support in the text of the statute. And it conflicts with a century of practice that has been widely known in Congress, not to mention by DOJ, IRS, J&J, and thousands of Red Cross volunteers, partners, donors, and supporters.

---

[6]     J&J claims that its grandfathered rights give it the right "to sell goods in commerce" (J&J Mem. 36). Leaving aside that the 1905 Charter did the same for ARC, the implication of J&J's theory is that no user of J&J products has any right to display the Red Cross symbol. We do not agree. But we point it out because it shows the folly of J&J's position.

[7]     J&J also makes the related argument that a retailer like Wal-Mart violates § 706 every time it "advertise[s], display[s], and sell[s]" a product bearing the Red Cross Emblem, because it is neither a grandfathered user nor an agent of ARC (under the Restatement of Agency definition), so Wal-Mart's sales of products bearing the Red Cross Emblem would violate § 706. J&J Mem. 30-31. This argument once again proves too much. If J&J were right, hospitals would violate federal law by displaying blood bags for use in the ER. Cataloguers who carried ARC products throughout the 1900s (or do so today) would violate federal law by displaying the Emblem. Schools who display the Emblem in connection with a life saving course? Criminals. Cause marketing partners, too. The list could go on forever. And in addition, the adage "be careful what you wish for" comes to mind: Wal-Mart sells far more products bearing the Red Cross symbol under J&J's name than it does under ARC's. If it were a violation of federal law for Wal-Mart to display a Red Cross on ARC products because Wal-Mart is neither a grandfathered user nor an agent of ARC, that same principle would make Wal-Mart's display of J&J products bearing a Red Cross symbol illegal too.

**B.      Geneva Conventions And The ICRC Regulations**

**1.      The Geneva Conventions All Preserve The Emblem To The National Red Cross Societies, And Bar Its Use By Any Private Entity Without Exception.**

Before showing the many reasons why J&J's resort to the Geneva Conventions is wrong, we pause on the irony of J&J's argument, for if accepted it would preclude J&J's own use of the Emblem as a grandfathered user.  As we will show, the international agreements relied upon by J&J address the rights of the Signatory Nations.  But none of the Conventions makes <u>any</u> allowance for—or suggests that a Signatory Nation should permit—any sort of grandfathered-user rights.  That puts J&J in the awkward position of advancing a theory that, if adopted, would mean that the United States violates international law by allowing J&J to use the Emblem.  One with unclean hands is not entitled to relief in equity.  <u>See</u>, <u>e.g.</u>, <u>Cohn & Berk v. Rothman-Goodman Mgmt. Corp.</u>, 125 A.D.2d 435, 436 (N.Y. App. Div. 1986); N.Y. Jur. Equity § 113.

But J&J need not worry, for its novel view of international law is wrong from the get-go.  As we show below, the Geneva Conventions are not self-executing.  Their implementation in the United States is by Congress through legislation.  Whatever the wisdom of grandfathering uses of the Red Cross, Congress has spoken.  And in doing so, Congress clearly authorized the ARC to use the Emblem and authorize others to do so, in furtherance of ARC's mission.

**2.      The Geneva Conventions Are Not Self-Executing And Are Not Enforceable By J&J.**

J&J cannot privately enforce the Geneva Conventions directly, nor can it seek to enforce the Geneva Conventions indirectly by requesting that this Court impose liability under the guise of New York state tort and trademark law.

Because "the Geneva Conventions are not self-executing treaties," courts have "routinely reject[ed] private claims brought under them."  <u>Stutts v. De Dietrich Group</u>, 2006 WL 1867060,

at *7 (E.D.N.Y. June 30, 2006); [8] see also Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 809

(D.C. Cir. 1984) (Bork, J. concurring) (finding 1949 Geneva Convention and other international

treaties not self-executing because they "expressly call for implementing legislation"; "[a] treaty

that provides that party states will take measures through their own laws to enforce its

proscriptions evidences its intent not to be self-executing"); Corrie v. Caterpillar, Inc., 403 F.

Supp. 2d 1019, 1025 (W.D. Wash. 2005) ("[T]he Geneva Convention is not 'self-executing,' that

is, it does not expressly or impliedly create a private claim for relief."), aff'd, 503 F.3d 974 (9th

Cir. 2007); Iwanowa v. Ford Motor Co., 67 F. Supp. 2d 424, 439 n.16 (D.N.J. 1999) ("Courts

have unanimously held that neither the Hague nor Geneva Conventions are self-executing.");

United States v. Fort, 921 F. Supp. 523, 526 (N.D. Ill. 1996) ("The courts have consistently held

that the Geneva Conventions . . . are not self-executing and, thus, provide no basis for the

enforcement of private rights in domestic courts."). See also United States v. Rommy, No. 06-

0520-cr, 2007 WL 3243813, at *18 (2d Cir. Nov. 5, 2007) ("As the Supreme Court has long

observed, absent explicit treaty language conferring individual enforcement rights, treaty

violations are generally addressed by the signatory sovereigns through diplomatic channels.");

Humane Soc'y of the United States v. Glickman, 217 F.3d 882, 887 (D.C. Cir. 2000) ("Treaties

are undertakings between nations; the terms of a treaty bind the contracting powers."). None of

the National Societies in the Red Cross Movement is bound directly by the Geneva Conventions;

---

[8]      "Self-executing" treaties are those that need no implementation by Signatory Nations,
those whose mere ratification creates rights and duties for private individuals enforceable by
domestic tribunals. See Flores v. Southern Peru Copper Corp., 414 F.3d 233, 257 n.34 (2d Cir.
2003). As shown above, the Geneva Conventions on their face made clear they required national
legislation to implement them. There is a strong legal presumption against reading treaties as
self-executing, and any treaty that "require[s] implementing action by the political branches of
government" as the Geneva Conventions do is considered non-self-executing. Id.; accord United
States v. De La Pava, 268 F.3d 157, 164 (2d Cir. 2001); Restatement (Third) of the Foreign
Relations Law of the United States § 907 cmt. a. (1987).

instead, each is bound by whatever national legislation its home nation has enacted to implement the Geneva Conventions.  Responsive SOF ¶ 180.  <u>Accord</u> Restatement (Third) of the Foreign Relations Law of the United States § 907 (1987) (treaties can only create rights against Nations).

Here, the courts have quite rightly held that the Geneva Conventions are not self-executing.  First, they lack the "explicit treaty language conferring individual enforcement rights" that would be required.  <u>United States v. Rommy</u>, 2007 WL 3243813, at *18 (2d Cir. Nov. 5, 2007).  And second, they say exactly the opposite, with specific reference to use of the Red Cross and other protected symbols.  <u>See</u>, <u>e.g.</u>, 1949 Convention, art. 44 (authorizing use of the emblem "in accordance with national legislation"); 1906 Convention, art. 27 (requesting that "signatory powers whose legislation may not now be adequate engage to take or recommend to their legislatures such measures as may be necessary to prevent the use, by private persons or by societies other than those upon which this convention confers the right thereto, of the emblem").

Thus, J&J is limited to advancing only those rights that Congress chose to create when it implemented the Geneva Conventions.  Just as Congress may have done in allowing grandfathered uses, "sovereigns may elect to overlook non-compliance with particular treaty requirements in given cases."  <u>United States v. Rommy</u>, 2007 WL 3243813, at *18.  <u>See</u> <u>Fund for Animals, Inc. v. Kempthorne</u>, 472 F.3d 872, 873 (D.C. Cir. 2006) (mute swan protected under international conventions to which the United States is a party but excluded from protection in the Migratory Bird Treaty Reform Act, which implements the international conventions).  So, J&J has the benefit of Congress's decision to allow its use of the Red Cross Emblem without fear of claim or prosecution, so long as it does so within the narrow confines of the grandfathered rights Congress chose to protect.  And in the same way, J&J's enforcement rights are limited to those that Congress chose to create in implementing the Geneva

Conventions.  Since Congress created no right for grandfathered users to enforce the Geneva Conventions against the National Red Cross Societies, all of J&J's arguments under the Geneva Conventions should be disregarded.

Just as J&J is foreclosed by Congress from bringing suit directly under the Geneva Conventions, so too is it foreclosed from using New York state law.  That is true even with respect to enforcement of self-executing treaties.  See El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 160 (1999) (where plaintiff had no direct right to recovery under Warsaw Convention, plaintiff could not artfully plead action for damages under New York tort law).  It is all the more so here.  Over a century ago, the Supreme Court made clear that courts lack power to tell the federal government whether and how to enforce treaties.  See Botiller v. Dominguez, 130 U.S. 238, 247 (1889) (a court "has no power to set itself up as the instrumentality for enforcing the provisions of a treaty with a foreign nation which the government of the United States, as a sovereign power, chooses to disregard"); Chinese Exclusion Cases, 130 U.S. 581, 603 (1889) (the validity of legislation implementing treaty obligations of a nation is "not a matter for judicial cognizance" and "[t]he question whether the government is justified in disregarding its engagements with another nation is not one for the determination of the courts").   Courts today rely on that same principle in rejecting claims seeking to adjudicate private party rights under a treaty:  "Only parties to a treaty may seek enforcement of the treaty and may do so only through diplomatic means."  Consejo de Desarrollo Economico de Mexicali v. United States, 417 F. Supp. 2d 1176, 1184 (D. Nev. 2006) (dismissing claims based on provisions of 1944 Mexican-U.S. Water Treaty for failure to state a claim because private party plaintiff lacked standing).

Another legal principle also bars J&J from using New York state law to impose liability for international treaty violations:  the foreign affairs preemption doctrine.  As the Supreme

Court has held, the possibility that state law "will produce something more than incidental effect in conflict with express foreign policy of the National Government . . . require[s] preemption of the state law." Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 420 (2003). That makes sense, "given the 'concern for uniformity in this country's dealing with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." Id. at 413 (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 427 (1964)); see also In re Assicurazioni Generali S.p.a. Holocaust Ins. Litig.,340 F. Supp. 2d 494, 502 (S.D.N.Y. 2004) (dismissing state statutory and common law claims because the Supreme Court has endorsed repeatedly "the notion of executive primacy in the sphere of foreign affairs").

This legal principle is clear: "No state can add to or take from the force and effect of [a] treaty or statute." Hines v. Davidowitz, 312 U.S. 52, 63 (1941). Thus, in Garamendi, the Court held that California's Holocaust Victim Insurance Relief Act—a state statute that required European insurers doing business in California to make certain disclosures about policies in effect during the Holocaust era—was preempted because "restitution for Nazi crimes has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements." Garamendi, 539 U.S. at 420-421 (emphasis added). The preemption of state law when it comes to issues of foreign affairs extends even "absent any affirmative federal activity in the subject area of the state law." Garamendi, 539 U.S. at 418 (citing Zschernig v. Miller, 389 U.S. 429, 432 (1968)).

So too here. J&J is purporting to use New York state law as a means for enforcing international treaty obligations relating to the use of the Red Cross symbol. But as we demonstrated above, Congress has already spoken directly to that question. And what Congress said cannot be amplified, muffled, or distorted by state law, whether case law or statutory.

Therefore, because New York tort law cannot "add to or take from the force and effect of [a] treaty or statute," this Court should reject J&J's bid to enforce the Geneva Conventions through this backdoor gambit.  Hines, 312 U.S. at 63.

> **3.     ARC Is Not Violating The Geneva Conventions In Any Event, And Is Acting Within The Authority Granted To It By The U.S. Congress.**

Even if J&J had standing and this Court were empowered to tell the United States Government how to implement the treaties, the ARC's use of the Red Cross Emblem does not violate the Geneva Conventions.

The provisions of the Geneva Conventions relating to uses of the Emblem seek to preserve the integrity of the symbol's association with humanitarian causes, a relationship that ARC's activities enrich, not endanger.  The 1949 Geneva Convention and its corresponding commentary make clear that the "Red Cross organizations [have] wide prerogatives in regard to the use of the sign," with their main constraint being to avoid "any practice likely to lower it in the eyes of the public."  1949 Geneva Convention Commentary to art. 44, nn. re ¶ 2 § 4.   ARC fully embraces the goal expressed in all of the Geneva Conventions of protecting the symbol from unauthorized uses and from compromising the symbol's integrity. That is why ARC has vigilantly policed private parties' unauthorized uses of the Red Cross Emblem for years through cease and desist letters, Responsive SOF ¶ 181, and why the ARC has focused its instructional and product offerings on things like health and safety, first aid and emergency preparedness.

In its effort to second-guess the judgments made by the American Red Cross in this connection, J&J extracts language from the Conventions, taking sections out of context to serve its narrow purposes.  J&J relies on two types of provisions from the Conventions:  (1) those that guard against misuse of the Emblem by pretenders, and (2) those that address and prohibit use of the Emblem in any fashion by private entities like J&J, provisions that do not apply to use by

ARC or its agents and certainly do not undermine the discretion National Societies have with respect to use of the Emblem. For instance, J&J relies on Article 23 of the 1906 Convention, but when viewed in context with the preceding articles, Article 23 is focused on preventing confusion about what the Emblem indicates and stopping pretenders from abusing the power of the Red Cross Emblem by using it to convey a false humanitarian identity. And Article 27 of that Convention, which J&J also relies on, states on its face that it applies to uses "by private persons [like J&J] or by <u>societies other than those upon which this convention confers the right thereto</u>." 1906 Convention, art. 27 (emphasis added). Nothing in any of these provisions constrains the Red Cross Societies in their own use of the Emblem or in their right to authorize its use.

ARC's activities do not deviate or detract from its overarching humanitarian mission; on the contrary, the conduct at issue in this case—partnering with third parties to ensure availability of ARC first aid and preparedness wares—is, and always has been, <u>necessary</u> to carrying out ARC's mission of preparedness and health and safety. Since at least as early as 1903, ARC has sold first aid kits. It has long charged a fee for CPR instruction, babysitting training, and swimming lessons. During World War II, ARC's first aid textbook "ha[d] become a national 'Best Seller.' " ARC sales of blood products and services supply the Nation's hospitals with nearly half of their blood supply. This diverse array of "commercial" activities share one characteristic in common; they all further and support ARC's mission to promote preparedness, health and safety, both directly, by improving the public's ability to respond to emergencies, and indirectly, by funding ARC's humanitarian activities and raising awareness of ARC's mission. By using the Emblem when engaging in the provision of first aid kits, life-saving training, and blood, ARC furthers the organization's humanitarian goals directly and indirectly, and it increases the public's awareness of ARC—ultimately strengthening the message of the Emblem

26

as its symbol.  Congress has had full knowledge of ARC's activities throughout, yet Congress has never seen fit to curtail them.  See Defs' SJ Mem. at 16-21.

J&J correctly observes (ad nauseam) that ARC cannot engage in commercial activities as a profit-making enterprise in the way that J&J can and does.  This is, after all, precisely why ARC turned down the suggestion from J&J's counsel back in 1917 that ARC acquire J&J and thereby resolve the parties' differences about use of the Emblem.  As ARC explained back then, it is a non-profit corporation that cannot be responsible to J&J's corporate investors.  Defs' SJ SOF ¶¶ 113-114.  It is also what ARC told Congress during the 1942 hearings, the same year that its first aid textbook was a national bestseller.  ARC's sales of first aid kits and other products over the years have served to advance and support ARC's charitable mission, not just enrich shareholders.  And throughout, ARC has ensured that the blood services and first aid and preparedness products bearing its brand are not "likely to lessen . . . the standing of the emblem"—faithfully avoiding the ills that the Geneva Conventions seek to guard against.  1949 Geneva Convention Commentary to art. 44, nn. re ¶ 2 § 4.

For these reasons, J&J's attempt to enforce its view of the Geneva Conventions must fail.

### 4.    J&J Also Cannot Rely On The 1991 ICRC Regulations.

Grasping at straws, J&J lastly claims that in enforcing the Geneva Conventions, it can also enforce guidelines put out by the ICRC, a sister organization to ARC, because they are the "principles laid down by the International Red Cross Conferences," to which the 1949 Geneva Convention refers.  This too fails as a matter of law for several reasons.

First, J&J has no power to enforce the Geneva Conventions themselves, much less the Conference principles to which they refer.  See supra 21-25.  And even if it did, J&J is wrong in claiming that the Convention's reference to the Conference principles makes the guidelines "binding on ARC by virtue of the Geneva Conventions."  J&J Mem. 2, 20.  That is so for the

simple reason that the guidelines are not the Conference principles J&J says they are.  Instead, the "principles" of the International Red Cross Conferences ("IRCC") are those known by heart throughout the Red Cross Movement:  humanity, impartiality, neutrality, independence, voluntary service, unity, and universality.  Responsive SOF ¶ 12.  They are not the ICRC Regulations, which were created nearly half a century after adoption of the 1949 Geneva Convention.  While we commend the IRCC principles to all, we do not believe they provide J&J a legal basis for its claims.

The ICRC guidelines are not the Conference principles that J&J claims are incorporated into the Geneva Conventions.  Instead, they are the considered view of a Swiss organization[9] issued decades later about best practices or internal policies to be incorporated by National Societies themselves at their discretion.  They do not have the force of law and are not even legally enforceable by ICRC, much less by a grandfathered user like J&J.  Indeed, while the ARC works closely with ICRC and other sister Societies, both ARC and ICRC recognize that the relationship between ARC and ICRC is not hierarchical in nature and that national societies "carry out their humanitarian activities according to local needs, in line with their own statutes and subject to national law."  Responsive SOF ¶ 12.  ICRC also acknowledges that national societies "are autonomous organizations" and that "it has no direct authority over them."  Responsive SOF ¶ 12.  Even the plain language of the Regulations acknowledges this.  Article 7 makes clear that the National Societies themselves "shall lay down the conditions governing use of the emblem."  Regulations, art. 7.  As ARC's own Senior Counsel, Julie Ortmeier, testified during her deposition, "The policies set by the ICRC are aspirational.  They're guidelines . . . the

---

[9]    The ICRC is one of the many entities that comprise the International Red Cross and Red Crescent Movement ("Movement"); the Movement is made up of numerous national societies, ICRC and the International Federation of Red Cross and Red Crescent Societies.  See Statutes of the International Red Cross and Red Crescent Movement ("Statutes"), art. 1 (2006).

ICRC has no enforcement capability."[10]  Responsive SOF ¶ 12.  There is no factual dispute about

that.  ICRC lacks authority to enforce its stipulations against sister societies.  J&J does too.

Recognizing the weakness of this position, J&J also attempts to rely on a draft internal

restatement of ARC policy.[11]  See J&J Mem. 24 (citing J&J Ex. 14 at 1-2).  Without noting that

the document is merely an internal ARC draft, J&J proposes to enforce it because it refers to "a

duty to abide by the 'Regulations.' "  The draft is just that, and even if it were a final document,

it would still provide no basis for J&J's sweeping accusation that ARC has engaged in "unlawful

activity."

First, the document fails on its face.  ARC certainly regards itself as responsible to abide

by ICRC's Regulations, but the undisputed evidence shows that it is under no legally binding

duty to do so, and certainly not one that is enforceable by J&J.  Rather, ARC's responsibility

grows out of the cooperation between ICRC and the National Societies, including ARC.  And

second, an organization's alleged failure to abide by internal policies (even those it actually

adopts) does not give rise to a private cause of action.  See Dickson v. United States, 831

F. Supp. 893, 898 n.7 (D.D.C. 1993) (observing that because plaintiff's claim of violation of

internal policies was "devoid of any reference to a statutory or common-law cause of action,"

there was no "legal basis for Plaintiff's arguments that the CIA's violations of its regulations was

'illegal' "); Cotz v. Mastroeni, 476 F. Supp. 2d 332, 373 n.44 (S.D.N.Y. 2007) ("Even if this

does in fact constitute a violation of internal policy, it does not give rise to a cognizable claim

---

[10]    J&J relies on an ARC staffer's characterization of the Regulations contained in a post-script to an internal e-mail and mistakenly concludes that ARC ignored the Regulations and proceeded with an illegal licensing program.  J&J Mem. 24.  Although the ARC is in compliance with the Regulations, the Regulations are not binding and as such even if ARC did not comply with the Regulations, that would not make ARC's actions illegal.

[11]    Omitted from J&J's Brief is the fact that this Restatement is in draft and has not yet been finalized by ARC.  Responsive SOF ¶ 27.

pursuant to § 1983."); <u>Overton v. United States</u>, 2000 WL 14274, at *4 (10th Cir. Jan. 7, 2000) ("The IRS' internal policy of refraining from seizing retirement funds does not provide a basis for plaintiff's claim.").

Although J&J has absolutely no basis to question ARC's compliance with ICRC guidelines, we would be remiss in not explaining that ARC is in complete compliance. Irony abounds, for the guidelines were created for the very purpose of enabling national societies such as ARC to expand their revenue-generating operations. Responsive SOF ¶ 13. In particular, Article 23 ¶ 1 provides guidelines for national societies' use of the Emblem in fund-raising situations and is explicit in sanctioning sales by National Societies of goods bearing the Emblem. <u>See</u> Regulations, art. 23, Commentary ¶ 1 ("<u>the name and emblem may be used</u> for fund-raising purposes <u>to sell an Object</u> . . . .") (emphases added). Further, paragraph three envisions National Societies "co-operat[ing] with a commercial company or other organization to raise funds," including by displaying the commercial companies' trademarks on articles sold by the national society. <u>Id.</u>, art. 23, ¶ 3 . Thus, when taken together, both paragraphs one and three of Article 23 contemplate sales of goods featuring the Emblem by National Societies and cooperation by National Societies with commercial companies to sell items bearing the Emblem (even in combination with the commercial companies' trademarks).[12] <u>Id.</u>, art. 23, ¶¶ 1 and 3 and Commentary ¶¶ 1 and 3.

Throughout its Motion, when J&J refers to Article 23, it simply ignores the first and third paragraphs and instead relies solely on paragraph four. <u>See</u> J&J Mem. 2, 12, 20, 24. Paragraph four describes a different revenue generating method than the one at issue in this case and

---

[12]    Sales of items by National Societies made in cooperation with commercial entities as described in paragraph 3 of the Regulations are very much like the sales of ARC goods made in cooperation with FAO, Magla, Learning Curve, and Water-Jel.

described in the first and third paragraphs of Article 23.  Instead, Paragraph 4 addresses situations in which a National Society authorizes a commercial company that made a contribution to "mention this assistance in its advertising material or on products for sale the proceeds from which are to be donated in full or in part to the National Society."  See Regulations, art. 23, Commentary ¶ 4.  Thus, the provision J&J focuses on is "cause marketing" situations, where a third party is authorized to use the Emblem on its separately branded goods to advertise that third party's contribution to the National Society.[13]

The Regulations do not prohibit ARC from selling goods featuring the Emblem and, just like the Geneva Conventions, § 706, and ARC's Charter, the Regulations actually authorize the very activity which J&J claims to be unlawful.

**POINT II.    THE AMERICAN RED CROSS HAS ACTED WITHIN ITS RIGHTS IN AUTHORIZING THE OTHER DEFENDANTS—AND MANY OTHER COMPANIES OVER THE LAST 100 YEARS—TO MANUFACTURE AND SELL PRODUCTS BEARING THE AMERICAN RED CROSS NAME AND EMBLEM.**

Although the license agreements between ARC and the other defendants confirm that their use of the Emblem is with ARC's authorization, J&J spills much ink arguing the purported "illegality" of the specific licenses between ARC and the other defendants under Virginia common law.  This is odd, given that J&J's proffered expert in domestic law proposes to opine that they are perfectly customary trademark license agreements.  Responsive SOF ¶ 182.  In any event, as we have shown and as the Department of Justice explained in 1978, this is not the right question.  The only question the Court should ask in examining the conduct at issue here is

---

[13]    And as the commentary to paragraph 4 suggests, even then, there are circumstances in which the Guidelines contemplate that a National Society may authorize use of the Emblem by a third party in connection with the sale of the third party's branded goods.  For example, when the Emblem is of "small dimensions" and "accompanied by an explanation enabling the public to clearly understand the relationship between the National Society and the contracting company or organization," the National Society may authorize use of the Emblem by third parties in advertising.  See Regulations, art. 23, Commentary ¶ 4.

whether ARC authorized the other defendants to place the Emblem on the products at issue, or whether their conduct was unauthorized and therefore criminal under § 706. The former is so.

It is important to clear the record on three points in this regard: First, J&J erroneously says that ARC has agreed in the past that "it has no power to license third parties to use the mark." J&J Mem. 31. Of course, the documents J&J cite say nothing of the sort. ARC has been authorizing third parties to use the mark for a century—and in fact, the organization could not function if it did not do so. What ARC has said is that the organization has no power to change the terms of 18 U.S.C. § 706. That seems fairly self-evident.

Second, the conduct in this case was authorized by ARC. That is the testimony of all parties to the License Agreements. Defs' SJ SOF ¶¶ 138, 140, 146, 152, 155. And after J&J raised an issue about it, the parties executed confirmatory amendments that leave no doubt that "the parties agree that [each licensee defendant] is a 'duly authorized agent' of the Red Cross within the meaning of 18 U.S.C. § 706 and that [each licensee defendant] is assisting Red Cross in carrying out its purposes . . . by distributing the Products described herein." Defs' SJ SOF ¶¶ 139, 145, 151, 154. For purpose of using the Emblem, the non-ARC-defendants are duly authorized agents; for all other purposes, they are independent contractors. This is the understanding the parties shared from the date they signed the original contracts, as the nunc pro tunc amendment confirms. J&J has no evidence to the contrary because no such evidence exists. ARC entered the contracts because it wanted ARC products manufactured for the American public, and ARC wanted those products to bear the Red Cross Emblem and ARC's name. There are no pretenders in this case.[14]

---

[14]    J&J calls the confirmatory amendments "silly." J&J Mem. 11. True, in a way. Confirming the obvious can seem silly. But if the language were not there, J&J would no doubt be proclaiming that fact across whole sections of its brief. And after all, it is J&J that is branding as federal criminals people who were authorized to use the Emblem.

Third, the agreements at issue make clear that ARC retains control over and has the right to monitor use of the Emblem on all goods that would be produced and sold in its name and bearing its Emblem.  Take the First Aid Only Agreement for example.  Article 4.1 required First Aid Only to submit a sample of the emergency preparedness kit to ARC for its approval before beginning production.  Responsive SOF ¶ 34.  That was done.  And until ARC gave its written approval of the product and the way in which the Emblem and ARC's name was to be used on any label, packaging, and advertising and promotional material, the contract prohibited FAO from shipping the product to any customer.  Id.  The contract further required that after ARC approved the sample, every item shipped had to conform to the sample in terms of the product itself, the labeling, the packaging, the advertising, the marketing, and the display material.  Id.

The contract gave ARC the sole and exclusive right to approve or disapprove the sample for any reason, including that the sample did not meet ARC's quality controls.  Id. at § 4.2.  And it made clear that any products not approved by ARC "will not be manufactured, sold, displayed, or used in any manner."  Id.  Further ensuring ARC's control of the Emblem, the contract barred sale of any "irregular" or "seconds."  Id. at § 4.3.

These quality controls were important because under trademark law (and as a matter of principle), use of the Red Cross Emblem by a licensee is considered use by the licensor—First Aid Only's use of the Emblem on ARC products equates to use by ARC.  So the product and marketing material veto rights and quality controls ensure that this use of the Emblem, a use that to the public is ARC's use, would be on products and done in a way that met ARC's high standards for protecting the integrity of the Emblem.  See 3 Thomas J. McCarthy, McCarthy on Trademarks & Unfair Competition §§ 18:48, 18:52; Hawaii-Pacific Apparel Group, Inc. v. Cleveland Browns Football Co., 418 F. Supp. 2d 501, 507-508 (S.D.N.Y. 2006).

J&J faults ARC for not adopting license agreements that gave ARC control over "the operation or day-to-day activities of any of its codefendants." J&J Mem. 8. This misses the point. As noted above, ARC was not trying make the other defendants its agents for all purposes and under all circumstances, nor was it required to. ARC was not directing machine operators in their day-to-day activities or mandating delivery routes, any more than it does so with respect to the manufacture of blood bags or training materials or emergency response supplies bearing the Emblem. The "agent" authorization in the Agreements was the one that mattered: the authorization to place the Emblem on approved products on ARC's behalf. As shown in Section I.A.4, above, that authorized agency was all federal law required.

**POINT III.    J&J'S SUMMARY JUDGMENT MOTION REGARDING ARC'S COUNTERCLAIMS MUST FAIL BECAUSE THE UNDISPUTED FACTS SHOW THAT J&J HAS EXCEEDED ITS GRANDFATHERED RIGHTS UNDER § 706.**

J&J is not entitled to summary judgment on ARC's counterclaims asserting that J&J is exceeding its grandfathered rights. As defendants showed in support of their own motion for summary judgment, the undisputed facts demonstrate J&J has done exactly that by using variants of the 1905 marks that convey a different commercial impression. Defendants' SJ Mem. 38-40. And J&J has also exceeded its grandfathered rights by using the symbol on goods different from those on which it used the symbol before 1905. Grandfathered rights are construed narrowly, and are limited to uses indistinguishable from those in place prior to 1905. J&J's use of the symbol in different forms and in selling different goods exceeds the scope of its grandfathered rights under § 706.

**A.    J&J Has Varied The Form Of The Symbol From That In Use Before 1905.**

As described fully in Section IV of defendants' summary judgment memorandum, it is ARC—not J&J—that is entitled to summary judgment on ARC's counterclaims because J&J has

failed to show that its current uses of the Emblem fall within its pre-1905 uses. Although ARC believes that it is entitled to summary judgment on this point and that there are no disputed material facts, at the very least, J&J's motion for summary judgment must be denied. The "facts" that J&J offers as supposedly supporting its motion do not establish its entitlement to summary judgment and are disputed. J&J is currently using the Emblem on its products under marks that were not part of its use before 1905.

J&J concedes that it cannot use the mark in a way that conveys a "different commercial impression." J&J Mem. 37. And it admits that it has in the '913 Registration added the words "Johnson and Johnson" and the word "first aid." Id. It claims—without any support—that it is merely making "minor rearrangements" of "familiar components." A cursory comparison of the photographs provided between pages 37 and 38 of J&J's brief shows this is not true.

And even if the marks were close, that would not do. The Federal Circuit's opinion in O-M Bread, Inc. v. U.S. Olympic Committee, 65 F.3d 933, 936-938 (Fed. Cir. 1995) is directly on point. In O-M Bread, the Federal Circuit considered the scope of rights for a grandfathered user under a statute that, like §706, gives exclusive rights to use the mark OLYMPIC to the Congressionally-chartered nonprofit. The court held that because grandfathered uses authorize conduct that is criminal for all others, grandfathered rights are narrowly construed and essentially frozen in time. See O-M Bread, 65 F.3d at 938. Thus, even adding the word "kids" to "Olympic" was prohibited. Id. (holding that "the rights of prior users are . . . restricted from enlargement").

Explaining that grandfathered marks are "restricted from enlargement," the court focused on whether the new mark and old mark conveyed a "different commercial impression." Id. at 938. When doing so, "[n]o part of the mark can be ignored in comparing the marks as a whole."

Id. at 937-938.  The commercial-impression test that the Federal Circuit relied on in O-M Bread stems from a trademark concept called "tacking," in which a party can ordinarily tack together all uses of a trademark that do not convey a different commercial impression and are legal equivalents.  See 3 Thomas J. McCarthy, McCarthy on Trademarks & Unfair Competition, § 17:26.  The standard for being legal equivalents is a strict one—it requires even more similarity than is required under "the familiar test of a likelihood of confusion."  Id. (quoting Van Dyne-Crotty, Inc. v. Wear-Guard Corp., 926 F.2d 1156 (Fed. Cir. 1991)).  Changes in format are particularly problematic, as the marks must be "indistinguishable" from one another.  Id. (quoting Pro-Cuts v. Schilz-Price Enters. Inc., 27 U.S.P.Q.2d 1224 (T.T.A.B. 1993)).

J&J presents no evidence that its contemporaneous depictions and uses of the Red Cross Emblem at issue are "indistinguishable" from or the "legal equivalent" to its pre-1905 uses:

1.      J&J now uses the mark on its Emergency Preparedness Kits.  For starters, J&J has added the word "Emergency," written within the Emblem.  Defs' SJ SOF ¶ 175.  J&J has provided no evidence that it used the word "Emergency" in connection with the Emblem, or depicted the word "Emergency" through the Emblem, prior to 1905.  In fact, J&J did not even sell emergency preparedness products prior to 1905, and it has admitted that the depiction containing the word "Emergency" inside the Red Cross Emblem is distinct from its pre-1905 use of the Red Cross Emblem as seen in its prior, grandfathered registrations.  Id. (citing Biribauer Dep. 66, Kotei Dep. 19).  J&J further admitted that "there's obviously graphically a difference between the red cross mark as a pure red cross and a red cross mark with other matter added to it."  Responsive SOF ¶ 183.  "Kids" was different.  "Emergency" is too.

2.      The commercial impression conveyed by the J&J All-Purpose First Aid Kit is also different.  It displays the Red Cross Emblem running almost the entire length and width of the

product, vastly magnifying the size and prominence of the Red Cross Emblem from J&J's pre-1905 uses.  In addition, none of the pre-1905 uses show the words "all-purpose" or "first aid" written inside the Emblem.  Responsive SOF ¶ 184.

3.      The commercial impression conveyed by J&J's '913 Registration is also not the legal equivalent of its pre-1905 uses.  J&J received this registration in 2006 (and has used it since 1993) for a composite mark which contained three discrete elements:  the Greek red cross, the words "first aid" and the script "Johnson & Johnson."  J&J had admitted that it did not use the entire mark depicted in the '913 registration prior to January 5, 1905, and in fact did not use it earlier than 1993.  Defs' SJ SOF ¶¶ 176-178.  Although it provides certain pre-1905 product photographs showing the use of the Red Cross Emblem in conjunction with the words "First Aid" somewhere on the product label, none of these uses involved the same format or layout, which would be required to find the two indistinguishable as a matter of law.  See 3 McCarthy's on Trademarks & Unfair Competition § 17:26.

4.      Finally, the commercial impression on J&J's line of home health care products also varies from its pre-1905 uses.  These products bear the Red Cross Emblem together with the words "Johnson & Johnson" adjacent to it, and the words "Hospital Products for Home Care" below "Johnson & Johnson."  Defs' SJ SOF ¶ 179.  J&J has no evidence that it used the Emblem in conjunction with the words "Hospital Products for Home Care" prior to January 5, 1905.

As a matter of law, these current uses are not "indistinguishable" from J&J's pre-1905 uses.  J&J attempts to justify some—but not all—of these current depictions and/or uses of the Emblem by providing seven examples in its brief of "Pre-1905 Examples of the Red Cross, 'Johnson & Johnson', and "First Aid" together."  See J&J Mem. insert between pp. 37-38.  However, none of J&J's examples are identical to, or have the same commercial impression as,

37

any of the present day depictions of the Emblem at issue. For instance, none show the phrase "first aid" written within the Emblem. Moreover, Exhibit 9 at JJARC364 appears to depict an Emblem in a field unconnected to any product, as does Exhibit 8 at JJARC293. Id.

In the end, J&J knows it cannot sustain its burden of showing indistinguishable or legally equivalent uses, for it admits that its current uses are not the same commercial impressions as those in 1905. Instead, J&J characterizes them as "substantially identical" and "minor rearrangements," but not as legal equivalents or indistinguishable. J&J Mem. 37. As the O-M Bread court found, any time "different marks present a different commercial impression and are not legal equivalents, it would be an incorrect interpretation of the [grandfather statute] to hold they are nonetheless grandfathered under the [grandfather provision]." 65 F.3d at 938.

### B.    J&J Is Using The Red Cross On Products It Did Not Sell In 1905.

J&J's grandfathered rights are limited to "the same class of goods" that it was using the cross on in 1905. J&J did not sell emergency preparedness products before 1905. Responsive SOF ¶ 185. Indeed, J&J's 30(b)(6) witnesses have admitted that there is a newly emerging emergency preparedness market, and that it wants to be a part of that new market. Id. The emergency preparedness kit that J&J now offers, as indicated by its label, includes over 170 items—many of which are distinctly not first aid items and were not being sold by J&J under the Red Cross label before 1905. For example, we submit that survival wrap and light sticks would have been foreign to victims of the 1900 Galveston flood. The kit also adds things like magnets, light sticks, and latex protective gloves that J&J admits were not sold under the Red Cross Emblem before 1905. J&J Mem. 38-39; Responsive SOF ¶¶ 186-191.

We applaud J&J's effort to place emergency preparedness items in the hands of the American public. But despite J&J's suggestion that it can put whatever it wants into a box with

a Red Cross symbol and call the additions "modern improvements," that represents an impermissible expansion of its grandfathered rights. It can sell its 170-item emergency preparedness kits and we hope it will, but not with a Red Cross symbol.

**POINT IV:     THE DEFENDANTS HAVE STANDING TO SEEK CANCELLATION.**

J&J is wrong in denying the standing of the non-ARC defendants to assert the declaratory judgment and cancellation counterclaims based on the genericness and/or functionality of the red cross symbol when used with first aid and wound care products. First, J&J's position is premised on its claim that the non-ARC defendants are federal criminals under § 706 when they partner with ARC and use the Emblem with its authorization. We have already explained why that is wrong. See supra 12-19.

Second, and in any event, the non-ARC defendants clearly have standing to assert their declaratory judgment and cancellation counterclaims against J&J's federally registered trademarks when, as here, J&J has asserted those federally registered trademarks against the non-ARC defendants. See Amended Complaint, ¶¶ 119-120 and 124. Thus, there is no question that the non-ARC defendants meet the standing requirements for their cancellation claim. See Loctite Corp. v. Nat'l Starch & Chem. Corp., 516 F. Supp. 190, 212 n.30 (S.D.N.Y. 1981) ("defendants clearly meet the relevant standing requirements [for cancellation] . . . since plaintiffs, in part on the basis of their registration, invoke against defendants the protection of the Lanham Act"); Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd., 977 F. Supp. 264, 267 (S.D.N.Y. 1997) ("[h]aving been sued for trademark infringement [and other Lanham Act violations], [defendant] has the requisite injury to confer standing [for cancellation]."). See also Starter Corp. v. Converse, Inc., 84 F.3d 592, 596 (2d Cir. 1996) (stating that in order to promptly resolve trademark disputes, "the finding of an actual controversy should be determined with

some liberality"); <u>Mears v. Montgomery</u>, 2004 WL 964093, at *14 (S.D.N.Y. 2004) ("any petitioner who establishes a real interest in the proceeding, as opposed to a hypothetical one or the claim of a mere intermeddler, has standing to seek cancellation of a mark registration") (internal quotation marks omitted); <u>Citigroup Inc. v. City Holding Co.</u>, 2003 WL 282202, at *15 (S.D.N.Y. Feb. 10, 2003).  The non-ARC defendants readily meet this standard.

## CONCLUSION

Both parties agree that the lawfulness of ARC's sale of products and authorization of others to use the Emblem is a question of law susceptible to resolution by summary judgment. For the reasons given here and in support of our motion, J&J's motion for summary judgment should be denied and the defendants' motion should be granted.


Dated:  December 5, 2007                    Respectfully submitted,

                                            HOGAN & HARTSON, L.L.P.

                                            By:_____s/Jonathan L. Abram_____
                                            Jonathan L. Abram (admitted <u>pro</u> <u>hac</u> <u>vice</u>)
                                            Raymond A. Kurz (admitted <u>pro</u> <u>hac</u> <u>vice</u>)
                                            555 Thirteenth Street, N.W.
                                            Washington, D.C. 20004
                                            Tel:  (202) 637-5681
                                            Fax:  (202) 637-5910

                                            Attorneys for Defendants

## **CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that on the 5th day of

December, 2007, I caused a true and correct copy of the foregoing to be served upon the

following via the Court's ECF Notification System:

> Gregory L. Diskant
> Sarah Elizabeth Zgliniec
> Patterson, Belknap, Webb & Tyler LLP
> 1133 Avenue of the Americas
> New York, NY 10036
> Tel:  (212) 336-2710
> Fax:  (212) 336-2222
> E-mail:  gldiskant@pbwt.com
> E-mail:  sezgliniec@pbwt.com
>
> Richard Zachary Lehv
> Roger L. Zissu
> Fross Zelnick Lehrman & Zissu, P.C.
> 866 United Nations Plaza
> New York, NY 10004
> Tel:  (212) 813-5900
> Fax:  (212)-813-5901
> E-mail:  rlehv@frosszelnick.com
> E-mail:  rzissu@frosszelnick.com

                                                        ___s/ Jonathan L. Abram___
                                                             Jonathan L. Abram