Jonathan L. Abram
Raymond A. Kurz
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel: (202) 637-5681
Fax: (202) 637-5910

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | 07 Civ. 7061 (JSR/DCF) |
| v. | ) ) | **ECF CASE** |
| THE AMERICAN NATIONAL RED CROSS, LEARNING CURVE INTERNATIONAL, INC., MAGLA PRODUCTS, LLC, WATER-JEL TECHNOLOGIES, INC., and FIRST AID ONLY, INC., | ) ) ) ) ) ) | **ELECTRONICALLY FILED** |
| Defendants. | ) ) ) | |

_____

**DEFENDANTS' RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT OF
UNDISPUTED FACTS AND DEFENDANTS' COUNTER-STATEMENT OF
UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 56.1, Defendants, through their attorneys, Hogan & Hartson L.L.P., hereby submit their response to Plaintiffs' Rule 56.1 Statement of Undisputed Facts and Defendants' Counter-Statement of Additional Material Facts As To Which There Are Genuine Issues To Be Tried.  The evidence cited in this response and Counter-Statement is:

- in the Amended Complaint of Plaintiffs Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc. ("J&J"), filed on September 5, 2007 (the "Complaint");

- attached to the accompanying Declaration of Jonathan Abram, dated December 5, 2007 ("Second Abram Decl.");

- attached to the Declaration of Jonathan Abram, dated November 21, 2007 that accompanied Defendants' Rule 56.1 Statement in Support of Defendants' Motion for Summary Judgment ("First Abram Decl.);

- in the Declaration of David Meltzer, Senior Vice President, International Services, of the American Red Cross, dated December 5, 2007 ("Meltzer Decl.");

- in the Declaration of Scott Conner, Senior Vice President, Preparedness & Health and Safety Services of the American Red Cross, dated November 19, 2007 ("Conner Decl.");

- in the Declaration of Gregory Ballish, Senior Vice President, Biomedical Services of the American Red Cross, dated November 19, 2007 (Ballish Decl.");

- in the Declaration of Joseph C. Becker, Senior Vice President, Preparedness & Response of the American Red Cross, dated Novemer 20, 2007 ("Becker Decl."); and

- in the Declaration of Kathleen Loehr, Interim Senior Vice President for Development of the American Red Cross, dated November 20, 2007 ("Loehr Decl.").

## DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT
## OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1

### I.  J&J's Use of the Red Cross Emblem

**1.**  Use by Johnson & Johnson (together with Johnson & Johnson Consumer Companies, Inc., "J&J") of the red cross emblem dates back to at least 1879 when its predecessor, Seabury & Johnson, adopted the emblem as a mark for their pharmaceutical and surgical products. *Protection of the Name and Emblem of the Red Cross: Hearings Before the H. Comm. on Foreign Affairs*, 77th Cong. 175-77 (2d Sess. 1942) [hereinafter "1942 H. Comm. Hearings"] (quoting testimony of George Seabury from Jan. 27, 1903) (App. 3, Tab 53 at 175-77).[1]

Response to 1:  Disputed.

In its complaint, J&J explains that it told the Patent and Trademark Office in 1906 that J&J "made first use of the mark in 1887."  Compl. ¶ 31.  J&J's trademark registrations for the Red Cross Emblem do not identify a date of first use anywhere earlier than 1887.  Compl. ¶ 31, Ex. A.

Moreover, the hearing testimony cited specifically states that Seabury & Johnson had no documentation of any use before 1884, and that Seabury & Johnson's early use of the Red Cross Emblem was not as a trademark, but rather as "an indication of the type and character of the goods rather than connected with the particular manufacturer."  1942 H. Comm. Hearings at 177, (J&J App. 3, Tab 53, Part 8).

According to Patent and Trademark Office records, the only entities using the Red Cross Emblem before 1881 when ARC was incorporated were selling:  (1) macaroni and (2) canned goods.  See *Red Cross:  Hearings on S. 2241 and H.R. 7420 Before the S.  Subcomm. on the*

---

[1]     "App." refers to the Appendices of legal materials submitted by Plaintiffs under the Declaration of Ravi V. Sitwala Submitting Appendices.  The Appendices include separate appendices for (1) statutes, (2) Geneva Convention material and (3) legislative history.  "Ex." refers to the Exhibits submitted under the Declaration of Ravi V. Sitwala Submitting Exhibits.

*Judiciary*, 77th Cong. 9 (2d Sess. Dec. 4,8, 1942) ("1942 S. Subcomm. Hearings") (J&J App. III, Tab 54).

**2.**     By 1903, through J&J's promotional efforts, "the public . . . came to rely upon the Red Cross as indicating [J&J's] goods, and to look upon the red-cross symbol as an indicia of origin." *Id.* at 160 (quoting opinion by N.J. Court of Chancery).

    Response to 2:  Disputed.

    By 1903, a red Greek cross had been used as a broad indicator of medicine for several hundred years.  See Compl. ¶ 20.

    Moreover, the American Red Cross had been using the Greek red cross in all of its works since at least as early as 1881. See Becker Decl. ¶ 3; Ballish Decl. ¶ 3.  Since at least as early as 1904, ARC's use included selling first aid kits bearing ARC's name and the Red Cross Emblem. See First Abram Decl., Ex. 16 (Agreement, Feb. 20, 1904); First Abram Decl., Ex. 17 (First Aid Supply Catalog of ARC first aid kits).  As a result, the public also associated the red cross with American Red Cross products.

    The 1942 Hearing included a list of numerous third parties using trademarks featuring a red Greek cross prior to 1903, demonstrating that this symbol did not uniquely identify J&J.  1942 Hearing List (J&J App. 53, Part 1, at 10-12).  For example, 30 different mediated plaster products—only one of which was Johnson's—were using the red cross by 1903.  1942 Hearing (J&J App. 53, Part 18, at 429).  Nine different adhesive plasters were using the red cross symbol by 1903, again only one of which was Johnson's.  Id. at 429-30.

    Defendants do not dispute that the quotation in J&J Fact 2 is a true and accurate representation of language contained in the New Jersey Court of Chancery opinion.

**3.**     J&J, itself or through subsidiaries, has used the emblem as a trademark for a variety of first-aid, wound-care, and other products, including gauze pads, adhesive tape, and first-aid kits containing such items as adhesive bandages, gauze pads, adhesive tape, analgesics, first-aid cream, health care gloves, cleansing wipes and instructional manuals. (*See* Exs. 6-13.)

3

<u>Response to 3</u>:  Disputed.

Defendants Magla, Learning Curve, First Aid Only and Water-Jel dispute that J&J has used the emblem as a valid trademark in connection with any goods.  The list of pre-1905 products bearing the red cross symbol demonstrates this genericness and/or functionality.  1942 Hearings at 429-33 (listing pre-1905 uses by category).  The above defendants will present expert testimony at trial establishing the functional or generic nature of the symbol in the area of first aid and wound care.  <u>See</u> Second Abram Decl., ¶ 3; <u>see also</u> Second Abram Decl., Ex. 163 (Carpinello Dep. 157-158); Second Abram Decl., Ex. 164 (Hirsh Dep. 142-145).

Moreover, Seabury & Johnson acknowledged that it had no documentation of any use before 1884, and that Seabury & Johnson's early use of the Red Cross Emblem was not as a trademark, but rather as "an indication of the type and character of the goods rather than connected with the particular manufacturer."  1942 H. Comm. Hearings at 177, (J&J App. 3, Tab 53, Part 8).

Defendants do not dispute that J&J has used a red cross symbol in connection with first-aid and wound-care products.

**4.**    J&J owns federal trademark registrations for the red cross emblem, including nos. 54,308, 1,889,576, 1,888,143, 1,870,955 and 3,178,913.  (Exs. 1-5.)

<u>Response to 4</u>: Disputed.

The Red Cross disputes J&J's characterization of the listed registrations as "for the red cross emblem."

Registration 1,870,955 is for the words "Red Cross" used on cotton and does not involve the Red Cross Emblem.  Compl. ¶ 31, Ex. A; J&J Ex. 4.

Registration 3,178,913 is for a composite mark using "Johnson & Johnson," "First Aid," and the Red Cross Emblem in conjunction with each other, which is not a trademark registration

"for the red cross emblem" alone.  J&J Ex. 5; First Abram Decl., Ex. 11 (Biribauer Dep. 71-73,

77); First Abram Decl., Ex. 153 (File Wrapper for Registration No. '913); First Abram Decl., Ex.

154 (Photograph of product using '913 Registration).

Setting aside validity, defendants do not dispute that J&J owns trademark registrations

nos. 54,308, 1,889,576, 1,888,143, 1,870,955 and 3,178,913.

**II.    The Geneva Convention, the American National Red Cross, and Its Charter**

**5.**     At the First International Conference at Geneva in 1863, what is now known as the
        International Committee of the Red Cross ("ICRC") was formed.  Resolutions of the
        Geneva International Conference, Art. 10 (Oct. 26-29, 1863) (App. II, Tab 21).

        Response to 5:  Disputed.

        It is undisputed that ICRC was founded in 1863; however the cited document references

the Geneva Committee, not the ICRC.

**6.**     The First Geneva Convention, adopted in 1864 by several countries, set forth rules for the
        treatment of the wounded during wartime.  (ARC Answer ¶ 34 (admitting Amended
        Complaint ¶ 34).)

        Response to 6:  Undisputed.

**7.**     In 1881, Clara Barton founded a group to campaign for ratification of the 1864 Geneva
        Convention by the United States.  (ARC Answer, Introductory Statement ("Intro") ¶ 10.)

        Response to 7: Undisputed.

**8.**     The efforts of Barton and her group successfully resulted in ratification by the United
        States of the Geneva Convention in 1882.  (*Id.* ¶ 12.)

        Response to 8:  Undisputed.

**9.**     In 1900, the U.S. Government federally chartered ARC by statute.  Act to Incorporate the
        American Red Cross, ch. 784, 31 Stat. 277 (1900) (App. I, Tab 1).

        Response to 9:  Undisputed.

**10.**    Since 1900, ARC's charter has been reenacted and amended a number of times.  ARC
        Charters and Amendments (App. I, Tabs 1-13).

        Response to 10:  Undisputed.

**11.**    The Geneva Convention has been revised a number of times, including in 1906, 1929 and 1949.  (App. II.)

Response to 11:  Undisputed.

### III.    The ICRC Regulations

**12.**    The ICRC principles referred to in the 1949 Geneva Convention are set forth in part in its Regulations on the Use of the Emblem of the Red Cross or the Red Crescent by the National Societies (the "Regulations").  Regulations (App. II, Tab 38).

Response to 12:  Disputed.

The 1949 Geneva Convention does not make any mention of the "ICRC principles."  It refers to the "principles laid down by the International Red Cross Conferences."  1949 Geneva Convention, art. 44 (J&J App. 26).  The principles of the International Red Cross Conferences that guide the International Red Cross Movement are:  humanity, impartiality, neutrality, independence, voluntary service, unity, and universality.  See Meltzer Decl. ¶ 4; Second Abram Decl., Ex. 165 (Statutes of the International Red Cross and Red Crescent Movement, Preamble (2006))

The ICRC is one of the many entities that comprise the International Red Cross and Red Crescent Movement ("Movement"); the Movement is made up of numerous national societies, ICRC and the International Federation of Red Cross and Red Crescent Societies.  Meltzer Decl. ¶¶ 4-6; Second Abram Decl., Ex. 165, (Statutes of the International Red Cross and Red Crescent Movement, art. 1 (2006)).

The ICRC Regulations to which J&J refers were issued in 1991 as non-binding guidelines published by a sister society.  Both ARC and ICRC recognize that the relationship between ARC and ICRC is not hierarchical in nature and that national societies "carry out their humanitarian activities according to local needs, in line with their own statutes and subject to national law."  Second Abram Decl., Ex. 166 ("What is ICRC's relationship with national Red

6

Cross and Red Crescent societies?," http://www.icrc.org/web/eng/siteeng0.nsf/htmlall/ 5fmjhl?opendocument).  ICRC also acknowledges that  national societies "are autonomous organizations" and that "it has no direct authority over them."  Id; see also Meltzer Decl. ¶¶ 7-11.

Article 7 of the 1991 Regulations makes clear that the National Societies themselves "shall lay down the conditions governing use of the emblem."  1991 Regulations, art. 7 (J&J App. II, Tab 38).

ARC's Senior Counsel, Julie Ortmeier, testified during her deposition that "[t]he policies set by the ICRC are aspirational.  They're guidelines. . . the ICRC has no enforcement capability." Second Abram Decl., Ex. 167 (Ortmeier Dep. 149:22-24).

**13.** The Regulations were revised in 1991 in part in order "to enable the National Societies to diversify and expand their sources of income, without prejudice to the respect due to the emblem."  Preamble to ICRC Regulations (App. II, Tab 38 at 1).

Response to 13:  Undisputed that this was one of the purposes of the 1991 revision.

**14.** The Regulations provide, in part, the following:

> [The National Society] shall not authorize the display of its emblem on items for sale and may authorize its display on advertising material only with the utmost restraint and on condition that the emblem be of small dimensions and accompanied by a clear explanation of the assistance received by the Society.

ICRC Regulations, art. 23 (App. II, Tab 38 at 11).

Response to 14:  Disputed.

This sentence is taken out of context and is therefore misleading.  Article 23, ¶ 1, of the 1991 Regulations states that National Societies "may use the emblem to support the campaigns and events it organizes to make its activities known, to disseminate knowledge of international humanitarian law and of the Movement's Fundamental Principles, or to raise funds, within the limits of Articles 2 to 5 of the Regulations."  ICRC Regulations, art. 23 ¶ 1(J&J App. II, Tab 38 at 11) (emphases added).  The Commentary to Article 23, ¶ 1 also states that "the name and

<u>emblem may be used</u> for fund-raising purposes <u>to sell an Object</u>."  Id., art. 23, Commentary ¶ 1 (J&J App. II, Tab 38 at 11) (emphases added).

Article 23 further states that National Societies may "<u>co-operate[] with a commercial company or other organization in order to raise funds</u> or further its dissemination activities" and "<u>may display the company's trademark, logo or name on articles used by the Society, on its advertising material or items which it sells</u>."  <u>Id.</u>, art. 23 ¶ 3 (emphases added).

Paragraph 4 of article 23, which J&J excerpts, addresses a cause marketing situation and states that National Societies "may authorize commercial companies or other organizations to mention in their advertising material that they have made a donation to or otherwise contributed to the National Society's work.  Such mention may also be authorized on products for sale the proceeds from which are to be donated in full or in part to the National Society."

## IV.    <u>ARC Testimony at Congressional Hearings</u>

**15.**    ARC representatives have testified at and submitted written materials in connection with Congressional hearings concerning reenactment and amendment of ARC's charter.   (*See* App. III, Tabs 49, 52-54 and 62-63.)

<u>Response to 15</u>:  Undisputed.

**16.**    In 1909, ARC Secretary Mabel Boardman testified before Congress in part:

> At the earthquake and fire at San Francisco they tried to draw a line and prohibit people from passing that line unless they should bear the Red Cross.  But the newspaper men pretty generally put on Red Cross badges, and other people used the badges to a great extent, and some people put them on automobiles, until the emblem was no longer respected, and one man in an automobile with a Red Cross badge attempting to ride through the lines was shot at by a national guardsman on refusing to stop, and the emblem became so abused that people no longer recognized it. Now, had that man in the automobile been a physician, authorized to use the emblem, and had he been going to the relief of some sick person he might have been shot because they did not regard it.

*American National Red Cross:  Hearing Before H. Subcomm. on Foreign Affairs*, 60th Cong. 2 (1909) (App. III, Tab 49 at 2).

8

Response to 16:  Undisputed that this accurately reflects a portion of the testimony, but this excerpt and the others J&J selects must be read together with the rest of the testimony given at the hearings.

When read in context, the testimony quoted in this paragraph makes clear that Ms. Boardman was testifying in support of banning any private users of the Red Cross Emblem.  She testified about abuses of the Emblem occurring and requested that the Emblem be further protected in accord with the 1906 Geneva Convention.  *American National Red Cross:  Hearing Before H. Subcomm. on Foreign Affairs*, 60th Cong. 2 (1909) (J&J App. III, Tab 49 at 1-2).

17.    Ms. Boardman, still then ARC Secretary, testified before Congress in 1910, testifying in part that the incident known as the Cherry mine disaster "show[ed] how a lack of control on [ARC's] part may give trouble".  *The Red Cross:  Hearing on H.R. 22311 Before the H. Comm. on Foreign Affairs*, 61st Cong. (2d Sess. 1910) (App. III, Tab 53 at 360).

Response to 17: Undisputed that this accurately reflects a portion of the testimony.

18.    Before Congress in 1919, Colonel Joseph M. Hartfield, legal advisor to ARC, testified concerning ARC's statutory charter in part:

> [T]he bill as prepared [in 1905] gave to the Red Cross the exclusive right to use the emblem and provided that it should be unlawful to use it for trade and commercial purposes. . . .  The effect of [the grandfather clause] was, of course, to say that anyone who, prior to January 5, 1905, had used for commercial purposes and as a trade-mark in their advertising matter the Red Cross emblem should not be liable to criminal punishment thereafter for using it.

*To Protect the Name "Red Cross":  Hearing before the H. Comm. on Patents*, 65th Cong. (3d Sess. 1919) (App. III, Tab 53 at 373).

Response to 18.  Disputed.

Colonel Hartfield's testimony goes to the 1910 grandfather clause, which he points out was incorporated because "a very large company manufacturing surgical dressings and surgical goods in New Jersey" opposed any legislation that gave ARC the exclusive right to use the

Emblem. *To Protect the Name "Red Cross": Hearing before the H. Comm. on Patents*, 65th

Cong. (3d Sess. 1919) (J&J App. III, Tab 53 at 373).

19.    Col. Hartfield further testified to Congress in part in 1919:

> [U]se of the emblem for commercial purposes tends to cheapen it,
> tends to make it appear to be a commercial proposition, tends to
> make it appear that we are lending our name and emblem to the
> commercial advantage of these people . . . .
>
> The use of the emblem for commercial purposes does seriously
> embarrass the Red Cross officials in the work and does interfere
> with it.

*Id.* at 377-78.

Response to 19:    Undisputed that this is an accurate quotation.

Colonel Hartfield's comments were directed at use of the Emblem by non-ARC firms

attempting to benefit from publicly associating the Emblem with ARC.  He was particularly

focused on the "principle offender" of this misuse of the Emblem—which he identified as J&J—

because J&J was permitting the impression that J&J was selling real Red Cross goods.  *To*

*Protect the Name "Red Cross": Hearing before the H. Comm. on Patents*, 65th Cong. (3d Sess.

1919) (J&J App. III, Tab 53 at 377).

20.    In 1942, hearings before Congress, ARC's Chairman Norman H. Davis explained in a
letter:

> The American Red Cross is not now engaged in any commercial
> venture for profit, has no intention of engaging in such operations,
> and is advised that the provisions of its charter, by which it is
> bound, would not permit it to engage in commercial enterprises for
> profit.

1942 H. Comm. Hearings (App. III, Tab 53 at 262).

Response to 20:    Undisputed that this quotation is accurate.

This quote has no relevance since the promissory estoppel claim was dismissed with

prejudice.  But in any event, ARC was not then, and never has engaged in commercial venture

for profit. All receipts from sales of ARC products, services, and publications help fund ARC's

humanitarian mission and help promote preparedness for medical and other emergencies,

disasters, and needs. See Conner Decl. ¶ 4; Loehr Decl. ¶ 4.

**21.**    During the Congressional hearings in 1942, ARC Chairman Davis also testified in part:

> The use of the Red Cross emblem for commercial purposes makes
> it easy for one desiring to undermine morale and unity among the
> people, particularly in wartimes, to spread rumors, about the red
> cross such as that the Red Cross is selling articles that are
> contributed for free distribution for relief purposes, or that the red
> cross is receiving a commission from, or participation in, the
> profits from the sale of these advertised products.
>
> The commercial use of the emblem tends to cheapen it and
> weakens the respect in which it is held. There is rising ground
> swell of resentment on the part of the American public against a
> use which in their minds is disrespectful to an emblem which they
> cherish.

*Id.* at 225.

Response to 21:   Undisputed that this quotation is accurate.

When read in context, ARC Chairman Davis is discussing the problems caused by use by

grandfathered users like J&J. *To Protect the Name "Red Cross": Hearing before the H. Comm.*

*on Patents*, 65th Cong. (3d Sess. 1919) (App. III, Tab 53, Part 10 at 224-225).

Chairman Davis is not talking about use of the Emblem by ARC; indeed, during World

War II, ARC's first aid textbook "ha[d] become a national 'Best Seller.' " See First Abram Decl.,

Ex. 51. During fiscal year 1940-41, ARC chapters sold over $30,000 in first aid kits and refills

for first aid kits. See First Abram Decl., Ex. 53 (Summary of Essential Supplies Incidental to the

Activities of ARC Distributed Principally Through its Chapters for Fiscal Year 1940-41, at 1).

**22.**    In 1942, ARC obtained and submitted to Congress a letter opinion from Attorney General
Francis Biddle. *Red Cross: Hearings on S. 2241 and H.R. 7420 Before the S. Subcomm.*
*on the Judiciary*, 77th Cong. 5 (2d Sess. Dec. 4,8, 1942) [hereinafter "1942 S. Subcomm.
Hearings"] (App. III, Tab 54 at 5) (stmt. Of ARC General Counsel Hughes).

Response to 22:  Undisputed.

23.    Attorney General Biddle's letter provided in part:

> I have your letter of June 8, 1842, in which you propound a
> question to me as counselor with respect to the powers of the
> American Red Cross.
> . . . .
> The corporation was granted no powers, either directly or by
> implication, to engage in ordinary commercial manufacturing or
> mercantile activities.  It is, of course, axiomatic that a corporation
> has only those powers which are granted affirmatively in its charter
> or which may be incidentally necessary to the fulfillment of the
> functions which it is created to discharge.  Needless to say, this
> principle applies with stronger reason to an institution such as the
> American Red Cross which has been repeatedly declared in
> administrative rulings and judicial decisions to be a nonprofit,
> charitable, and educational institution and which has long enjoyed
> under such rulings a unique status among charities as a quasi-
> governmental agency.
>
> For the reasons thus briefly indicated it is clear that the American
> Red Cross is not empowered to engage in business of a
> commercial or manufacturing character in competition with private
> business.

*Id.* at 5-6.

Response to 23:  Undisputed that this quotation is accurate.

24.    During the 1942 hearings, ARC's representative H.J. Hughes testified in part in exchange
with Senator Mahoney:

> [Sen. Mahoney:]  Your point is that [the clause] undertakes to
> prohibit something which the Red Cross is not authorized to do by
> its charter?
>
> [Hughes:]  That is it; yes, sir.

*Id.* at 6.

Response to 24:  Undisputed that this quotation is accurate.

In context, H.J. Hughes had just completed explaining that ARC was selling textbooks

and first aid kits through the national ARC and chapters.  1942 S. Subcomm. Hearings at 5 (J&J

App. III, Tab 54).

**V.      ARC Publications and Pronouncements**

**25.**      ARC has issued a variety of publications and statements addressing use of the red cross
          emblem.  (Exs. 14-15, 55-69.)

          Response to 25:  Undisputed.

**26.**      In 2006, ARC issue a report titled *American Red Cross Governance for the 21st Century*,
          which states in part that ARC's federal charter "designates the Red Cross as the national
          Red Cross society of the United States for purposes of carrying out the duties of the
          United States as a signatory to the Geneva conventions and performing the duties
          required of a national Red Cross society in the International Red Cross and Red Crescent
          Movement."  (Ex. 51 at 5 & n. 28.)

          Response to 26:  Undisputed that this quotation is accurate.

          Footnote 28 cited by J&J reiterates the seven fundamental principles guiding the Red

Cross Movement, as determined by the International Red Cross Conferences:  humanity,

impartiality, neutrality, independence, voluntary service, unity, and universality.

**27.**      As explained in ARC's Restatement of American Red Cross Fundraising and Revenue
          Generation Policies, ARC recognizes it has a duty to abide by the ICRC Regulations
          regarding use of the emblem:

                    As an organization, we also have a duty to abide by the
                    'Regulations on the Use of the Emblem of the Red Cross or the
                    Red Crescent by the National Societies' outlined and published by
                    the International Committee of the Red Cross.  The ICRC
                    regulations require that National Societies (including the American
                    Red Cross) use the Red Cross brand consistently with both
                    international humanitarian law under Fundamental Principles and
                    that activities neither tarnish the prestige nor reduce the respect due
                    the Red Cross brand.

          (Ex. 14 at 1-2.)

          Response to 27:  Disputed.

The document J&J is citing is an internal draft and has not been finalized by ARC.

Second Abram Decl., Ex. 167 (Ortmeier Dep., 164:7-10).  Therefore, it cannot bind or impose

any duty on ARC, or "recognize" any duty.  It is simply a draft.  And it does not remotely suggest

that J&J has any authority to enforce any aspect of the ICRC pronouncements mentioned..

**28.**     As recently as 2004, ARC Senior Counsel stated in part in a letter to a would-be
commercial user of the red cross emblem:  "Unlike standard trademark enforcement and
policing designed to protect commercial purposes, the Red Cross mission is quite
different.  ***We must protect the Red Cross emblem because misuse, intentional or
inadvertent, can put lives at risk***."  The same letter explains in part that "[w]hen a red
cross appears on the vest of a worker at the scene of a disaster, it indicates that person is a
trained Red Cross worker with the necessary skills and knowledge to respond to the
danger at hand.  When it appears on the roof of a tent or vehicle during military hostility,
the emblem signals a neutral and safe haven for medical treatment."  (Ex. 15 at
ARC154010.)

    Response to 28:  Disputed.

This exhibit is an unsigned draft letter and there is no testimony or evidence it was ever

sent.  And even with respect to the unsent document J&J references, it contains nothing to

support J&J's suggestion that ARC's Charter restricts it from licensing the emblem to

manufacturers of Red Cross Products.  In fact, ARC has been licensing other firms to produce

Red Cross Brand merchandise for over a century. See First Abram Decl., Ex. 13 (1903 First Aid

Kit Photograph, listing price of first aid textbook as $1.00); First Abram Decl., Ex. 14 (Excerpt

of ARC Annual Report for the Year Ending December 31, 1903, at 23).  Furthermore, the

Department of Justice has expressly acknowledged that the American Red Cross may authorize

others, including commercial firms, to use the Emblems on products.  See First Abram Decl., Ex.

86 (Attachment to Letter from John Currin, ARC, to Michael Kelly, Counselor to Attorney

General, Sept. 12, 1978); First Abram Decl. 87 (Letter from Philip Heymann, Assistant Attorney

General, to John Currin, ARC, Oct. 11, 1978). The IRS has also ruled that the American Red

Cross's "distribution of a first aid kit . . . is in direct and substantial furtherance of the purpose

for which [ARC was] recognized as exempt" under the Internal Revenue Code, and income from

such sales is not subject to the unrelated business tax.  First Abram Decl., Ex. 88 (IRS Revenue

Ruling, Feb. 8, 1985, at 5).

**VI.    ARC's Sale and License of Red Cross Brand Products**

**29.**    ARC has entered into license agreements with various companies for those companies to
manufacture and sell products that display the red cross emblem.  (Exs. 26-29.)

Response to 29: Disputed.

ARC has not entered into any license agreements with any third parties to manufacture

and sell products that display the red cross emblem alone. See First Abram Decl., Ex. 129

(ARC/Water-Jel Agreement & Amendment ¶ 2.1, Schedule A); First Abram Decl., Ex. 133

(ARC/First Aid Only Agreements & Amendments ¶ 2.1, Schedule A); First Abram Decl., Ex. 137

(ARC/Learning Curve Agreement & Amendment ¶ 2.1, Schedule A); First Abram Decl., Ex. 140

(ARC/Magla Agreement & Amendment ¶ 2.1, Schedule A).

ARC does not dispute that it has entered into license agreement with certain companies

for those companies to, among other things, manufacture and sell ARC products displaying the

American Red Cross name and Red Cross Emblem.  See First Abram Decl., Ex. 129

(ARC/Water-Jel Agreement & Amendment ¶ 2.1, Schedule A); First Abram Decl., Ex. 133

(ARC/First Aid Only Agreements & Amendments ¶ 2.1, Schedule A); First Abram Decl., Ex. 137

(ARC/Learning Curve Agreement & Amendment ¶ 2.1, Schedule A); First Abram Decl., Ex. 140

(ARC/Magla Agreement & Amendment ¶ 2.1, Schedule A).

The ARC has also entered into a wide variety of other agreements over the years

authorizing other companies to use the American Red Cross name and Red Cross Emblem in the

manufacture of items for the ARC or for sale to the public.  See, e.g., First Abram Decl., Ex. 16

(ARC-First Aid Supply Company Agreement, Feb. 20, 1904); First Abram Decl., Ex. 17 (First

Aid Supply Catalog of ARC first aid kits); First Abram Decl., Ex. 75 (Excerpt of Deposition of

Andrea Morisi, Nov. 9, 2007 ("Morisi Dep.") 128, 134, 136-137, 139-142, 144-145, 146-148,

149, 152-153, 155); First Abram Decl., Ex. 91 (Advertisement for "American Red Cross First

Aid: The Video Kit"); First Abram Decl., Ex. 99 (ARC-Sirena Apparel Licensing Agreement,

Feb. 1, 1995, at 1).

**30.**   Companies with which ARC has entered license agreements for the manufacture and sale
of products that display the red cross emblem include at least: First Aid Only, Inc,
Learning Curve International, Inc, Water Jel Technologies, Inc., and Magla Products,
LLC (collectively the "Licensee Defendants").  (*Id.*)

Response to 30:  Disputed.

ARC has not entered into license agreements with Learning Curve International, Inc. or

Water-Jel Technologies, Inc. nor has it entered into any license agreements which purport to

license use of the Red Cross Emblem alone.  Defendants do not dispute that ARC has entered

into license agreements with First Aid Only, Inc., Learning Curve Brands, Inc., Water-Jel

Technologies, LLC, and Magla Products, LLC (collectively the "Licensee Defendants") to,

among other things, manufacture and sell ARC products displaying the American Red Cross

name and Red Cross Emblem.  See First Abram Decl., Ex. 129 (ARC/Water-Jel Agreement &

Amendment ¶ 2.1, Schedule A); First Abram Decl., Ex. 133 (ARC/First Aid Only Agreements &

Amendments ¶ 2.1, Schedule A); First Abram Decl., Ex. 137 (ARC/Learning Curve Agreement

& Amendment ¶ 2.1, Schedule A); First Abram Decl., Ex. 140 (ARC/Magla Agreement &

Amendment ¶ 2.1, Schedule A).

**31.**   Products displaying the red cross emblem that are manufactured and sold by companies
pursuant to license agreements with ARC (the "Red Cross Brand Products") include at
least:  first aid kits (FAO and Learning Curve), hand sanitizers (Water Jel) and latex
gloves (Magla).  (*Id.*; Exs. 20-21.)

Response to 31:  Disputed

Products displaying the Red Cross Emblem alone are not manufactured or sold by the Licensee Defendants. Defendants do not dispute that ARC has entered into license agreements with the Licensee Defendants to, among other things, manufacture and sell ARC products displaying the American Red Cross name and Red Cross Emblem. See First Abram Decl., Ex. 129 (ARC/Water-Jel Agreement & Amendment ¶ 2.1, Schedule A); First Abram Decl., Ex. 133 (ARC/First Aid Only Agreements & Amendments ¶ 2.1, Schedule A); First Abram Decl., Ex. 137 (ARC/Learning Curve Agreement & Amendment ¶ 2.1, Schedule A); First Abram Decl., Ex. 140 (ARC/Magla Agreement & Amendment ¶ 2.1, Schedule A).

Defendants dispute that First Aid Only, Learning Curve, Water-Jel or Magla sell any ARC products under the incomplete agreements depicted in J&J Exs. 26-29. Defendants dispute that First Aid Only and Learning Curve sell ARC general first aid kits under the Corporate Brand License Agreements shown in Exs. 26-29.

Defendants do not dispute that First Aid Only sells ARC emergency preparedness kits and that Learning Curve sells ARC infant and toddler first aid kits or that Water-Jel sells ARC hand sanitizer and that Magla sells ARC latex gloves under the Corporate Brand License Agreements. See First Abram Decl., Ex. 129 (ARC/Water-Jel Agreement & Amendment ¶¶ 1.6, 2.1, Schedule A); First Abram Decl., Ex. 133 (ARC/First Aid Only Agreements & Amendments ¶¶ 1.5, 2.1, Schedule A); First Abram Decl., Ex. 137 (ARC/Learning Curve Agreement & Amendment ¶¶ 1.7, 2.1, Schedule A); First Abram Decl., Ex. 140 (ARC/Magla Agreement & Amendment ¶¶ 1.8, 2.1, Schedule A).

**32.**     Red Cross Brand Products are sold variously through retailers, including Target, Wal-Mart, Walgreens, and CVS. (Ex. 21.)

Response to 32: Disputed.

ARC incorporates herein its response to 31. Exhibit 21 does not support the statement that the "Red Cross Brand Products," as defined in Fact 31, are sold in these four retailers.

In fact, the ARC first aid kits manufactured by First Aid Only, included by J&J as "Red Cross Brand Products" in Fact 31 and listed in Exhibit 21, are not sold at Target, Wal-Mart, Walgreens, or CVS. A separate line of products, the ARC emergency preparedness kits manufactured by First Aid Only, is sold at Target. See Second Abram Decl., Ex. 168 (Niyangoda Dep. 115).

Defendants further dispute that ARC products listed in Fact 31 are sold at all four stores. For example, ARC products manufactured by Water-Jel under the ARC-Water-Jel agreement are not sold at CVS, Walgreens, or Target. See First Abram Decl., Ex. 132 (Hirsh Dep. 63). ARC products manufactured by Learning Curve are not sold at Wal-Mart. See First Abram Decl., Ex. 139 (Excerpt of Deposition of Kyle Nanna (Nov. 13, 2007) 144). And ARC products manufactured by Magla are not sold at Walgreens. See First Abram Decl., Ex. 141 (Carpinello Dep. 167-168).

**33.**     ARC sells on its "Red Cross Store" webpage (www.redcrossstore.org), and, on another page (http://www.redcross.org/sponsors/howtohelp/dollars.htm), has links to web sites variously selling, Red Cross Brand Products, including first aid kits, hand sanitizers, latex gloves, radios, clothing, jewelry, shoes and Christmas ornaments that display the red cross emblem. (Exs. 24, 21.)

Response to 33: Disputed.

Defendants dispute that the webpage located at http://www.redcross.org/sponsors/ howtohelp/dollars.htm has "links" to websites selling first aid kits, hand sanitizers, latex gloves, radios, clothing, jewelry, shoes or Christmas ornaments that display the red cross emblem. Defendants do not dispute that the Red Cross Store webpage sells products displaying the American Red Cross name and Red Cross Emblem and that the webpage located at

http://www.redcross.org/sponsors/howtohelp/dollars.html has "links" to websites selling certain

other goods displaying the American Red Cross name and Red Cross Emblem.

**34.**     The License Agreements ARC entered into with the Licensee Defendants do not provide
ARC with control over the operation or day-to-day activities of the Licensee Defendants.
(Exs. 26-29.)

Response to 34:  Disputed.

The License Agreements speak for themselves.  Among other controls, they provide ARC

an absolute veto over any and all products, labels, packaging, advertising, marketing and

displays produced by its licensees and bearing the Red Cross emblem.  The agreements make

clear that ARC retains control over and has the right to monitor use of the Emblem on all goods

that would be produced and sold in its name and bearing its Emblem.  Section Article 4.1 of the

Agreements requires that the licensee submit a sample of the products to ARC for its approval

before beginning production.  And it requires that ARC give its written approval of the product

and the way in which the Emblem and ARC's name is to be used on any label, packaging, and

advertising and promotional material before the licensee can ship the product to any customer.

The Agreements further require that after ARC approves the sample, every item shipped has to

conform to the sample in terms of the product itself, the labeling, the packaging, the advertising,

the marketing, and the display material.  See First Abram Decl., Ex. 129 (Water-Jel Agreement &

Amendment ¶ 4.1); First Abram Decl., Ex. 133 (First Aid Only Agreements & Amendment ¶

4.1); First Abram Decl., Ex. 137 (Learning Curve agreement & Amendment ¶ 4.1); First Abram

Decl., Ex. 140 (Magla Agreement & Amendment ¶ 4.1); Second Abram Decl., Ex. 168

(Niyangoda Dep. 58-59, 60-61).

The Agreements also give ARC the sole and exclusive right to approve or disapprove the

sample for any reason, including that the sample did not meet ARC's quality controls.  Id. at

§ 4.2.  And it makes clear that any products not approved by ARC "will not be manufactured,

19

sold, displayed, or used in any manner." Id. Further ensuring ARC's control of the Emblem, the contract bars sale of any "irregular" or "seconds." Id. at § 4.3. The Agreements also give ARC the right to inspect the production facilities of each of the licensees. Id. at § 4.4.

**35.** As originally executed, the License Agreements provide in part:

> 13.4 Independent Contractor. This Agreement does not provide for a joint venture, partnership, agency, franchise, dealership, distributorship or employment relationship between the parties or any other relationship other than licensor and licensee.

(*Id.*)

Response to 35: Undisputed.

**36.** After this lawsuit was filed, ARC and the Licensee Defendants each signed a so-called "confirmatory amendment" providing in part:

> Section 13.4 of the Agreement is hereby deleted in its entirety and replaced with the following:
>
> 13.4 Independent Contractor. This Agreement does not provide for a joint venture, partnership, franchise, dealership, distributorship or employment relationship between the parties or any other relationship other than licensor and licensee. Notwithstanding the foregoing, the parties agree that Licensee is a "duly authorized agent" of Licensor within the meaning of 18 U.S.C. § 706 and that Licensee is assisting Licensor in carrying out its purposes pursuant to 36 U.S.C. § 300101 et seq. under this Agreement by distributing the Products as described herein.

(Exs. 30-33.)

Response to 36: Undisputed that the quotation is accurate.

**37.** The Licensee Defendants were not and are not employees of ARC.

Response to 37: Undisputed.

**38.** The Licensee Defendants were not and are not agents of ARC.

Response to 38: Disputed.

All parties to the agreements understood that the non-ARC defendants were and are

ARC's agents for purposes of having ARC's authorization to use the Emblem in accord with 18

20

U.S.C. § 706.  They had ARC's express authorization to use ARC's name and Emblem, as the nunc pro tunc confirmatory amendments make clear.  The nunc pro tunc confirmatory amendments confirmed the existing nature of the relationship and did not change the parties relationship in any way.  See, e.g., First Abram Decl., Ex. 138 (Excerpt of Deposition of Patrick Meyer, Nov. 15, 2007, 66); First Abram Decl., Ex. 132 (Excerpt of Deposition of Howard Hirsch, Nov. 8, 2007 ("Hirsh Dep.") 134).

Authorization is what is required under the statute to be a duly authorized agent, as noted by the Department of Justice. See First Abram Decl., Ex. 87 (Letter from Philip Heymann, Assistant Attorney General, to John Currin, ARC, Oct. 11, 1978, at 2).  And, as a matter of law, the authorization provided by the ARC made the co-defendants ARC's duly authorized agents under 18 U.DS.C. § 706 for purposes of using the Emblem.

**39.**    The retailers through which Red Cross Brand Products are sold were not and are not employees of ARC.

Response to 39:  Disputed.

The Red Cross sells its products directly to consumers through stores operated by its chapters, see Connor Decl. ¶ 3-5; Becker Decl. ¶ 6, 8-9; Loehr Decl. ¶ 3-5, and its own website, Pl.'s Rule 56.1 Statement ¶ 33, both of which were and are operated by employees and volunteers of the American Red Cross.  The Kansas City Chapter has operated retail stores in shopping malls in the Greater Kansas City Area.  See First Abram Decl., Ex. 76 (Excerpt of Mall Service Center Analysis:  One Year of Experience, Greater Kansas City Chapter, Aug. 1992); First Abram Decl., Ex. 77 (Brochure on Innovative Service Delivery—The Mall Way, ARC Greater Kansas City Chapter); First Abram Decl., Ex. 78 (Photographs of Red Cross Mall Store). Therefore, at least some retailers selling Red Cross Brand Products were and are employees of the American Red Cross.

21

Defendants do not dispute that the Licensee Defendants are authorized to sell ARC products through the channels of distributions specifically identified in the Corporate Brand License Agreements, including through retail channels. Corporate Brand License Agreements. See First Abram Decl., Ex. 129 (ARC/Water-Jel Agreement & Amendment ¶¶ 1.2, 2.2); First Abram Decl., Ex. 133 (ARC/First Aid Only Agreements & Amendments ¶ 2.2, Schedule B); First Abram Decl., Ex. 137 (ARC/Learning Curve Agreement & Amendment ¶¶ 1.2, 2.2); First Abram Decl., Ex. 140 (ARC/Magla Agreement & Amendment ¶¶ 1.3, 2.2). As such, the sale of ARC products bearing the American Red Cross name and Red Cross Emblem in retail channels is expressly authorized by ARC and is in furtherance of the Red Cross' mission. Id.; Conner Decl. ¶ 4; Loehr Decl. ¶ 4.

**40.**    The retailers through which Red Cross Brand Products are sold were not and are not agents of ARC.

Response to 40: Disputed.

The Red Cross sells its products directly to consumers through stores managed by its chapters, see Connor Decl. ¶ 3-5; Becker Decl. ¶ 6, 8-9; Loehr Decl. ¶ 3-5, and its own website, Pl.'s Rule 56.1 Statement ¶ 33, both of which were and are operated by employees and volunteers of the American Red Cross. Therefore, these retail establishments selling Red Cross Brand Products were and are employees and agents of ARC.

Defendants do not dispute that the Licensee Defendants are authorized to sell ARC products through the channels of distribution specifically identified in the Corporate Brand License Agreements, including through retail channels. Corporate Brand License Agreements. See First Abram Decl., Ex. 129 (ARC/Water-Jel Agreement & Amendment ¶¶ 1.2, 2.2); First Abram Decl., Ex. 133 (ARC/First Aid Only Agreements & Amendments ¶ 2.2, Schedule B); First Abram Decl., Ex. 137 (ARC/Learning Curve Agreement & Amendment ¶¶ 1.2, 2.2); First

Abram Decl., Ex. 140 (ARC/Magla Agreement & Amendment ¶¶ 1.3, 2.2).  As such, the sale of

ARC products bearing the American Red Cross name and Red Cross Emblem in retail channels

is expressly authorized by ARC and is in furtherance of the Red Cross' mission.  Id.; Conner

Decl. ¶ 4; Loehr Decl. ¶ 4.

**41.**    Most people who purchase Red Cross Brand Products from retailers were not and are not
employees of ARC.

Response to 41:  Disputed.

J&J has offered no evidence in support of this "fact" in violation of Local Civil Rule

56.1(d).  The Defendants know of no evidence identifying purchasers of ARC products, and

cannot say who "most people" are.

**42.**    Most people who purchase Red Cross Brand Products from retailers were not and are not
agents of ARC.

Response to 42:  Disputed.

J&J has offered no evidence in support of this "fact" in violation of Local Civil Rule

56.1(d).  The Defendants know of no evidence identifying purchasers of ARC products, and

cannot say who "most people" are.

**43.**    Most people who purchase Red Cross Brand Products from ARC's Red Cross Store were
not and are not employees of ARC.

Response to 43:  Disputed.

J&J has offered no evidence in support of this "fact" in violation of Local Civil Rule

56.1(d).  The Defendants know of no evidence identifying purchasers of ARC products, and

cannot say who "most people" are.

**44.**    Most people who purchase Red Cross Brand Products from ARC's Red Cross Store were
not and are not agents of ARC.

Response to 44:  Disputed.

J&J has offered no evidence in support of this "fact" in violation of Local Civil Rule 56.1(d). The Defendants know of no evidence identifying purchasers of ARC products, and cannot say who "most people" are.

**VII.    Undisputed Material Facts Specific to Defendants' Counterclaims**

**45.**    J&J used the red cross emblem along with the words "Johnson & Johnson" on first aid products prior to 1905. (ARC Counterclaims ¶ 11; *see, e.g.*, Ex. 11 at JJARC427-28; Ex. 12 at JJARC463-65; *see also* Ex. 7 at JJARC260; Ex. 8 at JJARC285; Ex. 9 at JJARC362, 377; Ex. 10 at JJARC 399.)

Response to 45: Disputed.

The American Red Cross disputes any implication in the statement that J&J's use of the words "Johnson & Johnson" with the red cross emblem prior to 1905 is the same—or conveys the same commercial impression—as its current uses of the red cross emblem. See First Abram Decl., Ex. 11 (Biribauer Dep. 71-73, 77); First Abram Decl., Ex. 153 (File Wrapper for Registration No. 3,178, 913); First Abram Decl., Ex. 154 (Photograph of product using '913 registration); see also First Abram Decl., Ex. 123 (Tolonen Dep. 165-214).

The pages cited in Plaintiff's Exhibits 7-10 are merely price lists, without pictures of actual J&J product offerings, which are insufficient to show what branding was used on the products. Plaintiff's Exhibit 12 is a 1905 price list, which cannot show what products J&J sold prior to 1905. In any event, the majority of products shown on the cited pages do not use the words "Johnson & Johnson"—only a single first aid manual lists Johnson & Johnson as the publisher of "Johnson's First Aid Manual." None of the products shown on the cited pages show the mark depicted in the '913 registration being used prior to 1905.

Defendants do not dispute that J&J's Exhibit 11 at JJARC 427-28 shows that "Johnson's First Aid Manual" was published by "Johnson and Johnson."

**46.**    J&J used the red cross emblem along with the words "Johnson & Johnson" and "First Aid" on products prior to 1905. *Id.*

24

<u>Response to 46</u>:  Disputed.

The American Red Cross disputes any implication in the statement that J&J's use of the words "Johnson & Johnson" and "First Aid" with the red cross emblem prior to 1905 is the same—or conveys the same commercial impression—as its current use of those words with the emblem.  <u>See</u> First Abram Decl., Ex. 11 (Biribauer Dep. 71-73, 77); First Abram Decl., Ex. 153 (File Wrapper for Registration No. 3,178, 913); First Abram Decl., Ex. 154 (Photograph of product using '913 registration); <u>see also</u> First Abram Decl., Ex. 123 (Tolonen Dep. 165-214).

The American Red Cross also disputes that ARC Counterclaim ¶ 11 supports this statement since it does not address use of the word "first aid."  The pages cited in Plaintiff's Exhibits 7-10 are merely price lists, without pictures of actual J&J product offerings, which are insufficient to show what branding was used on the products.  Plaintiff's Exhibit 12 is a 1905 price list, which is insufficient to show what products J&J sold prior to 1905.  In any event, the majority of products shown on the cited pages do not use the words "Johnson & Johnson"—only a single first aid manual lists Johnson & Johnson as the publisher of "Johnson's First Aid Manual."  None of the products shown on the cited pages show the mark depicted in the '913 registration being used prior to 1905.

Defendants do not dispute that J&J's Exhibit 11 at JJARC 427-28 shows that "Johnson's First Aid Manual" was published by "Johnson and Johnson."

**47.**    J&J used the words "Johnson & Johnson" inside of the red cross emblem on products prior to 1905.  (*E.g.*, Ex. 8 at JJARC293; Ex. 9 at JJARC364; Ex 11 at JJARC427, 430.)

<u>Response to 47</u>:  Disputed.

Exhibit 8 at JJARC293 does not show a product.

Exhibit 9 at JJARC364 does not show a product.  It shows a field with a red cross and the letters "J&J" in it.

Exhibit 11 at JJARC427 does not show a product with "Johnson & Johnson" written inside the Red Cross Emblem.

Exhibit 11 at JJARC430 shows a bar of soap that appears to say "Johnson & Johnson" below the words "Quality Guaranteed."

In addition, the American Red Cross disputes any implication in the statement that J&J's pre-1905 use of "Johnson & Johnson" inside a red cross is the same—or conveys the same commercial impression—as its current use of those words inside the emblem.  See First Abram Decl., Ex. 11 (Biribauer Dep. 66); First Abram Decl., Ex. 148 (Photographs of J&J Emergency First Aid Kit and All Purpose First Aid Kit, exhibit to Biribauer Dep.); First Abram Decl., Ex. 143 (Kotei Dep. 19, 23-25); First Abram Decl., Ex. 149 (Photograph of J&J Emergency First Aid Kit, exhibit to Kotei Dep.); First Abram Decl., Ex. 150 (Photograph of J&J All-Purpose First Aid Kit, exhibit to Kotei Dep.); First Abram Decl., Ex. 123 (Tolonen Dep. 213).  None of the products shown on the cited pages show the mark depicted in the '913 registration being used prior to 1905.

**48.**    J&J used the letters "J&J" inside of the red cross emblem on products prior to 1905.  *Id.*

Response to 48:  Disputed.

Exhibit 8 at JJARC293 does not show a product.

Exhibit 9 at JJARC364 does not show a product.  It shows a field with a red cross and the letters "J&J" in it.

Exhibit 11 at JJARC427 shows a first aid manual with "J&J" written inside the Red Cross Emblem.

Exhibit 11 at JJARC430 does not show a product with "J&J" written inside the Red Cross Emblem.

In addition, the defendants dispute any implication in the statement that J&J's use of "J&J" inside a red cross is the same—or conveys the same commercial impression—as its current uses of the Red Cross Emblem. See, e.g., First Abram Decl., Ex. 149 (Photograph of J&J Emergency First Aid Kit, exhibit to Kotei Dep.); First Abram Decl., Ex. 150 (Photograph of J&J All-Purpose First Aid Kit, exhibit to Kotei Dep.); First Abram Decl., Ex. 11 (Biribauer Dep. 71-73, 77); First Abram Decl., Ex. 153 (File Wrapper for Registration No. 3,178, 913); First Abram Decl., Ex. 154 (Photograph of product using '913 registration).  None of the products shown on the cited pages show the mark depicted in the '913 registration being used prior to 1905.

**49.**     J&J sold first-aid kits bearing the red cross emblem prior to 1905.

Response to 49:  Undisputed.


### DEFENDANT'S COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS

In addition to the above disputes of fact, defendants submit the following statements of undisputed facts to supplement their prior 56.1 statement submitted with their motion for summary judgment:

180.     None of the National Societies in the Red Cross Movement are bound directly by the Geneva Conventions; instead, each is bound by whatever national legislation its home nation has enacted to implement the Geneva Conventions.  Meltzer Decl. ¶ 10.

181.     ARC has vigilantly policed private parties' unauthorized uses of the Red Cross Emblem for years through cease and desist letters, because ARC fully embraces the goal expressed in all of the Geneva Conventions that the Emblem be protected from unauthorized uses and from compromising the symbol's integrity.  See Second Abram Decl., Ex. 167 (Ortmeier Dep.16-17, 29-30); Second Abram Decl., Ex. 169 (Morisi Dep. 10, 21-24, 29-32).

182.    J&J has proffered an expert in domestic law to testify regarding the License Agreements being customary trademark license agreements.  See Exhibit to Abram Decl. in Support of Motion to Strike, Dec. 3, 2007, Docket Entry No. 58 (Expert Report of Kenneth B. Germain).  The defendants have moved to strike this expert.  See Defendant's Motion to Strike, Dec. 3, 2007, Docket Entry No. 56.

183.    J&J admitted that "there's obviously graphically a difference between the red cross mark as a pure red cross and a red cross mark with other matter added to it."  First Abram Decl., Ex. 11 (Biribauer Dep. at 70).

184.    None of J&J's pre-1905 uses of the Emblem show the words "all-purpose" or "first aid" written inside the Emblem.  See, e.g., J&J Ex. 7-11.

185.    J&J purposefully went beyond the first aid and wound care arena into the business of selling emergency preparedness products, which it had not done before 1905.  See Second Abram Decl., Ex. 170 (Kotei Dep. at 105); First Abram Decl., Ex. 152 (1904 J&J catalog).  J&J saw this new emergency preparedness market developing after 9/11 and Hurricane Katrina. Second Abram Decl., Ex. 171 (Tolonon Dep. 112-113, 148-149).

186.    J&J admitted that it is not aware of having sold red cross light sticks under the Red Cross Emblem prior to January 5, 1905.  See Second Abram Decl., Ex. 172 (Plaintiffs' Response to Defendants' First Set of Requests for Admission, Response to RFA No. 1).

187.    J&J is currently selling lightsticks under the Red Cross Emblem.  See Abram Decl., Ex. 170 (Kotei Dep. at 35); First Abram Decl., Ex. 149 (Photograph of J&J Emergency Preparedness Kit).

188.    J&J admitted that it is not aware of having sold survival wrap under the Red Cross Emblem before 1905.  <u>See</u> Second Abram Decl., Ex. 172 (Plaintiffs' Response to Defendants' First Set of Requests for Admission, Response to RFA No. 4).

189.    J&J is currently selling survival wrap under the Red Cross Emblem.  <u>See</u> Second Abram Decl., Ex. 170 (Kotei Dep. at 35); First Abram Decl., Ex. 149 (Photograph of J&J Emergency Preparedness Kit).

190.    J&J admitted that it is not aware of having sold individually branded red cross latex protective gloves prior to January 5, 1905.  <u>See</u> Second Abram Decl., Ex. 172 (Plaintiffs' Response to Defendants' First Set of Requests for Admission, Response to RFA No. 8).

191.    J&J is currently selling latex gloves in packaging bearing the Red Cross Emblem.  <u>See</u> Second Abram Decl., Ex. 170 (Kotei Dep. at 35); First Abram Decl., Ex. 149 (Photograph of J&J Emergency Preparedness Kit).


Dated:  December 5, 2007                              Respectfully submitted,


                                                      HOGAN & HARTSON, L.L.P.

                                                      By:_____s/ Jonathan L. Abram_____
                                                      Jonathan L. Abram (admitted <u>pro hac vice</u>)
                                                      Raymond A. Kurz (admitted <u>pro hac vice</u>)
                                                      555 Thirteenth Street, N.W.
                                                      Washington, D.C. 20004
                                                      Tel:  (202) 637-5681
                                                      Fax:  (202) 637-5910

                                                      Attorneys for Defendants

## **CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that on the 5th day of

December, 2007, I caused a true and correct copy of the foregoing to be served upon the

following via the Court's ECF Notification System:

> Gregory L. Diskant
> Sarah Elizabeth Zgliniec
> Patterson, Belknap, Webb & Tyler LLP
> 1133 Avenue of the Americas
> New York, NY 10036
> Tel:  (212) 336-2710
> Fax:  (212) 336-2222
> E-mail:  gldiskant@pbwt.com
> E-mail:  sezgliniec@pbwt.com
>
> Richard Zachary Lehv
> Roger L. Zissu
> Fross Zelnick Lehrman & Zissu, P.C.
> 866 United Nations Plaza
> New York, NY 10004
> Tel:  (212) 813-5900
> Fax:  (212)-813-5901
> E-mail:  rlehv@frosszelnick.com
> E-mail:  rzissu@frosszelnick.com

    s/ Jonathan L. Abram
        Jonathan L. Abram
