# EXHIBIT 163

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------x

5    JOHNSON & JOHNSON and JOHNSON & JOHNSON

6    CONSUMER COMPANIES, INC.,

7              Plaintiffs,

8

9          v.      Case Number 07-CIV-7061 (JSR)

10

11   THE AMERICAN NATIONAL RED CROSS, LEARNING

12   CURVE INTERNATIONAL, INC., MAGLA PRODUCTS,

13   LLC, WATER-JEL TECHNOLOGIES, INC., and

14   FIRST AID ONLY, INC.,

15              Defendants.

16   ------------------------------x

17

18            ***HIGHLY CONFIDENTIAL***

19         DEPOSITION OF ALISON CARPINELLO

20            New York, New York

21            November 9, 2007

22

23   Reported by:

24   MARY F. BOWMAN, RPR, CRR

25   JOB NO. 13847

1    Carpinello - HIGHLY CONFIDENTIAL

2    whatever manner, have you received any

3    communications that talk about confusion?  In

4    other words, has anyone ever said oh, I thought

5    this glove was made by the Red Cross?

6         MR. REDUQUE:  Objection to form.

7    A.    I know of no complaints or inquiries

8    to that nature.

9    Q.    Is it Magla's understanding that the

10   Red Cross, the cross itself standing alone, is a

11   generic symbol?

12        MR. REDUQUE:  Objection.  We served

13        objections to the topics on the supplemental

14        notice of -- supplemental Rule 30(b)(6)

15        notice which had two topics; one on

16        genericness, one on functionality.

17        Ms. Carpinello has not been designated

18        to testify to those topics.  We object to

19        those topics, as I said earlier, because

20        they call for legal conclusions and

21        premature disclosure of expert testimony.

22        But subject to those objections,

23        please go ahead and answer that question.

24        But I will caution you to the extent that

25        you have an understanding of genericness and

 1                 Carpinello - HIGHLY CONFIDENTIAL

 2          would respond accordingly to that question

 3          based on attorney/client communications with

 4          either me or any other attorney on the

 5          defense team, I would instruct you not to

 6          answer the question, but to otherwise answer

 7          the question if you can do so based on your

 8          own personal understanding.

 9          A.    Can you repeat the question.

10               (Record read)

11          A.    I don't know if it was Magla's

12     understanding, but my personal thing would be it

13     is a generic symbol.

14          Q.    Fair enough.  A generic symbol for

15     what then?

16          A.    Safety, medical, first aid.

17          Q.    Do you know if that concept, the idea

18     of the Red Cross being a generic symbol, do you

19     know if that was discussed in the -- first

20     internally in Magla in the process of

21     negotiating the license agreement?

22               MR. REDUQUE:  Can I just get a

23          standing objection on my previous ones for

24          all the questions that deal with

25          genericness?

# EXHIBIT 164

Page 1

1

2              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK

3

     JOHNSON & JOHNSON, et al.,        )

4                                      )

            Plaintiffs,                )

5                                      )

                 vs.                   ) 07 CIV 7061

6                                      )

     AMERICAN RED CROSS, et al.,       )

7                                      )

            Defendants.                )

8    ------------------------------)

9

10

11

12      VIDEOTAPED DEPOSITION OF HOWARD HIRSCH

13             New York, New York

14         Thursday, November 8, 2007

15

16

17

18

19

20

21

22

23   Reported by:
     Philip Rizzuti

24   JOB NO. 13845

25

Page 142

1                            Hirsch

2     correct?

3            A.    Yes.

4            Q.    If you turn to page 4, paragraphs

5     numbered 7 and 8?

6            A.    Yes.

7            Q.    Do you understand that you have

8     been designated to testify on topics 7 and 8

9     as a corporate representative?

10               MR. REDUQUE:  That is actually

11          wrong.  We served our objections last

12          night and objected to topics 7 and 8 on

13          the ground that they call for a legal

14          conclusion and expert testimony

15          prematurely.

16               So Mr. Hirsch has not been

17          designated to testify as to topics 7 and

18          8, but with those objections in mind you

19          can ask your questions.

20          Q.    Okay.  Looking at topic 7, have

21     you had a moment to review it?

22          A.    Yes.

23          Q.    Does Water-Jel think that the Red

24     Cross mark is generic?

25               MR. REDUQUE:  Objection.  Calls

1                        Hirsch

2          for a legal conclusion.  To the extent

3          that your understanding of what generic

4          means is based exclusively on

5          conversations that you had with counsel I

6          would instruct you to not answer the

7          question.  But to the extent that you

8          have an understanding of what the term

9          generic means that is separate and apart

10         from your conversations that you had with

11         counsel, please go ahead and answer the

12         question.

13              Just so I can have a standing

14         objection to any questions that relate to

15         topics 7 and 8 based on the objections

16         that we served last night, just so I

17         don't have to keep repeating them.

18              MS. LEIBENSPERGER:  Yes.

19              MR. REDUQUE:  Thank you.

20         A.    So based on my understanding, yes,

21   I do believe that the Red Cross emblem is

22   generic.

23         Q.    Why do you believe that?

24         A.    Because the emblem has been used

25   for my entire lifetime to symbolize first-aid

1                    Hirsch

2    or lifeguard assistance, and separate and

3    apart from any manufacturer or organization.

4         Q.    What does the Red Cross emblem

5    mean to you?

6         A.    It means help available here, or

7    first-aid station.

8         Q.    Does Water-Jel have any evidence

9    that the Red Cross is generic?

10        A.    We have done no separate studies.

11        Q.    So Water-Jel doesn't have any

12   consumer survey?

13        A.    No.

14        Q.    Is the J&J mark generic?

15        A.    The Johnson & Johnson trademark?

16        Q.    The Johnson & Johnson Red Cross

17   trademark, does that fall into being --

18             MR. REDUQUE:  Same objection to

19        form.

20        A.    The Johnson & Johnson Red Cross is

21   always coupled with the Johnson & Johnson

22   brand name, and therefore that coupling is not

23   generic.  But if Johnson & Johnson were to put

24   out a package that just had a Red Cross on it

25   and no other identification it would be

1                          Hirsch

2    generic and it would not be associated with

3    Johnson & Johnson.  That is my opinion.

4          Q.    Do you think that the American Red

5    Cross use of the red cross, is that cross

6    generic?

7          A.    I think the same comment applies,

8    is that coupled with the American Red Cross

9    name, that coupling with the Red Cross is very

10   specific.  But the Red Cross by itself,

11   whatever its origin, is generic.

12              That is not only in this country,

13   it is around the world.

14              MS. LEIBENSPERGER:  Would you mark

15        as Hirsch Exhibit 19, Defendant Water-Jel

16        Technologies LLC's Responses and

17        Objections to Plaintiff's First Set of

18        Requests For Admission.

19              (Hirsch Exhibit 19, Defendant

20        Water-Jel Technologies LLC's Responses

21        and Objections to Plaintiff's First Set

22        of Requests For Admission, marked for

23        identification, as of this date.)

24          Q.    Mr. Hirsch, I have handed you

25   Hirsch Exhibit 19, have you seen this document

# EXHIBIT 165

# STATUTES
## OF THE INTERNATIONAL RED CROSS
## AND RED CRESCENT MOVEMENT

*(adopted by the 25th International Conference*
*of the Red Cross at Geneva in 1986,*
*amended in 1995[1] and 2006[2])*

**Preamble**.................................................................................................. 5

### SECTION I

**General Provisions**

Article 1      Definition ......................................................... 6
Article 2      States Parties to the Geneva Conventions ......................... 7

### SECTION II

**Components of the Movement**

Article 3      National Red Cross and Red Crescent Societies ................. 7
Article 4      Conditions for recognition of National Societies ............. 9
Article 5      The International Committee of the Red Cross................... 9
Article 6      The International Federation
               of Red Cross and Red Crescent Societies..................... 11
Article 7      Cooperation ................................................ 12

### SECTION III

**Statutory Bodies**

**The International Conference of the Red Cross and Red Crescent**

Article 8      Definition................................................. 13
Article 9      Composition ............................................... 13
Article 10     Functions ................................................. 13
Article 11     Procedure.................................................. 14

**The Council of Delegates**
**of the International Red Cross and Red Crescent Movement**

Article 12     Definition................................................. 15
Article 13     Composition ............................................... 15
Article 14     Functions ................................................. 16
Article 15     Procedure.................................................. 16

---

[1] Resolution 7 of the 26th International Conference of the Red Cross and Red Crescent at Geneva.

[2] Resolution 1 of the 29th International Conference of the Red Cross and Red Crescent at Geneva.

2                              CONTENTS

**The Standing Commission of the Red Cross and Red Crescent**

Article 16      Definition ........................................................................... 17
Article 17      Composition ....................................................................... 17
Article 18      Functions ........................................................................... 18
Article 19      Procedure ........................................................................... 19

SECTION IV

**Final Provisions**

Article 20      Amendments ...................................................................... 20
Article 21      Entry into force ................................................................. 20

# RULES OF PROCEDURE
## OF THE INTERNATIONAL RED CROSS
## AND RED CRESCENT MOVEMENT

*(adopted by the 25th International Conference*
*of the Red Cross at Geneva in 1986,*
*amended in 1995[1])*

## SECTION I

### General Provisions

Rule 1     General object of these Rules ............................................. 21
Rule 2     Other rules ...................................................................... 21
Rule 3     Conflicting provisions ..................................................... 21

## SECTION II

### The International Conference

Rule 4     Place and date .................................................................. 22
Rule 5     Convocation..................................................................... 22
Rule 6     Provisional agenda .......................................................... 22
Rule 7     Submission and despatch of official documents............... 23
Rule 8     Submission and distribution
           of National Society reports on their work........................ 23
Rule 9     Participants ..................................................................... 23
Rule 10    Guests ............................................................................. 24
Rule 11    Information media .......................................................... 24
Rule 12    Languages........................................................................ 24
Rule 13    Alphabetical order .......................................................... 24
Rule 14    Quorum ........................................................................... 25
Rule 15    Chairmanship .................................................................. 25
Rule 16    Bureau and commissions................................................. 25
Rule 17    Notification of proposals ................................................ 26
Rule 18    Debates............................................................................ 26
Rule 19    Adoption of resolutions................................................... 27
Rule 20    Voting procedure ............................................................ 28
Rule 21    Election of members of the Standing Commission ........... 28
Rule 22    Proceedings of the Conference........................................ 29

---

[1] Resolution 7 of the 26th International Conference of the Red Cross and Red Crescent at Geneva.

4                                    CONTENTS

SECTION III

**The Council of Delegates**

Rule 23        Place and date ................................................................. 30
Rule 24        Convocation ..................................................................... 30
Rule 25        Provisional agenda .......................................................... 30
Rule 26        Opening meeting .............................................................. 31
Rule 27        Work of the Council ........................................................ 31
Rule 28        Proceedings of the Council .............................................. 31

SECTION IV

**The Standing Commission**

Rule 29        Convocation ..................................................................... 31
Rule 30        Quorum ............................................................................ 32
Rule 31        Proceedings of the Standing Commission ........................ 32

SECTION V

**Final Provisions**

Rule 32        Amendments to the Statutes and to these Rules ................ 32
Rule 33        Entry into force of these Rules ........................................ 32

STATUTES
OF THE INTERNATIONAL RED CROSS
AND RED CRESCENT MOVEMENT

PREAMBLE

The International Conference of the Red Cross and Red Crescent,

*Proclaims* that the National Red Cross and Red Crescent Societies, the International Committee of the Red Cross and the International Federation of Red Cross and Red Crescent Societies together constitute a worldwide humanitarian movement, whose mission is to prevent and alleviate human suffering wherever it may be found, to protect life and health and ensure respect for the human being, in particular in times of armed conflict and other emergencies, to work for the prevention of disease and for the promotion of health and social welfare, to encourage voluntary service and a constant readiness to give help by the members of the Movement, and a universal sense of solidarity towards all those in need of its protection and assistance.

*Reaffirms* that, in pursuing its mission, the Movement shall be guided by its Fundamental Principles, which are:

**Humanity**          *The International Red Cross and Red Crescent Movement, born of a desire to bring assistance without discrimination to the wounded on the battlefield, endeavours, in its international and national capacity, to prevent and alleviate human suffering wherever it may be found. Its purpose is to protect life and health and to ensure respect for the human being. It promotes mutual understanding, friendship, cooperation and lasting peace amongst all peoples.*

**Impartiality**      *It makes no discrimination as to nationality, race, religious beliefs, class or political opinions. It endeavours to relieve the suffering of individuals, being guided solely by their needs, and to give priority to the most urgent cases of distress.*

**Neutrality**        *In order to continue to enjoy the confidence of all, the Movement may not take sides in hostilities or engage at any time in controversies of a political, racial, religious or ideological nature.*

**Independence**      *The Movement is independent. The National Societies, while auxiliaries in the humanitarian services of their governments and subject to the laws of their respective countries, must always maintain their autonomy so that they may be able at all times to act in accordance with the principles of the Movement.*

**Voluntary Service** *It is a voluntary relief movement not prompted in any manner by desire for gain.*

6 STATUTES AND RULES OF PROCEDURE

**Unity** *There can be only one Red Cross or one Red Crescent Society in any one country. It must be open to all. It must carry on its humanitarian work throughout its territory.*

**Universality** *The International Red Cross and Red Crescent Movement, in which all Societies have equal status and share equal responsibilities and duties in helping each other, is worldwide.*

*Recalls* that the mottoes of the Movement, *Inter arma caritas* and *Per humanitatem ad pacem*, together express its ideals.

*Declares* that, by its humanitarian work and the dissemination of its ideals, the Movement promotes a lasting peace, which is not simply the absence of war, but is a dynamic process of cooperation among all States and peoples, cooperation founded on respect for freedom, independence, national sovereignty, equality, human rights, as well as on a fair and equitable distribution of resources to meet the needs of peoples.

## SECTION I: GENERAL PROVISIONS

### ARTICLE 1

#### Definition

1. The International Red Cross and Red Crescent Movement[1] (hereinafter called "the Movement") is composed of the National Red Cross and Red Crescent Societies recognized in accordance with Article 4[2] (hereinafter called "National Societies"), of the International Committee of the Red Cross (hereinafter called "the International Committee") and of the International Federation of Red Cross and Red Crescent Societies (hereinafter called "the Federation").

2. The components of the Movement, while maintaining their independence within the limits of the present Statutes, act at all times in accordance with the Fundamental Principles and cooperate with each other in carrying out their respective tasks in pursuance of their common mission.

3. The components of the Movement meet at the International Conference of the Red Cross and Red Crescent (hereinafter called "the International Conference") with the States Parties to the Geneva Conventions of 27 July 1929 or of 12 August 1949.

---

[1] Also known as the International Red Cross.

[2] Any National Society recognized at the date of entry into force of the present Statutes shall be considered as recognized in terms of Article 4.

EXHIBIT 166

Case 1:07-cv-07061-JSR    Document 63-3    Filed 12/05/2007    Page 19 of 72

What is ICRC's relationship with national Red Cross and Red Crescent societies?    Page 1 of 2

About the ICRC | ICRC activities | The ICRC worldwide | Focus | Humanitarian law | Info resources | News

Français  Español  عربي  Portug




Ottawa Convention
**The prohibition of anti-personnel mines**

MAKE A DONATION    Searc

**ICRC**

What's new | Contac

**Home** > **Info resources** > **Frequently asked questions**

Print this page

**15-11-2002 FAQ**

# What is ICRC's relationship with national Red Cross and Red Crescent societies?

ICRC, national societies from 178 countries and their International Federation form the International Red Cross and Red Crescent Movement. All within the Movement share common fundamental principles but are not linked hierarchically. In conflict situations ICRC takes the lead role and directs the work of its partners.

**What national societies do:** Within their own countries, national societies are autonomous organisations working with professional staff and trained volunteers. They carry out their humanitarian activities according to local needs, in line with their own statutes and subject to national law.

**When conflict breaks out:** ICRC and the national society will agree on procedures to work together, as far as possible, to help the victims. According to a 1997 accord (<u>**Seville Agreement**</u>), ICRC takes lead responsibility in conflict areas.

**ICRC's areas of expertise:** ICRC is a reference on international humanitarian law (IHL), restoring family links and conflict preparedness and response. In these areas, ICRC contributes to the development of national societies.

**Recognizing new societies:** ICRC has the statutory responsibility of checking that all national societies in formation fulfill certain conditions. After recognition it has no direct authority over them.

**Mobilizing support:** Much of ICRC's work for the victims of conflict is supported by national societies, which provide funding and/or personnel. Societies which have the means also contribute to the development of those which need such assistance, in order to strengthen the Movement as a whole.

**Making policy:** ICRC, all national societies and their International Federation meet every two years to decide on matters of common interest (Council of Delegates). Every four years they also meet at the International Conference, along with the governments of states that have signed up to the Geneva Conventions.

*More on this:* International Review of the Red Cross (June 1998) - <u>**Cooperation between National Societies and the International Committee of the Red Cross: an essential and demanding partnership**</u>

*The answers to FAQs on this site are intended as brief, informative summaries of what are often complex matters, and the terminology used has no legal significance.*

**Other documents in this section:**
**Info resources > Frequently asked questions**

What is ICRC's relationship with national Red Cross and Red Crescent societies?     Page 2 of 2

**In other sections:**
**Focus\RC Movement**
**ICRC Activities\Cooperation with National Societies**

**Home | Site map | Search | What's new | Contacts | Copyright | Privacy policy |**

© 2007 International Committee of the Red Cross                    15-11-2002

EXHIBIT 167

Highly Confidential

Page 1

1            JULIE A. ORTMEIER

2      BEFORE THE UNITED STATES DISTRICT COURT

3        FOR THE SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - x

5   JOHNSON & JOHNSON and        :

6   JOHNSON & JOHNSON CONSUMER   :

7   COMPANIES, INC.,             :

8           Plaintiffs,          : Civil Action No.

9        vs.                     : 07Civ7061(JSR/DCF)

10  THE AMERICAN RED CROSS,      :

11  LEARNING CURVE INTERNATIONAL, :

12  INC., MAGLA PRODUCTS, LLC,   :

13  WATER-JEL TECHNOLOGIES, INC., :

14  and FIRST AID ONLY, INC.,    :

15          Defendants.          :

16  - - - - - - - - - - - - - - x

17

18            HIGHLY CONFIDENTIAL

19      VIDEOTAPED 30(b)(6) DEPOSITION OF

20            JULIE A. ORTMEIER

21

22            Washington, D.C.

23            Wednesday, November 14, 2007

24  REPORTED BY:

25    SARA A. WICK, RPR, CRR

Highly Confidential

Page 2

1                    JULIE A. ORTMEIER

2         Deposition of JULIE A. ORTMEIER, called for

3    examination pursuant to Notice of Deposition, on

4    Wednesday, November 14, 2007, in Washington, D.C.,

5    at the offices of Hogan & Hartson LLP, 555 13th

6    Street Northwest, at 9:37 a.m., before SARA A. WICK,

7    a Notary Public in and for the District of Columbia,

8    when were present on behalf of the respective

9    parties:

10

11              PATRICK ALMONRODE, ESQ.

12              Patterson Belknap Webb & Tyler LLP

13              1133 Avenue of the Americas

14              New York, New York 10036

15              212-336-2339

16              palmonrode@pbwt.com

17              On behalf of Plaintiffs

18

19

20

21

22

23

24

25                    -- continued --

TSG Reporting - Worldwide  (877) 702-9580

Highly Confidential

Page 3

1          JULIE A. ORTMEIER

2     APPEARANCES (continued):

3

4          ANNA KURIAN SHAW, ESQ.

5          Hogan & Hartson LLP

6          555 13th Street Northwest

7          Washington, DC 20004

8          202-637-5687

9          ajkurian@hhlaw.com

10          On behalf of Defendants

11

12     Also Present:  William Causey

13               Jonathan Perry, Videographer

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential

Page 16

1                    JULIE A. ORTMEIER

2        Q     What is that meaning?

3        A     Someone who is not authorized.

4        Q     Not authorized to do what?

5        A     To use the Red Cross emblem.

6        Q     Okay.  Does the American Red Cross take

7    steps to prevent or stop unauthorized uses of the

8    Red Cross emblem?

9        A     Yes.

10       Q     Do you send out cease-and-desist letters?

11   And by "you," of course, I mean the American Red

12   Cross.

13       A     Yes, we do.

14       Q     Do you send out letters asking trademark

15   applicants to amend their applications?

16       A     In some instances, yes.

17       Q     Do you take any other steps to prevent or

18   stop unauthorized uses of the Red Cross emblem?

19       A     Besides what?

20       Q     Besides those two that we talked about,

21   sending out cease-and-desist letters and sending out

22   letters to ask trademark applicants to amend their

23   applications.

24       A     We have engaged in campaigns to educate

25   certain segments or certain industries that we

Highly Confidential

Page 17

1              JULIE A. ORTMEIER

2    notice there is a prevalent misuse of a Red Cross,

3    yes.

4         Q    What are those industries or segments or

5    however you --

6         A    Several years ago, we -- we sent letters

7    to the adult costume industry for the naughty nurse

8    costumes.  We have also, through various Hollywood

9    studios, sent letters and educational material to

10   them to make sure that they understood what a red

11   cross is, its, you know, use in movies and TV shows

12   and that type of thing.

13             Those are the two that come to mind.

14        Q    You defined those -- or you mentioned

15   those, referred to those as campaigns.

16        A    Yes, I did.

17        Q    And so those were -- in those instances,

18   you sent those letters out to every company that you

19   could find in those segments?

20             MS. SHAW:  Objection; foundation.

21             THE WITNESS:  We sent the letters out

22   based on lists found by my paralegal at the time.

23             BY MR. ALMONRODE:

24        Q    I see.  How does a possible unauthorized

25   use of the emblem come to your attention, the

Highly Confidential

Page 29

1                  JULIE A. ORTMEIER

2    send C&D letters to all unauthorized users that come

3    to its attention?  I'm sorry.  That's badly phrased.

4              Setting aside for now trademark

5    applications, because I realize that's a different

6    process, does the Red Cross make it a practice to

7    send C&D letters to all other unauthorized users of

8    the emblem that come to its attention?

9       A    Generally, yes.  There are exceptions.  If

10   we have contacted someone in the past and another

11   misuse is brought to our attention, sometimes we'll

12   pick up the phone, if we have a contact at that

13   company.  It's more efficient, and a lot of times

14   it's just a mistake on their part.

15      Q    Okay.  But is it fair to say that the Red

16   Cross tries to -- tries to prevent or stop every

17   unauthorized use that comes to its attention?

18      A    In the United States, yes.

19      Q    Okay.  And you would make that effort

20   without regard to the type of business or

21   organization or individual that might be misusing?

22   I'm sorry.  Is that true?

23      A    Yes.

24      Q    Without regard to whether they're making

25   money from the unauthorized use or not?

Highly Confidential

Page 30

1                JULIE A. ORTMEIER

2       A    Yes.

3       Q    Are there any particular kinds of

4  unauthorized uses which the Red Cross would not

5  send, would not try to stop or prevent?

6            MS. SHAW:  Objection; vague.

7            THE WITNESS:  No, not that I can think of.

8            BY MR. ALMONRODE:

9       Q    What's the Red Cross's purpose in trying

10  to prevent or stop unauthorized uses?

11      A    We have an obligation under the Geneva

12  Conventions to protect the emblem.  We educate a

13  number of people about 18 USC 706.  And we are

14  protecting the American Red -- the American Red

15  Cross's rights in the Red Cross emblem.

16      Q    When you say you have an obligation under

17  the Geneva Conventions to protect the emblem, in

18  what sense do you mean the word "protect"?

19      A    Prevent the misuse of or stop.

20      Q    Right.  And how does that protect the

21  emblem?

22            MS. SHAW:  Objection; vague.

23            THE WITNESS:  I'm sorry.  Will you repeat

24  the question.

25            BY MR. ALMONRODE:

Highly Confidential

Page 149

1              JULIE A. ORTMEIER

2    organization.

3         Q    Okay.  And is that, in part, because

4    misuses can, in some circumstances, put American Red

5    Cross personnel in danger in armed conflicts?

6         A    Yes, American Red Cross and other Red

7    Cross workers, yes.

8         Q    Of course.  I'm sorry.  Now, the next

9    sentences says, "for this reason, the Canadian Red

10   Cross society does not authorize use of the emblem

11   for commercial purposes and does not accept money or

12   royalties for such use."

13            Do you know whether that's currently the

14   policy of the Canadian Red Cross?

15            MS. SHAW:  Objection; calls for

16   speculation.

17            THE WITNESS:  I don't know.

18            BY MR. ALMONRODE:

19        Q    If you know.  Are all of the national

20   societies around the world bound to the same degree

21   by the policies set by the ICRC?

22        A    The policies set by the ICRC are

23   aspirational.  They're guidelines.  They're -- the

24   ICRC has no enforcement capability.

25        Q    Are you finished?

Highly Confidential

Page 164

1                JULIE A. ORTMEIER

2    policy on cause marketing?

3        A    May I look at my other exhibits?

4        Q    Sure.

5            MS. SHAW:  I'll just caution the witness

6    not to speculate.

7            THE WITNESS:  Because the statement of

8    revenue-generating policies in Exhibit 8 is in draft

9    form, I don't know if there is a written policy in

10   place today.

11           BY MR. ALMONRODE:

12       Q    The document you just referred to, Exhibit

13   8, when it mentions "restatement," it refers to

14   itself as a restatement, do you know if there was a

15   written policy that this is restating?

16       A    I do not know.

17       Q    Is there someone who might know the

18   answers to those questions?

19       A    I would think Kristine Templin or Kathleen

20   Loehr might.

21       Q    The American Red Cross currently licenses

22   the emblem for commercial use by other entities; is

23   that correct?

24           MS. SHAW:  Objection; foundation.

25           MR. ALMONRODE:  Well --

EXHIBIT 168

Highly Confidential

Page 1

1              JENNIFER NIYANGODA

2        BEFORE THE UNITED STATES DISTRICT COURT

3          FOR THE SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - x

5    JOHNSON & JOHNSON and          :

6    JOHNSON & JOHNSON CONSUMER     :

7    COMPANIES, INC.,               :

8          Plaintiffs,             : Civil Action No.

9        vs.                        : 07Civ7061(JSR/DCF)

10   THE AMERICAN RED CROSS,        :

11   LEARNING CURVE INTERNATIONAL, :

12   INC., MAGLA PRODUCTS, LLC,     :

13   WATER-JEL TECHNOLOGIES, INC., :

14   and FIRST AID ONLY, INC.,      :

15         Defendants.             :

16   - - - - - - - - - - - - - - x

17

18              HIGHLY CONFIDENTIAL

19        VIDEOTAPED 30(b)(6) DEPOSITION OF

20              JENNIFER NIYANGODA

21

22                  Washington, D.C.

23                  Friday, November 16, 2007

24   REPORTED BY:

25     SARA A. WICK, RPR, CRR

Highly Confidential

Page 2

1              JENNIFER NIYANGODA

2        Deposition of JENNIFER NIYANGODA, called for

3   examination pursuant to Notice of Deposition, on

4   Friday, November 16, 2007, in Washington, D.C., at

5   the offices of Hogan & Hartson LLP, 555 13th Street

6   Northwest, at 9:21 a.m., before SARA A. WICK, a

7   Notary Public in and for the District of Columbia,

8   when were present on behalf of the respective

9   parties:

10

11           PHYLLIS STAUB WALLITT, ESQ.

12           Patterson Belknap Webb & Tyler LLP

13           1133 Avenue of the Americas

14           New York, New York 10036

15           212-336-2339

16           palmonrode@pbwt.com

17           On behalf of Plaintiffs

18

19

20

21

22

23

24

25                  -- continued --

Highly Confidential

Page 3

1              JENNIFER NIYANGODA

2      APPEARANCES (continued):

3

4              ANNA KURIAN SHAW, ESQ.

5              WILLIAM SLAVEN, ESQ.

6              Hogan & Hartson LLP

7              555 13th Street Northwest

8              Washington, DC 20004

9              202-637-5687

10             ajkurian@hhlaw.com

11             On behalf of Defendants

12

13     Also Present:  Julie Ortmeier

14                    Jonathan Perry, Videographer

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential

Page 58

1                JENNIFER NIYANGODA

2        A    I was the lead on the business side.

3        Q    And other than the process that you

4    testified to earlier involving the research team and

5    risk and legal, was anyone else involved with the

6    contracting at American Red Cross?

7        A    Legal counsel.

8        Q    Any of the individuals that report to you,

9    were they involved with the contracting process?

10       A    They may have been.

11       Q    And who was that?

12       A    Who was it at what point in time?

13       Q    Okay.  Was Shay Harris involved in

14   negotiations and contracting?

15       A    In -- I guess I need specific examples.

16   She helped me.

17       Q    Right.

18       A    So she may have helped facilitated it --

19   facilitate some contracts.

20       Q    Okay.  And then the final phase is product

21   development; is that right?

22       A    Yes.

23       Q    And who oversees product development?

24       A    I do.

25       Q    Is that something that the -- is product

Highly Confidential

Page 59

1              JENNIFER NIYANGODA

2    development something that the licensee does?

3              MS. SHAW:  You can answer.  Sorry.

4              THE WITNESS:  We do it together.

5              BY MS. WALLITT:

6        Q    Can you explain that process?

7        A    Red Cross retains all control over the

8    product development process, including the packaging

9    and promotional developments.  So we have final

10   review and approval.

11       Q    How else does American Red Cross maintain

12   control -- retain control of the final review and

13   approval?

14       A    What other ways?  I guess I'm not sure

15   about your question.

16       Q    Okay.

17       A    Our involvement is consulting along the

18   way.  So we have our health and safety team and our

19   preparedness team reviewing and providing their

20   expert input into the products.  We also work

21   closely with the product development team at our --

22   on our partner side.

23       Q    Okay.  And is this after -- this is after

24   a contract has been signed; is that right?

25       A    Correct.

Highly Confidential

Page 60

1           JENNIFER NIYANGODA

2       Q    And what other roles does the licensing

3  partner play in this process other than product

4  development, if any?

5       A    What do you mean by "roles"?  It's a

6  pretty open-ended question.

7       Q    Right.  Well, generally, what does the

8  licensee do for the American Red Cross?

9           MS. SHAW:  Objection; vague.

10          THE WITNESS:  Yeah, it's a pretty

11  open-ended question.  That's our entire partnership.

12  So there's a lot of roles.

13          BY MS. WALLITT:

14      Q    Okay.  Well, generally, does the -- the

15  licensee manufactures the product; is that right?

16      A    Yes.

17      Q    And does the licensee do the advertising

18  for product?

19      A    Yes.

20      Q    What about marketing?

21      A    Yes.

22      Q    What other -- what other similar roles

23  does the licensee play?

24      A    Retail distribution.

25      Q    So the licensee decides how the product's

Highly Confidential

Page 61

                    JENNIFER NIYANGODA

1

2    going to be distributed to retail?

3        A    They make their recommendations, and

4    again, the Red Cross retains all review and

5    approval.

6        Q    And the licensee -- let me rephrase that.

7             How does the -- what role does the Red

8    Cross -- American Red Cross play in overseeing the

9    manufacturing of the products?

10       A    We don't oversee the manufacturing of the

11   product.  We, again, review and approve all the

12   products and product samples that come out of the

13   manufacturing process.

14       Q    If the licensee were to subcontract for

15   manufacturing of the product, is that something that

16   the American Red Cross would approve or disapprove?

17       A    I'd have to consult with my legal counsel.

18   I'm not sure what that means.

19       Q    Let's suppose that a contract was signed

20   and a licensing partner was going to manufacture the

21   product in China.  Is that something that the

22   American Red Cross would want to approve before

23   allowing the licensee to manufacture the product in

24   China?

25            MS. SHAW:  Objection; vague.

Highly Confidential

Page 115

1         JENNIFER NIYANGODA

2    for speculation.

3         THE WITNESS:  I think we would discuss the

4    opportunity and the scope of an exclusivity.

5         BY MS. WALLITT:

6    Q    And the Target co-branded kit, that was

7    only sold at Target; right?

8    A    The one with the Target name on it?

9    Q    Yes.

10   A    Correct.  It may have been on amazon.com,

11   too.  I'm not sure.

12   Q    Okay.  Thanks.

13   A    I just want to make clear, though, that

14   this doesn't have anything to do with the Target

15   kit, this document.  There seems to be some

16   confusion.

17        (Exhibit Niyangoda 17 identified.)

18        MS. WALLITT:  This is a document that's

19   been Bates stamped 19035 through 36.

20        BY MS. WALLITT:

21   Q    I could direct your attention to the

22   bottom e-mail sent by Kathleen Loehr.

23   A    Okay.

24   Q    On the second page, the last paragraph,

25   was there a concern that individuals who would wear

EXHIBIT 169

Highly Confidential

Page 1

1                ANDREA MORISI

2         UNITED STATES DISTRICT COURT

3      FOR THE SOUTHERN DISTRICT OF NEW YORK

4

5    - - - - - - - - - - - - - -x

6    JOHNSON & JOHNSON, et al., :

7         Plaintiffs,        :    Case Number

8      vs.                   :    07 CIV 7061

9    AMERICAN RED CROSS, et al.,:

10        Defendants.        :

11   - - - - - - - - - - - - - -x

12

13            HIGHLY CONFIDENTIAL

14     30(B)(6)VIDEO DEPOSITION OF ANDREA MORISI

15

16

17            Washington, DC

18          Friday, November 9, 2007

19

20

21

22

23   REPORTED BY:

24     CARMEN SMITH

25

Highly Confidential

Page 2

1                    ANDREA MORISI

2         Deposition of ANDREA MORISI, called for

3    examination pursuant to notice of deposition, on

4    Friday, November 9, 2007, in Washington, DC, at the

5    offices of Hogan & Hartson, 555 13th Street NW, at

6    9:42 a.m., before CARMEN SMITH, a Notary Public

7    within and for the District of Columbia, when were

8    present on behalf of the respective parties:

9

10        CHRISTOPHER Y. MILLER, ESQ.

11        Patterson Belknap Webb & Tyler LLP

12        1333 Avenue of the Americas

13        New York, New York 10036-6710

14        cymiller@pbwt.com

15        212-336-2948

16        On behalf of Plaintiffs

17

18        ANNA J. KURIAN SHAW, ESQ.

19        Hogan & Hartson LLP

20        555 Thirteenth Street, Northwest

21        Washington, DC 20004

22        ajkurian@hhlaw.com

23        202-637-5687

24        On behalf of Defendants

25                            -- continued --

Highly Confidential

1                ANDREA MORISI

2            APPEARANCES (Continued):

3

4     ALSO PRESENT:

5            WILLIAM F. CAUSEY, ESQ.

6              (American Red Cross)

7         T.J. O'TOOLE (Video Operator)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential

Page 10

                    ANDREA MORISI

1

2       Q    How did they change?

3       A    I took over the intellectual property

4   matters.

5       Q    Who did you take over the intellectual

6   property matters from?

7       A    A woman named Patsy Davis.

8       Q    Did Patsy Davis leave the American Red

9   Cross or just move on to other things within the

10  organization?

11      A    She left the American Red Cross.

12      Q    Okay.  You mentioned that you worked on

13  intellectual property matters starting in 1991 or

14  1992.  What types of intellectual property matters

15  were you working on?

16      A    Addressing misuses of the Red Cross name

17  and emblem by third parties, filing trademark

18  applications and defending those and advising units

19  on copyright issues.

20      Q    Okay.  And when you say "advising units,"

21  do you mean national American Red Cross units or

22  chapters or both?

23      A    Both.

24      Q    At the time you started in 1991, was there

25  anyone else working on intellectual property issues

Highly Confidential

Page 21

1                    ANDREA MORISI

2    student-type function I then later supervised.

3        Q    So when you were a law clerk at the

4    American Red Cross in parts of 1987 and '88, you

5    worked on trademark issues for the American Red

6    Cross?

7        A    Yes.

8        Q    What kind of work did you do?

9        A    Reviewing the Trademark Gazette,

10   responding -- addressing through correspondence

11   misuses of the name and emblem that were brought to

12   our attention.

13       Q    So would you send -- let me back up.

14            What's a cease-and-desist letter?

15       A    In -- at the American Red Cross, it's an

16   educational letter that we send to say we understand

17   you are using the emblem.  You may not be aware of

18   the statute.  Bringing it to your attention.  We ask

19   you to please cooperate and cease in its use.

20       Q    So is it your view that the American Red

21   Cross doesn't send cease-and-desist letters to

22   people concerning the American Red Cross name and

23   emblem?

24            MS. KURIAN SHAW:  Objection;

25   mischaracterizes the witness's testimony.

Highly Confidential

Page 22

1                  ANDREA MORISI

2    Objection; calls for a legal conclusion.

3              THE WITNESS:  Did you say does or does

4    not?

5              BY MR. MILLER:

6        Q    I'll ask it so that we're clear.

7        A    Thank you.

8        Q    Is it your view -- let me ask you this.

9    When you were in charge of trademark issues at the

10   American Red Cross, were the letters that you sent

11   to people who you believed were using the American

12   Red Cross name or emblem improperly cease-and-desist

13   letters or not?

14       A    Yes, they were cease-and-desist letters.

15       Q    What's a cease-and-desist letter?

16             MS. KURIAN SHAW:  Asked and answered.

17             THE WITNESS:  As I described above.

18             BY MR. MILLER:

19       Q    Well, I think in your last answer, you're

20   talking about educational.  Just so we're clean, can

21   you describe what a cease-and-desist letter is?

22       A    It was a we're aware of your use of the

23   emblem and asking you to cease.

24             MS. KURIAN SHAW:  Counsel, I believe you

25   have several of them.  If you would like to show one

Highly Confidential

Page 23

1                    ANDREA MORISI

2    to Ms. Morisi and she can identify it for you, you

3    know, we could do that too.

4              BY MR. MILLER:

5        Q    Okay.  I just -- this is really

6    background, but I think it's important for the

7    record.  So let's see if we can do it this way.

8              So at the American Red Cross, when you

9    were in charge of trademark issues, you often got

10   information about third parties using the American

11   Red Cross name or emblem; right?

12       A    Correct.

13       Q    And you would often send them a letter

14   concerning that use that you'd heard about; right?

15             MS. KURIAN SHAW:  Objection; foundation.

16             BY MR. MILLER:

17       Q    You can answer.

18       A    Yes.

19       Q    And in sending this letter, you explained

20   why you thought that this third party's use of the

21   American Red Cross name or emblem was improper;

22   right?

23       A    Yes.

24       Q    And in the letter that you would send to

25   third parties, you also asked the third parties,

Highly Confidential

Page 24

1                    ANDREA MORISI

2  typically, to stop using the American Red Cross name

3  or emblem; right?

4       A    Always.

5       Q    So when you were a law clerk with the

6  American Red Cross in parts of 1987 and '88, you

7  sent cease-and-desist letters -- let me -- sorry.

8            When you were a law clerk with the

9  American Red Cross in 1987 and 1988, did you send

10  cease-and-desist letters to third parties who were

11  using the American Red Cross name or emblem?

12       A    To the extent I prepared them for the

13  attorney.

14       Q    Okay.  So at the time, did you not sign

15  the letters that were sent out to users of the

16  American Red Cross name and emblem?

17       A    I did not sign.

18       Q    Okay.  And who did at that time?

19       A    Pat Xeller, X-e-l-l-e-r.

20       Q    Who is Pat Xeller?

21       A    She was an attorney in our office at that

22  time.

23       Q    Was she in charge of trademark issues at

24  the time, or no?

25       A    Yes, she was in charge.

Highly Confidential

Page 29

```
1                    ANDREA MORISI

2     other documents.

3          Q    What were the other documents?

4               MS. KURIAN SHAW:  To the extent you

5     recall.

6               THE WITNESS:  On the Microflex Corporation

7     case and other document -- other documents.

8               BY MR. MILLER:

9          Q    What were some of those?

10         A    IRS opinions, educational brochures, the

11    complaint.

12         Q    In this case?

13         A    Yes.

14         Q    When you say you reviewed a file

15    concerning First Aid Only, or FAO, was that a

16    cease-and-desist file on FAO?

17         A    Yes.

18         Q    And where was that file?

19         A    That file -- I don't know where that file

20    was.

21         Q    Did you ask someone to get it for you?

22         A    Yes.

23         Q    Who got it for you?

24         A    I don't know.

25         Q    What kind of file did you review for
```

Highly Confidential

                         ANDREA MORISI

2    Water-Jel?

3         A    The correspondence between Water-Jel's

4    representatives and myself.

5         Q    Did you talk to anyone at the American Red

6    Cross to prepare for your deposition?

7         A    Just my counsel.

8         Q    So when you started working as the

9    trademark lawyer for the American Red Cross in 1991

10   or 1992, the folks at the American Red Cross working

11   on trademark issues were you and a law clerk; right?

12        A    Yes.

13        Q    How did you get information about uses of

14   the American Red Cross name or emblem by people

15   other than the American Red Cross at that time?

16             MS. KURIAN SHAW:  Objection; asked and

17   answered.

18             THE WITNESS:  They would be brought to our

19   attention by our chapters, which are across the

20   country, across the world, Red Cross staff across

21   the world.  They would be brought to our attention

22   by volunteers and other individuals who were aware

23   of the -- or had questions about the appropriateness

24   of someone's mark.  They were discovered by me in

25   catalogues and by others in the organization and

Highly Confidential

Page 31

1                 ANDREA MORISI

2    later by the Internet.

3             BY MR. MILLER:

4        Q    And when you started at the American Red

5    Cross, there was an intern who also interviewed --

6    excuse me.

7             When you started at the American Red Cross

8    working on trademark issues, there was also an

9    intern who reviewed the Trademark Gazette published

10   by the government concerning trademark applications;

11   right?

12       A    Correct.

13       Q    And that was another source of information

14   about people who were using the trademark -- excuse

15   me.

16            Was the Trademark Gazette also a source of

17   information about third parties using the American

18   Red Cross name or emblem?

19       A    Yes, they were a potential use of the --

20   potential misuse, I should say, of the Red Cross

21   name and emblem.

22       Q    Okay.  And why was all this activity

23   undertaken to determine that other people were

24   using -- to determine whether or not other people

25   were using the American Red Cross name or emblem?

Highly Confidential

Page 32

1                    ANDREA MORISI

2       A    The organization has an obligation to

3    protect that emblem, two obligations, I would say.

4    The first is via responsibility with Geneva

5    Conventions, educating individuals and others about

6    the appropriate use of the emblem, particularly in

7    combat and civil disorder type situations, civil

8    unrest.

9              And then sort of our domestic

10   responsibilities, shall we say, for trademark-type

11   protections, as our intellectual property, to be

12   preserved for our use.

13      Q    So in the time you've worked on trademark

14   issues at the American Red Cross, do you know how

15   many cease-and-desist letters you sent to third

16   parties?

17            MS. KURIAN SHAW:  Objection; calls for

18   speculation.

19            THE WITNESS:  Feels like thousands.  I

20   don't know the number.

21            BY MR. MILLER:

22      Q    When you were the -- when you were in

23   charge of trademark issues at the American Red

24   Cross, about how much of your time was devoted to

25   trademark issues?

EXHIBIT 170

Page 1

1

2              UNITED STATES DISTRICT COURT

3         FOR THE SOUTHERN DISTRICT OF NEW YORK

4

5   - - - - - - - - - - - - - - - - -x
                                      )
6   JOHNSON & JOHNSON, et al.,         )
                                      )
7                    Plaintiffs,       )   Case No.
                                      )   07 CIV 7061
8           -against-                  )
                                      )
9   AMERICAN RED CROSS, et al.,        )
                                      )
10                   Defendants.       )
    - - - - - - - - - - - - - - - - -x

11

12      *CONTAINS HIGHLY CONFIDENTIAL PORTIONS*

13

14      VIDEOTAPED DEPOSITION OF AMLIN KOTEI

15              New York, New York

16         Tuesday, November 6, 2007

17

18

19

20

21

22  Reported by:

23  JEFFREY BENZ, CRR, RMR

24  JOB NO. 13954

25

Page 2

1

2

3

4

5                              November 6, 2007

6                              9:35 a.m.

7

8

9        Videotaped deposition of AMLIN KOTEI, held at

10   the offices of Patterson, Belknap, Webb & Tyler,

11   1133 Avenue of the Americas, New York, New York,

12   before Jeffrey Benz, a Certified Realtime

13   Reporter, Registered Merit Reporter and Notary

14   Public of the State of New York.

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2    A P P E A R A N C E S:

3

       PATTERSON BELKNAP WEBB & TYLER, LLP

4

       Attorneys for Plaintiffs

5

           1133 Avenue of the Americas

6

       New York, New York    10036-6710

7

       BY:  PHYLLIS STAUB WALLITT, ESQ.

8

9

10     HOGAN & HARTSON LLP

11     Attorneys for Defendants

12         555 Thirteenth Street, Northwest

13         Washington, D.C.  20004

14     BY:  PHILLIP O. METCALF, ESQ.

15         ASHLEY R. DOBBS, ESQ.

16

17

18

19

20

21

22

23

24  ALSO PRESENT:

25      SILVIO FACCHIN, Videographer

1                              Kotei

2     that there were any hard-and-fast divisions

3     amongst components.

4          Q.   Now, everything that's depicted on the

5     back of the label for -- for the emergency first

6     aid kit would certainly be included in the

7     boxing, right?

8          A.   Sorry?

9          Q.   I said everything that's depicted on

10    the label would be in the boxes, right?

11         A.   Yes.

12         Q.   Okay.  Which would include

13    flashlights, batteries, whistles, light sticks,

14    masks, gloves, correct?

15         A.   Yes.

16         Q.   In addition to bandages and things

17    like that, correct?

18         A.   Yes.

19         Q.   I know we've been going for a little

20    while.  Just like, whenever you want to take a

21    break, let me know, and we'll do it.

22         A.   I will.

23              (Business plan document,

24         Bates-numbered JJARC 6265 through 6275, was

25         marked Kotei Exhibit 5 for identification,

```
1                           Kotei
2    we took it out.
3         Q.   Was it your understanding that the
4    emergency first aid kit, Eagle Scout, would
5    extend Johnson & Johnson into the field of
6    emergency preparedness products?
7         A.   At the current time that would be --
8    that would have been true.  I don't know if in
9    the past the company had done this.  So -- in
10   past years, they may -- in the '40s and the '50s
11   and even in the '80s, there may have been
12   products that dealt in that area, but as of
13   2006, we didn't have any products in that area.
14   So yes.
15            MR. METCALF:  Okay.  Exhibit-- what I
16        have here is Exhibit 14.
17            (E-mail chain and attachment,
18        Bates-numbered 12947, 12948, and 12951,
19        were marked Kotei Exhibit 14 for
20        identification, as of this date.)
21        Q.   Exhibit 14.  E-mail chain that starts
22   at -- e-mail chain and attachment, starts at
23   Bates Number 12947 through 12951.
24            I'm sorry.  I skipped a couple pages.
25   It's not right.
```

EXHIBIT 171

Contains Highly Confidential Portions

Page 1

1          JEFF TOLONEN
2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ----------------------------------------X
    JOHNSON & JOHNSON and JOHNSON & JOHNSON
4   CONSUMER COMPANIES, INC.,
5                  Plaintiffs,
6             v.    Case Number 07-CIV-7061 (JSR)
7   THE AMERICAN NATIONAL RED CROSS, LEARNING
    CURVE INTERNATIONAL, INC., MAGLA PRODUCTS,
8   LLC, WATER-JEL TECHNOLOGIES, INC., and
    FIRST AID ONLY, INC.,
9
                 Defendants.
10  ----------------------------------------X
11
12
13     VIDEOTAPED DEPOSITION OF JEFF TOLONEN
14            New York, New York
15         Wednesday, November 7, 2007
16
17  REPORTED BY:  BARBARA R. ZELTMAN
                 Professional Shorthand Reporter
18
19  Job Number:  13956
20
21
22
23
24
25

Contains Highly Confidential Portions

Page 2

1                      JEFF TOLONEN

2

3

                                    November 7, 2007

4                                   9:34 a.m.

5

6           Videotaped deposition of JEFF TOLONEN

7    taken by Defendants, pursuant to Notice, at the

8    offices of PATTERSON BELKNAP WEBB & TYLER, LLP, 1133

9    Avenue of the Americas, New York, New York, before

10   BARBARA R. ZELTMAN, a Professional Shorthand

11   Reporter and Notary Public within and for the State

12   of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

Contains Highly Confidential Portions

Page 3

1              JEFF TOLONEN

2   A P P E A R A N C E S:

3

4   PATTERSON BELKNAP WEBB & TYLER, LLP

5   Attorneys for the Plaintiffs

6        1133 Avenue of the Americas

7        New York, New York 10036

8        BY:  PHYLLIS WALLITT, ESQ.

9

10

11  HOGAN & HARTSON, LLP

12  Attorneys for the Defendants

13       555 Thirteenth Street, NW

14       Washington, DC 20004

15       BY:  PHILLIP METCALF, ESQ.

16

17

18  Also present:  Josh Lipson, Videographer

19

20

21

22

23

24

25

Contains Highly Confidential Portions

Page 112

1              JEFF TOLONEN

2       thought it was consistent with what we

3       were trying to accomplish in the

4       Emergency First Aid Kit.

5          Q    How does a flashlight -- let me

6       ask you a question.

7              Do you consider a flashlight a

8       first aid product?

9          A    The flashlight itself is not

10      branded Johnson & Johnson Red Cross

11      first aid.  I don't know if that answers

12      your question.

13         Q    We talked earlier about what

14      your kind of working definition of first

15      aid was.  And first aid products.

16             Would you consider -- you

17      wouldn't consider a flashlight a first

18      aid product?

19         A    A flashlight in itself isn't a

20      wound cover or something that would have

21      a direct implication of first aid.

22             My understanding and for the

23      purposes of this kit is people aren't

24      always afforded the luxury of conducting

25      first aid on a Sunday afternoon in a

Contains Highly Confidential Portions

Page 113

1               JEFF TOLONEN

2      park.

3           Oftentimes more emergency

4      situations create unique first aid

5      needs.  And so our thinking in building

6      this kit was, frankly, post 2005 we saw

7      a massive increase in the entire

8      category of first aid kits, a dramatic

9      increase in sales directly related to

10     Hurricane Katrina, and then people

11     preparing for and after the fact either

12     replenishing supplies and preparing for

13     potentially the next one.

14           The implication of that from a

15     first aid standpoint is that there can

16     be useful items that enable the conduct

17     of first aid in more -- in different

18     situations, not always a Sunday in the

19     park.

20           So the intention of this kit,

21     the kernel of the idea of the consumer

22     insight was let's provide a first aid

23     kit that allows and enables the conduct

24     of first aid in more emergency

25     situations.

Contains Highly Confidential Portions

Page 148

JEFF TOLONEN

1    from The American Red Cross, Casey Minix

2    Bagnalli and Jennifer Charnetski.

3

4            Just as a matter of practice.

5    It would be consistent with how I would

6    take notes on other conversations on a

7    particular document to have noted other

8    parties that may have been part of the

9    conversation.

10           If we went back and checked the

11   calendar for Monday, October 23rd and I

12   could be certain and verify that that

13   was a date we had a call set up, we can

14   verify whether or not this was part of

15   that conversation or at least feel more

16   confident that it was.

17       Q    Did you consider the Emergency

18   First Aid Kit to be Johnson & Johnson's

19   entry into the field of the emergency

20   preparedness?

21       A    Maybe in a deliberate sense, not

22   emergency preparedness but first aid and

23   more emergency kinds of contexts;

24   however, anecdotally just based on the

25   sales trends on the rest of our first

Contains Highly Confidential Portions

Page 149

JEFF TOLONEN

1
2       aid kit line and recognizing certain
3       causal events, i.e., Hurricane Katrina,
4       even 9-11, it was clear that consumers
5       viewed purchasing our kits as a good
6       thing to do, responsible thing to do to
7       have items on hand.
8               So the way I would answer your
9       question is emergency preparedness
10      wasn't particularly what we were going
11      after, outside of how having any gauze
12      pad or tape on hand in the event of a
13      first aid emergency would be preparing
14      for that first aid need.
15          Q    Was it your understanding that
16      American Red Cross had marketed their
17      first aid kit, as they sold in Target,
18      as an emergency preparedness kit?
19          A    I don't remember the exact
20      designation of the product, but I
21      believe it was titled something like the
22      Emergency Preparedness Kit for a Family
23      of Four, maybe as the designation.
24              MR. METCALF:  Let's take lunch.
25              THE VIDEOGRAPHER:  It is 1:06.

EXHIBIT 172

Gregory L. Diskant
Karla G. Sanchez
Ravi V. Sitwala
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel:  (212) 336-2000
Fax:  (212) 336-2222

Roger L. Zissu
Richard Z. Lehv
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017
Tel:  (212) 813-5900

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE AMERICAN NATIONAL RED CROSS, LEARNING CURVE INTERNATIONAL, INC., MAGLA PRODUCTS, LLC, WATER-JEL TECHNOLOGIES, INC., and FIRST AID ONLY, INC., <br><br> Defendants. | Case No. 07-CV-07061 (JSR) |

**PLAINTIFFS' RESPONSES TO DEFENDANTS'
FIRST SET OF REQUESTS FOR ADMISSION**

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, plaintiffs

Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc. (collectively "J&J"),[1] by

---

[1]    Defendants First Sets of Requests for Admission to each of the plaintiffs are identical to one another.  Defendants' definition of J&J includes Johnson & Johnson's "affiliates, subsidiaries, divisions,

inconsistent with J&J's understanding, J&J reserves the right to amend or supplement its Responses.

       7.     Pursuant to Rule 36, any admission made herein is made only in the above captioned action and is not intended and shall not be construed to be an admission for any other action or proceeding.  In addition, by its Responses, J&J does not intend to waive, but, on the contrary, expressly preserves:  (a) the right to object on any ground to the use or introduction into evidence of any Response in any subsequent proceeding or in the trial of this or any other action on any ground; and (b) the right to object on any ground at any time to other requests for admission or other discovery involving these Requests or the subject matter thereof.

       8.     These General Objections and Responses, including the General Objections to Definitions set forth below, are incorporated in full into each specific response set forth below.

## GENERAL OBJECTIONS TO DEFINITIONS

J&J incorporates by reference its objections to definitions in its responses and objections to Defendants' First Request for Production of Documents and Things.

## REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1

J&J did not sell light sticks under the J&J Cross Design and/or J&J Cross Design Variants prior to January 5, 1905.

### RESPONSE TO REQUEST FOR ADMISSION NO. 1

In addition to J&J's general objections, J&J objects to this Request as particularly vague in that "light stick" is not defined nor is it clear what it means to "sell [an item] *under the* J&J Cross Design and/or J&J Cross Design Variants."  Subject to and without waiving these objections, J&J is not aware of sales of individually branded red cross light sticks of the sort

3

shown in Exhibit B to ARC's Answer and Counterclaims prior to January 5, 1905, and otherwise denies the Request.

## REQUEST FOR ADMISSION NO. 2

J&J did not sell tweezers under the J&J Cross Design and/or J&J Cross Design Variants prior to January 5, 1905.

## RESPONSE TO REQUEST FOR ADMISSION NO. 2

In addition to J&J's general objections, J&J objects to this Request as particularly vague in that it is not clear what it means to "sell [an item] *under the* J&J Cross Design and/or J&J Cross Design Variants." Subject to and without waiving these objections, J&J is not aware of sales of individually branded red cross tweezers prior to January 5, 1905, and otherwise denies the Request.

## REQUEST FOR ADMISSION NO. 3

J&J did not sell magnets under the J&J Cross Design and/or J&J Cross Design Variants prior to January 5, 1905.

## RESPONSE TO REQUEST FOR ADMISSION NO. 3

In addition to J&J's general objections, J&J objects to this Request as particularly vague in that it is not clear what it means to "sell [an item] *under the* J&J Cross Design and/or J&J Cross Design Variants." Subject to and without waiving these objections, J&J is not aware of sales of individually branded red cross magnets of the sort shown in Exhibit B to ARC's Answer and Counterclaims prior to January 5, 1905, and otherwise denies the Request.

## REQUEST FOR ADMISSION NO. 4

J&J did not sell survival wrap under the J&J Cross Design and/or J&J Cross Design Variants prior to January 5, 1905.

## RESPONSE TO REQUEST FOR ADMISSION NO. 4

In addition to J&J's general objections, J&J objects to this Request as particularly vague in that "survival wrap" is not defined nor is it clear what it means to "sell [an item] *under*

4

*the* J&J Cross Design and/or J&J Cross Design Variants." Subject to and without waiving these

objections, J&J is not aware of sales of individually branded red cross survival wrap of the sort

shown in Exhibit B to ARC's Answer and Counterclaims prior to January 5, 1905, and otherwise

denies the Request.

### REQUEST FOR ADMISSION NO. 5

J&J did not sell first aid guides under the J&J Cross Design and/or J&J Cross
Design Variants prior to January 5, 1905.

### RESPONSE TO REQUEST FOR ADMISSION NO. 5

In addition to J&J's general objections, J&J objects to this Request as particularly

vague in that it is not clear what it means to "sell [an item] *under the* J&J Cross Design and/or

J&J Cross Design Variants." Subject to and without waiving these objections, J&J denies the

Request.

### REQUEST FOR ADMISSION NO. 6

J&J did not sell first aid kits under the J&J Cross Design and/or J&J Cross Design
Variants prior to January 5, 1905.

### RESPONSE TO REQUEST FOR ADMISSION NO. 6

In addition to J&J's general objections, J&J objects to this Request as particularly

vague in that it is not clear what it means to "sell [an item] *under the* J&J Cross Design and/or

J&J Cross Design Variants." Subject to and without waiving these objections, J&J denies the

Request.

### REQUEST FOR ADMISSION NO. 7

J&J did not sell hand sanitation gel under the J&J Cross Design and/or J&J Cross
Design Variants prior to January 5, 1905.

### RESPONSE TO REQUEST FOR ADMISSION NO. 7

In addition to J&J's general objections, J&J objects to this Request as particularly

vague in that "hand sanitation gel" is not defined nor is it clear what it means to "sell [an item]

1408389v.2

*under the* J&J Cross Design and/or J&J Cross Design Variants." Subject to and without waiving

these objections, J&J is not aware of sales of individually branded red cross hand sanitation gel

of the sort sold by defendant Water-Jel and advertised on ARC's website, but did sell antiseptic

liquid soaps prior to January 5, 1905, and otherwise denies the Request.

## REQUEST FOR ADMISSION NO. 8

J&J did not sell latex protective gloves under the J&J Cross Design and/or J&J
Cross Design Variants prior to January 5, 1905.

## RESPONSE TO REQUEST FOR ADMISSION NO. 8

In addition to J&J's general objections, J&J objects to this Request as particularly

vague in that it is not clear what it means to "sell [an item] *under the* J&J Cross Design and/or

J&J Cross Design Variants." Subject to and without waiving these objections, J&J is not aware

of sales of individually branded red cross latex protection gloves prior to January 5, 1905, and

otherwise denies the Request.

## REQUEST FOR ADMISSION NO. 9

The Bill entitled "A BILL to protect the insignia and the name of the Red Cross"
referenced in the 1895 Clara Barton Document was never enacted.

## RESPONSE TO REQUEST FOR ADMISSION NO. 9

Subject to and without waiving J&J's general objections, J&J admits that the

particular bill referenced in the 1895 Clara Barton Document was not enacted.

## REQUEST FOR ADMISSION NO. 10

J&J did not use the mark depicted in U.S. Reg. No. 3,178,913 prior to January 5,
1905.

## RESPONSE TO REQUEST FOR ADMISSION NO. 10

Subject to and without waiving J&J's general objections, J&J admits that it did

not use the entire mark depicted in the '913 registration prior to January 5, 1905, but that it did

6

1408389v.2