Gregory L. Diskant
Robert W. Lehrburger
Sarah Zgliniec
Ravi V. Sitwala
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel:  (212) 336-2000
Fax:  (212) 336-2222

Roger L. Zissu
Richard Z. Lehv
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017
Tel:  (212) 813-5900

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 07-CV-07061 (JSR) |
| v. | ) ) ) | |
| THE AMERICAN NATIONAL RED CROSS, LEARNING CURVE INTERNATIONAL, INC., MAGLA PRODUCTS, LLC, WATER-JEL TECHNOLOGIES, INC., and FIRST AID ONLY, INC., | ) ) ) ) ) ) ) | **Publicly Filed Version** |
| Defendants. | ) ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

PRELIMINARY STATEMENT........................................................................................1

ARGUMENT.......................................................................................................................3

I.    Legal Limitations on ARC's Use of the Red Cross Emblem......................................3

II.   Defendants' Licensing Scheme Violates 18 U.S.C. § 706, ARC's Charter,
      and the Geneva Convention.......................................................................................6

      A.   Section 706 Protects the Red Cross Emblem Against Commercial Use............6

           1.   Section 706 Protects the Red Cross Emblem, Not ARC.........................6

           2.   Section 706 Limits ARC's Ability to Authorize Third-Party Use of Its
                Emblem to Its Duly Authorized Employees and Agents..........................9

      B.   ARC's Charter Forbids It from Engaging in Commerce  in Competition
           with Private Business ......................................................................................12

           1.   ARC's Federal Charter Provides No Power to Engage in Commercial
                Activity..................................................................................................14

           2.   The Legislative History of the Federal Charter Confirms that ARC
                Has No Ability to Engage in Commerce..................................................18

           3.   IRS Rulings Regarding the Relatedness of Certain Activities
                Are Irrelevant ........................................................................................23

      C.   ARC's Licensing Scheme Violates the Geneva Convention and ICRC
           Regulations  ......................................................................................................24

III.  J&J's Claim for Tortious Interference with Business Relations ...............................25

IV.   J&J's Claim for Unfair Competition........................................................................27

V.    J&J's Claim for Dilution ..........................................................................................29

      A.   J&J's Red Cross Emblem Is Distinctive..........................................................29

      B.   The Record Contains Evidence of Both Blurring and Tarnishment.................30

      C.   J&J's Claims Are Not Barred by Laches..........................................................32

VI.   J&J's Claims for Tortious Interference with Contract .............................................35

      A.   J&J's Contract with FAO .................................................................................35

      B.   J&J's Contract with Water-Jel..........................................................................37

VII.  ARC's Counterclaims Should Be Dismissed ...........................................................38

CONCLUSION...................................................................................................................40

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Air Cargo News, Inc. v. Tabmag Publishing, Ltd.*, 07-CV-480 (DLI) (RLM)
2007 WL 1101183 (E.D.N.Y. Apr. 11, 2007) ..............................................32

*Alabama Power Co. v. Ickes*, 302 U.S. 464 (1938) ...............................................6

*Allcar Motor Parts Corp. v. Federal-Mogul Corp.*, No. 96 CIV. 4419 (JFK),
1998 WL 671448 (S.D.N.Y. Sept. 29, 1998) ..............................................26

*AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796 (7th Cir. 2002) ..................33

*Asgrow Seed Co. v. Winterboer*, 513 U.S. 179 (1995) ......................................10

*Baylor University Medical Ctr. v. Heckler*, 758 F.2d 1052 (5th Cir. 1985) ....................34

*Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125 (2d Cir. 2004)................30

*Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 248 (S.D.N.Y. 2001)...........27

*Carvel Corp. v. Noonan*, 350 F.3d 6 (2d Cir. 2003) ..........................................25

*Commissioner v. Groetzinger*, 480 U.S. 23 (1987) .............................................5

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989).............................10

*Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187 (2d Cir. 1996) .............................32, 34

*Costello v. United States*, 365 U.S. 265 (1961) ................................................34

*Couveau v. American Airlines, Inc.*, 218 F.3d 1078 (9th Cir. 2000) ................................32

*D'Andrea v. Rafla-Demetrious*, 3 F. Supp.2d 239 (E.D.N.Y. 1996),
*aff'd*, 146 F.3d 63 (2d Cir. 1998) ..........................................................26

*Deere & Co. v. MTD Holdings Inc.*, 41 F.3d 39 (2d Cir. 1994) ......................................31

*Distasio v. Perkin-Elmer Corp.*, 157 F.3d 55 (2d Cir. 1998) .........................................35

*Doe v. American National Red Cross*, 845 F. Supp. 1152 (S.D.W. Va. 1994) ..................14

*Grupke v. Linda Lori Sportswear*, 921 F. Supp. 987 (E.D.N.Y. 1996) ..............................27

*Hannex Corp. v. GMI, Inc.*, 140 F.3d 194 (2d Cir. 1998) ..............................................26

ii

*Hermes International v. Lederer de Paris Fifth Avenue, Inc.*, 219 F.3d 104
(2d Cir. 2000) ..................................................................................................35

*H.G Shopping Centers, L.P. v. Birney*, No. H-99-0622, 2000 WL 33538621
(S.D. Tex. Nov. 29, 2000) ..............................................................................34

*Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497
(2d Cir. 1996) ..................................................................................................31

*Johnson v. Mississippi*, 488 F.2d 284 (5th Cir. 1974), *aff'd on other grounds*,
421 U.S. 213 (1975) .........................................................................................16

*Kelly v. U.S. Department of Justice*, No. 03-4137-JAR, 2003 WL 22533562
(D. Kan. Oct. 31, 2003)....................................................................................16

*Marcella v. Brandywine Hospital*, 47 F.3d 618 (3d Cir. 1995) .........................5, 13, 14, 18

*NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974) ..............................................19

*Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208 (2d Cir. 1999), *abrogated on
other grounds by Mosely v. VSecret Catalogue, Inc.*, 537 U.S. 418 (2002) ......29

*New Orleans, M.&T.R. Co. v. Ellerman*, 105 U.S. 166 (1881)........................6, 13

*New York v. Horelick*, 424 F.2d 697 (2d Cir. 1970) ...........................................15

*O-M Bread, Inc. v. U.S. Olympic Committee*, 65 F.3d 933 (Fed. Cir. 1995) ....39

*PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266 (2d Cir.
1987) ................................................................................................................26

*Precision Instrument Manufacturing v. Automotive Maintenance Machine Co.*
324 U.S. 806 (1945) ........................................................................................35

*Reisner v. Regent University of California*, 1991 WL 571161 (C.D. Cal. 1991)...............14

*Roy Export Co. v. Establishment of Vaduz.*, 672 F.2d 1095 (2d Cir. 1982) ......27

*Rozak v. American Red Cross Blood Services*, 945 F. Supp. 1183
(N.D. Ind. 1996) .............................................................................................14

*Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037 (2d Cir. 1980)......27

*Savin Corp. v. Savin Group*, 391 F.3d 439 (2d Cir. 2004) ................................30

iii

*Six West  Retail Acquisition, Inc. v. Sony Theatre Management Corp.*,
No. 97 Civ. 5499 (LAP), 2004 WL 691680 (S.D.N.Y. Mar. 31, 2004),
*aff'd*, 124 Fed. Appx. 73 (2d Cir. 2005) ................................................26

*Sutton Import-Export Corp. v. Starcrest of California*, 762 F. Supp. 68
(S.D.N.Y. 1991) .................................................................................27

*Tennessee Electric Power Co. v. Tennessee Valley Authority*, 306 U.S. 118 (1939)...........6

*Unique Sports Generation, Inc. v. LGH-III, LLC*, No. 03 Civ. 8324 (JGK) (DF),
2005 WL 2414452 (S.D.N.Y. Sept. 30, 2005) ...........................................27

## STATE CASES

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182 (2004) ...............................................25

*Vigoda v. DCA Products Plus Inc.*, 293 A.D.2d 265 (1st Dept. 2002) ...........................26

## FEDERAL STATUTES

33 Stat. 599 (1905) ...............................................................14, 17

36 Stat. 604 (1910) ...............................................................4, 15

15 U.S.C. § 1052(b) ...............................................................39

15 U.S.C. § 1065 ...............................................................30

15 U.S.C. § 1115 ...............................................................30

15 U.S.C. § 1125(c)(1) ...............................................................29, 30

15 U.S.C. § 1125(c)(2)...............................................................31

15 U.S.C. § 1125(c)(2)(B) ...............................................................30, 31

15 U.S.C. § 1125(c)(3)(C) ...............................................................29

18 U.S.C. § 706...............................................................*passim*

36 U.S.C. § 80305 ...............................................................12

36 U.S.C. § 130506 ...............................................................12

36 U.S.C. § 220506(b)...............................................................12

iv

36 U.S.C. § 300106(a) ...................................................................................3, 15

**STATE STATUTES**

N.Y.C.P.L.R. (8) ...........................................................................................32

**LEGISLATIVE HISTORY**

H.R. 5580, 53d Cong. (2d Sess. 1894)................................................................9

H.R. Rep. No. 61-1256 (1910) ........................................................................12

*House Report on the American National Red Cross Governance Modernization
Act of 2007*, H. Rep. No. 110-87 (2007) ....................................................18

*Protection of the Name and Emblem of the Red Cross: Hearings Before H.
Comm. on Foreign Affairs*, 77th Cong. 225 (2d Sess. 1942)........................ *passim*

*Red Cross: Hearings on S. 2241 and H.R. 7420 Before the
S. Subcomm. on the Judiciary*, 77th Cong. 6 (2d Sess 1942)........................ *passim*

*Terminating Further Commercial Use of the Red Cross: Hearings Before H.
Comm. on Foreign Affairs*, 78th Cong. 238 (2d Sess. 1944) ...............1, 8, 16

*The Red Cross: Hearing on H.R. 22311 Before the H. Comm. on
Foreign Affairs*, 61st Cong. (2d Sess. 1910)......................................9, 10, 22

*To Protect the Name "Red Cross": Hearing before the H. Comm. On Patents*,
65th Cong. (3d Sess. 1919) ...................................................................16, 22

**OTHER AUTHORITIES**

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
§ 24:119 (4th ed. 2007) ........................................................................31

*Black's Law Dictionary* 1226 (7th ed. 1999) ...................................................21

*Commentary to Art. 44, Restrictions in the Use of the Emblem, of the Geneva
Convention for the Amelioration of the Condition of the Wounded and Sick
in Armed Forces in the Field*, Aug. 12, 1949.................................................5

*Concise Oxford Dictionary of Current English* 919 (3rd ed. 1934) ..................21
*Geneva Convention for the Amelioration of the Conditions of the Wounded of the
Armies in the Field*, July 6, 1906, 35 Stat. 1885 .................................... 8, 10

*Geneva Convention for the Amelioration of the Conditions of the Wounded and*

*Sick in Armed Forces in the Field*, Aug. 12, 1949, 6 U.S.T. 3114 ........................3, 4, 7

*International Committee of the Red Cross Regulations on the Use of the Emblem of the Red Cross or the Red Crescent by the National Societies* (1965, revised 1991) ................................................................................................. *passim*

Restatement (Third) of Unfair Competition § 31 cmt. c (1995) ........................................34

vi

## PRELIMINARY STATEMENT

On September 1, 2004, ARC opened its online store to sell branded red cross products over the internet. ARC signed the first licensing arrangement at issue in this case on July 14, 2005, authorizing Magla, one of its four codefendants, to sell red cross branded products in retail stores and other commercial channels of trade. In the ensuing months, the other three codefendants signed up. In April 2006, ARC went public with its new program and issued a press release announcing "a new licensing initiative" in which it would license companies to make and sell "consumer products" bearing the red cross emblem which "will become available at major retailers nationwide throughout 2006." (Ex. 70).[1] It is this program that forms the basis for J&J's complaint, not the prior century of sporadic and non-commercial sales of first-aid products that ARC alleges were made by its chapters and fundraisers.

ARC's motion for summary judgment distorts beyond recognition both the federal criminal statute enacted to protect the red cross emblem and ARC's limited powers under its federal charter. The federal criminal statute is not, as ARC would have it, limited to protecting the public "against pretenders." (ARC Br. at 1). That is the purpose of the first sentence of § 706, which prevents fraudulent use of the emblem. The second sentence, the prohibition on "use" that is at issue here, limits use (beyond the grandfathered users) to the armed forces of the United States and ARC and "its duly authorized employees and agents." It is designed to limit use of the emblem to the "exclusively humane purpose[s] for which [it was] created and adopted." *Terminating Further Commercial Use of the Red Cross: Hearings Before the H.*

---

[1] "App. __" refers to the Appendices of legal materials submitted by J&J under the Declaration of Ravi V. Sitwala Submitting Appendices in support of J&J's motion for summary judgment. "Ex. __" refers to exhibits filed by J&J. Exhibits 1-69 were filed as part of J&J's motion for summary judgment in three volumes under the Declaration of Ravi V. Sitwala Submitting Exhibits. Exhibits 70-133 are filed with this opposition to Defendants' motion for summary judgment under the Declaration of Phyllis S. Wallitt Submitting Exhibits.

*Comm. on Foreign Affairs*, 78th Cong. 227 (2d Sess. 1944) [hereinafter "1944 H. Comm. Hearings"] (reprinting letter from Franklin D. Roosevelt) (App. III, Tab 62 at 227). ARC ignores its limited ability to authorize use only by its "duly authorized agents" and argues instead that it has a largely unfettered right to "authorize third parties to use the emblem," even when ARC surrenders control of its use. (ARC Br. at 1).

ARC is just as cavalier with its interpretation of its charter. ARC's charter is substantially the same today as it was in 1905. The powers it grants ARC are limited to humanitarian purposes and, as Attorney General Biddle concluded upon reviewing the charter in 1942, "the American Red Cross is not empowered to engage in business of a commercial or manufacturing character in competition with private business." 1942 S. Subcomm. Hearings at 6 (App. III, Tab 54 at 6). This was also the charter that ARC's chairman reviewed in 1942, when he reported to Congress that ARC had no ability to engage "in any commercial venture for profit," which he defined to mean any activities that generated an "excess of revenues over costs." 1942 H. Comm. Hearings at 262 (App. III, Tab 53 at 262). Yet, ARC defends its new-found view that it may generate profits by competing with private business in commercial endeavors of all kinds.

Instead of grappling with the serious legal impediments to its reckless course of conduct, ARC engages in meaningless comparisons to other non-profit organizations and it claims that forcing ARC to comply with the law will "completely hobble[]" its fundraising efforts. (ARC Br. at 5). But ARC is not like other not-for-profits. It is, as it notes, the only federally chartered entity that is a "treaty obligation organization." (ARC 56.1 Stmt. ¶ 6; *see also* Ex. 72 at 4). The law protecting the emblem exists not to protect ARC, but rather to protect the victims of disasters. As ARC elsewhere notes, "the Emblem marks people, places, and items that

victims can trust in time of dire need." (Becker Decl. ¶ 5). That is the reason why the red cross emblem is subject to unique federal and international protection and that is what makes items displaying the red cross emblem dramatically different than (for example) Girl Scout cookies. Acknowledging that profound difference, the Girl Scout's charter, unlike ARC's charter, freely permits the Girl Scouts to license its mark to be used on bakery products and other commercial goods for sale.

   The International Red Cross has studied at great length how National Societies such as ARC can legitimately use the red cross emblem to raise funds, while preserving its unique status as a symbol of neutrality and aid. It has prepared detailed regulations, made binding by the Geneva Convention, which strictly prohibit the National Societies (including ARC) from authorizing use of the emblem on "items for sale." ICRC Regulations, art. 23 (App. II, Tab 38 at 11). ARC will not be "completely hobbled" if it conforms its activities to the rule of law.

## ARGUMENT

### I. Legal Limitations on ARC's Use of the Red Cross Emblem

   In sweeping terms, ARC suggests that this case challenges virtually any use of the red cross emblem. That is not so. It is therefore worth beginning by reviewing the legal framework that governs what ARC can and cannot do with the emblem. The sources of relevant law are the Geneva Convention, ARC's federal charter, federal criminal law and International Red Cross rules enacted pursuant to the Geneva Convention.

   First, and most importantly, ARC can use the red cross emblem for its humanitarian purposes. That is expressly permitted under both the charter and the Geneva Convention. 36 U.S.C. § 300106(a) (App. I, Tab 13); 1949 Convention, art. 44 (App. II, Tab 26). Such use is not barred by either the federal criminal statute, which expressly exempts ARC, or

1417742v.1

the rules of the International Red Cross. Thus, ARC may contract with suppliers to provide it

with red cross stationery and red cross water bottles. It may authorize its employees and

volunteer agents to wear the red cross emblem while engaged in their humanitarian efforts.

In addition, as part of its humanitarian efforts, ARC may give away supplies and

goods bearing the red cross emblem. While 18 U.S.C. § 706 on its face might suggest that "use"

of the red cross emblem is forbidden by anyone who is not an ARC employee and agent – *e.g.*, a

disaster victim – both ARC and J&J agree that the 1948 recodification of the criminal statute

made no substantive change in the 1910 legislation. It is thus clear that (other than fraudulent

use) the only prohibited third-party use of the red cross emblem is for "any business or charitable

purpose." 36 Stat. 604 (1910) (App. I, Tab 3). When ARC provides goods bearing the emblem

to disaster victims, or other third parties for their personal use, those recipients are not using the

emblem for "any charitable or business purpose" and so they are free to receive and use such

materials. By the same token, ARC can distribute to contributors for their personal use

Christmas seals and other tokens bearing the emblem.

In the commercial world, ARC's charter prohibits it from engaging in commercial

activity in competition with private enterprise. The International Red Cross has carefully studied

how its National Societies can raise funds consistent with their obligation to keep the red cross

emblem out of commerce. Its regulations, which are binding on ARC under the Geneva

Convention, 1949 Convention, art. 44 (App II, Tab 26); ICRC Regulations, art. 23 (App. II, Tab

38 at 11); (Ex. 14 at 1-2), permit limited fundraising use of the emblem. For instance, ARC may

allow a commercial venture for a limited time and under ARC's strict control to use the emblem

in fund-raising advertising to indicate support for ARC. *See generally* ICRC Regulations (App.

II, Tab 38). Such approved activities do not insert ARC itself into commerce, and so do not

4

violate the charter. Moreover, as the Department of Justice noted in opining on this subject in 1978, such activities do not violate the criminal law if the use of the emblem is pursuant to appropriate documentation that establishes an agency relationship between ARC and the commercial venture. (Ex. 17).

ARC notes its practice over the years of making sporadic sales of red cross kits through its chapters, a practice that according to ARC's congressional testimony was only occasional and strictly limited when it occurred. Such sales – which are not the subject of this complaint – were permissible under ARC's charter so long as they did not engage ARC in a commercial business, *i.e.*, so long as they were irregular and sporadic. *See Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987). Nor did they violate the criminal law since the sales were to third parties for their personal use. Although such sales in the first half of the twentieth century were lawful, they became illegal under the International Red Cross rules, adopted pursuant to the 1949 Geneva Convention, barring use of the emblem on any "items for sale." ICRC Regulations, art. 23 (App. II, Tab 38 at 11). Indeed, the Geneva Convention was specifically concerned about National Societies selling branded red cross kits, and explicitly sought to ban such sales. 1949 Geneva Convention Commentary to Article 44 at 7 (App. II, Tab 33 at 7).

Finally, ARC expresses concern about its ability to collect blood from volunteer donors and then sell it to hospitals at a profit. (*See, e.g.*, ARC Br. at 6). ARC's blood business is not the subject of this dispute. Nor is it the proper subject of a private legal challenge, even though such commercial sales are outside the scope of ARC's federal charter. *Marcella v. Brandywine Hosp.*, 47 F.3d 618, 622 (3d Cir. 1995). As ARC elsewhere notes, a private party cannot premise an unfair competition claim on the assertion that a competitor's activities are

1417742v.1

*ultra vires* if "the competition is not [itself] illegal." *New Orleans, M.&T.R. Co. v. Ellerman*, 105 U.S. 166, 177 (1881); *accord Ala. Power Co. v. Ickes*, 302 U.S. 464 (1938); *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 139 (1939). Because it is not otherwise illegal to engage in the sale of blood, ARC's participation in that commercial business in competition with private enterprise does not give rise to a private right of action against ARC. (These cases have no bearing on J&J's challenge here, because ARC's actions in selling branded red cross goods in commerce are not only *ultra vires* but also illegal.)

      In short, requiring ARC to abide by the rules of the federal criminal law and the International Red Cross − and "not authorize the display of its emblem on items for sale," ICRC Regulations, art. 23 (App. II, Tab 38 at 11) − will not "completely hobble" ARC. Rather, ARC will be left with the power to engage in a broad array of legitimate activities in furtherance of its mission, all explicitly considered and approved by the International Red Cross.

## II.     Defendants' Licensing Scheme Violates 18 U.S.C. § 706, ARC's Charter, and the Geneva Convention

### A.     Section 706 Protects the Red Cross Emblem Against Commercial Use

      Section 706 limits ARC's ability to authorize third parties to use the emblem to its "duly authorized employees and agents," a standard plainly violated by ARC's licensing scheme. ARC largely ignores the actual language of the statute and attempts to recast it as "sole[ly]" concerned with "pretenders." (ARC Br. at 10).

#### 1.     Section 706 Protects the Red Cross Emblem, Not ARC

      Section 706 does, of course, protect the red cross emblem "against pretenders." The first sentence provides:

> Whoever wears or displays the sign of the Red Cross or any
> insignia colored in imitation thereof for the fraudulent purpose of
> inducing the belief that he is a member of or an agent of the
> American National Red Cross [commits a crime].

18 U.S.C. § 706 (App. I, Tab 16).

      This case is not concerned with the first sentence of § 706, but rather the second. The second sentence is not directed "against pretenders," but rather against anyone who "uses" the emblem:

> Whoever, whether a corporation, association or person, other than the American National Red Cross and its duly authorized employees and agents and the sanitary and hospital authorities of the armed forces of the United States, uses the emblem of the Greek red cross on a white ground, or any sign or insignia made or colored in imitation thereof or the words "Red Cross" or "Geneva Cross" or any combination of these words [commits a crime].

*Id.* The ban on "use" is limited by the 1910 statute, which further requires that the "use" be "for any business or charitable purpose." (J&J Opening Br. at 16-19). Section 706 is an implementation of the terms of the 1906 Geneva Convention, which requires signatory countries to pass statutes protecting the red cross emblem from dilution through any use other than the humanitarian uses provided for in the Convention. 1906 Convention, arts. 23, 27 (App. II, Tab 23). To that end, § 706 bans all commercial use of the emblem, other than preexisting commercial uses, and limits ARC's ability to authorize use to "its duly authorized employees and agents." 18 U.S.C. § 706 (App. I, Tab 16).

      As ARC has recognized, § 706 protects the emblem, not ARC. Indeed, the importance of the emblem transcends ARC and the other National Red Cross Societies, who are only among several groups authorized to use the emblem by the Geneva Convention and federal law. 1949 Convention, art 44 (App. II, Tab 26); 18 U.S.C. § 706. ARC has long recognized the emblem's significance:

- The emblem "represents much more than a particular organization. It indicates to members of a devastated community that help has arrived. It provides hope in times of disaster, and, most important, it protects lives in times of war and armed conflict." (Ex. 73 at ARC 147200 (Oct. 6, 1997)).

- "'What is the value of the Red Cross emblem?' A Red Cross worker could answer with one word – it's [sic] value is 'imponderable.' In disasters that emblem signifies rescue – help, medical and physical; it provides a right of way." 1942 H. Comm. Hearings at 248 (stmt. of ARC's August Belmont) (App. III, Tab 53 at 248).

- "[T]his symbol [is] a symbol of mercy and humanitarianism." 1944 H. Comm. Hearings at 238 (stmt. of ARC's Colonel Joseph M. Hartfield) (App. III, Tab 62 at 238).

The effectiveness of the emblem as a symbol of neutrality and relief would be undermined if it were to be diluted through general use – whether innocent or not. ARC has consistently held this belief:

- "[P]ermitting more widespread use of the emblem, thus undermining its instant identification with the humanitarian principles of the Red Cross, would not be in anybody's interest." (Ex. 73 at ARC147200).

- "Our interest is solely to try to prevent, as every other civilized nation has done, the use of this symbol for commercial purposes. It should be used by the armed forces and the Red Cross National Society alone. It ought not to be at the same time used by commercial people who exercise control over this use and who use it for dollar profit." 1944 H. Comm. Hearings at 257 (stmt. of Col. Hartfield) (App. III, Tab 62 at 257).

- "[W]e are robbing the American people of something that belongs to them spiritually if we do not reserve this emblem for the purposes for which it was created. First, because of the meaning this emblem has for those who work in the organization; secondly, the significance it has for the people who are aided in their hour of need by those who serve under this emblem; third, because of the protection that it offers to the wounded, and those in tragic need of assistance." 1942 H. Comm. Hearings at 249 (stmt. of Ms. Belmont) (App. III, Tab 53 at 249).

For this reason, the 1906 Geneva Convention provided that the emblem "may only be used, whether in time of peace or war, to protect or designate sanitary formations and establishments, the personnel and matériel protected by the convention." 1906 Convention, art. 23 (App. II, Tab 23). To that end, it called for signatories to enact an absolute ban on other use of the emblem, "particularly for commercial purposes by means of trade-marks or commercial labels." *Id.* art. 27. With the exception of the grandfathered users, that is the purpose of § 706.

8

2.    **Section 706 Limits ARC's Ability to Authorize Third-Party Use of Its Emblem to Its Duly Authorized Employees and Agents**

Before its first federal charter was enacted, ARC sought the power to license others to use the red cross emblem in commerce. In 1894, ARC lobbied for a bill that would have allowed ARC to grant "special permission" to license third-party commercial use of the emblem in exchange for fees. An Act to Protect the Insignia and the Name of the Red Cross, H.R. 5580, 53d Cong. (2d Sess. 1894) (App. III, Tab 53 at 279-81). (While it lobbied, it entered into a contract with J&J that expressly stated that, if it obtained such power, J&J would have exclusive rights to use the emblem in its classes of goods. (Ex. 74).) But ARC never received that right. Before its first federal charter in 1900, ARC thought better of the issue and it never again sought licensing power. Having abandoned its explicit request for such a right, ARC can hardly argue that § 706 provides a right to license *sub silentio*.

By its terms, § 706 limits ARC's ability to authorize third parties to use its emblem only to its "duly authorized employees and agents." ARC argues that the statute is not concerned with "formal master-servant agency relationship[s]" (ARC Br. at 9), and that it "is just not so" "that [third-parties] must . . . qualify as 'agents' as defined by the law of agency, or ARC cannot authorize their use of the Emblem" (*id.* at 2). As the Court observed, "it sounds like [ARC] may be using agent differently than Congress had in mind when it passed [section] 706." (Ex. 71 at 9-10).

In fact, the legislative history makes clear that the 1910 limitation upon ARC's ability to authorize third parties to use the emblem only to its "duly authorized employees and agents" was directly responsive to ARC's own complaints to Congress that incidents under the previous statute "show[ed] how a ***lack of control*** on [ARC's] part may give trouble." 1910 H. Comm. Hearings (stmt. of Mabel Boardman) (emphasis added) (App. III, Tab 53 at 360).

9

Accordingly, Ms. Boardman explained "the main part [of the bill] is to get *that control*." *Id.* (emphasis added).

Congress responded to ARC's request by using the common law terms "employees" and "agents" specifically to limit ARC's ability to authorize use of the emblem to those over whom it had the requested control.  There is nothing about this legislative history that suggests that "agents" has anything other than its ordinary common law meaning.  (As ARC recognizes elsewhere, "[w]hen terms used in a statute are undefined, we give them their ordinary meaning."  (ARC Br. at 12 (*quoting Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995))); *see also Community For Creative Non-Violence v. Reid,* 490 U.S. 730, 739 (1989).)

ARC's principal argument for giving § 706 a non-traditional meaning is its mis-citation to an opinion letter it received from the Department of Justice in 1978.  Of course, the opinion letter is not binding on the courts, and ARC does not suggest it is.  Rather, it is simply an opinion provided by DOJ in response to an inquiry from ARC.  Nonetheless, the DOJ letter makes clear that, contrary to ARC's interpretation, an appropriate agency relationship must be established in writing before a third party may be authorized to use the emblem.

The DOJ opinion involved proposed uses of the emblem that are permitted under § 706 – "where ARC authorizes or licenses a distributor of commercial products to use the emblem *on advertising* for products sold at retail."  (ARC Br. at 8 (emphasis added)).  Such uses do not raise the issue presented by this case, where use of the emblem on an item for sale necessarily requires ARC ultimately to surrender control over the emblem.  In contrast, when the emblem appears only in advertising, the agent – and through the agent, the principal (ARC) – retains control over the use of the emblem.  DOJ opined, consistent with International Red Cross

10

regulations, that ARC can establish by appropriate documentation an agency relationship with such an advertiser.

The core of ARC's question, however, was not about the need for an agency relationship. The issue on which ARC sought guidance was whether it could create an agency relationship with a commercial enterprise that could possibly benefit more from the relationship then ARC. DOJ opined that, if the agency served a purpose reasonably related to ARC's proper activities, the benefit to the agent was irrelevant.

The letter emphasizes throughout that a legitimate agency relationship is a necessary prerequisite. DOJ stressed that under § 706, ARC's "mere authorization is not enough" – expressly rejecting the argument that ARC makes here. (*See* ARC Br. at 9 ("ARC authorized each of the co-defendants in this case . . . .")). DOJ confirmed that "[t]he authorization may only run to [ARC] employees and agents." (Ex. 17 at 1). Indeed, ARC – the principal, with control over its agents – must itself "request that use be made of its insignia," rather than the request coming from the agent. (*Id.* at 2). Consistently, the DOJ letter uses standard agency terminology straight from the Restatement in discussing in detail the agent-principal relationship that must be created. (*Id.* at 2). The DOJ letter does not support the conclusion that "agent" in § 706 has anything other than its ordinary meaning.

Finally, ARC argues that "agents" under §706 can include any third-party licensees by pointing to examples of third parties licensed to sell goods by other federally chartered organizations – specifically, the Girl Scouts, Little League Baseball, and the U.S. Olympic Committee. But in sharp contrast to § 706, the federal charters of each of these organizations explicitly allow for licensing third parties. For example, the Girl Scout charter provides:

> The corporation has the exclusive right to use all emblems and
> badges, descriptive or designating marks, and words or phrases the
> corporation adopts, including the badge of the Girl Scouts,
> Incorporated, . . . *and to authorize their use, during the life of the
> corporation, in connection with the manufacture, advertisement,
> and sale of equipment and merchandise.*

36 U.S.C. § 80305 (emphasis added); *accord* Little League Baseball Charter, 36 U.S.C.

§ 130506; U.S. Olympic Committee Charter, 36 U.S.C. § 220506(b).

Although ARC purports not to understand, the difference is clear. Use of the red

cross emblem is limited because, unlike the Girl Scouts' emblem, the red cross emblem serves a

paramount humanitarian purpose and the criminal law is designed to protect that purpose from

dilution through indiscriminate use. H.R. Rep. No. 61-1256 (1910) (App. III, Tab 53 at 347)

("[T]he pending bill was introduced for the purpose of affording to [the emblem] as much

protection as possible" because of "the necessity of preserving [its] protective powers."). Simply

put, there is nothing in the law that supports ARC's view that "agents" in § 706 means anything

other than common law agents over whom it has control. ARC makes no effort to assert that it

has such an agency relationship with either its third-party licensees or with the retailers who sell

its branded goods, and it does not. (*See* J&J Opening Br. at 31-35). As a result, its licensing

scheme to sell goods through commercial channels of trade is illegal under § 706.

**B.    ARC's Charter Forbids It from Engaging in Commerce
       in Competition with Private Business**

J&J's opening brief demonstrated that ARC's charter is limited to its humanitarian

activities and that, as both the Attorney General and ARC's chairman told Congress in the 1940s,

it does not permit ARC to engage in commercial activities in competition with private business.

ARC offers a scattershot of largely irrelevant responses that, in the end, all depend on distorting

a charter that, as ARC elsewhere notes, is unique. (ARC 56.1 Stmt. ¶ 6; Ex. 72; *see also* Ex. 51

at 5 & n.28 (*citing* ARC Charter, §§ 2(2) and 5(b))). In fact, because ARC's authorization of the

12

sale of branded goods in commerce is both outside the scope of its federal charter and illegal, it may be enjoined in this private action.[2]  *E.g.*, *Ellerman*, 105 U.S. at 177.

While no court has considered the precise issue raised here, the courts have already recognized that certain commercial activity by ARC – the sale of blood – falls outside the scope of its federal charter.  In the late 1940's – after promising Congress it would do no such thing – ARC created a highly profitable business selling blood to the Nation's hospitals.  Whether such a commercial business was within the scope of ARC's federal charter arose when blood recipients sued ARC and sought a trial by jury.  If the blood business were authorized by ARC's federal charter, it could be considered quasi-governmental, and not be subject to jury trial.  On the other hand, if the blood business were not a chartered activity, it would not be immunized from a trial by jury.  In the leading case on the subject, the Third Circuit recognized that ARC's commercial sale of blood does not involve the exercise of any powers under its federal charter.

The Third Circuit found that "the collection and distribution of human blood for medical purposes is a commercial operation on the part of the Red Cross and other entities that operate blood banks."  *Marcella v. Brandywine Hosp.*, 47 F.3d 618, 621 (3d Cir. 1995).  Reviewing the humanitarian purposes of ARC's federal charter, the Third Circuit concluded that these ARC activities are "not mentioned in its charter" and are operated by divisions that are independent from those "which perform chartered activities."  *Id.* at 622 n.5.  While ARC "sometimes works in a context in which it seems to be almost 'an arm of the government,'" that is

---

[2] ARC reprises its puzzling contention that J&J did not allege that ARC's commercial activities violated its charter in the Amended Complaint (the "Complaint").  But in the second paragraph, the Complaint states: "By its Congressional charter, Defendant ARC has no ability to engage in commercial activities in competition with private businesses such as J&J . . . ."  (Amended Complaint ¶ 2).  This theme pervades the remainder of the factual statement in the complaint. (*See, e.g., id.* ¶¶ 3, 37-38, 59-60, 71, 80).  And J&J's relevant causes of action all allege that ARC's activities are "*ultra vires*" or "unauthorized."  (*Id.* ¶¶ 98, 104, 107, 120).

not true with respect to blood collection. *Id.* at 624. Rather, "ARC has elected to participate and compete with private corporations in the blood services industry… [and] [a]s a full fledged industry participant . . . ." *Id.* at 624 n.6 (*quoting Doe v. Am. Nat'l Red Cross*, 845 F. Supp. 1152, 1153 n.4 (S.D.W.V. 1994), rejecting *Reisner v. Regent Univ. of Cal.*, 1991 WL 571161 (C.D. Cal. 1991)). (In *Doe*, cited by the Third Circuit, "the Court divine[d] ARC's blood-banking services are not eleemosynary or governmental in nature, but rather essentially constitute a private commercial enterprise." *Doe*, 845 F. Supp. at 1153 n.4.) The Third Circuit therefore concluded that a jury trial against ARC over such a personal injury suit would not be "inconsistent with, or interfere with, the role outlined in the organization's charter." *Marcella*, 47 F.3d at 624; *see also Rozak v. Am. Red Cross Blood Servs.*, 945 F. Supp. 1183, 1185-86 & n.1 (N.D. Ind. 1996).

Notably, ARC has sought a jury trial in this case, essentially admitting that the sale of branded red cross goods in commerce falls outside the scope of its charter. (ARC Answer at 46).

### 1.    ARC's Federal Charter Provides No Power to Engage in Commercial Activity

J&J demonstrated in its opening papers that ARC's charter is limited solely to authorizing ARC to engage in its humanitarian mission, and precludes commercial activity. ARC provides no basis to second guess this straightforward conclusion.

(a)    **The Criminal Prohibition**. ARC purports to find an authorization to engage in commercial activities by negative implication in the criminal provisions enacted in 1905 and 1910. In 1905, Congress made it unlawful for anyone "other than the Red Cross of America" to use the emblem in commerce. 33 Stat. at 601 (App. I, Tab 2). In 1910, Congress revised the prohibition to make it unlawful for anyone "other than the American National Red Cross and its duly authorized employees and agents and the army and navy sanitary hospital

1417742v.1

authorities of the United States" to use the emblem "for any business or charitable purpose." 36 Stat. 604 (App. I, Tab 3). Although the criminal prohibition is no longer part of ARC's charter and has not been since 1948, ARC purports to find in § 706 an affirmative grant of congressional power to engage in commercial activities.

At oral argument on the motion to dismiss, the Court recognized this argument for what it is – a claim that an affirmative grant of power was supposedly provided by negative implication. (Ex. 75 at 41). Indeed, that is the argument and it makes no sense whatsoever. Presumably, if the 1905 statute implies an affirmative grant of power for ARC to engage in commerce using the red cross emblem, then the 1910 statute expands that affirmative grant of power to authorize the army and the navy also to use the red cross emblem in commerce. Such an argument is laughable. Moreover, if the 1905 and 1910 statutes somehow authorized ARC to use the emblem in commerce, one wonders why ARC's chairman Norman Davis and Attorney General Biddle reviewed precisely the same charter in 1942 and concluded it provided ARC with no ability whatsoever to engage in commerce. *See* 1942 H. Comm. Hearings 262 (letter from Norman H. Davis) (App. III, Tab 53 at 262); 1942 S. Subcomm. Hearings 5 (letter from Attorney General Biddle) (App. III, Tab 54 at 5-6).

Section 706 is not a grant of power. ARC's power to use the emblem comes not from § 706, but rather from the express grant in its charter allowing ARC to "have and use" the emblem "[i]n carrying out its purposes." 36 U.S.C. § 300106(a) (App. I, Tab 13). Section 706 is a prohibitionary *criminal* statute – it does not confer power on anyone, it simply proscribes acts. *See New York v. Horelick*, 424 F.2d 697, 702 (2d Cir. 1970) ("Unlike the statutes on public accommodations, voting rights and fair housing which we have reviewed, the 1968 Act does not in terms confer substantive rights; it is solely a criminal statute permitting federal prosecution for

15

interference with a long list of activities."); *see also Johnson v. Mississippi*, 488 F.2d 284, 287

(5th Cir. 1974), *aff'd on other grounds*, 421 U.S. 213 (1975); *Kelly v. U.S. Dept. of Justice*, No.

03-4137-JAR, 2003 WL 22533562, at *2 (D. Kan. Oct. 31, 2003).

      Moreover, it is inconceivable that in 1905 Congress meant to give ARC the power

to use the red cross emblem for commercial sales of red cross branded goods. The purpose of the

1905 act was to *limit* commercial use of the emblem, not to authorize it. In ARC's own words,

"Congress . . . in 1905 . . . provided that the [red cross] name and symbol was not a thing to be

used for commercial purposes . . . ." 1944 H. Comm. Hearings at 256 (stmt. of Col. Hartfield)

(App. III, Tab 62 at 256); *see also* 1919 H. Comm. Hearings (stmt. of Col. Hartfield) (App. III,

Tab 53 at 373) ("[T]he bill as prepared [in 1905] gave to the Red Cross the exclusive right to the

use of the emblem and provided that it should be unlawful to use it for trade and commercial

purpose."). The 1910 conforming amendment to the 1906 Geneva Convention is to the same

effect. *See* Article by Maj. Gen. George W. Davis (App. III, Tab 53 at 367); 1944 H. Comm.

Hearings at 227 (letter from Franklin D. Roosevelt) (App. III, Tab 62 at 227); (*see also* Ex. 81 at

ARC155430 ("[O]ur charter . . . prohibits the use of the Red Cross name or emblem for

commercial purposes.")).

      **(b)**    **Power to Dispose of Property**. ARC raises two other makeweight

arguments based on its charter. First, it argues because it has the power to dispose of property,

it may sell that property. (ARC Br. at 12-13). That is true. But that does not mean ARC has

the power to engage in a commercial activity in competition with private business. Indeed,

ARC Chairman Davis made this very distinction in his Congressional testimony in 1942:

      [Committee Chairman Bloom:] . . . [Y]ou do sell books and things
      there?

      [Chairman Davis:] For our own needs, we can sell things; we have

got the power to buy and sell things.

[Chairman Bloom:]  But not for commercial purposes?

[Chairman Davis:]  No.

1942 H. Comm. Hearings at 252 (App. II, Tab 53 at 252).

ARC continued to make the distinction in later hearings. *See, e.g.*, 1942 S. Subcomm. Hearings at 5 (App. III, Tab 54 at 5) ("It apparently occurred to some, from a casual glance at a half page of our annual reports which deals with resale supplies, that the Red Cross in fact was engaged in commercial transactions.  This is not the fact.  We do have for sale to our chapters . . . and employees first-aid kits.  Our pamphlet listing resale supplies carries the following statement:  'Since the Red Cross makes no attempt to handle the foregoing items on a commercial basis, any inquiries from individuals, industries, or organizations other than the Red Cross should be referred to the usual trade channels.'").

(c)    **The Catch-All Provisions**.  Finally, ARC attempts to eviscerate its enumerated humanitarian powers by pointing to the "catch-all" provisions of its charter.  ARC crams the power to do anything an ordinary corporation may do into the power to "do any other act necessary to carry out this chapter and promote the purposes of the corporation" contained in the original charter and the purpose "to conduct other activities consistent with the foregoing purposes," which was added in 2007.  (ARC Br. at 11-12).

The "do any other act necessary" power cited by ARC was part of its charter when ARC Chairman Davis and Attorney General Biddle explained to Congress that ARC's charter does not allow for commercial activity.  *See* 33 Stat. 599 (App. I, Tab 2).  Indeed, Attorney General Biddle explicitly referenced this power before finding no commercial powers in ARC's charter.  1942 S. Subcomm. Hearings at 5-6 (App. III, Tab 54 at 5-6) ("It is, of course, axiomatic that a corporation has only those powers which are granted affirmatively in its charter or which

17

may be incidentally necessary to the fulfillment of the functions which it is created to

discharge."). ARC cannot now suggest that the very same language that did not confer upon it

power to engage in commerce in 1942 now does.

The 2007 amendments to ARC's charter concerned misgovernance of ARC in

response to Hurricane Katrina. The amendments restructured ARC in order to allow it to

respond to disasters faster and with more efficiency. *See* H.R. Rep. No. 110-87, 110th Cong. at 7

(2007) (App. III, Tab 75 at 57). They had nothing to do with commercial activity and ARC does

not contend that they did. (ARC Br. at 19-20). Indeed, unlike the days of testimony and

multiplicity of submissions concerning ARC's lack of commercial power in 1942, there was no

discussion about this issue in the hearings leading to the 2007 amendment. It is unreasonable to

suggest that Congress silently sought to overturn over 100 years of history by endowing ARC

with the power to engage in commerce in making this minor amendment. Rather, as Congress

explained, the additional purpose – "to conduct other activities consistent with the foregoing

purposes" – allows only for "the Red Cross to conduct other activities that are consistent with the

activities the Red Cross *has been historically authorized to carry out*." H.R. Rep. No. 110-87 at

12 (App. III, Tab 75 at 62).

Simply put, there is no basis to disagree with the Third Circuit's conclusion that

commercial profit-making activities by ARC are "not mentioned in its charter." *Marcella*, 47

F.3d at 622 n.5.

### 2. The Legislative History of the Federal Charter Confirms that ARC Has No Ability to Engage in Commerce

Beyond the charter itself, ARC's representations to Congress over the years make

it abundantly clear that the charter confers no power to engage in commercial activities.

Moreover, by subsequently reenacting the relevant language from ARC's charter, Congress

should be presumed to have understood and accepted ARC's reasoned interpretation. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274-75 (1974).

Attempting to preempt this argument, ARC presents a version of the legislative history that would make Lewis Carroll blush. In ARC's view, the days of testimony and multiplicity of letters submitted on the issue whether ARC was, or could be, engaged in commercial activity were simply directed at the question whether ARC used its revenues in furtherance of its charitable purpose. (ARC Br. at 20). But that was not the issue; indeed, no doubt is ever expressed on that score throughout the hearings (or in this litigation). Instead, the question was "whether the Red Cross authorizes the making of any products for commercial purposes." 1942 H. Comm. Hearings at 252 (stmt. of Rep. Mundt) (App. III, Tab 53 at 252). ARC Chairman Davis had a simple answer to this question – "No, we do not." *Id.*

The issue arose because J&J repeatedly expressed concern about present or future commercial sales by ARC in competition with private enterprise. Nevertheless, the most J&J could muster in 1942 to support its concerns were possible catalog sales made about 30 years earlier (in 1914-1915) and the possibility of a future change in ARC policies. 1942 S. Subcomm. Hearings at 29 (App. III, Tab 54 at 29). ARC vigorously, and successfully, rebutted this challenge.

At first, evidence was presented suggesting that ARC sold matchbooks, textbooks, and first-aid kits, sometimes at an apparent profit according to ARC's financial records. 1942 H. Comm. Hearings at 251-55 (App. III, Tab 53 at 251-55). Ms. Belmont of ARC explained that ARC "never distribute[s] [the match books] indiscriminately to the public. [It] only give[s] them to soldiers and sailors . . . . [And it] give[s] them away, and ha[s] done so for many years in the veterans' hospitals." *Id.* at 251. She further explained that the textbooks were sold at cost. *Id.* at

253. Similarly, ARC Chairman Davis explained that the profit figures for the first-aid kits were "very misleading," and that ARC "do[es] not make profit" on the sales. *Id.* at 255. He promised to assemble and submit the pertinent facts to the Committee. *Id.*

After the hearing, Chairman Davis submitted two letters to Congress explaining the sales raised in the hearing. As to the sales of matchbooks, he submitted a letter stating: "These match books are not used, in any sense, for advertising purposes by the Red Cross," but rather were part of its program to distribute free cigarettes to VA hospital patients (which later grew to overseas canteens and kits for soldiers departing for abroad). *Id.* at 262. "These matches are not distributed anywhere else in the United States." *Id.*

In a separate letter, Chairman Davis clarified that the revenue figures identified in ARC's books were not in fact profits. First, Chairman Davis explained that the sales were limited to those "which are essential for Red Cross service programs" and included only "a limited number of first aid kits which are used by our chapters." *Id.* He further explained that "the sum of $215,160.81 represents excess revenue over the purchase price and certain specified costs [from ARC's resale operations], but does not at all represent a profit. . . . If [educational and promotional expenses connected with the supplies] were included, instead of there being an excess of revenues over cost, there would be a deficit." *Id.* Chairman Davis concluded:

> The American Red Cross is not now engaged in any commercial
> venture for profit, has no intention of engaging in such operations,
> and is advised that the provisions of its congressional charter, by
> which it is bound, would not permit it to engage in commercial
> enterprises for profit.

*Id.*

ARC's response to Chairman Davis' unequivocal letter is disingenuously to confuse his use of the ordinary word "profit" with ARC's tax-exempt status as a "not-for-profit" organization. As Chairman Davis' letter makes explicit, ARC's sales of red cross kits did not

20

"represent a profit" because there was no "excess of revenues over cost." This is and was the ordinary dictionary definition of profit, "[t]he excess of revenues over expenditures in a business transaction." BLACK'S LAW DICTIONARY 1246 (8th ed. 2004); *see also* CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 919 (3d ed. 1934) (defining "profit" as "pecuniary gain, excess of returns over outlay"). Indeed, ARC also submitted a letter from its Vice Chairman of Finance, James K. McClintock, to explain that the costs on ARC's books understate its actual costs and therefore falsely suggest a profit when deducted from revenues. 1942 H. Comm. Hearings at 267-68 (App. III, Tab 53 at 267-68).

ARC's point before Congress was that it did not engage in commercial ventures for profit and had no ability under its charter to do so. If it was simply arguing that, for tax purposes, ARC is a "not-for-profit organization" – so that none of its revenues are returned to shareholders as profits – all it had to do was say so, not explain at length that it made no excess revenues over its costs.

ARC's attempt to explain away Attorney General Biddle's letter is even more disingenuous. Without quoting the letter, ARC argues that "the best reading of the letter" is "that ARC has no power to engage in commercial enterprises *just* to turn a profit." (ARC Br. at 20) (emphasis added). But when ARC sought and submitted the letter, it described it as opining "on what power or right, if any, [ARC] possessed under its present congressional charter, to engage in commercial enterprises." 1942 S. Subcomm. Hearings 5 (stmt. of ARC General Counsel Hughes) (App. III, Tab 54 at 5). Moreover, the letter itself unequivocally concludes:

> [T]he American Red Cross is not empowered to engage in business
> of a commercial or manufacturing character in competition with
> private business.

*Id.* at 6.

Rather than confront the impact of the legislative record, ARC spends pages detailing its alleged historical sales of products. Its supposed point is that Congress must have known about these sales and therefore understood – notwithstanding the statements of Messrs. Davis and Biddle – that ARC's charter allows for commercial sales of branded red cross products. (ARC Br. at 16-20). In fact, wading through ARC's extensive Rule 56.1 statement (apparently created to circumvent the page limitations on its brief) reveals that most of the alleged sales by ARC were not commercial, but rather isolated and sporadic sales by local chapters. (J&J Responses and Objections to Defendants' 56.1 Stmt. ¶¶ 36-79, 86-103). In any event, the scope of ARC's congressional charter is best explained by what ARC actually told Congress over the years, rather than by arguments about what Congress "must have known."

As early as 1910, ARC testified that it did not use the red cross emblem on articles of merchandise:

> Congressman Henderson: [S]o far as trademarks are concerned, there is contemplated the actual affixing of that mark, whatever it may be, to goods and articles of merchandise. The Red Cross Society, of course, never affixed this mark or symbol to articles of merchandise. It was engaged in a different purpose; it was not engaged in trade. . . .
>
> Boardman: It has used the mark only on articles of stationery and its reports.

1910 H. Comm. Hearings (App. III, Tab 53 at 358). ARC representative Colonel Hartfield testified more emphatically in 1919 that "[t]he Red Cross does not manufacture any merchandise of any kind, and is not engaged in commercial business of any character. . . ." He even disclaimed the particular activity at issue here: "We have refused to permit [corporations] to divide profits with us . . . . [W]e have consistently refused to lend ourselves to any of these commercial ventures." 1919 H. Comm. Hearings (stmt. of Col. Hartfield) (App. III, Tab 53 at 378); *see also id.* at 389.

In 1942, ARC's General Counsel, H.J. Hughes, reaffirmed ARC's refusal to engage in commercial endorsements.  He professed to be aware of only one "tragic case" where a misguided member authorized a commercial endorsement, "horrif[ying]" the national leadership:

> [Rep. Eberharter:]  Mr. Hughes, did the American Red Cross ever endorse any article manufactured or sold?
>
> Mr. Hughes:  No, sir.  We did have a tragic case where a particular article was endorsed by a volunteer member of one of our chapters. . . .  We were simply horrified when we learned of that situation from the Federal Trade Commission. . . .  [O]ther than that, *I can say I know of no other – certainly there has never been an authorized endorsement*.
>
> [Rep. Eberharter:]  *Either by the national organization or local chapters.*
>
> [Mr. Hughes:]  *No.  None are permitted to endorse any article of merchandise, nor have we ever, though we have had innumerable requests for permission to use the emblem, and we could, as some charity institutions or character-building institutions do, we could gain large sums of money from licensing the use of the Red Cross emblem; that has not been done in a single instance.*

1942 H. Comm. Hearings at 26 (emphases added) (App. III, Tab 53 at 26); *see also id.* at 266-68 (similar statement from ARC VP James McClintock).

Based on this legislative record, Congress repeatedly reenacted ARC's charter with the same powers interpreted by Chairman Davis and Attorney General Biddle.  ARC's charter, understood in the context of its legislative history, does not permit ARC to engage in commercial activity.  Its sales of branded red cross goods in commerce are both *ultra vires* and illegal.

### 3.    IRS Rulings Regarding the Relatedness of Certain Activities Are Irrelevant

Finally, ARC cites a 1985 IRS ruling that distribution by ARC of a certain first-aid kit through its chapters "will not constitute unrelated trade or business" under the Internal

Revenue Code. (ARC Ex. 88 at 5). ARC contends that this establishes that the sale of first-aid kits furthers ARC's mission and is therefore permitted by the charter. Of course, the IRS ruling is a ruling under the tax code, not ARC's charter. The IRS simply considered whether the sale of first-aid kits was related to ARC's tax-exempt activities under the tax code, and not whether the charter permits ARC to engage in commerce or license its emblem for use in commerce.

Moreover, the facts presented to the IRS in 1985 are substantially different from those presented here. ARC told the IRS that the proposed kits at issue: would not compete with any existing kits sold by for-profit organizations (ARC Ex. 88 at 2, 5), would not be promoted by paid advertising (*id.* at 3), and would not be the subject of "joint ventures, partnerships, co-production or marketing arrangements with manufacturers" (*id.* at 3). The IRS ruling has no relationship to ARC's current commercial scheme.

C.   **ARC's Licensing Scheme Violates the Geneva Convention and ICRC Regulations**

Although the issue was squarely identified in response to ARC's motion to dismiss the complaint (Ex. 76 at 47-48), and has been addressed during discovery, ARC's brief completely ignores the limits imposed on its use of the emblem under the Geneva Convention and the regulations of the International Red Cross. As set forth in J&J's motion for summary judgment, the ICRC Regulations are clear. The National Society "***shall not authorize the display of its emblem on items for sale*** . . . ." ICRC Regulations, art. 23 (emphasis added) (App. II, Tab 38 at 11).

* * *

The issues presented under § 706, ARC's federal charter, the Geneva Convention and the regulations issued pursuant thereto by the International Red Cross, all present issues of

24

law susceptible to resolution on summary judgment.  The scheme of ARC and its codefendants to

sell branded goods in commerce over the internet and through retail outlets violates federal law.

### III.    J&J's Claim for Tortious Interference with Business Relations

ARC moved to dismiss J&J's claim for tortious interference with business

relations, and it lost.  It reprises its argument, adding nothing new.  The tort requires that the

defendant act "by wrongful means," which includes conduct that amounts to "a crime or

independent tort."  *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004).  That element is met by

proof of Defendants' unlawful conduct, as set forth above.

ARC also argues -- again -- that J&J cannot establish "injury to the business

relationship," *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003), because J&J continues to

sell its red cross products to retailers Target, Wal-Mart, Walgreens, and CVS.  (ARC Br. at 33).

ARC ignores the evidence that J&J has lost sales because of the sale of ARC-branded products to

those retailers.  J&J has observed "market share changes" in the "presence of American Red

Cross first aid kits on the shelf in retailers where we compete." (Ex. 113 at 79-80).  J&J's

damages are fully supported by expert testimony.  As explained by economist Dr. Christine

Meyer, J&J's lost sales follow directly from the defendants' sale of competing red cross brand

first-aid products.  (Ex. 118 at 17).  J&J's sales of Purell have similarly been reduced by

competition with Water-Jel's ARC branded hand sanitizer.  (*Id.* at 20).  This testimony mandates

denial of ARC's motion for summary judgment.

Apparently recognizing that it cannot win by disputing the fact of J&J's lost sales,

ARC distorts the cause of action, arguing that evidence of reduced sales to retailers is not

sufficient.  According to ARC, J&J's claim fails as a matter of law because "J&J has no evidence

that it lost or failed to obtain a business relationship with any of the four retailers . . . ."  (ARC

Br. at 33). But this tort is not so narrow. Contrary to ARC's depiction, the tort may arise in a variety of circumstances, depending on the particular nature of the defendant's meddling.

ARC cites a litany of inapt cases, all addressing the situation where a defendant's interference prevents the plaintiff from consummating a potential contract with a third party. Of course, it is axiomatic that where the plaintiff complains of a thwarted contract, the plaintiff must show that, but for the defendant's interference, it would have obtained the prospective contract. *See Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97 civ. 5499, 2004 WL 691680, at *21 (S.D.N.Y. Mar. 31, 2004 (requiring plaintiff to demonstrate that it "would have received a contract but for the acts of the defendant"), *aff'd*, 124 Fed. Appx. 73 (2d Cir. 2005); *Allcar Motor Parts Corp. v. Federal-Mogul Corp.*, No. 96 civ. 4419, 1998 WL 671448, at *5 (S.D.N.Y. Sept. 29, 1998) (same); *D'Andrea v. Rafla-Demetrious*, 3 F. Supp. 2d 239, 250 (E.D.N.Y. 1996), *aff'd*, 146 F.3d 63 (2d Cir. 1998) (same); *Vigoda v. DCA Prods. Plus Inc.*, 293 A.D.2d 265, 266-67 (1st Dep't 2002) (same).

But such cases do not define the tort and they are inapposite here. J&J has not alleged that ARC's unlawful interference prevented it from consummating contracts – rather, it contends that ARC has caused J&J to lose sales from existing customers. Such claims are fully actionable under this tort. *See Hannex Corp. v. GMI, Inc.*, 140 F.3d 194 (2d Cir. 1998) (noting that the tort includes "interferences with . . . the opportunity of selling or buying . . . chattels or services" and lies when "defendant tortiously interfered with a continuing business or other customary relationship not amounting to a formal contract") (citations and quotations omitted); *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 270 (2d Cir. 1987) (abrogated on other grounds) (this cause of action "usually involves interference with a 'business relationship

not amounting to a contract,' resulting in a breach, or severance of the relationship itself, or *at least some injury* to that relationship.") (citations omitted, emphasis added).

Indeed, numerous courts – including this one – regularly allow claims to proceed where claimants have alleged such lost sales. *See, e.g., Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 248, 254 (S.D.N.Y. 2001) (Rakoff, J.) (injury included loss of sales, delay of launch in retail store because retailer cancelled an intended purchase, and reduced order by another customer); *Grupke v. Linda Lori Sportswear*, 921 F. Supp. 987, 992 (E.D.N.Y. 1996) (allowing allegations that some customers "ceased or substantially reduced their business"); *Sutton Import-Export Corp. v. Starcrest of Cal.*, 762 F. Supp. 68, 71 (S.D.N.Y. 1991) (interference led to lost "repeat sales"); *Unique Sports Generation, Inc. v. LGH-III, LLC*, No. 03 Civ. 8324 JGK DF, 2005 WL 2414452, at *6 (S.D.N.Y. Sept. 30, 2005) (allegations of lost sales satisfy obligation to plead "injury to the business relationship").

No other analysis makes sense. Under ARC's theory, if J&J had been selling millions of dollars worth of first-aid kits to a retailer, it would have a claim for tortious interference with business relations if ARC's wrongful conduct resulted in J&J losing the relationship, but not if J&J lost all but a handful of sales. (In any event, to the extent ARC wants to focus on individual contracts, J&J's lost sales do in fact comprise contracts that never came to fruition. J&J enters into contracts during the year with its retailers by executing purchase orders. (Decl. of Jeffrey Tolonen ¶¶ 6-10).)

## IV.    J&J's Claim for Unfair Competition

J&J's unfair competition claim requires proof of two elements: (1) unfair means of competition, and (2) bad faith. *See Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980). Unfair competition is a "broad and flexible doctrine" encompassing an "incalculable variety of illegal practices." *Roy Export Co. v. Establishment of Vaduz*, 672 F.2d

1095, 1105 (2d Cir. 1982). The first element is satisfied by the defendants' illegal licensing

scheme to use the red cross emblem in commercial competition with J&J. As for bad faith, the

record is filled with examples that preclude summary judgement, including:

- Before using its emblem in advertisements in 1978, ARC sought DOJ's opinion about the propriety of such use (Ex. 16), but when it came to the licensing program introduced in 2006 and which serves as the gravamen of J&J's complaint, ARC sought no such opinion.

- In its 1978 opinion, DOJ expressly stated that ARC could authorize use of the emblem only to agents (Ex. 17), but when ARC entered into its arrangements with the codefendants here, the agreements expressly disavowed any agency relationship. (Exs. 26-29 ¶ 13.4).

- When caught in these contractual relations with third party licensees who were not "agents," rather than disavowing the agreements, ARC rewrote them pretextually to purport to confirm an imaginary original understanding that its licensees were in fact "agents." (Exs. 30-33).

- In entering into two of those agreements, ARC knowingly disregarded and interfered with agreements between its licensees and J&J not to use the red cross emblem. (*See* discussion of tortious interference with contract, *infra*).

- Although ARC recognizes that it is bound by the ICRC regulations (Ex. 14 at 1-2), ARC ignored ICRC rules regarding use of the emblem on goods for sale, even when that violation was identified by an employee. (Ex. 52 at ARC20383; Ex. 77 at 179-81).

- ARC likewise ignored concern by its staff about selling items such as T-shirts or shoes bearing the emblem that could cause unauthorized persons to be perceived as ARC employees or volunteers. (Ex. 54 at ARC19036).

- ARC also disregarded the public safety by knowingly authorizing inferior goods to be sold in competition with J&J. (*See* Exs. 34-38, Ex. 114 at FAO20600).

- ARC ignored years of sworn representation by its officers and representatives to Congress that ARC cannot engage in commercial sale of emblem branded goods.

- In disregard of J&J's legal rights, ARC and its codefendants targeted retailers with J&J relationships and products sold by J&J. (*See, e.g.*, Ex. 49 at ARC54902; J&J Opening Br. at 10-11).

## V.    J&J's Claim for Dilution

### A.    J&J's Red Cross Emblem Is Distinctive

According to ARC, "J&J's trademark dilution claim fails as a matter of law because Congress has expressly permitted ARC and its authorized users to use the emblem." (ARC Br. at 22).  But J&J's dilution claim is that the licensing scheme is illegal and that the licensed uses are therefore unauthorized.  (Complaint ¶¶ 3, 4, 72, 92, 118-127).  If so, there is nothing in Congress' limited grant of rights to ARC that prevents this claim.  To the contrary, ARC's illegal authorization of third party use of the emblem thwarts the purposes of § 706, which is essentially an anti-dilution provision, and J&J's assertion of its own federal anti-dilution rights furthers Congress' purpose.

The Federal Trademark Dilution Act ("FTDA") provides a cause of action to "the owner of a famous mark that is distinctive." 15 U.S.C. § 1125(c)(1).  The FTDA does not define distinctiveness, but it is a well-known, traditional and "crucial trademark concept, which places marks on a ladder reflecting their inherent strength or weakness." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215 (2d Cir. 1999), *abrogated on other grounds by Mosely v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2002).

ARC argues that ARC's own "widespread use" has undermined the emblem's distinctiveness so as to preclude a dilution claim, since that use has prevented the emblem from serving "to distinctly identify J&J as the source of goods and services." (ARC Br. at 23).  ARC cites no case standing for this proposition.  Indeed, ARC's long history of non-commercial use of the emblem is irrelevant to the distinctiveness of J&J's emblem for commercial purposes.  The FTDA permits a claim only against ARC's use of the red cross "in commerce," expressly exempting "any non-commercial uses." 15 U.S.C. § 1125(c)(3)(C).

J&J's emblem mark was registered long ago, in 1906. (Ex. 1). Once a mark has been registered and in continuous use for more that five years, that mark is incontestable by operation of law under 15 U.S.C. §§ 1065 and 1115. *See Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130 (2d Cir. 2004). An incontestable mark is entitled to a presumption of inherent distinctiveness. *Savin Corp. v. Savin Group*, 391 F.3d 439, 451 (2d Cir. 2004). ARC cannot rebut that presumption by a conclusory statement, unsupported by either case law or evidence, that the emblem lacks distinctiveness.

### B.    The Record Contains Evidence of Both Blurring and Tarnishment

A dilution plaintiff need demonstrate only a likelihood of either blurring or tarnishment; there is no requirement to prove actual dilution. 15 U.S.C. § 1125(c)(1). Here, the evidence shows that J&J is likely to suffer both types of dilution.

### 1.    **Blurring:**  Blurring is diminishment of the capacity of the mark in

question to identify and distinguish goods and services. *Savin*, 391 F.3d at 449. A court "may consider all relevant factors" when determining the likelihood of dilution by blurring. 15 U.S.C. § 1125(c)(2)(B). Such an analysis is inappropriate for resolution on summary judgment. Indeed, ARC does not even bother to address the non-exclusive list of six factors set forth in the statute.

All six relevant factors will be subject of proof at trial. The marks are certainly similar (*compare, e.g.*, Exs. 13 and 20), and ARC has conceded J&J's "strong rights" in the mark (*see* Ex. 97 at 8 ¶ 2). Except for defendants' dilution activities, J&J has engaged in "substantially exclusive use" of the mark in commerce. ARC itself has recognized the distinctiveness of the use of the red cross emblem on healthcare and first-aid products, such as those made by J&J: "The red cross symbol is <u>not</u> a generic symbol for hospital, healthcare, first-aid or medical services, products or personnel." (*E.g.*, Ex. 78 at ARC154000) (emphasis added). ARC records demonstrate a keen interest in appealing directly to J&J's customers by using its mark. (*E.g.*,

Exs. 39-42). And testimony from an ARC representative before Congress illustrates the likelihood of blurring: "A short time ago, when one of our members went to a defense meeting with a Red Cross button on his coat, someone came up to him and said, 'I see you represent Johnson & Johnson.'" 1942 H. Comm. Hearings at 248 (stmt. of ARC's August Belmont) (App. III, Tab 53 at 248).

In an attempt to defeat J&J's blurring claims, ARC sets up two strawmen. First, ARC asserts that the FTDA requires that a senior user's mark be the sole and unique use in the first place. (ARC Br. at 30) (*citing Deere & Co. v. MTD Holdings Inc.*, 41 F.3d 39, 43 (2d Cir. 1994). But the FTDA expressly provides that substantial exclusivity of use is just one factor considered among several. *See* 15 U.S.C. § 1125 (c)(2)(B).

Second, ARC claims that "one of the elements of a blurring claim is predatory intent" and such intent "is wholly absent here." (ARC Br. at 31). But there is ample evidence of ARC's bad faith, recited above. Meanwhile, under the FTDA, intent is a factor that may be considered, but it is not a required element. *See* 4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:119 (4th ed. 2007) (*quoting* 15 U.S.C. § 1125(c)(2)(B)(v)).

**2.    Tarnishment:**  There is ample evidence that J&J's red cross emblem is likely to suffer tarnishment from distribution and sale by defendants of inferior quality products under the red cross brand. *See Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996). ARC cites J&J witnesses who were unaware that ARC was selling goods of inferior quality. But, in fact, discovery has shown the opposite. (*See, e.g.* Ex. 34-37 (ARC knowingly consenting to the distribution of first-aid manuals with flawed instructions); Ex. 114

31

at FAO20600 (noting that Learning Curve's kit described as "ideal for 'mommy'" is really "just a regular first-aid kit with a cheap blanket included")).

### C.    J&J's Claims Are Not Barred by Laches

Laches requires a defendant to show both unreasonable delay and prejudice resulting from that delay. *E.g., Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996). "Because the application of laches depends on a close evaluation of all the particular facts in a case, it is seldom susceptible of resolution by summary judgment." *Couveau v. American Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000). Three reasons independently preclude summary judgment: J&J has not delayed; ARC has offered no evidence of prejudice resulting from any delay; and ARC's bad faith precludes application of laches.

### 1.    No Unreasonable Delay:    ARC cannot show the first, most fundamental element of laches – that J&J, with knowledge of its claim, unreasonably delayed bringing suit. J&J did not delay at all. J&J commenced this action in August of 2007, shortly after ARC announced its "new licensing initiative" in April 2006 (Ex. 70) and well within the applicable six-year statute of limitations.[3]  Accordingly, "there is no presumption of laches and the burden remains on the defendant to prove the defense." *Conopco*, 95 F.3d at 191.

ARC's lengthy rendition of its history of use of the emblem is thus beside the point. Most of the history is of non-commercial uses outside the scope of the dilution statute. At best, ARC identifies a few isolated commercial events over the past century, contending "[a]s early as 1904, J&J complained about ARC being in the 'commercial business.'" (ARC Br. at 27).

---

[3] The FTDA has no specified statute of limitations; accordingly, the statute of limitations for the analogous state law applies. Federal courts "have consistently held that the six-year fraud statute, N.Y. C.P.L.R. 213(8), is the applicable statute of limitations for Lanham Act claims brought in New York." *Air Cargo News, Inc. v. Tabmag Publ'g, Ltd.*, 07-CV-480 (DLI) (RLM) 2007 WL 1101183 *11 (E.D.N.Y. Apr. 11,2007) (slip copy) (*citing Conopco*, 95 F.3d at 191).

32

Setting aside J&J's right to rely upon ARC's vigorous denials of such activities in sworn
Congressional testimony, all these prior activities differ in kind from the pervasive mass market
activities here –ARC's 2004 website and 2006 licensing program.  As ARC explained to retailers,
it was not until the 2006 licensing initiative that ARC red cross branded products "start[ed]" to
"hit the shelves across all retail channels – *firmly establishing the American Red Cross as a
consumer brand*."  (Ex. 80 at ARC495) (emphasis in original).  That was when J&J's dilution
claim ripened.

      There is thus no need to invoke the doctrine of "progressive encroachment" (ARC
Br. at 27).  But that doctrine is fully available.  In arguing otherwise, ARC relies entirely on a
single case, *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796 (7th Cir. 2002), whose
holding is limited to its facts:  "The court continues to believe that in light of the infancy of the
federal anti-dilution act, it would be far too sweeping to say . . . that the progressive
encroachment doctrine never can apply in a dilution case."  *Id.* at 823.

      Although the court's reasoning is limited, it is also erroneous.  The court
seemingly confused the fact that a dilution claim can be established without proof of competition
between the defendant and the plaintiff with the rule of laches that the plaintiff cannot
"inexcusably delay" instituting its cause of action.  A plaintiff may have a potential cause of
action against any mark similar to its own, regardless whether the marks are in competition, but
that should not mean that the plaintiff necessarily "inexcusably delays" if it does not institute
immediate litigation upon learning of the mark.  Yet that seems to be the gist of the Seventh
Circuit's reasoning.  "[T]he test for likelihood of dilution ignores competition and looks solely
[1] to the marks' similarity and [2] to the renown of the senior mark."  *Id.* at 823-24.  By this

reasoning, unless those two factors change over time (which is unlikely), a dilution claim must be brought upon first notice of the similar mark.

But the proper question for analysis of inexcusable delay, including progressive encroachment, is whether the defendant has changed the manner of its use of the mark in a way that increases the threat to the plaintiff's trademark rights. *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 31 cmt. c. (1995). There is no support in the law for the idea, advanced here by ARC, that the owner of a mark on notice of a similar one must institute litigation immediately or be barred forever, even when defendant's use changes in such a way as to be commercially threatening. *See, e.g.*, *H.G. Shopping Ctrs., L.P. v. Birney*, No. H-99-0622, 2000 WL 33538621, at *7 (S.D. Tex. Nov. 29, 2000) ("Plaintiff's assertion of progressive encroachment with regard to Plaintiff's dilution claim" requires "Defendant in some way increase or expand its use of the challenged mark.")

      **2.**     **No Prejudice:** "In order to prevail on the affirmative defense of laches, a defendant must prove that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action." *Conopco*, 95 F.3d at 192; *see also Costello v. United States*, 365 U.S. 265, 282 (1961). "Laches contemplates harm resulting from delay; prejudice does not arise merely because one loses what otherwise he would have kept." *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1058 (5th Cir. 1985) (quotation omitted).

      ARC has offered no evidence of prejudice resulting from J&J's alleged delay. This is not a case where a defendant has created a fanciful mark in which it has invested substantial sums. Rather, ARC chose to use for its commercial products the red cross emblem that was created by the 1864 Geneva Convention and that ARC is permitted by federal law to use solely for humanitarian purposes. In effect, by using its protected emblem in commerce, ARC

took a free ride on a valuable asset it was charged with safeguarding. If the Court were to enjoin ARC's licensing scheme, the free ride would be over, but ARC would still be permitted to use the emblem for non-commercial purposes as explicitly authorized by its charter.

        **3.**      **ARC's Bad Faith Precludes its Assertion of Laches:** Finally, the doctrine of laches includes a "good faith component" which is "part of the fundamental principle that 'he who comes into equity must come with clean hands.'" *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) (citations and some quotations omitted) (*quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (1945). As recounted above, ARC's bad faith precludes invocation of laches.

## VI.    J&J's Claims for Tortious Interference With Contract

        J&J's claim for tortious interference with contract are straightforward. J&J alleges that ARC knew of agreements between J&J and defendants FAO and Water-Jel prohibiting their use of the red cross emblem and that ARC induced them to breach the agreements. In its motion, ARC relies on the self-serving denials of its witnesses to argue it did not have the requisite knowledge of the contracts or the intent to induce FAO and Water-Jel's breach of them. (ARC Br. at 36-37). But knowledge and intent are states of mind, the determinations of which are best left to the jury. *See Distasio v. Perkin-Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998) (summary judgment should be used "sparingly" when states of mind and intent are at issue). Reasonable jurors could infer that ARC knew of the contracts and intended to induce their breach.

### A.    J&J's Contract with FAO

        In April 2002, FAO filed a trademark application for a mark incorporating the red cross symbol to be used with first aid-related products. (Ex. 82). The application was published for opposition in July 2003. (Ex. 83). J&J filed an opposition to the registration and began

discussions with FAO to resolve the matter. (Ex. 84). By an agreement dated July 7, 2005, J&J agreed to drop its opposition to the mark in return for FAO's promise to "not use the design feature of the mark... in whole or in part in the color red or orange . . . in connection with the goods identified" in the application. (Ex. 85).

The settlement discussions were a matter of public record. While negotiations were ongoing, both parties filed numerous motions in the opposition requesting extensions of time "to allow the parties to continue their settlement efforts." (*See, e.g.*, Ex. 86). J&J's opposition was formally withdrawn when FAO filed an amendment on November 8, 2005, to add a disclaimer that essentially repeated the terms of its promise in the FAO agreement: "The [crosses] in the mark are not displayed in the color red or orange . . . " (Ex. 122).

ARC's General Counsel and Senior Counsel both confirmed that in the course of policing unauthorized use of the red cross emblem, ARC regularly monitors trademarks applications and proceedings in the USPTO. (Ex. 95 at 12-13, 61-71; Ex. 106 at 18). Reasonable jurors could thus infer that ARC learned of the FAO settlement by monitoring the opposition proceeding and knew about FAO's settlement with J&J when J&J finally withdrew its opposition.

But there is more. E-mail correspondence between FAO and ARC show that ARC was well aware of the limitations imposed by the FAO settlement agreement. In October 2006, after ARC and FAO entered into their license agreement, ARC's employee in charge of the licensing program, Jennifer Niyangoda, commented to FAO in an email that FAO "is not allowed to use [its] logo in red, according to [ARC's] legal counsel." (Ex. 87). Not being allowed to use the "logo in red" is, of course, a term of FAO's agreement with J&J. (Ex. 85 at 1). FAO's CEO Dick James responded to ARC's comment: "All FAO products used in these kits will have the

36

FAO logo in blue, green or purple……. no red or orange. As agreed, the red is being phased out."
(Ex. 88 at FAO6625). Again, "no red or orange" reflects the terms of the FAO-J&J agreement.
(Ex. 85 at 1). To make matters clearer, Mr. James testified that "as agreed" was a reference to the
settlement agreement. (Ex. 89 at 257-58).

This is more than sufficient to allow a jury to infer that ARC knew about, and
intentionally interfered with, J&J's contract with FAO.

### B.     J&J's Contract with Water-Jel

In July 1993, Water-Jel filed two trademark applications in the USPTO for a mark
incorporating the red cross symbol to be used on burn dressings and ointments. (Exs. 90-91).
The applications were published for opposition in January 1994. (Ex. 92). This time, J&J and
ARC worked closely together in opposing Water-Jel's application. ARC's Assistant General
Counsel advised J&J's counsel in February 1994 that ARC had sent Water-Jel its "standard letter"
and resolved the matter upon Water-Jel's assurance that it "was willing to discontinue using the
red cross in their mark." (Ex. 96 at JJARC14491).

As with the FAO proceeding, J&J filed several requests for extensions of time to
oppose the applications, in each one indicating that it was in settlement negotiations with Water-
Jel. (See, e.g., Ex. 93). J&J and Water-Jel eventually reached an agreement on January 31, 1995,
that Water-Jel would "disclaim any right to the use of the Greek cross portion of its mark in red
or in white on a red background." (Ex. 94). As a consequence, J&J, like ARC, agreed not to
oppose Water-Jel's application. (Ex. 94).

Based on ARC's regular monitoring of trademark proceedings at the USPTO, and
the particular interest ARC had in these particular Water-Jel's trademark applications – which it
communicated to J&J in writing – jurors may reasonably infer that ARC knew that J&J and

1417742v.1

Water-Jel entered into an agreement to resolve the dispute when it became apparent that J&J never filed an opposition after its many requests to extend the time to do so.

## VII.    ARC's Counterclaims Should Be Dismissed

ARC seeks summary judgment on its counterclaims alleging that J&J has exceeded its grandfathered rights under § 706.  J&J has already demonstrated why the counterclaims are meritless and why J&J is entitled to summary judgment -- the allegedly new uses are not actually new and do not convey a different commercial impression than J&J's pre-1905 uses.  (*See* J&J Opening Br. at 35-40).  ARC now cites two more allegedly non-grandfathered uses -- the words "Hospital Products for Home Care" near the red cross emblem, and the word "Emergency" in the red cross.  (ARC Br. at 38-39).

ARC's allegations about the phrase "Hospital Products for Home Care", like its earlier allegations (*see* J&J Opening Br. at 37-38), concern use by J&J of its name and other phrases on its packaging in addition to the red cross emblem.  J&J used the red cross in this way prior to 1905.  Indeed, ARC admits that J&J has regularly placed its name beside the emblem. (ARC Counterclaim ¶ 11).  Under ARC's bizarre theory, § 706 limits J&J's ability to change the styling of its name and the remainder of the packaging on which the red cross emblem is used. That is not what § 706 says -- it simply limits use of the emblem to the same purpose and same class of goods as grandfathered businesses used prior to 1905.  (*See* J&J Opening Br. at 36-37).

ARC's other complaint, about the word "Emergency" in the cross under J&J's name, is a use that is substantially similar to J&J's use of its name inside of the cross prior to 1905.  (*See e.g.*, Ex. 8 at JJARC293; Ex. 9 at JJARC364; Ex. 11 at JJARC427, 430)  Moreover, J&J's use of "emergency" in connection with the red cross is not a new use.  Prior to 1905, J&J marketed a "Red Cross Emergency Fire Kit."  (Ex. 11 at JJARC428).

38

In any case, neither of the uses identified for the first time in ARC's brief conveys a different commercial impression than J&J's pre-1905 uses. Although it seeks summary judgment, ARC does not even attempt to make the necessary showing. It simply cites *O-M Bread, Inc. v. U.S. Olympic Committee*, 65 F.3d 933 (Fed. Cir. 1995), for the legal proposition and declares "So too here." (ARC Br. at 39) ARC's lack of any reasoning is unsurprising – the "new" marks convey the same commercial impression as J&J's pre-1905 uses. The words added to the goods describe precisely the nature of the goods that have been sold since before 1905 – that a first-aid kit is to be used in "emergencies" is no surprise and conveys no different impression with or without the word "emergency." Similarly, the concept that consumer first-aid products are similar to those used in hospitals is hardly new. (*See, e.g.*, Ex. 11 at JJARC427 (1904 J&J price list advertising to the medical profession a "household accident case" containing the same goods sold to doctors)).

ARC additionally argues by way of footnote that J&J's emergency preparedness kits also exceed the scope of J&J's rights. But, as explained in J&J's opening brief, J&J has the right to use the emblem in the same class of goods for which it used it prior to 1905. (J&J Opening Br. at 36, 38-39). No reasonable juror could find that emergency preparedness kits are not part of the same class of goods as first-aid kits and emergency fire kits.

Finally, ARC contends that 15 U.S.C. § 1052(b), which bars registration of "insignia[s] of the United States," mandates that J&J's '913 mark be cancelled, as the red cross is an insignia of the United States under 18 U.S.C. § 706. (ARC Br. at 40). But, as discussed above, § 706 specifically preserves J&J's right to use the cross as a trademark on certain of its goods (and the '913 registration is limited to these goods). Accordingly, § 1052(b) cannot be read to prohibit the registration of the '913 mark.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for

summary judgment in its entirety.

Dated: New York, New York
       December 5, 2007

Gregory L. Diskant
Robert W. Lehrburger
Sarah Zgliniec
Ravi V. Sitwala
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
gldiskant@pbwt.com
Tel: (212) 336-2000
Fax: (212) 336-2222

and

Roger L. Zissu
Richard Z. Lehv
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017
rlehv@frosszelnick.com
Tel: (212) 813-5900

*Attorneys for Plaintiffs*

1417742v.1