Jonathan L. Abram
Raymond A. Kurz
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C.  20004
Tel:  (202) 637-5681
Fax:  (202) 637-5910

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE AMERICAN RED CROSS, LEARNING CURVE INTERNATIONAL, INC., MAGLA PRODUCTS, LLC, WATER-JEL TECHNOLOGIES, INC., and FIRST AID ONLY, INC., <br><br> Defendants. | 07 Civ. 7061 (JSR/DCF) <br><br><br> **ECF CASE** <br> **ELECTRONICALLY FILED** |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ....................................................................................... 1

POINT I.    NONE OF THE "LEGAL LIMITATIONS" THAT J&J CITES
            PREVENTS ARC FROM SELLING RED CROSS PRODUCTS TO
            THE PUBLIC............................................................................................. 1

            A.    ARC's Charter Does Not Prohibit ARC Sales.................................. 1

            B.    Section 706 Does Not Bar Sales Of ARC Products.......................... 4

            C.    The Geneva Conventions Provide J&J No Support.......................... 7

POINT II.   J&J'S APPEAL TO SUBSEQUENT LEGISLATIVE HISTORY
            FAILS ...................................................................................................... 7

POINT III.  SUMMARY JUDGMENT IS WARRANTED ON J&J'S
            TRADEMARK DILUTION CLAIMS (COUNTS FIVE & SIX)................ 11

            A.    The Noncommercial Exemption In The FTDA Does Not
                  Apply Here........................................................................................ 11

            B.    Laches Bars J&J's Dilution Claims .................................................. 13

            C.    There Is No Evidence Of Blurring Or Tarnishment .......................... 16

POINT IV.   SUMMARY JUDGMENT FOR ARC IS WARRANTED ON THE
            REMAINING TORT CLAIMS .................................................................... 17

            A.    Tortious Interference With Business Relations (Count One) ............ 17

            B.    Tortious Interference With Contractual Relations
                  (Count Two)....................................................................................... 18

            C.    Unfair Competition (Count Three) ................................................... 20

POINT V.    J&J HAS EXCEEDED ITS GRANDFATHERED RIGHTS UNDER
            § 706.......................................................................................................... 20

CONCLUSION.................................................................................................................. 20

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Page**

**CASES:**

ABC v. DEF, 500 F.3d 103, 109 (2d Cir. 2007)................................................................8

AM Gen. Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 823, 824
    (7th Cir. 2002).....................................................................................................13, 14

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)........................................19

Byron v. Chevrolet Motor Div. of Gen. Motors Corp., 1995 WL 465130, at *9
    (S.D.N.Y Aug. 7, 1995) .........................................................................................15

Calvin Klein Trademark Trust v. Wachner, 129 F. Supp. 2d 248, 254
    (S.D.N.Y. 2001) .....................................................................................................18

Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1103-04 (N.Y. 2004) ..............................17

Comm'r v. Groetzinger, 480 U.S. 23, 35 (1987) .......................................................2, 6

Distasio v. Perkin-Elmer Corp, 157 F.3d 55, 61 (2d. Cir. 1998)...........................18, 19

Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 567 (2005)......................7

FTC v. A.P.W. Paper Co., 328 U.S. 193, 201 & n.7 (1946)..........................................5

Grupke v. Linda Lori Sportswear, 921 F. Supp. 987, 992-993
    (E.D.N.Y. 1996).....................................................................................................18

H.G. Shopping Ctrs., L.P. v. Birney, 2000 WL 33538621, at *8
    (S.D. Tex. Nov. 29, 2000).....................................................................................14

Hermès Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107
    (2d Cir. 2000).........................................................................................................16

Hilton Int'l Co. v. Hilton Hotels Corp., 888 F. Supp. 520, 537
    (S.D.N.Y. 1995) .....................................................................................................14

Marcella v. Brandywine Hosp., 47 F.3d 618, 621, 622, 624 (3d Cir. 1995) ..............3, 4

Marvel Characters, Inc. v. Simon, 310 F.3d 280, 290 (2d Cir. 2002) ...........................1

Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 905 (9th Cir. 2002)........................12

McKnight v. Taylor, 42 U.S. 161, 168 (1843)..............................................................15

Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985) .......................................................19

## TABLE OF AUTHORITIES—Continued

Page

New Orleans, M. & T.R. Co. v. Ellerman, 105 U.S. 166, 173-174 (1881) ....................................3

Paco Sport, Ltd. v Paco Rabanne Perfumes, 2000 WL 1721126, at *7
     (2d Cir. Nov. 16, 2000).............................................................................................17

Pan Am. World Airways, Inc. v. Flight 001, Inc., 2007 WL 2040588,
     at *13 (S.D.N.Y. July 13, 2007) .............................................................................16

Panavision Int'l, L.P. v. Toeppen, 945 F. Supp. 1296, 1303 (C.D. Cal. 1996),
     aff'd, 141 F.3d 1316 (9th Cir. 1998)........................................................................12

ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical
     Therapy P.C., 314 F.3d 62, 69 (2d Cir. 2002) ........................................................13

Radio Today Inc. v. Westwood One, Inc., 684 F. Supp. 68, 73-74
     (S.D.N.Y. 1988)........................................................................................................5

Robins Island Pres. Fund, Inc. v. Southold Dev. Corp., 959 F.2d 409, 424
     (2d Cir. 1992)..........................................................................................................15

Shannon v. United States, 512 U.S. 573, 583-584 (1994)................................................8

Solid Waste Agency of N. Cook County v. United States Army Corps
     of Eng'rs, 531 U.S. 159, 169-170 (2001) ................................................................8

Stone v. Williams, 873 F.2d 620, 625 (2d Cir. 1989), vacated after rehear'g
     on other grounds, 891 F.2d 401 (2d Cir. 1989) ......................................................16

Sutton Imp.-Exp. Corp. v. Starcrest of Cal., 762 F. Supp. 68, 69 n.2
     (S.D.N.Y. 1991)........................................................................................................18

Unique Sports Generation, Inc. v. LGH-III, LLC, 2005 WL 2414452, at *5
     (S.D.N.Y. Sept. 30, 2005).........................................................................................18

United States v. Giffen, 326 F. Supp. 2d 497, 505 (S.D.N.Y. 2004).............................8

**STATUTES:**

15 U.S.C. § 1125(c)(2)(B) .............................................................................................16

15 U.S.C. § 1125(c)(3)(C) .............................................................................................12

18 U.S.C. § 706................................................................................................... passim

## TABLE OF AUTHORITIES—Continued

Page

36 U.S.C. § 300105(a)(6)..................................................................................1, 2, 3

36 Stat. 604 (1910)................................................................................................6

N.Y. Gen. Bus. Law § 360-*l* .............................................................................12

**LEGISLATIVE MATERIALS:**

1909 House Hearing, <u>American National Red Cross:  Hearing on H.R. 27473</u>
    <u>before the Subcomm. of the House Comm. on Foreign Affairs,</u>
    60th Cong. (1909) ......................................................................................8

1910 House Hearing, <u>A Bill to Amend an Act Entitled "An Act to Incorporate</u>
    <u>the American National Red Cross":  Hearing on S. 6877 and H.R. 22311</u>
    <u>Before the H. Comm. on Foreign Affairs</u>, 61st Cong. (1910),
    <u>reprinted in</u> 1942 House Hearings ..........................................................6, 8

1942 House Hearings, <u>Protection of the Name and Emblem of the [ARC]:</u>
    <u>Hearings on  H.R. 6911 Before the H. Comm. on Foreign Affairs,</u>
    77th Cong. (1942) ....................................................................................9, 10

1942 Senate Hearing, <u>Red Cross:  Hearings on S. 2411 and H.R. 7420</u>
    <u>Before the Subcomm. of the S. Comm. on the Judiciary</u>, 77th Cong. (1942) ...................4, 7, 9

<u>A Bill to Terminate Commercial Use of the Red Cross</u>, 77th Cong. (1944)................................11

H.R. Bill No. 5580, <u>An Act to Protect the Insignia and Name of the Red Cross</u>,
    53d Cong. (1894), <u>reprinted in</u> 1942 House Hearings ..............................5

H.R. Rep. No. 104-374, 104th Cong., 1st Sess. (1995) .................................12

H.R. Rep. No. 110-87, 110th Cong., 1st Sess. (2007) ...................................4

**OTHER AUTHORITIES:**

4 J. Thomas McCarthy, <u>McCarthy on Trademarks & Unfair Competition</u> § 24:128
    (4th ed. 2001) ....................................................................................... 11-12

5 J. Thomas McCarthy, <u>McCarthy on Trademarks & Unfair Competition</u> § 27:71
    (4th ed. 2001) ...........................................................................................12

<u>Black's Law Dictionary</u> 138 (6th ed. 1990)..................................................20

<u>Restatement (Third) of Unfair Competition</u> § 31 (1995) .............................13

## PRELIMINARY STATEMENT

J&J offers many opinions about what ARC can and cannot do under its Charter, but has precious little to say about the Charter's actual text. The text matters. It broadly empowers ARC to do any act to "promote the purposes of the corporation." 36 U.S.C. § 300105(a)(6). What the text does <u>not</u> do is draw any distinction based on the "commercial" nature of ARC's actions. That is no surprise, since for more than a century ARC has sold products in direct competition with private industry—from first aid kits to blood supplies.

J&J's results-oriented interpretations of both the Charter and § 706 produce wild inconsistencies and absurd results. Americans who use ARC products do not violate the federal criminal law regardless of whether they were given or purchased their first aid kit and regardless of whether they purchased it from a Red Cross Chapter or at the ARC website. <u>Cf.</u> J&J Opp. 4, 5; J&J SJ Mem. 29. And ARC's sales are not federal crimes just because they provide needed funding for the organization's humanitarian mission. <u>Cf.</u> J&J Opp. 19-21 (claiming sales at or near cost are permissible). Nor does J&J have a roving commission to ensure that ARC complies with the Geneva Conventions or the ICRC regulations. In short, neither J&J nor any other Fortune 500 company has the right to dictate what ARC's mission is, what falls within that mission, or whether ARC should continue its century-long practice of selling first aid kits and other preparedness and health items to the American public.

**POINT I.    NONE OF THE "LEGAL LIMITATIONS" THAT J&J CITES PREVENTS ARC FROM SELLING RED CROSS PRODUCTS TO THE PUBLIC.**

**A.    ARC's Charter Does Not Prohibit ARC Sales.**

1.    As with any statute passed by Congress, this Court must "look first to the language of the [Charter] itself," because if the Charter's language is unambiguous, the "judicial inquiry is complete." <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 290 (2d Cir. 2002).

Congress unambiguously empowered ARC to do any "act necessary to carry out this chapter and promote the purposes of the corporation." 36 U.S.C. § 300105(a)(6). Under this broad power—which has remained essentially unchanged since 1905—ARC has engaged in a number of ventures over the past century that have competed directly with private enterprise: from its earliest first aid kits to its pervasive sale of blood products today. The reason ARC has been able to do so under its Charter is not because these sales lack a "commercial" component, but because they all "promote the purposes of the corporation." Id.

The IRS opinion letter that defendants cite confirms what the plain language of the Charter makes clear. In that letter, the IRS did not ask whether ARC's sales of first aid kits were "commercial"—they were sales, after all—but whether selling first aid kits related to ARC's 501(c)(3) purposes, which include "conducting emergency relief to comfort victims of national disasters such as fire, famine or pestilence." ARC Ex. 88 at 1. And it did so with full acknowledgment that the kits would be made "available to the public at large" for double the manufacturing cost, and could be sold through retailers for a royalty payment. Id. at 2. J&J is therefore exactly wrong to say that the IRS letter has no relevance. J&J Opp. 23.

2.      J&J struggles to explain why—if the Charter bans "commercial" sales—Congress never stepped in when it discovered nearly 100 years ago that ARC had begun selling first-aid kits. J&J tries to reconcile its interpretation with historical fact by insisting that all pre-2004 sales were not ultra vires because ARC's Charter allows it to engage in "irregular and sporadic sales." J&J Opp. 5. Putting aside that the sales were not in any way "irregular" and "sporadic," the Charter says nothing of the kind. J&J makes that distinction up.[1] More telling

---

[1]      J&J's only source for its "irregular and sporadic" rule is a citation to Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987), a case in which the Supreme Court addressed whether a full-time gambler's losses were entitled to preferential tax treatment under the Tax Code provision for losses "attributable to a trade or business." There, the Court held that a full-time

still, J&J maintains that its theory would not bar ARC from selling blood products and services—but never explains how ARC's Charter could permit sales of blood products in competition with private firms but not sales of first aid kits. The only difference we can see is that J&J is not in the blood business.

In the end, J&J's proposed rule—that ARC can do nothing "commercial"—cannot be squared with history and would read into the Charter words that Congress did not use. Our view, by contrast, applies the plain text of the Charter and is in keeping with settled practice and the considered judgments of federal agencies. Defendants ask what the Charter itself asks, whether selling first aid, preparedness, blood, and other health-related supplies "promote[s] the purposes of the corporation." 36 U.S.C. § 300105(a)(6). With the deference J&J concedes is owed to ARC in making such judgments (J&J Mem. 26), there is only one possible answer.

3.     Even if the Charter said what J&J says it does, J&J would have no standing to pursue claims based on conduct that it deems "ultra vires." See Defs' SJ Mem. 10-11. In claiming this awesome power, J&J's only citation is to a non-existent page of a case that held just the opposite: that one competitor lacks standing to sue another competitor for allegedly engaging in ultra vires competition. See New Orleans, M. & T.R. Co. v. Ellerman, 105 U.S. 166, 173-174 (1881); J&J Opp. 13.

4.     J&J wrongly asserts that the court in Marcella v. Brandywine Hospital, 47 F.3d 618 (3d Cir. 1995), found that ARC's sales are unauthorized by its Charter. J&J Opp. 13. First, the sales at issue in Marcella were of blood products and services, which even J&J apparently does not claim are unlawful. Second, the issue in Marcella was not the lawfulness of sales at all, but whether in making those sales, ARC was "to be treated as a part of the federal government"

---

gambler is in the "trade or business" of gambling and thus his losses are not losses from "a hobby." Id. Needless to say, Groetzinger tells us nothing about ARC's right under its Charter to continue its longstanding practice of selling products to further and fund its mission.

and have immunity from a jury trial.  47 F.3d at 621.  The court held that ARC does not act as the federal government.  Id. at 622, 624.  Although it observed in a footnote that sales of blood products are not specifically mentioned in ARC's Charter, it never suggested that this made ARC's conduct an unlawful "commercial operation"—just that in selling blood products, ARC acts as a private charity, not as the United States.[2]

5.      J&J now disputes that when the 1905 and 1910 Charters made it illegal for almost everyone except ARC and its employees and agents to use the Emblem in trade or business or to induce the sales of goods, Congress was acknowledging that ARC could do so.  J&J Opp. 14-15.  But when its suited them, J&J read the 1910 Charter provisions in precisely the same way we do.  1942 Senate Hearing at 29.  J&J was right back then, when it recognized the plain meaning of the text.  And that reading is only logical, given that Congress was fully aware in 1905 and 1910 that ARC was selling Red Cross products to the public directly and for royalties.[3]

### B.      Section 706 Does Not Bar Sales Of ARC Products.

1.      In its discussion of § 706, J&J errs in claiming that the "first sentence" of § 706 guards against pretenders but not the second sentence.  J&J Opp. 1, 6-7.  The Supreme Court sees it differently.  In interpreting the language that J&J refers to as the "second sentence" of § 706, the Supreme Court found it "apparent" from this statutory language that Congress was concerned "with protecting the Red Cross against pretenders" and "with protecting the public

---

[2]      In a related error, J&J asserts that ARC's request for a jury trial on its counterclaims is a concession that ARC's sales of Red Cross products are beyond its charter.  J&J Opp. 14.  That is wrong.  ARC's right to seek a jury trial on its own claims against J&J—claims seeking damages from J&J—has nothing to do with whether ARC has governmental immunity from a jury trial seeking damages from ARC.

[3]      J&J's last argument on the Charter merits only passing response.  J&J claims the power to sell property in ARC's Charter contains an unspoken limitation that the property sold not be sold in competition with private businesses.  J&J Opp. 16-17.  But the Charter contains no such limitation, one that would sweep away decades of sales by ARC, including its sales of blood products, first aid kits, and lifesaving gear and guides.

against the false impression that goods purchased were the products of the Red Cross or were sponsored by it." <u>FTC v. A.P.W. Paper Co.</u>, 328 U.S. 193, 201 & n.7 (1946). Section 706 operates as a whole to protect and preserve the Emblem for ARC, its duly authorized agents, and its duly authorized employees.

2.      J&J's attempt to circumvent the DOJ's 1978 interpretation of § 706 is unavailing. It suggests the Court ignore the DOJ opinion letter as non-binding and tries to distinguish what the DOJ said from the present case. J&J Opp. 10. But its argument makes no sense. The DOJ informed ARC that it could authorize or license a company to use the Emblem on advertising for products sold at retail. J&J now takes the odd position that the letter spoke only to advertising, which, it says, does not include a product's packaging. That is not the law, and certainly would surprise Tony the Tiger on a box of cereal or the Keebler Elves on a box of cookies. <u>See</u>, <u>e.g.</u>, <u>Radio Today Inc. v. Westwood One, Inc.</u>, 684 F. Supp. 68, 73-74 (S.D.N.Y. 1988) (product packaging is advertising for trademark purposes). Finally, contrary to J&J's interpretation, the DOJ letter makes clear that a limited agency relationship is created when ARC authorizes the third party to use the Emblem in the course of an activity furthering ARC's mission and purpose. The letter undermines J&J's theory that § 706 can be satisfied only if ARC takes over each and every one of the day-to-day activities of the third-party entity. <u>See</u> ARC Ex. 87.

3.      J&J is also wrong when it says ARC sought licensing power in 1894, but "thought better of the issue" and never did so again. J&J Opp. 9. In fact, the 1894 proposed bill that J&J cites would have prohibited "everyone not directly connected with [ARC] <u>or without special permission granted by the central committee of the Red Cross</u>" from wearing, using, or in any way displaying the Emblem. H.R. 5580 (J&J Tab 53 at 279) (emphasis added). This is virtually identical in impact and import to the language ultimately enacted in 1910 prohibiting commercial

use by anyone other than ARC, its duly authorized employees, and its duly authorized agents—
i.e., those who receive special permission from ARC to use the Emblem in a specific way.

4.    J&J also repeatedly quotes out of context a 1910 statement by ARC about its need
for greater control over the Emblem.  J&J Opp. 9, 10; J&J SJ Mem. 17, 28.  But the statement,
when not selectively excerpted, makes the same point that both Congress and ARC have always
been concerned with:  the problem of pretenders and unauthorized entities using the Emblem.
ARC wanted the criminal prohibition strengthened and the grandfather provision deleted.  As an
example, ARC noted that the Chicago Tribune sent nurses to the Cherry Mine disaster site who
wore the Red Cross while acting in ways that some considered inappropriate.  They were not
nurses that ARC had authorized and they were not affiliated with ARC, and yet ARC could not
prevent them from walking around the hospital wearing the Red Cross Emblem.  1910 House
Hearing (J&J Tab 53 at 360).  The fact that J&J and others have successfully preserved
grandfathered uses does not limit ARC's right to use and authorize use of the Emblem itself.

5.    J&J's last § 706 argument is that when Congress said ARC's duly authorized
agents may use the Emblem without violating the criminal prohibition, it meant something
meaningfully different from when it told the Girl Scouts that they could authorize the use of the
Girl Scout's badge.  Not so.  The language J&J quotes from the Girl Scouts Charter matches up
closely with the permissible uses under the 1910 Charter that ARC's duly authorized agents
could lawfully use the Emblem "for the purpose of trade or as an advertisement to induce the
sale of any article."  36 Stat. 604 (1910).  All parties agree that the lawful uses under the 1910
Charter were preserved when this provision was recodified in 1948.  If Congress had intended to
prohibit ARC from authorizing third-party use, it would have said so.  Cf. 20 U.S.C.A. § 1087-

2(s)(4)(C) (Sallie Mae "may not transfer or permit the use of [its name] to or by any entity other than a subsidiary of the Association" on wind-up).

    **C.    The Geneva Conventions Provide J&J No Support.**

    J&J offers absolutely no authority for its reliance on the non-self-executing Geneva Conventions, and it presents no argument supporting its reading of those treaties.  J&J's attempt to tie the ICRC Regulations to those treaties and enforce them is even more egregious, as it is based on a misunderstanding of who the ICRC is and what its Regulations are.  After all, the Regulations plainly provide that "the name and emblem may be used for fund-raising purposes to sell an Object," Regulations, art. 23, Commentary ¶ 1, and that National Societies may "co-operate with a commercial company or other organization to raise funds," including by displaying the commercial companies' trademarks on articles sold by the national society, id., art. 23, ¶ 3.  See generally Defs' Opp. to J&J's MSJ 20-31.

**POINT II.    J&J'S APPEAL TO SUBSEQUENT LEGISLATIVE HISTORY FAILS.**

    J&J includes in its opposition page after page of snippets of testimony from failed legislative proposals many years after the 1905 and 1910 Charters amendment.  J&J's snippets are neither the stuff of estoppel nor are they even part of the legislative history of the governing Charter provisions, and they are taken entirely out of the context in which they were made.

    To begin with, J&J's resort to subsequent Congressional hearings puts the cart before the horse.  J&J has not identified any statutory ambiguity in the 1905 or 1910 Charters.  E.g., Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 567 (2005) (rejecting reliance on legislative history where statute was not ambiguous).  Indeed, during the very hearings J&J cites, J&J itself shared ARC's view that the 1910 Charter authorized ARC's use of the Emblem in the sale of goods.  See 1942 Senate Hearing at 29.

Moreover, the Court's task is to construe the statute as enacted, not to glean meaning from the legislative history of other, different legislative proposals, years later, that were never enacted. See Shannon v. United States, 512 U.S. 573, 583-584 (1994) (holding that courts have no authority to enforce principles gleaned solely from statements in legislative history not connected to any reference point in an enacted statute).[4] Despite the irrelevance of most of the hearing testimony to the meaning of the 1905 Charter as amended in 1910, ARC takes this opportunity to put the snippets back in context.

In 1909 and 1910, ARC was concerned about the use of the red cross emblem by pretenders. People were pretending to be affiliated with ARC as a way into cordoned-off areas, which lessened the protection offered to genuine Red Cross employees in danger zones.[5] People were using ARC's name to solicit funds—either directly, as in false collection for a disaster, or indirectly, through selling goods that gave the appearance of profiting the Red Cross.[6] Unauthorized people were using ARC's name or Emblem on products such as chicken feed and cow remedies.[7] Misuse of the Emblem within the United States was extensive and rapidly growing as the importance and usefulness of the American Red Cross increased.[8] ARC's concern related to those who used the Emblem without ARC's authorization, not with it.

---

[4]     "Subsequent legislative history does not provide a reasonable platform to interpret an original statute's text or legislative history." United States v. Giffen, 326 F. Supp. 2d 497, 505 (S.D.N.Y. 2004); see also ABC v. DEF, 500 F.3d 103, 109 (2d Cir. 2007). Even more to the point, "discarded legislative proposals are seldom useful in interpreting an existing statute." Griffen, 326 F. Supp. 2d at 505-506 (citing Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs, 531 U.S. 159, 169-170 (2001) ("Failed legislative proposals are 'a particularly dangerous ground on which to rest an interpretation of a prior statute.' ")).

[5]     1909 House Hearing at 2 (J&J Tab. 49); 1910 House Hearing at 354 (J&J Tab 53-16).

[6]     1909 House Hearing at 2, 11, 18; 1910 House Hearing at 354.

[7]     1909 House Hearing at 2-3; 1910 House Hearing at 360.

[8]     1909 House Hearing at 17.

In 1942, J&J clearly read ARC's 1910 Charter to permit ARC to sell goods to the public. 1942 Senate Hearing at 29. And J&J was not alone in that reading. Congressman Mundt understood that even under the proposed bill barring commercial use by non-ARC entities, ARC would still be able to sell products for commercial purposes. Id. at 252. So did Congressman Eaton. Id. at 254 (elimination of grandfathered uses "looks to me like it is going to create a monopoly for the Red Cross to manufacture and sell certain articles as against the private institutions of the country"); id. at 255 (Congressman Eaton noting what appeared to be a 38% profit on ARC sales of first aid kits and stating "I have no objection to the Red Cross getting all of the money it possibly can because I believe in it 100 percent").

The problems discussed during the 1942 hearings focused on President Roosevelt's concern about undermining the enemy's respect for the Red Cross Emblem in wartime (which required barring its use on commercial buildings like a dynamite factory or a J&J smokestack).[9] ARC was also concerned once again with pretenders, unauthorized people using the Red Cross name or Emblem on products in order to make them appear to be ARC-approved, including on rat poison, shoes, and drug stores.[10] It was clear to ARC that the 1910 law had proven ineffective because grandfathered users were finding new ways to stretch their right to use the Red Cross symbol on new products and in new streams of advertising their for products.[11]

During the 1942 House Hearings, the Red Cross was asked whether it would be "not only unfortunate, but disastrous, if the Red Cross was restricted from engaging in any sort of

---

[9]     1942 House Hearings at 70; id. at 229 (noting that if the enemy saw the Emblem on a J&J smokestack, it could bomb our hospitals; it could not distinguish a hospital from a factory).

[10]     1942 Senate Hearing at 12, 18; 1942 House Hearings at 9, 22, 24, 27, 32, 40.

[11]     For example, J&J testified that it had started using the Red Cross Emblem on band-aids, which had not been invented before 1905 and to which there were technically no grandfathered rights. See 1942 Senate Hearing at 38. See also 1942 House Hearings at 7 (grandfathered user for Emblem on mattresses expanded use to other furniture; grandfathered user for aspirin tablets expanded use to manhood tablets); id. at 26, 225, 233; 1942 Senate Hearing at 58.

enterprise that would bring a return into the organization?" 1942 House Hearings at 257. ARC

answered in the affirmative, and explained that it did not view selling things like first aid kits,

which are part of its educational mission, to be beyond its lawful power. Id. Two Committee

members then went on to point out that they saw no objection to ARC—as "an organization for

charity or humanity"—using its Emblem in the sales of products "to raise funds for the benefit of

the organization." Id. at 257-258.

It is odd that J&J even refers to the letter that President Roosevelt submitted in 1942.

As ARC General Counsel Hughes testified, "We believe that the scales weight down on

the side of the Army, Navy, and those interested in the Red Cross, as against those who have

used, and who want to continue to use the emblem solely to make money." 1942 Senate Hearing

at 63. Mr. Hughes also explicitly told Congress that although to his knowledge in 1942 the Red

Cross had not done so, "we could, as some charity institutions or character-building institutions

do, we could gain large sums of money from licensing the use of the Red Cross emblem." 1942

House Hearings at 26 (emphasis added).

In explaining the commercial uses of concern, ARC Chairman Davis relayed the story of

the Red Cross Shoe Company, a small firm that became a grandfathered user and then took

advantage of its status to begin "licensing stores around the country to use the emblem upon their

place of business, to call these stores a Red Cross Shoe Store." 1942 House Hearings at 224.

This unauthorized use by third-party commercial entities "interferes with the proper performance

of the duties" of ARC and "causes confusion." Id. at 228. To prevent this, and to preserve the

"sacred emblem" for ARC and its authorized uses, ARC asked Congress to bar all those

grandfathered commercial users and advertisers. Id.

It is odd that J&J even refers to the letter that President Roosevelt submitted in 1942.

J&J Opp. 1-2. In this letter, President Roosevelt expressed his support for legislation that would

have barred J&J's use of the Emblem, stating that to "loyal Americans it seems almost a sacrilege" for a private entity like J&J to use the Emblem, since it was preserved for the International Red Cross societies in 1864 and adopted by private companies like J&J only after that date. These private parties, including J&J, thus began their use of the Red Cross Emblem with full knowledge that the Emblem had been reserved worldwide for Red Cross Societies. A Bill to Hearing to Terminate Commercial Use of the Red Cross (1944) at 227, Letter from Franklin D. Roosevelt (J&J Tab 62).

**POINT III.     SUMMARY JUDGMENT IS WARRANTED ON J&J'S TRADEMARK DILUTION CLAIMS (COUNTS FIVE & SIX).**

As a matter of federal law, ARC's use of the Emblem in ways allowed by Congress cannot amount to dilution of a grandfathered user's mark. If ARC's actions are permissible under its Charter and § 706—and they are—then J&J's dilution theory must fail. J&J does not disagree. J&J Opp. 29. Even if that were not so, J&J's dilution claims would still fail.

**A.     The Noncommercial Exemption In The FTDA Does Not Apply Here.**

J&J concedes that much of ARC's century-long use of the Emblem was lawful, including its use for humanitarian purposes, on first aid and related goods sold to the public through chapters, and for the sale of blood in competition with commercial business. J&J Opp. 1, 3-5. That should end J&J's dilution claim. Such pervasive use means J&J's mark is not distinctive. Nor can J&J get around this problem by asserting that ARC's historical use fell within the narrow exemption for "non-commercial" use under the Federal Trademark Dilution Act ("FTDA") and was therefore not dilutive. J&J Opp. 29. J&J is wrong for two reasons.

1.     The non-commercial use exemption from FTDA liability has nothing to do with whether the use is by a non-profit. Rather, the exemption precludes dilution liability for uses of

a mark that are protected non-commercial speech under the First Amendment.[12]   15 U.S.C.

§ 1125(c)(3)(C); 4 J. Thomas McCarthy, <u>McCarthy on Trademarks & Unfair Competition</u>

§ 24:128, n.4 (4th ed. 2001) (the exemption "expressly incorporates the concept of 'commercial'

speech from the "commercial speech" doctrine, and proscribes dilution actions that seek to

enjoin use of famous marks in "noncommercial" uses (such as consumer product reviews)")

(quoting H.R. Rep. No. 104-374 (Nov. 30, 1995)); <u>accord</u> <u>Panavision Int'l, L.P. v. Toeppen,</u> 945

F. Supp. 1296, 1303 (C.D. Cal. 1996) (exemption "prevent[s] courts from enjoining

constitutionally-protected speech"), <u>aff'd</u>, 141 F.3d 1316 (9th Cir. 1998).   Therefore, this

exemption means there can be no dilution claim against certain constitutionally protected uses of

another's trademark.   <u>Mattel, Inc. v. MCA Records, Inc.</u>, 296 F.3d 894, 905 (9th Cir. 2002)

(citing parody, satire and editorial as forms of noncommercial speech).   So when David

Letterman refers to "sweatshop Barbie" in a "Top Ten New Items from the Kathie Lee Gifford

Product Line" list, there is no dilution of the Barbie (or Kathie Lee Gifford) trademark.   ARC's

historical use of the Emblem, whether at a blood drive or on a blood bag, in a chapter store or on

a first aid kit, falls well outside this narrow FTDA exemption.[13]

     2.     Faced with overwhelming evidence showing how ARC historically used the

Emblem to sell goods and services—which J&J admits was permissible—J&J gins up some

creative distinctions between those historical uses and ARC's current uses.   But what J&J points

to are either no distinctions at all or distinctions without a difference.   For example, J&J relies on

an irrelevant allegation that the current licensing program is the first time ARC products are

---

[12]     The noncommercial exemption does not appear in the state law claim and is inapplicable to the state dilution claim.   <u>See</u> N.Y. Gen. Bus. Law § 360-*l*.

[13]     The term "commercial" under the Lanham Act encompasses advertising and promotion of goods and services offered by non-profit organizations.   5 J. Thomas McCarthy, <u>McCarthy on Trademarks & Unfair Competition</u> § 27:71 (4th ed. 2001).

being sold in retail channels of trade, but it does not matter for a dilution claim whether a party is in a competing channel of trade. AM Gen. Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 824 (7th Cir. 2002). But in any event, ARC has presented extensive evidence of its sales in retail channels since long before the current licensing program. Def's SOF ¶¶ 36-79, 86-107.

J&J next claims ARC's prior sales were irregular and sporadic and did not rise to a commercial level under the FTDA. First, the quantity of sales has no bearing on a FTDA claim, which equally prohibits dilution from successful and unsuccessful unauthorized commercial uses of famous marks. AM General, 311 F.3d at 824. And second, J&J's characterization is also flatly contradicted by the extensive history of ARC's product sales set forth in defendants' 56.1 Statement. ARC has presented undisputed evidence from its archives and from the National Archives demonstrating that its sales have been going on in the open for over a century. Had J&J brought its claim back in the 1920s or even the 1940s, ARC probably could have found even more. See infra 15. J&J simply cannot wipe from the historical record ARC's pervasive pre-2004 commercial use of the Emblem.

**B.     Laches Bars J&J's Dilution Claims.**

J&J has known about ARC's use of the Emblem in connection with commercial activities for over a century.[14] It is hard to imagine a clearer case of laches.

**1.     A Delay Of More Than 100 Years Is Inexcusable.** J&J relies on "progressive encroachment" to excuse its delay. But as we previously demonstrated, progressive encroachment is irrelevant to a laches analysis in a dilution claim since the claim does not turn on likelihood of confusion. As the Second Circuit has explained, "likelihood of confusion is

---

[14]     J&J cannot disclaim knowledge of ARC's use of the Emblem given its repeated complaints that ARC was in a "commercial business" dating back to 1904 and its repeated efforts to partner with ARC on a first aid kits for sale to the public, including those sold in retail stores. Defs' SOF ¶¶ 108-131.

essential to a progressive encroachment analysis."[15] ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C., 314 F.3d 62, 69 (2d Cir. 2002) (progressive encroachment doctrine only applies where likelihood of confusion is at issue); accord Hilton Int'l Co. v. Hilton Hotels Corp., 888 F. Supp. 520, 537 (S.D.N.Y. 1995) ("the [progressive encroachment] doctrine has apparently only been applied in trademark infringement cases"). J&J's opposition fails to address this point.

Instead, J&J argues that the Seventh Circuit's decision in AM General is erroneous. Not surprising, because the Seventh Circuit held, under astonishingly similar facts, that the progressive encroachment doctrine does not apply in a dilution context. 311 F.3d at 823-824. J&J claims that even after AM General, there may be some circumstances in which the progressive encroachment doctrine might apply to dilution claims. J&J Opp. 33. Given the similarity between AM General and this case, there is no need to reach some hypothetical other circumstances in another case where the doctrine may apply. It does not apply here.

J&J asks the Court to rely instead on H.G. Shopping Centers. J&J Opp. 34. But there, the court held exactly the opposite of what J&J says it did: the court found that progressive encroachment did not apply. See H.G. Shopping Ctrs., L.P. v. Birney, 2000 WL 33538621, at *8 (S.D. Tex. Nov. 29, 2000) ("The court finds Plaintiff is not excused, by the doctrine of progressive encroachment, for its delay in bringing the dilution claim."). J&J's view boils down to a claim that failure to "institute immediate litigation upon learning of the mark" should not necessarily result in a finding of inexcusable delay. J&J Opp. 33. We are not talking about

---

[15]    For this reason, J&J's reliance on § 31 of the Restatement (Third) of Unfair Competition is in error. Section 31 deals with unreasonable delay in the context of trademark infringement, not dilution. See Restatement (Third) of Unfair Competition § 31 cmt. c (1995) ("The plaintiff in some cases may also be justified in delaying a protest or the commencement of litigation until the viability of the defendant's infringing business is evident.") (emphasis added).

"institut[ing] immediate litigation."  Under J&J's theory, ARC has been diluting J&J's mark ever

since Congress granted ARC its federal Charter in 1900.  Waiting over 100 years is laches.

    2.    **Prejudice Abounds.**  J&J questions the prejudice arising from its 100-year delay.

While ARC has been remarkably successful in excavating relevant archival evidence, it no

longer has access to all of the evidence that refutes J&J's claims.  McKnight v. Taylor, 42 U.S.

161, 168 (1843).  Indeed, J&J makes hay of that, first complaining about the length of our

extensive 56.1 Statement and then characterizing ARC's evidence of sales as "sporadic" and of

only "a few isolated commercial events."  J&J Opp. 5, 32.  The criticism is misplaced, but if J&J

had filed suit in 1915 or even 1950, ARC undoubtedly would have even fuller proof of its sales.

And J&J's delay has also enabled it to characterize and rely on old statements since all

involved—Clara Barton, Colonel Hartfield, Mabel Boardman, Francis Biddle, Edwin Perry, H.G.

Hughes, and Norman Davis—are now deceased.  See Robins Island Pres. Fund, Inc. v. Southold

Dev. Corp., 959 F.2d 409, 424 (2d Cir. 1992) (applying laches where plaintiff's two-century

delay ensured no one "alive at the time [was] here to support or refute these claims").[16]

    In addition, ARC has invested resources establishing its current organization and fund-

raising structure, including its relationships with defendants, in reliance on a century of

acquiescence to its sales.  This reliance is sufficient prejudice to invoke laches.  See Byron v.

Chevrolet Motor Div. of Gen. Motors Corp., 1995 WL 465130, at *9 (S.D.N.Y Aug. 7, 1995)

(finding sufficient prejudice because during seven year delay the defendants "expended

substantial resources developing" and disseminated the intellectual property at issue).

    The analyses for inexcusable delay and prejudice are a "sliding scale" so that " '[w]here

there is no excuse for delay, as here, defendants need show little prejudice.' "  Id. at *7 (quoting

---

[16]    J&J similarly disputes that ARC's photograph of first aid products from 1903 reflects products sold to the public because no one who is alive today can testify as to who the individual purchasers were.  J&J Resp. SOF ¶ 36.

Stone v. Williams, 873 F.2d 620, 625 (2d Cir. 1989)).  Defendants have shown more than sufficient prejudice to justify invoking laches.

       **3.**      **There Is No Evidence Of Bad Faith.**  Finally, J&J tries to throw bad faith into the laches analysis.  Relying on the Second Circuit's decision in Hermès Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104 (2d Cir. 2000), J&J asserts that bad faith is an absolute bar to the laches defense.  None of J&J's allegations of bad faith have any merit.  And Hermès presented a different situation—the impact of a plaintiff's intentional infringement on a laches defense.  Id. at 107 ("[I]ntentional infringement is a dispositive, threshold inquiry that bars further consideration of the laches defense.").  Here, there is no allegation of historic trademark infringement, much less intentional infringement.  Nor could there be, since Congress expressly authorized ARC to use the Red Cross Emblem.  J&J's allegation of bad faith does not bar laches.

      **C.**      **There Is No Evidence Of Blurring Or Tarnishment.**

       **1.**      **There Is No Evidence Of Blurring.**  J&J first insists that the Court cannot rule on summary judgment without analyzing all six factors that the FTDA says a Court "may consider" in determining whether a mark is likely to cause dilution by blurring.  15 U.S.C. § 1125(c)(2)(B) (emphasis added).  Courts have rejected dilution claims by considering less than all six factors.  Pan Am. World Airways, Inc. v. Flight 001, Inc., 2007 WL 2040588, at *13 (S.D.N.Y. July 13, 2007).  Given ARC's overwhelming historical commercial use of the Emblem,  J&J's rights in the Emblem, if any, have already been diluted by ARC's historical activities which J&J admits are permissible and lawful.  Thus, J&J cannot show substantially exclusive use, and that should be the end of J&J's claim.

       **2.**      **There Is No Evidence of Tarnishment.**  J&J offers virtually no foundation for its claim that ARC's goods have been so bad as to tarnish J&J's grandfathered mark.  Based on a

minor printing error, it concludes that a first aid guide contained "flawed instructions."  J&J Opp.

31.  J&J, however, fails to establish how the misprint would result in the guide being of inferior

quality, even referring to an online consumer review that calls the kit "a good kit," gives it a

rating of 3 1/2 out of 5 stars, and notes no "flawed instructions."  This is hardly evidence of

shoddy goods.[17]  Further, an email which J&J cites as evidence of the inferior quality describes

the kit as " a regular first aid kit."  Finally, and most importantly, the evidence cited by J&J fails

to demonstrate that J&J has or will suffer from any negative association.  See, e.g., Paco Sport,

Ltd. v Paco Rabanne Perfumes, 2000 WL 1721126, at *7 (2d Cir. Nov. 16, 2000).

**POINT IV.    SUMMARY JUDGMENT FOR ARC IS WARRANTED ON THE
                REMAINING TORT CLAIMS.**

      **A.    Tortious Interference with Business Relations (Count One)**

      1.    J&J's tortious interference claim depends on its showing that a crime has been

committed here.  Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1103-04 (N.Y. 2004) (franchisor's

conduct in distributing its products in supermarkets did not constitute crime or independent tort

and was not aimed solely at harming franchisees).  J&J has shown no such thing.

      2.    Nor does J&J provide any evidence detailing any specific injury to its business

relation with Target, CVS, Wal-mart, or Walgreens.  As the defendants' opening brief stated, a

plaintiff only avoids summary judgment if it can demonstrate the loss of an existing or

prospective business relationship.  Losing sales to a competitor is an everyday possibility in the

marketplace; it does not create tort liability.  But J&J does not even have evidence of actual lost

sales, nor do the cases it cites forestall summary judgment.

      J&J accuses us of "ignor[ing] the evidence that J&J has lost sales" (J&J Opp. 25), but

J&J points to only two items of "evidence," neither of which show a single lost sale.  J&J first

---

[17]    This random online review claiming that the guide does not instruct users to call 911 in
certain situations is also wrong.  See J&J Ex. 36 at ARC 0086744 (instructing users to call 911).

notes a vague statement that if ARC first aid kits are on the shelf at a retailer and garner sales,

some of those sales might be lost sales to J&J. J&J Opp. 25 (citing J&J Ex. 113 at 79-80). Of

course, for any particular sale to amount to a lost J&J sale, J&J would need evidence that an

individual who purchased an ARC first aid kit would have purchased a J&J first aid kit—and not

some other brand and not left the first aid kit for purchase another day—had there been no ARC

kit on the shelf. J&J has no such evidence. J&J also invokes the report of its economic expert,

who offers only the non-earthshattering economic principle that if competition increases, sales

for any particular competitor may decrease. Id. (citing J&J Ex. 118 at 17, 20). Neither of these

pieces of so-called "evidence of lost sales" demonstrates even a single lost business relationship.

And J&J's two summary judgment cases show just the kind of evidence J&J lacks here.[18]

In Calvin Klein Trademark Trust v. Wachner, 129 F. Supp. 2d 248, 254 (S.D.N.Y. 2001), a

plaintiff survived summary judgment by presenting evidence that a specific customer cancelled a

$400,000 order and another customer reduced an order by over $1 million because of comments

the defendant made on the Larry King Show. In Sutton Import-Export Corp. v. Starcrest of

California, 762 F. Supp. 68, 69 n.2 (S.D.N.Y. 1991), the plaintiff presented letters from sixteen

of the defendant's actual customers explaining that the customer bought the defendant's product

by mistake while intending to purchase the plaintiff's product. J&J has no such evidence.

### B.    Tortious Interference With Contractual Relations (Count Two)

J&J seeks to avoid summary judgment by incanting the word "intent" and appealing to

false inferences. But even J&J's own case emphasizes that "plaintiffs may not avoid summary

judgment by simply declaring that state of mind is at issue." Distasio v. Perkin-Elmer Corp, 157

---

[18]    J&J cites two additional cases on whether alleging lost sales is sufficient to withstand a
motion to dismiss. See J&J Opp. 27, citing Grupke v. Linda Lori Sportswear, 921 F. Supp. 987,
992-993 (E.D.N.Y. 1996); Unique Sports Generation, Inc. v. LGH-III, LLC, 2005 WL 2414452,
at *5 (S.D.N.Y. Sept. 30, 2005). At summary judgment mere allegations do not suffice.

F.3d 55, 61 (2d. Cir. 1998); accord Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).  There is no dispute that a "plaintiff [can]not defeat the properly supported summary judgment motion of a defendant . . . without offering 'any significant probative evidence tending to support the complaint.' " Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citation omitted).

Here, J&J's tortious interference claim hinges not only on its improbable interpretation of the agreements, but also on whether it can show that ARC knew about the FAO and Water-Jel contracts with J&J before entering its own contract with those defendants.  J&J has no evidence that ARC knew of these contracts—because no such evidence exists.  Defs' SOF ¶¶ 142-143 and 149-150. What J&J offers instead is sheer speculation.  It claims that the ARC must have known because the "settlement discussions were a matter of public record." J&J Opp. 36.  But J&J's settlement agreements with First Aid Only and Water-Jel were not referenced nor made part of the public record of the proceedings before the USPTO.  Thus, even if J&J could establish that ARC scrutinized the USPTO proceedings, no amount of monitoring would have alerted ARC to the terms of the agreements.

J&J next looks for an "inference" of ARC knowledge in an email exchange in which an ARC employee advised First Aid Only that the company could not use its logo in the color red, and the company confirmed that it was phasing out its use of red.  J&J Resp. SOF ¶ 150.  That is what ARC tells innumerable firms every year in its effort to prevent unauthorized use of the red cross, Defs' SOF ¶ 181; there is no basis for J&J's speculation that surely ARC must have been referring to J&J's settlement agreements.  Nor can J&J rely on the deposition testimony of First Aid Only, because its designee testified that ARC was not aware of the FAO-J&J Agreement. See Defs' Ex. 173 at 251-252.  This count is ripe for summary judgment.

### C.    Unfair Competition (Count Three)

There is nothing "unfair" about ARC's sales of first aid or other products or licensing

manufacturing partners in that effort.  This type of licensing is in keeping with how ARC has

conducted its business for the last century, since it owns no manufacturing or publishing

facilities of its own.  Bad faith involves "actual or constructive fraud" or "a design to mislead or

deceive another" prompted by "sinister motive."  Black's Law Dictionary 138 (6th ed. 1990)

(definition of "bad faith").  Nothing on J&J's list comes even close.

### POINT V.    J&J HAS EXCEEDED ITS GRANDFATHERED RIGHTS UNDER § 706.

J&J's Opposition offers nothing new.  It is not limiting its use of the Emblem to "the

same purpose and the same class of goods" as in 1905, given its expansion into emergency

preparedness kits,[19] its "Hospital Products for Home Care" line of products, and its products sold

under the '913 Registration.  36 Stat. 604.  <u>See</u> Defs' Mem. 38-40; Defs' Opp. 34-40.

### CONCLUSION

For the reasons given here and in our opening brief, the defendants' motion for summary

judgment should be granted.

Dated:  December 12, 2007                    Respectfully submitted,

                                             HOGAN & HARTSON, L.L.P.

                                             By:        s/Jonathan L. Abram
                                             Jonathan L. Abram (admitted <u>pro</u> <u>hac</u> <u>vice</u>)
                                             Raymond A. Kurz (admitted <u>pro</u> <u>hac</u> <u>vice</u>)
                                             555 Thirteenth Street, N.W.
                                             Washington, D.C. 20004
                                             Tel:  (202) 637-5681
                                             Fax:  (202) 637-5910

                                             Attorneys for Defendants

---

[19]    Emergency preparedness goods are classified in International Class 9 ("IC 009), <u>see</u> ARC
Ex. 174, while J&J's trademark registrations are for International Class 3 and 5, <u>see</u> J&J Ex. 2-5.

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that on the 12th day of

December, 2007, I caused a true and correct copy of the foregoing to be served upon the

following via the Court's ECF Notification System:

> Gregory L. Diskant
> Sarah Elizabeth Zgliniec
> Patterson, Belknap, Webb & Tyler LLP
> 1133 Avenue of the Americas
> New York, NY 10036
> Tel:  (212) 336-2710
> Fax:  (212) 336-2222
> E-mail:  gldiskant@pbwt.com
> E-mail:  sezgliniec@pbwt.com
>
> Richard Zachary Lehv
> Roger L. Zissu
> Fross Zelnick Lehrman & Zissu, P.C.
> 866 United Nations Plaza
> New York, NY 10004
> Tel:  (212) 813-5900
> Fax:  (212)-813-5901
> E-mail:  rlehv@frosszelnick.com
> E-mail:  rzissu@frosszelnick.com


                                        s/ Jonathan L. Abram
                                        Jonathan L. Abram