Gregory L. Diskant
Robert W. Lehrburger
Sarah Zgliniec
Ravi V. Sitwala
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel:  (212) 336-2000
Fax:  (212) 336-2222

Roger L. Zissu
Richard Z. Lehv
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017
Tel:  (212) 813-5900

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER COMPANIES, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 07-CV-07061 (JSR) |
| v. | ) ) ) | |
| THE AMERICAN NATIONAL RED CROSS, LEARNING CURVE INTERNATIONAL, INC., MAGLA PRODUCTS, LLC, WATER-JEL TECHNOLOGIES, INC., and FIRST AID ONLY, INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

---

**PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF J&J's MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................iii

ARGUMENT .......................................................................................................1

I.   J&J May Sue to Protect Itself from Injury Caused by ARC's Unlawful Acts ..........................1

II.  Commercial Use of the Red Cross Emblem Is Illegal,
     Except for Grandfathered Users ......................................................................3

     A.   ARC's Charter Does Not Permit ARC to Engage in Commercial Activity......................3

     B.   Congress Banned All Commercial Use of the Red Cross Emblem,
          Except for Grandfathered Users ..............................................................4

III. ARC Has Illegally Authorized Use of the Red Cross Emblem ...............................................6

     A.   "Agent" Has Its Ordinary Meaning – Requiring Authority and Control...........................6

     B.   "Agents" Do Not Include Trademark Licensees..........................................................10

     C.   ARC's Codefendants Are Not Its Agents.....................................................................11

     D.   ARC's Retailers Are Not Its Agents............................................................................13

IV.  The 1949 Geneva Convention and ICRC Regulations
     Prohibit ARC's Licensing Scheme ...............................................................................14

V.   ARC Raises No Legitimate Issues Regarding Its Counterclaims............................................17

VI.  The Codefendants Have No Standing to Assert Their Counterclaims....................................19

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Botiller v. Dominguez,*
    130 U.S. 238 (1889) ...........................................................................................3

*Butler v. Mapes,*
    76 U.S. 766 (1869) ...........................................................................................12

*Carvel v. Noonan,*
    3 N.Y.3d 182 (2004) ...........................................................................................2

*Community for Creative Non-Violence v. Reid,*
    490 U.S. 730 (1989) ...........................................................................................10

*Detroit Creamery Co. v. Velvet Brand Ice Cream Co.,*
    153 N.W. 664 (Mich. 1915) ...............................................................................11

*Dickerson v. Rogers,*
    21 N.E. 992 (N.Y. 1889) ....................................................................................7

*El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,*
    525 U.S. 155 (1999) ...........................................................................................3

*FDIC v. Schaffer,*
    731 F.2d 1134 (4th Cir. 1984) ...........................................................................10

*Flintridge Station Associates v. America Fletcher Mortgage Co.,*
    761 F.2d 434 (7th Cir. 1985) .............................................................................12

*Goodrich v. Musgrave Fence & Automobile Co.,*
    135 N.W. 58 (Iowa 1912) ....................................................................................7

*Guard-Life Corp. v. Parker Hardware Manufacturing Corp.,*
    50 N.Y.2d 183 (1980) .........................................................................................2

*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995) ...........................................................................................6

*Hamdan v. Rumsfeld,*
    126 S.Ct. 2749 (2006) .......................................................................................16

*Hartzell Fan, Inc. v. Waco, Inc.,*
    505 S.E.2d 196 (Va. 1998) ................................................................................12

ii

*In re Houbigant,*
    914 F.Supp. 997 (S.D.N.Y. 1996) ............................................................................19

*K Mart Corp. v. Cartier, Inc.,*
    486 U.S. 281 (1988) ....................................................................................................11

*Lea v. New Home Sewing Machine Co.,*
    139 F. 732 (E.D.N.Y. 1905) .......................................................................................11

*Leuis v. National Cash Register Co.,*
    84 N.J.L. 598 (N.J. Sup. Ct. 1913) ............................................................................7

*MacMahan Pharmacal Co. v. Denver Chemical Manufacturing Co.,*
    113 F. 468 (8th Cir. 1901) .........................................................................................11

*O-M Bread, Inc. v. U.S. Olympic Committee,*
    65 F.3d 933 (Fed Cir. 1995) ......................................................................................18

*Palmer & Hardin v. Grand Lodge K. of P. of Kentucky,*
    121 S.W. 678 (Ky. Ct. App. 1909) ...........................................................................7

*Pan American World Airways, Inc. v. Eclipse Holdings, Inc.,*
    1998 WL 205313 (S.D.N.Y. Apr. 27, 1998) ...........................................................19

*Pickens & Plummer v. Diecker & Brothers,*
    21 Ohio St. 212 (1871) ................................................................................................7

*Public Service Commission of Utah v. Wycoff Co.,*
    344 U.S. 237 (1952) ....................................................................................................20

*Robinson v. New York Central & H.R.R. Co.,*
    66 N.Y. 11 (1876) .........................................................................................................7

*Rome Ambulatory Surgical Center., LLC v. Rome Memorial Hospital, Inc.,*
    349 F.Supp.2d 389 (N.D.N.Y. 2004) ........................................................................2

*Roy Export Co. v. Columbia Broadcasting System, Inc.,*
    672 F.2d 1095 (2d Cir. 1982) ....................................................................................3

*Shanklin v. Allis-Chalmers Manufacturing Co.,*
    254 F.Supp. 223 (S.D. W.Va. 1966) .........................................................................12

*Singer Manufacturing Co. v. Rahn,*
    132 U.S. 518 (1889) .....................................................................................................7

iii

*Sternaman v. Metropolitan Life Insurance Co.*,
    170 N.Y. 13 (1902) ..................................................................................7

*United States v. Menasche*,
    348 U.S. 528 (1955) ...............................................................................6

*United States v. Noriega*,
    808 F.Supp. 791 (S.D. Fla. 1992) .........................................................16

*United States v. Phillips*,
    219 F.3d 404 (5th Cir. 2000) ................................................................10

*United States v. Vitillo*,
    490 F.3d 314 (3d Cir. 2007) ..................................................................9

*U.S. Olympic Committee v. O-M Bread, Inc.*,
    26 U.S.P.Q.2d 1221 (T.T.A.B. 1993) ...................................................18

*Webb v. Smart Document Solutions, LLC*,
    499 F.3d 1078 (9th Cir. 2007) ................................................................3

*Wet Seal, Inc. v. FD Management, Inc*,
    82 U.S.P.Q.2d 1629 (T.T.A.B. 2007) ...................................................18

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995) .............................................................................20

## STATUTES

36 Stat. 604 (1910)..........................................................................................5

18 U.S.C. § 666...........................................................................................9, 10

18 U.S.C. § 706..........................................................................................*passim*

36 U.S.C. §§ 300101-13 ................................................................................15

36 U.S.C. § 300102.......................................................................................15

36 U.S.C. § 300105(b) ..................................................................................15

36 U.S.C. § 300106(a) ..............................................................................15, 16

Cal. Bus. & Prof. Code §§ 17200-10 ..............................................................3

iv

# LEGISLATIVE HISTORY

H.R. Rep. No. 61-1256 (1910)..................................................................................10

*American National Red Cross: Report to Accompany H.R. 27473,*
    H. Rep. No. 60-2188 (1909) .........................................................................4, 5

*American National Red Cross: Hearing on S. 6877 and H.R. 22311*
    *Before the H. Comm. on Foreign Affairs,* 61st Cong. (April 21, 1910) ....................10

*Protection of the Name and Emblem of the Red Cross: Hearings Before the H. Comm. on*
    *Foreign Affairs,* 77th Cong. (2d Sess. 1942) ..............................................4

*Red Cross: Hearings on S. 2441 and H.R. 7420 Before the S. Subcomm. on the Judiciary,*
    77th Cong. (2d Sess. 1942) .......................................................................4

*Terminating Further Commercial Use of the Red Cross: Hearings*
    *Before the H. Comm. on Foreign Affairs,* 77th Cong. (2d Sess. 1944) ...................5, 6

*To Protect the Name "Red Cross": Hearings Before the H. Comm. on Patents,*
    65th Cong. (3d Sess. 1919)...........................................................................5

# OTHER AUTHORITIES

28 Am. & Eng. Enc. of Law (2d ed. 1902) ....................................................................11

3 Thomas J. McCarthy, *McCarthy on Trademarks & Unfair Competition*
    (4th ed. 2007) ........................................................................................11, 14, 19

Sheldon Amos, *The History and Principles of the Civil Law of Rome: An Aid To*
    *the Scientific and Comparative Jurisprudence* (1883) ...............................................8

*Commentary to Art. 44, Restrictions in the Use of the Emblem of the Geneva*
    *Convention for the Amelioration of the Condition of the Wounded and Sick*
    *In Armed Forces in the Field,* Aug. 12, 1949 ..............................................16

*Geneva Convention for the Amelioration of the Condition of the Wounded of the*
    *Armies in the Field,* July 6, 1906, 35 Stat. 1885 ...........................................4

*Geneva Convention for the Amelioration of the Condition of the Wounded and*
    *Sick in Armed Forces in the Field,* Aug. 12, 1949, 6 U.S.T. 3114 .............................15

Oliver Wendell Holmes, Jr., *Agency,* 4 Harv.L.Rev. 345 (1891) ........................................7

Oliver Wendell Holmes, Jr., *Agency (II),* 5 Harv.L.Rev. 1 (1891) ......................................7

*International Committee of the Red Cross Regulations on the Uses of the Emblem of the Red Cross or the Red Crescent by National Societies* (1965, revised 1991) ................................................................................................................17

George L. Reinhard, *A Treatise on the Law of Agency* (1902) ...........................................8

*Report of the Comm. on Foreign Relations Regarding the Geneva Conventions for the Protection of War Victims,* S. Exec. Rep. No. 84-9 (1955) ...........................15

*Restatement (First) of Agency* § 1 (1933) ...........................................................9

*Restatement (Second) of Agency* § 1 (1958) ......................................................9

*Restatement (Third) of Agency* § 1.01 (2006) ...................................................9

*Restatement (Second) of Torts* § 767 cmt. c (1979) ...........................................2

Warren A. Seavey, *The Rationale of Agency*, 29 Yale L.J. 859 (1920) ...........................8, 9

1419616v.1

## ARGUMENT

**I.    J&J May Sue to Protect Itself from Injury Caused by ARC's Unlawful Acts**

ARC accuses J&J of trying to be the "Mission Police," supposedly embarking on a wide-ranging effort to enforce ARC's legal obligations.  To the contrary, J&J is content to let ARC deal on its own with the various controversies in which it finds itself enmeshed, in consultation with its board and Congress.  But when ARC takes unlawful actions that interfere with J&J's rights, the law provides redress.  Despite ARC's misleading recitation of its supposed history of commercial activity, ARC does not deny that it first began to interfere with J&J's customers – Walmart, CVS, Target, Walgreens – in 2006.  It likewise does not deny that it was not until that same period that ARC for the first time (except for apparently aberrant catalog sales in approximately 1914-15) began competing with J&J for direct sales to consumers with widespread solicitations for business on the Internet.  It is these new commercial activities that are causing J&J injury, and they are the gravamen of J&J's suit.

ARC picked this fight by entering aggressively into J&J's commercial space, a space ARC repeatedly told Congress it would and must avoid.  ARC can hardly complain when J&J observes that the emperor has no clothes – that ARC's activities violate its federal charter, the Geneva Convention and federal criminal law.  ARC argues there is no private right of action against ARC for its illegal acts.  J&J does not contend there is.  But state tort law, on which J&J relies, unequivocally permits J&J to prove ARC's illegal conduct when, as here, such illegality establishes the elements of the state tort claims.

Section 706, the federal criminal provision, is the prism for all the legal issues in this case.  Section 706 cannot be interpreted without interpreting ARC's federal charter, of which § 706 was originally a part.  Meanwhile, neither § 706 nor ARC's charter can be interpreted without analyzing the Geneva Convention, which both the charter and § 706 implement into

United States law. We ask the Court to do so on this motion because ARC's alleged violations of § 706 – if established – form a proper premise for J&J's claim for tortious interference with prospective business relations. As the New York Court of Appeals has ruled, an act amounting to "a crime" will establish the "wrongful means" necessary for this tort. *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004). Defendants' violations of § 706 satisfy this standard.

ARC's violations of its charter and the Geneva Convention's implementing legislation are illegal, but not criminal. As noted, these sources must be construed in order to interpret § 706. But their violation should also independently satisfy the "wrongful" element of J&J's tortious interference claim. The *Carvel* court left "for another day" whether wrongful acts not amounting to crimes might support the cause of action. *Id.* at 191. Acts that are illegal, but not criminal, should meet the standard. The *Carvel* court cited its decision in *Guard-Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 193 (1980), and to the provisions of the Restatement (Second) of Torts. 3 N.Y. 3d at 190. One of those cited provisions provides that "[c]onduct specifically *in violation of statutory provisions* or contrary to established public policy may for that reason make an interference improper." *See* RESTATEMENT (SECOND) OF TORTS § 767, cmt. c (emphasis added) (cited in both *Guard-Life* and *Carvel*).

Thus, consistent with *Carvel*, ARC's violation of its charter and of the Geneva Convention may independently form the basis for a state law tortious interference claim. *See, e.g.*, *Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc.*, 349 F. Supp. 2d 389, 422-24 (N.D.N.Y. 2004) (applying *Carvel* and analyzing alleged civil antitrust violation as support for plaintiff's claim). As we have noted (J&J Opp. Br. 5-6, 12-13), the cases ARC cites with respect to private enforcement of *ultra vires* claims do not preclude such allegations where the conduct involved is illegal and, in any event, those cases did not interpret New York law.

2

ARC's violations also are predicates to J&J's claim for unfair competition, a "broad and flexible doctrine" encompassing an "incalculable variety of illegal practices." *Roy Export Co. v. CBS, Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982). There is no reason why ARC's violations of federal criminal and statutory law should not fall within this standard. *See, e.g., Webb v. Smart Document Solutions, LLC*, 499 F.3d 1078, 1083 (9th Cir. 2007) (analyzing alleged violation of federal HIPAA law as support for plaintiff's unfair competition claim under Cal. Bus. & Prof. Code §§ 17200-10). And these violations are also direct evidence of ARC's bad faith, another element of J&J's unfair competition claim.

The cases ARC cites are inapposite. (ARC Opp. Br. 22-24). None of them addresses the situation here, where a party asserts a violation of federal law as an element of a state law cause of action. Rather, ARC's cases all stand for the unremarkable propositions that a private party may not (1) sue under a treaty if the treaty provides no private right of action, *e.g., El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 160 (1999), or (2) seek enforcement of a treaty in the face of conflicting federal law, *e.g., Botiller v. Dominguez*, 130 U.S. 238 (1889).

## II. Commercial Use of the Red Cross Emblem Is Illegal, Except for Grandfathered Users

ARC's brief obscures the meaning of the Geneva Convention, ARC's charter and § 706 by attempting to analyze them separately, rather than recognizing that they are joined at the hip. The charter is an implementation of the Geneva Conventions and what is now § 706 was originally a provision of the charter. Reading the three authorities together, the charter and § 706 prohibit ARC's commercial licensing of the red cross emblem.

### A. ARC's Charter Does Not Permit ARC to Engage in Commercial Activity

ARC's charter, enacted pursuant to the Geneva Convention, nowhere empowers ARC to engage in commercial activity, let alone to use the emblem in commerce. In 80 pages of

briefing, ARC has yet to provide any reasonable explanation for why the statements to Congress of ARC Chairman Norman H. Davis and Attorney General Francis Biddle were wrong. (*See* J&J Opp. Br. 12-24). The statements were based on effectively the same charter at issue here, and they summarize days of testimony and documentary submissions on this subject. As Messrs. Davis and Biddle recognized, "the provisions of [ARC's] congressional charter, by which it is bound, would not permit it to engage in commercial enterprises for profit," 1942 H. Comm. Hearings 262 (App. III, Tab 53 at 262); ARC "is not empowered to engage in business of a commercial or manufacturing character in competition with private business," 1942 S. Subcomm. Hearings 6 (App. III, Tab 54 at 6).

### B. Congress Banned All Commercial Use of the Red Cross Emblem, Except for Grandfathered Users

With ARC's charter as a backdrop, the purpose and effect of § 706 become clear – the section bans *all* commercial use of the red cross emblem other than grandfathered users who had used the emblem commercially prior to 1905. This is clear from the statute's history, its terms, and the universal pronouncements by ARC and the U.S. government.

The facts are recited in our opening brief (J&J Opening Br. 12-23), with the issue coming to rest in the 1910 amendment. Congress revised the prohibitions on use in that year in order to "conform[] with the requirements of [the 1906 Convention]." H.R. Rep. No. 60-2188 (1909) (App. III, Tab 53 at 343). The 1906 Convention provided that "[t]he emblem . . . may only be used" for the humanitarian (non-commercial) efforts of the National Societies. 1906 Convention, art. 23 (App. II, Tab 23). Other than these protected uses, the Convention called for a complete ban on any use of the emblem, "particularly for commercial purposes by means of trade-marks on commercial labels." *Id.* art. 27. To comply with the Convention, Congress extended the prohibitions on use of the emblem, first enacted in 1905, to bar all non-exempt

4

business and charitable uses, and limited grandfathered users to use of the emblem only for the same purpose and on the same class of goods as before 1905. 36 Stat. at 604 (App. I, Tab 3).

Thus, after the 1905 and 1910 legislation, no commercial use of the emblem was permitted other than grandfathered use. This of course included commercial use by ARC (and its agents, who are limited by the scope of ARC's powers), since ARC was not empowered to engage in commerce in the first place. The substance of the statute has not changed since 1910.

Until this litigation, it was perfectly clear to ARC that the 1905 and 1910 amendments to its charter banned all commercial use of the emblem:

- "[T]he fact [is] that the red cross name or emblem must in no case be used for commercial purposes with one class of exception, namely, where the use was legitimately made by concerns prior to the year 1905." (Ex. 81 at ARC155430) (1919 statement by ARC National Headquarters).

- "[T]he bill as prepared [in 1905] gave to the Red Cross the exclusive right to the use of the emblem and provided that it should be unlawful to use it for trade and commercial purpose. . . . The effect of [the grandfather clause as amended in 1910] was, of course, to say that anyone who, prior to January 5, 1905, had used for commercial purposes and as a trade-mark in their advertising matter the Red Cross emblem should not be liable to criminal punishment thereafter for using it." 1919 H. Comm. Hearings (stmt. of Col. Hartfield) (App. III, Tab 53 at 373).

- "The clear intent of the [1905] law is that no one should use [the red cross emblem] for commercial purposes." "Congress both in 1905 and 1910 provided that the [red cross] name and symbol was not a thing to used for commercial purposes . . . ." 1944 H. Comm. Hearings at 251, 256 (stmt. of Col. Hartfield) (App. III, Tab 62 at 251, 256).

This was also the understanding of the legislative and executive branches of the federal government. The House Report on the predecessor to the 1910 legislation explained that its intent was "to limit, as far as possible, the use of the emblem of the American Red Cross, or the Geneva Cross, for purposes of trade or advertisement to those who may have previously acquired rights." H.R. Rep. No. 60-2188 (1909) (App. III, Tab 53 at 343). Similarly, President Franklin D. Roosevelt explained that the 1905 and 1910 amendments "ma[de] effective

provisions of the [1906] treaty prohibiting the use of the Red Cross name or emblem for commercial purposes."  1944 H. Comm. Hearings at 227 (App. III, Tab 62 at 227).

Because ARC's charter does not permit ARC to engage in commerce and § 706 bans all ungrandfathered commercial use of the red cross emblem, the defendants' scheme to sell red cross branded goods in commerce violates both ARC's charter and § 706.

## III.    ARC Has Illegally Authorized Use of the Red Cross Emblem

Even if ARC's charter and § 706 did not ban ARC from using the emblem in commerce, § 706 restricts ARC's ability to authorize others to use the emblem "for any business or charitable purpose" to "its duly authorized employees and agents."  ARC's agreements with third party licensees to use its emblem in commerce and to sell goods to third party retailers violate the criminal law, even if ARC otherwise has some rights to engage in commerce.

### A.    "Agent" Has Its Ordinary Meaning –
### Requiring Authority and Control

ARC argues that "agents" in § 706 does not mean common law agents, but rather anyone that ARC authorizes.  It would thus, contrary to standard canons of statutory construction, eliminate the word "agents" altogether from the statute and rewrite the law to grant ARC the right to authorize use of its emblem by any "duly authorized persons."  *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) ("[T]he Court will avoid a reading which renders some words altogether redundant."); *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.").  DOJ has already expressly rejected such a reading of the statute – telling ARC that "mere authorization is not enough." (Ex. 17 at 1).  This Court should reach that result as well.

In arguing that § 706 requires nothing more than mere "authorization," ARC essentially concedes that its codefendants are not agents in any ordinary sense.  Rather, it

contends that J&J is imposing an unnecessary additional limitation on the language of § 706 by insisting that the principal must have the right to control the acts of its agent. But the requirement of control by the principal has always been central to what it means to be an agent, whether that agent is "merely authorized" or "duly authorized," and whether that agent is "general" or "special." This was true in 1910, as it is today.[1]

In the Spring of 1891, Oliver Wendell Holmes, Jr. published a seminal review of the law of agency. Oliver Wendell Holmes, Jr., *Agency*, 4 HARV. L. REV. 345 (1891); *Agency (II)*, 5 HARV. L. REV. 1 (1891). Holmes traced the idea of agency back to the Roman principle of *patria potestas* -- paternal power. 4 HARV. L. REV. at 351-52. Arguing that agency reflects a "fiction of identity," whereby acts done by an agent are considered those of the principal, Holmes noted that the authority of the *paterfamilias* under Roman law extended not only to cover his family and slaves but also "freemen filling a servile place for the time being." *Id.*

According to Holmes "the *patria potestas* is the substantive ground, that it is extended to cover free agents, who are not even domestic servants, and that finds its formal expression in the fiction of identity." *Id.* at 352. Such agents were under the complete control of

---

[1] *See, e.g.*, *Leuis v. Nat'l Cash Register Co.*, 84 N.J.L. 598, 600 (N.J. Sup. 1913) (agency where salesman's contract required him "to conform to [the Company's] rules and regulations"); *Goodrich v. Musgrave Fence & Auto Co.*, 135 N.W. 58, 58 (Iowa 1912) (prospective buyer of automobile not agent of seller because buyer "was in no manner subject to the [seller's] orders or directions as to the use of the car"); *Palmer & Hardin v. Grand Lodge K. of P. of Ky.*, 121 S.W. 678, 679 (Ky. Ct. App. 1909) (no agency where corporation "acted in its own behalf" and defendant "had no control over it"); *Sternaman v. Metro. Life Ins. Co.*, 170 N.Y. 13, 19 (1902) (applicant for insurance did not control examining doctor and parties "cannot accomplish the impossible by contract"); *Dickerson v. Rogers*, 21 N.E. 992, 993 (N.Y. 1889) (no agency absent evidence that defendant ever "attempted to interfere with or control" purported agent); *Robinson v. N.Y. Cent. & H.R.R. Co.*, 66 N.Y. 11, 12 (N.Y. 1876) (since passenger "had no right and no power to control" driver's acts, he was not her agent); *Pickens & Plummer v. Diecker & Bros.*, 21 Ohio St. 212, 215 (1871) (salesman "a mere servant or agent" because he "was at all times subject to the will of his employers"); *see also Singer Mfg. Co. v. Rahn*, 132 U.S. 518, 523 (1889) (master-servant relationship where company "reserves to itself the right of prescribing and regulating, not only what business [salesman] shall do, but the manner in which he shall do it, and might, if it saw fit, instruct him what route to take, or even at what speed to drive").

their principal. *See, e.g.*, SHELDON AMOS, THE HISTORY AND PRINCIPLES OF THE CIVIL LAW OF

ROME: AN AID TO THE STUDY OF SCIENTIFIC AND COMPARATIVE JURISPRUDENCE 258 (1883)

(describing "[*p*]*atria potestas*" as including "all the human beings – wife, children or

descendants, free labourers, and slaves, who were held to be from the earliest times under the

control of one head, the *paterfamilias*").

In the early twentieth century, as today, this idea of control was essential to a

proper understanding of agency. For instance, one standard treatise from 1902 explained why a

principal is liable for the acts of its agent as follows:

> [T]he law deems it proper and just that one who selects a substitute
> to act for him, and who is therefore presumed to know his
> qualifications and to have chosen him with reference thereto, and
> who has it in his power to remove him for his misconduct, and
> ***whose orders such substitute is bound to obey and execute***,
> should be held responsible for his acts . . . .

GEORGE L. REINHARD, A TREATISE ON THE LAW OF AGENCY IN CONTRACT AND TORT 3 (1902)

(emphasis added).

In 1920, Warren A. Seavey, who later became the ALI Reporter for the

Restatement (First) of Agency, reviewed the case law with care and argued that there was a need

to clarify the vocabulary of agency. Warren A. Seavey, *The Rationale of Agency*, 29 YALE L. J.

859 (1920). In particular, Seavey considered the word "authority," which was "combined usually

with the idea of representation and with delegation." *Id.* at 860. The term "cannot be discarded

since its long continued use has made it an essential part of our legal vocabulary. Unfortunately,

however, it is used indiscriminately in two very different senses, *e.g.*: the power held by the

agent, and the power coupled with the privilege of exercising it." *Id.* To Seavey, it had to remain

clear that "authority is limited by the expression of the principal's will in accordance with the

agreement with or direction to the agent." *Id.* at 861.

8

Seavey proposed a clarifying definition of agent by "[a]ssembling the factors which appear to be necessary in the agency relation . . . power, fiduciary, and control." *Id.* at 868. Assembling these factors, Seavey defined agency as follows: "Agency is a consensual relationship in which one (the agent) holds in trust for and subject to the control of another (the principal) a power to affect certain legal relations of that other." *Id.* Critically, Seavey emphasized that the definition was nothing new. "This definition purports to be nothing more that a rearrangement of the elements which are universally recognized as essential." *Id.*

The Restatement followed suit in due course, re-stating – but not changing – what Seavey called the "universally recognized" law of agency. *Id.* The Restatement (First) published in 1933 defines agency as "the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf ***and subject to his control***, and consent by the other so to act." RESTATEMENT (FIRST) OF AGENCY § 1 (1933) (emphasis added). *See also* RESTATEMENT (SECOND) OF AGENCY § 1 (1958); RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006). In 1910, as today, a hallmark of agency was the principal's ability to exercise control over the agent.

ARC has scoured the U.S. Code looking for the word "agent" and it points to 18 U.S.C. § 666 as a purported guide to interpreting "agents" in § 706. Unlike § 706, § 666 contains its own non-standard – and broad – definition of "agent" that does not reference the need for control. Even with the express statement by Congress, however, this broad definition has engendered a circuit split on whether control is nonetheless necessary. *Compare United States v. Vitillo*, 490 F.3d 314, 323 (3d Cir. 2007) ("We must interpret § 666(d) as written, and cannot use hornbook agency principles to restrict the broad definition of 'agent' that Congress provided"), *with United States v. Phillips*, 219 F.3d 404, 422 n.2 (5th Cir. 2000) ("A reasonable application of

9

the statute precludes the senseless conclusion that an individual can be an agent of one who exercises no control, direct or indirect, over that individual.").

The dispute over the meaning of "agent" in § 666 has no application here. Except for cases involving a special definition of agent (as in § 666, *see also FDIC v. Schaffer*, 731 F.2d 1134, 1137 & n.5 (4th Cir. 1984)), ARC does not cite a single case stating that control of an agent by its principal is not an element of agency. Absent a special definition, Congress' use of the term "agents" should be given its common law meaning. *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 741 (1989) (where the term "employee" was undefined in a statute, it should be interpreted "in light of the general common law of agency").

As it happens, there can be no doubt that Congress intended "agents" in § 706 to mean persons under the control of ARC. (*See* J&J Opening Br. 16-19). ARC specifically asked Congress to limit use of the emblem to ARC's personnel over whom it had control – its employees and agents. As ARC's Mabel Boardman explained, "the main part [of the bill] is to get *that control*." 1910 H. Comm. Hearings (stmt. of Mabel Boardman) (emphasis added) (App. III, Tab 53 at 360). Congress agreed, approving language that would "prohibit the use of the sign of the red cross by irresponsible persons *over whom [ARC] had no control*." H.R. Rep. No. 61-1256 (1910) (App. Ill., Tab 53 at 347) (emphasis added).

**B.    "Agents" Do Not Include Trademark Licensees**

Focus on the law of 1910 reveals not only that Congress intended "agents" to have its ordinary, common law meaning, but also that Congress could not have intended the phrase "duly authorized employees and agents" to have permitted ARC to license the emblem for commercial use by third parties.

At the time of the 1910 amendment, it was widely understood that the licensing of trademarks – which were considered source identifiers, *see* 3 J. Thomas McCarthy, MᴄCᴀʀᴛʜʏ

ON TRADEMARKS & UNFAIR COMPETITION ("McCarthy") § 18:39 (4th ed. 2007) -- was fraudulent, illegal, and "philosophically impossible." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 313 (1988) (Brennan, J., concurring in part and dissenting in part); *see also MacMahan Pharmacal Co. v. Denver Chemical Mfg. Co.*, 113 F. 468, 474-75 (8th Cir. 1901) ("A trade-mark cannot be assigned, or its use licensed, except as incidental to a transfer of the business or property in connection with which it has been used."); *Lea v. New Home Sewing Mach. Co.*, 139 F. 732 (E.D.N.Y. 1905) (same); *Detroit Creamery Co. v. Velvet Brand Ice Cream Co.*, 153 N.W. 664, 665 (Mich. 1915) ("As a general rule, a valid license cannot be granted for the use of a trade-mark.") (quoting 28 AM. & ENG. ENC. OF LAW 405 (2d ed.)).

"Not until the 1930's did a trend develop approving of trademark licensing . . . [a]nd not until the passage of the Lanham Trade-Mark Act in 1946 did that trend become the rule." *K Mart*, 486 U.S. at 313 (citations omitted). By allowing use of the red cross emblem by ARC's "agents," Congress could not have authorized *sub silentio* trademark-type licensing. For ARC to obtain the power to license, it would have needed Congress' specific authorization. That is exactly what ARC attempted to obtain in 1894, when it sought (unsuccessfully) the right to grant "special permission" to others to use the emblem in trade – and when it agreed that, if it obtained that right, J&J would retain exclusive use of the red cross in its categories of goods. (*See* J&J Opp. Br. 9). Congress's failure to provide such an explicit grant of licensing power to ARC – and its grant of such explicit rights to other federally chartered entities – only underscores the fact that ARC has no such power. (*See* J&J Opp. Br. 11-12).

## C.    ARC's Codefendants Are Not Its Agents

ARC entered into classic trademark licenses with the codefendants, not agency relationships. (J&J Opening Br. 31-35). ARC has all but conceded that its licensees are not its agents under hornbook agency law, but it suggests that they are special agents for the purpose of

using the emblem (ARC Opp. Br. 15-17, 33-34), a relationship supposedly confirmed by retroactive license amendments that ARC now agrees are "silly," (*id.* at 32 n.14).

J&J agrees that "th[e] notion of limited agency is well recognized." (ARC Opp. Br. 15). But agency, whether general or limited, is still defined by the rules of agency – as the cases cited by ARC cites bear out.[2] A limited or special agency still must have, within its limited scope, all the characteristics of agency – including the ability of the principal to control its agent. In its irrelevant focus on establishing the limited nature of the licensees' purported agency, ARC obscures the real question: whether the licensees are agents.

ARC's description of the purported limited agency identifies the card trick it is attempting to play: "ARC designated each firm as its authorized agent *for the purpose of placing the Emblem on approved products*." (ARC Opp. Br. 16) (emphasis added). This is a disingenuous – indeed false – description of the licenses ARC granted. As ARC would have it, its licensees are authorized only to "plac[e] the emblem on approved products," just as a sign painter might be authorized to paint the red cross on ARC's office door. But that is not the commercial relationship ARC authorized. The licensees have been permitted not only to place the mark on packaging, but also then to promote red cross branded goods in commerce and to sell them to retailers for resale to the public. ARC essentially concedes that its limited rights of control are only those of a trademark licensor and do not reach the full use of the emblem that it

---

[2] *See Butler v. Mapes*, 76 U.S. 766, 772-73 (1869) ("incumbent on the plaintiff to prove … that [purported agent] . . . had authority to act for and bind the defendants"); *Flintridge Station Assocs. v. Am. Fletcher Mortgage Co.*, 761 F.2d 434, 439 (7th Cir. 1985) ("[a]n agency relationship can exist only if the agent is subject to the principal's control with respect to work details"); *Shanklin v. Allis-Chalmers Mfg. Co.*, 254 F. Supp. 223, 226 (S.D. W.Va. 1966) (contract with agent of manufacturer indicates "the control defendant [manufacturer] had over the demonstration of their equipment"); *Hartzell Fan, Inc. v. Waco, Inc.*, 505 S.E.2d 196, 200 (Va. 1998) ("[a]gency is defined as a fiduciary relationship arising from the 'manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the agreement by the other so to act'").

has (illegally) authorized. ARC and its codefendants got it right in their original agreements – their relationship is one of licensor and licensee, not agency. (*See* Exs. 26-29 at ¶ 13.4).

### D.    ARC's Retailers Are Not Its Agents

ARC has no reasoned response to the fact that the retailers who sell its red cross branded wares are also not its agents and thus are not permitted to engage in the business of selling red cross goods under § 706. Except for exempted uses, the 1910 legislation forbade the use of the emblem "for any business or charitable purpose." The 1948 revision eliminated both this phrase and one requiring grandfathered users to use the emblem "for the same purpose and for the same class of goods." With respect to these deletions, the revisers noted they made no substantive revisions; "changes were made in phraseology." 18 U.S.C. § 706 (Supp. II 1949) (App. I, Tab 14, Supp. II). (ARC misreads the legislative history on this point; this comment applies specifically to § 706.) ARC agrees that "the limitation of the 1910 charter remains effective today" (ARC Counterclaim ¶ 8) with respect to the omitted phrase limiting the rights of grandfathered users. But the nonsubstantive changes in phraseology in 1948 were made to both limitations on "use," and they thus preserve the 1910 prohibition on use "for any business or charitable purpose." (Any other reading would senselessly criminalize any third party who received and used an item bearing the red cross.)

Because the retailers who sell ARC's branded products are using the emblem for a "business" purpose and are not ARC's agents, ARC violates the law by licensing its codefendants to sell through retail channels of trade. ARC argues that the statute must allow this nonetheless because (1) any other result would cripple ARC's programs, and (2) J&J's retailers can lawfully make sales of J&J's red cross branded goods. (ARC Opp. Br. 19 n. 7).

ARC's concern is misplaced. Nothing in J&J's claim precludes ARC, which is exempted from § 706, from distributing red cross goods to the victims it serves or to those who

provide financial support. (J&J Opp. Br. 4). ARC expresses particular concern about use of the

emblem by its cause-marketing and training partners. But ARC can allow appropriate third-party

use by establishing a proper agency relationship, as DOJ has advised. (Ex. 17 at 2). These

issues have no bearing, however, on retailers selling red cross branded goods who have no direct

relationship whatsoever with ARC, let alone an agency relationship.

ARC's argument that J&J's reading of the statute would similarly bar J&J from

selling to retailers is also incorrect. The grandfather provision exempted preexisting commercial

uses. Before 1905, J&J sold trademarked goods to retailers, providing the retailers an implied

license to use the trademark. *See* 3 McCarthy § 18:41 ("When a trademark performs a source-

identifying function, the general rule is that a merchant or dealer who merely resells the branded

goods without change is not infringing and needs no license."). That same use continued after

1905. In contrast, ARC's rights do not entail grandfathered trademark uses, but rather are limited

to authorizing third-party use only by its employees and agents.

## IV.    The 1949 Geneva Convention and ICRC Regulations Prohibit ARC's Licensing Scheme

ARC spends several pages arguing that the 1949 Geneva Convention is not self-

executing. (*See* ARC Opp. Br. 20-23). This argument is besides the point. The United States

***has*** enacted the relevant portions of the 1949 Geneva Convention bearing on ARC, making them

part of American law.

ARC's charter – in all of its enactments over the years – is an implementation of

the Geneva Convention. The current charter explains that ARC's purposes include providing aid

"in accordance with the spirit and conditions of" the Geneva Conference of 1863 and the Geneva

Conventions of 1864, 1929, and 1949, "to which the United States of America has given its

adhesion." 36 U.S.C. § 300102 (App. I, Tab 13). The charter goes on to "designate[] [ARC] as

14

the organization authorized to act in matters of relief under the treaties of Geneva, August 22, 1864, July 27, 1929, and August 12, 1949." *Id.* § 300105(b).

With regard to ARC's use of the red cross emblem, ARC's charter specifically incorporates by reference the provisions of the Geneva Convention. It states that "[i]n carrying out its purposes under this chapter, the corporation may have and use, as an emblem and badge, a Greek red cross on a white ground, as described in the treaties of Geneva, August 22, 1864, July 27, 1929, and August 12, 1949." 36 U.S.C. § 300106(a) (App. I, Tab 13). In particular, U.S. law implements the terms of the 1949 Geneva Convention governing use of the emblem, subject to a specific reservation protecting grandfathered use of the emblem. *See* 1949 Convention, 6 U.S.T. at 3214-16 (App. II, Tab 26 at 3214-16); Ex. Rep No. 9, 84th Cong. 10 (1st Sess. 1955) (App. III, Tab 65 at 30) (explaining that "very little in the way of new legislative enactments" is necessary to give effect to 1949 Convention; relevant emblem provisions already enacted with the exception of the reserved grandfathered rights).

The 1949 Convention – as implemented through ARC's charter – limits ARC's peacetime use of the red cross emblem to that which is in accord with national legislation and "in conformity with the principles laid down by the International Red Cross Conferences." *Id.* art. 44. The Commentary to the 1949 Convention elaborates on the scope of these authorized uses of the emblem. "Though not binding law, the commentary is, as the parties recognize, relevant in interpreting the Conventions' provisions." *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2790 n.48 (2006); *see also United States v. Noriega*, 808 F. Supp. 791, 795 n.6 (S.D. Fla. 1992) (Commentary "widely recognized as a respected authority on interpretation of the Geneva Conventions"). The Commentary makes clear that commercial sales of red cross branded goods are illegal.

15

First, the Commentary disapproves – but does not call illegal – occasional sales by Red Cross National Societies of objects bearing the emblem in the course of fundraising:

> The emblem must retain its high significance and prestige in all circumstances, and any practice likely to lower it in the eyes of the public must be scrupulously avoided. To take only one example, Red Cross organizations, to raise funds, have sometimes sold objects bearing the red cross. Such practices are likely to lessen, in varying degrees, the standing of the emblem, and are therefore prejudicial to the good name of the Red Cross as a whole.

1949 Geneva Convention Commentary to Art. 44, nn. re ¶ 2 § 4 (App. II, Tab 33 at 5).

The Commentary goes on, however, to note that the commercial sale of goods bearing the red cross emblem, particularly first-aid kits, "exceed[s] the limits set by the Conventions." "[T]he absence of control" is the "greatest objection" to such sales:

> The question has also been raised in certain countries, of whether the red cross sign can appear on first-aid boxes and kits sold commercially for private use – especially by motorists. Although it might, perhaps, be useful to be able to identify such boxes or kits quickly in cases of accident or sudden illness, we feel that the practice should be discouraged.
>
> ***Such a practice would exceed the limits set by the Convention.*** The use of the emblem would increase and its value diminish; and commercial advertising would enter in. ***But the greatest objection of all, in our opinion, would be the absence of any form of control.***

*Id.* at 7 (emphases added).

By authorizing commercial sales in violation of the Geneva Convention, ARC is unfairly competing with J&J and tortiously interfering with its business relations by "wrongful means." The result is the same whether the Geneva Convention's provisions on use of the emblem are considered to have been enacted into federal law or whether they are used simply as a guide to construing the meaning of the implementing statutes – ARC's charter and § 706.

ARC has raised a factual issue about whether the ICRC Regulations last revised in 1991 are binding on ARC, and so the Court should not rely on them now. But we note that they are consistent with the Commentary, that ARC has recognized its duty to abide by them and that ARC is in violation of them, as one of its employees has recognized. (Ex. 14 at 1-2; Ex. 52 at ARC20383). The second paragraph of Article 23 permits use of the emblem on promotional items that are either "of reduced dimensions" or "made of rapidly perishable material." ICRC Regulations, art. 23 (App. II, Tab 38 at 10-12). The next paragraph permits National Societies to sell such tokens as part of their fundraising efforts. *Id.* (This is also permitted by U.S. law, so long as ARC does not do so on an ongoing commercial basis.) The final paragraph covers use by third parties of the emblem – the issue here. Commercial companies may use the emblem in advertisements, not on commercial products: "[A National Society] shall not authorize the display of its emblem on items for sale . . . ." *Id.*

## V.    ARC Raises No Legitimate Issues Regarding Its Counterclaims

ARC's analysis of J&J's alleged "expansion" beyond its grandfathered rights does not survive scrutiny. ARC turns a blind eye to J&J's many varied uses of the mark in the years before 1905. As J&J has demonstrated (J&J Opening Br. 35-39; J&J Opp. Br. 38-40), J&J's pre-1905 uses of the red cross emblem (1) typically included the words "Johnson & Johnson" or "J&J," (2) sometimes showed "Johnson & Johnson" or "J&J" appearing within the red cross, and (3) appeared in conjunction with other words, such as "First Aid" and "Emergency." The uses about which ARC now complains – the '913 registration, J&J's current use of the emblem with the words "Johnson & Johnson" appearing inside, and the use of the word "Emergency" on emergency first-aid kits – are all within this grandfathered scope.

Moreover, J&J's pre-1905 use of the emblem includes use on hospital products for home use (*e.g.*, Ex. 11 at JJARC427) and general use first-aid kits (*e.g.*, *id.* at JJARC427-28).

J&J's use of words to describe those products – that already were in use – as "Hospital Products for Home Use" or "All-Purpose" cannot create a different commercial impression.  Such uses are fundamentally distinct from *O-M Bread,* where the grandfathered user of "OLYMPIC" on bakery products sought to create and register a new trademark "OLYMPIC KIDS" for a children's extension of its bakery products.  *See O-M Bread, Inc. v. U.S. Olympic Comm.*, 65 F.3d 933 (Fed Cir. 1995).  The uses challenged by ARC are on pre-existing products, not line extensions.

ARC splits hairs too finely when it argues that the differences in graphical presentation and size of the emblem create a different commercial impression outside J&J's grandfathered scope.  "Inconsequential modification or modernization" of the mark does not create a different commercial impression.  *Wet Seal, Inc. v. FD Mgmt., Inc.*, 82 U.S.P.Q.2d 1629, 1635 (T.T.A.B. 2007); *see also U.S. Olympic Comm. v. O-M Bread*, 26 U.S.P.Q.2d 1221, 1226 (T.T.A.B. 1993) (OLYMPIC KIDS "not a mere design or stylization change").  ARC relies on the concept of trademark "tacking" (ARC Opp. Br. 36), but only selectively.  Citing McCarthy, ARC omits his observation that cases have permitted tacking in a wide variety of circumstances, including:  "rearrangement of words; the combination of a mark with another word; . . . the embellishment of a word or letter with a design; . . . a change in lettering style; and a modernization of a picture mark."  3 McCarthy § 17:27 (citations omitted).

ARC's hair-splitting is even more labored when it comes to the contents of J&J's first-aid kits, which include, among many other items, updated technologies such as light sticks and survival wrap.  J&J has not expanded beyond its grandfathered scope to enter the light stick or survival wrap business.  Rather, the product J&J is selling is a *first-aid kit* – the same product it was selling when Congress enacted the grandfather provision.  ARC's argument would turn the grandfather clause – a *permissive* exception allowing J&J to continue to exercise its rights in the

18

mark – into a nullity.  Were ARC's interpretation correct, J&J would be constrained to continue forever selling kits that contain such antiquated products as cat gut ligatures and kidney plasters.

## VI.    The Codefendants Have No Standing to Assert Their Counterclaims

ARC's codefendants allege that they have standing to bring counterclaims for cancellation of J&J's red cross marks and a declaration of their invalidity because the codefendants are using the red cross emblem themselves.  (*See, e.g.,* Water-Jel Ans. and Counterclaim ¶¶ 11, 18, 26, and corresponding paragraphs of other co-defendants' counterclaims).  But if this Court rules that the codefendants' use of the emblem is illegal, then their interest evaporates – and with it, their standing to sue J&J.  *In re Houbigant, Inc.*, 914 F. Supp. 997, 1002 (S.D.N.Y. 1996); *see also Pan Am. World Airways, Inc. v. Eclipse Holdings, Inc.*, No. 95 Civ. 2763, 1998 WL 205313, at *4 (S.D.N.Y. Apr. 27, 1998) (because defendant lacked legal right to use its mark, defendant had no standing to seek cancellation of plaintiff's mark).  None of the cases cited by the codefendants is to the contrary.

This stands to reason.  No legitimate purpose would be served by allowing a party who has been adjudicated to be an illegal user of a mark to bring affirmative claims to challenge the validity of J&J's presumptively valid trademarks.  The codefendants' cancellation counterclaim should be dismissed, and the Court should decline to exercise jurisdiction over the codefendants' redundant declaratory judgment counterclaim.  *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) ("We have repeatedly characterized the Declaratory Judgment Act as 'an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'") (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952)).

19

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary

judgment.

Dated:  New York, New York
       December 12, 2007

                    Gregory L. Diskant
                    Robert W. Lehrburger
                    Sarah Zgliniec
                    Ravi V. Sitwala
                    PATTERSON BELKNAP WEBB & TYLER LLP
                    1133 Avenue of the Americas
                    New York, New York 10036
                    gldiskant@pbwt.com
                    Tel:  (212) 336-2000
                    Fax:  (212) 336-2222

                         and

                    Roger L. Zissu
                    Richard Z. Lehv
                    FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                    866 United Nations Plaza
                    New York, New York 10017
                    rlehv@frosszelnick.com
                    Tel:  (212) 813-5900

                    *Attorneys for Plaintiffs*

1419616v.1