UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
JOHNSON & JOHNSON and JOHNSON &      :
JOHNSON CONSUMER COMPANIES, INC.,    :
                                     :          07 Civ. 7061 (JSR)
             Plaintiffs,             :
                                     :          OPINION AND ORDER
             -v-                     :
                                     :
THE AMERICAN NATIONAL RED CROSS, et  :
al.,                                 :
                                     :
             Defendants.             :
------------------------------------- x

JED S. RAKOFF, U.S.D.J.

        Section 706 of the federal criminal code, 18 U.S.C. § 706,

provides:

        Whoever wears or displays the sign of the Red Cross or any
        insignia colored in imitation thereof for the fraudulent purpose
        of inducing the belief that he is a member of or an agent for
        the American National Red Cross; or
        Whoever, whether a corporation, association or person,
        other than the American National Red Cross and its duly
        authorized employees and agents and the sanitary and hospital
        authorities of the armed forces of the United States, uses the
        emblem of the Greek red cross on a white ground, or any sign or
        insignia made or colored in imitation thereof or the words 'Red
        Cross' or 'Geneva Cross' or any combination of these words --
        Shall be fined under this title or imprisoned not more than
        six months, or both.
        This section shall not make unlawful the use of any such
        emblem, sign, insignia or words which was lawful on the date of
        enactment of this title.

18 U.S.C. § 706.  The instant case presents the question of whether

the American National Red Cross itself violated this provision when,

beginning in 2005, it licensed four companies to manufacture and sell

products displaying the Red Cross name and emblem.  The answer is,

No.

        By way of background, on September 5, 2007 plaintiffs Johnson &

Johnson and Johnson & Johnson Consumer Companies, Inc. (collectively,

"J&J") filed an Amended Complaint against the American National Red
Cross (more commonly called the American Red Cross, here abbreviated
as "ARC") and against ARC's four licensees, Learning Curve
International, Inc. ("Learning Curve"), Magla Products, LLC
("Magla"), Water-Jel Technologies, Inc. ("Water-Jel") and First Aid
Only, Inc. ("FAO").  The Amended Complaint alleged eight causes of
action (or "Counts"): (1) tortious interference by all defendants
with plaintiffs' prospective economic advantage; (2) tortious
interference by ARC with plaintiffs' existing contractual relations;
(3) unfair competition by all defendants; (4) promissory estoppel
against ARC; (5) unlawful dilution by all defendants of plaintiffs'
federally protected trademark rights; (6) unlawful dilution by all
defendants of plaintiffs' trademark rights under New York law; (7)
breach of contract by FAO; and (8) breach of contract by Water-Jel.
On September 20, 2007, defendant ARC filed three counterclaims
against J&J alleging: (1) violation by J&J of 18 U.S.C. § 706; (2)
cancellation of J&J's trademark; and (3) unfair competition by J&J.
Codefendants Water-Jel, Magla, Learning Curve and FAO filed
counterclaims against J&J alleging: (1) invalidity of J&J's trademark
and (2) cancellation of J&J's trademark.

    By Order dated November 5, 2007 and Memorandum Order dated
January 2, 2008, the Court dismissed Count 4 (promissory estoppel)
and limited Count 1 (tortious interference with prospective economic
advantage) to interference with J&J's business relationships with
four retailers: Target, Wal-Mart, Walgreens, and CVS.  The parties

then filed the summary judgment motions that are the subject of this
Opinion and Order.  Specifically, J&J moved for partial summary
judgment in its favor on aspects of Counts 1, 2, 3, 5 and 6 and for
summary judgment dismissing all of defendants' counterclaims in their
entirety.  All defendants moved for summary judgment dismissing
Counts 1, 2, 3, 5 and 6 of the Amended Complaint, and ARC also moved
for summary judgment in its favor on its first and second
counterclaims.[1]  For the reasons stated below, all of the motions are
denied except for the portion of J&J's motion seeking dismissal of
ARC's three counterclaims and the portion of defendants' motion
seeking dismissal of Counts 1, 3, 5 and 6 of the Amended Complaint.

The Court turns first to J&J's motion for partial summary
judgment on counts 1, 2, 3, 5, and 6.  Specifically, J&J "moves for
summary judgment that ARC has acted illegally in authorizing third
parties to sell branded red cross products through commercial
channels of trade, and that ARC's codefendants are acting illegally
in doing so."  See Plaintiff's Memorandum of Law in Support of Motion
for Summary Judgment ("Pl. Mem.") at 3.[2]  The illegality, J&J argues,
consists of violations of (a) Section 706 (supra), (b) ARC's federal
charter, and © the international agreement known as the Geneva

---

[1] The defendants also moved to strike the expert report of
Kenneth B. Germain submitted by plaintiffs.  For the reasons
stated hereafter, this motion is denied as moot.

[2] Plaintiff has failed to explain, and it is unclear to the
Court, how the alleged illegality impacts Count 2.

Convention.[3]  The relevant provisions of these various laws are best
considered chronologically.

As is well known, the Geneva Convention first came into
existence as the result of the efforts of Henry Dunant, a Swiss
businessman, to foster international humanitarian treaties designed
to protect those engaged in assisting the wounded on battlefields.
To this end, the first Geneva Convention, promulgated in 1864 (and
ratified by the United States in 1882), provided that "[a]
distinctive and uniform flag shall be adopted for hospitals,
ambulances and evacuations . . . The flag . . . shall bear a red
cross on a white ground."  See Convention for the Amelioration of the
Wounded in Armies in the Field, Aug. 22, 1864, art. 7, 22 Stat. 940,
944; Appendix II In Support of J&J's Motion for Summary Judgment
("App. II"), Tab 22.

The first Geneva Convention also contemplated that rescue groups
utilizing the red cross symbol would be established in every country
ratifying the Convention.  In the case of the United States, Clara
Barton, in 1881, incorporated the predecessor of the ARC.
Defendants' Statement of Material Undisputed Facts Pursuant to Local
Civil Rule 56.1 ("Def. 56.1") ¶ 4; Plaintiffs' Response to

---

[3] J&J's now concedes that genuine disputes of fact preclude
J&J's obtaining partial summary judgment on its further claim
that ARC's conduct also violated the regulations of the
International Committee of the Red Cross ("ICRC").  See
Plaintiff's Reply Memorandum of Law in Support of J&J's Motion
for Summary Judgment ("Pl. Rep.") at 17 ("ARC has raised a
factual issue about whether the ICRC Regulations last revised in
1991 are binding on ARC, and so the Court should not rely on them
now").

Defendants' Statement of Undisputed Facts ("Pl. 56.1 Response") ¶ 4. Then, in 1900, Congress federally chartered the American National Red Cross (ARC). <u>See</u> An Act to Incorporate the American National Red Cross, and for Other Purposes, 31 Stat. 277, 279 (1900) (the "Charter Act"); Appendix I in Support of J&J's Motion for Summary Judgment ("App. I"), Tab 1.

The Charter Act provided that ARC would have the right "to have and to use, in carrying out its purposes hereinafter designated . . . a Greek red cross on a white ground," <u>i.e.,</u> the emblem described in the first Geneva Convention. The designated purposes of the organization were, <u>inter alia</u>, to furnish volunteer aid to the sick and wounded in times of war in accordance with the Geneva Convention, to continue and carry on a system of national and international relief in times of peace so as to mitigate suffering caused by famine, fire, flood, etc., and "generally to promote measures of humanity and the welfare of mankind." <u>Id.</u> ARC was also given the power generally to "do all such acts and things as may be necessary to carry into effect the provisions of this Act and promote the purposes of said organization," <u>id.</u>, and was designated as the organization authorized to act in matters of relief under the Geneva Convention. Lastly, the Act provided:

> [I]t shall be unlawful for any person within the jurisdiction of the United States to falsely and fraudulently hold himself out as, or represent or pretend himself to be a member of or an agent for the American National Red Cross for the purpose of soliciting, collecting, or receiving money or material; or for any person to wear or display the sign of the red cross . . . for the fraudulent purpose of inducing the belief that he is a member of or an agent for the American National Red Cross.

Id.

The Charter Act was amended by Congress in 1905.  The powers and purposes of the organization remained largely the same, but, among other changes, the following language was added to the above-quoted prohibition: "[n]or shall it be lawful for any person or corporation, other than the Red Cross of America, not now lawfully entitled to use the sign of the Red Cross, hereafter to use such sign or any insignia colored in imitation thereof for the proposes of trade or as an advertisement to induce the sale of any article whatsoever."  An Act To Incorporate the American National Red Cross, 33 Stat. 599, 601 (1905); App. I, Tab 2.

In 1906, a second Geneva Convention was promulgated, and it was ratified by the United States in 1907.  Article 23 of the Convention provided that "[t]he emblem of the red cross on a white ground and the words Red Cross or Geneva Cross may only be used, whether in time of peace or war, to protect or designate sanitary formations and establishments, the personnel and materiel protected by the convention."  See Convention for the Amelioration of the Condition of the Wounded in Armies in the Field, July 6, 1906, art. 23, 35 Stat. 1885, 1896-97; App. II, Tab 23 (emphasis in original).  Article 27 of the Convention provided that "[t]he signatory powers whose legislation may not now be adequate engage to take or recommend to their legislatures such measures as may be necessary to prevent the use, by private persons or by societies other than those upon which this convention confers the right thereto, of the emblem or name of the Red Cross or Geneva Cross, particularly for commercial purposes

by means of trade-marks or commercial labels." Art. 27, 35 Stat. at 1897-98; App II, Tab 23.

Of particular importance, Congress again amended the Charter Act in 1910, replacing a portion of the prior language of prohibition with the following:

> It shall be unlawful for any person, corporation, or association other than the American National Red Cross and its duly authorized employees and agents and the army and navy sanitary and hospital authorities of the United States for the purpose of trade or as an advertisement to induce the sale of any article whatsoever or for any business or charitable purpose to use . . . the emblem of the Greek Red Cross on a white ground, or any sign or insignia made or colored in imitation thereof, or of the words 'Red Cross' or 'Geneva Cross' or any combination of these words: <u>Provided</u>, <u>however</u>, That no person, corporation, or association that actually used . . . the said emblem, sign, insignia, or words for any lawful purpose prior to [January 5, 1905] shall be deemed forbidden by this Act to continue the use thereof for the same purpose and for the same class of goods.

An Act to Amend an Act Entitled "An Act to Incorporate the American National Red Cross" Approved January 5, 1905, 36 Stat. 604 (1910); App. I, Tab 3 (emphasis in original). The Charter Act, on its face, imposed no limitations on the use that ARC could make of the Red Cross emblem and words. Moreover, the above-quoted language strongly suggested that, among other things, ARC could use the Red Cross logo and words "for the purpose of trade or as an advertisement to induce the sale of any article whatsoever or for any business or charitable purpose," since such uses were only forbidden to others. However, the concluding proviso, in recognition of the fact that certain companies, including J&J, had long before used the Red Cross emblem for commercial purposes, "grandfathered" such users, exempting them from the prohibition on use of the Red Cross emblem.

7

Still another Geneva Convention was signed in 1929.  The Geneva
Convention of 1929 maintained, in substance, the language of Article
23 of the Geneva Convention of 1906 and added "[m]oreover, the
volunteer aid societies provided for under Article 10 may, in
conformity with their national legislation, employ the distinctive
emblem for their humanitarian activities in time of peace."  <u>See</u>
Convention of Geneva of July 27, 1929 For the Amelioration of the
Condition of the Wounded and Sick of Armies in the Field, July 27,
1929, Art. 24, 47 Stat. 2074, 2091-92; App. II, Tab 25.  The
Convention of 1929 amended Article 27 of the Convention of 1906 by
providing that governments whose legislation was not adequate to
enforce the treaty would undertake to recommend legislation to
prevent all use by private persons or societies not authorized under
the Convention of the emblem and name Red Cross, "whether for
commercial or other purposes."  Art. 28, 47 Stat. at 2092-93; App.
II, Tab 25.

In 1948, the prohibition on use by non-grandfathered third
parties contained in the Charter Act was moved from that Act to Title
18 of the United States Code and enacted essentially in its current
form, as set forth at the start of this Opinion.  The relevant
provision prohibits anyone other than the ARC from "us[ing]" the Red
Cross emblem and words, except for such "use" as was lawful prior to
the act.  At oral argument of the instant motions, both sides agreed
that such changes as were made between the wording of the prohibition
contained in the 1910 version of the Charter Act and the wording of
the prohibition set forth in section 706 of the Criminal Code were

8

only matters of "phraseology" and that the substance of the
prohibition remained the same. See transcript 1/4/08 at 27-28, 62.
Thus it was still the case that, so far as Section 706 was concerned,
no prohibition of any kind was placed on ARC's use of the Red Cross
emblem and name and that, by clear implication from the wording of
the Charter Act of 1910, this included uses "for the purpose of trade
or as an advertisement to induce the sale of any article whatsoever
or for any business or charitable purpose."

The various forms of the Geneva Convention referenced above were
superseded by another Geneva Convention, promulgated in 1949 and
subsequently ratified by virtually every nation in the world.
Article 44 of that Convention, still in effect today, provides in
pertinent part that:

> With the exception of the cases mentioned in the following
> paragraphs of the present Article, the emblem of the Red Cross
> on a white ground and the words "Red Cross" or "Geneva Cross"
> may not be employed, either in time of peace or in time of war,
> except to indicate or to protect the medical units and
> establishments, the personnel and material protected by the
> present Convention . . . The National Red Cross Societies . . .
> shall have the right to use the distinctive emblem conferring
> the protection of the Convention only within the framework of
> the present paragraph.
> Furthermore, National Red Cross . . . Societies may, in
> time of peace, in accordance with their national legislation,
> make use of the name and emblem of the Red Cross for their other
> activities which are in conformity with the principles laid down
> by the International Red Cross Conference.

Geneva Convention for the Amelioration of the Condition of the
Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, art.
44, 6.3 U.S.T. 3114, 3144; App. II, Tab 26.

As for the Charter Act, it was most recently amended by Congress
in 2007.  The only change relevant here added the purpose "to conduct

other activities consistent with the foregoing purposes" to the list
of purposes discussed above.  See The American National Red Cross
Governance Modernization Act of 2007, P.L. 110-26, 121 Stat. 103, 106
(2007); App. II, Tab 13.

   With this legislative history in mind, the Court turns to J&J's
contention that section 706, the Charter Act, and the Geneva
Convention of 1949 were all violated when, beginning in 2005, ARC
entered into licensing agreements with the four codefendants to
manufacture and sell products displaying the Red Cross emblem and
words (collectively, the "logo").  The ARC contract with FAO,
effective July 1, 2007, is typical.  It reads: "Licensee is in the
business of manufacturing, marketing, distributing and selling to
companies workplace emergency preparedness and first aid products and
desires to obtain from Red Cross a license to use the Logo in
connection with the marketing, distributing and selling" of these
products, and "Red Cross is willing to grant Licensee a nonexclusive
license to use the Logo in connection with the marketing,
distribution and sale to companies of" such products.  See Workplace
Emergency Preparedness and First Aid Agreement, Exhibit 133 to
Declaration of Jonathan L. Abram in Support of Defendants' Motion for
Summary Judgment dated November 21, 2007 ("Abram Decl.").  The
contract further provides that FAO will submit to ARC, for ARC's
review and written approval, a sample of any product to be produced,
and "[a]ll Products offered for sale must confirm in all respects to
the Sample approved by Red Cross."  Id. § 4.1.  ARC reserves the
"sole and absolute right to disapprove" any sample product submitted.

"Approval or disapproval lies solely in Red Cross' discretion, and
any Sample not approved in writing will be deemed unlicensed and will
not be manufactured, sold, displayed or used in any manner." Id. §
4.2.  FAO is solely responsible for the manufacture, production, sale
and distribution of the products, and is free to sell the products at
any price it chooses. Id. §§ 10.1.4, 2.3.  However, ARC may require
"in its sole and absolute discretion," that FAO include with the
product ARC promotional materials, first-aid information, coupons for
ARC first-aid classes, and notices relating to ARC's financial
benefit from the products. Id. § 5.3.  Lastly, FAO agrees that its
use of the logo "shall inure to Red Cross's benefit," and that the
good will associated with the logo belongs exclusively to ARC. Id.
§§ 6.1, 6.6.  Based on the above-quoted language, ARC argues that the
licensees are acting as ARC's agents, at least for purposes of using
the Red Cross logo, while J&J argues that no such agency is created.
But on the view the Court takes of the matter, as elaborated infra,
this debate is irrelevant to the motions at hand.

    Pursuant to the various licensing agreements, products
containing the Red Cross logo have been sold at Target, Wal-Mart,
Walgreens and CVS.  Plaintiffs' Rule 56.1 Statement of Undisputed
Facts in Support of Their Motion for Summary Judgment ("Pl. 56.1") ¶
32; Defendants' Response to Plaintiffs' Rule 56.1 Statement of
Undisputed Facts ("Def. 56.1 Response") ¶ 32.  Counsel have provided
the Court with samples of a number of the products so branded.  The
hand sanitizer manufactured by Water-Jel is illustrative.  The front
panel of the package is labeled with the Red Cross emblem next to the

11

words "American Red Cross."  Beneath the emblem it reads "Be Red
Cross Ready."  The bottom of the front panel reads "Official Licensed
Product of the American Red Cross" and "Water-Jel will pay 5% of the
purchase price of this product to the American Red Cross."  One side
of the package reads "Clean hands may help prevent illness . . . The
American Red Cross, a humanitarian organization led by volunteers,
provides relief to victims of disasters and helps people prevent,
prepare for and respond to life's emergencies.  The Red Cross relies
on donations of time, money and blood to fulfill its lifesaving
mission.  To learn more about the American Red Cross visit:
www.redcross.org."

As already noted, section 706, on its face, does not prohibit
ARC from making any use whatever of the Red Cross emblem and words.
Its predecessor, the prohibition provision of the 1910 Charter Act,
implicitly emphasized this breadth by prohibiting use by anyone else
(except the grandfathered users) "for the purpose of trade or as an
advertisement to induce the sale of any article whatsoever or for any
business or charitable purpose"; and here, in section 706, there is
no limitation of any kind placed on the purposes for which ARC may
use the Red Cross emblem and words.  Entering into a license
agreement is a standard business arrangement undertaken "for the
purposes of trade" and "to induce the sale of any article," and
therefore does not contravene section 706.  The fact that the
ultimate purpose of these licensing activities is a "charitable
purpose" -- i.e., to raise funds that ARC, a not-for-profit
organization, can utilize for its charitable endeavors -- only

12

further emphasizes their legitimacy under Section 706.

Although, as J&J emphasizes, representatives of the ARC, in testimony before Congress and elsewhere, have sometimes minimized their intent to make commercial use of the Red Cross logo, this is of no moment where the statute itself imposes no limitation on commercial use.  When the statutory language is plain and unambiguous, no resort to legislative history can change its meaning.  See Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 567 (2005).[4]

For over a century, in fact, ARC has entered into a number of arrangements to use the Red Cross emblem and words in an ostensibly commercial context -- including, of particular relevance here, entering into licensing agreements that utilize the logo.[5]  As early as 1904, ARC entered into an agreement that granted First Aid Supply of the Red Cross, a corporation doing business in New Jersey, the right to use the Red Cross emblem and the words "Under the auspices and for the benefit of the American National Red Cross" on an emergency chart, emergency box, and medical and surgical dressings and supplies made and sold by First Aid Supply, in return for First

---

[4] In addition, most of the legislative history on which J&J relies occurred after 1910, when the scope of the usage permitted ARC had already been fixed.

[5] While J&J does not contest that 706 itself does not prohibit ARC's commercial use of the Red Cross emblem and words, see infra, it goes to great lengths to try to suggest that many of ARC's seemingly commercial ventures did not, so far as any available evidence is concerned, actually realize a profit or even actually come to fruition.  This is wholly irrelevant if, as J&J concedes, the statute does not prohibit such activity.

Aid Supply's promise to pay ARC a commission of 2-10% on each piece
sold.  Abram Decl., Exhibit 16.  Similarly, in 1913, J&J itself wrote
a letter to ARC offering to manufacture first aid kits that would
contain J&J goods but would be labeled with the Red Cross emblem and
would state that they were manufactured by J&J on behalf of ARC.  The
letter acknowledged that products using the ARC logo were being
manufactured by a J&J competitor at the time.  Id., Exhibit 106; Def.
56.1 ¶ 111; Pl. Response 56.1 ¶ 111.

    More recently, with ARC's apparent authorization, the 1987
Travel Horchow catalogue included the "official automobile first aid
kit of the American Red Cross" for $50.00.  Abram Decl., Exhibit 93.
Also in the late 1980's, ARC licensed a company called Akla to
manufacture and sell an ARC first aid kit.  Def. 56.1 ¶ 91; Pl.
Response 56.1 ¶ 91.  In the 1990's, ARC partnered with a number of
companies to put the Red Cross emblem on watches, Tiffany & Co.
items, scarves, jewelry, and bottles of water.  Def. 56.1 ¶ 97; Pl.
Response 56.1 ¶ 97.  And for many years now, pursuant to agreements
with ARC, various manufacturers have placed the Red Cross emblem on
blood bags, packaging, and other items distributed in the medical
field.  Def. 56.1 ¶ 26, 31; Pl. Response 56.1 ¶ 26, 31; Declaration
of Gregory Ballish in Support of Defendants' Motion for Summary
Judgment dated Nov. 19, 2007 ("Ballish Decl.") ¶¶ 4-5.

    As noted, J&J does not dispute that, whatever the prohibition
allegedly imposed on the ARC by the Charter Act and the Geneva
Convention (see infra), Section 706 does not prohibit ARC itself from
making commercial use of the Red Cross emblem and words.  See

14

transcript 1/4/08 at 32-33, 39-40. J&J contends, however, that the use of the Red Cross logo by the four codefendants nonetheless violates the statute because the statute prohibits use of the Red Cross emblem and words by anyone other than the grandfathered users and the "American National Red Cross <u>and its duly authorized employees and agents</u>" (emphasis supplied), and the four codefendants are (in J&J's view) mere licensees. But this argument -- as well as the defendants' opposing argument that the four licensees qualify as "agents" of the ARC for certain purposes -- misapprehends the point of the statutory language concerning employees and agents. As a corporation, the ARC can only act through employees and/or agents, and the statutory reference to "authorized employees and agents" is in that respect simply classic corporate "boilerplate" that recognizes this fact; but its inclusion is especially important in the case of a charitable institution like ARC that frequently makes use of unpaid volunteer agents to carry out its mission. The reference to "employees and agents" thus says nothing about scope of the uses permitted ARC, or whether ARC, through its employees or agents, can license others to use its logo.

The real question then is whether the permission the statute gives to ARC to use its logo for any purpose, including commercial purposes, inherently contemplates that such uses will entail subsequent or subordinate uses by others in order to carry out the uses permitted to ARC. It could hardly be otherwise, for surely every business use, or for that matter charitable use of the Red Cross emblem and words by ARC inevitably involves some subsequent

15

"use" by a third party.  Thus, even the ultimate purchasers of a product bearing the Red Cross emblem or words, whether sold to the purchaser by ARC, a licensor, a retailer, or whomever, will in some sense make "use" of the Red Cross emblem and words.  No reasonable interpretation of the statute prohibits such use, or any other use that follows in the ordinary course, once ARC, through its employees or agents, has lawfully authorized the initial business use.

J&J argues that the ultimate purchaser of a product would not be implicated by the criminal law in any event because the consumer would not make use of the emblem "for the purpose of trade or as an advertisement to induce the sale of any article whatsoever or for any business or charitable purpose," i.e., the purposes prohibited to third parties by provisions of the 1910 Charter Act that served as a direct predecessor to Section 706.  See Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opposition") at 4.  However, ultimate consumers quite aside, J&J's interpretation would criminalize not only the licensing agreements that, as noted above, ARC has been entering into for more than a century, but also a host of other familiar and traditional ARC activities.

For example, ARC, like other charities, has for decades entered into so-called "cause marketing" arrangements, by which distributors of commercial products or services, in order to make use of ARC's goodwill for their mutual benefit, state in their advertising that each time a consumer purchases one of their products, the distributor will donate a stated sum of money to ARC.  Yet, according to J&J's

16

interpretation of the criminal prohibition, these distributors are,
by using the Red Cross name and emblem, breaking the criminal law, as
is ARC in entering into such arrangements, because the distributors
are not ARC's employees or agents.  The doubtfulness of this
interpretation is well illustrated by the ironic fact that in 1986
J&J itself entered into a cause-marketing promotional agreement with
ARC.  Pursuant to that agreement, J&J agreed to donate to ARC five
cents for every J&J coupon redeemed, and to provide promotional
materials for the program stating: "Help Johnson & Johnson support
the American Red Cross.  For each purchase with the coupon below,
Johnson & Johnson will donate five cents to the American Red Cross."
See Def. 56.1 ¶ 135-136; Pl. 56.1 Response ¶ 135-136; Letter of
Agreement dated October 1, 1986, Exhibit 128 to Abram Decl.[6]

Even more telling, J&J concedes that ARC can lawfully contract
(as it does) with manufacturers and suppliers to supply it with the

_____

[6] Since section 706 is a criminal statute, it is also worth
noting that in September 1978, ARC Secretary John L. Currin wrote
a letter to United States Attorney General Griffin Bell
requesting guidance on the meaning of 18 U.S.C. § 706.  Abram
Decl., Ex. 86.  Mr. Currin explained that ARC "would like to have
the approval of the Department of Justice . . . to use and, on a
highly selective basis, to permit the use of its name and emblem
in peacetime by non-Red Cross organizations."  Id. at 2.  In an
attached memo, ARC gave a number of examples of proposed uses of
the Red Cross Emblem, including: (1) a distributor of commercial
products wants to state in its advertising that for each product
sold, the distributor will donate to ARC a specific sum of money
(a "cause marketing" arrangement); and (2) producers of written
materials on first aid wish to acknowledge publicly that their
materials have been reviewed and authenticated by ARC.  Id.,
Exhibit 86, "Use of the Red Cross Name and Emblem," at 4-5.  In
response, the Department of Justice opined that neither of these
uses violated section 706 (although the Department came to this
conclusion on a somewhat different theory than that set forth
above).  Id., Exhibit 87.

17

water bottles, blankets, and other such items bearing the Red Cross logo that ARC uses for its disaster relief activities.  See Pl. Opposition at 3-4.  Yet this is inconsistent with J&J's own interpretation of the statute, for suppliers are neither employees nor agents of ARC: they are third parties who make "use" of the Red Cross emblem and words, pursuant to ARC's permission, just like the licensed defendants in this case.  In both situations the third parties undertake such "use" in order to make a profit; but they may do so, under section 706, because in both cases ARC has authorized the use, in the former case so that it can obtain branded goods for its own distribution and in the latter case so that it can realize royalties from the licensed sales.  In both cases, ARC itself is engaging in a use the statute permits, and the subsequent uses of the Red Cross emblem and words by the parties with whom ARC contracts, not to mention those still further down the usage chain, cannot be held to violate 706 without thereby rendering nugatory the permission granted ARC for the initial use.

Turning to the ARC Charter, nothing on its face prohibits the activities here in issue; and, as a congressional act that not only stands in pari materia with section 706, but was itself the source of the prohibition contained therein, it should be given the same interpretation.

The prohibitions set forth in the Geneva Convention of 1949 -- the one presently in force -- present an arguably closer question. Article 44 of that Convention (the Article most directly on point) provides that national Red Cross societies may, "in accordance with

18

their national legislation, make use of the name and emblem of the
Red Cross for their other activities which are in conformity with the
principles laid down by the International Red Cross Conference."
Geneva Convention for the Amelioration of the Condition of the
Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, art.
44, 6.3 U.S.T. 3114, 3144; App. II, Tab 26.  The parties, as noted
supra, have unresolved disputes about which "principles laid down by
the International Red Cross Conference" are here applicable, as well
as about what they mean.  But the reference to "national legislation"
arguably implies that it is that legislation which sets the outer
boundaries of which uses are permitted.

The official commentary to this language is also somewhat Janus-
like.  It states:

> The emblem must retain its high significance and prestige in all
> circumstances, and any practice likely to lower it in the eyes
> of the public must be scrupulously avoided.  To take only one
> example, Red Cross organizations, to raise funds, have sometimes
> sold objects bearing the red cross.  Such practices are likely
> to lessen, in varying degrees, the standing of the emblem, and
> are therefore prejudicial to the good name of the Red Cross as a
> whole. . . . Every portrayal of the red cross reinforces or
> weakens, to a certain extent, the spiritual significance of the
> sign, in its highest connotation of disinterested aid to the
> suffering.  The new Convention has granted Red Cross
> organizations wide prerogatives in regard to the use of the
> sign.  Conscious of the honour, as well as the responsibilities,
> which this implies, they must jealously watch over what has been
> entrusted to them.  What hope is there of successfully resisting
> commercial interests which make unscrupulous use of the prestige
> attaching to the emblem, if those directly interested, and its
> natural guardians, use it recklessly and bring it into
> disrepute[?]

Commentary to Art. 44, 6.3 U.S.T. 3114, 3144, App. II, Tab 33.
However, a fair reading of this commentary, in the Court's view, is
that use of the Red Cross logo to raise funds, while strongly

19

discouraged, is not in fact prohibited, even if the author of the commentary thinks it is deserving of a scolding.[7]

On balance, then, the Court concludes that ARC's activities here in issue do not violate the Geneva Convention. More fundamentally, however, even if ARC's activities here in issue could be read to violate the Geneva Convention or the ARC Charter or the regulations of the ICRC, such violations would not constitute a basis for granting the summary judgment that J&J here seeks or, conversely, would not raise a barrier to granting the defendants' cross-motion. To understand why this is so requires examining individually each of the five causes of action as to which J&J seeks partial summary judgment in its favor and as to which the defendants seek summary judgment dismissing the claims: i.e., Counts 1, 2, 3, 5, and 6.

As to Count 1, the New York tort of interference with prospective economic advantage requires a plaintiff to prove that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006) (internal quotation marks omitted). In Carvel Corp v. Noonan, 818 N.E.2d 1100, 1103 (N.Y. 2004) the New York Court of Appeals held that, with regard to the third element of

---

[7] A further commentary relied on by J&J, see Pl. Rep. at 16, actually refers to a different paragraph of Article 44 of the Convention not here relevant.

the tort, "as a general rule, the defendant's conduct must amount to a crime or an independent tort." The Court recognized one exception, where the defendant "engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs," id. (internal quotation marks omitted), but declined to decide whether "there can ever be other instances of conduct which, though not a crime or tort in itself, was so culpable . . . that it could be the basis for a claim of tortious interference with economic relations." Id. at 1103-04 (internal quotation marks omitted). Instead, the Court indicated, without deciding, that "wrongful" means might potentially include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and economic pressure. Id. at 1104.

In this case, for the reasons discussed supra, defendants' actions do not violate the criminal prohibition contained in 18 U.S.C. § 706. They also do not violate the Red Cross's congressional charter or the Geneva Convention, but even if such activities did violate the Charter, or the Geneva Convention, or the ICRC regulations, none of these putative violations constitutes a crime or independent tort under New York law, and under any fair reading of the New York precedents, none would constitute the "wrongful" or "culpable" means otherwise required by New York courts to sustain a claim for tortious interference with prospective economic advantage. Nor is there any evidence that the defendants have begun selling Red Cross branded goods in commerce "for the sole purpose of inflicting

intentional harm on" J&J.  Accordingly, Count 1 must be dismissed.[8]

Skipping Count 2 for the moment and turning instead to Count 3, which charges the common law tort of unfair competition,  New York law has "long recognized two theories of common-law unfair competition: palming off and misappropriation."  ITC Ltd. v. Punchgini, Inc., 9 N.Y.3d 467, 476 (2007).  Palming off consists of the sale of the goods of one manufacturer as those of another.  Id. Misappropriation consists of the taking advantage in bad-faith of "the results of the skill, expenditures and labors of a competitor[.]"  Id. at 477 (internal quotation marks omitted).  See also Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980).

In this case, J&J has introduced no evidence of palming off or misappropriation.  Although J&J argues that ARC's alleged violations of section 706, the Charter Act, and the Geneva Convention constitute an "illegal practice" under Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc., 672 F.2d 1095, 1105 (2d Cir. 1982), and are evidence of bad faith, the Court has already held, supra, that no such violations occurred.  Moreover, even if they had, or even if there had been violations of the ICRC regulations, or, as J&J also argues, even if there were other badges of bad faith, see Pl. Opposition at 28, the claim would still have to

---

[8] This holding obviates the need for the Court to reach ARC's alternative argument that J&J's claim for tortious interference with prospective economic advantage must be dismissed because J&J has failed to introduce any evidence of injury to its relationship with the four retailers to whom this claim is limited: Wal-Mart, Walgreens, CVS and Target.

be dismissed because J&J has introduced no evidence to suggest that
any of the defendants are attempting to palm-off their own products
as J&J's products, or that ARC placed the Red Cross emblem on these
products in order to take wrongful advantage of J&J's name or
goodwill or in an effort to misappropriate the labors and
expenditures of J&J.

Roy Export explained that the essence of the tort of unfair
competition is "endeavoring to reap where (one) has not sown[,] . . .
taking the skill, expenditures and labors of a competitor, and
misappropriati(ng) for the commercial advantage of one person . . . a
benefit or property right belonging to another." Id. at 1105
(internal quotations marks and citations omitted).  In this case, it
is clear beyond genuine dispute that ARC and the other codefendants
are attempting to profit from ARC's own good will and reputation, not
J&J's.  Therefore, Count 3 must be dismissed.

With regard to Counts 5 and 6 for trademark dilution under,
respectively, federal and state law, summary judgment must also be
granted to defendants.  The Trademark Dilution Revision Act of 2006,
15 U.S.C. § 1125(c)(1) provides: "Subject to the principles of
equity, the owner of a famous mark that is distinctive, inherently or
through acquired distinctiveness, shall be entitled to an injunction
against another person who, at any time after the owner's mark has
become famous, commences use of a mark or trade name in commerce that
is likely to cause dilution by blurring or dilution by tarnishment of
the famous mark, regardless of the presence or absence of actual or

likely confusion, of competition, or of actual economic injury."[9]
Pursuant to the Act, "a mark is famous if it is widely recognized by
the general consuming public of the United States as a designation of
source of the goods or services of the mark's owner." Id. §
1125(c)(2)(A).  As the Second Circuit has explained, "the element of
fame is the key ingredient" to a claim of federal trademark dilution,
and should be addressed by a district court before reaching other
issues.  Savin Corp v. Savin Group, 391 F.3d 439, 449-450 (2d Cir.
2004).

Section 360-l of the New York General Business Law states:
"Likelihood of injury to business reputation or of dilution of the
distinctive quality of a mark or trade name shall be a ground for
injunctive relief in cases of infringement of a mark registered or
not registered or in cases of unfair competition, notwithstanding the
absence of competition between the parties or the absence of
confusion as to the source of goods or services."  N.Y. Gen. Bus. Law
§ 360-l.  In order to state a claim under this section, a plaintiff
must show that (1) its trademark "is of truly distinctive quality or
has acquired secondary meaning" and (2) "there is a likelihood of
dilution."  MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.,
2004 WL 434404, *9 (S.D.N.Y. Mar. 8, 2004) (internal quotation marks
omitted).  Only "extremely strong marks" are entitled to protection
under the statute.  Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,
973 F.2d 1033, 1049 (2d Cir. 1992) (internal quotation marks

_____

[9] The Act, effective October 6, 2006, amends the Federal
Trademark Dilution Act of 1996, 109 Stat. 985 (1996).

omitted).  In addition, "secondary meaning" requires a showing that,
"through exclusive use and advertising by one entity, a name or mark
has become so associated in the mind of the public with that entity
or its product that it identifies the goods sold by that entity and
distinguishes them from goods sold by others."  <u>Allied Maint. Corp v.</u>
<u>Allied Mech. Trades, Inc.</u>, 42 N.Y.2d 538, 545 (1977).

    Both causes of action therefore require J&J to show that the Red
Cross name and emblem are truly distinctive <u>as a marker of J&J's</u>
<u>goods</u>.[10]  At least with regard to use, by the codefendants here, of
the Red Cross name and emblem, by or at the behest of ARC and as a
reference to the ARC, such a showing is impossible.  ARC has used the
name and emblem for more than 100 years.  In addition to the uses
discussed above, it is undisputed that ARC has used the emblem for
decades for such purposes as to identify workers, volunteers,
shelters and first aid supplies provided by ARC to victims of floods,
hurricanes and other disasters, Def. 56.1 ¶ 22-23; Pl. 56.1 Response
¶ 22-23; on materials, textbooks, and other items provided to those
enrolled in its first aid, water safety, babysitting and CPR classes,
Def. 56.1 ¶ 24; Pl. 56.1 Response ¶ 24; and to mark locations where
blood drives take place and on blood supply packaging, Def. 56.1 ¶
26; Pl. 56.1 Response ¶ 26.  Further still, ARC's right to use the

---

        [10] J&J argues that because its mark was registered more than
five years ago, it is entitled to a presumption of inherent
distinctiveness under 15 U.S.C. § 1065.  <u>See</u> <u>Savin Corp. v. Savin</u>
<u>Group</u>, 391 F.3d 439, 451 (2d Cir. 2004).  Even if this were true,
the argument is unavailing because the 2006 Act requires that a
mark be "famous," not merely inherently distinctive.  <u>See</u> 15
U.S.C. § 1125(c)(1) & (c)(2)(A); 4 McCarthy on Trademarks and
Unfair Competition 24:104 at 24-279 - 24-280 (2007).

emblem has been specifically granted by Congress in the original Charter Act of 1900, which gave ARC the right "to have and to use, . . . a Greek red cross on a white ground," i.e., the Red Cross emblem. See 31 Stat. at 279; App. I, Tab 1.  The current criminal prohibition prohibits the use of the Red Cross name or emblem by any corporation, association or person, "other than the American National Red Cross and its duly authorized employees and agents and the sanitary and hospital authorities of the armed forces of the United States," 18 U.S.C. § 706, which, as held above, includes the uses here in issue.

J&J's own right to use the name and emblem is protected by the "grandfather clause," which provides "this section shall not make unlawful the use of any such emblem, sign, insignia or words which was lawful on the date of enactment of this title." Id.  However, a grandfathered user cannot use federal trademark dilution law to trump the dominant use for the emblem granted by Congress to ARC.  See generally Radzanower v. Touche Ross & Co., 426 U.S. 148, 153 (1976). In addition, there is no evidence in the record to suggest that members of the general consuming public see the Red Cross name and emblem as a designation of J&J's products rather than as a designation of ARC or the international Red Cross.  Because ARC has used the name and emblem for over 100 years and has been granted exclusive use of the name and emblem by Congress, J&J cannot seriously argue that the words "Red Cross" and the Red Cross emblem serve as an exclusive designation of J&J products.[11]  Therefore,

---

[11] Even J&J concedes that its dilution claims depend on its arguments of the illegality of defendants' actions under 18

counts 5 and 6 for trademark dilution must be dismissed.

Returning now to count 2, the claim against ARC for tortious interference with contractual relations, the Court concludes that defendants' motion for summary judgment must be denied.[12]  Under New York law, the elements of a claim for tortious interference with contractual relations are that: (1) a valid contract exists; (2) defendant had knowledge of the contract; (3) defendant intentionally and improperly procured the breach of the contract; and (4) the breach resulted in damage to plaintiff.  Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir. 1996).  ARC argues that summary judgment must be granted because there is no evidence that ARC had knowledge of J&J's settlement agreements with Water-Jel and FAO.  "To establish inducement of breach of contract, New York law requires, inter alia, that the alleged inducer have knowledge at the time of inducement of the contract in issue."  800America, Inc. v. Control Commerce, Inc., 202 F. Supp. 2d 288, 289 (S.D.N.Y. 2002).

Here, while the direct evidence of such knowledge may be thin, a reasonable juror could infer such knowledge from ARC's regular practice of monitoring Patent Office applications for unauthorized uses of the red cross. Declaration of Phyllis Wallitt Submitting

---

U.S.C. § 706, which the Court has now rejected.  Pl. Opposition at 29.

[12] As for plaintiffs' own summary judgment motion, even though J&J stated in its notice of motion that it was moving for partial summary judgment on Count 2 (among other counts), it has failed to explain, and the Court cannot discern, what its theory of summary judgment -- relating to defendants' alleged violation of section 706, ARC's Charter, and the Geneva Convention -- has to do with Count 2.

Exhibits dated Dec. 5, 2007 ("Wallitt Decl."), Exhibit 95 at 12-13
and Exhibit 106 at 18.  Such monitoring would have put ARC on notice
of FAO's and Water-Jel's respective applications to use the Red Cross
emblem, and that inquiry, in turn, would then likely have revealed
J&J's agreements with FAO and Water-Jel not to oppose the
registrations if certain changes were made (the very agreements in
issue in Count 2).  See id., Exhibits 85 and 94.

    In addition, certain other circumstantial evidence supports this
inference.  For example, an email dated October 18, 2006 from
Jennifer Niyangoda of ARC to the CEO of FAO, Richard James, stated:
"First Aid Only is not allowed to use your logo in red, according to
our legal counsel.  The bandages included in the product have your
logo in red."  Id., Exhibit 87.  Mr. James responded "All FAO
products used in these kits will have the FAO logo in blue, green or
purple . . . no red or orange.  As agreed, the red is being phased
out."  Id., Exhibit 88.  Mr. James testified that the "agreement" he
was referring to was the FAO agreement with J&J.  Id., Exhibit 89 at
257-59.

    While ARC also argues that there is no evidence that, in
entering into ARC's contracts with FAO and Water-Jel, ARC thereby
intended to induce FAO and Water-Jel to breach their contracts with
J&J "intentionally and improperly," such issues of intent are
classically reserved to the jury in all but the most clear-cut cases.
See Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir. 1998)
("[s]ummary judgment should be used sparingly when . . . state of
mind or intent are at issue") (internal quotation marks omitted).

Accordingly, ARC's motion for summary judgment dismissing Count 2 must be denied.

The Court turns finally to the defendants' various counterclaims. ARC's three counterclaims allege that J&J violated section 706, engaged in unfair competition, and registered a trademark consisting of an insignia or coat of arms of the United States in violation of 15 U.S.C. § 1052(b). All three of these counterclaims thus depend on allegations that J&J impermissibly exceeded its grandfathered rights.

As previously noted, the criminal prohibition on use of the Red Cross emblem and words included in the 1910 Charter Act contained an exception for so called "grandfathered" users: "Provided, however, That no person, corporation, or association that actually used . . . the said emblem, sign, insignia, or words for any lawful purpose prior to [January 5, 1905] shall be deemed forbidden by this Act to continue use thereof for the same purpose and for the same class of goods." 36 Stat. 604; App. I, Tab 3 (emphasis omitted). Although the "phraseology" was changed when the prohibition was moved to the U.S. Criminal Code,[13] both parties agree that the criminal prohibition has remained the same, in substance, since 1910. See transcript 1/4/08 at 27-28, 62. Therefore, the relevant question is whether J&J is currently using the emblem "for the same purpose and for the same class of goods" as it was before 1905.

---

[13] The grandfather clause of 18 U.S.C. § 706 reads: "This section shall not make unlawful the use of any such emblem, sign, insignia or words which was lawful on the date of enactment of this title."

Noting that such "grandfather" clauses are to be construed narrowly, see O-M Bread, Inc. v. U.S. Olympic Comm., 65 F.3d 933, 936-37 (Fed. Cir. 1995), ARC claims that a number of J&J's current uses of the Red Cross emblem exceed its grandfathered rights because they do not create the same commercial impression as, and are not legally equivalent to, J&J's pre-1905 uses.  See O-M Bread, 65 F.3d at 936-38; Wet Seal Inc. v. FD Mgmt. Inc., 82 U.S.P.Q.2d 1629, 1635-1637 (2007); Am. Paging Inc. v. Am. Mobilphone Inc., 13 U.S.P.Q.2d 2036, 2038-39 (1989).  In particular ARC objects to (1) J&J's use of a red cross emblem with the words "Johnson and Johnson Emergency First Aid Kit" and "Johnson and Johnson All-Purpose First Aid Kit" written inside it on first aid kits, see Abram Decl., Exhibit 148; Def. 56.1 ¶ 175; Pl. 56.1 Response ¶ 175; (2) J&J's 2006 registration of a trademark, which it currently uses, composed of a red cross emblem with the words "First Aid" and "Johnson & Johnson" written next to it, id., Exhibit 154; Def. 56.1 ¶ 176; Pl. 56.1 Response ¶ 176; (3) J&J's use of a red cross emblem with the words "Johnson & Johnson" adjacent to it and the words "Hospital Products for Home Care" beneath them, id., Exhibit 162; Def. 56.1 ¶ 179; Pl. 56.1 Response ¶ 179; and (4) J&J's sale of  "emergency preparedness kits" marked with a red cross emblem, that contain, among other things, light sticks and refrigerator magnets.

However, the Court finds that none of these uses of the red cross emblem creates a different commercial impression than J&J's pre-1905 uses.  Before 1905, J&J used the red cross emblem on medicines and pharmaceutical preparations, dental, medicinal and

30

surgical appliances, and cosmetics and toilet preparations.  See
Declaration of Ravi V. Sitwala Submitting Exhibits dated Nov. 21,
2007 ("Sitwala Decl."), Exhibits 7-11.  With regard to J&J's current
use of a red cross emblem with words written inside it, J&J sold a
first aid manual that was marked with a red cross emblem with the
letters "J&J" written inside before 1905.  Id., Exhibit 11.  In
addition, a product called Surgeon's Green Soap was marked with a
large red cross with the words "Quality Guaranteed Johnson & Johnson"
written inside, id., and, J&J's 1899 price list was labeled with the
same image on the back cover.  Id., Exhibit 8.  The Supplemental 1905
price list includes both an Accident Case and Accident Cabinet that
contain first aid manuals marked with a red cross emblem with the
letters "J&J" written inside.  Id., Exhibit 12.

     As to J&J's registration and use of a red cross emblem with the
words "First Aid", "Johnson & Johnson", and "Hospital Products for
Home Care" written next to it, these too are legally equivalent to a
number of J&J's pre-1905 uses.  For example, J&J's factory accident
case contained a first aid manual that was marked with a red cross
emblem and the words "Johnson's First Aid Manual" above it.  Id.,
Exhibit 11.  A first aid handbook in the household accident case was
labeled with a red cross emblem placed between the words "First" and
"Aid."  Id.  J&J's first aid packets were labeled with images of red
crosses on two corners and the words "Johnson's First Aid for Wounds"
written between them.  Id.  J&J's many pre-1905 uses of a red cross
emblem with these and other words written next to, above, beneath and
around the symbol preclude any argument that J&J's current use of the

31

emblem in connection with the words "First Aid," "Johnson & Johnson" or "Hospital Products for Home Care" creates a different commercial impression or exceeds J&J's grandfathered rights.

Finally, as to J&J's sale of an "emergency preparedness kit" that contains light sticks and refrigerator magnets, although the products inside the kit are somewhat different from those sold prior to 1905, the kit itself is part of the same class of goods as all of J&J's first aid kits and accident cases sold prior to that time.  If ARC were correct that J&J could only sell kits containing exactly the same products as those sold prior to 1905, "J&J would be constrained to continue forever selling kits that contain such antiquated products as cat gut ligatures and kidney plasters."  Pl. Rep. at 19. Accordingly, J&J's motion for summary judgment in its favor on ARC's three counterclaims is granted, ARC's corresponding motion for summary judgment in its favor on ARC's first and second counterclaims is denied, and the three counterclaims are hereby dismissed.

As for J&J's motion for summary judgment dismissing the codefendants' two counterclaims for trademark invalidity pursuant to 28 U.S.C. § 2201 and cancellation of trademark under 15 U.S.C. § 1119 and 15 U.S.C. § 1064(3), this motion is premised entirely on the premise that if the codefendants' use of the emblem is illegal under 18 U.S.C. § 706, "then the codefendants do not have standing to assert these counterclaims."  Pl. Mem. at 39.  Because, however, the Court has concluded that the codefendants' use of the emblem is not illegal under 18 U.S.C. § 706, this argument is moot and the motion

must be denied.[14]

In sum, the Court hereby grants the portion of plaintiffs' summary judgment motion that seeks dismissal of the three counterclaims brought by defendant American National Red Cross and hereby grants the portion of defendants' summary judgment motion that seeks dismissal of Counts 1, 3, 5 and 6 of the Amended Complaint.  In all other respects, the parties' respective summary judgment motions are hereby denied.  Counsel are instructed to jointly call Chambers at 2 p.m. on May 16, 2008 to schedule a prompt date for trial of the remaining claims, i.e. Counts 2, 7, and 8 of the Amended Complaint and the two counterclaims of the codefendants.

_____
                            JED S. RAKOFF, U.S.D.J.

Dated:      New York, New York
            May 14, 2008

---

[14] Similarly, defendants' motion to strike the expert report of Kenneth B. Germain must be denied as moot.  In the report, Mr. Germain opines on (1) whether the license agreements between ARC and the four codefendants are typical trademark license agreements; (2) whether the license agreements initially created agency relationships between ARC and the codefendants; and (3) whether the confirmatory amendments created agency relationships between ARC and the codefendants -- but all of this relates to an interpretation of the "agent" language of 18 U.S.C. § 706 that the Court has now rejected, and so the opinions are irrelevant.